1   MANATT, PHELPS & PHILLIPS, LLP
    JOHN F. LIBBY (Bar No. CA 128207)
2   E-mail: jlibby@manatt.com
    JOHN W. MCGUINNESS (Bar No. CA 277322)
3   E-mail: jmcguinness@manatt.com
    EMIL PETROSSIAN (Bar No. CA 264222)
4   E-mail: epetrossian@manatt.com
    11355 West Olympic Boulevard
5   Los Angeles, California 90064
    Telephone: (310) 312-4000
6   Facsimile: (310) 312-4224

7   LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
    KRISTEN CLARKE (*Pro Hac Vice* Application Forthcoming)
8   Email: kclarke@lawyerscommittee.org
    JON M. GREENBAUM (Bar No. CA 166733)
9   E-mail: jgreenbaum@lawyerscommittee.org
    EZRA D. ROSENBERG (*Pro Hac Vice* Application Forthcoming)
10  E-mail: erosenberg@lawyerscommittee.org
    DORIAN L. SPENCE (*Pro Hac Vice* Application Forthcoming)
11  E-mail: dspence@lawyerscommittee.org
    1401 New York Avenue NW, Suite 400
12  Washington, DC 20005
    Telephone: (202) 662-8600
13  Facsimile: (202) 783-0857

14  PUBLIC COUNSEL
    MARK ROSENBAUM (Bar No. CA 59940)
15  E-mail: mrosenbaum@publiccounsel.org
    610 South Ardmore Avenue
16  Los Angeles, California 90005
    Telephone: (213) 385-2977
17  Facsimile: (213) 385-9089

18  *Attorneys for Plaintiffs*
    CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST
19  IMMIGRATION

20  *[Additional Counsel Listed on Signature Page]*

21          **IN THE UNITED STATES DISTRICT COURT**

22         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

23                      **SAN JOSE DIVISION**

24

25  CITY OF SAN JOSE, a municipal           Case No. 5:18-cv-2279
    corporation; and BLACK ALLIANCE
26  FOR JUST IMMIGRATION, a                 **COMPLAINT FOR**
    California nonprofit corporation,       **DECLARATORY AND**
27                                          **INJUNCTIVE RELIEF**
                        Plaintiffs,
28

vs.

WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,

Defendants.

**[Administrative Procedure Act Case]**

## INTRODUCTION

1. The City of San Jose, a municipal corporation ("San Jose" or "the City"), and the Black Alliance for Just Immigration, a California nonprofit corporation ("BAJI"), (collectively "Plaintiffs") seek declaratory and injunctive relief against the U.S. Department of Commerce, Wilbur L. Ross, Jr., in his official capacity as Secretary of the U.S. Department of Commerce, the U.S. Census Bureau, and Ron Jarmin in his official capacity as Acting Director of the U.S. Census Bureau (collectively, "Defendants") for violating the United States Constitution and the Administrative Procedure Act ("APA") by arbitrarily and capriciously adding new and untested questions to the 2020 Decennial Census that will require all United States residents to disclose whether they are citizens. If these questions are added to the Census, there will be an increase in the undercount of persons living in San Jose, and specifically an increased undercount of minority populations, leading to the unconstitutional and unlawful loss of representation in the United States House of Representatives and millions of dollars of federal funds. In addition, BAJI's mission to advance racial, social, and economic justice for the minority and immigrant communities it serves will be frustrated by the inclusion of citizenship questions in the 2020 Census. Further, BAJI will have to divert organizational resources both to educate its constituents regarding issues posed by these questions and to counteract their harmful effect.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

2.     The Constitution provides that all persons in each state, regardless of citizenship status, shall be counted every ten years.  U.S. Const., art. I, § 2, cl. 3, and amend. XIV, § 2.  The Constitution mandates this "actual Enumeration" of the population for the purpose of apportioning congressional representatives among the states.  U.S. Const., art. I, § 2, cl. 3.  It is long-settled that all persons residing in the United States—citizens and non-citizens alike—must be counted to fulfill the Constitution's "actual Enumeration" mandate.  *Id.*; *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) (holding that the Equal Protection Clause applies to persons who are in the country without proper authorization because "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term").

3.     The U.S. Census Bureau ("Bureau"), a division of the U.S. Department of Commerce, will conduct the next census, also known as the "decennial census," in 2020 ("2020 Census").  The census surveys the number of persons in each household and, in the process, gathers certain demographic information about those persons.  The Bureau's stated goal in administering the census "is to count every person living in the United States once, only once and in the right place."

4.     As an administrative agency of the executive branch, the Bureau is subject to the APA, 5 U.S.C. §§ 551 *et seq*.  Among other provisions, the APA requires that agency action not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," not be "contrary to constitutional right, power, privilege or immunity," and not be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706.

5.     Not since 1950 has the decennial census asked whether each respondent is a citizen of the United States.  Consistent with modern practice, and as required by statute under 13 U.S.C. § 141(f)(1), the Bureau submitted to

Congress in March 2017 a report of the proposed subjects planned for the 2020 Census. None of the subjects related to citizenship or immigration status.

6. However, in a December 12, 2017 letter, late in the census planning process and months after the statutory deadline for reporting proposed subjects, the General Counsel of the Justice and Management Division of the U.S. Department of Justice requested that the Bureau include a citizenship question on the 2020 Census. While the letter suggested that adding a citizenship question would assist the Department of Justice in enforcing "Section 2 of the Voting Rights Act," codified at 52 U.S.C. § 10301, the letter did not address whether or how a citizenship question would facilitate the Bureau's constitutional duty to capture the "actual Enumeration" of the U.S. population. Nor did the letter consider whether adding a citizenship question would serve the Voting Rights Act's purpose of ensuring fair representation for all communities, ignoring substantial evidence— and the Bureau's own past admissions—that fewer people would respond to the 2020 Census if it includes a citizenship question. *See* Ex. 1 (Dec. 12, 2017, Letter from Arthur E. Gary to Dr. Ron Jarmin).

7. On March 26, 2018, the Department of Commerce, setting aside decades of practice, announced that the final list of census questions that it will submit to Congress will include a question asking the citizenship status of every person in every household in the United States. Ignoring its own past findings, and highlighting the arbitrary and capricious nature of its decision, the Department of Commerce asserted that it "is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness" to the 2020 Census. Ex. 2 at 7 (Mar. 26, 2018, Letter from Wilbur Ross to Karen Dunn Kelley).

8. The Department's action violated the APA's prohibition against arbitrary and capricious actions, as well as actions that violate the Constitution and exceed the agency's statutory authority. The Bureau departed from its long-

standing and well-established processes for revising the decennial census questionnaire as well as the schedule for reporting subjects of the census to Congress.  While changes to questions on the decennial census typically take several years to test, evaluate, and implement, Defendants' decision-making process in this instance—to the extent it even took place—was compressed into a hasty and unprecedented period of fewer than four months, and well after it had reported to Congress on the planned subjects for the 2020 Census.

