CHAD A. READLER
Acting Assistant Attorney General
CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Tel.: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION,<br><br>          Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>          Defendants. | Civil Action No. 3:18-cv-02279-RS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   August 9, 2018<br>Time:   1:30 p.m.<br>Judge:  Honorable Richard Seeborg<br>Dept.:  3 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 9, 2018, at 1:30 p.m., or as soon thereafter as

the matter may be heard, in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate

Avenue, San Francisco, California 94102, defendants Wilbur L. Ross, Jr., Secretary of Commerce;

U.S. Department of Commerce; Ron Jarmin, performing the nonexclusive functions and duties of

Director, U.S. Census Bureau; and U.S. Census Bureau will and hereby do move this Court for an

order dismissing this action.  This motion is based upon this Notice of Motion and Motion to

Dismiss, the Memorandum of Points and Authorities in Support of Motion to Dismiss, all other

1    papers and pleadings on file in this action, and such oral and documentary evidence as may be

2    presented at hearing of this motion.

3

4    Date:  June 21, 2018                               Respectfully submitted,

5                                                       CHAD A. READLER
                                                        Acting Assistant Attorney General
6
                                                        BRETT A. SHUMATE
7                                                       Deputy Assistant Attorney General

8                                                       JOHN R. GRIFFITHS
                                                        Director, Federal Programs Branch
9
                                                        CARLOTTA P. WELLS
10                                                      Assistant Director, Federal Programs Branch

11                                                        _/s/ Stephen Ehrlich_____
                                                        KATE BAILEY
12                                                      STEPHEN EHRLICH
                                                        CAROL FEDERIGHI
13                                                      Trial Attorneys
                                                        United States Department of Justice
14                                                      Civil Division, Federal Programs Branch
                                                        20 Massachusetts Ave., NW
15                                                      Washington, DC 20530
                                                        Tel.: (202) 305-9803
16                                                      Fax: (202) 616-8470
                                                        Email: stephen.ehrlich@usdoj.gov
17
                                                        Attorneys for Defendants
18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

I.     CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS..............2

II.    HISTORY OF INCLUSION OF A CITIZENSHIP QUESTION .........................3

III.   REINSTATEMENT OF A CITIZENSHIP QUESTION IN THE 2020 CENSUS...........5

IV.   2020 CENSUS PROCEDURES AND PLANS TO MINIMIZE NON-RESPONSE........9

LEGAL STANDARDS ......................................................................................................10

ARGUMENT ...................................................................................................................11

I.     THIS CASE IS NOT JUSTICIABLE .......................................................12

     A.    Plaintiffs Lack Standing to Maintain this Action.....................................12

          1.   Plaintiffs' allegations of injury are too speculative and conclusory.....................13

          2.   Plaintiffs' alleged injuries are not fairly traceable to the challenged action..........18

     B.    Plaintiffs' Suit is Barred by the Political Question Doctrine. .......................19

          1.   The content of the census questionnaire is textually committed to Congress. ..................21

          2.   The Court has no judicially manageable standards to make the necessarily policy-based determinations regarding the content of the census questionnaire. .....................22

     C.    The Secretary's Decision Is Not Subject to Judicial Review Under the Administrative Procedure Act.....................24

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ENUMERATION CLAUSE .....................................................27

CONCLUSION ................................................................................................................31

i

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Abdelhamid v. Ilchert,*
   774 F.2d 1447 (9th Cir. 1985)......................................................................24

4

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) ....................................................................27

5

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .............................................................................. 10, 11

6

7

*Baker v. Carr,*
   369 U.S. 186 (1962) ....................................................................................20

8

*Bates v. Donley,*
   935 F. Supp. 2d 14 (D.D.C. 2013) ..............................................................11

9

10

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .............................................................................. 10, 11

11

*Citizens to Preserve Overton Park, Inc., v. Volpe,*
   401 U.S. 402 (1971) ....................................................................................24

12

13

*City of Los Angeles v. Cty. of Kern,*
   581 F.3d 841 (9th Cir. 2009) ......................................................................18

14

*City of Los Angeles v. Evans,*
   2001 WL 34125617 (C.D. Cal. Apr. 25, 2001) ...........................................28

15

16

*City of Phila. v. Klutznick,*
   503 F. Supp. 663 (E.D. Pa. 1980)...............................................................26

17

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ......................................................................13, 17, 18

18

19

*Ctr. for Policy Analysis on Trade & Health v. Office of the U.S. Trade Policy,*
   540 F.3d 940 (9th Cir. 2008) ......................................................................24

20

*Dep't of Commerce v. U.S. House of Representatives,*
   525 U.S. 316 (1999) .............................................................................passim

21

22

*Fed'n for Am. Immigration Reform v. Klutznick,*
   486 F. Supp. 564 (D.D.C. 1980)..................................................................15

23

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..................................................................23, 26, 29, 31

24

25

*FW/PBS, Inc. v. Dallas,*
   493 U.S. 215 (1990) ....................................................................................12

26

*Gaffney v. Cummings,*
   412 U.S. 735 (1973) ....................................................................................28

27

28

DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS – No. 3:18-cv-02279-RS

*Gerritsen v. Warner Bros. Entm't Inc.*,
    112 F. Supp. 3d 1011 (C.D. Cal. 2015) ..................................................................3

*Glavin v. Clinton*,
    19 F. Supp. 2d 543 (E.D. Va. 1998), *aff'd sub nom,*
    *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ...........16

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...............................................................................................12

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...............................................................................................24

*Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*,
    482 U.S. 270 (1987) ...............................................................................................24

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ...............................................................................20, 22, 23

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) ...............................................................................17

*Legal Tender Cases*,
    79 U.S. 457 (1870), *abrogated on other grounds, Tahoe-Sierra Pres.*
    *Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) .....................30

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...............................................................................................24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................................10, 12, 13, 18

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ...............................................................................................18

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ...............................................................................12

*Morales v. Daley*,
    116 F. Supp. 2d 801 (S.D. Tex. 2000), *aff'd*, 275 F.3d 45 (5th Cir. 2001) ...........29, 30

*Nat'l Labor Relations Board v. Noel Canning*,
    134 S. Ct. 2550 (2014) ...........................................................................................30

*Nat'l Law Ctr. on Homelessness & Poverty, v. Kantor*,
    91 F.3d 178 (D.C. Cir. 1996) ............................................................................16, 17

*Oregon Nat. Res. Council v. Thomas*,
    92 F.3d 792 (9th Cir. 1996) ...................................................................................25

*Paralyzed Veterans of Am. v. McPherson*,
    2008 WL 4183981 (N.D. Cal. 2008) .........................................................................3

*Prieto v. Stans*,
    321 F. Supp. 420 (N.D. Cal. 1970) .........................................................................28

iii

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009) ...............................................................11

*Renne v. Geary,*
    501 U.S. 312 (1991) ...............................................................................10

*Republic of Marshall Islands v. United States,*
    865 F.3d 1187 (9th Cir. 2017) ...............................................................20

*Ridge v. Verity,*
    715 F. Supp. 1308 (W.D. Pa. 1989) .......................................................15

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ...............................................................10

*Salmon Spawning & Recovery All. v. Gutierrez,*
    545 F.3d 1220 (9th Cir. 2008) ...............................................................19

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) ...............................................................21

*Senate of the State of Cal. v. Mosbacher,*
    968 F.2d 974 (9th Cir. 1992) ...................................................19, 26, 28

*Sharrow v. Brown,*
    447 F.2d 94 (2d Cir. 1971).....................................................................16

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) .................................................................................18

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ...........................................................................13

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ...............................................................................13

*Tucker v. Dep't of Commerce,*
    958 F.2d 1411 (7th Cir. 1992) .........................................................23, 26

*U.S. Dep't of Commerce v. Montana,*
    503 U.S. 442 (1992) .........................................................................15, 23

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*
    243 F.3d 1181 (9th Cir. 2001) ...............................................................10

*United States v. Little,*
    321 F. Supp. 388 (D. Del. 1971)............................................................30

*United States v. Moriarity,*
    106 F. 886 (S.D.N.Y. 1901)...................................................................30

*United States v. Munoz-Flores,*
    495 U.S. 385 (1990) ...............................................................................20

*United States v. Rickenbacker,*
    309 F.2d 462 (2d Cir. 1962) ................................................................................30

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) ...............................................................................11

*Utah v. Evans,*
    536 U.S. 452 (2002) ..........................................................................23, 28, 31

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ............................................................................................12

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004) ............................................................................................20

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................................... 12, 18

*Webster v. Doe,*
    486 U.S. 592 (1988) ...................................................................................... 24, 25

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ................................................................................................23

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ............................................................................................13

*Wisconsin v. City of NY,*
    517 U.S. 1 (1996) .........................................................................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ............................................................................................20

**STATUTES**

2 U.S.C. § 2a ...............................................................................................................15

5 U.S.C. § 701 ......................................................................................................24, 25

13 U.S.C. § 2..................................................................................................................2

13 U.S.C. § 4..................................................................................................................2

13 U.S.C. § 5..................................................................................................................3

13 U.S.C. § 9................................................................................................................10

13 U.S.C. § 141 .................................................................................................2, 21, 25

13 U.S.C. § 195 ............................................................................................................23

13 U.S.C. § 221 ........................................................................................................3, 18

20 U.S.C. § 6337 ..........................................................................................................16

42 U.S.C. § 1301 ...........................................................................................................16

49 U.S.C. § 5305 ...........................................................................................................16

