MANATT, PHELPS & PHILLIPS, LLP
JOHN F. LIBBY (Bar No. CA 128207)
E-mail:  jlibby@manatt.com
JOHN W. MCGUINNESS (Bar No. CA 277322)
E-mail:  jmcguinness@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail:  epetrossian@manatt.com
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
KRISTEN CLARKE (*Pro Hac Vice* Application Forthcoming)
E-mail:  kclarke@lawyerscommittee.org
JON M. GREENBAUM (Bar No. CA 166733)
E-mail:  jgreenbaum@lawyerscommittee.org
EZRA D. ROSENBERG (Admitted *Pro Hac Vice*)
E-mail:  erosenberg@lawyerscommittee.org
DORIAN L. SPENCE (Admitted *Pro Hac Vice*)
E-mail:  dspence@lawyerscommittee.org
1401 New York Avenue NW, Suite 400
Washington, DC 20005
Telephone:  (202) 662-8600
Facsimile:  (202) 783-0857

*[Additional Counsel Listed on Signature Page]*

*Attorneys for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California nonprofit corporation,<br><br>        Plaintiffs,<br><br>    vs.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,<br><br>        Defendants. | Case No.  3:18-cv-2279-RS<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:    August 10, 2018<br>Time:    10:00 a.m.<br>Judge:  Honorable Richard Seeborg<br>Dept:    3 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

I. THE CONSTITUTIONAL, STATUTORY, AND REGULATORY FRAMEWORK GOVERNING THE CENSUS ........................................................ 3

II. THE BUREAU'S PREPARATIONS FOR THE 2020 CENSUS WITHOUT A CITIZENSHIP QUESTION ........................................................................................ 5

III. DEFENDANTS' PRETEXTUAL AND ARBITRARY JUSTIFICATIONS FOR ADDING A CITIZENSHIP QUESTION TO THE 2020 CENSUS ........................... 6

IV. THE ADDITION OF A CITIZENSHIP QUESTION AS A RESULT OF IMPROPER POLITICAL INFLUENCES AND AGENDAS ................................... 9

V. THE HARM TO PLAINTIFFS RESULTING FROM A CITIZENSHIP QUESTION THAT WILL CAUSE A DISPROPORTIONATE UNDERCOUNT ........ 10

ARGUMENT ........................................................................................................................ 12

I. LEGAL STANDARD .............................................................................................. 12

II. PLAINTIFFS HAVE STANDING TO CHALLENGE DEFENDANTS' INCLUSION OF A CITIZENSHIP QUESTION ON THE 2020 CENSUS ................... 13

A. Plaintiffs have plausibly alleged that adding a citizenship question to the 2020 Census will cause Plaintiffs multiple, non-speculative injuries ................ 14

1. Plaintiffs assert plausible facts — including Defendants' own findings — that establish that the addition of a citizenship question will result in a disproportionate undercount ............................. 14

2. Plaintiffs have plausibly alleged that a census undercount will directly harm Plaintiffs' representational, electoral, and federal-funding interests, and require an expenditure of time and resources ........ 16

B. Plaintiffs' injuries are fairly traceable to the challenged action because the two are linked together by a strong causal chain .................................. 19

III. PLAINTIFFS' CLAIMS DO NOT POSE A POLITICAL QUESTION EXEMPT FROM JUDICIAL REVIEW ................................................................................... 22

A. The Constitution does not textually commit the conduct of the census to the exclusive authority of Congress ......................................................... 23

B. The Supreme Court has set forth manageable standards that allow the Court to review Defendants' manner of conducting the census ........................... 25

IV. DEFENDANTS HAVE FAILED TO REBUT THE STRONG PRESUMPTION IN FAVOR OF JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT ................................................................................................. 27

V. PLAINTIFFS HAVE ADEQUATELY STATED A CLAIM UNDER THE ENUMERATION CLAUSE .................................................................................... 32

CONCLUSION .................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................................. 9

*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991) ......................................................................... 31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 13

*ASSE Int'l, Inc. v. Kerry*,
   803 F.3d 1059 (9th Cir. 2015) ................................................................... 28, 29

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
   501 U.S. 104 (1991) .......................................................................................... 7

*Attias v. Carefirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018) ..................... 20

*Backus v. General Mills, Inc.*,
   122 F. Supp. 3d 909 (N.D. Cal. 2015) ............................................................. 18

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................. 16, 22, 23, 25

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................. 19, 20

*Block v. Meese*,
   793 F.2d 1303 (D.C. Cir. 1986) ....................................................................... 21

*Borough of Bethel Park v. Stans*,
   319 F. Supp. 971 (W.D. Pa. 1970) ................................................................... 31

*Bowen v. Michigan Acad. of Family Physicians*,
   476 U.S. 667 (1986) ................................................................................. 27, 32

*Carey v. Kluznitz*,
   637 F.2d 834 (2d Cir. 1980) ............................................................................ 17

*Carey v. Population Services Intern.*,
   431 U.S. 678 (1977) ........................................................................................ 22

*Central Delta Water Agency v. United States*,
   306 F.3d 938 (9th Cir. 2002) ........................................................................... 15

*Chief Probation Officers of Cal. v. Shalala*,
   1996 WL 134890 (N.D. Cal. Mar. 14, 1996) .................................................... 18

*Circle Click Media LLC v. Regus Management Group LLC*,
   2015 WL 6638929 (N.D. Cal. Oct. 30, 2015) .................................................. 13

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

ii

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - NO. 3:18-CV-2279-RS**

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*City & County of San Francisco v. U.S. Dep't of Transp.*,
    796 F.3d 993 (9th Cir. 2015) ........................................................................28

4

*City of Camden v. Plotkin*,
    466 F. Supp. 44 (D.N.J. 1978) ......................................................................31

5

*City of Detroit v. Franklin*,
    4 F.3d 1367 (6th Cir. 1993) ...........................................................17, 31, 32

6

*City of Los Angeles v. U.S. Dep't of Commerce*,
    307 F.3d 859 (9th Cir. 2002) ...................................................................17, 28

7

*City of New York v. U.S. Dep't of Commerce*,
    34 F.3d 1114 (2d Cir. 1994) .........................................................................26

8

*City of New York v. U.S. Dep't of Commerce*,
    713 F. Supp. 48 (E.D.N.Y. 1989) .................................................................31

9

*City of Philadelphia v. Klutznick*,
    503 F. Supp. 663 (E.D. Pa. 1980) ...............................................................31

10

*City of Willacoochee v. Baldrige*,
    556 F. Supp. 551 (S.D. Ga. 1983) ....................................................24, 28, 31

11

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...............................................................................14, 21

12

*Corrie v. Caterpillar*,
    503 F.3d 974 (9th Cir. 2007) ........................................................................23

13

*Ctr. for Biological Diversity v. Mattis*,
    868 F.3d 803 (9th Cir. 2017) ........................................................................25

14

*Dep't of Commerce v. United States House of Representatives*,
    525 U.S. 316 (1999) ........................................................................15, 16, 17

15

*Dist. of Columbia v. U.S. Dep't of Commerce*,
    789 F. Supp. 1179 (D.D.C. 1992) ................................................................31

16

*Doe v. Holy*,
    557 F.3d 1066 (9th Cir. 2009) ......................................................................13

17

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ...............................................................................13, 34

18

*Fair Housing of Marin v. Combs*,
    285 F.3d 899 (9th Cir. 2002) ........................................................................13

19

*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) ..................................................3, 14, 20, 25

20

*Fish v. Kobach*,
    294 F. Supp. 3d 1154 (D. Kan. 2018) ..........................................................10

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - NO. 3:18-CV-2279-RS**

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Fish v. Kobach,*
840 F.3d 710 (10th Cir. 2016)....................................................................10

4

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) .............................................................................24, 32

5

6

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) .............................................................................13, 19

7

*Heckler v. Chaney,*
470 U.S. 821 (1985)....................................................................................32

8

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*
624 F.3d 1083 (9th Cir. 2010).....................................................................18

9

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ..........................................................................9

10

11

*Leonard v. Clark,*
12 F.3d 885 (9th Cir. 1993).........................................................................22

12

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ....................................................................................12

13

*Mack v. South Bay Beer Distribs.,*
798 F.2d 1279 (9th Cir. 1986)........................................................................7

14

15

*Matrixx Initiatives, Inc. v. Siracusano,*
563 U.S. 27 (2011) ......................................................................................13

16

*Mendia v. Garcia,*
768 F.3d 1009 (9th Cir. 2014).................................................................19, 20

17

18

*Morales v. Daley,*
116 F. Supp. 2d 801 (S.D. Tex. 2000) .........................................................34

19

*NAACP v. State of Ala. ex rel. Patterson,*
357 U.S. 449 (1958) ....................................................................................21

20

*Nixon v. United States,*
506 U.S. 224 (1993) ....................................................................................23

21

22

*Padula v. Webster,*
822 F.2d 97 (D.C. Cir. 1987) ......................................................................29

23

*Preminger v. Peake,*
552 F.3d 757 (9th Cir. 2008)........................................................................18

24

25

*Prieto v. Stans,*
321 F. Supp. 420 (N.D. Cal. 1970) ........................................................24, 34

26

*Quon v. Stans,*
309 F. Supp. 604 (N.D. Cal. 1970) ..............................................................24

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - NO. 3:18-CV-2279-RS**

## TABLE OF AUTHORITIES
### (continued)

Page

*Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ...................................................................28

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008)...............................................................................21

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
   638 F.3d 1163 (9th Cir. 2011)...............................................................................20

*Senate of State of Cal. v. Mosbacher*,
   968 F.2d 974 (9th Cir. 1992)..................................................................................31

*Sheikh v. U.S. Dep't of Homeland Sec.*,
   685 F. Supp. 2d 1076 (C.D. Cal. 2009)..................................................................30

*Spencer Enters., Inc. v. United States*,
   345 F.3d 683 (9th Cir. 2003)..................................................................................29

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)...................................................................................13, 14

*State of Texas v. Mosbacher*,
   783 F. Supp. 308 (S.D. Tex. 1992) ........................................................................24

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014)...........................................................................................14

*Tucker v. U.S. Dep't of Commerce*,
   958 F.2d 1411 (7th Cir. 1992)...............................................................................31

*U.S. Dep't of Commerce v. Montana*,
   503 U.S. 442 (1992) .........................................................................................22, 33

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
   11 F. Supp. 2d 76 (D.D.C. 1998) ...........................................................................3

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990).................................................................................................3

*United States v. Rickenbacker*,
   309 F.2d 462 (2d Cir. 1962).......................................................................33, 34, 35

*Utah v. Evans*,
   536 U.S. 452 (2002) .......................................................................................*passim*

*Utah v. Evans*,
   182 F. Supp. 2d 1165 (D. Utah 2001) ...................................................................34

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...............................................................................................19

*Webster v. Doe*,
   486 U.S. 592 (1988) ...............................................................................................32

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

v

## TABLE OF AUTHORITIES
### (continued)

Page

*West End Neighborhood Corp. v. Stans,*
    312 F. Supp. 1066 (D.D.C. 1970) ........................................................................................31

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) ......................................................................................... *passim*

*Young v. Klutznick,*
    497 F. Supp. 1318 (E.D. Mich. 1980), *rev'd on other grounds* 652 F.2d 617
    (6th Cir. 1981) ........................................................................................................23

*Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ...............................................................................................27

### STATUTES

5 U.S.C. § 701 ......................................................................................................28, 31

5 U.S.C. § 706 ..............................................................................................................30

13 U.S.C. §§ 1 *et seq.* ....................................................................................................4

13 U.S.C. § 2 ..........................................................................................................4, 28

13 U.S.C. § 4 ................................................................................................................4

13 U.S.C. § 9 ..............................................................................................................21

