MANATT, PHELPS & PHILLIPS, LLP
JOHN F. LIBBY (Bar No. CA 128207)
E-mail: jlibby@manatt.com
JOHN W. MCGUINNESS (Bar No. CA 277322)
E-mail: jmcguinness@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail: epetrossian@manatt.com
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
KRISTEN CLARKE (*Pro Hac Vice* Application Forthcoming)
Email: kclarke@lawyerscommittee.org
JON M. GREENBAUM (Bar No. CA 166733)
E-mail: jgreenbaum@lawyerscommittee.org
EZRA D. ROSENBERG (Admitted *Pro Hac Vice*)
E-mail: erosenberg@lawyerscommittee.org
DORIAN L. SPENCE (Admitted *Pro Hac Vice*)
E-mail: dspence@lawyerscommittee.org
1401 New York Avenue NW, Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*Attorneys for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

*[Additional Counsel Listed on Signature Page]*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California nonprofit corporation,<br><br>        Plaintiffs,<br><br>        vs.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,<br><br>        Defendants. | Case No. 3:18-cv-2279-RS<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>Date:       December 7, 2018<br>Time:      10:00 a.m.<br>Dept:      3<br>Judge:     The Hon. Richard Seeborg<br>Trial Date:  January 7, 2019 |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that at 10:00 a.m. on December 7, 2018 in Courtroom 3 of the United States District Court, located at 450 Golden Gate Avenue in San Francisco, Plaintiffs City of San Jose and Black Alliance For Just Immigration ("Plaintiffs") will move for partial summary judgment on Count Three and Count Four of the Complaint pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Northern District of California.

Plaintiffs request an order that Defendants' decision to add a citizenship question to the 2020 Census short-form questionnaire was not in accordance with law and arbitrary and capricious as a matter of law.

The Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Ana G. Guardado and exhibits thereto, the Declarations of Jeff Ruster, Monique Melchor, Opal Tometi, and Kristen Clements, and any additional matters that the Court may consider at the time of the hearing.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ...................................................................... 2

I.      PLAINTIFFS ARE RELYING ONLY ON THE ADMINISTRATIVE RECORD FOR ALL ISSUES EXCEPT STANDING ........................................................... 2

II.      DEFENDANTS IGNORED STATUTES AND REGULATIONS GOVERNING CHANGING THE CENSUS ........................................................................... 2

     A.      Ross Chose to Add the Citizenship Question for Reasons that Are Not in the Record ........................................................................... 2

     B.      Commerce Sought Out Another Agency to Request the Question ........................ 3

     C.      DOJ Reverses Course and Asks for a Citizenship Question................................. 4

III.      SECRETARY ROSS IGNORED EVIDENCE FROM BUREAU EXPERTS AND STAKEHOLDERS AND IMPOSED HIS PREDETERMINED POSITION .................. 5

     A.      The Bureau Proposes a Better Means of Providing CVAP Data .......................... 5

     B.      The Bureau's Full Review Concludes Administrative Records Are a Better Means of Obtaining CVAP Data ........................................................ 6

     C.      Ross Conducts Perfunctory Meetings with Stakeholders ..................................... 7

     D.      Commerce Ignored the Answers to Follow-up Questions to the Bureau................ 7

     E.      Commerce Demands New Analysis from Census ................................................ 8

     F.      Ross Issued His Decision Without Considering Key Findings and Without Disclosing that He Asked DOJ to Make the Request ............................................ 9

     G.      Ross Discloses Some of the Truth After Litigation Begins ................................. 10

IV.      ADDING THE QUESTION HAS HARMED, IS HARMING, AND WILL HARM PLAINTIFFS ................................................................................. 10

     A.      San Jose is Spending Money on Outreach Now to Reduce the Negative Impact of Including a Citizenship Question........................................................ 10

     B.      Including the Citizenship Question Will Lower Self-Response Rates, Leading to Incorrect Enumerations and a Likely Differential Undercount .......... 11

     C.      San Jose Has a Substantial Risk of Being Harmed by the Addition of the Citizenship Question ....................................................................... 12

     D.      BAJI Has Suffered and Will Suffer Harm Unless the Question Is Removed....... 13

STANDARD OF REVIEW .......................................................................................... 14

ARGUMENT ............................................................................................................. 14

I.      PLAINTIFFS HAVE STANDING TO CHALLENGE ROSS'S DECISION ................ 14

     A.      Injury to San Jose and BAJI Is Both Actual and Reasonably Imminent ............. 15

     B.      San Jose Has Standing ................................................................ 16

         1.      San Jose Has Suffered and Will Suffer an Injury in Fact ........................ 16

         2.      San Jose's Injury Is Fairly Traceable to the Citizenship Question .......... 16

i

**TABLE OF CONTENTS**
(continued)

Page

   3. San Jose's Injury Will Be Redressed by Removing the Citizenship
    Question ................................................................................................ 17

  C. BAJI Has Standing ........................................................................................ 17

   1. BAJI Has Suffered and Will Suffer an Injury in Fact Due to a
    Diversion of Its Resources and the Frustration of Its Mission .................. 17

   2. BAJI's Injury Is Fairly Traceable to the Citizenship Question and
    Will Be Redressed By Its Removal ........................................................... 18

II. THE DECISION TO ADD THE CITIZENSHIP QUESTION WAS MADE IN
 EXCESS OF STATUTORY JURISDICTION, AUTHORITY, OR
 LIMITATIONS ........................................................................................................ 18

  A. The Secretary Is Required to Submit Census Topics Three Years in
   Advance and May Not Modify Them Unless He Find "New
   Circumstances." ........................................................................................... 19

  B. The Statute Is Unambiguous and this Court Need Not Apply Chevron
   Deference ..................................................................................................... 19

  C. Commerce Violated the Census Act ............................................................. 20

III. THE DECISION TO ADD A CITIZENSHIP QUESTION MUST BE STRUCK
 DOWN AS ARBITRARY AND CAPRICIOUS ...................................................... 21

  A. Ross's Explanation for the Decision Was Implausible and Pretextual ................. 22

  B. Defendants Departed From Long-Standing Census Procedure, Then
   Altered the Bureau's Description of Its Procedure Without Its Knowledge ........ 24

   1. The Evidence Shows that Ross Deviated from Pre-Testing
    Protocols ..................................................................................................... 24

   2. The Evidence Shows that Adding the Question Without Testing
    Will Have Unpredictable Adverse Consequences ..................................... 25

  C. Ross's Explanation Runs Counter to the Evidence Before the Agency ............... 27

   1. The Evidence Shows that Adding the Question Will Decrease
    Response Rates and Increase Burdens ....................................................... 27

   2. Ross Ignored the Impact of Inaccurate Responses and the Value of
    Administrative Records .............................................................................. 28

   3. Ross's Decision Relied on a Flawed and Incredible DOJ Request
    that Was Itself Contrary to the Record Evidence ...................................... 29

IV. RELIEF SOUGHT ................................................................................................... 29

CONCLUSION .................................................................................................................. 30

**TABLE OF AUTHORITIES**
(continued)

**Page**

### CASES

*Am. Motorcycle Ass'n Dist. 37 v. Norton*,
  Nos. C 03-03807 SI, C 03-02509 SI, 2004 WL 1753366 (N.D. Cal. Aug. 3, 2004) ...................................................................................................................27

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*,
  397 U.S. 150 (1970)........................................................................................17, 29

*Ass'n of Nat'l. Advertisers, Inc. v. F.T.C.*,
  627 F.2d 1151 (D.C. Cir. 1979)...............................................................................30

*Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  745 F.2d 677 (D.C. Cir. 1984) ................................................................................25

*Baker v. Castle & Cooke Homes Hawaii, Inc.*,
  No. CIV. 11-00616 SOM, 2012 WL 1454967 (D. Haw. Apr. 25, 2012) .................18

*Beno v. Shalala*,
  30 F.3d 1057 (9th Cir. 1994)...................................................................................17

*Brooklyn Heights Ass'n v. Nat'l Park Serv.*,
  818 F. Supp. 2d 564 (E.D.N.Y. 2011) ....................................................................25

*Butte Cty., Cal. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ................................................................................28

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..........................................................................................18, 19

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
  341 F.3d 961 (9th Cir. 2003).................................................................................15

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004)..........................................................................16, 17

*City of Tacoma, Washington v. F.E.R.C.*,
  460 F.3d 53 (D.C. Cir. 2006)..................................................................................29

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..........................................................................................15, 16

*Corley v. United States*,
  556 U.S. 303 (2009)................................................................................................20

*D.C. Fed'n of Civic Assoc'ns v. Volpe*,
  459 F.2d 1231 (D.C. Cir. 1971) ..............................................................................24

*De Loss v. Dep't of Hous. & Urban Dev.*,
  714 F. Supp. 1522 (S.D. Iowa 1988).......................................................................25

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)............................................................................................26

iii

# TABLE OF AUTHORITIES
(continued)

**Page**

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ........................................................................................19, 20

*Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*,
   896 F.3d 600 (4th Cir. 2018)........................................................................................29

*Evenwel v. Abbott*,
   136 S. Ct. 1120 (2016) ................................................................................................12

*Fair Hous. of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002)................................................................................17, 18

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ....................................................................................................22

*Federation for American Immigration Reform (FAIR), et al., v. Philip M.
Klutznick, et al.*,
   79-3269, 1980 WL 683642 (D.D.C. Jan 3, 1980) ....................................................12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)..............................................................................................15, 16

*Genuine Parts Co. v. Envtl. Prot. Agency*,
   890 F.3d 304 (D.C. Cir. 2018) ....................................................................................27

*Hadley v. Kellogg Sales Co.*,
   243 F. Supp. 3d 1074 (N.D. Cal. 2017) ......................................................................22

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ....................................................................................................17

*Home Box Office, Inc. v. F.C.C.*,
   567 F.2d 9 (D.C. Cir. 1977) (per curiam) ...................................................................23

*I.N.S. v. Orlando Ventura*,
   537 U.S. 12 (2002) ......................................................................................................29