9.      The citizenship question asks, "Is this person a citizen of the United States?" and requires the respondent to select one of the following responses:

**Is this person a citizen of the United States?**

☐ Yes, born in the United States
☐ Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas
☐ Yes, born abroad of U.S. citizen parent or parents
☐ Yes, U.S. citizen by naturalization – *Print year of naturalization*
   ☐☐☐☐
☐ No, not a U.S. citizen

(1) "Yes, born in the United States"; (2) "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas"; (3) "Yes, born abroad of U.S. citizen parent or parents"; (4) "Yes, citizen by naturalization – Print year of naturalization"; or (5) "No, not a U.S. citizen."

10.      Including the citizenship question on the 2020 Census will directly impede the Bureau from achieving its objective of making an "actual Enumeration" of the U.S. population.  Ultimately, it will make the census data less accurate and reliable.  Numerous studies—including those conducted by the Bureau itself—point to the same conclusion:  Asking about citizenship will likely reduce the number of non-citizens and their citizen relatives or household members who respond to the

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

2020 Census, and result in an increased undercount of minority populations.  At least four former Bureau directors share the view that inquiring about citizenship status on the census "would likely exacerbate privacy concerns and lead to inaccurate responses from non-citizens worried about a government record of their immigration status."  Brief of Former Directors of the U.S. Census Bureau as Amici Curiae in Support of Appellees at 23, *Evenwel v. Abbott*, 136 S.Ct. 1120 (2016) (No. 14-940), 2015 WL 5675832, at *23.  "The sum effect would be bad Census data."  *Id*. at 25.

11.    San Jose and its residents will suffer harm through both lost representation and foregone federal funding if the citizenship question is included on the 2020 Census.  The data from the 2020 Census will be used not only to allocate congressional seats but also to determine funding for public health, education, transportation and neighborhood improvements, all of which are to be determined based on population as determined by the Census.  Including the citizenship question will result in undercounting in San Jose as its residents—both non-citizens and their citizen relatives—are discouraged from responding.  The inaccurate data will in turn result in funding allocations that will disadvantage San Jose and its residents.

12.    BAJI will also be harmed due to the diversion of essential and limited resources—including time and money—from other important matters that it ordinarily would have been addressing through dialogues, presentations, workshops, publications, technical assistance and trainings to build alliances between African American and immigrant communities, in order to educate its diverse constituents regarding issues related to the census citizenship questions.  Like the residents in San Jose, the minority and immigrant communities BAJI serves will also be deterred from responding to the 2020 Census because of the citizenship question.  Thus, BAJI will have to further divert resources to combat any resulting political dilution, loss of federal funding, and other harmful effects

suffered by the communities it serves.  BAJI is further injured because Defendants' activities impair BAJI's ability to carry out its mission to advance equity and justice for minority and immigrant communities through its advocacy work.

13.     San Jose and BAJI therefore seek a declaration that including the citizenship question on the 2020 Census violates the Constitution's "actual Enumeration" mandate and the APA's prohibition against "arbitrary and capricious" agency action.  Further, to avoid irreparable harm, San Jose and BAJI seek an injunction prohibiting the Bureau from including the citizenship question on the 2020 Census.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction in this action under 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (judicial review under APA).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705–706.

15.     Defendants' submission of the final census questions to Congress no later than March 31, 2018, is a final agency action and is therefore judicially reviewable under the APA.  5 U.S.C. §§ 704, 706.

16.     Venue properly lies within the Northern District of California because Plaintiff, the City of San Jose, is a public entity in this judicial district; BAJI, a California nonprofit corporation, maintains an office and provides services in this judicial district; and a substantial part of the events or omissions giving rise to this action will occur or have occurred in this district.  28 U.S.C. § 1391(e).

//

//

//

**INTRADISTRICT ASSIGNMENT**

17.     Under Civil Local Rules 3-5(b) and 3-2(c), Plaintiffs allege that assignment of this action to the San Jose division of this Court is proper.  Plaintiffs further allege that transfer of this action to the San Francisco division of this Court may be proper in light of a pending related action, *State of California v. Wilbur J. Ross, Jr.*, Case No. 3:18-cv-01865, to serve the interests of justice and for the convenience of parties and witnesses.

**PARTIES**

18.     Plaintiff City of San Jose is a municipal corporation, organized as a Charter City under the California Constitution and the laws of the State of California, and is located in the County of Santa Clara.  It is the tenth-largest city in the United States.

19.     What is today San Jose had originally been home to the Ohlone Indians for hundreds of years.  San Jose was founded by Spain on November 29, 1777, as El Pueblo de San Jose de Guadalupe.  San Jose was California's first civilian settlement.  In 1821, San Jose became part of the newly independent country of Mexico.  After the Treaty of Guadalupe Hidalgo ceded California to the United States at the end of the Mexican-American War in 1848, San Jose became California's first incorporated U.S. city.  Since its founding, San Jose has always been a home to immigrants, with nearly 40% of its current population having been born in another country.

20.     San Jose is bringing this action on its own behalf as a municipal corporation.  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1200 (9th Cir. 2004); 5 U.S.C. § 551(2).  San Jose has standing because Defendants' actions have caused and will continue to cause San Jose to suffer concrete and substantial harm, and such harm would be redressed by this lawsuit.  San Jose has an interest in ensuring that the 2020 Census counts all of its residents.  There are no other adequate

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

7

1  remedies available because the failure to capture accurate data in the 2020 Census

2  cannot be reversed.

3      21.      Plaintiff BAJI is a California nonprofit corporation with offices in

4  Oakland, California and Los Angeles, California, as well as in New York, New

5  York, and Atlanta, Georgia.  BAJI was founded in April 2006 in response to the

6  mobilization of immigrant communities and their supporters against repressive

7  immigration bills that were pending before the United States Congress at the time.

8  Propelled by the belief that a thriving multiracial democracy requires racial, social,

9  and economic justice for all, BAJI educates and engages African Americans and

10  Black immigrants to organize and advocate for equality and justice in laws and in

11  their communities through dialogues, presentations, workshops, publications,

12  technical assistance, and trainings.

13      22.      BAJI also builds coalitions and initiates campaigns to advance racial

14  justice, and, at the local and regional levels, provides its partner organizations with

15  relevant training and technical assistance.  BAJI's flagship project is the

16  advancement of just immigration policies and the promotion of cultural shifts

17  necessary to secure equal rights for its members and their communities.

18      23.      BAJI has direct organizational standing to bring suit because its

19  essential and limited resources—including time and money —will be diverted from

20  other important matters that it ordinarily would have been addressing through

21  dialogues, presentations, workshops, publications, technical assistance, and

22  trainings to build alliances between African American and immigrant communities,

23  in order to educate its constituents regarding, and counteract the harmful effect of,

24  the inclusion of citizenship questions into the 2020 Census.  *Fair Housing of Marin*

25  *v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *see also Havens Realty Corp. v.*

26  *Coleman*, 455 U.S. 363 (1982).  Additionally, the use of the 2020 Census to

27  question U.S. residents regarding their citizenship status, and associated effects

28  such as discouraging responses, producing fear and anxiety in minority and

immigrant communities, and reducing both congressional representation and federal funding, frustrate and undermine BAJI's core mission and will require a further expenditures to investigate the scope of these harms and rigorously mitigate them. *Id.* As a result, BAJI has suffered and will continue to suffer concrete and substantial harm as a result of Defendants' actions. There are no other adequate remedies available because the failure to capture accurate data in the 2020 Census cannot be reversed.