52 U.S.C. § 10301 ...........................................................................................................6

Census Act of 1790, 1 Stat. 101 (1790) .......................................................................29

Census Act of 1820, 3 Stat. 548 (1820) .......................................................................29

Census Act of 1850, 9 Stat. 430 (1850) .......................................................................29

**RULES**

Fed. R. Civ. P. 12 ...........................................................................................................10

**U.S. CONSTITUTION**

U.S. Const. art. I, § 2 ............................................................................................2, 19, 21, 25

U.S. Const. amend. XIV, § 2 ................................................................................... 19, 29

**OTHER AUTHORITIES**

2020 Census Operational Plan: A New Design for the 21st Century (Sept. 2017, v.30)
     https://www2.census.gov/programs-surveys/decennial/2020/program-management/
     planning-docs/2020-oper-plan3.pdf ...............................................................7, 9, 10, 28

Census Topic Report No. 11, Response Rates and Behavior Analysis
     https://www.census.gov/pred/www/rpts/TR11.pdf ....................................................30

https://www.census.gov/geo/reference/webatlas/blocks.html ..........................................5

https://www.census.gov/newsroom/blogs/random-samplings/2011/07/what-are-census-
     blocks.html ..............................................................................................................5

https://www.census.gov/popclock/ .............................................................................28

https://www.census.gov/population/apportionment/about/computing.html ...............15

https://www.census.gov/programs-surveys/acs/about/acs-and-census.html....................5

National Research Council, Counting People in the Information Age (D. Steffey & N. Bradburn
     eds. 1994) ...............................................................................................................30

Sheridan's Complete Dictionary of the English Language (6th ed. 1796) ............................21

Testimony,
     https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=395239 ........14

United Nations, Department of Economic and Social Affairs, Principles
     and Recommendations for Population and Housing Censuses,
     https://unstats.un.org/unsd/publication/seriesM/Series_M67rev3en.pdf .................29

1
2

U.S. Census Bureau, Archive of American Community Survey Questions,
    https://www.census.gov/programs-surveys/acs/methodology/questionnaire
    -archive.htm.......................................................................................................... 5, 29

U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000,
    https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf......................... 3, 4, 5

U.S. Census Bureau, Twenty Censuses: Population and Housing Questions 1790-1980
    https://www.census.gov/history/pdf/20census.pdf ......................................................... 4

U.S. Census Bureau, Questionnaires,
    https://www.census.gov/history/www/through_the_decades/questionnaires/ ......................... 4

U.S. Census Bureau, Questions Planned for the 2020 Census and American Community
    Survey (Mar. 2018),
    https://www2.census.gov/library/publications/decennial/2020/operations/planned-
    questions-2020-acs.pdf ................................................................................................. 3, 9

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS – No. 3:18-cv-02279-RS

**INTRODUCTION**

The relief sought in this suit—an order barring the Secretary of Commerce from collecting demographic information through the decennial census—is as extraordinary as it is unprecedented. The Constitution vests in the political branches of government discretion to decide the manner in which the census is conducted. In the exercise of that discretion, the Secretary decided to reinstate a question about U.S. citizenship on the 2020 decennial census. Not only has citizenship information historically been collected as far back as 1820, but citizenship information also forms an important component of enforcing the Voting Rights Act of 1965. Plaintiffs' claim that the Constitution precludes the Secretary from simply asking a question fails for at least four reasons.

First, Plaintiffs—a city and a nonprofit advocacy organization—lack standing to challenge the Secretary's decision to add a citizenship question to the decennial census. Plaintiff City of San Jose's ("San Jose's") claimed injuries of lost representation in Congress and decreased federal funding, based on its allegation that adding the citizenship question will reduce the response rates of its residents, are too speculative to confer Article III standing. Plaintiff Black Alliance for Just Immigration ("BAJI") asserts standing in its own right but its allegations regarding diversion of resources and frustration of its mission are too conclusory. And even if Plaintiffs could allege injuries that are concrete and non-speculative, those injuries would be not be fairly traceable to the Secretary's decision but would be attributable instead to the independent decisions of individuals who disregard their legal duty to respond to the census.

Second, Plaintiffs' challenge is unreviewable under the political question doctrine. The Constitution textually commits the "[m]anner" of conducting the census to Congress, and it contains no judicially discoverable or manageable standards for determining which demographic questions may be included on the census form. That question involves policy determinations that are ill-suited for judicial resolution and that the Constitution expressly commits to the political branches. Plaintiffs' challenge elides the serious separation-of-powers concerns that would be implicated by a court order dictating the form and content of the decennial census questionnaire.

Third, Plaintiffs are similarly barred from proceeding under the Administrative Procedure Act because the form and content of the census is committed to the Secretary's discretion by law.

1

"Congress has delegated its broad authority over the census to the Secretary [of Commerce]," *Wisconsin v. City of NY*, 517 U.S. 1, 19 (1996), and it has done so in broad terms: Congress authorized the Secretary to conduct the decennial census "in such form and content as he may determine," 13 U.S.C. § 141(a), and to obtain other demographic information through that device, *id.* These broad delegations leave a court with no meaningful standard to apply and accordingly preclude judicial review of which demographic questions the Secretary decides to include on the decennial census form.

Fourth, Plaintiffs cannot state a claim for relief under the Constitution's Enumeration Clause. U.S. Const. art. I, § 2, cl. 3. The Secretary has developed comprehensive plans to conduct a person-by-person headcount of the population, and there is no allegation that he has failed to put in place procedures to count the population, all of whom are under a legal obligation to answer. The Secretary's decision to reinstate a citizenship question is consistent with the longstanding historical practice of asking about citizenship and other demographic information, whereas Plaintiffs' theory would call into question the constitutionality of asking any demographic questions—*e.g.,* about sex, Hispanic origin, race, or relationship status—that go beyond counting the population and that could cause at least some individuals not to respond for any of various reasons, such as discomfort with the question or increased time needed to answer.

For all of these reasons, this action should be dismissed.

## BACKGROUND

## I.    CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS

The U.S. Constitution requires that an "actual Enumeration" of the population be conducted every 10 years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I § 2, cl. 3. Through the Census Act, Congress has delegated to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine," 13 U.S.C. § 141(a), and has "authorized [him] to obtain such other census information as necessary," *id.* The Bureau of the Census assists the Secretary in the performance of this responsibility. *See id.* §§ 2, 4. As required by the Constitution, a national census of the U.S. population has been conducted every 10 years since 1790. U.S. Census Bureau, Questions

Planned for the 2020 Census and American Community Survey, at 1 (Mar. 2018), https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf ("Questions Planned").

The Act directs that the Secretary "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title." 13 U.S.C. § 5. Nothing in the Act, however, directs the precise content of the questions that are to be included on the decennial census questionnaire. The Act imposes a legal duty on all persons to respond to the census. See *id.* § 221.

## II.     HISTORY OF INCLUSION OF A CITIZENSHIP QUESTION

Throughout our history, the United States has used the census to collect additional information beyond the population count "in response to the challenges facing the nation and a national desire to understand ourselves." Questions Planned, supra, at 1. This has included, for many decennial censuses, information about foreign birth, naturalization, and citizenship.

Beginning in 1820, the Census was used to tabulate citizenship by inquiring of each household the number of "foreigners not naturalized." *See* U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000, at 6, https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf ("Measuring America").[1]   With the exception of 1840, censuses from 1820 to 1880 asked for citizenship or birthplace in some form.[2] Decennial censuses from 1890 through 1950 specifically requested citizenship information more consistently. The 1890

---

[1] The Court may take judicial notice of the undisputed historical facts concerning the census and other related surveys appearing in documents posted on government websites. *See Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("[T]he court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies."); *Paralyzed Veterans of Am. v. McPherson*, No. 06-cv-4670, 2008 WL 4183981, at *5 (N.D. Cal. 2008) (taking judicial notice of "information on government agency websites, which have often been treated as proper subjects for judicial notice").

[2] In 1830, the Census asked whether individuals were "foreigners not naturalized." Measuring America at 7. No question regarding birthplace or citizenship status was included in the 1840 Census. *Id.* at 8. In the 1850, 1860, and 1880 enumerations, the questionnaires asked for place of birth (though not citizenship *per se*). *Id.* at 9, 11, 13. The Census included a question regarding citizenship in 1870 (whether the individual was a "Male citizen of U.S. 21 years of age and upwards"), along with questions about the individual's place of birth and whether either parent was of foreign birth. *Id.* at 13, 15.

3

Census asked for the place of birth of the respondent and his or her parents and, for adult males of foreign birth 21 years or older, the number of years the individual had resided in the United States, whether he had naturalized, or, if not, whether naturalization papers had been taken out. *Measuring America*, at 22, 28. The 1900, 1910, 1920, and 1930 Censuses asked, with some variations, for the birthplaces of the individual and his or her parents, the year of immigration for all foreign-born individuals, and, for any adult male of foreign birth 21 years or older, whether he had naturalized or was an alien. *Id.* at 34, 37; *id* at 45, 49; *id.* at 58; *id.* at 59. The next two enumerations asked for the individual's place of birth and either (in 1940) for the citizenship of all foreign-born individuals or (in 1950) whether a foreign-born individual had naturalized. *Id.* at 62; *id.* at 66. The 1940 census also began the practice of sampling a portion of the population to collect some information, though the answers for all individuals were entered on the same form. Thus, the 1940 and 1950 Censuses asked only some of the population for the birthplaces of their parents. *Id.* at 62-63 (1940, 5%); *id.* at 66, 68 (1950, 20%).