13 U.S.C. § 141 ..................................................................................................... *passim*

44 U.S.C. § 3501 ..........................................................................................................4

44 U.S.C. § 3504 ......................................................................................................4, 29

44 U.S.C. § 3506 ......................................................................................................4, 27

44 U.S.C. § 3516 ..........................................................................................................29

### OTHER AUTHORITIES

5 C.F.R. § 1320.18(c) ...................................................................................................4

Cal. Constit. art XXI, § 1 ..............................................................................................17

Census Act of 1790, 1 Stat. 101 (1790) ........................................................................35

Census Bureau, Statistical Quality Standards (rev. July 2013).................................5, 30

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 515, 114 Stat.
    2763 (2000) ........................................................................................................5, 29

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
    Appropriations Act of 1998, Pub. L. No. 105-119, 111 Stat. 2480-81 (1997) ..........4

Holmes, Steven A., *Report Says Census Bureau Helped Relocate Japanese*, N.Y.
    Times (Mar. 17, 2000), https://www.nytimes.com/2000/03/17/us/report-says-
    census-bureau-helped-relocate-japanese.html ......................................................21

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

# TABLE OF AUTHORITIES
## (continued)

**Page**

Metzger, Gillian E. & Kevin M. Stack, *Internal Administrative Law*, 115 Mich. L. Rev. 1239, 1283 (2017).................................................................................29

Office of Mgmt. and Budget, Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71609 (Dec. 2, 2014) ................................................................5

Office of Mgmt. and Budget, Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys, 71 Fed. Reg. 55, 522, §§ 1.3, 1.4, 2.3.1 (Sept. 22, 2006).......................................................................................5, 30

*Senate Appropriations Committee, Commerce, Justice, Science and Related Agencies Subcommittee Hearing on the F.Y. 2019 Funding Request for the Commerce Department*, 115th Cong. 26 (May 10, 2018)..................................15, 31

Trump, Donald J. (@realDonaldTrump), Twitter (Jun 24, 2018, 8:02 AM), https://twitter.com/realDonaldTrump.........................................................15

U.S. Const. Art. I, § 2, cl. 3, Am. XIV § 2......................................... *passim*

U.S. Const. Art. I, § 3 cl. 6........................................................................23

## RULES

Fed. R. Civ. P. 8 .........................................................................................12

Fed. R. Civ. P. 12 ..................................................................................12, 13

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - NO. 3:18-CV-2279-RS**

## **INTRODUCTION**

In early 2019, the U.S. Census Bureau will begin the irreversible process of publishing and distributing the 2020 Decennial Census forms.  As was the case with every previous decennial census, the purpose of the 2020 Census will be to conduct a headcount of all persons residing in the United States, regardless of citizenship status.  Because census data is used for federal and state legislative apportionment and funding allocations (among other uses), the data collected during the 2020 Census will impact federal, state, and local policy for years to come.

In March 2018, U.S. Secretary of Commerce Wilbur Ross announced that he had decided to add a citizenship question to the 2020 Census, marking the first time in 70 years that every Census respondent will be required to disclose their citizenship status.[1]  Ross initially claimed that he made his decision in response to a request by the U.S. Department of Justice ("DOJ") for assistance with enforcing Section 2 of the Voting Rights Act to prevent voter discrimination.  But in truth, and as Ross later expressly admitted, he was the one who contacted the DOJ in the first instance to solicit the DOJ's request.  The evidence gathered to date confirms that Ross did so to further the Trump Administration's anti-immigration political agenda — not for any legitimate purpose.

Ross's decision to add the citizenship question was arbitrary, capricious, and unconstitutional.  Ross decided to add the question against the recommendations of Census Bureau staff and independent experts who agreed that including the question would reduce response rates and increase the costs of the 2020 Census.  Further, Defendants failed to adequately test the potential effects of adding a citizenship question, particularly on the quality of census results and the Census Bureau's ability to conduct an actual enumeration of the United States population.  Adding a citizenship question to the 2020 Census will inevitably result in disproportionate undercounts of minority communities — which is precisely the intended result. Because Ross's decision was a politically motivated attempt to exclude large swaths of minority

---

[1] The defendants in this action are Ross, in his official capacity as Secretary of the U.S. Department of Commerce; the U.S. Department of Commerce; Ron Jarmin, in his official capacity as Acting Director of the U.S. Census Bureau; and the U.S. Census Bureau.  Plaintiffs will refer herein to the foregoing individuals and agencies collectively as the "Defendants."

1  residents from the 2020 Census, his decision violates both the U.S. Constitution and the

2  Administrative Procedure Act and gives rise to actionable claims for which the plaintiffs in this

3  action, the City of San Jose and the Black Alliance for Just Immigration ("BAJI") (collectively,

4  "Plaintiffs"), are entitled to judicial relief.

5        Plaintiffs bring this action to prevent the irreparable harm that will result from

6  Defendants' decision to require all 2020 Census respondents to disclose their citizenship status at

7  a time when immigrants, legal permanent residents, and undocumented residents alike are

8  justifiably concerned about their status and security in this country.  As numerous commentators

9  and experts have explained, and as the Census Bureau's own experts have opined, substantial

10  numbers of immigrants and other members of minority communities are likely to forego

11  responding to the 2020 Census to avoid risking disclosure of their citizenship status or the status

12  of other members of their households.  This will result in an undercount of the U.S. population in

13  locales with sizeable minority communities, such as the City of San Jose.  And in turn, the

14  undercount will have dire consequences for the members of those communities, such as those that

15  BAJI serves.

16        In their complaint, Plaintiffs specifically and plausibly allege that Defendants' decision to

17  add a citizenship question to the 2020 Census at the Eleventh Hour, in disregard of decades of

18  practice and expert consensus, directly interferes with their constitutional and statutory duty to

19  conduct an "actual Enumeration" of the population.  As explained below, Plaintiffs have standing

20  to bring this action based on their allegations that Defendants' conduct has caused them, and will

21  continue to cause them, concrete injuries-in-fact.  Those injuries-in-fact are fairly traceable to

22  Defendants' decision to add a citizenship question to the 2020 Census.  Moreover, Plaintiffs

23  allege, and the administrative record produced to date confirms, that Ross decided to add the

24  citizenship question to the 2020 Census to oblige political influences and promote the Trump

25  Administration's anti-immigrant agenda — not, as he claims, to help the DOJ combat voter

26  discrimination.  And regardless of Defendants' motivations, they did not conduct any testing of

27  the citizenship question before submitting the new census questionnaire to Congress for approval

28  on the eve of the statutory deadline.  Whether driven by willful incompetence or improper

1   political motivation, Defendants' arbitrary and capricious decision must be enjoined.

2           If accepted at face value, Defendants' arguments would insulate their decisions

3   concerning the Census from any judicial review.  But "federal courts routinely resolve census

4   disputes." *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 95

5   (D.D.C. 1998) (denying motion to dismiss complaint challenging use of statistical sampling to

6   supplement Census head count).  This case should be no different.  The Administrative Procedure

7   Act authorizes courts to set aside agency action, findings, and conclusions found to be "arbitrary,

8   capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

9   Since the Supreme Court's historic decision in *Marbury v. Madison*, 5 U.S. 137 (1803), district

10  courts have had the power and authority to strike down laws, statutes, and executive actions that

11  contravene the U.S. Constitution.  *United States v. Munoz-Flores*, 495 U.S. 385, 396–97 (1990)

12  ("None of the Constitution's commands explicitly sets out a remedy for its violation.

13  Nevertheless, the principle that the courts will strike down a law when Congress has passed it in

14  violation of such a command has been well settled for almost two centuries.").  Plaintiffs'

15  challenge to Defendants' inclusion of a citizenship question falls squarely within the purview and

16  jurisdiction of this Court.

17          With their motion, Defendants invite the Court to relinquish its oversight of Defendants'

18  administration of their statutory and constitutional duties in connection with the 2020 Census.

19  The Court should decline the invitation and deny Defendants' motion in its entirety.

20                          **STATEMENT OF FACTS**

21  **I.      THE CONSTITUTIONAL, STATUTORY, AND REGULATORY FRAMEWORK**

22          **GOVERNING THE CENSUS**

23          The U.S. Constitution mandates an "actual Enumeration" of the population once every

24  decade to count "the whole number of persons" in each state.  U.S. Const. Art. I, § 2, cl. 3, and

25  Amend. XIV, § 2.  All persons in each state, regardless of citizenship status, must be counted.

26  Compl. ¶ 2; *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 567

27  (D.D.C. 1980).  The Constitution requires an "actual Enumeration" of the population for the

28  purpose of apportioning congressional seats among the states based on their respective

1    populations.  Art. I, § 2, cl. 3.  Additionally, Congress, states, and municipalities such as the City

2    of San Jose rely on decennial census data for many purposes, including federal, state, and local

3    legislative districting.  Compl. ¶ 32.  Census data also impacts allocation to states and localities of

4    critical funding for federal benefits and infrastructure programs.  *Id*. ¶¶ 33, 85.

5         Under the Census Act, 13 U.S.C. §§ 1 *et seq.* (the "Act"), Congress delegated its

6    constitutional duty to conduct the decennial census to the Secretary of Commerce ("Secretary")

7    and the U.S. Census Bureau ("Bureau"), a federal statistical agency within the Department of

8    Commerce ("Commerce").  Compl. ¶ 29; 13 U.S.C. §§ 2, 4, 141(a).  The Act expressly limits the

9    Secretary's discretion in conducting the census, declaring it "essential" to obtain a population

10   count that is "as accurate as possible, consistent with the Constitution and laws of the United

11   States."  Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies

12   Appropriations Act of 1998, Pub. L. No. 105-119, 111 Stat. 2480-81 (1997) (codified at 13

13   U.S.C. § 141 annot.).  The Act also imposes strict statutory deadlines for developing and

14   approving the content of the census questionnaire.  Under § 141(f), the Secretary must submit to

15   Congress a final list of subjects to be covered in the census questionnaire at least three years

16   before the census date, and must submit a final list of specific questions two years before the

17   census date.  Compl. ¶ 30; *see* 13 U.S.C. §§ 141(f)(1)–(2).  Following the submission of each of

18   these reports, the Secretary has limited discretion to alter their content and may do so only if

19   "new circumstances exist which necessitate that the subjects, types of information, or questions

20   contained in reports so submitted be modified."  Compl. ¶ 30; 13 U.S.C. § 141(f)(3).