*In Re Dep't of Commerce, et al.*,
   586 U.S. __ (2018) ........................................................................................................1

*In re Dep't of Commerce, et al.*, *petition filed*,
   (October 29, 2018) (No. 18-557) ..................................................................................2

*Lamie v. U.S. Tr.*,
   540 U.S. 526 (2004) ....................................................................................................19

*Mendina v. Garcia*,
   768 F.3d 1009 (9th Cir. 2014).................................................................................16, 17

*Mendoza v. Zirkle Fruit Co.*,
   301 F.3d 1163 (9th Cir. 2002)......................................................................................16

*Michigan v. E.P.A.*,
   135 S. Ct. 2699 (2015) ................................................................................................28

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*,.
   463 U.S. 29 (1983)....................................................................................................21, 22, 27

*Mulry v. Driver*,
   366 F.2d 544 (9th Cir. 1966)................................................................................................29

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
   545 F.3d 1147 (9th Cir. 2008).............................................................................................21

*Nat'l Small Shipments Traffic Conference, Inc. v. I.C.C.*,
   725 F.2d 1442 (D.C. Cir. 1984) ..........................................................................................25

*Nehemiah Corp. of Am. v. Jackson*,
   546 F. Supp. 2d 830 (E.D. Cal. 2008)................................................................................30

*North Carolina v. E.P.A.*,
   531 F.3d 896 (D.C. Cir.), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) ...........................19

*Northwest Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   117 F.3d 1520 (9th Cir. 1997).............................................................................................10

*NW Motorcycle Ass'n v. United States Dep't Agric.*,
   18 F.3d 1468 (9th Cir. 1994)...............................................................................................14

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015)...............................................................................................27

*Padula v. Webster*,
   822 F.2d 97 (D.C. Cir. 1987) ..............................................................................................24

*Presidio Golf Club v. Nat'l Park Serv.*,
   155 F.3d 1153 (9th Cir. 1998).............................................................................................17

*Robins v. Spokeo, Inc.*,
   867 F.3d 1108 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 931 (2018) ...................................15, 18

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ....................................................................................................18, 20

*Sec. & Exch. Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947)..............................................................................................................30

*Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v.*
   *Babbitt*,
   961 F. Supp. 1276 (W.D. Wis. 1997)...................................................................................23

*State v. Bureau of Land Mgmt.*,
   286 F. Supp. 3d 1054, 1065 (N.D. Cal. 2018) ...................................................................29

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014) .........................................................................................................15

v

# TABLE OF AUTHORITIES
(continued)

Page

*Tummino v. Torti*,
603 F. Supp. 2d 519 (E.D.N.Y. 2009), *amended sub nom. Tummino v. Hamburg*, No. 05-CV-366 ERK VVP, 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013) ...........................................................................................................24

*Ursack, Inc. v. Sierra Interagency Black Bear Grp.*,
No. 08-1808 SC, 2009 WL 2422784 (N.D. Cal. Aug. 6, 2009), *aff'd*, 639 F.3d 949 (9th Cir. 2011).........................................................................................3

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017)......................................................................16, 18

*Water Quality Ins. Syndicate v. United States*,
225 F. Supp. 3d 41, 69 (D.D.C. 2016) ...............................................................26

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
18 F.3d 854 (10th Cir. 1994)...............................................................................23

## STATUTES

5 U.S.C. § 706(2) ............................................................................................ passim

13 U.S.C. § 9(a)(2)................................................................................................18

13 U.S.C. § 141(f) (1)-(3) ..................................................................... 1, 3, 18-23

44 U.S.C. § 3504(e)(3)(A) ......................................................................................8

44 U.S.C. § 3506(e)(4)............................................................................................8

## OTHER AUTHORITIES

5 C.F.R. § 1320.18(c)...............................................................................................8

40 C.F.R. § 1502.9(c)(1)(ii) ..................................................................................21

163 Cong. Rec. S1455 (Feb. 27, 2017) ..................................................................2

U.S. Const. Am. XIV .............................................................................................26

## RULES

Fed. R. Civ. P. 56(a)..............................................................................................14

Fed. R. Evid. 201 ..................................................................................................10

vi

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### <u>INTRODUCTION</u>

While there may be "nothing unusual about a new cabinet secretary inclined to favor a different policy direction," *In Re Dep't of Commerce, et al.*, 586 U.S. __ (2018) (Gorsuch, J., concurring and dissenting), Congress has mandated that agencies abide by the Administrative Procedure Act ("APA") when they implement such policies. Commerce Secretary Wilbur Ross disregarded the most basic principles of administrative procedure when he added a citizenship question to the 2020 Decennial Census ("Census"). The administrative record[1] reveals conduct on the part of Ross and his subordinates that violated a clear Congressional mandate and broke all the well-established internal rules for changing course with the Census. Ross's decision, if upheld, would make a shambles of bedrock APA law.

Ross's deviation from settled law and procedure is extraordinary. He ignored express statutory requirements that required the Census Bureau ("Bureau") to provide topics for the Census by March 2017, absent "new circumstances" that "necessitate" a change.[2] He ignored settled Bureau protocol for the addition of questions to the Census (and, indeed, his staff appears to have deleted that protocol from a Bureau document without the Bureau's knowledge). He disregarded the concrete and well-considered conclusions of the entire professional scientific staff of the Bureau that adding the question would impair the quality of Census data, while at the same time would *not* provide reliable citizenship data. And he concocted a charade that some other agency needed a citizenship question on the Census questionnaire. Any one of these undisputed facts, in itself, is sufficient to sustain a finding that Ross's decision to add a citizenship question to the Census violated the APA. Taken in any combination, these decisions attain a level of arbitrariness and capriciousness rarely witnessed in an administrative action.

---

[1] Defendants concede that all documents number stamped from 000001 through 0013099, aside from those created after March 26, 2018, are part of the administrative record in this matter. (*See* Declaration of Ana G. Guardado ("Guardado Decl."), ¶2, Ex. 1.) Plaintiffs do not waive the right to rely on extra-record discovery ordered by this Court in opposition to any motion for summary judgment filed by Defendants, at trial should this Court deny Plaintiffs' motion, or in support of their Enumeration Clause claim on which they are do not seek summary judgment.
[2] 13 U.S.C. §§ 141(f)(1)-(3).

1

## STATEMENT OF UNDISPUTED FACTS

### I.   PLAINTIFFS ARE RELYING ONLY ON THE ADMINISTRATIVE RECORD FOR ALL ISSUES EXCEPT STANDING.

For purposes of this Motion, Plaintiffs are relying solely on the administrative record produced by Defendants in this action. Plaintiffs are not relying on any documents that were produced pursuant to a finding of "bad faith" by Defendants, and do not rely on any of the "extra-record discovery that has already been produced." Brief for Petitioner at 7, 14, *In re Dep't of Commerce, et al.*, *petition filed*, (October 29, 2018) (No. 18-557). The extra-record discovery ordered by this Court and others is certainly relevant and helpful to Plaintiffs claims, but Defendants' actions are so egregious that the APA violation can be proved by the administrative record.

### II.   DEFENDANTS IGNORED STATUTES AND REGULATIONS GOVERNING CHANGING THE CENSUS.

#### A.   Ross Chose to Add the Citizenship Question for Reasons that Are Not in the Record.

Discussions concerning adding the citizenship question began immediately after Wilbur Ross became Secretary of Commerce.[3] In March 2017, Earl Comstock, Director of Policy and Strategic Planning for the Department of Commerce, wrote Ross a response to "Your Question on the Census," which appears to have been whether non-citizens are counted for Congressional apportionment. (0002521.)[4] A Bureau FAQ page confirmed that they are. (*Id.*) High-level Administration officials also lobbied Ross to add the citizenship question. On April 5, 2017, Ross's executive assistant wrote to Ross's wife that "Steve Bannon has asked that the Secretary talk to someone about the Census." (0002561.) Ross also had discussions with Kansas Secretary of State Kris Kobach about adding the citizenship question, as Kobach reminded Ross in a July 21, 2017 email. (000763.)

But by the time Ross had these conversations, it was too late to change the content of the Census. The Bureau, pursuant to federal law, had already submitted its topics for the Census by

---

[3] *See* 163 Cong. Rec. S1455 (Feb. 27, 2017).
[4] The applicable portions of the administrative record are attached as Exhibit 3 to Guardado Decl.

the March 31, 2017 deadline[5] (000194), stating that only five subjects would be included in the Census: age, gender, race/ethnicity, relationship, and homeowner status (000204-000213), and noting that other topics including citizenship would be included on the American Community Survey ("ACS") as they have been in the past. (000214-67.) Thus, by April 2017, the Bureau had notified Congress that citizenship would not be a topic on the Decennial Census.

Although the statutory deadline had passed, Ross complained to Comstock on May 2, 2017 that he was "mystified why nothing has been done in response to my months['] old request that we include the citizenship question." (0003710.) Comstock responded that the Bureau had already sent the topics to Congress, but suggested that a question could be added that was not among those topics. (*Id.*) Comstock added that "[w]e need to work with Justice to get them to request that citizenship be added back as a census question[.] . . . I will arrange a meeting with DoJ staff this week to discuss." (*Id.*)

### B.    Commerce Sought Out Another Agency to Request the Question.

By the next day, Senior White House Advisor Eric Branstad looked for a Department of Justice ("DOJ") contact "[r]egarding [a] Census and Legislative issue" to put in touch with Comstock. (0003701.) Branstad referred Comstock to Mary Blanche Hankey at DOJ, with whom Comstock met "in person to discuss the citizenship question." (0002462 and 0012756.) Hankey referred Comstock to James McHenry, the newly-appointed Acting Director of DOJ's Executive Office of Immigration Review,[6] with whom Comstock spoke several times. (*Id.*)

On July 21, 2017, while Comstock searched for an agency to request the citizenship question, Kobach wrote to Ross "at the direction" of Bannon reminding him how important it was to exclude non-citizens from apportionment counts. Kobach emphasized that, without a citizenship question "aliens who do not actually 'reside' in the United States are still counted for congressional apportionment." (000764.) Kobach sent Ross the exact language of what ultimately

---

[5] *See* 13 U.S.C. §§ 141(f)(1)-(3).