24.     Defendant Wilbur L. Ross is the Secretary of the U.S. Department of Commerce and is sued in his official capacity.  Secretary Ross is responsible for fulfilling the Department of Commerce's duties under the Constitution, the APA, and the Census Act.

25.     Defendant U.S. Department of Commerce is a federal agency.  The Department of Commerce, led by Secretary Ross, oversees the Bureau, which is tasked with executing the 2020 Census.

26.     Defendant Dr. Ron Jarmin is responsible for performing the non-exclusive functions and duties of the Director of the U.S. Census Bureau and is sued in his official capacity.  Dr. Jarmin's duties include ensuring that the Bureau executes the 2020 Census.

27.     Defendant U.S. Census Bureau, the federal government's largest statistical agency, is an agency within the Department of Commerce, established by Title 13 of the United States Code.  *See* 13 U.S.C. §§ 1 *et seq.*

## SUMMARY OF ALLEGATIONS

### A.     Origin and Purpose of the Census

28.     The U.S. Constitution provides legal authority for the census, which it refers to as "Enumeration."  Article I, section 2, clause 3 of the Constitution provides, in relevant part, that "Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers . . . .  The actual Enumeration shall be made within three Years

after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct." The Fourteenth Amendment to the Constitution makes clear that the enumeration must include "the whole number of persons in each state." The Constitution therefore requires that the enumeration make no distinction between citizens, documented immigrants, or undocumented immigrants. All are persons.

29. Congress has delegated the taking of the census to the Secretary of Commerce. Under 13 U.S.C. § 141(a), "[t]he Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year." The Secretary has authority to conduct the census "in such form and content as he may determine." *Id.* Likewise, the Bureau Director "is necessarily invested with discretion in matters of form and procedure when these are not specifically provided for by law." *U.S. ex rel. City of Atlanta v. Steuart,* 47 F.2d 979, 982 (D.C. Cir. 1931).

30. Defendants' discretion in taking the census is not unfettered and, in particular, is subject to congressional oversight. Three years before the census, the Secretary must submit to Congress a report proposing the subjects to be included in the census. 13 U.S.C. § 141(f)(1). Two years before the census, the Secretary must submit to Congress the specific questions to be included in the census. *Id.* § 141(f)(2). The Secretary may later modify the subjects or questions only if he submits a report to Congress finding that "new circumstances exist which necessitate" the modification. *Id.* § 141(f)(3).

31. Defendants' discretion in taking the census is also subject to the APA. Under the APA, Defendants must ensure that any agency action is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

32.     Congress, states, and municipalities rely on census data for many purposes, including allocation of federal funding and state and local legislative districting. *Wisconsin v. City of New York*, 517 U.S. 1, 5-6 (1996); *City of Los Angeles v. U.S. Dep't. of Commerce*, 307 F.3d 859, 864 (9th Cir. 2002).

33.     Under the direction of the Secretary of Commerce and the Bureau Director, the Bureau conducts the constitutionally required census every ten years by counting all U.S. residents in the place where they live.  Besides using the results of the decennial census for the constitutional purpose of determining the number of seats for each state in the House of Representatives, the federal government relies on census data to determine how to distribute billions of dollars of funding each year, including funding for Medicaid, Medicare Part B, the Supplemental Nutrition Assistance Program (SNAP), the State Children's Health Insurance Program (S-CHIP), and the Highway Planning and Construction Program.

34.     The Bureau last included a citizenship question in the decennial census questionnaire in 1950.

35.     From 1970 to 2000, the Bureau employed two questionnaires:  a "short form" and a "long form."  The short-form questionnaire, which most households received, included a "minimum number of questions" about the race, ethnicity, age, and gender of each occupant.  Approximately one out of every six households received the long-form questionnaire, which collected a broader array of social, housing, economic, education, disability, employment, citizenship, and income information.

36.     After the 2000 Census, the Bureau discontinued the long-form questionnaire and replaced it, to some degree, with the American Community Survey ("ACS").  Unlike the decennial census, the ACS is not required by the Constitution, and its results do not constitute the enumeration required by the Constitution.  While the decennial census requires an actual enumeration of all

1   persons residing within the United States, the ACS surveys a statistical sample of

2   the population—over 3.5 million households receive the ACS annually.[1]  The ACS

3   already contains a citizenship question.

4       37.     On March 28, 2017, Secretary Ross timely submitted a report

5   containing the subjects proposed to be included in the 2020 Census.  The subjects,

6   which were unchanged from the 2010 Census, did not include citizenship or

7   immigration status.

8       **B.**      **The Bureau's Process for Developing Its Survey Content in**

9               **Advance of the Decennial Census**

10      38.     The 2020 Census has been designed and developed in an iterative

11  fashion, incorporating results from various tests conducted over the past decade.[2]

12      39.     The Bureau develops and tests the content, specific language, order,

13  and layout of the census questionnaire to improve the accuracy of the enumeration.

14  In addition to fulfilling the Bureau's constitutional duty, this development process

15  involves multiple steps that ensure the accuracy, reliability, and objectivity of the

16  final data, as consistent with prior Bureau practice and as required by the

17  Information Quality Act.  Consolidated Appropriations Act, 2001, Pub. L. No. 106-

18  554, § 515, 114 Stat. 2763 (Dec. 21, 2000).

19      40.     Government-wide statistical standards adopted under the Information

20  Quality Act require the Commerce Department and the Bureau to carefully design

21  the census questionnaire to "minimize respondent burden while maximizing data

22  quality" and to "achieve the highest rates of response."[3]  The standards also require

23  testing each component of the questionnaire to ensure that it operates as intended.

24

25  [1] *See* U.S. Census Bureau, *American Community Survey Information Guide*, (Oct. 2017),
    https://www.census.gov/content/dam/Census/programs-
26  surveys/acs/about/ACS_Information_Guide.pdf.
    [2] U.S. Census Bureau, *2020 Census Operational Plan* (Sept. 2017), https://www2.
27  census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-
    plan3.pdf.
28  [3] Office of Mgmt. and Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for*

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

41.     The questionnaire development process and the evaluation of changes to individual inquiries take several years to complete.  For example, the Bureau has spent almost ten years developing and testing the content, specific language, and layout of just one proposed change to the question regarding race and ethnicity on the 2020 questionnaire.  From 2008 through 2012, the Bureau conducted comprehensive research into the possibility of combining race and ethnicity into one question on the 2020 Census.  The research focused on whether this proposed change would improve respondent understanding of the question and improve the accuracy of race and ethnicity data collected.[4]

42.     The Bureau then spent several years designing and conducting tests in different geographical areas on the proposed change to the question regarding race and ethnicity to explore different alternatives for the language, layout, and instructions regarding a revised question.  The testing was designed to assess the accuracy and reliability of alternative forms of asking the proposed question.  In 2016, the Bureau conducted outreach to federal agencies and to the public to obtain feedback on the proposed change.[5]  For example, in August 2016, BAJI organized a meeting between representatives of the Census Bureau and Latinx and African diaspora community leaders in New York to discuss possible changes to the 2020 Census questionnaire that could provide respondents with more accurate options to self-identify their race and/or ethnicity.[6]

43.     The Bureau began conducting major testing of proposed changes to the 2020 Census questionnaire with the 2014 Census Test.  At that time, the Bureau assessed wording changes to the race and Hispanic origin question, as well as new

---

*Statistical Surveys* §§ 1.3, 1.4, 2.3.1 (2006).
[4] U.S. Census Bureau, *Research to Improve Data on Race and Ethnicity* (2016), https://www.census.gov/about/our-research/race-ethnicity.html.
[5] *Id.*
[6] Ramon Taylor, *Race Question in US Census Draws Scrutiny, Criticism*, Voice of America News (Aug. 23, 2016), https://www.voanews.com/a/race-question-us-census-draws-scrutiny-criticism/3477850.html.

potential response categories for married and unmarried relationships.  The 2014 Census Test did not assess the content, wording, or layout of a question regarding citizenship status.