The 1950 Census is the last one to have asked *all* respondents for citizenship status. In 1960, the Census Bureau asked 25% of the population for the birthplace of the respondent and his or her parents, though naturalization status was not requested. *Measuring America* at 72-73. All residents of New York were asked for place of birth and, if not born in the U.S. or Puerto Rico, whether they were citizens. U.S. Census Bureau, Twenty Censuses: Population and Housing Questions 1790-1980, at 71, https://www.census.gov/history/pdf/20censuses.pdf.   In 1970, the first year respondents were asked to mail back the questionnaire, 20% of the population were asked for their birthplace, 15% were asked for parents' birthplace, and 5% were asked whether the individual, if foreign born, had naturalized. *Measuring America*, at 78. The questionnaires asking for more detailed information from a sample of the population were called the "long-form questionnaire." *See* U.S. Census Bureau, Questionnaires, https://www.census.gov/history/www/through_the_decades/questionnaires/.   In 1980, 1990, and 2000, the long form, which approximately 1 in 6 households received instead of the short form, asked for the individual's birthplace, and foreign-born persons were asked either whether they had naturalized (1980) or whether they were citizens (1990, 2000). *See id.*; *Measuring America*,

1   at 91-92. The corresponding "short-form questionnaire," sent to the majority of households, did not

2   ask for birthplace or citizenship status in those years.

3          Beginning in 2005, in order to provide communities, businesses, and the public with more-

4   timely statistical information, the Census Bureau began collecting monthly (and releasing annually)

5   the more extensive long-form data through the American Community Survey ("ACS"), which is sent

6   yearly to a sample of the population—about one in 38 households. Information regarding national

7   origin and citizenship has been collected through the ACS every year since 2005. *See* U.S. Census

8   Bureau, Archive of American Community Survey Questions, https://www.census.gov/programs-

9   surveys/acs/methodology/questionnaire-archive.html ("ACS Questionnaire Archive") (noting

10  citizenship questions on every ACS questionnaire). The replacement of the long-form questionnaire

11  with the yearly ACS after the 2000 Census enabled the 2010 census to be a "short-form-only" census.

12  The 2020 census will also be a "short-form-only" census. The ACS will continue to be distributed

13  each    year,    as    usual,    to    collect    additional    data.    https://www.census.gov/programs-

14  surveys/acs/about/acs-and-census.html.

15         In recent decades, the Census Bureau has obtained citizenship data consistently through the

16  long-form questionnaire and, since 2005, the yearly ACS (as well as some other surveys). Because the

17  ACS collects information from only a sample of the population, it produces annual estimates only

18  for census tracts and census block groups. *See* https://www.census.gov/newsroom/blogs/random-

19  samplings/2011/07/what-are-census-blocks.html. The decennial census attempts a full count of the

20  population and produces population counts as well as counts of other, limited information (such as

21  race)    down    to    the    smallest    level,    known    as    the    "census    block."    *See*

22  https://www.census.gov/geo/reference/webatlas/blocks.html.    The    Census    Bureau    currently

23  provides the Department of Justice ("DOJ") with estimated citizenship data at the "census block

24  group" level, which is a collection of census blocks.

25  **III.    REINSTATEMENT OF A CITIZENSHIP QUESTION IN THE 2020 CENSUS**

26         In early 2017, the new leadership at the Department of Commerce began evaluating various

27  fundamental issues in connection with the upcoming 2020 census, including funding and content.

28  Administrative Record ("A.R.") at 1321 (Dkt. Nos. 38, 52). Part of those considerations included

5

whether to reinstate a citizenship question. *Id.* As part of that evaluation process Commerce reached out to federal government components, including the Department of Justice ("DOJ"). *Id.*

On December 12, 2017, DOJ submitted a letter to the Census Bureau "formally request[ing] that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship." Letter from Arthur Gary, General Counsel, DOJ, to Ron Jarmin, performing the nonexclusive duties of the Director, U.S. Census Bureau (Dec. 12, 2017), Compl. ¶ 3 & Ex. 1 (Dkt. No. 1) ("DOJ Letter"); *see also* A.R. at 663. DOJ stated that "[t]his data is critical to the Department's enforcement of Section 2 of the Voting Rights Act" ("VRA"), now codified at 52 U.S.C. § 10301, and instrumental "[t]o fully enforce those requirements." A.R. 663. DOJ had explained that "the decennial census questionnaire is the most appropriate vehicle for collecting that data" because it would provide census-block-level citizenship voting age population ("CVAP") data that are not currently available from the ACS surveys (which provide data only at the larger census block group level). *Id.* DOJ explained that having citizenship data at the census block level will permit more effective enforcement of the VRA. *Id.* at 663-64.

On March 26, 2018, after examining the issue and considering input from a variety of sources, the Secretary of Commerce issued a memorandum reinstating a citizenship question on the 2020 Census questionnaire.  Memorandum to Karen Dunn Kelley, Under Secretary for Economic Affairs, from the Sec'y of Commerce on Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire at 1 (Mar. 26, 2018), Compl. ¶ 7 & Ex. 2; *see also* A.R. at 1313. The Secretary stated that the census should collect such information in order to provide DOJ with census-block-level data to assist in enforcing the VRA. A.R. 1313.

The Secretary first emphasized the goal of conducting a complete and accurate decennial census. A.R. at 1313. The Secretary also observed that, as detailed above, collection of citizenship data in the decennial census has a long history and that the ACS has included a citizenship question since 2005. *Id.* at 1314. The Secretary therefore found that "the citizenship question has been well tested." *Id.* He also confirmed with the Census Bureau that census-block-level citizenship data are not available using the annual ACS. *Id.*

1   The Secretary asked the Census Bureau to evaluate the best means of providing the data

2   requested by DOJ, and the Census Bureau initially presented three alternatives: Option A would have

3   continued the status quo and provided DOJ with ACS citizenship data at the census-block-group

4   level, rather than the block level requested in the DOJ Letter; Option B would have placed the ACS

5   citizenship question on the decennial census, which goes to every American household; and Option

6   C instead would have provided block-level citizenship data for the entire population using existing

7   federal administrative-record data.[3] A.R. 1314-16. In his decision memo, the Secretary found that

8   Option A would not provide DOJ with improved CVAP data, as there was no guarantee that the

9   accuracy or level of detail of the ACS data could be enhanced to meet DOJ's requirements even using

10  sophisticated modeling methods. *Id.* at 1314-15. After discussing Options B and C, *id.* at 1315-16, the

11  Secretary indicated that he had asked the Census Bureau to develop and implement a fourth

12  alternative, Option D, which would effectively combine Options B and C. *Id.* at 1316. Under this

13  fourth option, a citizenship question would be reinstated on the decennial census in the same form

14  as it appears on the ACS, imposing on each of the country's inhabitants the legal obligation to self-

15  respond. *Id.* at 1316-17. The Secretary directed the Census Bureau to further enhance its

16  administrative-record data sets, protocols, and statistical models to maximize its ability to match the

17  decennial census responses with administrative records. *Id.* at 1316. The combination of responses

18  to the question and more-developed practices for comparing those responses with administrative

19  records would then permit the Census Bureau to determine the inaccurate response rate (whether for

20  non-response, conflicting responses, or other reasons) for the entire population. *Id.* at 1317. The

21  Secretary concluded that this combined option would provide DOJ with the most complete and

22  accurate CVAP data. *Id.*

23

24

---

25   [3] Administrative records include data from the Internal Revenue Service, the Social Security Administration, the Centers for Medicare and Medicaid Services, the Department of Housing and
26   Urban Development, the Indian Health Service, the Selective Service, and the U.S. Postal Service. 2020 Census Operational Plan: A New Design for the 21st Century, at 22-26 (Sept. 2017, v.3.0),
27   https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf ("2020 Census Operational Plan"). Administrative records will be utilized
28   only if the data is corroborated by at least two sets of records.

1     In addition to discussing the operational aspect of DOJ's request with the Census Bureau,

2   the Secretary closely considered stakeholder views. He reviewed letters from local, state, and federal

3   officials and advocacy groups, monitored stakeholder commentary in the press, and spoke personally

4   to interested parties on both sides of the issue. A.R. 1313-14. In particular, the Secretary considered

5   but rejected concerns raised by a number of parties that reinstating a citizenship question on the

6   decennial census would negatively impact the response rate for noncitizens. *Id.* at 1315-16, 1317-18.

7   While the Secretary agreed that a "significantly lower response rate by non-citizens could reduce the

8   accuracy of the decennial census and increase costs for non-response follow up operations," *id.* at

9   1315, he concluded that "neither the Census Bureau nor the concerned stakeholders could document

10   that the response rate would in fact decline materially" as a result of reinstatement of the citizenship

11   question. *Id.* Based on his discussions with outside parties, Census Bureau leadership and others

12   within the Department of Commerce, the Secretary determined that, to the best of everyone's

13   knowledge, limited empirical data exists on how reinstatement of a citizenship question might impact

14   response rates on the 2020 Census. *Id.* at 1315, 1317. Thus, "while there is widespread belief among

15   many parties that adding a citizenship question could reduce response rates, the Census Bureau's

16   analysis did not provide definitive, empirical support for that belief." *Id.* at 1316; *see also id. at* 1317-

17   18.