21        Other federal laws govern the specific manner in which the census must be developed and

22   conducted.  Congress passed the Paperwork Reduction Act of 1995 ("PRA") to ensure the

23   "integrity, quality, and utility of the Federal statistical system."  44 U.S.C. § 3501(9).  To regulate

24   the activities of the Bureau, the PRA directs the Office of Management and Budget ("OMB") to

25   issue "[g]overnment-wide policies, principles, standards, and guidelines" governing "statistical

26   collection procedures and methods," which the Bureau is required to follow.  *See id.* §§

27   3504(e)(3)(A), 3506(e)(4); 5 C.F.R. § 1320.18(c).  Moreover, the Bureau must "ensure the

28   relevance, accuracy, timeliness, integrity, and objectivity of [the] information collected."  44

1   U.S.C. § 3506(e)(1).

2          The Bureau develops and tests the content, specific language, order, and layout of census

3   questionnaires through a process consistent with prior Bureau practice, and as required by the

4   Information Quality Act.  Compl. ¶ 39; Consolidated Appropriations Act, 2001, Pub. L. No. 106-

5   554, § 515, 114 Stat. 2763 (2000).  Further, the OMB has issued government-wide Statistical

6   Policy Directives defining the standards that agencies such as the Bureau must follow when

7   developing survey content.  Under those Directives, the Bureau must "function in an environment

8   that is clearly separate and autonomous from the other administrative, regulatory, law

9   enforcement, or policy-making activities within their respective Departments," design surveys "to

10  achieve the highest practical rates of response, commensurate with the importance of survey

11  uses," and test survey components to administer surveys in a way that "maximiz[es] data quality"

12  while "minimizing respondent burden and cost."  *See* Compl. ¶ 40; Office of Mgmt. and Budget,

13  Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies

14  and Recognized Statistical Units, 79 Fed. Reg. 71609 (Dec. 2, 2014); Office of Mgmt. and

15  Budget, Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys, 71

16  Fed. Reg. 55, 522, §§ 1.3, 1.4, 2.3.1 (Sept. 22, 2006).

17         Finally, the Bureau itself has issued Statistical Quality Standards that "apply to all

18  information products released by the Bureau and the activities that generate those products" —

19  including the decennial census.  Compl. ¶ 39; Census Bureau, Statistical Quality Standards at ii,

20  10, 18, 20 (rev. July 2013).  These standards impose rigorous pretesting requirements to identify

21  problems and test and refine data collection instruments before implementation.  *Id.*

22  **II.     THE BUREAU'S PREPARATIONS FOR THE 2020 CENSUS WITHOUT A**

23          **CITIZENSHIP QUESTION**

24         The Bureau has been preparing for the 2020 Census for several years.  Compl. ¶ 38.

25  Before each decennial census, the Bureau conducts tests regarding the content, specific language,

26  order, and layout of the census questionnaire to improve the accuracy of the enumeration.  *Id.*

27  ¶ 39.  The development process and evaluation of any changes to the census questionnaire takes

28  several years to complete.  *Id.* ¶ 41.  The 2020 Census has been designed and developed in an

1   iterative fashion, incorporating results from various tests conducted over the past decade.  *Id.*

2   ¶ 38.  No tests have included a citizenship question or gathered data on the impact of a citizenship

3   question in the context of the 2020 Census questionnaire.  *Id.* ¶¶ 43, 47–48.

4       In March 2017, Defendants submitted to Congress a report of the proposed subjects

5   planned for the 2020 Census, as required by 13 U.S.C. § 141(f)(1).  Compl. ¶¶ 5, 37.  The

6   subjects were unchanged from the 2010 Census.  *Id.* ¶ 37.  Citizenship was not among the

7   subjects that Defendants had identified for the 2020 Census questionnaire.  *Id.*

8       The 2018 final "dress rehearsal" for the 2020 Census, the End-to-End Census Test, was

9   already underway by the time Ross decided to add the citizenship question in March 2018.  The

10  End-to-End Census Test did not include a citizenship question.  Compl. ¶ 47.  As a result, none of

11  the major tests for the 2020 Census have assessed the content, language, layout, or order of the

12  citizenship question on the questionnaire, or the impact that the question regarding citizenship

13  status will have on response rates and accuracy.  *Id.*

14  **III.**   **DEFENDANTS' PRETEXTUAL AND ARBITRARY JUSTIFICATIONS FOR**

15      **ADDING A CITIZENSHIP QUESTION TO THE 2020 CENSUS**

16      Nearly nine months after the subjects for the 2020 Census had been identified, on

17  December 12, 2017, the DOJ sent a letter to the Bureau requesting the inclusion of a citizenship

18  question on the 2020 Census.  Compl. ¶¶ 6, 61.  The DOJ claimed that data from a citizenship

19  question would be appropriate for use in enforcing Section 2 of the Voting Rights Act ("VRA").

20  Compl. ¶¶ 6, Ex. 1.  The DOJ did not address whether or how a citizenship question would

21  impact the Bureau's duty to capture the "actual Enumeration" of the U.S. population.  *Id.*

22      On March 26, 2018, Ross issued a memorandum directing the Bureau to place the

23  citizenship question on the 2020 Census.  Compl. ¶ 62, Ex. 2.  Ross's memorandum stated that

24  his rationale for including the citizenship question is that "[k]nowing how many people reside in

25  the community and how many of those people are citizens, in combination with other

26  information, provides the statistical information that helps the government enforce Section 2 of

27  the Voting Rights Act and its protections against discrimination in voting."  Compl. ¶ 63, Ex. 2.

28  Thus, unless the Court grants the relief requested in this action, the census will ask every member

of every household in the United States whether each person residing in that household is a citizen of the United States.  Compl. ¶ 9.  The question also will ask whether each citizen was naturalized, born "in the United States," born "in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas," or "born abroad to U.S. citizen parent or parents."  *Id*.

In the March 2018 memorandum, Ross claimed that he had taken a "hard look" at the DOJ's request (which Ross later disclosed came at Ross's behest[2]), had considered all relevant facts and data, and had concluded that the "value" of a citizenship question was "of greater importance than any adverse effect that may result."  Compl., Ex. 2 at 1, 7.  He determined that the best option to address the DOJ's request was to add the ACS citizenship question to the decennial census.  Compl. ¶ 64.  Ross speculated that the citizenship question may not cause an undercount because "there is no information available to determine the number of people who would in fact not respond because of a citizenship question being added, and no one has identified any mechanism for making such a determination."  Compl., Ex. 2 at 5.  Further, he illogically concluded that "the need for accurate citizenship data" was worth the risk of an undercount.  *Id*.

Ross further asserted in his March 2018 memorandum that the citizenship question has been "well tested."  Compl., Ex. 2.  Yet at the same time, he readily admitted that "no empirical data existed on the impact of a citizenship question on responses," and that Commerce was "not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness."  *Id*. at 3, 7.  Because Defendants' consideration of the citizenship question came so late in the census planning process, none of the census content tests or preparations for the 2020 Census contemplated inclusion of a citizenship question.  Compl. ¶ 47.

Although Defendants refer to the citizenship question as a "reinstatement," *see* Defs.' Mem. at 5–9, not since the 1950 Census have all U.S. residents been required to report their citizenship status as part of the decennial enumeration.  Compl. ¶¶ 5, 34–35.  The decennial censuses between 1960 and 2000 collected citizenship information only from a limited subset of

---

[2] *See* Supplement to Administrative Record (Docket No. 52-1) at AR001321.  The Court may take judicial notice of the Administrative Record in ruling on Defendants' motion to dismiss.  *See Mack v. South Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. 104 (1991).

the U.S. population.  *Id.*  And since 2005, the Bureau has collected citizenship information solely through the American Community Survey ("ACS").[3]  *Id.* ¶ 36.  The Bureau and numerous past Census Directors from both Republican and Democratic administrations have opposed adding a citizenship question to the person-by-person census count, warning that such an inquiry would suppress response rates and undermine the accuracy of the census.  *Id.* ¶¶ 71, 80–84.

Plaintiffs allege several facts that further underscore the irrational, arbitrary, and capricious nature of the Secretary's decision to include a citizenship question on the 2020 Census.  *First*, in the over 50 years since the VRA's enactment, the Bureau has never asked about citizenship when conducting its 100% enumeration of the population.  Compl. ¶ 67.  Courts regularly rely on ACS data rather than decennial census data to calculate "citizen voting age population" in voting rights litigation.  *Id.* ¶ 68.  And in any event, data collected through the decennial census would not provide a "reliable calculation" of "citizen voting age population" because citizenship information collected decennially will quickly become outdated and less reliable over the course of the subsequent decade.  *Id.* ¶ 69.

*Second*, including the citizenship question on the decennial census actually undermines the VRA's purpose of ensuring fair representation for all communities, because it will likely deter responses from non-citizens and their relatives — many of whom are members of the minority populations that Section 2 of the VRA is designed to protect.  Compl. ¶ 63.

*Third*, the detail requested by the citizenship question, concerning whether respondents were citizens at birth or naturalized, or where citizens were born, can serve no purpose whatsoever in the enforcement of Section 2 of the VRA.  Compl. ¶ 63.  Section 2 of the VRA prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in a language minority group.  A citizen, whether that person is a citizen at birth or naturalized, is entitled to protection against discrimination in voting.

*Fourth*, Defendants have failed to identify and explain any "new circumstances" that

---

[3] Between 1960 and 2000, citizenship was asked on the long-form questionnaire sent once every decade to approximately 1 in 6 households.  The ACS is a separate survey that the Bureau administers to a sample of the U.S. population on a monthly basis.  Compl. ¶ 36.  Ross decided to import the multi-part citizenship question designed for use in the ACS directly into the 2020 Census questionnaire — without any changes and without any separate pre-testing.

1    "necessitated" this modification to the subjects that Defendants submitted to Congress in 2017, as

2    required by statute under 13 U.S.C. § 141(f)(3).  Compl. ¶ 65.

3          Accordingly, including a question regarding citizenship that will lead to a systematic

4    undercount of minority populations across the United States will undermine, not advance, the

5    goals of the VRA by impairing fair representation of those groups and the states in which they

6    live.  Ross' purported reasoning for adding the citizenship question is a pretext for other unstated

7    and ulterior purposes.  Compl. ¶ 70.  Plaintiffs contend that Ross asked the DOJ to provide a

8    justification for adding the citizenship question.

9    **IV.    THE ADDITION OF A CITIZENSHIP QUESTION AS A RESULT OF**

10   **IMPROPER POLITICAL INFLUENCES AND AGENDAS**

11         While the Bureau has spent most of the past decade preparing for a 2020 Census without a

12   citizenship question, the Trump Administration has been intent on using the census to advance its

13   anti-immigration political agenda.  *See* Compl. ¶¶ 72–81.  It is only now, after the Trump

14   Administration has declared an all-out war on immigrant populations, that the citizenship

15   question has been added to the 2020 Census.  This is no coincidence.

16         Indeed, the partial Administrative Record that Defendants have produced to date (Docket

17   Nos. 38, 52) (the "AR") confirms that (1) the White House demanded the inclusion of a

18   citizenship question in the 2020 Census to reduce the representation of non-citizens in Congress

19   and for other illicit purposes; (2) Ross obediently complied with the White House's demand; and

20   (3) Ross has now changed his explanation as to how the decision to add the citizenship question

21   came about.  Specifically, in July 2017, Kris Kobach, Kansas's Secretary of State and then-

22   Deputy Chair of the Presidential Commission on Election Integrity — also known as the "Voter

23   Fraud Commission" — contacted Ross "at the direction of Steve Bannon," the White House's

24   Chief Strategist at the time.[4]  AR000763.  In a July 2017 e-mail to Ross, Kobach complained that

25   ───────────────────
     [4] Kobach first came to national attention by authoring Arizona's "Show Me Your Papers" law,
26   most of which was struck down in *Arizona v. United States*, 567 U.S. 387 (2012).  Later, in
     *League of Women Voters of United States v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016), the D.C.
27   Circuit preliminarily enjoined action taken by the Executive Director of the Election Assistance
     Commission, at Kobach's request, to change the federal voter registration form to require
     documentary proof of citizenship.  And in Kansas, Kobach required documentary proof of
28   citizenship from those registering to vote for federal elections until the Tenth Circuit enjoined

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

9

1   the absence of a citizenship question on the Census questionnaire "leads to the problem that aliens

2   who do not 'reside' in the United States are still counted for congressional apportionment

3   purposes." AR000764. Kobach noted that it was "essential" to add a citizenship question to the

4   2020 Census to combat this purported "problem." *Id*. Kobach proposed the precise citizenship

5   question language that Ross subsequently added to the 2020 Census form. *Id*.