[6] *See* https://www.justice.gov/opa/pr/attorney-general-sessions-announces-appointment-james-mchenry-director-executive-office. Plaintiffs seek judicial notice of certain "relevant background information," such as the identity of individuals named in the record and the history of the census, through government documents, as is proper in APA proceedings. *Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, No. 08-1808 SC, 2009 WL 2422784, at *6 (N.D. Cal. Aug. 6, 2009), *aff'd*, 639 F.3d 949 (9th Cir. 2011).

3

1   became the citizenship question that Ross chose to add to the Census. (*Id*.) On August 8, Ross

2   wrote to Comstock to ask "where is the DOJ in their analysis? If they still have not come to a

3   conclusion please let me know your contact person and I will call the AG." (001247.)

4       On September 8, 2017, Comstock reported to Ross that "Justice staff did not want to raise

5   the question given the difficulties Justice was encountering in the press at the time (the whole

6   Comey matter)." (0012756.) Instead, DOJ's McHenry referred Comstock to an official at the

7   Department of Homeland Security ("DHS"), who also declined to request a question on behalf of

8   DHS. Comstock reported that attorneys from Commerce were going to "look into the legal issues

9   and how Commerce could add the question to the Census itself." (*Id*.)

10      Ross followed through on his promise to call Attorney General Jeff Sessions. Five days

11  after Comstock told Ross that neither DOJ nor DHS would ask the Bureau to put the question on

12  the Census, John Gore, the acting head of DOJ's Civil Rights Division, wrote to Ross's chief of

13  staff to discuss "a DOJ-DOC issue." (0002652.) By September 17, the Attorney General and Ross

14  had spoken. (*Id*.) Danielle Cutrona from the Attorney General's office told Ross's Chief of Staff,

15  "we can do whatever you all need us to do." (*Id*.) When DOJ had not asked that Census add a

16  citizenship question by November 27, 2017, Ross wrote to Peter Davidson, the General Counsel

17  of Commerce: "Census is about to begin translating the questions into multiple languages and has

18  let the printing contract. We are out of time. Please set up a call for me tomorrow with whoever is

19  the responsible person at Justice. We must have this resolved." (0011193.) Davidson reassured

20  Ross that "I can brief you tomorrow . . . no need for you to call." (*Id*.) Two weeks later, DOJ

21  issued the request that Ross had sought for months.

22      **C.      DOJ Reverses Course and Asks for a Citizenship Question.**

23      By this time, however, DOJ had already confirmed that it did not want a citizenship

24  question on the Census. In accordance with the statutory deadlines described above, DOJ

25  formally informed the Bureau that it "had no needs to amend the current content and uses or to

26  request new content in the American Community Survey (ACS) for the 2020 Census." (000311.)

27  In October 2016, Arthur Gary, General Counsel for the Justice Management Division of DOJ,

28  supplemented this letter, formally requesting that the Bureau "consider a new topic in the ACS

4

relating to LGBT populations." (*Id.*) Thus, as of the statutory deadline for adding new topics, DOJ had, consistent with the Bureau's process, provided its complete update on its needs for the Census with no mention of a need for additional citizenship-related data.

That changed after Ross spoke with Attorney General Sessions. On December 12, 2017, Gary signed a new letter, this one to acting Census Director Ron Jarmin, "to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called 'long form' census." (000663.) (the "DOJ Request"). Gary based his request—which contradicts the one he had sent just a year before—on a purported need for "citizen voting-age population data for census blocks, block groups, counties, towns, and other locations." (000664.)

## III.   ROSS IGNORED EVIDENCE FROM BUREAU EXPERTS AND STAKEHOLDERS AND IMPOSED HIS PREDETERMINED POSITION.

### A.   The Bureau Proposes a Better Means of Providing CVAP Data.

Upon receiving the DOJ Request, the career scientists at the Bureau set out to study how best to meet DOJ's ostensible need for block-level CVAP data. On December 22, they prepared a technical memorandum (0011646-49) and an accompanying White Paper (0011634-45). In these documents, the experts at the Bureau analyzed the advantages and disadvantages of using a citizenship question on the Census to obtain CVAP data, identifying two advantages: (1) the provenance of the data is transparent and (2) the data are contemporaneous with the census by construction (0011647), and three disadvantages: (1) potential negative impact on voluntary cooperation with the census, (2) poorer quality citizenship data than would be available through administrative records, and (3) additional cost. (*Id.*).

The Bureau noted that the decline in response rate for household with at least one non-citizen to the ACS, which contains a citizenship question, was 5.1 percentage points more than the decline for all-citizen households. (0011647.) Additionally, the Bureau found that "there is a tendency for noncitizen ACS respondents to report being U.S. citizens." (0011640.) Further, the cost of additional non-response follow up ("NRFU") was calculated at $32,000,000 based on the lower response rate. (0011647.) The Bureau found that administrative records—birth certificates,

Social Security data, drivers' licenses, and the like—could be used to cross-reference census data and provide DOJ with more accurate block-level CVAP information than using the citizenship question, without the drawbacks of adding the question itself. (0011647-48.)

**B.    The Bureau's Full Review Concludes Administrative Records Are a Better Means of Obtaining CVAP Data.**

The Bureau's scientific staff then conducted a month-long review into the impact of three potential alternatives regarding citizenship and the Census, namely: (A) no change in data collection, (B) adding a citizenship question to the Census, and (C) obtaining citizenship status from administrative records for the whole population; they set forth their findings in a January 19, 2018 Memo. (001277-85.) The Bureau compared the self-response rate in the short form census to the long form census (which, like the ACS, had contained a citizenship question) and the ACS since 2000. For 2000, it found that the decline in self-response from the short form to the long form was 3.3 percentage points higher for non-citizen households. (001280.) In 2010, the decline in self-response from the short form to the ACS was 5.1 percentage points higher for non-citizen households. (*Id*.) The Bureau also found that the item nonresponse rate on the ACS from 2013 through 2016 was much greater than the comparable rates for other demographic variables. (*Id*.) The Bureau concluded that the increased burden[7] of the citizenship question would lead to a decline in *overall* self-response, and a larger decline in self-response in non-citizen households. The Bureau provided Ross with an estimate that NRFU costs would increase $27.5 million by adding the citizenship question, emphasizing that the estimate was a conservative one. (001282.) In comparison, the cost to use administrative data on citizenship instead of adding the question to the Census would be between $500,000 and $2 million. (*Id*.)

The Bureau recommended either Alternative A (no change) or C (using administrative records), explaining that Alternative C would meet the stated use in the DOJ Request without increasing response burden or harming the quality of the Census count. It concluded that Alternative B (adding the citizenship question) would be very costly, would harm the quality of the census count, and would use substantially less accurate citizenship status data than are

---

[7] Survey methodologists consider "burden" to include both the direct time costs of responding and the indirect costs arising from nonresponse due to perceived sensitivity of the topic. (001281.)

1  available from administrative sources. (001277.)

2  **C.**  **Ross Conducts Perfunctory Meetings with Stakeholders.**

3  Ross met with numerous stakeholders about the citizenship question, including officials,

4  academics, and representatives of interest groups, the vast majority of whom rejected the addition

5  of the citizenship question.[8] On January 26, 2018 six former directors of the Bureau, who served

6  under administrations of both parties, wrote to Ross opposing adding the citizenship question,

7  emphasizing that the Bureau's well-established process had been ignored, noting that "adding an

8  untested question on citizenship status at this late point in the decennial planning process would

9  put the accuracy of the enumeration and success of the census in all communities at grave risk."

10  (001057.) They implored Ross to consider the "great deal of evidence that even small changes in

11  survey question order, wording, and instructions can have significant, and often unexpected,

12  consequences for the rate, quality, and truthfulness of response." (001058.)

13  **D.**  **Commerce Ignored the Answers to Follow-up Questions to the Bureau**

14  On January 30, 2018, following review of the January 19 Memo, Comstock asked the

15  Bureau to respond to 35 follow-up questions (0005216), including one asking "[w]hat was the

16  process that was used in the past to get questions added to the decennial Census or do we have

17  something similar where a precedent was established?" (0009832-33.) The Bureau responded by

18  setting forth its well-established process for adding questions:

19  The Census Bureau follows a well-established process when adding or changing content
    on the census or ACS to ensure the data fulfill legal and regulatory requirements
20  established by Congress. Adding a question or making a change to the Decennial Census
    or the ACS involves extensive testing, review, and evaluation. This process ensures the
21  change is necessary and will produce quality, useful information for the nation.
22  • The Census Bureau and the Office of Management and Budget (OMB) have laid
    out a formal process for making content changes.
23  • First, federal agencies evaluate their data needs and propose additions or changes
    to current questions through OMB.

24

25  [8] Among them were the Senior Vice President of Data Science for Nielsen, Christine Pierce, who stated that in her
    experience including a sensitive question "could make people less likely to respond." (001276.) The leader of the
26  bipartisan United States Conference of Mayors wrote that a citizenship question would "increase the burden on
    respondents, likely heighten privacy concerns around the census, and lower participation by immigrants who fear the
27  government will use this information to harm them and their families." (001066.) The attorneys general of Iowa and
    Mississippi opposed the question. (001201 and 001205.) A Chamber of Commerce leader wrote that the question
28  could lead to inaccurate census data, which businesses use "to analyze demographic and economic trends required for
    business strategy." (001238.)

7

- In order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations.
- Final proposed questions result from extensive cognitive and field testing to ensure they result in the proper data, with an integrity that meets the Census Bureau's high standards . . . .
- The final decision is made in consultation with OMB.

(0009832-33.)[9]

But this response from the Bureau was not included in the administrative record that Commerce initially produced in this matter. Instead, an entirely new answer, which nothing in the administrative record suggests was ever shown to or approved by anyone at the Bureau, was included. That answer reads:

> Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed [*sic*] bound by past precedent when considering the Department of Justices' request. Rather, the Census Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation. As you are aware, that process is ongoing at your direction.