44.    The 2015 National Content Test was an opportunity for the Bureau to "compare different versions of questions" prior to making final decisions prior to the 2020 Census.[7]  While the Bureau tested changes to questions related to race and ethnicity, the Bureau did not design tests of language, layout, or instructions for a question regarding citizenship status.  The Bureau announced the results of this test in early March 2017, none of which related to citizenship.[8]

45.    The Bureau had other opportunities during the major tests in 2016 and April 2017 to test its questionnaire for the 2020 Census.  However, the questionnaires assessed in these tests did not include a question regarding citizenship status.  On information and belief, the Bureau did not begin considering whether to add a demand for citizenship information to the 2020 Census until approximately eight months after it began conducting major testing in 2017.

46.    The Bureau concluded its process designing the race and ethnicity questions at the end of 2017, after nine years of evaluation and testing, because it "needed to make a decision on the design of the race and ethnicity questions by December 31, 2017, in order to prepare for the 2020 Census systems, and deliver the final 2020 Census question wording to Congress by March 31, 2018."[9]

47.    The timing of Secretary Ross's late decision to include the citizenship question prevented the Bureau from including the question in its only full trial run

---

[7] U.S. Census Bureau, *Information Collection Request: 2015 National Content Test*, 80 Fed. Reg. 29,609, 29,610 (May 22, 2015).
[8] U.S. Census Bureau, *2015 National Content Test Race and Ethnicity Analysis Report* (Feb. 28, 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/final-analysis-reports/2015nct-race-ethnicity-analysis.pdf.
[9] U.S. Census Bureau, *2020 Census Program Memorandum Series: 2018.02, Using Two Separate Questions for Race and Ethnicity in 2018 End-to-End Census Test and 2020 Census* (Jan. 26, 2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2018_02.pdf.

of the census count, the 2018 End-to-End Census Test, which commenced its final phase in March 2018 in Providence County, Rhode Island.[10]  The End-to-End Census Test is a dress rehearsal for the 2020 Census, in which the Bureau tests and validates all major components, including operations, procedures, systems, and infrastructure.  The 2018 End-to-End Census Test does not include any request for citizenship information on the questionnaire sent to households.  As a result, none of the major tests for the 2020 Census will have assessed the content, language, layout, or order of the citizenship question on the questionnaire, or the impact that the question regarding citizenship status would have on response rates and accuracy.

48.    To date, the Bureau has not tested the language or layout of the citizenship question in the context of the decennial census questionnaire.

## C.    San Jose's Efforts to Prepare for the 2020 Census

49.    The City of San Jose is taking action ahead of the 2020 Census to ensure that as many of its residents as possible are accurately counted.  Even without the addition of a question regarding citizenship status, past censuses have undercounted San Jose's population, costing it millions of dollars.  In 2010, the Bureau counted 945,942 residents of San Jose.  San Jose estimates that this reflected an undercounting of as many as 70,000 residents, resulting in annual losses of approximately $20 million in federal funds.[11]  With the addition of the citizenship question, the undercounting and resulting loss will likely be even more significant.

---

[10] Michael Wines, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question*, N.Y. Times (Mar. 30, 2018), https://www.nytimes.com/2018/03/30/us/census-bureau-citizenship.html.

[11] Maureen Naylor, *Effort under way for accurate 2020 Census count in San Jose*, FOX KTVU News (Mar. 8, 2018), http://www.ktvu.com/news/effort-underway-for-accurate-2020-census-count-in-san-jose.

50.     San Jose has many foreign-born residents, including undocumented immigrants, who came to the City to live, work, and raise families.  Indeed, the City has been an extremely diverse region since the mid-1800s—a factor that has led to immigrants gravitating to San Jose, where there are already established immigrant communities.  Waves of immigrants, from China, Mexico, Vietnam, India, Europe, and elsewhere, have played a fundamental role in the creation of three profoundly different industries:  first mining, then agriculture, and finally technology in San Jose and the Silicon Valley.[12]

51.     According to the Pew Research Center, San Jose is among the twenty metropolitan areas of the United States with the largest number of undocumented immigrants.  As of February 2017, the Pew Research Center estimates that as much as 17% of San Jose's population consists of undocumented immigrants.[13]

52.     San Jose city leaders are concerned that recent raids by Immigration and Customs Enforcement ("ICE") could hinder an accurate census count with undocumented families fearful of deportation.

53.     Even without the added burden of a citizenship question, the U.S. Census Bureau reports that households with immigrant laborers "may not be willing to respond to the census or able to provide data for their housemates."[14]

54.     To improve the accuracy of the 2020 Census in San Jose, on December 2, 2017, representatives from six San Jose nonprofit organizations joined San Jose and the nonprofit organization Cities of Service to test a new community address-mapping methodology and text-messaging tool that will help the City prepare for

---

[12] City of San Jose, *Envision San Jose 2040: A Brief History of San Jose* (Aug. 8, 2013), http://www.sanjoseca.gov/DocumentCenter/View/19862.

[13] Jeffrey S. Passel and D'Vera Cohn, 2*0 metro areas are home to six-in-ten unauthorized immigrants in U.S.*, Pew Research Center (Feb. 9, 2017), http://www.pewresearch.org/fact-tank/2017/02/09/us-metro-areas-unauthorized-immigrants/.

[14] Herbert F. Stackhouse and Sarah Brady, *Census 2000 Mail Return Rates Final Report*, U.S. Census Bureau (Jan. 30, 2003), https://www.census.gov/pred/www/rpts/A.7.b.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

the 2020 Census.[15]  San Jose will rely on community volunteers in spring 2018 to scour neighborhoods where it suspects many families are doubled up or living in unpermitted housing.[16]  The volunteers will use a texting app San Jose tested in December to identify unofficial units.  The City will then flag them on the Bureau's master address list for San Jose.