18     Certain stakeholders informed the Secretary that reinstating a citizenship question could

19   negatively impact response rates because of heightened, general distrust of the government. But the

20   Secretary concluded that those commenters referred to individuals who may decline to participate

21   regardless of whether the census includes a citizenship question and noted that "no one provided

22   evidence that there are residents who would respond accurately to a decennial census that did not

23   contain a citizenship question but would not respond if it did." A.R. at 1317. The Secretary further

24   observed that, based on past experience, "certain interest groups consistently attack the census and

25   discourage participation." *Id.* at 1318. The Secretary explained that the Census Bureau intends to take

26   steps to conduct respondent and stakeholder-group outreach in an effort to mitigate the impact of

27   the foregoing issues on the 2020 decennial census. *Id.*

28

1    Finally, the Secretary explained his decision not to implement Option C, which would have

2    relied solely on administrative records without reinstating a citizenship question. A.R. at 1316. The

3    Secretary noted that the use of administrative records is still evolving, and that the Census Bureau

4    does not yet have a complete data set for the entire population; in fact, based on the credible

5    administrative record data identified by the Census Bureau in the 2010 Census, some 25 million

6    voting-age people would need to have their citizenship status imputed by the Census Bureau if not

7    given the opportunity to self-respond. *Id.* Reliance on administrative records alone thus would not

8    provide DOJ with the complete and accurate block-level CVAP data it requested. *Id.*

9    The citizenship question is not the only question beyond the total number of persons residing

10   at a location that the 2020 census questionnaire will pose. For example, the questionnaire also will

11   ask questions regarding sex, Hispanic origin, race, and relationship status. *See* Questions Planned, at

12   13. Plaintiffs do not challenge the Secretary's decision to include any of those questions.

13   **IV.    2020 CENSUS PROCEDURES AND PLANS TO MINIMIZE NON-RESPONSE**

14   The Department of Commerce and the Census Bureau have extensive plans in place to

15   maximize self-response and thereby minimize the amount of non-response follow up. The 2020

16   Census will be the first to rely extensively on digital methods and automation. It will be the first

17   census where individuals are encouraged to respond online. 2020 Census Operational Plan, at 15, 18-

18   19, 26, 88. Most housing units will receive several short mailings instructing them to complete the

19   census either online or by telephone. *Id.* at 18, 21. Online forms will be provided in multiple

20   languages. *Id.* at 19, 98. If households do not respond by the fourth mailing, the full paper

21   questionnaire will be sent.[4] *Id.* at 99. Housing units that are less likely to have Internet access will

22   receive a full paper questionnaire in the first mailing, to allow them to respond immediately via mail.

23   *Id.* at 91, 95.

24   Each household will receive up to six mailings, if necessary. 2020 Census Operational Plan,

25   at 99. If no response has been received after the fifth mailing, a census enumerator will be assigned

26   to that address. *Id.* at 114. The enumerator will personally visit all units to which he or she is assigned

27

28   _____
     [4] In particularly hard-to-reach areas, census questionnaires will be hand delivered. 2020
     Census Operational Plan, at 102-05.

9

1   to verify that the address is occupied and to attempt to contact a household member to complete the

2   questionnaire. *Id.* If the enumerator is not able to complete the questionnaire, administrative records

3   will be used to identify vacant housing units and determine response data for occupied households

4   where the Census Bureau has high-quality administrative records. *Id.* at 22, 114, 117. If such records

5   do not exist, a final postcard encouraging self-response will be mailed, and all addresses still non-

6   responsive will be subject to up to six contact attempts, with eligibility to have the data obtained from

7   a proxy (such as a neighbor or landlord) after the third unsuccessful attempt. *Id.*

8        The Census Bureau also plans to mount extensive publicity and outreach campaigns, in which

9   it will work with units of local government, the media, and community-based organizations to

10   encourage people to respond to the census. 2020 Census Operational Plan, at 92-95. Through that

11   outreach the Census Bureau also regularly reiterates its commitment to preserving the confidentiality

12   of the data it collects as required by statute. *Id.* at 19; *see* 13 U.S.C. § 9.

13   **LEGAL STANDARDS**

14        To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff

15   must establish a court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504

16   U.S. 555, 561 (1992). Courts should "presume that [they] lack jurisdiction unless the contrary appears

17   affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotation marks and

18   citations omitted). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone*

19   *v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the

20   allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.*

21   When considering such a facial attack, the Court must "must accept as true the allegations of the

22   complaint."  *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).

23        To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

24   must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

25   *Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility

26   that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

27   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short

28   of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550

10

U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as … factual allegation[s]" are "disentitle[d] … to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). Although the Court generally may not rely on evidence outside the pleadings in deciding a motion under Rule 12(b)(6), it "may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). Further, "when faced with a motion to dismiss in the APA context, a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment," *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citing *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).

## **ARGUMENT**

In seeking to invalidate the Secretary's decision to reinstate a question about citizenship on the decennial census form, Plaintiffs ask the Court to second-guess the Secretary's judgment about how to exercise authority that has been delegated to him by the Constitution through Congress—a particularly troublesome request because the relief requested would intrude deeply into matters textually committed to the discretion of the political branches of government.

Plaintiffs' request is not justiciable for multiple reasons. As an initial matter, Plaintiffs have not established Article III standing. Their claimed injuries from loss of representation or funding are too speculative to confer standing. Furthermore, any injury that may occur would not be fairly traceable to the challenged decision; it would be attributable to the independent, unlawful actions of third parties. But even if Plaintiffs could clear the standing hurdle, the Constitution commits the "[m]anner" of conducting the census to Congress, and Congress has delegated that authority to the Secretary in such broad terms that there is no judicially discernible standard against which to measure the Secretary's exercise of his discretion. Plaintiffs' challenge to the Secretary's decision thus presents a nonjusticiable political question. Further, the decision at issue is committed to agency discretion by law and unreviewable under the APA. And lastly, Plaintiffs fail to state a claim under the Enumeration

Clause of the Constitution because the Secretary has wide discretion to control the content of the Census, and to determine the method to count every person. This case should be dismissed.

## I.     THIS CASE IS NOT JUSTICIABLE

### A.     Plaintiffs Lack Standing to Maintain this Action.

The doctrine of constitutional standing, an essential aspect of the Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Defs. of Wildlife*, 504 U.S. at 560-61. An organization such as BAJI suing on its own behalf must satisfy the same requirements for standing that apply to individuals. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Where a plaintiff does not establish each of the elements of standing, a court must dismiss that claim for lack of subject matter jurisdiction. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982) ("Those who do not possess Art[icle] III standing may not litigate as suitors in the courts of the United States.").

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing the required elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* But "[t]his is not to say that plaintiff may rely on a bare legal conclusion to assert injury-in-fact, or engage in an 'ingenious academic exercise in the conceivable' to explain how defendants' actions caused his injury." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011); *see also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ("it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' ... 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" (citation omitted)).

1    Plaintiffs have not met this burden here. Plaintiffs' allegations of injury are too speculative

2    and conclusory to satisfy the requirement that they present a concrete injury-in-fact. In addition,

3    Plaintiffs fail the causation prong of the standing inquiry because they have not established that their

4    alleged injuries can be fairly traced to government action rather than the independent actions of third

5    parties.

6    **1.   Plaintiffs' allegations of injury are too speculative and conclusory.**

7        The standing requirement of "injury in fact" requires an allegation that the plaintiff "has

8    sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action.

9    *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted). The injury or threat of injury

10   must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not

11   "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S.

12   488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560). An alleged future injury must be "*certainly*

13   *impending*"; "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568

14   U.S. 398, 409 (2013) (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

15       Plaintiff San Jose's claimed injuries—stemming from predictions about future non-responses

16   to census questions—are not "certainly impending" but rather are too speculative to demonstrate the

17   necessary concrete injury-in-fact. San Jose claims that the reinstatement of the citizenship question

18   on the decennial census (but not the presence of other questions touching on sex, Hispanic origin,

19   race, or relationship status that some respondents might prefer not to answer) "will result in

20   undercounting" in California and, in particular, in the City of San Jose.  Compl. ¶¶ 11, 85, 99.  This

21   anticipated undercount, San Jose avers, will threaten the city with loss of representation in the U.S.

22   House of Representatives and also with the loss of federal funding under a variety of federal

23   programs.  *Id.* ¶¶ 11, 85-87, 93, 101.

24       At the outset, San Jose's claims of injury are premised on its belief that the addition of the

25   citizenship question will ultimately cause a net *decrease* in the response rate (and ultimately in the

26   population count) for the 2020 Census, at least disproportionately in California and/or San Jose. *See,*

27   *e.g.,* Compl. ¶¶ 11, 85, 99. This assertion is entirely speculative, however. As Secretary Ross pointed

28   out, there is little "definitive, empirical" evidence regarding the effect of adding a citizenship question

13

1    to the decennial census. A.R. 1316; *see also id.* at 1315-18. Indeed, as the Secretary confirmed with the

2    Census Bureau, non-response rates for the citizenship question on the 2013-2016 ACS surveys were

3    comparable to non-response rates for other questions on those same surveys. *Id.* at 1315. Moreover,

4    households historically have failed to respond to the census and other surveys for a variety of reasons,

5    even when no citizenship question was included. *See id.* Plaintiffs do not provide any reason to

6    conclude that households who otherwise would respond in 2020 would now choose not to do so

7    because of the citizenship question and, critically, admit that, "[e]ven without the added burden of a

8    citizenship question," "households with immigrant laborers 'may not be willing to respond to the

9    census or able to provide data for their housemates.'"  Compl. ¶ 53. This aligns with information the

10   Secretary gathered through his stakeholder outreach process—that there are many individuals who

11   would decline to participate in the 2020 census regardless of whether it included a citizenship

12   question. Specifically, the Secretary stated that "no one provided evidence that there are residents

13   who would respond accurately to a decennial census that did not contain a citizenship question but

14   would not respond if it did." A.R. at 1317.