6   In his June 2018 "supplement" to the AR, Ross contradicted his prior explanation and

7   confirmed that the DOJ did not initiate the request to add a citizenship question to the 2020

8   Census. To the contrary, after conferring with "senior Trump Administration officials"

9   (presumably, Kobach, Bannon and others), it was ***Ross*** who approached the DOJ to seek its

10   support for a citizenship question. AR001321. Although DOJ eventually requested adding the

11   citizenship question, it did so only at Ross's prompting, which itself was done at the White

12   House's behest.

13   On March 26, 2018, Ross issued a memorandum confirming the addition of a citizenship

14   question to the 2020 Census, setting aside decades of practice regarding the decennial census,

15   defying the advice of his own and other experts, and using the 2020 Census to promote the anti-

16   immigrant and voter suppression agenda of the Trump Administration. Compl. ¶ 62, Ex. 2.

17   ## V.   THE HARM TO PLAINTIFFS RESULTING FROM A CITIZENSHIP QUESTION

18   ## THAT WILL CAUSE A DISPROPORTIONATE UNDERCOUNT

19   As alleged in the Complaint, there is compelling evidence — including studies performed

20   by the Bureau itself and findings cited in Ross's March 2018 memorandum[5] — that the inclusion

21   of a citizenship question on the 2020 Census will result in a disproportionate undercount of

22   certain demographic groups, including immigrants, minorities, and noncitizens. Compl. ¶ 72.

23   Since at least 1980, the Bureau has recognized that, because of immigrants' fear of how

24

25   him from doing so. *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016); *see also Fish v. Kobach*, 294 F. Supp. 3d 1154, 1168 (D. Kan. 2018) (finding that Kobach disobeyed a preliminary

26   injunction order by failing to ensure that voter registration applicants became fully registered and willfully failed to make sure county election officials were properly trained).

27   [5] Ross's March 2018 memorandum notes that the drop-off in response rates between the long

28   form questionnaire (which asked about citizenship) and the short form questionnaire (which did not) was 3.3% greater for noncitizens than for citizens in the 2000 Census. Compl., Ex. 2 at 4.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - NO. 3:18-CV-2279-RS**

1   information disclosed on the Census may be used against them, "any effort to ascertain

2   citizenship will inevitably jeopardize the overall accuracy of the population count."  Compl. ¶ 82.

3   The Bureau's own experts believe that adding the citizenship question may threaten the accuracy

4   and confidentiality of enumeration, jeopardize the Bureau's nonpartisan reputation, and make the

5   2020 Census more expensive to conduct.  This is especially troubling in light of the Trump

6   Administration's proposed funding cuts, which will adversely affect the 2020 Census and thus

7   exacerbate the citizenship question's effect on the accuracy of the census.  *Id*. ¶¶ 83–84.

8          Both before and after requesting and receiving the DOJ's December 2017 letter, Ross met

9   with a number of elected officials, stakeholders, interest groups, and experts regarding the

10   addition of the citizenship question.  The AR reveals that many experts rejected the idea of adding

11   the citizenship question.  *See* AR001257 (finding that the Bureau could provide the DOJ the

12   requested data through statistical sampling); AR001259 (Former Deputy Director of the Bureau

13   told Ross that the citizenship question would diminish response rates, decrease quality of

14   responses, and increase costs); and AR001276 (data firm Nielsen cautioned against adding a

15   citizenship question).  Chief Scientist and Associate Director of Research and Methodology at the

16   Bureau, Dr. John M. Abowd, conducted three distinct analyses which showed that adding a

17   citizenship question will have a negative effect on the accuracy and quality of the 2020 Census

18   and likely will cause a significant decline in response rates from noncitizen households.

19   AR001277, AR001279–82.  Dr. Abowd recommended alternative methods to satisfy the DOJ's

20   concerns.  AR001283.  However, Ross mischaracterized and substantially ignored Dr. Abowd's

21   findings in his March 2018 Memorandum.  Compl., Ex. 2.

22          Additionally, a disproportionate undercount in the 2020 Census will cause significant

23   harm to cities such as San Jose, which has a large immigrant population, and to residents who live

24   there.  Compl. ¶¶ 85, 92.  An undercount will cause California and its municipalities to lose

25   federal funding, including resources from the federal assistance programs that distribute funds on

26   the basis of decennial census-derived statistics.  *Id*.  Citywide, 12.6% of San Jose's population

27   lives below the poverty line.  *Id*. ¶ 86.  Many San Jose residents rely on federally funded benefits

28   for their livelihoods.  *Id*. ¶ 87.  And San Jose will lose millions of dollars in federal funding for

11

1    public health, education, transportation and neighborhood improvements on an annual basis if

2    there is an undercount of its population.  *Id*. ¶ 101.

3         Further, the results of the 2020 Census likely will be inaccurate if the citizenship question

4    is included, which in turn means that apportionment of congressional seats based upon those

5    results will not account for "the whole number of persons in each state," in violation of the

6    Fourteenth Amendment's apportionment clause.  Compl. ¶ 100.  San Jose will be awarded fewer

7    seats in the U.S. House of Representatives than its population dictates.  *Id*. ¶ 93.

8         The expected undercount also will harm BAJI, which advocates for minority and

9    immigrant communities, because of the drain on its resources caused by the need to divert funds

10   to educate constituents regarding the citizenship question and other programming to minimize its

11   effects.  *Id*. ¶¶ 88, 94.  Further, the diminished federal funding and political representation of

12   minority and immigrant communities as a result of the citizenship question directly frustrates

13   BAJI's goal of fostering racial, economic, and social equality for Black immigrants and other

14   historically underrepresented communities.  *Id*.

15                                        **ARGUMENT**

16        Each of Defendants' arguments that Plaintiffs' claims must be dismissed are meritless.

17   *First*, Plaintiffs have standing to challenge the Secretary's decision because they allege facts

18   establishing concrete injury resulting from the inclusion of a citizenship question on the 2020

19   Census.  *Second*, Ross's decision regarding the content of the 2020 Census is not an inherently

20   political question committed to his unfettered discretion and is subject to judicial review.  *Third*,

21   Plaintiffs plausibly allege that Defendants have violated their Constitutional duty to conduct an

22   actual "Enumeration" of the population.

23   **I.    LEGAL STANDARD**

24        A complaint must set forth "a short and plain statement of the grounds for the court's

25   jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to

26   relief."  Fed. R. Civ. P. 8(a).  Under Rule 12(b)(1) of the Federal Rules of Civil Procedure,

27   Plaintiffs bear the burden of demonstrating that the Court has subject-matter jurisdiction.  *See*

28   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  When a motion to dismiss attacks

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

12

1   jurisdiction under Rule 12(b)(1) on the face of the complaint, the court assumes the factual

2   allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor.

3   *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

4      To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs "need only allege 'enough facts to

5   state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563

6   U.S. 27, 45 n.12 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

7   claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

8   the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

9   (2009).  This court "must accept as true all of the factual allegations contained in the complaint."

10   *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

11   **II.**  **PLAINTIFFS HAVE STANDING TO CHALLENGE DEFENDANTS' INCLUSION**

12      **OF A CITIZENSHIP QUESTION ON THE 2020 CENSUS.**

13      To allege standing, Plaintiffs must state facts sufficient to demonstrate that they "(1)

14   suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

15   and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136

16   S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61); *see also Fair Housing of Marin v.*

17   *Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding direct organizational standing where a

18   nonprofit "showed a drain on its resources from both a diversion of its resources

19   and frustration of its mission"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)

20   (organizational standing requires a personal stake in the outcome of the controversy).

21      Defendants base their standing challenge only on the first and second prongs.  However, a

22   plaintiff's "general factual allegations of injury resulting from the defendant's conduct" are

23   sufficient to establish standing at the pleading stage, and courts "must 'presume that general

24   allegations embrace those specific facts that are necessary to support the claim.'" *Circle Click*

25   *Media LLC v. Regus Management Group LLC*, No. 3:12-CV-04000-SC, 2015 WL 6638929, at *4

26   (N.D. Cal. Oct. 30, 2015) (quoting *Lujan*, 504 U.S. at 561).  Here, San Jose and BAJI have

27   alleged specific facts regarding their respective injuries-in-fact that are fairly traceable to

28   Defendants' decision to add a citizenship question to the 2020 Census.

**A.** **Plaintiffs have plausibly alleged that adding a citizenship question to the 2020 Census will cause Plaintiffs multiple, non-speculative injuries.**

To establish an injury in fact, Plaintiffs must allege an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548.  Allegations of a "future injury" can satisfy this prong "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).  Here, Plaintiffs allege — and Defendants' own findings support — that the addition of a citizenship question will result in a disproportionate undercount of immigrants and those residing in immigrant communities.

> 1. Plaintiffs assert plausible facts — including Defendants' own findings — that establish that the addition of a citizenship question will result in a disproportionate undercount.

In arguing that Plaintiffs' allegations are merely conjectural, hypothetical, and speculative, *see* Defs.' Mem. at 13, Defendants wholly ignore findings ***from their own studies*** providing that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count." *FAIR v. Klutznick*, 486 F. Supp. at 568 (discussing the Bureau's representations that citizenship questions inevitably trigger hostility, resentment, and refusal to cooperate in minority communities); Compl. ¶ 82.  Indeed, the Bureau itself has definitively concluded that adding a citizenship question to the decennial census will result in an undercount of immigrant communities.  Compl. ¶¶ 71–72, 80–83.  Further, the Census Scientific Advisory Committee — the Bureau's own advisory body — has concluded that the decision to add the citizenship question was based on flawed logic and may threaten the accuracy and confidentiality of enumeration, make the census more expensive to conduct, and jeopardize the Bureau's nonpartisan reputation.  Compl. ¶ 83.  The Bureau further has concluded that there is "an unprecedented ground swell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants," and that these concerns "may present a barrier to participation in the 2020 Census."  Compl. ¶ 80.  The Bureau also has reported heightened

concerns and fears about questions regarding citizenship and immigration status on the census in light of anti-immigrant political rhetoric from the current Administration, including President Trump's repeated calls to deport undocumented immigrants without due process.  Compl. ¶ 81; Donald J. Trump (@realDonaldTrump), Twitter (Jun 24, 2018, 8:02 AM), https://twitter.com/ realDonaldTrump.

Notably, Defendants do not dispute or even address in their Motion to Dismiss the numerous findings that the citizenship question will cause an increased undercount during the 2020 Census.  And while Defendants argue in their Motion that Plaintiffs' allegations of decreased response rates are speculative, Ross confirmed in sworn testimony before Congress as recently as May 10, 2018 that the Bureau itself estimates that response rates will decline by 1% overall as a result of the citizenship question.[6]  *Senate Appropriations Committee, Commerce, Justice, Science and Related Agencies Subcommittee Hearing on the F.Y. 2019 Funding Request for the Commerce Department*, 115th Cong. 26 (May 10, 2018).  The impact on majority-minority jurisdictions such as San Jose likely will be much greater.

In addition to Defendants' concessions, Plaintiffs sufficiently plead facts regarding the predominance of immigrants in their communities, the growing culture of fear and intimidation in the current political climate, and the deterrent effect of the citizenship question on response rates in immigrant communities.  *See* Compl. ¶¶ 52–53, 55–57, 60.  In any case, Defendants' insistence on a "definitive" answer regarding the effect of the citizenship question, *see* Defs.' Mem. at 13–14 n.5, is not appropriate under the facial plausibility standard applied at the motion to dismiss stage.  As the Supreme Court recognized in *Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999), "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme — possibly irremediable — hardship." *Id.* at 332; *see also Central Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) (when the injury plaintiffs face is

---

[6] In their Motion, Defendants noticeably oscillate between inconsistent positions (1) insisting that the citizenship question has been "well tested," and (2) claiming that they are unaware of empirical data regarding how a citizenship question might impact response rates on the 2020 Census.  *See* Defs.' Mem. at 6–8.

1    "difficult or impossible to remedy," they need not wait for the irreversible harm to occur before

2    challenging the government action in court).