(001296.) It was only after Judge Furman ordered completion of the administrative record that Defendants produced the Bureau's original response to Commerce's question 31.

### E.    Commerce Demands New Analysis from Census.

After the Bureau provided its conclusions in the January 19 Memo, Ross demanded analysis of a fourth alternative option, Alternative D, under which the Bureau would include the citizenship question on the Census, but then use administrative records, such as Social Security records, to provide CVAP data. (001316, 0009812.) On March 1, 2018, the Bureau presented its findings, concluding that, because the drop in self-response rate that would come from including a citizenship question would remain, "Alternative D would result in poorer quality citizenship data than Alternative C." (001312.) After all, it "would still have all the negative cost and quality

---

[9] This well-established process is derived from the several federal laws that govern the specific manner in which the census is to be developed and conducted, including the Paperwork Reduction Act of 1995, *see* 44 U.S.C. §§ 3504(e)(3)(A), 3506(e)(4); 5 C.F.R. § 1320.18(c). The Bureau itself has issued Statistical Quality Standards applicable to "all information products released by the Bureau and the activities that generate those products"— including the decennial census. *See* Statistical Quality Standards, U.S. Census Bureau, July 2013, *available at* https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf at ii. These standards are discussed in the administrative record. (001093-95.)

1   implications of Alternative B" set forth in the January 19 Memo. (*Id.*) But it would not resolve

2   any concerns about using administrative records instead of the question, because those people

3   "refusing to self-respond due to the citizenship question are particularly likely to refuse to

4   respond in NRFU as well, resulting in a proxy response." (001311; *see also* 0009816 (discussing

5   further problems with Alternative D).)

6   ### F.   Ross Issued His Decision Without Considering Key Findings and Without Disclosing that He Asked DOJ to Make the Request

7   On March 22, 2018, despite having worked for nearly a year to get DOJ, then DHS, then

8   DOJ again, to issue a request for the citizenship question, Ross testified under oath to the House

9   Ways and Means Committee that "[DOJ], as you know, initiated the request for inclusion of the

10   citizenship question."[10] This testimony was consistent with Ross's memo, ("Decision Memo")

11   issued four days later, in which he wrote that DOJ "requested" that he add the citizenship

12   question and that "[f]ollowing receipt" of this request, he took a "hard look" at the issue.

13   (001313-20.) Nowhere in the Decision Memo did Ross discuss his and his staff's strenuous

14   efforts to get DOJ to make this request.

15   In the Decision Memo, Ross dismissed the concerns of statistical experts, former Bureau

16   chiefs, and others who had warned that adding a citizenship question would lower data quality.

17   When considering Option C (the administrative record only option), Ross emphasized inaccurate

18   response rates and dismissed administrative records, but when considering Option D (adding the

19   citizenship question and using administrative records), he ignored inaccurate responses and

20   praised administrative records. (001317.) Ross did not consider concerns of experts that the

21   question needed to be tested in the context and on the instrument that it was going to be used

22   because some question having something to do with citizenship had been asked "in some form or

23   another for nearly 200 years."[11] He dismissed the higher costs associated with adding the

24

---

25   [10] *See* Transcript of a Hearing Before the Committee on Ways and Means, U.S. House of Representatives, March

26   22,2018, serial no. 115-FC09, *available at* https://docs.house.gov/meetings/WM/WM00/20180322/108053/HHRG-115-WM00-Transcript-20180322.pdf.

27   [11] As the Bureau notes, this statement is not true. Aside from a question in 1870 that was used to count freed slaves who were denied the right to vote, no citizenship question was asked between 1820 and 1890, and none was asked in 1950. *See History, 2000 Census of Population and Housing,* U.S. Census Bureau, December 2009 p. 131, *available*

28   *at* https://www.census.gov/history/pdf/Census2000v1.pdf. From 1950 through 2000, the question was asked only as part of a survey on the "long-form" questionnaire, and since 2010, the question was asked as part of the American

9

1  question. (001319.) He concluded by stating that "[t]he citizenship data provided to DOJ will be

2  more accurate with the question than without it" without citing to any study, authority, or expert

3  for this conclusion. (*Id*.)

4      **G.    Ross Discloses Some of the Truth After Litigation Begins.**

5          After Plaintiffs filed a motion to expand discovery based on evidence of improper

6  influence, Ross issued a "supplement" to his administrative determination indicating that, indeed,

7  "senior governmental officials" had discussed adding a citizenship question months before DOJ

8  "initiated" the issue. (001321.)

9  **IV.    ADDING THE QUESTION HAS HARMED, IS HARMING, AND WILL HARM
10          PLAINTIFFS**

11      **A.    San Jose is Spending Money on Outreach Now to Reduce the Negative Impact
              of Including a Citizenship Question.**

12          Aware that adding the citizenship question to the Census will depress self-response rates,

13  the Bureau and Commerce have publicly stated that local communities need to do more than they

14  have in past decades to protect their interest in a full count. In July 2018, Ross wrote to the United

15  States Commission on Civil Rights asking "Federal, state, and local leaders" to conduct outreach

16  regarding the citizenship question, and that "[b]y encouraging non-citizens, their friends, and their

17  families to respond to the census, these community leaders can help the Census Bureau conduct a

18  complete and accurate count."[12] On October 2, 2018 Ross issued a public statement about how

19  Commerce has "encouraged [states] to establish so-called 'Complete Count Committees'" that

20  would work to "encourage participation in the Census."[13]

21          San Jose has already spent, and will continue to spend, precious municipal resources to

22  encourage participation in the Census *specifically because* a citizenship question will be added.

23  Jeff Ruster, San Jose's Assistant Director of Economic Development, has detailed the expenses

24

25  Community Survey. (0005477.)
    [12] Letter from Secretary Ross to Catherine Lhamon, United States Commission on Civil Rights, July 5, 2018,
26  https://www.usccr.gov/press/2018/07-17-18-letter.pdf. The letter and other "government documents" in this section
    are subject to judicial notice under Fed. R. Evid. 201; going outside the administrative record to establish standing is
27  routine in APA cases. *See, e.g.*, *Northwest Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28
    (9th Cir. 1997) (considering affidavits for the limited purpose of standing).
28  [13] *See* https://www.commerce.gov/news/secretary-speeches/2018/10/remarks-secretary-wilbur-l-ross-us-census-
    national-partnership-press.

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– CASE NO. 3:18-cv-2279-RS**

that San Jose has already incurred, and will continue to incur, directly traceable to the inclusion of the citizenship question. Ruster personally assisted in the preparations for a "Complete Count Committee," just as Ross recommended, bringing together over 100 representatives from community-based, educational, government, and private sector organizations. (Ruster Decl. ¶ 7.) He has worked to identify low visibility housing and developed programs to encourage hard-to-count populations to participate. (Ruster Decl. ¶ 5.) In working directly on these outreach programs, Ruster heard firsthand from community representatives about concerns due to the citizenship question being added. (Ruster Decl. ¶ 8.) Community members have informed him that hard-to-count populations, including non-citizens, will not respond to the Census if it includes a citizenship question. (Ruster Decl. ¶ 8.) In fact, at the presentation of the Santa Clara County Complete Count Committee meeting in September 2018, the very first obstacle listed was "Citizenship Question." (Ruster Decl., Ex. 1, SJBAJI00020.)

Even if the Bureau were to compensate for the lowered self-response rate entirely through the use of NRFU, San Jose will have already diverted funds from other activities to lessen the impact of the question. San Jose has allocated $300,000 to such efforts, expects to allocate at least $300,000 more, and will divert resources from other programs to "outreach specifically aimed at increasing participation among groups more likely to resist responding because of the inclusion of a citizenship question." (Ruster Decl. ¶ 13). These funds will be diverted before the Census takes place, and will therefore be used—if the citizenship question is included—whether or not NRFU procedures ultimately correct any initial undercount. (Ruster Decl. ¶¶ 14-15.) If the Bureau is enjoined from putting the citizenship question on the Census, San Jose would be able to use these funds for other purposes. (Ruster Decl. ¶ 16.)

**B.   <u>Including the Citizenship Question Will Lower Self-Response Rates, Leading to Incorrect Enumerations and a Likely Differential Undercount.</u>**

In its post-enumeration analysis of the 2010 Decennial Census, the Bureau found that even though the census "did not have a significant percent net undercount" it had a significant undercount by race or Hispanic origin.[14] With the citizenship question, these undercounts are

---

[14] *See* 2010 Census Coverage Measurement Memorandum Series #2010-G-01 ("Census Coverage Memo"), *available at* https://www.census.gov/coverage_measurement/pdfs/g01.pdf. The Bureau found a net undercount of 2.06% in the

11

likely to be even higher. As long ago as 1980, and as recently as 2016, the Bureau has held that a citizenship question would "enhance the problems of enumerating minorities thereby exacerbating the undercount"[15] and lead to a "reduced rate of response overall and an increase in inaccurate response."[16] In analyzing the DOJ Request, the Bureau calculated that on instruments including a citizenship question, the "decline in self-response was 5.1 percentage points greater for noncitizen households than for citizen households." (001280.) While the Bureau will attempt to follow up with non-respondents using NRFU, it emphasized that "[t]hose refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well, resulting in a proxy response." (001311.) If the Bureau was unable to obtain an accurate count of Blacks and Latinos without a citizenship question, it is pure speculation on their part that they will obtain an accurate count with one.

### C. San Jose Has a Substantial Risk of Being Harmed by the Addition of the Citizenship Question.

According to the Bureau, 174,510 of San Jose's 1,009,363 residents—over 17%—are non-citizens, while under 7% of the national population are non-citizens. San Jose's population is 32.6% Hispanic, nearly double the national percentage of 17.3%.[17] Any undercount of non-citizens will therefore disproportionally affect San Jose.