55.    San Jose has taken steps to increase participation in the 2020 Census, in part because of fears that immigrants will be undercounted, particularly in the current political climate.  In an article on cities worried about census undercounting, the mayor of San Jose was quoted in *The New York Times* as stating, "Rumors of ICE raids are on Spanish-speaking radio every other day, and you've got this enormous fear from residents about talking to the government.  You do everything you can to communicate to people, 'Hey you're safe with the city, please talk to us.'"[17]

56.    On February 6, 2018, the mayor of San Jose signed a letter to Secretary Wilbur Ross urging him not to add a question on citizenship to the census, noting that "experts, elected officials, and community leaders all agree that adding a question on citizenship in particular will lower initial response."[18]

57.    Santa Clara County, which includes San Jose, also has taken steps to increase participation in the 2020 Census and voice its concern about the inclusion of a citizenship question.  On February 16, 2018, Santa Clara County filed a

---

[15] Rosalind Becker, *City of San José Brings Tech and People Together to Prepare for 2020 Census*, Cities of Service (Dec. 14, 2017), https://citiesofservice.org/stories/city-san-jose-brings-tech-people-together-prepare-2020-census/.

[16] Emily Badger, *Extra Doorbells, Satellite Dishes: How Cities Search for People the Census May Miss*, N.Y. Times (Feb. 22, 2018), https://www.nytimes.com/2018/02/22/upshot/census-cities-undercounting-immigrants.html.

[17] *Id.*

[18] Mitchell J. Landrieu, New Orleans Mayor, et al., The United States Conference of Mayors, to the Honorable Wilbur Ross, Secretary of Commerce, U.S. Dep't. of Commerce (Feb. 6, 2018), http://www.usmayors.org/wp-content/uploads/2018/02/20180206-census-letter.pdf.

Freedom of Information Act request concerning the possible inclusion of a citizenship question on the 2020 Census and information on how the Bureau plans to protect the privacy of individuals who respond to the Census.[19]  Santa Clara County noted in its press release that "[e]xperts have emphasized the potential dampening effect of such a question [on citizenship] on census response rates in diverse communities like Santa Clara County."[20]

58.  San Jose has spent approximately $50,000 on its efforts to prepare for the 2020 Census to date, and it anticipates substantial additional costs.

**D.  <u>BAJI Advocates for Accurate Census Data for Minority Communities and Proper Representation of the Growing Black Immigrant Population</u>**

59.  BAJI has consistently advocated for equitable political representation of minority and immigrant communities.  Its 2016 meeting with Bureau representatives to press for a 2020 Census questionnaire that could obtain more accurate data regarding the race and ethnicity of its respondents was an extension of BAJI's efforts to bolster federal funding for historically undercounted and under-resourced minority and immigrant communities.

60.  BAJI has also partnered with the Immigrant Rights Clinic at New York University School of Law to produce a comprehensive, statistical report on the growing population of Black or African American immigrants in the United States.[21]  The report drew attention to the social, political, and economic conditions

---

[19] Letter from James R. Williams, County Counsel, and Danielle L. Goldstein, Deputy County Counsel, County of Santa Clara, to Vernon E. Curry, Freedom of Information Act Officer, U.S. Census Bureau (Feb. 16, 2018), https://www.sccgov.org/sites/opa/newsroom/Documents/Census%20FIOA%20request.pdf.

[20] Press Release, Office of the County Counsel, County of Santa Clara, County of Santa Clara Files Request for Information on Possible Census Citizenship Question and Privacy Concerns (Feb. 16, 2018), https://www.sccgov.org/sites/opa/newsroom/Documents/FOIA%20press%20release%202.16.18%20FINAL.pdf.

[21] Juliana Morgan-Trostle and Kexin Zheng, New York University School of Law Immigrant

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

of this diverse population and provides federal, state, and local recommendations based on this data.  Based on its broad experience advancing equal rights for minority and immigrant communities, BAJI has warned the public that the inclusion of the citizenship question in the 2020 Census will instill fear and intimidation in Black immigrant communities and suppress their political representation.  BAJI has diverted, and will continue to divert, resources to raise awareness regarding the new census citizenship questions and the related issues.

**E.    The U.S. Department of Justice's Request to Add a Citizenship Question to the 2020 Census**

61.    Nearly nine months after the subjects for the 2020 Census had been identified, on December 12, 2017, the General Counsel of the Justice and Management Division of the U.S. Department of Justice sent a letter to the Bureau requesting the inclusion of a citizenship question on the 2020 Census.  The Department of Justice's purported rationale for requesting the addition of a citizenship question was to assist the Department of Justice with enforcing Section 2 of the Voting Rights Act.

62.    On March 26, 2018, setting aside decades of practice regarding the decennial census, Secretary Ross and the Department of Commerce announced that the final list of census questions that they will submit to Congress will include a question on citizenship status.  Specifically, the question will ask, for every member of every household, whether that person is a citizen of the United States. The question also will ask whether a citizen was naturalized, born "in the United States," born "in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas," or "born abroad to U.S. citizen parent or parents."[22]

---

Rights Clinic, and Carl Lipscombe, Black Alliance for Just Immigration, *The State of Black Immigrants* (2016), http://www.stateofblackimmigrants.com/assets/sobi-fullreport-jan22.pdf.
[22] U.S. Census Bureau, *Questions Planned for the 2020 Census & American Community Survey* (Mar. 29, 2018) at 7, https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

63.     Consistent with the Department of Justice's December 2017 letter, the purported rationale for including the citizenship question on the 2020 Census is that "[k]nowing how many people reside in the community and how many of those people are citizens, in combination with other information, provides the statistical information that helps the government enforce Section 2 of the Voting Rights Act and its protections against discrimination in voting."[23]  But including a citizenship question on the 2020 Census is likely to decrease the accuracy of the 2020 Census and undermine the core objective of the Census by deterring responses from non-citizens and their relatives, many of whom are members of the minority populations that Section 2 of the Voting Rights Act is designed to protect.  Thus, including the question actually **undermines** the Voting Rights Act's purpose of ensuring fair representation for all communities.  *See* Ex. 1.  Further, the detail requested by the citizenship questions, concerning whether respondents were citizens at birth or naturalized, or where citizens were born, can serve no purpose whatsoever in the enforcement of Section 2 of the Voting Rights Act.

64.     In his March 26, 2018, letter, Secretary Ross stated that, to address the Department of Justice's request, he had determined that the best option was to add the ACS citizenship question to the decennial census.  Underscoring the arbitrary and capricious nature of his decision, Secretary Ross speculated that the citizenship question may not cause an undercount because "there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination."  Ex. 2 at 5.  Secretary Ross concluded illogically that "the need for accurate citizenship data" was worth the risk of an undercount.  *Id.*

65.     Defendants failed to identify and explain any "new circumstances" that "necessitated" this modification to the subjects Secretary Ross submitted to Congress in 2017, as required by statute.  13 U.S.C. § 141(f)(3).

---

[23] *Id.*

66.     The Census does not produce citizenship data at a level below the block group, out of privacy concerns.  By including the citizenship data for all households, the data would be available at the census block level.  In some cases, a census block only includes one household and, where that is the case, the citizenship status of the individuals in that household would be in the public domain.