15          Thus, Plaintiffs merely speculate that the reinstatement of a citizenship question alone will

16   reduce self-response rates. Plaintiffs also ignore that the Census Bureau has extensive procedures in

17   place to address non-responses and to obtain accurate data for those households that decline to

18   respond. Indeed, the Census Bureau plans to increase outreach to address the potential for non-

19   responses (for whatever reason), and is investing in extensive procedures to meet any non-response

20   challenge. Consequently, it is entirely unknown (and unknowable) at present whether any initial

21   decrease in self-response rates will result in an undercount at the close of the 2020 Census, after the

22   Census Bureau has completed all its processes for enumerating.[5] Plaintiffs provide no support for

23   their conclusion that any nonresponse problem will be proportionately higher in San Jose than

24   elsewhere simply because of San Jose's "large immigrant population." Compl. ¶ 92. In sum, Plaintiffs'

25   allegations that the reinstatement of the citizenship question will ultimately produce an increase in

26          [5] This conclusion is confirmed by recent testimony by Dr. Ron Jarmin, performing the
27   nonexclusive duties of the Director of the Census Bureau, who stated that there is no "definitive
     answer" as to whether a citizenship question could produce a differential increase in the non-response
28   rate and could offer only that the impact in some communities "*might* be important." *See* Testimony,
     https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=395239, at 1:41:36, 1:44:20.

the undercount in San Jose is nothing more than speculation and hence insufficient to establish standing.

Second, even to the extent that there may be a chance of a greater undercount because of the citizenship question, San Jose's allegations that it faces a risk of losing representation or funding as a consequence of any such additional hypothetical undercount also are too speculative to satisfy Article III. San Jose alleges generally that an increased undercount (assuming one occurs) will impact the number of representatives that San Jose has in the House of Representatives (apportionment) and will also decrease its share of federal funds under a variety of federal programs. Compl. ¶¶ 85-87, 93, 101, 109. In neither case, however, are San Jose's allegations sufficiently concrete and nonspeculative. As to the allegations regarding apportionment, Plaintiffs merely asserts that "San Jose will be awarded fewer seats in the U.S. House of Representatives than its population dictates." *Id.* ¶¶ 93, 101, 109. But San Jose does not set forth facts explaining how it reached this conclusion or whether it has taken into account any potential undercount in *other* states that may result from the reinstatement of the citizenship question. Apportionment is a complex process that is determined by ranking states in order of priority for seats, based on their populations (multiplied by a multiplier). *See* 2 U.S.C. § 2a(a) (apportionment of existing number of Representatives to occur "by the method known as the method of equal proportions"); https://www.census.gov/population/apportionment/about/computing.html; *see generally U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992). Thus, each state's likelihood of gaining or losing seats is affected not only by its own total population but also by the population of *other* states, which may also be moving up or down in the priority listing. Here, San Jose does not allege that it will remain at risk of losing seats *even if potential undercounts in other states are taken into account*. Its allegations in this regard are therefore too conclusory to establish standing. *See Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (finding no standing to bring an apportionment claim when "none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (holding "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" where plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" which depends, *inter alia*, on "the

interplay of all the other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge method of apportionment "presents difficulty" because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York *but for every other State as well*" (emphasis added)); *cf. Glavin v. Clinton*, 19 F. Supp. 2d 543, 548 (E.D. Va. 1998) (finding that plaintiffs had alleged a sufficient injury related to appointment and redistricting resulting from the Commerce Department's plan regarding statistical adjustment where "they are able to calculate its effects by reference to the results of the Post–Enumeration Survey completed in 1992, which closely mirrors the methodology the Department will utilize as part of its plan for Census 2000"), *aff'd sub nom, Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999).

San Jose's allegations with regard to its claimed loss of funding (*see* Compl. ¶ 1, 11, 85-87) lack specificity as to which programs are at issue and hence are not concrete enough to support standing. It also is speculative that a decrease in the count (if any) will affect funding received by San Jose. San Jose fails to acknowledge that the allocation of funds under the cited programs is not generally directly proportional to population but is a function of multiple factors including, often, the populations of other states. *See* 49 U.S.C. § 5305(d)(1) (apportioning public transportation planning funds to states in the relation that the population of urbanized areas in each state bears to the total population of urbanized areas in all states); 20 U.S.C. § 6337 (education funding); 42 U.S.C. § 1301(a)(8)(A) (Medicaid formula measuring a state's per capita income against the national average per capita income). Given the complexity of these calculations and the interrelationships between all the states' funding, San Jose's allegations that it or its residents may face a loss of federal funds from an increased undercount are too speculative to satisfy Article III's requirements. *See Nat'l Law Ctr. on Homelessness & Poverty, v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (finding no standing where court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," noting that "if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities").[6]

---

[6] Defendants acknowledge that the court in *National Law Center on Homelessness and Poverty* was ruling on a motion for summary judgment and that a number of courts have found allegations of loss of funding to be sufficient to survive motions to dismiss. *See* 91 F.3d at 185 (citing cases). But most

16

1    Plaintiff BAJI's allegations are similarly lacking in specificity.  As an organization suing on its

2  own behalf, BAJI may establish injury by showing "both a diversion of its resources and a frustration

3  of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088

4  (9th Cir. 2010). In other words, BAJI must show it was faced with a choice between either suffering

5  some form of injury from the defendants' activities or diverting resources to counteract the problem.

6  *See id.* ("The organization could not avoid suffering one injury or the other, and therefore had

7  standing to sue.").  BAJI has not made such a showing here.  BAJI alleges that it has been forced to

8  divert resources to address the effects of the citizenship question because the reinstatement of the

9  question will "impair BAJI's ability to carry out its mission to advance equity and justice for minority

10  and immigrant communities through its advocacy work."  Compl. ¶ 12.  But BAJI does not explain

11  how the simple addition of a question to the census will impair its ability to carry out its advocacy

12  mission, or even how an increased undercount (if one occurs) will produce such an effect.  BAJI's

13  missions are the advancement of just immigration policies and a multiracial society, and the

14  furtherance of racial, social, and economic justice for all.  *Id.* ¶¶ 21-22. These missions are fairly far

15  afield from the content of a census questionnaire.  BAJI "cannot manufacture the injury by incurring

16  litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect

17  the organization at all."  *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088.

18    In sum, Plaintiffs do not put forward allegations that satisfy the Article III requirement that

19  a plaintiff's threatened injury must be concrete and "certainly impending" and must not rely on a

20  "highly attenuated chain of possibilities." *Clapper*, 568 U.S at 410.  However, even if Plaintiffs had

21  adequately pled a concrete, non-speculative injury regarding loss of funding and therefore had met

22  their pleading burden for Article III standing, that injury alone would not bring them within the zone

23  of interests protected by the Constitution's Enumeration Clause, which has no relation to, and was

24  not intended to, ensure that federal grant monies flow equally to all individuals. *See Lujan v. Nat'l*

25  *Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("[A] plaintiff must establish that the injury he complains of

26

27  of those cases involved post-census challenges to counting methodologies, and none of them
involved a challenge to the mere inclusion of a *question* on the census form. Defendants respectfully
28  contend that the layers of speculation required here to conclude that plaintiffs will be injured by the
addition of one question on the census form distinguishes this case from these prior decisions.

1    … falls within the 'zone of interests' sought to be protected by the statutory provision whose

2    violation forms the legal basis for his complaint."); *City of Los Angeles v. Cty. of Kern*, 581 F.3d 841, 846

3    (9th Cir. 2009) ("[A] party's complaint must fall within the zone of interests to be protected or

4    regulated by the statute or constitutional guarantee in question.") (internal citation omitted). For

5    prudential standing to exist to assert a claim under the Enumeration Clause, Plaintiffs would have to

6    adequately plead an injury related to apportionment. BAJI has not plead an apportionment injury

7    and, as shown above, San Jose's allegations in that regard are insufficient.

8    **2.   Plaintiffs' alleged injuries are not fairly traceable to the challenged action.**

9    To ensure that a plaintiff's allegations of harm are fairly attributable to the challenged action,

10   it is necessary to allege "a causal connection between the injury and the conduct complained of,"

11   such that the alleged injury is "fairly traceable to the challenged action of the defendant." *Defs. of*

12   *Wildlife*, 504 U.S. at 560 (internal alterations and citation omitted). Indeed, the Supreme Court

13   repeatedly has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on

14   speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. At bottom, "a federal

15   court [must] act only to redress injury that fairly can be traced to the challenged [conduct] of the

16   defendant, and not injury that results from the independent action of some third party not before the

17   court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Warth v. Seldin*, 422 U.S.

18   at 506 (finding standing lacking where alleged injury resulted from outside forces, "rather than . . .

19   respondents' assertedly illegal acts").

20   Even if Plaintiffs' allegations here were not inherently speculative, and even accepting all well-

21   pleaded facts as true, the allegations rely upon the intervening acts of third parties violating a clear

22   legal duty to participate in the decennial census. *See* 13 U.S.C. § 221. Specifically, Plaintiffs do not

23   claim that their threatened injuries—loss of representation and decreases in federal funding—will

24   result *directly* from the Secretary's decision to reinstate a citizenship question on the decennial form.