3         2.    <u>Plaintiffs have plausibly alleged that a census undercount will directly</u>

4               <u>harm Plaintiffs' representational, electoral, and federal-funding interests,</u>

5               <u>and require an expenditure of time and resources.</u>

6         Plaintiffs plausibly allege that decreased response rates resulting from the citizenship

7    question will cause them imminent, substantial harm, including through vote dilution, a reduction

8    of their federal funding, and the diversion of their time and resources so as to combat the effects

9    of the citizenship question.  Compl. ¶¶ 85–89, 109–110.  Each of these injuries is "concrete"

10   harm.

11        *First*, the Supreme Court has already held that the "threat of vote dilution" as a result of

12   procedural changes to the decennial census can be a "concrete" injury in fact that is "actual or

13   imminent, not 'conjectural' or 'hypothetical.'"  *Dep't of Commerce*, 525 U.S. at 332 (quoting

14   *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  In *Department of Commerce*, various U.S.

15   residents and counties challenged Commerce's plan to use statistical sampling in the 2000 Census

16   to address the "chronic and apparently growing problem of 'undercounting' certain identifiable

17   groups of individuals," including certain minorities.  *Id*. at 320, 322.  The plaintiffs alleged that

18   such sampling would result in vote dilution on the state and local levels because of (1) subsequent

19   re-apportionment of state representatives based on federal decennial census population data; and

20   (2) the use of federal decennial census data for intrastate legislative redistricting.  *See id*. at 330–

21   34.  Applying the summary judgment standard, the Court found that plaintiffs' expected loss of

22   representation "undoubtedly satisfie[d] the injury-in-fact requirement of Article III standing."  *Id*.

23   at 331.  The Court reasoned that "voters have standing to challenge an apportionment statute

24   because 'they are asserting a plain, direct and adequate interest in maintaining the effectiveness of

25   their votes.'"  *Id*. at 331–32 (quoting *Baker v. Carr*, 369 U.S. 186, 208 (1962)).

26        Likewise here, Plaintiffs allege that they will be "disproportionately affected" by the

27   census undercount as it relates to their representation.  Compl. ¶¶ 92, 114.  The impact of adding

28   a citizenship question to the census will disproportionally impact San Jose because of its large

immigrant population vis-à-vis other municipalities.  Compl. ¶¶ 49–51, 92–93, 114.  Further, 40% of San Jose's population was born outside the United States and as much as 17% of its population consists of undocumented immigrants, ranking it among the twenty metropolitan areas of the United States with the largest number of undocumented immigrants.  Compl. ¶¶ 19, 51.  Given the significant size of San Jose's immigrant population, an undercount impacts San Jose's political representation on the national, state, and local levels.

San Jose, which spans California's 17th, 18th, and 19th congressional districts, has three representatives in the U.S. House of Representatives.  As required by the California Constitution, California's State Senate also relies on the census enumeration as the population base for intrastate redistricting.  *See* Cal. Constit. art XXI, § 1.  San Jose spans three state-level districts, and is currently represented by three State Senators.  Disproportionately low response rates resulting from a citizenship question on the census could decrease the enumeration counts for San Jose and its immediate surrounding area[7] below the level required to maintain its three congressional seats and three State Senate seats.  Thus, Plaintiffs plausibly allege that an undercount of San Jose's large immigrant community because of the citizenship question threatens to decrease their political representation.  Such voter dilution is a concrete injury.  *See Dep't of Commerce*, 525 U.S. at 332.  Further, Defendants' contentions that Plaintiffs do not take into consideration undercounts of other states is simply not accurate as the Complaint alleges with specificity the disproportionate harm the citizenship question will cause San Jose because of the size of its immigrant populations.

*Second*, Defendants do not dispute that federal funding is impacted by census data.  *See Wisconsin v. City of New York*, 517 U.S. 1, 5–6 (1996); *City of Los Angeles v. U.S. Dep't of Commerce*, 307 F.3d 859, 864 (9th Cir. 2002) (Congress, states, and municipalities rely on census data for many purposes including allocation of federal funding).  Courts have concluded that a city can satisfy standing requirements by alleging that a census undercount would "result in a loss of federal funds."  *See e.g.*, *City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993); *Carey*

---

[7] Santa Clara County, in which San Jose resides, has also raised concerns about the impact that the citizenship question will have on response rates.  Compl. ¶ 57.

*v. Kluznitz*, 637 F.2d 834, 836, 838 (2d Cir. 1980); *Chief Probation Officers of Cal. v. Shalala*, No. C-95-4644 DLJ, 1996 WL 134890, at *3 (N.D. Cal. Mar. 14, 1996).  Plaintiffs repeatedly assert in their Complaint that an undercount will result in annual losses of millions of dollars[8] in federal funds relied upon by San Jose, its residents, and the minority and immigrant communities that BAJI serves.  *See e.g.*, Compl. ¶¶ 11–12, 32–33, 49, and 85–88.  Contrary to Defendants' allegation that Plaintiffs' claim of loss of funding lacks specificity as to which programs are at issue, Plaintiffs identified numerous specific federal funding streams that are dependent on census data, including funding for Medicaid, Medicare Part B, the Supplemental Nutrition Assistance Program, the State Children's Health Insurance Program, and the Highway Planning and Construction Program.  Compl. ¶ 33.  Courts have concluded that a city can satisfy standing requirements by alleging that a census undercount would "result in a loss of federal funds."

*Third*, Defendants' reliance on *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest* 624 F.3d 1083, 1088 (9th Cir. 2010) is misplaced.  In *La Asociacion*, the organization-plaintiff ***made no attempt*** to allege organizational standing in its complaint.  Whereas, BAJI pleads organizational standing with specificity.  Compl. ¶ 23 (discussing in detail the diversion of BAJI's essential and limited resources, including time and money, to address and counteract the harmful effect of the inclusion of a citizenship question into the 2020 Census).

Defendants then incredulously argue that there is no connection between BAJI's goal of fostering racial, economic, and social equality for Black immigrants and other historically underrepresented communities, and a census citizenship question that will disproportionately depress the response rates of immigrant communities and thus their political representation and federal funding.  Yet the Bureau partnered with BAJI just two years ago to discuss possible changes to the 2020 Census questionnaire and the impact of its questions on the very community that BAJI serves.  Compl. ¶ 42.  As alleged in the Complaint, this meeting "was an extension of BAJI's efforts to bolster federal funding for historically undercounted and under-resourced

---

[8] Even minimal loss of federal funding is sufficient to establish standing.  *See Backus v. General Mills, Inc.*, 122 F. Supp. 3d 909, 919 (N.D. Cal. 2015) ("The injury may be minimal . . . an identifiable trifle is sufficient to establish standing." (alteration in original) (internal quotation marks omitted) (citing *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008))).

1    minority and immigrant communities." *Id.* ¶ 59.  Thus, Defendants' claim that BAJI's mission is

2    "fairly far afield from the context of a census questionnaire," Defs.' Mem at 17, is undermined by

3    the Bureau's own conduct and falls short of disproving BAJI's organizational standing.

4         Further, Plaintiffs' showing that they chose to divert critical resources to counteract

5    Defendants' actions in an attempt to minimize the harmful effects of a citizenship question on the

6    census is directly analogous to the Supreme Court's holding in *Havens Realty Corp.*  There, the

7    plaintiffs satisfied the standing requirement by alleging: "Plaintiff HOME has had to devote

8    significant resources to identify and counteract the defendant's [sic] racially discriminatory

9    steering practices." *Havens Realty Corp.*, 455 U.S. at 378–79.  Both San Jose and BAJI plead in

10   much greater detail the ways in which their time and resources will be — and already have been

11   — diverted as a result of the addition of a citizenship question to the census. *See e.g.*, Compl. ¶¶

12   12, 23, 58, 60, 94, 110.

13        **B.**    **Plaintiffs' injuries are fairly traceable to the challenged action because the**

14               **two are linked together by a strong causal chain.**

15        Defendants cannot reasonably dispute that Plaintiffs' injuries are "fairly traceable" to the

16   challenged action.  To meet the causation element of standing, plaintiffs must allege their injuries

17   are "fairly traceable to the challenged action of the defendant[s], and not the result of the

18   independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167

19   (1997).  However, the fact that "the harm to [plaintiffs] may have resulted indirectly does not in

20   itself preclude standing." *Warth v. Seldin*, 422 U.S. 490, 504 (1975).  Causation may be found

21   even if there are multiple links in the chain connecting the defendants' unlawful conduct to the

22   plaintiffs' injuries; there is no requirement that the defendants' conduct comprise the last link in

23   the chain. *See Bennett*, 520 U.S. at 168–69.  "[W]hat matters is not the length of the chain of

24   causation, but rather the plausibility of the links that comprise the chain." *Mendia v. Garcia*, 768

25   F.3d 1009, 1012–13 (9th Cir. 2014).

26        Here, Plaintiffs easily meet their burden at this stage of the litigation by alleging a causal

27   chain plausibly linking the challenged action to their injuries. *Bennett*, 520 U.S. at 168 ("on a

28   motion to dismiss we presum[e] that general allegations embrace those specific facts that are

necessary to support the claim"). Plaintiffs have specifically alleged that Defendants' addition of the citizenship question to the 2020 Census will exacerbate nonresponse rates among minority and immigrant communities, resulting in an increased undercount of these populations and attendant injuries in the form of lost representation, foregone federal funding, and diversion of resources. Compl. ¶¶ 1, 10–12, 20, 23, 49, 58, 60, 83, 85–89, 92–94, 99–102, 109–110, 114.

Defendants wrongly contend that Plaintiffs' injuries are not "fairly traceable" to Ross's decision because they will be, in part, attributable to the "independent actions of third parties." Defs.' Mem. at 13. Defendants claim that Plaintiffs lack standing because their injuries will result from the "failure [of individuals] to respond" to the 2020 Census. *Id.* at 18. This baseless argument rests on a non-existent requirement that Defendants' conduct be the very last step in the chain of causation. *See Bennett*, 520 U.S. at 168; *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018) ("Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant.").

Plaintiffs plausibly allege facts showing that the Defendants' unlawful conduct "is at least a substantial factor motivating the third parties' actions," thereby establishing a sufficiently causal chain connecting the following: (1) Defendants' decision; (2) the decision of individuals to not respond to the 2020 Census; and (3) Plaintiffs' injuries. *Mendia*, 768 F.3d at 1013 (quoting *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)); *accord San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1171 (9th Cir. 2011). Statistical experts and Defendants' own reports have confirmed that the addition of the citizenship question will chill response rates within minority and immigrant communities in light of the Trump Administration's heightened anti-immigrant rhetoric and near-constant declarations of anti-immigrant policies. Compl. ¶¶ 6, 10, 71–73, 80–83.

The existence of other factors which may also deflate response rates does not detract from the fact that Plaintiffs plausibly allege that the addition of the citizenship question will *exacerbate* nonresponse rates. Additionally, the Bureau itself has made representations to federal courts acknowledging the plausibility of this casual chain. *Id.* ¶ 82; *FAIR*, 486 F. Supp. at 568

("[A]ccording to the Bureau any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count."). It is evident that Plaintiffs have made a showing without relying on "speculation" or "guesswork" about third parties' motivations. *Clapper*, 568 U.S. at 413.

Further, it is of no consequence whether the decisions of individuals to not respond to the 2020 Census are subject to legal penalties or are irrational in the eyes of Defendants.[9] *See, e.g.*, *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462–63 (1958) (holding that violence against NAACP members by private third parties did not defeat the causation element of standing); *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (holding "irrational" reactions of the public leading to depressed sales did not defeat the causation element of standing in suit challenging Department of Justice's classification of three films as "political propaganda").