Kristen Clements administers grants programs, including the Community Development Block Grant program ("CDBG") and the Home Investment Partnerships Program ("HOME") for San Jose. (Clements Decl. ¶¶ 1, 3, 4.) Both programs receive funding based on federal formulas linked to census data. (Clements Decl. ¶¶ 12, 14, 22.) If the Census underreports the population of San Jose relative to jurisdictions with fewer non-citizens, San Jose will receive less funding than it otherwise would. (Clements Decl. ¶¶ 23-27.)

---

black population in the 2010 Census, a net undercount of 1.54% for the Hispanic population, a net undercount of 4.88% in the American Indian population, and a net *overcount* of almost a percent of the white population. *Id at* 1-2.
[15] Defendants' Reply Memorandum and Opposition to Plaintiffs' Motion for Summary Judgment, *Federation for American Immigration Reform (FAIR), et al., v. Philip M. Klutznick, et al.,* 79-3269 (D.D.C. Jan 3, 1980) 1980 WL 683642 at 22.
[16] Brief of Former Directors of the U.S. Census Bureau as Amici Curiae in Support of Appellees, *Evenwel v. Abbott,* 136 S. Ct. 1120 (2016), 2015 WL 5675832 at 23-26.
[17] The Bureau's data on ACS are available at https://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml (enter "San Jose" or "United States" and click under "2016 American Community Survey").

12

1  Monique Melchor oversees San Jose's programs funded through the Workforce

2  Innovation and Opportunity Act ("WIOA"). (Melchor Decl. ¶¶ 1,3.) Funds allocated through

3  WIOA are awarded based on several factors, including data from the Bureau of Labor Statistics

4  ("BLS") and the Bureau. (Melchor Decl. ¶¶ 5,6.) Because this funding is allocated, in part, on

5  data provided by the Bureau, an undercount of San Jose relative to cities with a lower population

6  of non-citizens would result in a reduction in funding and a decrease in services provided to this

7  vulnerable population. (Melchor Decl. ¶¶ 10,11.)

8  **D.      BAJI Has Suffered and Will Suffer Harm Unless the Question Is Removed.**

9  Plaintiff Black Alliance for Just Immigration ("BAJI") is a California nonprofit

10  corporation with offices in Oakland, Los Angeles, and New York. (Declaration of BAJI's

11  Executive Director Opal Tometi ("Tometi Decl.") ¶ 2.) It is a membership organization with

12  approximately 1200 members, predominantly Black immigrants, refugees, and/or African

13  Americans concentrated in Oakland and other parts of the Bay Area, San Jose, Los Angeles, New

14  York, Miami, Atlanta, and Washington, D.C. BAJI's core mission is to educate and engage Black

15  immigrant communities to organize and advocate for racial, social and economic justice for

16  themselves and other underrepresented communities. (Tometi Decl. ¶¶ 4–7.)

17  Several of BAJI's members have told BAJI that they would be reluctant to participate in

18  the Census if it contains a question about their citizenship status, expressing fears about

19  confidentiality and privacy, particularly in the context of the heightened anti-immigrant political

20  rhetoric. Others have expressed concern about the effects of the question, such as political

21  dilution and the loss of federal funding, on the historically underrepresented communities whom

22  BAJI represents. (Tometi Decl. ¶¶ 9–11.)

23  To address, and attempt to mitigate, the effects of the addition of a citizenship question to

24  the Census, BAJI has diverted time and money from other important organizational activities to

25  educate its constituents about the citizenship question and advocate against its inclusion and

26  prepare additional outreach efforts to mobilize their constituents to respond to the Census so that

27  they may be properly counted. (Tometi Decl. ¶¶ 12–14.) BAJI has engaged partner organizations

28  and donors in conversations about census outreach, begun preparing strategies to engage Black

1    immigrant communities in the Census, and is soliciting potential funding for census outreach and

2    education. (Tometi Decl. ¶ 18.) Outreach to encourage the participation of its constituents in the

3    Census will require the expenditure of additional money, staff time, and operational expenses,

4    including materials, computers, telephones, and other office equipment. (Tometi Decl. ¶ 14.) To

5    date, BAJI has dedicated numerous staff hours to addressing the addition of a citizenship question

6    to the Census and expects to allocate at least an additional $200,000 in the next two years.

7    (Tometi Decl. ¶¶ 19–20.) The inclusion of a citizenship question on the Census will therefore

8    require BAJI to divert its limited and essential resources prior to the date the Census is conducted,

9    regardless of whether the Bureau's NRFU procedures ultimately correct any initial undercount

10   and the ultimate impact of the question itself. (Tometi Decl. ¶¶ 16, 19.)

### STANDARD OF REVIEW

12          Summary judgment shall be granted if the record shows that there is no genuine dispute as

13   to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

14   56(a). Under the APA, this Court "shall hold unlawful and set aside agency action" that is "found

15   to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"

16   "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory

17   jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5

18   U.S.C. §706(2). Plaintiffs' third and fourth counts, that Defendants' decision to add the question

19   was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and

20   "arbitrary and capricious" under the APA, are appropriate for summary judgment. *See NW*

21   *Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) (Finding that

22   where a review of a final agency determination is limited to administrative record, resolution of

23   the matter does not require fact finding, does not present any genuine issues of material fact and

24   summary judgment is appropriate).

### ARGUMENT

26   **I.     PLAINTIFFS HAVE STANDING TO CHALLENGE ROSS'S DECISION.**

27          To satisfy Article III's standing requirements, "a plaintiff must show (1) it has suffered an

28   'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural

14

1   or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3)

2   it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

3   decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81,

4   (2000). Both San Jose and BAJI easily meet these standards.

5            **A.**     **Injury to San Jose and BAJI Is Both Actual and Reasonably Imminent.**

6       Ross himself acknowledged the need for entities like San Jose and BAJI to try to

7   ameliorate the effects of the citizenship question in his imploring them to conduct outreach to

8   encourage responses to the Census.[18] But this costs money, so "both the challenged conduct" (the

9   decision to add the citizenship question) and "the attendant injury" (the expenditures made by San

10   Jose, and BAJI, as directed by Ross, to protect its interest in an accurate count) "have already

11   occurred." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017), *cert. denied*, 138 S. Ct.

12   931 (2018).

13       Additionally, the Ninth Circuit has held that plaintiffs have standing to challenge a

14   procedural action when "it is reasonably probable that the challenged action will threaten their

15   concrete interests." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th

16   Cir. 2003). A plaintiff need not "demonstrate that it is literally certain that the harms they identify

17   will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013); *see also Susan B.*

18   *Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). At a minimum, the Bureau's analyses of

19   the need and impact of a citizenship question and Ross's own pleas for cities and organizations to

20   take extra steps reflect Defendants' own knowledge that the posing of the citizenship question

21   will lead to a higher non-response rate and a more difficult NRFU process. Defendants

22   themselves know that the risk is real.

23       Moreover, however confident Defendants might be that they will be able to count

24   everyone, their own track record says the opposite: even without a citizenship question, they have

25   fallen significantly short in counting the very populations—notably Latinos and Blacks—who are

26   likely to be disproportionately among the immigrant populations whom Defendants acknowledge

27

28   ———————————

[18] See notes 12 and 13, *supra*.

1   are going to be difficult to count accurately.[19] If these populations cannot be counted accurately

2   when there is no citizenship question, the risk they will not be counted accurately when the

3   Census contains the citizenship question is substantial.

4       **B.    San Jose Has Standing.**

5           **1.    San Jose Has Suffered and Will Suffer an Injury in Fact.**

6           When plaintiffs identify a "substantial risk" of harm and "reasonably incur costs to

7   mitigate or avoid that harm," those costs establish Article III standing. *Clapper*, 568 U.S. at 414

8   n.5. At summary judgment, facts set forth in the undisputed declaration of a city official

9   "sufficiently demonstrate[] Article III injury." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198

10  (9th Cir. 2004). As set forth above, San Jose has already diverted money to encourage hard-to-

11  count populations to participate in the Census *specifically* because the Bureau has announced that

12  it will include a citizenship question and asked that cities perform more outreach. Loss of money

13  is the prototypical "concrete, actual injury." *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163,

14  1172 (9th Cir. 2002). And the expenditures—both now and in the future—are "actual or

15  imminent." *Friends of the Earth, Inc.*, 528 U.S. at 180.

16          The loss of funds that will result from a likely undercount constitutes an additional

17  concrete injury. Based upon Defendants' admissions of the obstacles to an accurate count caused

18  by the citizenship question, it is reasonably likely that there will be some undercount in San Jose

19  that would not have occurred absent the citizenship question. Any differential undercount

20  attributable to the citizenship question will harm San Jose to some degree for purposes of

21  standing. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)

22  (receipt of two unwanted text messages sufficient to confer Article III standing).

23          **2.    San Jose's Injury Is Fairly Traceable to the Citizenship Question.**

24          To demonstrate that an injury is fairly traceable to a government action, a plaintiff must

25  show that the "government's unlawful conduct is at least a substantial factor motivating the third

26  parties' actions." *Mendina v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quotation omitted).

27  The particular efforts that San Jose has undertaken which constitute the basis of its injury are

28

---

[19] Census Coverage Memo at 1-2 (finding differential undercounts by race and Hispanic origin in the 2010 census).

1  those precisely suggested by Defendants to mitigate the potential undercounts likely to be caused

2  by inclusion of the citizenship question in the Census. Further, the potential loss of funds by San

3  Jose is directly related to the reasonably likely undercount, which is directly traceable to the

4  inclusion of a citizenship question. "[W]hat matters is not the length of the chain of causation, but

5  rather the plausibility of the links that comprise the chain." *Mendina*, 768 F.3d at 1012–13

6  (quotation and citation omitted); *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th

7  Cir. 1998) (finding that harm to a golf club, in the form of losing membership, is "fairly

8  traceable" to agency building a rival clubhouse that lured members away).

### 3. San Jose's Injury Will Be Redressed by Removing the Citizenship Question.

"[T]o have standing, a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994). If there is no citizenship question, that portion of the undercount attributable to the citizenship question—and San Jose's subsequent funding loss— will be eliminated as well. Because San Jose's "injuries will not occur if the Plan is not implemented," it has Article III standing. *City of Sausalito*, 386 F.3d at 1199.