67.     In the over fifty years since the Voting Rights Act's enactment, the Bureau has never asked about citizenship when conducting its 100% enumeration of the population.  As Kenneth Prewitt, a director of the Bureau under President Clinton, explained recently to *The New York Times*, "It's certainly unnecessary . . . . The Voting Rights Act is being administered very well with data from the American Community Survey.  The Justice Department has ruled on that a number of times over the last 15 years."[24]

68.     Moreover, in voting rights litigation following the 2010 Census, including in at least one case brought by the Department of Justice, federal courts were able to rely on the citizenship data contained in the ACS in analyzing claims under Section 2 of the Voting Rights Act.  Courts regularly rely on ACS data to calculate "citizen voting age population."  *See, e.g.*, *Perez v. Abbott*, 250 F. Supp. 3d 123, 133 (W.D. Tex. 2017); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1392 (E.D. Wash. 2014); *Cisneros v. Pasadena Indep. Sch. Dist.,* No. 4:12-CV-2579, 2014 WL 1668500, at *8 (S.D. Tex. Apr. 25, 2014); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 727 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris County*, 601 F. App'x 255 (5th Cir. 2015).

69.     Data collected through the decennial census would not provide a "reliable calculation" of "citizen voting age population" in any event, because

---

[24] Michael Wines and Emily Baumgaertner, *At Least Twelve States to Sue Trump Administration Over Census Citizenship Question*, *N.Y. Times* (Mar. 27, 2018), https://www.nytimes.com/2018/03/27/us/census-citizenship-question.html.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

citizenship information collected decennially will quickly become outdated and less reliable over the course of the subsequent decade.

70. Including a question regarding citizenship status on the 2020 Census will undermine, not advance, the goals of the Voting Rights Act. A question regarding citizenship that leads to a systematic undercount of minority populations across the United States will impair fair representation of those groups and the states in which they live. As a result, the purported reasoning that the citizenship question is necessary for enforcement of Section 2 of the Voting Rights Act is a pretext for other unstated and ulterior purposes.

F. **The Chilling Effect of Adding the Citizenship Question to the Census Form**

71. The Bureau is well aware that adding the citizenship question to the census form will directly cause an undercount in the 2020 Census.

72. The Bureau itself has recognized that minority and immigrant populations have historically been challenging groups to count accurately in the decennial census, due to issues such as language barriers and distrust of government.[25]

73. The risk of undercounting is pronounced in the current political environment. San Jose residents and members of the communities served by BAJI will not consider whether to respond to the citizenship question in a vacuum. Rather, the current Administration's heightened anti-immigrant rhetoric and pattern of policies and actions that target immigrant communities will inevitably color people's decisions. These policies and actions include the rescission of the Deferred Action for Childhood Arrivals program; the ban on travel from several majority-Muslim countries; the suspension on refugee admissions to the United

---

[25] *See* U.S. Census Bureau, *2020 Census Operational Plan* (Sept. 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

States; the termination of special protections from removal for migrants from nations experiencing war and natural disasters; increased detention of undocumented migrants; efforts to suspend or terminate federal funding to localities that elect to limit their participation in federal immigration enforcement efforts; and efforts to build a physical wall along the Mexico-U.S. border, among other actions.

74.     The Administration's anti-immigrant rhetoric has been prevalent in the years leading up to the 2020 Census.  For example, Donald Trump during his campaign for President and since becoming President has made clear his animus toward immigrants, documented and otherwise.  Leaders in his Administration, including at the Department of Justice and Department of Homeland Security, also have made anti-immigrant statements.

75.     Candidate Trump repeatedly denigrated Mexican immigrants in particular, even comparing them to rapists in his presidential bid announcement: "When Mexico sends its people, they're not sending their best.  They're not sending you.  They're not sending you.  They're sending people that have lots of problems and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume are good people."[26]

76.     During the first Republican presidential debate, candidate Trump doubled down on his disparaging comments about Mexican immigrants, claiming that "[t]he Mexican government is much smarter, much sharper, much more cunning.  And they send the bad ones over because they don't want to pay for them. They don't want to take care of them."[27]

---

[26] *The Washington Post* Staff, *Full text: Donald Trump announces a presidential bid* (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.d9c21741c206.

[27] Suzanne Gamboa, *Trump Claims in Debate Mexico 'Sends the Bad Ones' to U.S.*, NBC News (Aug. 6, 2015), https://www.nbcnews.com/news/latino/trump-claims-debate-mexico-sends-bad-ones-u-sn405661.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

77.     During another presidential debate in October 2016, candidate Trump once again broadly assaulted immigrant families and communities with his views on immigration by declaring, "We have some bad hombres here and we're going to get them out."[28]

78.     ICE's Acting Director, Thomas Homan, testified in June 2017 that "If you're in this country illegally, and you committed a crime by entering this country, you should be uncomfortable.  You should look over your shoulder."[29]

79.     United States Attorney General Jeff Sessions stated on Fox News in April 2017 that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported—well, they are.  The policy is that if people are here unlawfully, they're subject to being deported.  Our priority is clear . . . we can't promise people who are here unlawfully that they're not going to be deported."[30]

80.     The Bureau itself expressed concern that anti-immigrant rhetoric by elected and appointed officials and the media would affect Census participation. Indeed, the Bureau's own 2017 study revealed "an unprecedented ground swell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants," and that these concerns "may present a barrier to participation in the 2020 Census."[31]  Ex. 3 at 15 [Meyers Report].  The studies'

---

[28] Elizabeth Gurdus, *Trump: 'We have some bad hombres and we're going to get them out,'* CNBC (Oct. 19, 2016), https://www.cnbc.com/2016/10/19/trump-we-have-some-bad-hombres-and-were-going-to-get-them-out.html.

[29] Maria Sacchetti, *ICE chief tells lawmakers agency needs much more money for immigration arrests*, *The Washington Post* (June 13, 2017), https://www.washingtonpost.com/local/social-issues/ice-chief-tells-lawmakers-agency-needs-much-more-money-for-immigration-arrests/2017/06/13/86651e86-5054-11e7-b064-828ba60fbb98_story.html?utm_term=.bdab82b48326.

[30] Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, FOX News (Apr. 19, 2017), http://www.foxnews.com/politics/2017/04/19/sessions-defends-immigration-policies-after-reported-dreamer-deportation.html.

[31] *See* Mikelyn Meyers, Center for Survey Management, U.S. Census Bureau, *Presentation on Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality*

respondents "express[ed] new concerns about topics like the 'Muslim ban,' discomfort 'registering' other household members by reporting their demographic characteristics, the dissolution of the 'DACA' (Deferred Action for Childhood Arrival) program, repeated references to Immigration and Customs Enforcement (ICE), etc."[32] Ex. 4 at 1 [Memorandum on the Meyers Report].

81.    The Bureau itself has reported heightened privacy concerns from members of the public when they are asked to respond to census questionnaires, as reflected in the Meyers Report:

- **Respondent Fears**
  - "The possibility that the Census could give my information to internal security and immigration could come and arrest me for not having documents terrifies me." (Spanish interview)
  - "Particularly with our current political climate, the Latino community will not sign up because they will think that Census will pass their information on and people can come looking for them." (Spanish interview)
  - English-speaker mentioned the "Muslim ban."

- **Respondent Focus Group Findings**
  - Legal residency status, fear of deportation, concern about how the data are used, and which agencies can see it (DHS? ICE?)
  - Receiving advice not to open the door; [Respondent]s should request warrant be slipped under the door.
    - "They say, 'Never open the door!'"
    - "This alert has been spread everywhere now." (Korean Focus Group)
  . . . .