25   Rather, Plaintiffs posit that individuals in their communities who otherwise would comply with their

26   legal obligation to respond to the census will be deterred from participating in the entire survey

27   because of the reinstatement of a single question. But that unlawful failure to respond to a legitimate

28   question simply is not *fairly* traceable to the Secretary. *Salmon Spawning & Recovery All. v. Gutierrez*, 545

18

1   F.3d 1220, 1228 (9th Cir. 2008) (finding causation lacking because "[t]he excessive harvesting

2   permitted under the Treaty is not fairly traceable to the United States' failure to withdraw from the

3   Treaty").  Moreover, it likely would be impossible to isolate and quantify the number of individuals

4   who would have responded but for addition of the citizenship question, both because every census

5   undercounts the population to some degree, *see Wisconsin*, 517 U.S. at 6, and because there will be no

6   reliable method to exclude from the total undercount individuals who would refuse to respond

7   regardless of the citizenship question because of any number of other factors, such as a general

8   reluctance to provide information to the government or the current political climate.

9       **B.     Plaintiffs' Suit is Barred by the Political Question Doctrine.**

10          Even if Plaintiffs had standing, their claims still must be dismissed because they are barred

11  by the political question doctrine. The Constitution provides that Representatives "shall be

12  apportioned among the several States . . . according to their respective numbers," which requires

13  "counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. To calculate

14  the "number of persons in each State," *id.*, the Enumeration Clause requires an "actual Enumeration"

15  every 10 years "in such Manner as [Congress] shall by Law direct." *Id.* art. I, § 2, cl. 3. This Clause

16  says only two things about the census: (1) there must be a decennial, person-by-person headcount of

17  the population, and (2) the "[m]anner" of conducting the census is up to Congress. The former

18  command presents a judicially cognizable question that courts have routinely answered; the latter

19  presents a nonjusticiable political question reserved for Congress and, through Congress's delegation,

20  for the Secretary.

21          This case implicates only the latter question because it does not involve whom to count, how

22  to count them, or where to count them. Indeed, Plaintiffs themselves admit that the Secretary will

23  conduct a person-by-person headcount of population, *see* Compl. ¶¶ 7, 66; *Senate of the State of Cal. v.*

24  *Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992) (noting that the census "is generally expected to be a

25  head count rather than a mere statistical manipulation"), and Plaintiffs' theory of harm relies on the

26  Secretary putting procedures in place to reach every individual in the country, *see generally* Compl.

27  ¶¶ 71-96.  Thus, only the Enumeration Clause's "[m]anner" prong is at issue here, as this case

28

19

concerns simply the "[m]anner" by which the Secretary performs the information-gathering function of the census. Judicial review of that question is barred by the political question doctrine.

The political question doctrine is "primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The functional nature of this doctrine requires a case-by-case inquiry into "the precise facts and posture of the particular case." *Baker*, 369 U.S. at 217; *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1200 (9th Cir. 2017).

Six factors inform whether a case presents a nonjusticiable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see Republic of Marshall Islands*, 865 F.3d at 1200. While the first two factors are most important, *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (examining only the first two factors); *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (observing that the factors are "probably listed in descending order of both importance and certainty"), the presence of any one of these factors can render a case nonjusticiable. *Republic of Marshall Islands*, 865 F.3d at 1200 ("[T]o find a political question, we need only conclude that one factor is present, not all." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005))). This case presents not one, but at least three factors that render this controversy nonjusticiable.

1

### 1.   The content of the census questionnaire is textually committed to Congress.

While the Enumeration Clause requires an "actual Enumeration" every 10 years, it also states that the census will be conducted "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3. The plain text of this Clause commits the "[m]anner" of conducting the Census to the sound discretion of Congress, thus satisfying the first and most important political question factor.

By using the phrase "in such Manner" to modify the phrase "[t]he actual Enumeration shall be made," the Constitution makes clear that Congress fully controls the manner in which the decennial census is conducted. Dictionaries roughly contemporaneous with the ratification of the Constitution demonstrate that the "[m]anner" of conducting the Census necessarily includes control over the census questionnaire.[7] The census questionnaire is quite literally the "form" of the census,[8] and it is the "method" by which an "actual Enumeration" is conducted—*i.e.*, the census is completed by inhabitants filling out the census questionnaire. Plaintiffs' challenge to the content of census questions thus goes directly to the "way of performing or executing" the census itself, a determination that is constitutionally entrusted to Congress.

Accordingly, the remedy for an unwise census question lies not in the courts, but in Congress. It is Congress to whom the Constitution entrusts the "[m]anner" of conducting the census, and only Congress can overturn the Secretary's decision to reinstate the citizenship question. The Census Act even requires the Secretary to report census questions to Congress two years prior to the Census for exactly this reason: to allow the Legislative Branch adequate time to consider the propriety of these questions. 13 U.S.C. § 141(f)(2). That congressionally established process further underscores what the Constitution's text makes clear: that Congress, not the courts, determines the form of the census. This case should therefore be dismissed as a nonjusticiable political question.

---

[7] Noah Webster's 1828 American Dictionary of the English Language defines "manner" as "form; method; way of performing or executing," and Thomas Sheridan's 1796 Complete Dictionary of the English Language (6th ed.) defines "manner" as "form, method" or "habit, fashion." *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 346-47 (1999) (Scalia, J., concurring in part) (examining the text of the Enumeration Clause by referencing these dictionaries).

[8] *See Form*, Sheridan's Complete Dictionary of the English Language (6th ed. 1796) (defining "form" as "[t]he external appearance of any thing, shape; particular model or modification").

DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS – No. 3:18-cv-02279-RS

1

2 **2. The Court has no judicially manageable standards to make the necessarily policy-based determinations regarding the content of the census questionnaire.**

3      The second and third political question factors also preclude the Court's intervention because

4 there are no judicially manageable standards for making policy decisions regarding census procedures,

5 such as the content of the census questionnaire.

6      The text and history of the Enumeration Clause unequivocally demonstrate that decisions

7 regarding the information-gathering procedures of the census are fully committed to Congress's

8 discretion. The reason for this constitutional delegation is axiomatic: each census procedure—from

9 the types of advertising and the use of different languages to promote the census, to the number of

10 regional census offices and the particular systems used to tabulate responses, to the number of

11 enumerators to hire and the process for in-person enumeration visits—requires a careful balancing

12 of considerations such as cost, testing, training, effectiveness, timing, informational need, and

13 accuracy.[9]

14      These considerations are quintessentially policy choices outside the province of the judiciary.

15 In this case, for example, the Secretary balanced the need for citizenship information with the cost

16 and effectiveness of efforts to mitigate non-responses, the possibility of lower response rates, the

17 cost of increased non-response follow-up, and the completeness and cost of administrative records.

18 There are no judicially manageable standards for determining how to weigh these factors, which do

19 not implicate the affirmative constitutional command to count, rather than estimate, the population.

20 Once a court ventures beyond that affirmative constitutional command, there is no law to apply; it is

21 in the realm of cost/benefit analyses and value judgments constitutionally entrusted to

22 representatives of the people and executive officials confirmed by the same. *Japan Whaling*, 478 U.S.

23 at 230.

24      The census-related cases decided by the Supreme Court are distinguishable. All have

25 concerned calculation methodologies, not pre-count information-gathering functions or content

26 determinations. *See, e.g., Utah v. Evans*, 536 U.S. 452, 452 (2002) ("hot-deck imputation"—a non-

27 ──────────────────

28      [9] These considerations are present to some degree when the Secretary decides who, where, and how to count inhabitants of the United States, which is why the Supreme Court defers to the Secretary's judgment in calculation-methodology cases. *See Wisconsin*, 517 U.S. at 19.

22

sampling process which infers characteristics of individuals based upon the characteristics of neighbors, resulting in inclusion of individuals who otherwise would be excluded—did not violate the Enumeration Clause); *Dep't of Commerce*, 525 U.S. at 316 (holding that statistical sampling violates the Census Act, 13 U.S.C. § 195, and declining to reach the Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1 (holding that Secretary did not violate Enumeration Clause by failing to correct a census undercount with data from a post-enumeration survey); *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (confirming that the method used to count federal employees serving overseas did not violate Enumeration Clause). The Constitution supplies a simple judicial standard for determining the constitutionality of such practices—the Secretary must perform a person-by-person headcount, rather than an estimate, of population. There is nothing incomprehensible about that standard.[10]

In stark contrast, there is no judicially discernible standard for determining whether the Secretary's decision to reinstate the citizenship question on the 2020 Census is unconstitutional. This is a "policy choice[] and value determination[] constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch." *Japan Whaling*, 478 U.S. at 230. Thus, this case is barred from judicial consideration by the political question doctrine.