Defendants cite *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008), for the proposition that unlawful acts of independent third parties break the chain of causation. But *Salmon Spawning* does not stand for that proposition and is inapplicable in any event. There, the Ninth Circuit did not rely at all on the unlawful nature of the injurious act; rather, the court held that the alleged injury (excessive salmon harvesting) was not traceable to the United States' failure to withdraw from the Pacific Salmon Treaty or its failure to ask Canadians to take additional conservation measures. *Id.* The court reasoned that "if the United States withdrew [from the Treaty], the harvesting of listed species would arguably increase because the Treaty set abundance-based limits on the Canadians' take," and that Canada "could . . . refuse to accommodate the United States' request." *Id.* Accordingly, the plaintiff's allegations relied on an "attenuated chain of conjecture insufficient to support standing." *Id.* No such "attenuated chain of conjecture" exists here.

---

[9] While it would certainly be unlawful for the Bureau to disclose personally identifiable information — including citizenship status — collected through the 2020 Census to law enforcement or immigration authorities, *see* 13 U.S.C. § 9, fears of such government collaboration are corroborated by the Bureau's "prominent role in the relocation of 120,000 residents of Japanese ancestry to detention camps" at the outset of the United States' entry into World War II. Steven A. Holmes, *Report Says Census Bureau Helped Relocate Japanese*, N.Y. Times (Mar. 17, 2000), https://www.nytimes.com/2000/03/17/us/report-says-census-bureau-helped-relocate-japanese.html. With that backdrop, widespread refusal to respond to the 2020 Census can hardly be considered "irrational."

1    In sum, both San Jose and BAJI satisfy Article III's standing requirement because they

2    plausibly allege that decreased response rates resulting from the addition of a citizenship question

3    will imminently cause them substantial, concrete injuries that are fairly traceable to Defendants'

4    conduct.  Notably, if this Court finds that San Jose has standing, it need not reach a decision

5    regarding BAJI's standing for this case to proceed, and vice versa.  *See Carey v. Population*

6    *Services Int'l*, 431 U.S. 678, 682 (1977) (where multiple plaintiffs join in asserting the same

7    claim, if one plaintiff has standing, the court need not decide the standing of the other

8    plaintiffs); *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (same).

9    **III.    PLAINTIFFS' CLAIMS DO NOT POSE A POLITICAL QUESTION EXEMPT**

10   **FROM JUDICIAL REVIEW.**

11   Contrary to Defendants' meritless arguments, Plaintiffs' claims do not pose a political

12   question that is exempt from judicial review.  Defs.' Mem. at 19–23.  Defendants cite three

13   factors, set forth in *Baker v. Carr*, 369 U.S. at 217, which they contend render Plaintiffs' claims

14   nonjusticiable.  None of those factors precludes the Court's adjudication of any of Plaintiffs'

15   claims in this action.

16   First, the Enumeration Clause does not "textually commit" the "manner" of conducting

17   the census solely to the discretion of Congress, while only permitting the "person-by-person

18   headcount of the population" to be subject to judicial review.  Second, the Supreme Court has set

19   forth a judicially manageable "reasonableness" standard against which to judge Defendants'

20   decision-making regarding the content of the census.  Plaintiffs' challenge to the citizenship

21   question does not present one of the rare and extraordinary cases in which the judicial branch is

22   precluded by the political question doctrine from fulfilling its role in our constitutional system of

23   checks and balances.  *See U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458 (1992)

24   (finding constitutionality of Congress's selection among alternative methods of apportionment is

25   "well within the competence of the Judiciary").

26   Ross does not have unlimited, unreviewable discretion to conduct the census however he

27   chooses, even where such conduct violates constitutional commands, runs afoul of statutory and

28   regulatory constraints, breaches agency standards, and is driven by improper political motivations

1    as alleged by Plaintiffs.

2        **A.     The Constitution does not textually commit the conduct of the census to the**

3            **exclusive authority of Congress.**

4       To bar review under the political question doctrine, a constitutional delegation of authority

5    must clearly vest discretion in a political branch "and nowhere else." *See, e.g.*, *Nixon v. United*

6    *States*, 506 U.S. 224, 229 (1993) (holding that Article I, § 3 cl. 6 effected a textual commitment

7    because it vested "sole" authority over impeachment in the Senate).  A case or issue that

8    "touches" on a power delegated to another branch is not necessarily beyond judicial review.

9    *Baker*, 369 U.S. at 211; *see also Corrie v. Caterpillar*, 503 F.3d 974, 982 (9th Cir. 2007), citing

10    *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986): ("We will not find a

11    political question 'merely because a decision may have significant political overtones.'").  The

12    first *Baker* factor does not render Plaintiffs' claims unreviewable.

13       Defendants argue that the portion of the Enumeration clause "in such Manner as

14    [Congress] shall by law direct" establishes a "textually demonstrable constitutional commitment"

15    to Congress of unreviewable discretion over the content of the census.  Defs.' Mem. at 19–21

16    (quoting *Baker*, 369 U.S. at 217).  Defendants concede that the Enumeration Clause requires "a

17    decennial, person-by-person headcount of the population," which presents "a judicially

18    cognizable question that courts have routinely answered."  Defs.' Mem. at 19.  Yet, Defendants

19    argue that the "manner" of conducting the census, including the content of the census form,

20    presents a nonjusticiable political question reserved for Congress.  *Id*.  Tellingly, Defendants do

21    not cite a single case in support of their argument.  Defendants fail to cite case law because there

22    is no support for Defendants' theory that only some Enumeration Clause challenges to the census

23    are subject to judicial review while Plaintiffs' claims are nonjusticiable.

24       Courts have uniformly held that the Enumeration Clause does not textually commit

25    exclusive, non-reviewable control over the census to Congress.  All the Enumeration Clause

26    "does is impose on Congress the responsibility to provide for the taking of a decennial census.  It

27    does not say that Congress and Congress alone has the responsibility to decide the meaning of,

28    and implement, Article 1, Section 2, Clause 3."  *Young v. Klutznick*, 497 F. Supp. 1318, 1326

1    (E.D. Mich. 1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981); *State of Texas v.*

2    *Mosbacher*, 783 F. Supp. 308, 312 (S.D. Tex. 1992) (although the Constitution granted Congress

3    the exclusive power to determine the manner of the census, there was no indication that the

4    actions were non-reviewable); *City of Willacoochee v. Baldrige*, 556 F. Supp. 551, 557 (S.D. Ga.

5    1983) ("[T]he Court finds no support for the argument that the Framers intended that all aspects

6    of the conducting of the census be exclusively within the province of Congress and exempt from

7    judicial review.").

8            Defendants argue that challenges as to "whom to count, how to count them, [and] where

9    to count them," pertain to the "actual Enumeration" clause, while Plaintiffs' claims regarding the

10   content of the census form relate to the "manner" in which the actual Enumeration is done.  Defs.'

11   Mem. at 19.  Defendants' strained parsing of the Enumeration clause fails for several reasons.

12   First, there is no distinction between the "manner" of conducting an "actual Enumeration" and

13   technical considerations of "whom to count, how to count them, [and] where to count them,"

14   which Defendants concede are subject to judicial review.  The content of the census form falls

15   under "the method, as opposed to the fact, of enumeration."  *See Quon v. Stans*, 309 F. Supp. 604,

16   605 (N.D. Cal. 1970) (evaluating whether the Census Director's decision to require respondents

17   to mail-back census forms was made "in a manner not irrational, arbitrary, or capricious"); *see*

18   *also Prieto v. Stans*, 321 F. Supp. 420, 421 (N.D. Cal. 1970) (denying the Census Bureau's

19   motion to dismiss the plaintiffs' claim that the short-form census questionnaire would lead to an

20   inaccurate enumeration where it did not offer an option for Mexican-Americans to self-identify).

21           Second, Defendants' proposed interpretation is inconsistent with decades of precedent in

22   which challenged census procedures have been considered part of the "manner" in which the

23   census was conducted.  *See Utah v. Evans*, 536 U.S. 452, 474 (2002) (holding that the use of

24   "hot-deck" imputation to infer information about certain addresses was permissible under the

25   Enumeration Clause as conferred by the "in such Manner" language); *Wisconsin*, 517 U.S. 1, 17

26   (upholding the Secretary's decision not to use a post-enumeration survey as part of Congress's

27   delegation of its broad authority to "conduct the census 'in such Manner as they shall by Law

28   direct'"); *Franklin v. Massachusetts*, 505 U.S. 788, 803–807 (1992) (upholding the Secretary's

manner of counting federal employees serving abroad).

Third, Plaintiffs clearly challenge "how" the Secretary has chosen to count the population — by using an untested questionnaire that demands the citizenship status of every household member. Ross's decision runs afoul of the "actual Enumeration" requirement because his conduct will lead to a disproportionate undercount of the population. Compl. ¶¶ 90–98. There is no support for Defendants' argument that the content of a census questionnaire is shielded from judicial review because it is "textually committed" solely to Congress.

## B. The Supreme Court has set forth manageable standards that allow the Court to review Defendants' manner of conducting the census.

The second and third *Baker* factors also do not preclude judicial review. The Secretary's "manner" of conducting the census, including adding a citizenship question, is constrained by the Constitution, statute, and agency policies. Courts are fully equipped to review Ross's decision to add a citizenship question without making policy determinations outside the scope of their constitutional authority. *See Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 823 (9th Cir. 2017) (no political question where court is asked to review process employed by the Government, not to pass judgment on the wisdom of Executive's foreign policy or military decisions).

First, the applicable standard of review derives directly from the text of the Constitution. To ensure equal representation for all, the Constitution, through both Article I, Section 2 and the Fourteenth Amendment, explicitly requires the federal government to accurately conduct an "actual Enumeration" of the people. U.S. Const. art. I, § 2, cl. 3. This language places a clear duty on the Secretary and Bureau to count the "whole number of persons in each State." U.S. Const. amend. XIV, § 2. In turn, this mandate creates a "strong constitutional interest in accuracy," *Utah*, 536 U.S. at 478, including in the enumeration of non-citizens. *See FAIR*, 486 F. Supp. at 567. Though broad, the Secretary's discretion does not permit him to evade this constitutional mandate.

The Supreme Court has held that decisions associated with the administration of the decennial census must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the census' constitutional purpose of

apportioning congressional representation." *Wisconsin*, 517 U.S. at 20 (court may review Secretary's conduct under a reasonable test even where Constitution vests Congress with discretion in conducting the census); *see City of New York v. U.S. Dep't of Commerce*, 34 F.3d 1114, 1129 (2d Cir. 1994), *rev'd on other grounds sub nom. Wisconsin*, 517 U.S. at 20 ("[T]he federal government . . . is required to make a good-faith effort to achieve the Constitution's plain objective of equal representation for equal numbers of people.").

The Constitution's concern for accurate enumeration of all persons is made plain in light of the fears that drove the drafters of the Enumeration Clause. The Clause, after all, was drafted with a focus on the total population to avoid the census being used as a tool for political manipulation. *See Utah*, 536 U.S. at 478; *see also id*. at 503 (Thomas, J., concurring and dissenting in part) (explaining that the Framers' "principle concern was that the Constitution establish a standard resistant to manipulation").

Ross exceeds the constitutional bounds of his discretion when he makes decisions that will affirmatively undermine the constitutional purpose of an actual Enumeration — as Plaintiffs plausibly allege he did in this case. Compl. ¶¶ 5–10. Thus, this Court may review whether Ross exceeded his discretion by adding a citizenship question that will undermine the accuracy of the enumeration without running afoul of the political question doctrine.

Defendants contend that the constitutional standard articulated by the Supreme Court is inapplicable here because Plaintiffs do not challenge a "calculation methodology." Defs.' Mem. at 22 n.9, 25. As explained above, this artificial distinction finds no support in the relevant case law. The requirement of a "reasonable relationship to the accomplishment of an actual enumeration" applies to the Secretary's "conduct of the census" generally; it is not limited to the Secretary's choice of calculation methodologies. *See Wisconsin*, 517 U.S. at 19–20. There is no sensible reason to read the Constitution as allowing review of calculation methodologies, while exempting from review any other decision by the Secretary on how to conduct the census regardless of its impact on the constitutional purpose of an accurate count.