### C. BAJI Has Standing.

### 1. BAJI Has Suffered and Will Suffer an Injury in Fact Due to a Diversion of Its Resources and the Frustration of Its Mission.

BAJI has standing for similar reasons. An injury in fact is established where a nonprofit organization shows "a drain on its resources from both a diversion of its resources and frustration of its mission." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). As set forth above, adding the citizenship question has forced and will continue to force BAJI to divert resources. Moreover, the question is reasonably likely to disproportionately impact immigrant-rich communities and therefore frustrate BAJI's mission to foster racial, economic, and social equality for Black immigrants.

Harm caused by infringement on "noneconomic values" also provides BAJI standing through its members. *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 154 (1970). Several BAJI members expressed fear as to the confidentiality of their citizenship

17

status. A loss of privacy, like other "aesthetic, emotional or psychological harms also suffice for standing purposes." *Baker v. Castle & Cooke Homes Hawaii, Inc.*, No. CIV. 11-00616 SOM, 2012 WL 1454967, at *4 (D. Haw. Apr. 25, 2012). Injury can stem from a loss of "reputational and privacy interests that have long been protected in the law." *Spokeo*, 867 F.3d at 1114.[20]

Here, Defendants' stated purpose for adding the question is to provide the Bureau with block-level data on residents' citizenship status. But the Bureau publishes CVAP data, and census blocks are so small (sometimes only a single household) that making such information public will intrude on BAJI members' privacy interests.[21]

### 2. BAJI's Injury Is Fairly Traceable to the Citizenship Question and Will Be Redressed By Its Removal.

Because it is the addition of the citizenship question that is frustrating BAJI's mission and leading to the diversion of its resources to mitigate harmful effects of the question and BAJI's members' privacy concerns, the removal of the untimely question would directly resolve the injury. BAJI's injury is concrete, traceable to the citizenship question, and will be redressed setting aside Defendants' action. *See, e.g., Fair Hous. of Marin*, 285 F.3d 899.

## II.   THE DECISION TO ADD THE CITIZENSHIP QUESTION WAS MADE IN EXCESS OF STATUTORY JURISDICTION, AUTHORITY, OR LIMITATIONS.

Courts must set aside agency actions that are made "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Defendants failed to follow the "unambiguously expressed intent of Congress" when they added the citizenship question to the Census, so their decision must be set aside. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). When "a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018).

---

[20] The burden of filling out the question on the form itself is at least as much of an imposition as receiving an unwanted text message, and that alone confers standing on every one of BAJI's members. *Van Patten*, 847 F.3d at 1043.

[21] Harm to the privacy interests of BAJI members provides them standing not only because of the psychological damage it entails, but also because it is protected by law. The Census Act requires that no "officer or employee of the Department of Commerce or bureau or agency thereof" may "make any publication whereby the data furnished by any particular establishment or individual under this title can be identified." 13 U.S.C. § 9(a)(2).

18

A.     **The Secretary Is Required to Submit Census Topics Three Years in Advance and May Not Modify Them Unless He Find "New Circumstances."**

While the Census Act provides the Secretary of Commerce the right to conduct a census "in such form and content as he may determine," the *process* in which Ross must develop and set forth that form and content is strictly regulated by federal law. That process is clear:

> (f) With respect to each decennial and mid-decade census conducted under subsection (a) or (d) of this section, the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census—
>     (1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;
>     (2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and
>     (3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C. § 141(f). For the Census, Ross was required to submit a report regarding the "subjects proposed to be included, and the types of information to be compiled, in such census" by March 2017. Once that report was submitted, those "subjects" and "types of information" could be modified only if Ross submitted to Congress a report in which he "finds *new circumstances exist which necessitate*" that those subjects change. 13 U.S.C. § 141(f)(3) (emphasis added). Ross did not follow this mandate.

B.     **The Statute Is Unambiguous and this Court Need Not Apply *Chevron* Deference.**

"Where the statute speaks to the direct question at issue, we afford no deference to the agency's interpretation of it and 'must give effect to the unambiguously expressed intent of Congress.'" *North Carolina v. E.P.A.*, 531 F.3d 896, 906 (D.C. Cir.), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) *quoting Chevron U.S.A., Inc.*, 467 U.S. at 842–43. When evaluating a statute, a court begins, as it does in any context, with the plain language of "the existing statutory text." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). Courts may also apply "the canon against reading conflicts into statutes" along with "other traditional canons" of construction to determine whether a statute is ambiguous. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018). Where,

19

interpreted under these canons, "a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst., Inc.*, 138 S. Ct. at 1355. Although agency interpretations of ambiguous statutes are accorded deference, when a statute is unambiguous, or "the canons supply an answer, '*Chevron* leaves the stage.'" *Epic Sys. Corp*, 138 S. Ct. at 1630 (quotation omitted).

The controlling statute in this case is not ambiguous. 13 U.S.C. § 141(f) states that the Secretary "shall" submit the required reports. "The word 'shall' generally imposes a nondiscretionary duty . . . ." *SAS Inst., Inc.*, 138 S. Ct. at 1351. The two reports are distinct and have separate contents: the first must set forth the "subjects" and "types of information" on the census, and the second must set for the "questions proposed to be included in such census." 13 U.S.C. §§ 141(f)(1), (2). The Secretary may "modify" those subjects, types of information, or questions only if he "finds new circumstances exist which necessitate" the change, and ***submits another report*** setting forth those new circumstances. 13 U.S.C. § 141(f)(3).

The statute plainly prohibits submitting a question that is not among the "topics" submitted the previous year without a finding of "new circumstances" for two reasons. First, if the topics included in Section 141(f)(1) impose no limitations on the questions, then Section 141(f)(1) is entirely superfluous, as the Secretary could submit a report listing any number of topics, or none at all, and simply modify those topics when submitting questions a year later. Of the canons of construction, "one of the most basic" is that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotations omitted). Second, adding a question that is not among the topics submitted the year before would by necessity add a topic (the topic of the new question) and therefore require a finding of "new circumstances." 13 U.S.C. § 141(f)(3). Finally, moving a topic from the ACS to the Census qualifies as "modify[ing]" the topic, and therefore requires the same finding as adding a topic. *Id*.

### C.   Commerce Violated the Census Act.

Defendants submitted their topics in March 2017 as required by law. (000194-270.) In March of 2018, after Ross issued the Decision Memo, Commerce submitted its "Questions

20

Planned for the 2020 Census and American Community Survey."[22] While the report states that the "statistics" are "essential" for enforcing the Voting Rights Act, it fails to identify any "new circumstances" that support its addition, and certainly none that "necessitate" the change. In fact, neither Ross's Decision Memo nor the DOJ Request even hint at any "new circumstances" that precipitated DOJ's request.

While precedent on what constitutes "new circumstances" under the Census Act is scarce, courts have interpreted the phrase in other contexts. Certain environmental regulations require agencies to supplement reports when "new circumstances or information relevant to environmental concerns" arise. 40 C.F.R. § 1502.9(c)(1)(ii). The Ninth Circuit has held that this obligation "extends only to new information or circumstances regarding environmental impacts that may not have been appreciated or considered when the EIS was prepared," and that agencies need not "consider new alternatives that come to light after issuance of the EIS." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1155 (9th Cir. 2008). No such "new circumstances" exist here. Ross violated the statute, and his decision must be overturned.

## III.  THE DECISION TO ADD A CITIZENSHIP QUESTION MUST BE STRUCK DOWN AS ARBITRARY AND CAPRICIOUS.

The APA requires courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co,*. 463 U.S. 29, 41 (1983) ("*State Farm*"). Agency action is arbitrary and capricious when any of the following factors are met: "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43. While there is some deference in arbitrary and capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and

---

[22] Available at https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf. Although Ross stated in the Decision Memo that the citizenship question would be placed last (001320), the Bureau's submission lists it second.

21

the choice made." *State Farm* at 43 (quotation and citation omitted). When the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account," it must provide a "reasoned explanation" for the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009).

## A.     Ross's Explanation for the Decision Was Implausible and Pretextual.

The administrative record shows that Ross's stated reason for adding the question—that DOJ approached the Bureau asking for the question to better enforce the Voting Rights Act—is pretextual and implausible. Rather, this decision has always been about, at a minimum, apportionment.[23] In March 2017, just weeks after Ross took office, he and Comstock were exchanging emails about the citizenship question which expressly connected the issue to citizens being counted for congressional apportionment. (0002521.) By May 2, 2017, Ross's "request that we include the citizenship question" was already "months['s]old." (0003710.) He had met with White House Chief Strategist Stephen Bannon and Election Integrity Commission Vice-Chair Kris Kobach, and had Earl Comstock, his chief policy officer research whether non-citizens are counted in apportionment. (0002521.) Kobach's July 2017 email to Ross not only provided him with the exact language that would find its way into the citizenship question in the Census, but was sent "at the direction of Steve Bannon." (000764.) Kobach specifically stated that the citizenship question could be used to exclude non-citizens from apportionment counts, noting that

---

[23] A citizenship question in the Census has long been sought by those who wish to exclude non-citizens from congressional apportionment. Steven Camarota, the author of a number of papers recommending excluding non-citizens from apportionment, wrote that to do so, the citizenship question would "have to move to the short form in order to exclude non-citizens." *The Impact of Non-Citizens on Congressional Apportionment, Center for Immigration Studies*, December 6, 2005 *available at* https://cis.org/Impact-NonCitizens-Congressional-Apportionment. When Dr. Camarota met with Ross, he explained that he no longer thinks the question would lower citizen participation, and that "concerns about decreased participation are unfounded." (001206.) Then-United States Senator David Vitter introduced an amendment to an appropriations act in 2009 that would have required the Bureau to add a citizenship question to the short form of the 2010 Decennial Census. *See* Vitter-Bennet Amendment No. 2644 to the Commerce, Justice Science and Related Agencies Appropriations Act of 2010, *available at* https://www.congress.gov/congressional-record/2009/10/13/senate-section/article/S10339-2.. At the time, Senator Vitter said on the floor of the Senate, "If you vote against this amendment, you are voting for your State having less representation in the House of Representatives than they would be if illegals are not counted in reapportionment. *See* Congressional Record, October 7, 2009, SR10192, *available at* https://www.congress.gov/crec/2009/10/07/CREC-2009-10-07-pt1-PgS10181-2.pdf. Judicial notice as relevant background is proper because courts "regularly take judicial notice of congressional records." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1087 (N.D. Cal. 2017)).