---

*for the 2020 Census*, presented at National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting (Nov. 2, 2017),  https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf  ("Meyers Report").

[32] *See* Memorandum from the Center for Survey Measurement on Respondent Confidentiality Concerns to Associate Directorate for Research and Methodology, U.S. Census Bureau (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf  ("Memorandum on the Meyers Report").

- o "In light of the current political situation, the immigrants, especially the Arabs and Mexicans, would be so scared when they see a government interviewer at their doorsteps." (Arabic Focus Group)
- o "The immigrant is not going to trust the Census employee when they are continuously hearing a contradicting message from the media every day threatening to deport immigrants." (Arabic Focus Group)

- **Behavior Changes Are Recent**
  - o "The politics have changed everything.  Recently." (Interviewer)
  - o "This may just be a sign of the times, but in the recent several months before anything begins, I'm being asked times over, does it make a difference if I'm not a citizen?" (Interviewer)
  - o "Three years ago was so much easier to get respondents compared to now because of the government changes . . . and trust factors . . . . Three years ago I didn't have problems with the immigration questions." (Interviewer)[33]

82.     These types of concerns are not new to the Bureau.  Since at least 1980, the Bureau has recognized that, because of immigrants' fear of how information disclosed on the Census may be used against them, "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count." *Fed'n for Am. Immigration Reform*, 486 F. Supp. at 568.

83.     The Bureau's own experts believe that adding the citizenship question may threaten the accuracy and confidentiality of enumeration, make the census more expensive to conduct, and jeopardize the Bureau's nonpartisan reputation.[34]

84.     The current Administration's proposed funding cuts will adversely affect the decennial census and will thus exacerbate the citizenship question's effect on its accuracy.  Former Bureau officials, members of Congress, and Government Accountability Office staff all have expressed concern about a funding shortage for the 2020 Census.  The Office of Management and Budget has ordered agencies to

---

[33] *See* Meyers Report at 8–9, 13.

[34] Wines, *supra*, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question*.

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

submit plans for personnel cuts and other restructuring moves, and the Department of Commerce has not publicly disclosed them or explained how they will affect its plans to hire up to half-a-million temporary workers to conduct the decennial census.  The hiring of these workers is particularly important to ensuring an accurate count, as they will be the ones following up with households that do not respond to the initial mailing.

### G.    Harm to San Jose, Its Residents and BAJI

85.    The undercount of Californians in the 2020 Census likely to result from the citizenship question will cause significant harm to cities such as San Jose and their residents.  The undercount that will result from the citizenship question will also cause California, and its municipalities, to lose federal funding, including resources from the federal assistance programs that distribute funds on the basis of decennial census-derived statistics.

86.    Citywide, 12.6% of San Jose's population lives below the poverty line.

87.    Many residents of San Jose depend upon the receipt of federally funded benefits for their livelihoods.  For example, 23.7% of San Jose residents receive Social Security income; 6.6% receive Supplemental Security Income; 2.8% receive cash public assistance income; and 7.6% receive supplemental nutrition assistance benefits.

88.    This undercount will also harm BAJI, which advocates for minority and immigrant communities, due to the drain on its resources caused by the need to educate its constituents regarding the citizenship questions and other programming to minimize its effects.  Further, the diminished federal funding and political representation of minority and immigrant communities as a result of the citizenship questions directly frustrates BAJI's goal of fostering racial, economic, and social equality for Black immigrants and other historically underrepresented communities.

89.    Unless enjoined now, the Bureau will proceed with finalizing the 2020 Census paper questionnaires, which are scheduled to be printed in May of 2019.

1    Only through an injunction can San Jose's right to have its residents fully and

2    accurately counted be preserved.  An injunction is further necessary to protect the

3    interests of BAJI.

### FIRST CAUSE OF ACTION

**(Violation of Constitution's "Actual Enumeration" Mandate;**

**U.S. Const., art. I, § 2, cl. 3)**

7        90.    Plaintiffs reallege and incorporate herein by reference each and every

8    allegation set forth in paragraphs 1 through 89 above as though set forth herein.

9        91.    The Constitution requires the "actual Enumeration" of all people in

10   each state every ten years for the sole purpose of apportioning representatives

11   among the states.  U.S. Const., art. I, § 2, cl. 3, and amend. XIV, § 2.  The clause

12   does not distinguish between citizens and non-citizens, nor does it distinguish

13   between the legal statuses of non-citizens.

14       92.    By including the citizenship question on the 2020 Census, Defendants

15   are in violation of the "actual Enumeration" clause of the Constitution.  Because the

16   question will diminish the response rates of non-citizens and their citizen relatives,

17   San Jose, which has a large immigrant population, and BAJI, which advocates for

18   Black immigrant communities, will be disproportionately affected by the census

19   undercount.  Inclusion of the question thus directly interferes with Defendants'

20   fulfillment of their constitutional responsibility, as delegated by Congress, to

21   conduct an "actual Enumeration" of the U.S. population.

22       93.    This violation harms San Jose and its residents.  San Jose will be

23   awarded fewer seats in the U.S. House of Representatives than its population

24   dictates.  Further, it will receive millions of dollars less in federal funding for public

25   health, education, transportation and neighborhood improvements on an annual

26   basis.

27       94.    This violation harms BAJI due to the diversion of its resources to

28   educate its constituents regarding the census citizenship questions and other

1    programming to minimize its effects and the frustration of its mission to advance

2    racial, economic, and social equality

3    95.    Defendants' violation has caused and will continue to cause ongoing,

4    irreparable harm to San Jose, its residents, and BAJI.

5    96.    An actual controversy exists between Plaintiffs and Defendants

6    regarding whether Defendants' inclusion of a citizenship question on the 2020

7    Census violates the "actual Enumeration" clause of the U.S. Constitution.

8    **SECOND CAUSE OF ACTION**

9    **(Violation of the Constitution's Apportionment Clause;**

10    **U.S. Const. amend. XIV, § 2)**

11    97.    Plaintiffs reallege and incorporate herein by reference each and every

12    allegation set forth in paragraphs 1 through 96 above as though set forth herein.

13    98.    The Constitution requires that representatives be "apportioned among

14    the several states according to their respective numbers, counting the whole number

15    of persons in each state, excluding Indians not taxed."  U.S. Const., amend. XIV,

16    § 2.

17    99.    By including the citizenship question on the 2020 Census, Defendants

18    will undercount "the whole number of persons in each state" because non-citizens

19    and their citizen relatives will be discouraged from responding.

20    100.   Because the results of the 2020 Census will be inaccurate if the

21    citizenship question is included, apportionment of congressional seats based upon

22    those results will not be based on "the whole number of persons in each state,"

23    violating the apportionment clause of the Fourteenth Amendment.

24    101.   This violation will harm San Jose and its residents.  San Jose will be

25    awarded fewer seats in the U.S. House of Representatives than its population

26    dictates.  Further, it will receive millions of dollars less in federal funding for public

27    health, education, transportation and neighborhood improvements on an annual

28    basis.