## C.   The Secretary's Decision Is Not Subject to Judicial Review Under the Administrative Procedure Act.

The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). Agency action is committed to agency discretion by law where "'statutes are drawn in such broad terms that in a given case there is no law to apply,'" *Citizens to Preserve Overton*

---

[10] The Court's apportionment cases are also inapposite. The Supreme Court has routinely decided cases involving congressional districting by States on the theory that the Constitution requires "equal representation for equal numbers of people." *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964). And the Court similarly has decided that challenges to the way in which Congress allocates congressional seats are justiciable. *See U.S. Dep't of Commerce v. Montana*, 503 U.S. at 459 (noting Congress is granted more deference than states in apportionment). But the nature of those controversies provided easily administrable standards: the number of people in each congressional district. *See Wesberry*, 376 U.S. at 2 (observing that one of Georgia's congressional districts contained more than twice as many residents as its other 10 districts); *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992) (noting that the Supreme Court's reapportionment cases "authorize the courts to intervene in the process of apportioning representatives," because "[e]quality of voting power is an administrable standard").

*Park, Inc., v. Volpe*, 401 U.S. 402, 410 (1971) (internal citation omitted). These decisions are not amenable to judicial review because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas. *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Ctr. for Policy Analysis on Trade & Health v. Office of the U.S. Trade Rep.*, 540 F.3d 940, 945 (9th Cir. 2008) (applying § 701(a)(2) to bar judicial review where relevant statutes "are devoid of standards suggesting what Congress intended"); *Abdelhamid v. Ilchert*, 774 F.2d 1447, 1449 (9th Cir. 1985) (confirming that determination whether §701(a)(2) applies must be made "in the context of a particular complaint"). This bar applies, moreover, even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs ("BLE")*, 482 U.S. 270, 283 (1987).

As the Supreme Court repeatedly has emphasized, application of § 701(a)(2)'s bar on judicial review "requires careful examination of the statute on which the claim of agency illegality is based," *Webster*, 486 U.S. at 600, along with whether the matter traditionally has been viewed as committed to agency discretion, *BLE*, 482 U.S. at 282, or whether the challenged action manifests a "general unsuitability" for judicial review because it involves a "complicated balancing of a number of factors," difficult judgments concerning the proper allocation of agency resources, or matters uniquely committed to another branch of government, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). These factors compel the conclusion here that the Secretary's decision to reinstate on the decennial census a request for citizenship data is—just like the conduct of the census generally—a classic example of a discretionary determination that is committed to the discretion of the Secretary of Commerce and thus not subject to judicial review.

In the first place, the applicable section of the Census Act, 13 U.S.C. § 141(a), contains no standards against which to assess the Secretary's exercise of discretion, particularly with regard to a matter as fundamental as the form and content of the questionnaire itself. Far from confining the Secretary's discretion, the statute delegates it in the broadest terms: "The Secretary shall … take a decennial census of population … in such form and content as he may determine," and, "[i]n connection with any such census, the Secretary is authorized to obtain such other census information as necessary." 13 U.S.C. § 141(a). This plain language confers discretion as broad as that granted by

24

the statute at issue in *Webster*, 486 U.S. at 600, which allowed the CIA Director to terminate an employee whenever he "shall *deem* such termination necessary or advisable in the interests of the United States." The language of § 141(a) contains similar "deeming" language—the census is to be conducted as the Secretary "may determine." And, just as the CIA Director's decision that terminating an employee is "necessary or advisable" is immune from judicial review, *id.*, so too is the Secretary's decision to collect information through the decennial census "as necessary" and "in such form and content as he may determine." 13 U.S.C. § 141(a). As in *Webster*, this statutory scheme embodies deference to the Secretary, and forecloses the application of any meaningful judicial review. *See Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792, 796-99 (9th Cir. 1996) (affirming dismissal for lack of subject-matter jurisdiction where agency action committed to agency discretion under § 701(a)(2)).

It is thus unsurprising that, even in cases challenging calculation methodologies under the Enumeration Clause, courts have construed the "conduct" of the census as generally unfit for judicial interference. As the Supreme Court has explained:

> The text of the Constitution vests *Congress* with virtually unlimited discretion in conducting the decennial "actual Enumeration," *see* Art. I, § 2, cl. 3, and notwithstanding the plethora of lawsuits that inevitably accompany each decennial census, there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides. … Through the Census Act, Congress has delegated its broad authority over the census to the Secretary.

*Wisconsin*, 517 U.S. at 19 (emphasis added). The Supreme Court's explication of the political branches' virtually unlimited discretion is highly probative of whether the Secretary's decisions exercising that discretion are subject to judicial review.[11]

Similar concerns led the Seventh Circuit to conclude that the absence of "guidelines for an accurate decennial census" from the Constitution, the Census Act, and the APA itself creates "the inference . . . that these enactments do not create justiciable rights." *Tucker*, 958 F.2d at 1417-18 ("So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a

---

[11] Although Justice Stevens's concurrence in *Franklin*, 505 U.S. at 816-20, concluded that the conduct of the census is not committed to agency discretion by law, this opinion failed to garner a majority of the Court and therefore lacks precedential value. It also predated *Wisconsin* and cannot be squared with the language in that unanimous opinion to the effect that Congress has delegated its virtually unlimited discretion to the Secretary.

1   case like this, that you might as well turn it over to a panel of statisticians and political scientists and

2   let them make the decision, for all that a court could do to add its rationality or fairness.") (internal

3   citations omitted); *see also id.* at 1419 (Ripple, J., concurring) ("[T]he plain language of the governing

4   statute makes it clear that the matter is committed to agency discretion."); *Senate of the State of Cal. v.*

5   *Mosbacher*, 968 F.2d 974, 977-79 (9th Cir. 1992) (finding "no law to apply" under the Constitution

6   and Census Act); *City of Phila. v. Klutznick*, 503 F. Supp. 663, 677 (E.D. Pa. 1980) (recognizing danger

7   of permitting local governments to manipulate conduct of census through judicial review).

8        Nor can Plaintiffs identify any meaningful standards derived from any other statute,

9   regulation, or historical practice against which to judge the Secretary's choice of content for the

10  census questionnaire, further demonstrating that there is no law to apply in this case. To the contrary,

11  the long history of decennial censuses since ratification of the Constitution establishes a tradition of

12  commitment of the *general* conduct of the census to the Secretary's discretion, subject to oversight

13  only by Congress. Furthermore, the longstanding historical practice of including citizenship, dating

14  back to 1820, *see supra*, Background § II, coupled with the fact that no challenge to the subject matter

15  of the census questions has ever been attempted (much less successfully maintained), strongly

16  countenances the conclusion that this matter traditionally has been viewed as discretionary.

17       Tellingly, Congress has reserved to itself the responsibility for oversight of the Secretary's

18  performance and correction of any perceived defects in the census without the intrusive and

19  fragmenting involvement of numerous—and often competing—lawsuits. Section 141(f) of the

20  Census Act requires the Secretary to submit to Congress "not later than 2 years before the appropriate

21  census date, a report containing the Secretary's determination of the questions proposed to be

22  included in such census." Plaintiffs' challenge here arises from the Secretary's decision to include in

23  that report a planned question regarding citizenship. Compl. ¶¶ 8, 30.

24       But the fact that the challenged final agency action challenged here takes the form of a

25  statutorily mandated report to Congress only underscores that Congress intended that *it* would

26  address any defects in those questions, not courts in suits brought against Executive Branch officers

27  after the report has been transmitted. By expressly reserving to itself the power to review the

28  Secretary's exercise of his discretion, Congress foreclosed the courts from second-guessing his

26

1  judgment as to the content of the census questionnaire. *Cf. Armstrong v. Bush*, 924 F.2d 282, 290-91

2  (D.C. Cir. 1991) (holding that Presidential Records Act impliedly precludes judicial review because it

3  "would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important

4  competing political and constitutional concerns"). In the end it is for Congress, not this Court, to

5  review the Secretary's exercise of his delegated discretion to determine which demographic questions

6  to ask in the census.

7  **II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ENUMERATION CLAUSE**

8

9          Even if this case were justiciable, Plaintiffs' Enumeration Clause claim should be dismissed.

10 The Constitution does not forbid the census from asking whether a person is a U.S. citizen. The

11 Constitution's reference to "actual Enumeration" is simple: population is to be determined through

12 a person-by-person headcount, rather than through estimates or conjecture. There is no allegation

13 that the Secretary is estimating rather than counting the population, nor any allegation that he has

14 failed to establish procedures for counting every resident of the United States. The Enumeration

15 Clause is therefore satisfied. Moreover, the Secretary's decision to reinstate a citizenship question is

16 consistent with historical practice dating back to the founding era. The census has collected

17 demographic information since its first iteration in 1790, and it asked citizenship-related questions as

18 early as 1820, and in many enumerations thereafter. The Secretary has complied fully with the

19 Constitution, and Plaintiffs' Enumeration Clause claim should be dismissed.[12]

20         Plaintiffs themselves recognize that the Secretary will conduct a headcount of population, *see*

21 Compl. ¶¶ 7, 66, and Plaintiffs' theory of harm relies on this fact, *see generally id.* ¶¶ 71-96. As described

22 above at Background § IV, the Census Bureau has comprehensive procedures in place for non-

23 response follow up and will attempt to contact nearly every person in the country, utilizing up to six

24 mailings and an in-person visit by an enumerator. 2020 Census Operational Plan, at 88-92, 112-21.

25 These operations in place for 2020 are more wide-ranging and more advanced than the operations

26 ───────────────
[12] Although Plaintiffs also assert a claim under the Apportionment Clause, Compl. ¶¶ 98-104,
27 this claim merely duplicates Plaintiffs' claim under the Enumeration Clause, which argues that
reinstatement of a citizenship question on the 2020 Census may have some impact on congressional
28 apportionment, *see* Compl. ¶¶ 91-96. This Apportionment Clause claim should therefore be dismissed
for the same reasons as Plaintiffs' Enumeration Clause claim.