Defendants contend the Secretary has unfettered discretion to make every census related decision: from types of advertising and the use of different languages to the number of census

1    offices and personnel.  Defs.' Mem. at 22.  Defendants are wrong.  Each of the Secretary's

2    decisions must be reasonably related to the accomplishment of an actual enumeration.  If

3    Defendants' interpretation were accepted, the Secretary would be free to engage in any census

4    procedure that undermines an actual count of the population without any reasonable basis for the

5    decision — for example by failing to advertise the census whatsoever, issuing questionnaires only

6    in a single foreign language, intentionally discriminating against specific residents, or assigning

7    one census taker per state.  Defendants offer no logical explanation for why such arbitrary and

8    unreasonable decisions would not be subject to judicial review, while conceding that questions

9    regarding calculation methodologies are reviewable.  Clearly, the courts may review the

10   reasonableness of any census decision and maintain deference to the Secretary's broad discretion.

11          Second, as described in greater detail at pp. 29–33, a robust set of statutes, regulations,

12   and agency standards governing the collection of statistical information further constrain the

13   Secretary's discretion and provide judicially manageable standards for reviewing his last-minute

14   decision to add an untested citizenship question to the census.  For example, under the PRA,

15   agencies must ensure the "accuracy" and "objectivity" of their data.  44 U.S.C. § 3506(e)(1).

16   Further, under OMB standards issued pursuant to the PRA, the Bureau must maximize data

17   quality, pretest surveys, and achieve the highest practical rates of response.  Compl. ¶ 40.

18          In light of these detailed requirements, the Court need not "supplant a . . . decision of the

19   political branches with the courts' own unmoored determination."  *Zivotofsky v. Clinton*, 566 U.S.

20   189, 196 (2012).  The relevant policy determinations regarding the paramount importance of

21   census accuracy and the procedures needed to ensure that the census is designed to achieve that

22   goal have already been made.

23   **IV.    DEFENDANTS HAVE FAILED TO REBUT THE STRONG PRESUMPTION IN**

24          **FAVOR OF JUDICIAL REVIEW UNDER THE ADMINISTRATIVE**

25          **PROCEDURE ACT.**

26          Defendants fail to carry their "heavy burden of overcoming the strong presumption" in

27   favor of judicial review of administrative actions under the APA.  *Bowen v. Michigan Acad. of*

28   *Family Physicians*, 476 U.S. 667, 672 (1986).  The authority endorsing judicial review is as

1    evident as the need for it is obvious.

2            Indeed, section 701(a)(2) of the APA exempts a narrow class of agency actions from

3    judicial review only where those actions are "committed to agency discretion by law." 5 U.S.C.

4    § 701(a)(2).  The Supreme Court has explained that this "narrow exception" occurs in "rare

5    instances" where "a court would have no meaningful standard against which to judge the

6    agency's exercise of discretion such as where statutes are drawn in such broad terms that in a

7    given case there is no law to apply." *City & County of San Francisco v. U.S. Dep't of Transp.*,

8    796 F.3d 993, 1001 (9th Cir. 2015) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)); *see*

9    *Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1030

10   (N.D. Cal. 2018).  In determining whether an agency decision fits within this exception, courts

11   consider "the language of the statute and whether the general purposes of the statute would be

12   endangered by judicial review." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015)

13   (internal citations omitted).  "[T]he mere fact that a statute contains discretionary language does

14   not make agency action unreviewable." *Id.*  Additionally, "[e]ven where statutory language

15   grants an agency 'unfettered discretion,' its decision may nonetheless be reviewed if regulations

16   or agency practice provide a 'meaningful standard by which this court may review its exercise of

17   discretion.'" *Id.*

18           Here, in addition to the standards supplied by the Constitution described above, a

19   substantial body of requirements stemming from the Act, administrative regulations, and Bureau

20   practice also constrict the Secretary's discretion and provide meaningful standards for judicial

21   review.

22           Undeniably, "the overall goal of the Census Act is accuracy." *City of Los Angeles*, 307

23   F.3d at 872; *City of Willacoochee*, 556 F. Supp. at 555 ("Necessarily implicit in the Census Act is

24   the command that the census be accurate.").  Through the Act, Congress delegated its

25   constitutional duty to conduct the decennial census to the Secretary and the Bureau.  13 U.S.C. §

26   2, 4, 141(a).  In doing so, Congress narrowed the Secretary's discretion by explicitly declaring

27   that "it is essential that the decennial enumeration of the population be as accurate as possible,

28   consistent with the Constitution and laws of the United States." 13 U.S.C. § 141 (note).

1    Moreover, the Act states that "[i]n connection with any such [decennial] census, the Secretary is

2    authorized to obtain such other census information as *necessary*." 13 U.S.C. § 141(a).  Plaintiffs

3    allege that the collection of citizenship information is not only unnecessary, but in fact

4    detrimental to both "actual Enumeration" and the enforcement of the Voting Rights Act.  Compl.

5    ¶¶ 10, 61–84.

6          Furthermore, changes to the decennial questionnaire are governed by long-standing and

7    extensive processes, which Defendants completely ignored.  *See* Compl. ¶¶ 8, 38–48.  Indeed,

8    these processes — as mandated and shaped by federal statutes, administrative requirements, and

9    Bureau practices — expressly bind the Secretary's discretion when adding questions to the

10   decennial census.  *See ASSE Int'l, Inc.*, 803 F.3d at 1069 (recognizing that an agency's decision

11   may be "reviewed if regulations or agency practice provide a 'meaningful standard'"); *Spencer*

12   *Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (same); *Padula v. Webster*, 822

13   F.2d 97, 100 (D.C. Cir. 1987) ("It is well settled that an agency, even one that enjoys broad

14   discretion, must adhere to voluntarily adopted, binding policies that limit its discretion." (citation

15   omitted)).  *See generally* Gillian E. Metzger & Kevin M. Stack, *Internal Administrative Law*, 115

16   Mich. L. Rev. 1239, 1283 (2017) ("[A]gency action that was otherwise unreviewable becomes

17   reviewable . . . if the agency's discretion is limited by preexisting agency rules, including those

18   rules that do not have the force and effect of law.").  Implicit in these multiyear-long processes is

19   the acknowledgement that there are no do-overs when it comes to enumeration.

20         The relevant requirements here stem, in part, from the Information Quality Act, which

21   directs the Director of the OMB[10] to require federal agencies to issue guidelines for "ensuring and

22   maximizing the quality, objectivity, utility, and integrity of information (including statistical

23   information)."  *See* Consolidated Appropriations Act of 2001, Pub. L. No. 106–554, § 515(b), 114

24   Stat. 2763 (codified at 44 U.S.C. § 3516 note).  The OMB guidelines require agencies to "design

25   surveys to achieve the highest practical rates of response, commensurate with the importance of

26   survey uses, respondent burden, and data collection costs, to ensure that survey results are

27   

---

28   [10] The Director of the Office of Management Budget sets "policies, standards, and guidelines"
     that govern statistical methods across the federal government.  *See* 44 U.S.C. § 3504(e)(3).

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

29

1   representative of the target population so that they can be used with confidence to inform

2   decisions" as well as pretest survey components to ensure accuracy and reliability.  *See* 71 Fed.

3   Reg. 55, 522 (Sept. 22, 2006) §§ 1, 2.3.1.

4       The Bureau's Statistical Quality Standards specify statistical quality standards for the

5   Bureau and govern the processes — from planning to collecting to analyzing and reporting — for

6   Bureau information products.  *See* Bureau's Statistical Quality Standards at i.  Critically, the

7   document specifically states, "All Census Bureau employees and Special Sworn Status

8   individuals <u>must</u> comply with these standards."  *Id.* at ii (emphasis added).  With respect to

9   questionnaire content, the Standards require pretesting in order to avoid "confusion,"

10  "misinterpretation," and "a loss of information."  *Id.* at 12.  The standards also expressly specify

11  the circumstances under which and the methods by which pretesting "must" occur.  Sub-

12  Requirement A2-3.3 states that "pretesting must be performed when," for example, "review by

13  cognitive experts reveals that adding pretested questions to an existing instrument may cause

14  potential context effects" or "an existing data collection instrument has substantive modifications

15  (e.g., existing questions are revised or new questions added)."  *Id.* at 8.  Additionally, pretesting

16  must verify that questions "are not unduly sensitive and do not cause undue burden."  *Id.*

17      There can be no doubt these requirements impose significant restraints on agency

18  discretion.  Indeed, they manifest the Bureau's intent to constrain its actions in a mandatory way

19  and provide ample "law to apply" for defining and enforcing the limits of the Secretary's

20  discretion.  *See Sheikh v. U.S. Dep't of Homeland Sec.*, 685 F. Supp. 2d 1076, 1091 (C.D. Cal.

21  2009) ("[T]he Ninth Circuit . . . has clearly held that internal agency policy directives or even

22  'agency practice' can supply a meaningful standard by which to review an agency's discretionary

23  act.").  Plaintiffs allege that adding the citizenship question is in clear contravention of these

24  requirements and long-standing Bureau practice.  *See* Compl. ¶¶ 41–46 (detailing the nearly

25  decade-long process by which the Bureau evaluated and eventually rejected a combined question

26  format for collecting race and ethnicity data).  Accordingly, Defendants' failure to comply with

27  these mandates may be properly reviewed under the APA.  *See* 5 U.S.C. § 706(2).

28      Reviewability of the challenged action is further evident in light of the decades of

1    precedent supporting judicial review of Bureau actions.  *See, e.g.*, *Kluznitz*, 637 F.2d at 838 ("We

2    fully recognize that there is no power to review agency action that is committed to agency

3    discretion by law, 5 U.S.C. § 701(a)(2), but this is not one of those rare instances where that

4    exception may be invoked." (citation and internal quotation marks omitted)); *Dist. of Columbia v.*

5    *U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (D.D.C. 1992) ("We note in passing that

6    there is no dispute over the ability of the court to review these actions of the Census Bureau under

7    the Administrative Procedure Act."); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp.

8    48, 53 (E.D.N.Y. 1989) ("[T]he overwhelming majority of cases considering this issue . . . have

9    concluded that § 701(a)(2) of the APA is inapplicable to the census statute."); *City of*

10   *Willacoochee*, 556 F. Supp. at 555 ("At the very least, the Census Act requires that the

11   defendants' decisions not be arbitrary or capricious."); *City of Philadelphia v. Klutznick*, 503 F.

12   Supp. 663, 675 (E.D. Pa. 1992) ("To hold that the [Bureau] is not subject to judicial review is to

13   hold that the Bureau is free to adopt any numbers, regardless of bias, manipulation, fraud or

14   similarly grave abuse . . . .  This cannot be."); *see also City of Camden v. Plotkin*, 466 F. Supp.