22

1   without it, "aliens who do not actually 'reside' in the United States are still counted for

2   congressional apportionment." (*Id.*) Prior to the issuance of the DOJ Request in December 2017,

3   there is no evidence in the record of any reason for adding the citizenship question other than

4   removing non-citizens from apportionment counts.

5        Ross wanted the Bureau to add the citizenship question, but no agency had asked for it. So

6   Comstock, with Ross's express approval, set out on a scheme to engineer a request from another

7   agency—any agency—by reaching out first to the White House and then DOJ. (0002462,

8   0003701.) When DOJ initially refused to order the Bureau to add the citizenship question,

9   Comstock sought help from DHS and was again rebuffed. (0012756.) Only after Ross followed

10  through on a promise to "call the AG" was the DOJ Request issued. (001247, 0002652.)

11       Agency decisions may be set aside for improper political influence when "the pressure

12  was intended to and did cause the [Agency's] actions to be influenced by factors not relevant

13  under the controlling statutes." *Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior*

14  *Chippewa) v. Babbitt*, 961 F. Supp. 1276, 1286 (W.D. Wis. 1997). While the Census Act requires

15  that the Bureau strive towards accuracy, Commerce in fact acted at the political direction of the

16  executive branch and Ross, and took steps to conceal the fact that it was doing so. When an

17  agency rationale is concocted for no reason except to "provide a pretext for the ulterior motive"

18  of the decision-maker, that decision is arbitrary and capricious. *Woods Petroleum Corp. v. U.S.*

19  *Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (invalidating agency decision as arbitrary and

20  capricious where action was pretext for ulterior motive).

21       Ross did not even hint that DOJ had not, in fact, initiated the request for the citizenship

22  question when he testified before Congress on March 22, 2018 or anywhere in his decision

23  memorandum of March 26, 2018. (001313-20). Only after this litigation was filed, did Ross

24  supplement the administrative record and own up to the fact that the issue was first raised by

25  "high government officials," and not DOJ. (001321.) *See Home Box Office, Inc. v. F.C.C.*, 567

26  F.2d 9, 54-55 (D.C. Cir. 1977) ("[W]here, as here, an agency justifies its actions by reference

27  only to information in the public file while failing to disclose the substance of other relevant

28  information that has been presented to it, a reviewing court cannot presume that the agency has

23

1    acted properly . . . but must treat the agency's justifications as a fictional account of the actual

2    decisionmaking process and must perforce find its actions arbitrary") (per curiam).

3           The covert nature of Comstock's scheme, Ross's collusion with Bannon, Kobach, and

4    Sessions, and the ensuing secrecy and contradictory statements demonstrate that "impartial

5    evaluation of the project envisioned by the statute was impermissibly distorted by extraneous

6    pressures." *D.C. Fed'n of Civic Assoc'ns v. Volpe*, 459 F.2d 1231, 1237 (D.C. Cir. 1971)

7    (Bazelon, J.) (overturning an agency decision because "[e]ven if the Secretary had taken every

8    formal step required by every applicable statutory provision, reversal would be required, in my

9    opinion, because extraneous pressure intruded into the calculus of considerations on which the

10   Secretary's decision was based"). Ross's shifting and contradictory accounts of this process

11   provide compelling evidence that the stated reason for the change was pretextual. Courts have

12   struck down actions by agencies for acting "in bad faith and in response to political pressure" on

13   more minor transgressions than those set forth here. *Tummino v. Torti*, 603 F. Supp. 2d 519, 548

14   (E.D.N.Y. 2009), *amended sub nom. Tummino v. Hamburg*, No. 05-CV-366 ERK VVP, 2013

15   WL 865851 (E.D.N.Y. Mar. 6, 2013) (negating FDA refusal to approve medication when director

16   overruled agency scientific staff).

17          **B.     Defendants Departed From Long-Standing Census Procedure, Then Altered
                      the Bureau's Description of Its Procedure Without Its Knowledge.**
18
19          "It is well settled that an agency, even one that enjoys broad discretion, must adhere to

20   voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97,

21   100 (D.C. Cir. 1987) (citation omitted)). Here, not only did Ross fail to follow the Bureau's well-

22   established process for changing census content, Commerce altered the description of the process

     in the record.
23
24          **1.     The Evidence Shows that Ross Deviated from Pre-Testing Protocols.**

25          Ross departed from the ordinary review process that the Bureau and Commerce use to add

26   new questions. The Bureau's Statistical Quality Standards require pre-testing before adding

27   questions to the Census, and even on those "rare occasions" where "cost or schedule constraints

28   may make it infeasible to perform complete pretesting" it still requires a detailed procedure

---

24

including obtaining a formal waiver before any content may be added to a survey.[24] The

Statistical Quality Standards specifically state that "All Census Bureau employees and Special

Sworn Status individuals *must* comply with these standards."[25] The failure of an agency to

comply with its own regulations and policies constitutes arbitrary and capricious conduct. *De*

*Loss v. Dep't of Hous. & Urban Dev.*, 714 F. Supp. 1522, 1534 (S.D. Iowa 1988).

Moreover, when in this matter, Commerce asked the Bureau about its process for adding

questions, the Bureau provided a summary to Commerce of the above-described "well-

established process." Sometime after this document was received by Commerce on March 1, this

section had been deleted and replaced. (001296.) The removal of the Bureau's description of its

testing process presents one of two possibilities, both of which evince arbitrariness. Either

Commerce removed the Bureau's opinion before it was presented to Ross, in which case

Commerce "so distort[ed] the record that an agency decisionmaking body can no longer rely on

[it] in meeting its obligations under the law." *Nat'l Small Shipments Traffic Conference, Inc. v.*

*I.C.C.*, 725 F.2d 1442, 1450–51 (D.C. Cir. 1984) (holding that inaccurate staff-prepared

summaries of adverse comments required that the decision-maker be independently informed of

the comments themselves). Or Ross reviewed the statement from the Bureau and ignored it, and

then it was altered in the record, resulting in a "revisionist" administrative review that is not

entitled to deference. *Brooklyn Heights Ass'n v. Nat'l Park Serv.,* 818 F. Supp. 2d 564, 569

(E.D.N.Y. 2011) (vacating agency decision that relied on a decision that ignored its "own

regulations as well as its . . . manual"). Concealing evidence that undermines an agency decision

is the kind of "administrative misconduct not covered by the other more specific paragraphs" that

renders a decision arbitrary and capricious. *Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of*

*Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

## 2. The Evidence Shows that Adding the Question Without Testing Will Have Unpredictable Adverse Consequences.

Ross wrote in his Decision Memo that the citizenship question "has been well tested"

because a question regarding citizenship "had been asked in some form or another for nearly 200

---

[24] Statistical Quality Standards, U.S. Census Bureau, July 2013, Standard A2, Subrequirement A2-3, p. 8.
[25] *Id.* p. ii (emphasis added).

1   years." (001318.) Not only is this statement false,[26] but Ross failed to consider that the context

2   and form of such questions—to say nothing of the fact that the early censuses were conducted

3   entirely in-person—determine whether the specific question he approved needs to be tested in

4   2018. In 1820, for example, the question was simply a checkbox on a column, reading "ALIENS

5   – foreigners not naturalized" and was to be asked of "White Persons" only.[27] In 1870,

6   enumerators counted whether a respondent was "a male citizen of the United States of 21 years or

7   upwards whose right to vote is denied or abridged on grounds other than 'rebellion or other

8   crime,'" hardly a citizenship count of the entire population.[28] And the question has not appeared

9   on any census asked of the entire population since 1950.[29]

10          Ross was given extensive evidence that testing questions is context-dependent. Six former

11   Bureau chiefs emphasized that a "great deal of evidence that even small changes in survey

12   question order, wording, and instructions can have significant, and often unexpected,

13   consequences for the rate, quality, and truthfulness of response." (001058.) In the ACS, the

14   citizenship question follows the question, "Where was this person born," which contextualizes the

15   request for citizenship.[30] Defendants cannot point to any context in which the citizenship question

16   has ever been asked in the form that they now propose. By stating that prior tests of different

17   questions on a similar topic were sufficient, despite concerns from those who know best, Ross

18   "ignore[d] critical context" and "cherry-pick[ed] evidence." *Water Quality Ins. Syndicate v.*

19   *United States*, 225 F. Supp. 3d 41, 69 (D.D.C. 2016). "In light of the serious reliance interests at

20   stake, the Department's conclusory statements do not suffice to explain its decision." *Encino*

21   *Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

22

23   [26] Aside from a question in 1870 counting freed slaves denied the right to vote, no citizenship question was asked between 1820 and 1890, and none was asked in 1960. *See History, 2000 Census of Population and Housing,* U.S. Census Bureau, December 2009 p. 131, *available at* https://www.census.gov/history/pdf/Census2000v1.pdf .

24   [27] *See* Historical Census Records*, available at* https://www.census.gov/history/pdf/1830-2-042018.pdf.

     [28] *See* Historical Census Records*, available at*

25   https://www.census.gov/history/www/through_the_decades/index_of_questions/1870_1.html. The question was used to enforce the Fourteenth Amendment, which reduced apportionment counts for denying voting rights to "any of the

26   male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime." U.S. Const. Am. XIV.

27   [29] *See History, 2000 Census of Population and Housing,* U.S. Census Bureau, December 2009 p. 131, *available at* https://www.census.gov/history/pdf/Census2000v1.pdf.

28   [30] *See* American Community Survey, *available at* https://www2.census.gov/programs-surveys/acs/methodology/questionnaires/2017/quest17.pdf.