102.   This violation harms BAJI and the minority and immigrant communities that it serves.  These underserved communities will be deprived of federally funded resources and benefits, and the municipalities in which they reside will lose congressional seats, resulting in their political dilution.

103.   Defendants' violation has caused and will continue to cause ongoing, irreparable harm to San Jose, its residents, and BAJI.

104.   An actual controversy exists between Plaintiffs and Defendants regarding whether Defendants' inclusion of a citizenship question on the 2020 Census violates the Apportionment Clause of the U.S. Constitution.

### THIRD CAUSE OF ACTION

**(Violation of APA's Requirement that Administrative Action Be in Accordance with Law, Not Contrary to Constitutional Right, and Not Beyond Statutory Authority; 50 U.S.C. § 706(2))**

105.   Plaintiffs reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 104 above as though set forth herein.

106.   A court must "hold unlawful and set aside" any agency action that is "not in accordance with law," "contrary to constitutional right," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

107.   Adding the citizenship question to the 2020 Census would be contrary to the constitutional requirement that the Census conduct "actual Enumeration" of all people in each state every ten years for the sole purpose of apportioning representatives among the states.  U.S. Const., art. I, § 2, cl. 3.

108.   Adding the citizenship question to the 2020 Census would also be contrary to the constitutional requirement that congressional seats be "apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed."  U.S. Const., amend. XIV, § 2.

109.   This violation will harm San Jose and its residents.  San Jose will be awarded fewer seats in the U.S. House of Representatives than its population dictates.  Further, it will receive millions of dollars less in federal funding for public health, education, transportation and neighborhood improvements on an annual basis.

110.   This violation harms BAJI due to the diversion of its resources to educate its constituents regarding the census citizenship questions and other programming to minimize its effects and the frustration of its mission to advance racial, economic, and social equality Defendants' violation has caused and will continue to cause ongoing, irreparable harm to San Jose, its residents, and BAJI.

111.   An actual controversy exists between Plaintiffs and Defendants regarding whether Defendants' inclusion of a citizenship question on the 2020 Census violates Section 706(2) of the APA.

## FOURTH CAUSE OF ACTION

### (Violation of APA's Arbitrary and Capricious Standard; 5 U.S.C. § 706(2)(A))

112.   Plaintiffs reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 111 above as though set forth herein.

113.   The APA requires courts to "hold unlawful and set aside" agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706.

114.   Defendants' inclusion of the citizenship question on the 2020 Census is all of the above.  Because the question will diminish the response rates of non-citizens and their citizen relatives, San Jose, which has a large immigrant population, and BAJI, which directly advocates for Black immigrant communities, will be disproportionately affected by the census undercount.  Inclusion of the

question thus directly interferes with Defendants' fulfillment of their constitutional responsibility, as delegated by Congress, to conduct an "actual Enumeration" of the U.S. population, as well as Secretary Ross's statutory duty to "take a decennial census of population" under 13 U.S.C. § 141(a).  A citizenship question, moreover, would not serve the purpose articulated by the U.S. Department of Commerce, because an undercount of non-citizens and their citizen relatives will decrease the accuracy of census data available to prove voter dilution under Section 2 of the Voting Rights Act.  Further, Defendants failed to follow their own internal agency policies and guidelines, including under the Information Quality Act, in reaching their decision to add the citizenship question.  And finally, Defendants made the decision to include the citizenship question very late in the census planning process and months after the statutory deadline for reporting proposed subjects had passed. This last-minute decision was done hurriedly, at the apparent request of the Department of Justice, on a pre-textual basis, and without the benefit of careful analysis and testing the Bureau usually engages in during the years leading up to the census.  This not only constitutes a failure to abide by a statutory mandate, but also reflects the hasty and ill-advised nature of the decision to include the citizenship question on the 2020 Census.

115.   Defendants' decision to add a citizenship question to the 2020 Census thus violates the APA's prohibition against "arbitrary and capricious" agency action.  The stated purpose of adding the question—that it is necessary to enforcing Section 2 of the Voting Rights Act—is not borne out by the facts and is a pretext for other unstated and ulterior purposes.

116.   Defendants' violation has caused and will continue to cause ongoing, irreparable harm to San Jose, its residents, and BAJI.

117.   An actual controversy exists between Plaintiffs and Defendants regarding whether Defendants' inclusion of a citizenship question on the 2020 Census violates Section 706(2)(A) of the APA.

1

## **PRAYER FOR RELIEF**

WHEREFORE, the City of San Jose and BAJI, by and through their attorneys, respectfully requests that this Court:

1. Issue a declaratory judgment, under 28 U.S.C. §§ 2201 and 2202, that including the citizenship question on the 2020 Census violates Article I, Section 2, Clause 3 of the United States Constitution and the APA;

2. Issue a preliminary injunction prohibiting all Defendants and all those acting in concert with them from including a citizenship question on the 2020 Census and from taking any irreversible steps to include a citizenship question on the 2020 Census;

3. Issue a permanent injunction prohibiting all Defendants and all those acting in concert with them from including the citizenship question on the 2020 Census;

4. Award Plaintiffs costs, expenses, and reasonable attorney fees; and

1        5.      Award such other relief as the Court deems just and proper.

2

3                                          Respectfully submitted,

4    Dated:  April 17, 2018              **MANATT, PHELPS & PHILLIPS, LLP**

5

6                                        By: _s/ John F. Libby_
                                              John F. Libby
7                                             John W. McGuinness
                                              Emil Petrossian
8                                             11355 West Olympic Boulevard
                                              Los Angeles, California 90064
9                                             Telephone:  (310) 312-4000
10                                            Facsimile:  (310) 312-4224

11                                       **LAWYERS' COMMITTEE FOR**
                                         **CIVIL RIGHTS UNDER LAW**
12                                            Kristen Clarke
                                              Jon M. Greenbaum
13                                            Ezra D. Rosenberg
                                              Dorian L. Spence
14                                            1401 New York Avenue NW, Suite 400
                                              Washington, DC 20005
15                                            Telephone:  (202) 662-8600
                                              Facsimile:  (202) 783-0857
16
                                         **PUBLIC COUNSEL**
17                                            Mark Rosenbaum
                                              610 South Ardmore Avenue
18                                            Los Angeles, California 90005
                                              Telephone:  (213) 385-2977
19                                            Facsimile:  (213) 385-9089

20                                       **CITY OF SAN JOSE**
                                              Richard Doyle, City Attorney
21                                            Nora Frimann, Assistant City Attorney
                                              Office of the City Attorney
22                                            200 East Santa Clara Street, 16th Floor
                                              San José, California 95113-1905
23                                            Telephone Number: (408) 535-1900
                                              Facsimile Number: (408) 998-3131
24                                            E-Mail:  cao.main@sanjoseca.gov

25                                       _Attorneys for Plaintiffs_
                                         CITY OF SAN JOSE and BLACK ALLIANCE
26                                       FOR JUST IMMIGRATION

27

28

1

## **FILER'S ATTESTATION**

2      Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, Ana G.

3   Guardado hereby attests that concurrence in the filing of this document has been

4   obtained from all the signatories above.

5   Dated:  April 17, 2018                    *s/ Ana G. Guardado*

6                                              Ana G. Guardado

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28