DEFS.' MEM. IN SUPP. OF MOTION TO DISMISS – No. 3:18-cv-02279-RS

performed in any previous decennial census. Indeed, the Complaint contains no allegations that the Secretary has failed to establish procedures for counting every resident of the United States. *See Prieto v. Stans*, 321 F. Supp. 420, 423 (N.D. Cal. 1970) (denying a preliminary injunction challenging the content of the 1970 questionnaire where robust census procedures demonstrated no "convincing or even reasonable showing" of success on the merits). As the extensive 2020 census operations make clear, a complete and accurate person-by-person enumeration of the population is fully contemplated.

Furthermore, while the possibility of an undercount exists in every census, the Constitution does not require perfection. *See Utah*, 536 U.S. at 504 (Thomas, J., concurring in part and dissenting in part) (canvassing the history of census undercounts, including the first Census in 1790); *Wisconsin*, 517 U.S. at 6 ("Although each [of the 20 past censuses] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal."); *Gaffney v. Cummings,* 412 U.S. 735, 745 (1973) (census data "are inherently less than absolutely accurate"); *Senate of the State of Cal.*, 968 F.2d at 979 (describing the 1990 Census as "one of the best ever taken in this country" despite counting "approximately 98 percent of the population"); *City of Los Angeles v. Evans*, No. 01-cv-1671, 2001 WL 34125617, at *2 (C.D. Cal. Apr. 25, 2001) ("Like all of its predecessors, Census 2000 produced less than perfect results."). As long as the Secretary has established procedures for counting every resident of the United States—and there is no allegation he has not—any undercount is the constitutionally permissible result of attempting to enumerate upwards of 325 million people across 3.8 million square miles. *See* https://www.census.gov/popclock/.

Historical practice confirms that the Secretary's decision to reinstate a citizenship question on the 2020 Census cannot convert an otherwise constitutional headcount into a violation of the Enumeration Clause. *See Wisconsin*, 517 U.S. at 21 (noting the importance of historical practice when examining Enumeration Clause issues); *Franklin*, 505 U.S. at 803-06 (same). Despite the Constitution's reference only to "the whole number of persons in each State," *see* U.S. Const. amend. XIV, § 2, every census since 1790 has collected demographic information beyond the number and location of inhabitants. *Morales v. Daley*, 116 F. Supp. 2d 801, 809 (S.D. Tex. 2000), *aff'd*, 275 F.3d 45 (5th Cir. 2001). In fact, the First Census in 1790 asked about age, race, and sex. Census Act of 1790,

28

1  § 1, 1 Stat. 101 (1790). Further, a wide range of demographic questions were asked in subsequent

2  decennial censuses and will be asked in 2020.[13] As detailed above, Background § II, these broad

3  demographic questions included citizenship-related questions as early as 1820 and continuing (on the

4  long-form questionnaire) through the 2000 Census. Although the long-form questionnaire was

5  discontinued after the 2000 Census, citizenship questions have been asked on the ACS to a sample

6  of the population—about one in 38 households—every year since 2005. *See* ACS Questionnaire

7  Archive, https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html

8  (noting citizenship questions on every ACS questionnaire). Thus, citizenship questions have a long

9  and established history in the census.[14]

10      Plaintiffs' theory, taken to its logical conclusion, would mean that the Enumeration Clause

11  prohibits any demographic questions on the census questionnaire that may theoretically reduce

12  response rates and cause some entirely speculative undercount. Under that standard, the long-form

13  questionnaire would have been unconstitutional, given that the long-form questionnaire *replaced* the

14  short form for a subset of population in previous censuses and elicited a substantially lower response

15  rate. *See* Census Topic Report No. 11, Response Rates and Behavior Analysis, at 9,

16  https://www.census.gov/pred/www/rpts/TR11.pdf (concluding that mail-back response rate for

17  2010 long form was 9.6% lower than short form). And many of the questions on the current and

18  prior short forms—such as questions about sex, Hispanic origin, race, and relationship status—would

19  also be called into question, as some people may prefer not to answer those questions as well.

20      But courts have universally approved the historical practice of gathering demographic

21  information. *See, e.g., Legal Tender Cases*, 79 U.S. 457, 536 (1870) ("Congress has repeatedly directed

22  … not only an enumeration of persons but the collection of statistics respecting age, sex, and

[13] Throughout the Nineteenth Century, demographic information on the Census expanded to include questions such as the number of persons "engaged in agriculture, commerce, and manufactures," Census Act of 1820, 3 Stat. 548 (1820), the "[p]rofession, occupation, or trade of each person over 15 years of age," the "value of real estate owned," and whether persons over age 20 could read and write, Census Act of 1850, 9 Stat. 430 (1850).

[14] There is nothing inherently suspect about a country asking its residents for citizenship information. Indeed, the United Nations recommends that its member countries ask their residents for such information during censuses. United Nations, Dep't of Econ. & Social Affairs, Principles & Recommendations for Population & Housing Censuses, § 4.110, https://unstats.un.org/unsd/publication/seriesM/Series_M67rev3en.pdf.

1 production. Who questions the power to do this?"); *abrogated on other grounds, Tahoe-Sierra Pres. Council,*

2 *Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002); *Dep't of Commerce*, 525 U.S. at 341 (such

3 questions, the Court has recognized, serve as "a linchpin of the federal statistical system by collecting

4 data on the characteristics of individuals, households, and housing units throughout the country."

5 (quoting Nat'l Research Council, Counting People in the Information Age 1 (D. Steffey & N.

6 Bradburn eds. 1994))).[15] And the Supreme Court has consistently held that such longstanding

7 historical practice is powerful evidence of constitutionality. *See Nat'l Labor Relations Bd. v. Noel Canning*,

8 134 S. Ct. 2550, 2559 (2014). As noted above, all decennial censuses have included demographic

9 inquiries, and the 2020 questionnaire is no different.

10     Plaintiffs do not challenge any aspect of the 2020 census that might infringe the Enumeration

11 Clause's command to conduct a person-by-person headcount of the population. Instead, Plaintiffs'

12 challenge focuses entirely on the Secretary's information-gathering decision to reinstate a citizenship

13 question on the 2020 Census. This is as meritless as it is unprecedented. Even when the Supreme

14 Court struggled to distinguish between unconstitutional estimates and acceptable enumeration in

15 calculation-methodology cases,[16] it recognized that the Clause "vests Congress with virtually

16 unlimited discretion in conducting the decennial" census. *Wisconsin*, 517 U.S. at 19; *see Utah*, 536 U.S.

17 at 474 (explaining that the Clause's language indicates "the breadth of congressional methodological

18 authority, rather than its limitation"). And in light of this discretion, the Supreme Court has never

19 invalidated the Secretary's population count on Enumeration Clause grounds. *See Utah*, 536 U.S. at

20 474 (holding hot-deck imputation permissible under the Enumeration Clause); *Dep't of Commerce*, 525

21 U.S. at 344 (holding that statistical sampling violates the Census Act and declining to reach

22 Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1; *Franklin*, 505 U.S. at 788. This case presents no

23 reason to break from those precedents.

24

25     [15] On the rare occasions that census questions have been challenged as unconstitutional, lower
courts have dismissed such contentions out of hand. *United States v. Rickenbacker*, 309 F.2d 462, 463

26 (2d Cir. 1962) (Marshall, J.); *Morales*, 116 F. Supp. 2d at 814-15; *United States v. Little*, 321 F. Supp.
388, 392 (D. Del. 1971); *United States v. Moriarity*, 106 F. 886, 891 (S.D.N.Y. 1901).

27     [16] *See, e.g.*, *Utah*, 536 U.S. at 452 (four separate opinions regarding hot-deck imputation); *Dep't*

28 *of Commerce*, 525 U.S. at 316 (five separate opinions regarding statistical sampling); *Franklin*, 505 U.S.
at 788 (three separate opinions regarding how to count federal employees serving overseas).

1      The Secretary's decision to reinstate a citizenship question was well within his discretion and

2  is fully consistent with the Constitution's text, longstanding historical practice, and judicial precedent.

3  Plaintiffs' theory, by contrast, would deem virtually every census questionnaire in the Nation's history

4  unconstitutional. The choice between those options is clear: Plaintiffs' Enumeration Clause claim

5  should be dismissed.

6                                          **CONCLUSION**

7      For the foregoing reasons, the Court should grant Defendants' motion and dismiss this case.

8

9  Dated:  June 21, 2018                         Respectfully submitted,

10                                               CHAD A. READLER
                                                 Acting Assistant Attorney General
11
12                                               BRETT A. SHUMATE
                                                 Deputy Assistant Attorney General
13
                                                 JOHN R. GRIFFITHS
14                                               Director, Federal Programs Branch

15                                               CARLOTTA P. WELLS
                                                 Assistant Director, Federal Programs Branch
16
                                                  _/s/ Stephen Ehrlich_____
17                                               KATE BAILEY
                                                 STEPHEN EHRLICH
18                                               CAROL FEDERIGHI
                                                 Trial Attorneys
19                                               United States Department of Justice
                                                 Civil Division, Federal Programs Branch
20                                               20 Massachusetts Ave., NW
                                                 Washington, DC 20530
21                                               Tel.: (202) 305-9803
                                                 Fax: (202) 616-8470
22                                               Email: stephen.ehrlich@usdoj.gov

23                                               *Attorneys for Defendants*

24

25

26

27

28