15   44, 52 (D.N.J. 1978); *Borough of Bethel Park v. Stans*, 319 F. Supp. 971, 977 (W.D. Pa. 1970);

16   *West End Neighborhood Corp. v. Stans*, 312 F. Supp. 1066, 1068 (D.D.C. 1970).[11]

17          Defendants' assertion that Congress has reserved to itself the responsibility of overseeing

18   the challenged action is flawed in view of this authority as well as the total absence of any

19   supporting law.  The fact that the Secretary is required to submit reports regarding the subjects

20   and questions of the decennial census to Congress does not preclude judicial review.  The

21   proposition "would create an enormous exception to judicial review."  *See, e.g.*, *Armstrong v.*

22   [11] Defendants rely on *Tucker v. United States Department of Commerce*, 958 F.2d 1411, 1417–18
23   (7th Cir. 1992), and *Senate of State of California v. Mosbacher*, 968 F.2d 974, 977–79 (9th Cir.
     1992), for the proposition that Plaintiffs' action is non-justiciable.  Defs.' Mem. at 28-29.  But
24   *Tucker* was decided before (1) the Supreme Court's holdings in *Utah* (2002), *Wisconsin* (1996),
     and *Franklin* (1992) that challenges to census procedures are justiciable; and (2) the enactment of
25   the Information Quality Act and the adoption of the information quality standards detailed above.
     In addition, *Tucker* supports the justiciability of an action strikingly similar to the present one:
26   "We might . . . have a different case if the challenge were not to the Census Bureau's statistical
     methodology but to some categorical judgment of inclusion or exclusion argued to be in violation
27   of history, logic, and common sense."  958 F.2d at 1418.  *Senate*, meanwhile, is inapposite
     because it pertains to the release of adjusted census data — not the conduct of the census.  968
28   F.2d at 978 ("This action does not dispute [the conduct of the census] . . . .  If it did, it would
     squarely present the controversy that other courts have wrestled with . . . .").

1    *Bush*, 924 F.2d 282, 291–92 (D.C. Cir. 1991) ("[T]he fact that Congress retains some direct

2    oversight over [agency conduct] does not necessarily indicate an intent to preclude judicial

3    review. . . Congress exercises oversight over all agencies, gets reports from many, and is often

4    consulted by the executive branch before specific actions are taken.").

5          Moreover, the challenged action can hardly be viewed in the same light as those truly

6    classic examples of determinations "committed to agency discretion" which involve national

7    security, as in *Webster v. Doe*, 486 U.S. 592, 603–04 (1988), or enforcement actions, as in

8    *Heckler v. Chaney*, 470 U.S. 821, 838–84 (1985).  "The taking of the census is not such an area of

9    traditional deference."  *Franklin*, 505 U.S. at 818–19 (Stevens, J., concurring in part).  Certainly,

10   "[t]he open nature of the census enterprise and public dissemination of the information collected

11   are closely connected with our commitment to a democratic form of government.  The

12   reviewability of decisions related to the conduct of the census bolsters public confidence in the

13   integrity of the process and helps strengthen this mainstay of our democracy."  *Id.*

14         Thus, statutory purposes and text, administrative regulations, agency practices, and

15   decades of decisional law all establish the availability of meaningful and judicially manageable

16   standards for judicial review of the Secretary's decision.  Defendants have not met their "heavy

17   burden of overcoming the strong presumption" in favor of judicial review of administrative

18   actions under the APA.  *Bowen*, 476 U.S. at 672.

19   **V.    PLAINTIFFS HAVE ADEQUATELY STATED A CLAIM UNDER THE**

20         **ENUMERATION CLAUSE.**

21         The Constitution requires Defendants to conduct an "actual Enumeration" of "the whole

22   number of persons in each State."  Art. I § 2, Am. XIV § 2.  Congress and the courts have

23   uniformly interpreted the Enumeration Clause to require not merely a "person-by-person

24   headcount" as Defendants would have it, Defs.' Mem. at 27, but a good-faith attempt at an

25   *accurate* headcount.  *City of Detroit*, 4 F.3d at 1378 (a "failure to conduct a good-faith

26   enumeration, or intentionally reducing some group's representation or funding" would violate the

27   Enumeration Clause.")  While Congress provided the Secretary discretion to obtain "other census

28   information as necessary," it specifically limited its grant of authority to the Secretary to methods

1    that obtain a count that is "as accurate as possible, consistent with the Constitution and laws of

2    the United States."  13 U.S.C. § 141 (note).  As argued above, the method chosen by the

3    Secretary must bear "a reasonable relationship to the accomplishment of an actual enumeration of

4    the population, keeping in mind the constitutional purpose of the census."  *Wisconsin*, 517 U.S. at

5    20.  And the Second Circuit has held that the government has "the authority to gather reliable

6    statistical data reasonably related to governmental purposes."  *United States v. Rickenbacker*, 309

7    F.2d 462, 463 (2d Cir. 1962).

8         Plaintiffs concede that the Secretary has broad discretion in determining the manner in

9    which to conduct the census, subject to a strong constitutional interest in obtaining accuracy.

10   *Utah v. Evans*, 536 U.S. at 478.  When Congress makes "an apparently good-faith choice of a

11   method of apportionment" that decision is likewise entitled to deference.  *Montana*, 503 U.S. at

12   464.  And while the Enumeration Clause "vests ***Congress*** with ***virtually*** unlimited discretion" in

13   conducting the Census, *Wisconsin*, 517 U.S. at 19 (emphasis added), Congress's grant to the

14   Secretary is predicated on obtaining a count that is "as accurate as possible, consistent with the

15   Constitution and laws of the United States," 13 U.S.C. § 141 note.  "Virtually" unlimited

16   discretion does not mean absolute discretion, as any method chosen by the Secretary must bear "a

17   reasonable relationship to the accomplishment of an actual enumeration of the population,

18   keeping in mind the constitutional purpose of the census."  *Wisconsin*, 17 U.S. at 20.

19        While no court has set forth a minimum standard for satisfying the Enumeration Clause,

20   Plaintiffs offer the standard shaped by the Constitution and case law: in choosing the manner in

21   which to conduct the census, the Secretary must act in good-faith to ensure a proper headcount of

22   the population, and may request additional data that is "reasonably related to governmental

23   purposes."  *See Rickenbacker*, 309 F.2d 463; *Wisconsin*, 517 U.S. at 20.  Defendants fail to meet

24   this standard and thus, violate their Constitutional duty.

25        Plaintiffs' allegations survive ***any*** conceivable standard for an Enumeration Clause claim.

26   Plaintiffs allege Defendants added the citizenship question mere days before the final list of

27   questions was due to Congress despite contrary advice of independent experts; Defendants failed

28   to adequately test the effect of adding a citizenship question on the quality of the census results

1    and its impact on the actual enumeration of the United States population; and Defendants'

2    decision to add the citizenship question will inevitably result in undercounts of minority

3    communities.  Compl. ¶ 47–48, 81–84.  In addition, Plaintiffs allege the rationale provided by

4    Defendants "is a pretext for other unstated and ulterior purposes."  Compl. ¶ 70.  On a motion to

5    dismiss, Plaintiffs' allegations are accepted as true.  *Erickson*, 551 U.S. at 94.  Therefore, to

6    prevail on their Motion, Defendants must prove that a Secretary does not violate the Enumeration

7    Clause as a matter of law when he rejects the Bureau's expert findings, fails to test census content

8    according to agency standards, and intentionally depresses the response rates of a politically

9    disfavored group by adding a question that will decrease their responses.[12]  Defendants cite no

10   support for this standard.

11        None of Defendants' cases support dismissal of the Complaint.  Defendants contend the

12   Enumeration Clause only requires a census by "a person-by-person headcount, rather than

13   through estimates or conjecture."  Defs.' Mem. at 27–28.  However, the cases that Defendants

14   rely upon have the benefit of an evidentiary record demonstrating what actions the Bureau took to

15   ensure accuracy of the headcount.  *See Prieto*, 321 F. Supp. at 422 (defendants presented

16   evidence demonstrating their efforts made to properly count Mexican-Americans to oppose a

17   motion for preliminary injunction and still, the court denied defendants' motion to dismiss).

18   Notably, two of the cases upon which Defendants rely were not decided on motions to dismiss,

19   but on summary judgment or even after trial.  *Utah v. Evans*, 182 F. Supp. 2d 1165, 1167 (D.

20   Utah 2001) (both parties filed motions for summary judgment based on a full record); *Wisconsin*,

21   517 U.S. at 20–24 (courts heard the complicated statistical evidence at the core of the dispute).

22        Defendants cite *Morales v. Daley*, 116 F. Supp. 2d 801, 809 (S.D. Tex. 2000), for the

23   proposition that the Enumeration Clause does not prohibit the Bureau from asking some

24   demographic data in addition to performing a population count.  Defs.' Mem. at 28–29.  *Morales*

25   like *Rickenbacker*, was brought by individuals who argued that they should not be subject to

26

---

[12] Defendants have argued here and elsewhere that such a bad faith claim is not justiciable and
may be remedied only by Congress.  But they do not argue they will still prevail if the Secretary
added the citizenship question to the 2020 Census to ensure that non-citizens and their families
would not respond.

criminal prosecution for refusing to answer census questions they found too intrusive.  The court

found that "Plaintiffs have not alleged or shown, however, that the data is likely to be used to

discriminate against them specifically."  116 F. Supp. 2d at 811.  By contrast, Plaintiffs here have

alleged that including a citizenship question will cause them harm by diverting resources and

causing diminished representation and funding from Congress.  *See* Compl. ¶¶ 85–89.

Finally, the historical use of a citizenship question does not favor Defendants' position.

*See* Defs.' Mem. at 28.  When the Court acknowledged in Wisconsin "the importance of

historical practice in this area," it was referring to cases that endorse using "rules that are

consistently applied year after year" when conducting a census.  517 U.S. at 21.  The Court

specifically noted in *Wisconsin* that implementing a method at odds with *recent* practices

suggested additional scrutiny.  517 U.S. at 21  Here, adding the citizenship question would ***depart***

from 70 years of recent historical practice.  Defendant's emphasis on earlier Census Acts such as

the Census Act of 1790, which required identifying slaves so that they could be counted as only

three-fifths of a person, highlights the inapplicability of earlier censuses when considering the

form of the 2020 Census.  *See* Census Act of 1790, 1 Stat. 101 (1790).

Defendants cannot prove as a matter of law that they acted in good-faith to ensure an

accurate headcount of the population, or that the citizenship data they seek to obtain through the

2020 Census is "reasonably related to governmental purposes."  *Rickenbacker*, 309 F.2d at 463;

*Wisconsin*, 517 U.S. at 20.  Plaintiffs plausibly allege a violation of the Enumeration Clause.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

1

Respectfully submitted,

2      Dated:    July 17, 2018          **MANATT, PHELPS & PHILLIPS, LLP**

3

4                                        By:  */s/ John F. Libby*
                                                John F. Libby
5                                               John W. McGuinness
                                                Emil Petrossian
6                                               Ana G. Guardado
                                                Olufunmilayo O. Showole
7                                               Salvador E. Perez
                                                11355 West Olympic Boulevard
8                                               Los Angeles, California 90064
                                                Telephone:  (310) 312-4000
9                                               Facsimile:  (310) 312-4224

10                                       **LAWYERS' COMMITTEE FOR CIVIL
                                         RIGHTS UNDER LAW**
11                                              Kristen Clarke
                                                Jon M. Greenbaum
12                                              Ezra D. Rosenberg
                                                Dorian L. Spence
13                                              1401 New York Avenue NW, Suite 400
                                                Washington, DC 20005
14                                              Telephone:  (202) 662-8600
                                                Facsimile:  (202) 783-0857

15                                       **PUBLIC COUNSEL**
16                                              Mark Rosenbaum
                                                610 South Ardmore Avenue
17                                              Los Angeles, California 90005
                                                Telephone:  (213) 385-2977
18                                              Facsimile:  (213) 385-9089

19                                       **CITY OF SAN JOSE**
                                                Richard Doyle, City Attorney
20                                              Nora Frimann, Assistant City Attorney
                                                Office of the City Attorney
21                                              200 East Santa Clara Street, 16th Floor
                                                San Jose, California 95113
22                                              Telephone Number:  (408) 535-1900
                                                Facsimile Number:  (408) 998-3131

23
                                         *Attorneys for Plaintiffs*
24                                       CITY OF SAN JOSE and BLACK ALLIANCE FOR
                                         JUST IMMIGRATION

25

26

27

28