1

### C.   Ross's Explanation Runs Counter to the Evidence Before the Agency.

2

The Ninth Circuit has emphasized that "a policy change violates the APA if the agency

3

ignores or countermands its earlier factual findings without reasoned explanation for doing so"

4

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quotation and

5

citation omitted). Ross "offered an explanation for its decision that runs counter to the evidence

6

before the agency" and must be set aside. *State Farm* at 43.

7

#### 1.   The Evidence Shows that Adding the Question Will Decrease Response Rates and Increase Burdens.

8

9

Ross wrote that Commerce's review found only "limited empirical evidence exists about

10

whether adding a citizenship question would decrease response rates materially." (001317.) In

11

fact, such evidence was overwhelming and unrebutted. In its January 19 memo, the Bureau

12

concluded that households with at least one non-citizen failed to respond to a survey containing

13

the citizenship question at higher rates. Ross discounted this conclusion but did not rebut the

14

Bureau's finding that the only difference between groups that responded less frequently was "the

15

presence of at least one noncitizen in noncitizen households." (001281.) The Bureau also found

16

that the breakoff rate (the rate at which a respondent stops completing the survey) was ***nine times***

17

***higher*** for Hispanics than for non-Hispanic Whites specifically at the citizenship question. (*Id.*)

18

Ross did not address the findings on the breakoff rate in his Decision Memo and "failed to

19

explain how the other sources it relied on provide substantial evidence." *Genuine Parts Co. v.*

*Envtl. Prot. Agency*, 890 F.3d 304, 315 (D.C. Cir. 2018).

20

Moreover, Ross acknowledged that the Bureau found there would be an "increased

21

burden" on those who answered the question but wrote that there would be no "additional

22

imposition" unless the respondent is a non-citizen. (001317.) But the Bureau made clear that the

23

burden, or imposition, would be borne by ***everyone*** who answers the question. The Bureau wrote

24

that "[s]urvey methodologists consider burden to include both the direct time costs of responding

25

and the indirect costs arising from nonresponse due to perceived sensitivity of the topic."

26

(001281.) When an agency relies on an inaccurate definition of a key term for its decision, that

27

decision must be set aside. *See Am. Motorcycle Ass'n Dist. 37 v. Norton*, Nos. C 03-03807 SI, C

28

27

1  03-02509 SI, 2004 WL 1753366 at *11 (N.D. Cal. Aug. 3, 2004) (setting aside an agency

2  decision based on a flawed definition of "adverse modification"). Ross ignored the burden that

3  will be imposed upon *all* respondents by adding the question.

### 2. Ross Ignored the Impact of Inaccurate Responses and the Value of Administrative Records.

6  In its January 19 Memo, the Bureau found that direct citizenship questions provide

7  "substantially less accurate citizenship status data than are available from administrative sources."

8  (001277.) This was one of the reasons that the Bureau recommended increasing accuracy by

9  linking responses to "an accurate, edited citizenship variable from administrative records to the

10 final 2020 Census microdata files." (001283.) In its analysis of Option D (adding the question and

11 using administrative records), the Bureau emphasized that these concerns would remain—the

12 option would "still have all the negative cost and quality implications" of adding the question and

13 "result in poorer quality data" than using administrative records alone. (001312.)

14 Considering Option C (using administrative records), Ross noted that the Bureau would

15 have to correct for inaccurate responses, noting the Bureau's finding that, when asked a

16 citizenship question, a significant number of non-citizens "inaccurately mark 'citizen'" (001316.)

17 His analysis of Option D omits this finding, noting only that asking the citizenship question

18 "gives each respondent the opportunity to provide an answer." (001317.) And while he

19 discounted administrative records when considering Option C, writing that the "Bureau is still

20 evolving its use of administrative records" he wrote that the Bureau could "further enhance its

21 administrative record data sets," when using those records under Option D. (001316-17.)

22 In short, Ross dismissed administrative records and highlighted self-response error when

23 evaluating Option C, but praised administrative records and dismissed self-response error when

24 evaluating Option D. (001316-17.) Also, Ross wrote that "The citizenship data provided to DOJ

25 will be more accurate with the question than without it." (001319.) Not only did Ross cite no

26 evidence for this conclusion (none exists), he simply "ignore[d] evidence contradicting [his]

27 position," rendering the decision arbitrary and capricious." *Butte Cty., Cal. v. Hogen*, 613 F.3d

28 190, 194 (D.C. Cir. 2010); *see also Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) (holding

28

that an EPA regulation that entirely ignores costs is arbitrary and capricious).

### 3. Ross's Decision Relied on a Flawed and Incredible DOJ Request that Was Itself Contrary to the Record Evidence.

The only evidence that Ross mustered in support of the citizenship question was the DOJ Request. The essential credibility of DOJ's request is completely belied not only by the fact that DOJ had only months earlier stated it did not need any different data from the Census, but also from the tooth-pulling by Ross to get DOJ to ask the question. Beyond that, it fails to distinguish between the information it supposedly seeks—CVAP data for census blocks (00664)[31]—and the means of obtaining that information. It asks that a specific method—putting the citizenship question on the Census—for obtaining the data but "provides no analysis or factual data to support this concern" over other means of doing so. *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1065 (N.D. Cal. 2018).

And while the DOJ Request does not provide any technical or scientific analysis to support its need for a citizenship *question* to obtain citizenship *data,* the Bureau scientists found a better means of obtaining these data. (001277-85.) Nevertheless, Ross simply implemented DOJ's recommendation. "While the action agency is not required 'to undertake an independent analysis' of another agency's conclusions, it may not 'blindly adopt [those] conclusions.'" *Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*, 896 F.3d 600, 610 (4th Cir. 2018) *quoting City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 76 (D.C. Cir. 2006).

## IV.    RELIEF SOUGHT.

Ordinarily, after striking down an agency action, courts "should remand a case to an agency for decision." *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002). But remand is not required when there is "no conceivable circumstance" in which remand could produce a different outcome. *Mulry v. Driver*, 366 F.2d 544, 550 (9th Cir. 1966). If, for example, this Court finds that the Secretary's decision violated the law because the topic of citizenship was not timely submitted to Congress, it is not possible that a remand could produce a different outcome.

Even if the administrative determination is overturned on grounds of arbitrariness and

---

[31] Plaintiffs do not concede the accuracy of this statement and reserve their right to introduce evidence to refute it at trial or in opposition to Defendants' summary judgment motion if appropriate.

1    capriciousness, remand could not lead to a different outcome. After remand, an agency is "bound

2    to deal with the problem afresh." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 201

3    (1947). First, there is simply no time for Defendants to reconsider the citizenship question. The

4    deadline to submit citizenship as a topic passed in March 2017. Census materials will be printed

5    in 2019. There are no conceivable circumstances in which Defendants could conduct a review of

6    the citizenship question in compliance with the APA before the deadline to print and deliver

7    census forms. Second, given that a finding of arbitrariness and capriciousness would rest on one

8    or more grounds of failure by Defendants to refute the procedural obstacles and substantive

9    objections by career staff, it is difficult to imagine a scenario where a remand could change the

10   outcome. Finally, a remand cannot cure Ross's pre-judging of the issue and creation of a false

11   scenario, which permeated the entire decision-making process.

12       Should this Court grant this motion and nevertheless remand, it should bar Ross and

13   Commerce from participating in such consideration because the record provides clear and

14   convincing evidence that Ross and Commerce have "an unalterably closed mind on matters

15   critical to the disposition of the proceeding." *Ass'n of Nat'l. Advertisers, Inc. v. F.T.C.*, 627 F.2d

16   1151, 1170 (D.C. Cir. 1979). Ross and Commerce's secretive scheme demonstrate that their

17   decision was pre-made and that they should not participate in any future consideration of the

18   citizenship question. *See Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp. 2d 830, 847 (E.D. Cal.

19   2008) (barring HUD Secretary from participating in reconsideration based on public statement

20   that "HUD intends to approve the new rule by the end of the year even if the agency receives

21   critical comments"). Any further consideration should be undertaken by the Bureau alone.

## CONCLUSION

23       Plaintiffs respectfully request that the Court set aside Ross's decision to add the

24   citizenship question and enjoin Defendants from taking steps to add the question to the Census.

25

26

27

28

30

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:      November 2, 2018

**MANATT, PHELPS & PHILLIPS, LLP**

By: *s/ John F. Libby*
        John F. Libby
        John W. McGuinness
        Emil Petrossian
        Ana G. Guardado
        Andrew C. Case
        Rory Adams
        Salvador E. Perez
        Olufunmilayo O. Showole
        11355 West Olympic Boulevard
        Los Angeles, California 90064
        Telephone: (310) 312-4000
        Facsimile: (310) 312-4224

        **LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
        Kristen Clarke
        Jon M. Greenbaum
        Ezra D. Rosenberg
        Dorian L. Spence
        1401 New York Avenue NW, Suite 400
        Washington, DC 20005
        Telephone: (202) 662-8600
        Facsimile: (202) 783-0857

        **PUBLIC COUNSEL**
        Mark Rosenbaum
        610 South Ardmore Avenue
        Los Angeles, California 90005
        Telephone: (213) 385-2977
        Facsimile: (213) 385-9089

        **CITY OF SAN JOSE**
        Richard Doyle, City Attorney
        Nora Frimann, Assistant City Attorney
        Office of the City Attorney
        200 East Santa Clara Street, 16th Floor
        San José, California 95113-1905
        Telephone Number: (408) 535-1900
        Facsimile Number: (408) 998-3131
        E-Mail: cao.main@sanjoseca.gov

        *Attorneys for Plaintiffs*
        CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

31

1

## **FILER'S ATTESTATION**

2

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, Ana G. Guardado hereby

3

attests that concurrence in the filing of this document has been obtained from all the signatories

4

above.

5

Dated:  November 2, 2018                                   *s/ Ana G. Guardado*
                                                                             Ana G. Guardado

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT– CASE NO. 3:18-cv-2279-RS**