1  MANATT, PHELPS & PHILLIPS, LLP
   JOHN F. LIBBY (Bar No. CA 128207)
2  E-mail:  jlibby@manatt.com
   JOHN W. MCGUINNESS (Bar No. CA 277322)
3  E-mail:  jmcguinness@manatt.com
   EMIL PETROSSIAN (Bar No. CA 264222)
4  E-mail:  epetrossian@manatt.com
   11355 West Olympic Boulevard
5  Los Angeles, California 90064
   Telephone:  (310) 312-4000
6  Facsimile:  (310) 312-4224

7  LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
   KRISTEN CLARKE (*Pro Hac Vice* Application Forthcoming)
8  Email:  kclarke@lawyerscommittee.org
   JON M. GREENBAUM (Bar No. CA 166733)
9  E-mail:  jgreenbaum@lawyerscommittee.org
   EZRA D. ROSENBERG (*Pro Hac Vice*)
10 E-mail:  erosenberg@lawyerscommittee.org
   DORIAN L. SPENCE (*Pro Hac Vice*)
11 E-mail:  dspence@lawyerscommittee.org
   1401 New York Avenue NW, Suite 400
12 Washington, DC 20005
   Telephone:  (202) 662-8600
13 Facsimile:  (202) 783-0857

14 *Attorneys for Plaintiffs*
   CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

15
   [Additional Counsel Listed Below]
16
                    **IN THE UNITED STATES DISTRICT COURT**
17
                 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
18

19 CITY OF SAN JOSE, a municipal                  3:18-cv-02279-RS
   corporation; and BLACK ALLIANCE FOR
20 JUST IMMIGRATION, a California               **DECLARATION OF ANA G.**
   nonprofit corporation,                        **GUARDADO IN SUPPORT OF**
21                                                **PLAINTIFFS' MOTION FOR**
                    Plaintiffs,                   **PARTIAL SUMMARY JUDGMENT**
22
           vs.                                    Date:        December 7, 2018
23                                                Time:        10:00 a.m.
   WILBUR L. ROSS, JR., in his official          Dept:        3
24 capacity as Secretary of the U.S. Department  Judge:       The Hon. Richard Seeborg
   of Commerce; U.S. DEPARTMENT OF               Trial Date:  January 7, 2019
25 COMMERCE; RON JARMIN, in his
   official capacity as Acting Director of the
26 U.S. Census Bureau; U.S. CENSUS
   BUREAU,
27
                    Defendants.
28

I, Ana G. Guardado, declare as follows:

1. I am an attorney at Manatt, Phelps, & Phillips, LLP, counsel for Plaintiffs City of San Jose and Black Alliance for Just Immigration in the above-captioned litigation. I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently thereto.

2. Attached as **Exhibit 1** is a true and accurate copy of an email exchange dated November 1, 2018, between myself and Daniel Halainen of the Civil Division of the Department of Justice, counsel for Defendants in this matter, in which Defendants confirmed the administrative record for the agency decision at issue in this matter is comprised of all documents produced by Defendants number-stamped 1 through 13,099, with the exceptions of 12,757 – 12,762 and 13,025 – 13,099, which were created after March 26, 2018.

3. Attached as **Exhibit 2** is a true and accurate copy of excerpts of the transcript of a July 3, 2017 hearing in *State of New York et al. v. Department of Commerce et al.*, 18-cv-02921 (S.D.N.Y.), Dkt. 205, ordering Defendants to complete the administrative record.

4. Attached as **Exhibit 3** is a selection of documents from the administrative record that Plaintiffs rely upon in their Motion for Partial Summary Judgment. These documents were number-stamped as follows: 0000194 – 0000270; 0000311 – 0000316; 0000663 – 0000665; 0000763 – 0000764; 0001057 – 0001058; 0001064 – 0001066; 0001090 – 0001101; 0001193; 0001201; 0001205; 0001206; 0001238; 0001247; 0001276; 0001277 – 0001285; 0001286 – 0001297; 0001308 – 0001312; 0001313 – 0001320; 0001321; 0001322 – 0001323; 0002462 – 0002482; 0002521 – 0002523; 0002561; 0002651 – 0002652; 0003701; 0003710; 0005216; 0008325 – 0008328; 0009812 – 0009833; 0011193; 0011634 – 0011645; 0011646 – 0011649; and 0012756.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 2nd day of November, 2018 at San Francisco, California.

*/s/ Ana G. Guardado*
Ana G. Guardado

DECLARATION OF ANA G. GUARDADO ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

*Additional Counsel for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

**PUBLIC COUNSEL**
MARK ROSENBAUM (Bar No. CA 59940)
Email:  mrosenbaum@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  (213) 385-2977
Facsimile:  (213) 385-9089

**CITY OF SAN JOSE**
RICHARD DOYLE, City Attorney (#88625)
NORA FRIMANN, Assistant City Attorney (#93249)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

DECLARATION OF ANA G. GUARDADO ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 1

## Guardado, Ana

| | |
|---|---|
| **From:** | Guardado, Ana |
| **Sent:** | Thursday, November 01, 2018 1:02 PM |
| **To:** | 'Halainen, Daniel J. (CIV)' |
| **Cc:** | Case, Andrew; Rosenberg, Ezra; Kopplin, Rebecca M. (CIV); Bailey, Kate (CIV); Coyle, Garrett (CIV); Ehrlich, Stephen (CIV); Federighi, Carol (CIV); Tomlinson, Martin M. (CIV); Wells, Carlotta (CIV) |
| **Subject:** | RE: San Jose v. Ross Census Litigation - Administrative Record |

Daniel,

Thank you for your prompt response. For clarity and convenience, we request that Defendants file and lodge a complete copy of the administrative record with the court.

Thank you,

**Ana Guardado**
Associate

**Manatt, Phelps & Phillips,** LLP
One Embarcadero Center
30th Floor
San Francisco, CA  94111
**D** (415) 291-7409   **F** (415) 291-7474

AGuardado@manatt.com
manatt.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

**From:** Halainen, Daniel J. (CIV) [mailto:Daniel.J.Halainen@usdoj.gov]
**Sent:** Thursday, November 01, 2018 12:47 PM
**To:** Guardado, Ana
**Cc:** Case, Andrew; Rosenberg, Ezra; Kopplin, Rebecca M. (CIV); Bailey, Kate (CIV); Coyle, Garrett (CIV); Ehrlich, Stephen (CIV); Federighi, Carol (CIV); Tomlinson, Martin M. (CIV); Wells, Carlotta (CIV)
**Subject:** RE: San Jose v. Ross Census Litigation - Administrative Record

Ana,

Thank you for reaching out. Defendants' position is that this challenge to a final agency action is properly reviewed, if at all, on the basis of the administrative record the agency compiled. In response to Judge Furman's July 3 order to supplement the administrative record, Defendants collected and produced a broader set of materials than would normally be considered appropriate for an administrative record. Consistent with the proceedings in the New York cases, Defendants will not contest that the documents produced on July 23, July 27 and August 3 in response to the Court's order, including the specific documents you list below, may be considered part of the administrative record in this matter. For clarity, this includes the documents bates stamped 1 through 13,0999, with the exceptions of 12,757-12,762 and 13,025-13,099, which postdate the Secretary's decision.

Let us know if you have any questions.

Best,

Daniel

**Daniel Halainen**
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC  20005
(202) 616-8101

---

**From:** Halainen, Daniel J. (CIV)
**Sent:** Thursday, November 01, 2018 1:24 PM
**To:** 'Guardado, Ana' <AGuardado@manatt.com>
**Cc:** Case, Andrew <ACase@manatt.com>; Rosenberg, Ezra <erosenberg@lawyerscommittee.org>; Kopplin, Rebecca M. (CIV) <rkopplin@CIV.USDOJ.GOV>; Bailey, Kate (CIV) <katbaile@CIV.USDOJ.GOV>; Coyle, Garrett (CIV) <gcoyle@CIV.USDOJ.GOV>; Ehrlich, Stephen (CIV) <sehrlich@CIV.USDOJ.GOV>; Federighi, Carol (CIV) <CFederig@CIV.USDOJ.GOV>; Tomlinson, Martin M. (CIV) <mtomlins@CIV.USDOJ.GOV>; Wells, Carlotta (CIV) <CWells@CIV.USDOJ.GOV>
**Subject:** RE: San Jose v. Ross Census Litigation - Administrative Record

Ana,

Thank you for your email. We will get back to you.

**Daniel Halainen**
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC  20005
(202) 616-8101

---

**From:** Guardado, Ana [mailto:AGuardado@manatt.com]
**Sent:** Thursday, November 01, 2018 1:04 PM
**To:** Halainen, Daniel J. (CIV) <dhalaine@CIV.USDOJ.GOV>
**Cc:** Case, Andrew <ACase@manatt.com>; Rosenberg, Ezra <erosenberg@lawyerscommittee.org>; Kopplin, Rebecca M. (CIV) <rkopplin@CIV.USDOJ.GOV>; Bailey, Kate (CIV) <katbaile@CIV.USDOJ.GOV>; Coyle, Garrett (CIV) <gcoyle@CIV.USDOJ.GOV>; Ehrlich, Stephen (CIV) <sehrlich@CIV.USDOJ.GOV>; Federighi, Carol (CIV) <CFederig@CIV.USDOJ.GOV>; Tomlinson, Martin M. (CIV) <mtomlins@CIV.USDOJ.GOV>; Wells, Carlotta (CIV) <CWells@CIV.USDOJ.GOV>
**Subject:** San Jose v. Ross Census Litigation - Administrative Record

Daniel,

I understand from Kate Bailey's out-of-office message that you are the appropriate contact for issues regarding the census litigation cases while Kate is occupied with trial in New York.

I am writing to confirm the documents comprising the administrative record for the agency decision that Plaintiffs are challenging in this action. Defendants filed a partial administrative record on June 6, 2018 [ECF 38], a supplemental

memorandum on June 21 [ECF 52], and subsequently produced thousands of additional documents to complete the administrative record per court order in *State of New York et al. v. United States Department of Commerce et al.*, Case No. 1:18-cv-02921-JMF. During the August 10, 2018 hearing in this action, Defendants confirmed that they produced additional documents comprising the administrative record. However, Defendants have not filed a new complete administrative record in this action. We ask Defendants to confirm that the administrative record contains the documents Defendants produced on July 23, July 27 and August 3 in response to the court order to complete the administrative record, including the following specific documents (identified by Defendants' Bates-number):

- 2462;
- 2521;
- 2561;
- 2652;
- 3701;
- 3710;
- 5216;
- 8325-8328;
- 9812-9833;
- 11193;
- 11634-11645;
- 11646-11649; and
- 12756

We appreciate a prompt **response today by 1:00 p.m. PT**, so that the parties can proceed with the filing deadline set for tomorrow November 2. Please let me know if you have any questions. I am available all day to discuss.

Thank you,

**Ana Guardado**
Associate

**Manatt, Phelps & Phillips, LLP**
One Embarcadero Center
30th Floor
San Francisco, CA  94111
**D** (415) 291-7409  **F** (415) 291-7474

AGuardado@manatt.com
**manatt.com**

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

# EXHIBIT 2

I739stao

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STATE OF NEW YORK, et al.,

                Plaintiffs,

          v.                          18 Civ. 2921 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, et al.,
                                      Argument

                Defendants.


------------------------------x

NEW YORK IMMIGRATION
COALITION,et al.,

                Plaintiffs,

          v.                          18 Civ. 5025 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, et al.,
                                      Argument

                Defendants.


------------------------------x

                                      New York, N.Y.
                                      July 3, 2018
                                      9:30 a.m.

Before:

                HON. JESSE M. FURMAN,

                                      District Judge

I739stao

1     had at least identified some basis for asserting privilege,

2     namely the deliberative process privilege, defendants here, at

3     least until the argument a moment ago, did not provide any such

4     basis.  See the states' letter at page two, note three.

5     Accordingly, defendants must produce a privilege log

6     identifying with specificity the documents that have been

7     withheld from the Administrative Record and, for each document,

8     the asserted privilege or privileges.

9            Second, plaintiffs seek an order directing the

10    government to complete the Administrative Record.  Although an

11    agency's designation of the Administrative Record is generally

12    afforded a presumption of regularity, that presumption can be

13    rebutted where the seeking party shows that "materials exist

14    that were actually considered by the agency decision-makers but

15    are not in the record as filed."  Comprehensive Community

16    Development Corp. v. Sebelius, 890 F.Supp. 2d 305, 309

17    (S.D.N.Y. 2012).  Plaintiffs have done precisely that here.

18           In his March 2018 decision memorandum produced in the

19    Administrative Record at page 1313, Secretary Ross stated that

20    he "set out to take a hard look" at adding the citizenship

21    question "following receipt" of a request from the Department

22    of Justice on December 12, 2017.  Additionally, in sworn

23    testimony before the House Ways and Means Committee, of which I

24    can take judicial notice, see, for example, Ault v. J. M.

25    Smucker Company, 2014 WL 1998235 at page 2 (S.D.N.Y. May 15,

Case 3:18-cv-02279-RS Document 99-1 Filed 11/02/18 Page 14 of 219
Case 1:18-cv-02921-JMF Document 205 Filed 07/20/18 Page 30 of 56     80
I739stao

1   2014), Secretary Ross testified under oath that the Department

2   of Justice had "initiated the request for inclusion of the

3   citizenship question."  See the states' letter at page four.

4   It now appears that those statements were potentially untrue.

5   On June 21, this year, without explanation, defendants filed a

6   supplement to the Administrative Record, namely a half-page

7   memorandum from Secretary Ross, also dated June 21, 2018.  That

8   appears at docket no. 189 in the states' case.  In this

9   memorandum, Secretary Ross stated that "soon after" his

10  appointment as Secretary, which occurred in February of 2017,

11  almost ten months before the request from the Department of

12  Justice, he "began considering" whether to add the citizenship

13  question and that "as part of that deliberative process," he

14  and his staff "inquired whether the department of justice would

15  support, and if so would request, inclusion of a citizenship

16  question."  In other words, it now appears that the idea of

17  adding the citizenship question originated with Secretary Ross,

18  not the Department of Justice and that its origins long

19  predated the December 2017 letter from the Justice Department.

20  Even without that significant change in the timeline, the

21  absence of virtually any documents predating DOJ's

22  December 2017 letter was hard to fathom.  But with it, it is

23  inconceivable to me that there aren't additional documents from

24  earlier in 2017 that should be made part of the Administrative

25  Record.

Case 3:18-cv-02279-RS   Document 99-1   Filed 11/02/18   Page 12 of 219
Case 3:18-cv-02921-JMF   Document 205   Filed 07/20/18   Page 81 of 90          81
I739stao

1          That alone would warrant an order to complete the

2   Administrative Record.  But, compounding matters, the current

3   record expressly references documents that Secretary Ross

4   claims to have considered but which are not themselves a part

5   of the Administrative Record.  For example, Secretary Ross

6   claims that "additional empirical evidence about the impact of

7   sensitive questions on the survey response rates came from the

8   Senior Vice-President of Data Science at Nielsen."  That's page

9   1318 of the record.  But the record contains no empirical

10  evidence from Nielsen.  Additionally, the record does not

11  include documents relied upon by subordinates, upon whose

12  advice Secretary Ross plainly relied in turn.  For example,

13  Secretary Ross's memo references "the department's review" of

14  inclusion of the citizenship question, and advice of "Census

15  Bureau staff."  That's pages 1314, 1317, and 1319.  Yet the

16  record is nearly devoid of materials from key personnel at the

17  Census Bureau or Department of Commerce -- apart from two

18  memoranda from the Census Bureau's chief scientist which

19  strongly recommend that the Secretary not add a citizenship

20  question.  Pages 1277 and 1308.  The Administrative Record is

21  supposed to include "materials that the agency decision-maker

22  indirectly or constructively considered."  Batalla Vidal v.

23  Duke, 2017 WL 4737280 at page 5 (E.D.N.Y. October 19, 2017).

24          Here, for the reasons that I've stated, I conclude

25  that the current Administrative Record does not include the

I739stao

1    full scope of such materials.  Accordingly, plaintiffs' request

2    for an order directing defendants to complete the

3    Administrative Record is well founded.

4         Finally, I agree with the plaintiffs that there is a

5    solid basis to permit discovery of extra-record evidence in

6    this case.  To the extent relevant here, a court may allow

7    discovery beyond the record where "there has been a strong

8    showing in support of a claim of bad faith or improper behavior

9    on the part of agency decision-makers."  National Audubon

10   Society v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997).  Without

11   intimating any view on the ultimate issues in this case, I

12   conclude that plaintiffs have made such a showing here for

13   several reasons.

14        First, Secretary Ross's supplemental memorandum of

15   June 21, which I've already discussed, could be read to suggest

16   that the Secretary had already decided to add the citizenship

17   question before he reached out to the Justice Department; that

18   is, that the decision preceded the stated rationale.  See, for

19   example, Tummino v. von Eschenbach, 427 F.Supp. 2d 212, 233

20   (E.D.N.Y. 2006) authorizing extra-record discovery where there

21   was evidence that the agency decision-makers had made a

22   decision and, only thereafter took steps "to find acceptable

23   rationales for the decision."  Second, the Administrative

24   Record reveals that Secretary Ross overruled senior Census

25   Bureau career staff, who had concluded -- and this is at page

# EXHIBIT 3

# Subjects Planned for the 2020 Census and American Community Survey

*Federal Legislative and Program Uses*

Issued March 2017
Revised



**United States Census Bureau™**

U.S. Department of Commerce
Economics and Statistics Administration
U.S. CENSUS BUREAU
**census.gov**

000194

Case 3:18-cv-02279-RS   Document 38-3   Filed 06/08/18   Page 195 of 440

The original version of the appendix has been revised.

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Protecting the Information Collected by These Subjects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Operational Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Subjects Planned for the 2020 Census and the American Community Survey . . . . . . . . . . . . . . . . . . . 5

    Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Race/Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Tenure (Owner/Renter) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Subjects Planned for the American Community Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Acreage and Agricultural Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Ancestry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Commuting (Journey to Work) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    Computer and Internet Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Fertility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Grandparent Caregivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    Health Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    Home Heating Fuel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Home Value and Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    Industry, Occupation, and Class of Worker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    Labor Force Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Language Spoken at Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    Marital Status and Marital History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    Migration (Previous Residence)/Residence 1 Year Ago . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    Place of Birth, Citizenship, and Year of Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    Plumbing Facilities, Kitchen Facilities, and Telephone Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    School Enrollment, Educational Attainment, and Undergraduate Field of Degree . . . . . . . . . . . . . . . 55

    Selected Monthly Owner Costs (Cost of Utilities, Condominium and Mobile Home Fees, Taxes,
      Insurance, and Mortgages) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    Supplemental Nutrition Assistance Program (SNAP)/Food Stamps . . . . . . . . . . . . . . . . . . . . . . . . . 59

    Units in Structure, Rooms, and Bedrooms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    Vehicles Available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    Veteran Status, Period of Service, and Department of Veterans Affairs (VA)
      Service-Connected Disability Rating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    Work Status Last Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    Year Built and Year Moved In . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Appendix: Year Current Subjects Planned First Asked in Decennial Census Program . . . . . . . . . . . . . . . A-1

Case 3:18-cv-02279-RS   Document 39-3   Filed 06/08/18   Page 197 of 440

000197

# Introduction

## BACKGROUND

Since 1790, a national census of the U.S. population has been conducted every 10 years, as required by the U.S. Constitution. Additional information beyond the population count has been collected with each census in response to the challenges facing the nation and a national desire to understand ourselves.

In the 20th century, most addresses received a "short" form, while a portion of addresses received a more detailed "long" form. The Census 2000 short form was designed to collect basic demographic and housing information (i.e., age, race, gender, relationship, and tenure) to be used for apportionment and redistricting. The long form sent to approximately 1 in 6 households collected social, housing, and economic information (i.e., citizenship, educational attainment, disability status, employment status, income, and housing costs) that was used to plan and determine funding for a wide array of federal, state, local, and tribal programs.

Since 2005, in order to provide communities, businesses, and the public with the detailed long-form information more frequently, these data have been collected monthly (and released annually) through the American Community Survey (ACS).[1] This innovation enabled the 2010 Census to be a "short-form-only" census. Decoupling the collection of short- and long-form data allowed the U.S. Census Bureau to focus decennial census efforts on the constitutional requirements to produce a count of the resident population, while employing technology in both collections to improve efficiencies, improve accuracy, and reduce costs. The result has been the dissemination of more current and detailed information than has ever been available.

The 2020 Decennial Census Program, comprised of the 2020 Census and the ACS, will provide an official count through a "short-form-only" census, as well as a portrait of communities counted across the nation through data collected by the ACS. This program is the only data-gathering effort that collects information from enough people to produce comparable data for every geographic area recognized by the Census Bureau.

## SUBMISSION OF SUBJECTS PLANNED FOR THE 2020 DECENNIAL CENSUS PROGRAM

Section 141(f) of the Census Act requires that the subjects to be included in the next census be submitted to Congress no later than 3 years before the census date. The contents of this handbook describe the subjects that will be asked on the 2020 Census and the ACS.

The Census Act also requires that the questions to be included in the next census be submitted to Congress no later than 2 years before the census date. A document that meets that requirement for the 2020 Census and the ACS will be submitted to Congress by March 31, 2018.

## ABOUT THE SUBJECTS PLANNED FOR THE 2020 DECENNIAL CENSUS PROGRAM

Throughout each decade, regular content reviews are conducted to ensure that the information collected through the decennial census program is required by federal programs. Beginning after the 1990 Census, the U.S. Office of Management and Budget (OMB) in conjunction with the Census Bureau, asked federal agencies to provide information describing their data needs. This information, updated each decade by subsequent changes to federal legislative requirements, is used to evaluate content considered for the decennial census program.

To prepare for the 2020 Census, OMB and the Census Bureau embarked on a comprehensive review including chartering the Interagency Council on Statistical Policy (ICSP) Subcommittee on the ACS and conducting the 2014 ACS Content Review. This effort was designed to examine and confirm the value of each question on the ACS, and to confirm and update the statutory and regulatory authority for the questions with federal agencies. In 2016, the Census Bureau asked federal agencies to provide any updates to this documentation.

The resulting information about federal uses is presented throughout the descriptions of the subjects on the following pages. These descriptions are designed to give the reader a clear understanding of 1) the relationship between questions asked of respondents and the summarized data that are released in published tables, 2) how federal agencies use the resulting data, and 3) the benefits of the data at the community level.

---

[1] The ACS also collects short-form data on its questionnaire. However, ACS asks for basic demographic and housing information from a sample of households, while the decennial census asks for basic demographic and housing information from all households.

# Protecting the Information Collected by These Subjects

The Census Bureau has an obligation to produce accurate, relevant statistics about the nation's economy and people, but we recognize that the information collected in these subjects is often private. We depend on cooperation and trust, and promise to protect the confidentiality of this information.

Federal law protects this information; Title 13 of the U.S. Code protects the confidentiality of all collected information. Violating this law is a crime with severe penalties. Please visit <www.census.gov/about /policies/privacy/data_protection/federal_law.html>.

## OUR PRIVACY PRINCIPLES

We recognize the value of respondent trust, and we believe that when a person answers the 2020 Census or the ACS we must serve as caretakers of the information. The Census Bureau's Privacy Principles remind us of this promise and help ensure the protection of respondent information throughout all of our activities.

The Privacy Principles are our guidelines. They help us as we determine content to consider respondents' rights and concerns. Every principle embodies a promise to the respondent.

### Necessity: Do we need to collect information on this subject?

Every time we prepare to ask a question, we determine whether the information is truly necessary. All of the information we collect is used for federal programs.

- We promise to collect only information necessary for each survey and census.

- We promise that we will use the information only to produce timely, relevant statistics about the population and the economy of the United States.

### Openness: Do respondents know why we are collecting this information?

We collect information only for statistical purposes, and it is never used to identify individuals. Before participating, respondents have the right to know why we are conducting the survey or census, why we are asking specific questions, and the purposes for which the information will be used.

- We promise to inform respondents about the purpose and uses for every survey or census we conduct before respondents provide answers.

### Respectful treatment of respondents: Are our efforts reasonable and do we treat people with respect?

- We promise to minimize the effort and time it takes for respondents to participate in the data collection by efficient designs.

- We promise to use only legal, ethical, and professionally accepted practices in collecting data.

- We promise to ensure any collection of sensitive information from children and other sensitive populations does not violate federal protections for research participants and is done only when it benefits the public good.

### Confidentiality: How do we protect this information?

In addition to removing personally identifiable information (i.e., names, telephone numbers, and addresses) from our data files, we use various approaches to protect personal information—including computer technologies, statistical methodologies, and security procedures.

Our security measures ensure that only a restricted number of authorized people have access to private information and that access is only granted to conduct our work and for no other purposes. Every person who works with census confidential information collected by the Census Bureau is sworn for life to uphold the law.

Violating the confidentiality of a respondent is a federal crime with serious penalties, including a federal prison sentence of up to 5 years, a fine of up to $250,000, or both.

- We promise that every person with access to respondent information is sworn for life to protect respondent confidentiality.

- We promise that we will use every technology, statistical methodology, and physical security procedure at our disposal to protect respondent information.

# Operational Questions

Some operational questions will appear on the 2020 Census and American Community Survey that will not result in published counts or estimates. These questions are asked to better administer the data collection process and to ensure greater accuracy of the data collected through the other subjects.

**A person's contact information, including name and phone number, are requested in case someone must be reminded to complete their response or to verify information in a follow-up operation.**

Contact information is not part of published estimates and is carefully protected, as mandated by federal law, to respect the personal information of respondents.

**An address is verified or requested to ensure that the data collected from the people in each household are included in the correct place.**

The U.S. Census Bureau is required to provide state legislatures with the small-area census population tabulations necessary for legislative redistricting. For example, a county count will be a summary of the data collected from all of the addresses in that county. To ensure that a household's data are included with the correct town, county, and state counts, we need to ensure that we know where the information was collected. Addresses are not part of published tabulations and are carefully protected, as mandated by federal law, to respect the personal information of respondents.

**The 2020 Census questions about the number of people in the home, whether anyone was included who does not usually live or stay there, or whether anyone who does usually live or stay there was forgotten, are used to ensure that everyone is counted once, only once, and in the right place.**

The first U.S. decennial census in 1790 established the concept of "usual residence" as the main principle in determining where people were to be counted. The Census Bureau uses residence criteria to determine whom to count and where, especially because the place where a person lives and sleeps most of the time is not necessarily the same as the person's voting residence or legal residence. Asking these additional questions helps ensure that no one is missed, people are not counted in multiple locations, and that people are included in the right place.

**The 2020 Census questions about maritime vessels, military living quarters, and other group quarters facilities, such as college or university student housing, nursing/skilled nursing facilities, group homes, emergency and transitional shelters for people experiencing homelessness, and other such locations, are used to better administer the data collection process in group living situations.**

Asking these additional questions helps ensure accurate classification of group quarters which is a part of the Census Bureau's mission to ensure that everyone is counted once, only once, and in the right place.

**Selected Statutory Uses of Operational Questions Data**

| U.S. Department of Commerce, Bureau of the Census | The Census Act, 13 USC § 141(c) |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | The Census Act, 13 USC § 181 |

# Subjects Planned for the 2020 Census and the American Community Survey

Case 3:18-cv-02279-RS   Document 38-3   Filed 06/08/18   Page 205 of 440

000203

# Age

Age asked since 1790.

> **AGE AND DATE OF BIRTH QUESTIONS ARE USED TO UNDERSTAND THE SIZE AND CHARACTERISTICS OF DIFFERENT AGE GROUPS AND TO PRESENT OTHER DATA BY AGE.**

Age data are used in planning and funding government programs that provide funds or services for specific age groups, such as children, working-age adults, women of childbearing age, or the older population. These statistics are also used to enforce laws, regulations, and policies against age discrimination in government programs and in society.

## AGE DATA HELP COMMUNITIES:

### Provide Assistance to Older Americans

Knowing how many people in a community are aged 60 and older helps local officials provide programs and services that enable older adults to remain living safely in their homes and communities (Older Americans Act). Age data are also used in programs that provide services and assistance to seniors, such as financial assistance with utilities (Low Income Home Energy Assistance Program).

### Provide Assistance to Children and Families

Knowing the numbers and ages of children in families in combination with other information, such as household income, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, age data are used in targeted efforts to enroll eligible people in Medicaid and the Children's Health Insurance Program.

### Educate Children and Adults

Knowing how many children and adults depend on services through schools helps school districts make long-term building, staffing, and funding decisions. Age in combination with other information, such as disability status, language spoken at home, and poverty status, assists schools in understanding the needs of their students and qualifying for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

### Ensure Equal Opportunity

Knowing the ages of people in the community in combination with information about housing, employment, and education, helps government and communities enforce laws, regulations, and policies against discrimination based on age. For example, age information is used to analyze the employment status of workers by age (Age Discrimination in Employment Act).

## Selected Statutory Uses of Age Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, and 1490a 7 CFR 3550.10 |
| U.S. Department of Education | 20 USC §§ 6333, 6334(a)(1), 6335(a), and 6337(b)(1)(A) |
| U.S. Department of Education | 220 USC §§ 6821, 6824, 7011(5), and 7801(20) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111–148, § 10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii(b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | 12 USC § 1701q; 24 CFR part 891 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, Public Law 89-110, as amended, § 203; 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2 |
| U.S. Department of Labor | Older Americans Act Amendments of 2000, Public Law 109-365, 42 USC § 3056e; 20 CFR 641.140, 641.360, and 641.365 |
| U.S. Department of Labor | 29 USC §§ 49f(a)(3)(D), 49g(d), and 49l-2(a)15 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n) (1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Age Discrimination in Employment Act of 1967, Public Law 90-202, 29 USC § 623(a)–(d) and 633a; 29 CFR 1625.7(d); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Social Security Administration | The Social Security Act, Public Law 74-271, as amended, 42 USC § 401(c) |

# Gender

Gender asked since 1790.

**A QUESTION ABOUT THE GENDER OF EACH PERSON IS USED TO CREATE STATISTICS ABOUT MALES AND FEMALES AND TO PRESENT OTHER DATA, SUCH AS OCCUPATION, BY GENDER.**

Gender data are used in planning and funding government programs and in evaluating other government programs and policies to ensure they fairly and equitably serve the needs of males and females. These statistics are also used to enforce laws, regulations, and policies against discrimination in government programs and in society.

## GENDER DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing the gender of people in the community in combination with information about housing, voting, language, employment, and education, helps government and communities enforce laws, regulations, and policies against discrimination on the basis of gender. For example, gender data are used to enforce laws against discrimination based on gender in education programs and activities receiving federal financial assistance (Title IX of the Education Amendments of 1972).

### Understand Changes

Knowing whether people of different genders have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. For example, the National Science Foundation uses gender data to provide information on women in the science and engineering workforce, and several agencies use gender data to investigate whether women, including women who are military veterans, have similar employment opportunities as men.

## Selected Statutory Uses of Gender Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8623(a)(2) and (4), § 8629(a)(1)–(3), and (6), § 8629(b) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3),(6),(8), 299b-2(a)(1), and 299(c)(1)(B) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, § 10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Health Resources and Services Administration, Bureau of Clinician Recruitment and Service | 42 USC § 254e; 42 CFR 5.2 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | Fair Housing Act, Public Law 90–284, 42 USC 3600–3620, 42 USC 3608(e) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e(2)(k); Wards Cove Packing Co. v. Atonio; 490 U.S. 642 (1989) |
| U.S. Department of Justice, Civil Rights Division | Title IX of the Education Amendments of 1972, 20 USC § 1701 et seq. |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352;42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Social Security Administration | The Social Security Act, Public Law 74-271, as amended, 42 USC § 401(c) |

000207

# Race/Ethnicity

Race asked since 1790, ethnicity asked since 1970.

> **QUESTIONS ABOUT A PERSON'S RACE OR ETHNICITY ARE USED TO CREATE DATA ABOUT RACE AND ETHNIC GROUPS.**

These data are required for federal and state programs and are critical factors in the basic research behind numerous policies, particularly for civil rights. Race and ethnicity data are used in planning and funding government programs that provide funds or services for specific groups. These data are also used to evaluate government programs and policies to ensure they fairly and equitably serve the needs of all racial and ethnic groups and to monitor compliance with antidiscrimination laws, regulations, and policies. States also use these data to meet legislative redistricting requirements.

The U.S. Census Bureau collects race and ethnicity data in accordance with the 1997 Office of Management and Budget standards on race and ethnicity. The categories on race and ethnicity are based on self-identification and generally reflect a social definition of race and ethnicity. The categories are not an attempt to define race and ethnicity biologically, anthropologically, or genetically.

## RACE AND ETHNICITY DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing the races and ethnicities of community members in combination with information about housing, voting, language, employment, and education, helps government and communities enforce antidiscrimination laws, regulations, and policies. For example, race and ethnicity data are used in the following ways:

- Establish and evaluate the guidelines for federal affirmative action plans under the Federal Equal Opportunity Recruitment Program.

- Monitor compliance with the Voting Rights Act and enforce bilingual requirements.

- Monitor and enforce equal employment opportunities under the Civil Rights Act of 1964.

- Identify segments of the population who may not be getting needed medical services under the Public Health Service Act.

- Allocate funds to school districts for bilingual services under the Bilingual Education Act.

### Understand Changes

Knowing if people of different races and ethnicities have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. The National Science Foundation uses data on race and ethnicity to provide information on people of different racial and ethnic backgrounds in the science and engineering workforce. Several federal agencies use race and ethnicity data to investigate whether housing or transportation improvements have unintended consequences for specific race and ethnic groups. Data on race and ethnicity are used with age and language data to address language and cultural diversity needs in health care plans for the older population.

### Administer Programs for Specific Groups

Knowing how many people are eligible to participate in certain programs helps communities, including tribal governments, ensure that programs are operating as intended. For example, the Indian Housing Block Grant program, Indian Community Development Block Grant program, and Indian Health Service all depend on accurate estimates of American Indians and Alaska Natives. Data for the American Indian and Alaska Native population come from the questions about a person's race or ethnicity.

## Selected Statutory Uses of Race/Ethnicity Data

| U.S. Department of Commerce, Bureau of the Census | 13 USC § 141(c) |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 52 USC § 10503 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC §§ 9902(2), 9903, and 9908(b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Administration for Community Living | Older Americans Act of 1965, Public Law 89-73, 42 USC § 3018 |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, § 10334; 42 USC § 300kk |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43; 25 USC § 1602 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, 42 USC 5306(a)(1); 24 CFR §1003.101 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203, 52 USC § 10503; 28 CFR Part 55 |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |

# Relationship

Relationship asked since 1880.

> **A QUESTION ABOUT THE RELATIONSHIP OF EACH PERSON IN A HOUSEHOLD TO ONE CENTRAL PERSON IS USED TO CREATE ESTIMATES ABOUT FAMILIES, HOUSEHOLDS, AND OTHER GROUPS, AND TO PRESENT OTHER DATA AT A HOUSEHOLD LEVEL.**

Relationship data are used in planning and funding government programs that provide funds or services for families, people living or raising children alone, grandparents living with grandchildren, or other households that qualify for additional assistance.

## RELATIONSHIP DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing about the different types of households in a community (single people, couples, families, roommates, etc.) helps communities understand whether available housing meets the needs of residents. Information about the relationships among people in a household, in combination with housing costs and the combined income of all people in a household, helps communities understand whether housing is affordable for residents.

When housing is not sufficient or not affordable, relationship data can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Provide Assistance to Families

Knowing more about families, such as the ages of children, household income, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them, such as Head Start and the Children's Health Insurance Program, and can help communities qualify for grants to fund these programs. Relationship data are also used to ensure that programs like Temporary Assistance for Needy Families are making a difference for families.

### Understand Changing Households

Information about living arrangements and how they are changing, including whether older residents are staying in their homes as they age, whether young people are living with parents or moving in with roommates, and which kinds of households include young children, can help communities plan future programs and services for residents. For example, the Social Security Administration estimates future program needs based on the current relationships of working people.

## Selected Statutory Uses of Relationship Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Energy | Energy Conservation and Production Act, Public Law 94-385, as amended, 42 USC § 6861, 6864; 10 CFR 440.10 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Education | 20 USC §§ 6333, 6334(a)(1), 6335(a), 6337(b)(1)(A) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8629 (a) (1)–(3) and (5)–(6), 8629 (b), and 8622 (11) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 13 USC § 141 note |
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, § 124(c)(5); 42 USC 15024 |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, as amended, Public Law 93-383, 42 USC 5301, 5302, and 5305; 24 CFR 91.205(a)–(c ), 91.305(a)–(c), 570.208(a)(1), 570.483(b)(1), 570.704(a)–(c), 570.707(a)–(c), and 570.901 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Social Security Administration | The Social Security Act, Public Law 74–271, as amended, 42 USC § 401(c) |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, § 334, 38 USC § 3122 |

# Tenure (Owner/Renter)

Tenure asked since 1890.

**A QUESTION ABOUT WHETHER A HOME IS OWNED OR RENTED IS USED TO CREATE DATA ABOUT TENURE, RENTERS, AND HOME OWNERSHIP.**

Tenure is the most basic characteristic to asses housing inventory. Tenure data are used in government programs that analyze whether adequate housing is affordable for residents. Tenure data are also used to provide and fund housing assistance programs. These statistics are also used to enforce laws, regulations, and policies against discrimination in private-market housing, government programs, and in society.

## TENURE DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of households in a community (single people, couples, families, roommates, etc.) and rates of home rental and ownership helps communities understand whether available housing meets the needs of residents. Data about owners and renters, in combination with housing costs and the combined income of all people in a household, help communities understand whether housing is affordable for residents.

When housing is not sufficient or affordable, data about owners and renters can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the balance of rented homes, mortgaged homes, and homes owned free and clear changes over time can help communities understand changes in local housing markets; identify opportunities to improve tax, assistance, and zoning policies; and to reduce tax revenue losses from vacant or abandoned properties. Tenure is also used in formulas that communities use to determine housing assistance funding (Fair Market Rents).

### Ensure Equal Opportunity

Knowing the characteristics of people who rent and people who own homes in the community, such as age, gender, race, Hispanic origin, disability, helps government and communities enforce laws, such as the 1968 Fair Housing Act, designed to eliminate discrimination in housing.

### Understand Changing Households

Knowing whether older residents are staying in homes as they age or moving into rented homes; and whether young people are staying with parents, renting with roommates, or buying homes, can help governments and communities distribute funds appropriately between home ownership and rental housing programs and services for residents.

## Selected Statutory Uses of Tenure Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, 1490a, 1490l, 1490m, 1490p-2, 1490r; 7 CFR 1940.563–564, 1940.575, 3560.11, and 3560.152(a)(2) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC § 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93–383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113; 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Rehabilitation Act of 1973, § 504, Public Law 93-112, 29 USC 794; 24 CFR § 8.22(b); 24 CFR § 8.23(a) |
| U.S. Department of Housing and Urban Development | 12 USC § 4568 |
| U.S. Department of Housing and Urban Development | 12 USC § 1701q; 24 CFR part 891 |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(I), (iii)(I), (iv), and(g); 15 U.S.C § 631 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965; 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg V. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6302(c), 6304(a), 6309(a) |

Case 3:18-cv-02279-RS Document 39-3 Filed 06/08/18 Page 251 of 440

# Subjects Planned for the American Community Survey

Case 3:18-cv-02279-RS   Document 38-3   Filed 06/08/18   Page 215 of 440

000215

# Acreage and Agricultural Sales

Acreage asked since 1960, agricultural sales asked since 1960.

**QUESTIONS ABOUT THE ACREAGE ASSOCIATED WITH HOUSES, MOBILE HOMES, AND AGRICULTURAL SALES ARE USED TO CREATE DATA ABOUT AGRICULTURAL PROPERTIES AND TO BETTER UNDERSTAND HOME VALUE STATISTICS.**

These data are used in planning government programs designed to benefit the farm population and identifying or excluding agricultural areas for many other programs.

## ACREAGE AND AGRICULTURAL SALES DATA HELP COMMUNITIES:

### Provide Equitable Housing Assistance

Knowing which homes might qualify for farm subsidies, and which homes qualify for housing subsidies, is important to ensure that funds are fairly allocated. For example, the historical definition of Fair Market Rents, used to allocate housing assistance, has always excluded units on acreage of more than 10 acres to eliminate those units that might benefit from farm subsidies and therefore have lower-than-market rents. Understanding which kinds of properties are eligible for certain programs helps communities inform eligible residents and determine whether the community is eligible for funds based on its farm population.

### Support Agricultural Programs

Knowing which areas of a community are agricultural helps communities ensure eligible institutions receive funding for cooperative agricultural extension work and agricultural research. This funding is distributed to eligible institutions based on a legislatively determined formula that uses these data.

### Plan Community Development

Knowing the size and agricultural nature of areas of each community can help communities understand changes in local housing markets; identify opportunities to improve tax, assistance, and zoning policies; and reduce tax revenue losses from vacant or abandoned properties.

### Selected Statutory Uses of Acreage and Agricultural Sales Data

| | |
|---|---|
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(iii)(I); 15 USC § 631 |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113, 24 CFR 982.401 |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(1), (b)(6), (b)(7), (e), and (g) |
| U.S. Federal Reserve Board | Public Law 95-128,12 USC § 2901 et seq.; 12 CFR 228.12 |
| U.S. Federal Reserve Board | Public Law 94-200, 12 USC § 2809(a);12 CFR 203 |

# Ancestry

Ancestry asked since 1980.

**A QUESTION ABOUT A PERSON'S ANCESTRY OR ETHNIC ORIGIN IS USED TO CREATE STATISTICS ABOUT ANCESTRY GROUPS IN AMERICA.**

Ancestry data are used in planning and evaluating government programs and policies to ensure they fairly and equitably serve the needs of all groups. These statistics are also used to enforce laws, regulations, and policies against discrimination in society.

## ANCESTRY DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing the ethnic groups in a community in combination with information about housing, voting, language, employment, and education, helps government and communities enforce laws, regulations, and policies against discrimination based on national origin. For example, ancestry data are used to enforce nondiscrimination in education (including monitoring desegregation); to enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations; and to enforce laws, regulations, and policies against discrimination in federal financial assistance (Civil Rights Act of 1964).

### Understand Changes

Knowing whether people from different backgrounds have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. For example, ancestry data are used with age and language data to address language and cultural diversity needs in health care plans for the older population.

## Selected Statutory Uses of Ancestry Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Justice, Civil Rights Division | Title VI of Civil Rights Act of 1964, 42 USC § 2000d–2000d-7; 28 CFR 42.101–42.112; 28 CFR 42.401–42.415; 28 CFR 50.3; 67 Fed. Reg. 41,555 (June 18, 2002); Lau v. Nichols, 414 U.S. 563 (1974) |
| U.S. Department of Justice, Civil Rights Division | Equal Educational Opportunities Act of 1974, 20 USC § 1701 et seq.; Castaneda v. Pickard, 648 F.2d 989 (1981) |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964, 42 USC § 2000c et seq. |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, § 673 (2), 674, and 681A, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115; 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); 42 C.F.R. § 136.12(a) |
| U.S. Department of Health and Human Services, Office for Civil Rights | Title VI of the Civil Rights Act of 1964, 42 USC § 2000d; Patient Protection and Affordable Care Act § 1557, 42 USC § 18116 |

# Commuting (Journey to Work)

Journey to work asked since 1960.

**QUESTIONS ABOUT WHERE PEOPLE WORK, HOW THEY GET THERE, WHEN THEY LEAVE, AND HOW LONG IT TAKES ARE USED TO CREATE DATA ABOUT COMMUTING OR A PERSON'S JOURNEY TO WORK.**

Journey to work data are used in planning and funding for improvements to road and highway infrastructure, developing transportation plans and services, and understanding where people are traveling in the course of a normal day. These data are also used to evaluate transportation plans to ensure they fairly and equitably serve the needs of all groups.

## COMMUTING DATA HELP COMMUNITIES:

### Improve Transportation Planning

Knowing where people commute to and from, and what time of day they are commuting, helps transportation planners create mass transportation and metropolitan transportation plans that are compliant with various transportation, environmental, and antidiscrimination regulations.

Local agencies and organizations use these statistics to plan transportation programs and services that meet the diverse needs of local populations, including the disabled population, bicycle commuters, carpool and ride-shares, and many other groups. Commuting data are also used to forecast future use of new or updated transportation systems.

### Ensure Equal Opportunity

Knowing where people could reasonably commute from in order to work in a certain area is used by communities and businesses for employment planning, and by communities and governments to enforce laws, regulations, and policies against employment discrimination.

### Understand Changes in Commutes

As commuting patterns change, information about where people could reasonably commute from in order to work in a certain area is used to understand commercial markets and labor force participation, and to plan local emergency response programs.

## Selected Statutory Uses of Commuting (Journey to Work) Data

| | |
|---|---|
| U.S. Department of Energy | Energy Policy Act of 1992, Public Law 102-486, 42 USC § 13385 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | 2003 Medicare Modernization Act, 42 USC § 1395ww(d)(13) |
| U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Healthcare Workforce Analysis | Public Health Service Act, §§ 761(b)(2)(A), 792(a), 792(b)(2), and 806(f)(1), 42 USC §§ 294n, 295k, and 296e |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, 42 USC § 2000e(2)(k); Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of the Interior | Public Law 102-477, 25 USC §§ 3401 and 3416; Senate Report 102-188 |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5304; 49 CFR Part 613, Subpart B |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6303(c ), 6304(a), 6309 (a) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC §§ 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112; 29 USC § 791(b); 29 CFR 1614.602 |

# Computer and Internet Use

Computer and Internet use asked since 2013.

**QUESTIONS ABOUT THE COMPUTERS AND DEVICES THAT PEOPLE USE, WHETHER PEOPLE ACCESS THE INTERNET, AND HOW PEOPLE ACCESS THE INTERNET ARE USED TO CREATE DATA ABOUT COMPUTER AND INTERNET USE.**

These statistics were first released to the public in September 2014. The questions were added as a requirement of the Broadband Data Improvement Act of 2008. They help federal agencies measure the nationwide development of broadband access and decrease barriers to broadband access.

## COMPUTER AND INTERNET USE DATA HELP COMMUNITIES:

### Ensure Residents Can Communicate

State and local agencies can use these statistics to evaluate access to broadband in their communities. They can measure access to information on the Internet, including access for schools, libraries, rural health care providers, and other public services. Communities ensure their residents are connected to assistance programs, emergency services, and important information. These statistics may also be useful to understand whether to use Internet or more expensive outreach methods for distributing important public health or safety information.

Federal agencies use these data to evaluate the extent of access to, and adoption of broadband, with a focus on underserved areas. State and local agencies might choose to use these statistics to evaluate access to broadband in their communities.

## Selected Statutory Uses of Computer and Internet Use Data

| | |
|---|---|
| U.S. Federal Communications Commission | Broadband Data Improvement Act of 2008, Public Law 110-385, 47 USC § 1303(d) |
| U.S. Department of Commerce, National Telecommunications and Information Administration | Broadband Data Improvement Act of 2008, Public Law 110-385, 47 USC § 1303(d) |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5304; 49 CFR Part 613, Subpart B |

# Disability

Disability asked since 1830.

> **QUESTIONS ABOUT A PERSON'S DIFFICULTY WITH SPECIFIC DAILY TASKS ARE USED TO CREATE STATISTICS ABOUT DISABILITY.**

Disability data are used in planning and funding government programs that provide funds or services for populations with disabilities. In addition, these data are used in evaluating other government programs and policies to ensure that they fairly and equitably serve the needs of all groups. These statistics are also used to enforce laws, regulations, and policies against discrimination.

## DISABILITY DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of disabled households in a community helps communities understand whether available housing meets the needs of residents. When housing is not sufficient or not affordable, disability data can help communities enroll eligible households in programs designed to assist them and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Provide Health Care to Children and Families

Knowing the disability status of people in families in combination with other information, such as household income, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, disability data are used to target efforts to enroll eligible people in Marketplace, Medicaid, and the Children's Health Insurance Program (CHIP). Disability data are also used to ensure that Marketplace, Medicare, Medicaid, and CHIP programs are adequately serving these families.

### Ensure Equal Opportunity

Knowing the disability status of people in the community in combination with information about housing, voting, employment, and education, helps governments and communities enforce laws, regulations, and policies against discrimination based on disability status. For example, disability data are used to evaluate whether there are health care or public health program disparities based on disability status (Developmental Disabilities Assistance and Bill of Rights Act of 2000).

### Provide Assistance to People With Disabilities

Knowing how many people in a community over a certain age have a disability helps local officials provide programs and services to older adults that enable them to remain living safely in their homes and communities (Older Americans Act). Disability status data are also used in programs that provide services and assistance to people with a disability, such as financial assistance with utilities (Low Income Home Energy Assistance Program).

### Understand Changes

Knowing whether people with disabilities have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. Communities also need to understand changes in the needs and geographic concentrations of people with disabilities to ensure that they can meet the community's needs during weather events, disasters, and public health emergencies.

## Selected Statutory Uses of Disability Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention | Public Health Service Act, § 301, 42 USC 241; Public Health Service Act, § 3101, 42 USC 300kk |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, § 124(c)(5); 42 USC 15024 |
| U.S. Department of Health and Human Services, Administration for Community Living | Older Americans Act of 1965; Public Law 89-73; 42 USC § 3013, 3024, 3030s-1, 3032 |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Health Resources and Services Administration | Public Health Service Act § 792(b)(2), 42 USC § 295(k)(b)(2) |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115; 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43, 25 USC § 1602 |
| U.S. Department of Health and Human Services, Office for Civil Rights | Rehabilitation Act of 1973, § 504 , Public Law 93-112; Americans With Disabilities Act Titles II and III, as amended by the ADA Amendments Act of 2008, Public Law 110-325, 42 USC 126 |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Rehabilitation Act of 1973, § 504, Public Law 93-112, 29 USC 794; 24 CFR §8.22(b); 24 CFR §8.23(a) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |

# Fertility

Fertility asked since 1890.

**A QUESTION ABOUT WHETHER A WOMAN HAD A BABY IN THE LAST YEAR IS USED TO CREATE STATISTICS ABOUT FERTILITY.**

Fertility data are used in planning government programs and adjusting other important data, such as the size of the population eligible for different services, as new people are born. These statistics can also be used to project the future size of the population and to understand more about growing families.

## FERTILITY DATA HELP COMMUNITIES:

### Provide Health Care to Children and Families

Knowing the numbers of women with a recent birth in combination with other information, such as marital status, labor force status, household income, health insurance status, and poverty status, can help communities understand changes in the demand for health care. For example, knowing how many American Indian babies are born can help communities, tribes, and the federal government estimate the demand for health care through the Indian Health Service.

## Understand Changing Households

Knowing the characteristics of women who are giving birth, including where in the country they live, is important to understand the relationships among different development patterns, including housing and travel information and public health and pollution.

Though local vital statistics offices typically have a count of births per year, fertility data are able to provide federal program planners, policymakers, and researchers with additional statistics about the age, education, and employment of parents in households welcoming children, and other important information about the homes (age, size, etc.) and households (income, language spoken, etc.) for a more complete picture of families.

State and local agencies can use these statistics in combination with other information about new mothers, such as education and income, to understand future needs for the local education system and health services.

## Selected Statutory Uses of Fertility Data

| | |
|---|---|
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43, 25 USC § 1602 |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43, 25 USC § 1602 |

# Grandparent Caregivers

Grandparent caregivers asked since 2000.

**QUESTIONS ABOUT WHETHER A PERSON IS THE PRIMARY CAREGIVER FOR HIS/HER GRANDCHILDREN AND HOW LONG HE/SHE HAS CARED FOR HIS/HER GRANDCHILDREN, ARE USED TO CREATE STATISTICS ABOUT GRANDPARENT CAREGIVERS.**

Grandparent caregiver data help federal agencies understand the special provisions needed for federal programs designed to assist families, as older Americans are often in different financial, housing, and health circumstances than those of other ages. These data are also used to measure the effects of policies and programs that focus on the well-being of families, including tax policies and financial assistance programs.

## GRANDPARENT CAREGIVER DATA HELP COMMUNITIES:

### Provide Assistance to Families

Knowing more about families, particularly those where grandparents care for grandchildren, along with data about the ages of children, household income, disability, and poverty status can help communities enroll eligible families in programs designed to assist them, such as the Children's Health Insurance Program, and can help communities qualify for grants to fund these programs. These data are also used to evaluate programs like Temporary Assistance for Needy Families.

### Provide Assistance to Older Americans

Knowing how many people in a community are over a certain age, including whether older Americans are caring for grandchildren, helps local officials fund programs and services targeted to reach older adults with the greatest economic and social needs (Older Americans Act).

### Understand Changing Households

Knowing more about how often grandparents are responsible for the basic care for grandchildren and how long they have been responsible in combination with information about age, presence of children, income, etc., can help communities understand if available housing and services are meeting residents' needs.

## Selected Statutory Uses of Grandparent Caregivers Data

| | |
|---|---|
| U.S. Department of Commerce,<br>Bureau of the Census | 13 USC § 141 note |
| U.S. Department of Health and Human Services,<br>Administration for Children and Families | 13 USC § 141 note |

# Health Insurance

Health insurance asked since 2008.

**QUESTIONS ABOUT THE SOURCES OF A PERSON'S HEALTH INSURANCE ARE USED TO CREATE STATISTICS ABOUT THE PERCENTAGE OF PEOPLE COVERED BY HEALTH INSURANCE AND THE SOURCES OF HEALTH INSURANCE.**

Health insurance data are used in planning government programs, determining eligibility criteria, and encouraging eligible people to participate in health insurance programs.

## HEALTH INSURANCE DATA HELP COMMUNITIES:

### Provide Assistance to Children and Families

Knowing the health insurance coverage status in combination with other information, such as number and age of children in families, household income, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, health insurance coverage status and age data are used to target efforts to enroll eligible people in Marketplace, Medicaid, and the Children's Health Insurance Program (CHIP). Health Insurance data are also used to ensure that Marketplace, Medicare, Medicaid, and CHIP programs are improving health outcomes for families.

### Provide Health Care for Veterans

Knowing the number and characteristics of veterans eligible to use Department of Veterans Affairs health care, compared to those currently using services, can help communities and the federal government estimate the future demand for health care services and facilities for veterans.

### Provide Health Care for American Indians

Knowing the health insurance coverage of American Indians can help communities, tribes, and the federal government estimate the demand for health care through the Indian Health Service.

### Understand Changes

Knowing the health insurance coverage status of people in a community helps planners identify gaps in community services, plan programs that address those gaps, and qualify for funding for those programs.

Knowing more about changes in health insurance coverage rates and the characteristics of people who have or do not have health insurance is also of interest to researchers, advocacy groups, and policymakers. For example, State Councils on Developmental Disabilities use health insurance coverage data in their comprehensive reviews and analyses of the unmet needs of people with developmental disabilities.

**Selected Statutory Uses of Health Insurance Data**

| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3), (6), (8), 299b-2(a)(1), and 299(c)(1)(B) |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); 42 CFR § 136.12(a) |
| U.S. Department of Health and Human Services, Office for Civil Rights | Rehabilitation Act of 1973, § 504; Public Law 93-112; Americans With Disabilities Act, Titles II and III, as amended by the ADA Amendments Act of 2008, Public Law 110-325, 42 USC, Chapter 126 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Veterans Affairs | Public Law 106-117, 38 USC §§ 8134(a)(2) |

000231

# Home Heating Fuel

Home heating fuel asked since 1940.

**QUESTIONS ABOUT HOME HEATING FUEL ARE USED TO CREATE DATA ABOUT HOME ENERGY USE.**

These data are used in government programs that analyze community air quality and energy needs. Federal agencies use these statistics to forecast future energy demand, analyze the fuels available to community residents, and plan and fund programs that help low-income residents afford to heat their homes.

## HOME HEATING FUEL DATA HELP COMMUNITIES:

### Provide Assistance With Utilities

Knowing which fuel is used to heat homes in combination with the cost of those fuels and the characteristics of the low-income households that need assistance with their utilities, helps communities enroll eligible households in assistance programs like the Low Income Home Energy Assistance Program and qualify for grants to fund assistance. These data are also used to evaluate whether these programs benefit eligible households.

### Estimate Future Energy Demand

Knowing the current users of certain heating systems and the kinds of systems used in new homes helps communities predict future demand for fuels and the future costs of systems in use in a community. For example, the Department of Energy uses these data to project demand over the next 30 years, assessing the energy needs of the U.S. economy in a domestic and international context.

### Measure Environmental Impacts

Communities with older heating systems may have lower air quality at times when they are in high use. Home heating fuel data are used to develop an inventory of the national aggregate emissions of each greenhouse gas and to research and report on the relationships among different development patterns (including housing and travel information) and public health and pollution (Clean Air Act, Clean Water Act).

## Selected Statutory Uses of Home Heating Fuel Data

| | |
|---|---|
| U.S. Department of Energy | Energy Policy Act of 1992, Public Law 102-486, Energy Policy Act of 1992, Public Law 102-486, 42 USC § 13385 |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629(a) and (b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8623(a)(2) and (4), § 8629(a)(1)–(3) and (6), § 8629(b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8623(a)(2) and (4) and § 8622(11) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629(a)(1)–(3) and (6) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(2), (b)(1), and (b)(6) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(1), (b)(6), (b)(7), (e), and (g) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254 (a)(2), (b)(6), and (s) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Home Value and Rent

Home value asked since 1940, rent asked since 1940.

> **QUESTIONS ABOUT THE MONTHLY RENT AMOUNT OR HOW MUCH THE HOME AND PROPERTY ARE WORTH ARE USED TO PRODUCE STATISTICS ABOUT RENT AND HOME VALUE.**

These data are used in government programs that analyze whether adequate housing is affordable for residents and provide and fund housing assistance programs. These statistics are also used to enforce laws, regulations, and policies designed to eliminate discrimination in private-market housing, government programs, and in society.

## HOME VALUE AND RENT DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of households in a community (single people, couples, families, roommates, etc.) helps communities understand whether available housing meets the needs of residents. Housing costs in combination with relationship and combined income of all people in a household helps communities understand whether housing is affordable.

When rental housing is not affordable, rent data are used to identify rental distribution of housing units (the standard cost of different types of housing in different areas of the country) and to determine Fair Market Rents, which the Department of Housing and Urban Development uses to determine the amount of tenant subsidies in housing assistance programs.

When housing is not sufficient or not affordable, housing cost data can help communities enroll eligible households in programs designed to assist them and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the balance of rented homes, mortgaged homes, and owned homes changes over time can help communities understand changes in local housing markets and identify opportunities to improve tax, assistance, and zoning policies.

### Ensure Equal Opportunity

Knowing more about people who rent and people who own homes in the community in combination with age, gender, race, Hispanic origin, disability, and other data, helps government and communities enforce laws, such as the 1968 Fair Housing Act designed to eliminate discrimination in housing.

## Selected Statutory Uses of Home Value and Rent Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC 1485, 1486, 1490a, 1490l, 1490m, 1490p-2, 1490r; 7 CFR 1940.560–1940.567, 1940.575; 7 CFR 3550.10, 3560.11, 3560.152(a)(2), 3560.254(c) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 9902 (2), 9908(b)(1)(A), and 9914 (a) and (c ) |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3),(6),(8), 299b-2(a)(1), and 299(c)(1)(B) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Social Security Act, Public Law 74-271, § 1848e(1)(A), 42 USC § 1395w-4(e)(1)(A) |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended; 42 USC § 1437f(c)(1); 24 CFR 888.113, 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Housing and Economic Recovery Act of 2008, Public Law 110-289, Federal Housing Enterprises Financial Safety and Soundness Act of 1992, § 1338, 12 USC § 4568 |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6303(c ), 6304(a), and 6309 (a) |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)-(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Income

Income asked since 1940.

**QUESTIONS ABOUT THE FUNDS A PERSON RECEIVES FROM VARIOUS SOURCES ARE USED TO CREATE STATISTICS ABOUT INCOME, ASSISTANCE, EARNINGS, AND POVERTY STATUS.**

Income data are used in planning and funding government programs that provide economic assistance for populations in need and measure the economic well-being of the nation. Income and poverty estimates are often part of allocation formulas that determine how food, health care, job training, housing, and other assistance are distributed.

## INCOME DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the combined income of all people in a household in combination with housing costs helps communities understand whether housing is affordable for residents. When housing is not sufficient or not affordable, income data can help communities enroll eligible households in programs designed to assist them and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Provide Assistance to Older Americans

Knowing how many older people in a community are living in poverty in combination with other information, such as age and disability status of other family members, can help communities ensure these residents receive appropriate assistance, such as financial assistance with utilities (Low Income Home Energy Assistance Program).

### Provide Assistance to Children and Families

Knowing household income in combination with other information, such as the number and age of children in families, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, income data are used to identify eligibility and provide funding in programs like Medicaid, the Child and Adult Care Food Program, and Head Start.

### Educate Children and Adults

Knowing how many children and adults depend on services through schools helps school districts make long-term building, staffing, and funding decisions. Household income and family composition determine poverty status, which is used along with school enrollment, information on disability status, and language spoken at home, to help schools understand the needs of their students and qualify for grants that help fund programs for students with needs for additional services or assistance, including free/reduced price school lunches (Elementary and Secondary Education Act of 1965).

### Plan Community Development

Knowing more about the financial situation of residents, including income, employment, and housing costs, can help communities qualify for loan and grant programs designed to stimulate economic recovery, improve housing, run job-training programs, and define areas as empowerment or enterprise zones.

## Selected Statutory Uses of Income Data

| | |
|---|---|
| U.S. Department of Agriculture | National Agricultural Research, Extension, and Teaching Policy Act, Public Law 95-113, Title XIV; Act of May 8, 1914, ch. 79, 7 USC § 3175; 7 USC § 343(d) |
| U.S. Department of Agriculture | Richard B. Russell National School Lunch Act, 42 USC § 1759a(g) |
| U.S. Department of Agriculture | 7 USC § 2020(e)(1); 7 CFR 272.4(b)(6) |
| U.S. Department of Agriculture | 42 USC § 1766(f)(3)(A)(ii)(I)(aa) and 1766(f)(3)(E)(i); 7 CFR 226.15(f) |
| U.S. Department of Education | 20 USC § 6333, 6334(a)(1), 6335(a), 6337(b)(1)(A) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention | Public Health Service Act, § 301, 42 USC 241; Public Health Service Act, § 3101, 42 USC 300kk |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, 42 USC 5306(a)(1); 24 CFR §1003.101 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93–383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974 as amended; Public Law 93-383, as amended, 42 USC 5301, 5302, and 5305; 24 CFR 91.205(a)–(c ), 91.305(a)–(c), 570.208(a)(1), 570.483(b)(1), 570.704(a)–(c), 570.707(a)–(c),  570.901 |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(I), (iii)(I), (iv), and(g); 15 U.S.C § 631 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |

# Industry, Occupation, and Class of Worker

Industry asked since 1820,[1] occupation asked since 1850, class of worker asked since 1910.

**QUESTIONS ABOUT A PERSON'S EMPLOYER, THE KIND OF BUSINESS OR INDUSTRY OF THAT EMPLOYER, THE KIND OF WORK A PERSON DOES, AND THAT PERSON'S MOST IMPORTANT ACTIVITIES ARE USED TO PRODUCE INDUSTRY, OCCUPATION, AND CLASS OF WORKER STATISTICS.**

These data are used to provide information about the labor force in government programs, to evaluate government programs and policies to ensure they fairly and equitably serve the needs of all groups, and to enforce laws, regulations, and policies against discrimination in society.

## INDUSTRY, OCCUPATION, AND CLASS OF WORKER DATA HELP COMMUNITIES:

### Provide Employment Opportunities

Knowing whether programs designed to employ specific groups, such as people with disabilities or veterans, are succeeding is important to employers, federal agencies, and federal government contractors (Vietnam Era Veterans' Readjustment Assistance Act, Rehabilitation Act of 1973). Industry, occupation, and class of worker data provide additional detail about the jobs and careers pursued by people participating in these programs.

State and local agencies use these statistics to identify labor surplus areas (areas with people available for hiring and training), plan workforce development programs including job fairs and training programs, and promote business opportunities.

### Ensure Equal Employment Opportunity

Knowing more about people who are employed or looking for work in combination with educational attainment, age, gender, race, Hispanic origin, disability status, veteran status, and other data, helps governments and communities enforce civil rights laws against employment discrimination. For example, these data are used to enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964).

### Understand Changes

Knowing the characteristics of growing or declining industries and occupations is an important part of estimating changes in the economy. Labor force estimates are used in funding decisions; to ensure surveys are accurate, including surveys that provide official labor market estimates; and to understand change in other data (Wagner-Peyser Act and Workforce Investment Act).

Class of worker data, in particular, are used by the National Institute of Food and Agriculture to understand changes in farm workers and agriculture.

---

[1] Industry asked in 1820, 1840, and 1910 until present.

# Selected Statutory Uses of Industry, Occupation, and Class of Worker Data

| | |
|---|---|
| U.S. Department of Agriculture | Smith- Lever Act of 1914, 7 USC § 343(c) |
| U.S. Department of Agriculture | 7 USC 3222b, NIFA Funding Opportunity Announcement (RFA) |
| U.S. Department of Agriculture | National Agricultural Research, Extension, and Teaching Policy Act, Public Law 95-113, Title XIV, 7 USC § 3222 |
| U.S. Department of Agriculture | National Agricultural Research, Extension, and Teaching Policy Act, Public Law 95-113, Title XIV, 7 USC § 3221 |
| U.S. Department of Agriculture | Act of Mar. 2, 1887, ch. 314, 7 USC § 361c |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964,Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | 49 USC §§6303(c ) and 6304(a); |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, § 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112; 29 USC § 791 (b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Age Discrimination in Employment Act of 1967, Public Law 90-202,29 USC § 623(a)–(d) and 633a; 29 CFR 1625.7(d); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |

# Labor Force Status

Labor force status asked since 1890.

QUESTIONS ABOUT WHETHER A PERSON WORKED LAST WEEK AND, IF THE ANSWER IS NO, WHY HE/SHE WAS NOT WORKING, WHETHER HE/SHE PLANS TO RETURN TO WORK, AND HOW MUCH THEY WORKED IN THE PAST YEAR ARE USED TO PRODUCE STATISTICS ABOUT THE LABOR FORCE, INCLUDING UNEMPLOYMENT STATISTICS.

Labor force data are used in planning and funding government programs that provide unemployment assistance and services. These data are also used to evaluate other government programs and policies to ensure they fairly and equitably serve the needs of all groups, and to enforce laws, regulations, and policies against discrimination in society.

## LABOR FORCE DATA HELP COMMUNITIES:

### Provide Employment Opportunities

Knowing whether programs designed to employ specific groups, such as people with disabilities or veterans, are succeeding is important to employers, federal agencies, and federal government contractors (Vietnam Era Veterans' Readjustment Assistance Act, Rehabilitation Act of 1973).

State and local agencies use these statistics to identify labor surplus areas (areas with people available for hiring and training), plan workforce development programs, including job fairs and training programs, and to promote business opportunities.

### Ensure Equal Opportunity

Knowing more about people who are employed or looking for work in combination with age, gender, race, Hispanic origin, disability status, veteran status, and other data, helps governments and communities enforce laws, regulations, and policies against discrimination in employment. For example, labor force data are used to enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964).

### Understand Changes

Knowing the characteristics of people who are working or looking for work is an important part of estimating changes in the economy. Labor force estimates are used in funding decisions; to ensure surveys are accurate, including surveys that provide official labor market estimates; and to understand change in other data (Wagner-Peyser Act and Workforce Investment Act).

## Selected Statutory Uses of Labor Force Status Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, Section 124(c)(3); 42 USC §15024 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Labor | 29 USC §§ 49f(a)(3)(D), 49g(d), and 49l-2(a) |
| U.S. Department of Labor | Workforce Investment Act of 1998, Public Law 105-220; 20 CFR 668.296(b) and 668.440 |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Moving Ahead for Progress in the 21st Century Act, Public Law 112-141 (2012), 49 USC § 5304 (a); 49 CFR Part 613, Subpart B |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, Section 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112, 29 USC § 791 (b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Age Discrimination in Employment Act of 1967, Public Law 90-202, 29 USC § 623(a)–(d) and 633a; 29 CFR 1625.7(d); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |

# Language Spoken at Home

Language spoken at home asked since 1890.[1]

**QUESTIONS ABOUT WHETHER A PERSON SPEAKS A LANGUAGE OTHER THAN ENGLISH AT HOME, WHAT LANGUAGE HE/SHE SPEAKS, AND HOW WELL HE/SHE SPEAKS ENGLISH ARE USED TO CREATE STATISTICS ABOUT LANGUAGE AND ABOUT ABILITY TO SPEAK ENGLISH.**

Language data are used in planning government programs for adults and children who do not speak English well. These data are also used to ensure that information about public health, law, regulations, voting, and safety is communicated in languages that community members understand.

## LANGUAGE SPOKEN AT HOME DATA HELP COMMUNITIES:

### Educate Children

Knowing how many children and youth with limited English-speaking abilities depend on services through schools helps school districts make long-term staffing and funding decisions. Language spoken at home in combination with other information, such as disability status, school enrollment, and poverty status, helps schools understand the needs of their students and qualify for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

## Ensure Equal Opportunity

Knowing the languages spoken by people in the community in combination with information about housing, voting, employment, and education, helps the government and communities enforce laws, regulations, and policies against discrimination based on national origin. For example, language data are used to support the enforcement responsibilities under the Voting Rights Act to investigate differences in voter participation rates and to enforce laws and policies related to bilingual requirements.

Knowing languages spoken in a community also helps federal agencies identify needs for services for people with limited English proficiency under Executive Order 13166.

### Understand Changes

Knowing whether people who speak languages other than English have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. For example, language data are used with age and ancestry data to address language and cultural diversity needs in health care plans for the older population.

---

[1] Language spoken at home was not asked in 1950.

## Selected Statutory Uses of Language Spoken at Home Data

| | |
|---|---|
| U.S. Department of Agriculture | 7 USC § 2020(e)(1); 7 CFR 272.4(b)(6) |
| U.S. Department of Commerce, Bureau of the Census | 52 USC § 10503 |
| U.S. Department of Education | 20 USC §§ 6821 and 6824, 7011(6), and 7801(25) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 9835(g) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC § 300kk |
| U.S. Department of Health and Human Services, Administration for Community Living | Older Americans Act of 1965, Public Law 89-73, as amended, 42 USC §§ 3013, 3024. 3030s-1, 3032 |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, § 10334; 42 USC § 300kk |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k (l) |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act 42 USC § 11371–11376; 42 USC § 12901; 24 CFR Part 91; 24 CFR Part 576; |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC § 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203, 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | The Civil Rights Act of 1964, Title VI, 42 USC § 2000d–2000d-7; 28 CFR 42.101–42.112; 28 CFR 42.401–42.415; 28 CFR 50.3; Lau v. Nichols, 414 U.S. 563 (1974) |
| U.S. Department of Justice, Civil Rights Division | Equal Educational Opportunities Act of 1974, 20 USC § 1701 et seq.; Castaneda v. Pickard, 648 F. 2d 989 (1981) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |

# Marital Status and Marital History

Marital status asked since 1880, marital history asked since 1850.

> **QUESTIONS ABOUT WHETHER A PERSON IS CURRENTLY MARRIED, WIDOWED, DIVORCED, SEPARATED, OR NEVER MARRIED; WHETHER HIS/HER MARITAL STATUS CHANGED IN THE PAST 12 MONTHS; AND LIFETIME MARRIAGES ARE USED TO CREATE STATISTICS ABOUT CURRENT MARITAL STATUS AND MARITAL HISTORY.**

Marital status and marital history data help federal agencies understand marriage trends, forecast future needs of programs that have spousal benefits, and measure the effects of policies and programs that focus on the well-being of families, including tax policies and financial assistance programs.

## MARITAL STATUS AND MARITAL HISTORY DATA HELP COMMUNITIES:

### Provide Benefits to Spouses and Survivors

Knowing more about how many spouses and ex-spouses may qualify for programs with spousal benefits, including veteran and social security programs, can help federal agencies ensure adequate funding and facilities for these programs and can help communities determine where gaps in benefits and services might exist.

### Provide Assistance to Families

Knowing more about families, particularly blended and single-parent families, along with data about the presence of children, labor force status, and poverty status, can help communities enroll eligible families in programs designed to assist them, such as the Children's Health Insurance Program, and can help communities qualify for grants to fund these programs. These data are also used to evaluate programs like Temporary Assistance for Needy Families.

### Understand Changing Households

Knowing more about community marriage trends (whether people are marrying later in life, not getting married, or marrying again) in combination with information about age, presence of children, income, etc., can help communities understand if the available housing, job training, rental assistance, and administrative services and programs are meeting residents' needs during their major life changes. These data also help the federal government plan for the future. For example, the Social Security Administration estimates future program needs based on the current relationships of working people.

## Selected Statutory Uses of Marital Status and Marital History Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 13 USC § 141 note |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3), (6), (8), 299b-2(a)(1), and 299(c )(1)(A) |
| U.S. Department of Health and Human Services, Center for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, Section 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs 38 USC § 3122 |
| U.S. Social Security Administration | Social Security Act, Public Law 74–271 as amended, 42 USC § 401(c) |

# Migration (Previous Residence)/Residence 1 Year Ago

Residence 1 year ago asked since 1930.

QUESTIONS ABOUT WHETHER A PERSON MOVED IN THE LAST YEAR AND WHERE HE OR SHE LIVED 1 YEAR AGO ARE USED TO CREATE STATISTICS ABOUT WHERE PEOPLE ARE MOVING (TO/FROM FOREIGN COUNTRIES AND WITHIN THE UNITED STATES).

Migration (residence 1 year ago) data are used in planning government programs and adjusting other important geographic data as people move. The characteristics of people who have moved are also an important part of estimating population changes. These population estimates are used in funding decisions, to ensure surveys are accurate, to understand change in other data, and to produce official international migration estimates.

## MIGRATION/RESIDENCE 1 YEAR AGO DATA HELP COMMUNITIES:

### Understand Changes

Knowing the characteristics of people who have moved and the patterns of migration (where people move to and from) is an important part of estimating population changes. Population estimates are used in funding decisions, to ensure surveys are accurate, to understand change in other data, and to produce international migration estimates. These data also help agencies assess residential stability and the effects of migration on urban and rural areas.

Knowing where certain populations move to and from helps federal agencies assess the needs of counties with large refugee populations and the effects of immigration on local areas.

Knowing the characteristics of people who live or have lived in certain areas is important to understand the relationships among different development patterns, including housing and travel information, public health, and pollution. These data may also assist state and local agencies in developing programs that attract new residents or employers.

## Selected Statutory Uses of Migration/Residence 1 Year Ago Data

| | |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 13 USC § 181 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC §§ 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i), |
| U.S. Department of Health and Human Services, Indian Health Service | Indian Citizenship Act of 1924, 25 USC § 13; 42 USC § 2001(a); 42 CFR 136.12(a) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Place of Birth, Citizenship, and Year of Entry

Place of birth asked since 1850, citizenship asked since 1820,[1] year of entry asked since 1890.[2]

> **QUESTIONS ABOUT A PERSON'S PLACE OF BIRTH, CITIZENSHIP, AND YEAR OF ENTRY INTO THE UNITED STATES ARE USED TO CREATE DATA ABOUT CITIZENS, NONCITIZENS, AND THE FOREIGN-BORN POPULATION.**

These statistics are essential for agencies and policymakers setting and evaluating immigration policies and laws, seeking to understand the experience of different immigrant groups, and enforcing laws, policies, and regulations against discrimination based on national origin. These statistics are also used to tailor services to accommodate cultural differences.

## PLACE OF BIRTH, CITIZENSHIP, AND YEAR OF ENTRY DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing how many people in the community are born in other countries in combination with information about housing, voting, language, employment, and education, helps the government and communities to enforce laws, regulations, and policies against discrimination based on national origin. For example, these data are used to support the enforcement responsibilities under the Voting Rights Act to investigate differences in voter participation rates and to enforce other laws and policies regarding bilingual requirements.

### Educate Children

Knowing how many foreign-born children depend on services through schools helps school districts make staffing and funding decisions. Place of birth, citizenship, and year of entry statistics in combination with other information, such as language spoken at home, help schools understand the needs of their students and qualify for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

### Understand Changes

Knowing whether people of different races or countries of birth have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. These data may also help communities with large refugee populations that qualify for financial assistance (Immigration Nationality Act).

---

[1] Citizenship asked 1820–1830, 1870, and 1890 to present.
[2] Year of entry asked 1890–1930, and 1970 to present.

### Selected Statutory Uses of Place of Birth, Citizenship, and Year of Entry Data

| | |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 52 USC § 10503 |
| U.S. Department of Commerce, Bureau of the Census | 13 USC § 141(c) |
| U.S. Department of Education | 20 USC §§ 6821, 6824, 7011(5), and 7801(20) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC §§ 9902 (2), 9903, and 9908(b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Office for Civil Rights | Civil Rights Act of 1964, Title VI; Patient Protection and Affordable Care Act, Section 1557 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)(C) |
| U.S. Department of Housing and Urban Development | Fair Housing Act, Public Law 90–284, 42 USC 3600–3620; 42 USC 3608(e) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203; 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964, Title VII, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964, Title VII, Public Law 88-352, 42 USC § 2000e-2 ; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112, 29 USC § 791 (b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352,42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Social Security Administration | Social Security Act, Public Law 74–271, as amended, 42 USC § 401(c) |

# Plumbing Facilities, Kitchen Facilities, and Telephone Service

Plumbing facilities asked since 1940, kitchen facilities asked since 1940, telephone service asked since 1960.

**QUESTIONS ABOUT THE PRESENCE OF HOT AND COLD RUNNING WATER, A BATHTUB OR SHOWER, A SINK WITH A FAUCET, A STOVE OR RANGE, A REFRIGERATOR, AND TELEPHONE SERVICE ARE USED TO CREATE DATA ABOUT INDICATORS OF HOUSING QUALITY.**

These data are used in planning and funding government programs that identify areas eligible for housing assistance, rehabilitation loans, and other programs that help people access and afford decent, safe, and sanitary housing. Public health officials may also use this information to locate areas in danger of ground-water contamination and waterborne diseases.

## PLUMBING FACILITIES, KITCHEN FACILITIES, AND TELEPHONE SERVICE DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing more about the quality of housing in a community helps communities understand whether available housing meets the needs of residents. When housing is not sufficient or not affordable, data on household facilities can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

## Plan Community Development

Knowing how the quality of different types of homes in combination with whether they are occupied or vacant, can help communities identify opportunities to improve tax, assistance, and zoning policies and to reduce tax revenue losses from vacant or abandoned properties. These data may also be useful in identifying types of homes in disaster-prone areas during emergency planning and preparation.

## Ensure Residents Can Communicate

Measuring the extent of telephone service, including access for schools, libraries, health care providers, and low-income residents, helps communities ensure their residents have universal access to assistance programs, emergency services, and important information.

## Measure Environmental Impacts

Substandard plumbing systems may impact the local water supply. Understanding where these systems are concentrated helps communities research their wastewater infrastructure needs and work to improve their systems.

## Selected Statutory Uses of Plumbing Facilities, Kitchen Facilities, and Telephone Service Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, 1490a, 1490c, 1490d, 1490e, and 1490l,; 7 CFR 1940.560–1940.567, 1940.575; 7 CFR 3550.10, 1980.312, 3560.11; 7 CFR 3550.53(a), 3550.67(b), 3550.68(c); 7 CFR 1980.301(d); 7 CFR 3560.152(a)(2), 3560.254(c) RD Instruction 1980-D, Exhibit C |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 (Also Appendices A and B) |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113; 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(I), (iii)(I), (iv), and (g); 15 U.S.C § 631 |
| U.S. Department of Housing and Urban Development | Federal Housing Enterprises Financial Safety and Soundness Act of 1992, § 1338, 12 USC § 4568 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625, 42 USC § 12747(b)(1)(A) and (B); 24 CFR 92.50(a), (b), and (c) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5304; 49 CFR Part 613, Subpart B |
| U.S. Federal Communications Commission | Telecommunications Act of 1996, Public Law 104-104, 47 USC §151 and 254; 47 CFR 54.702(i) |

# School Enrollment, Educational Attainment, and Undergraduate Field of Degree

School enrollment asked since 1850, educational attainment asked since 1940, undergraduate field of degree asked since 2009.

**QUESTIONS ABOUT WHETHER A PERSON IS ATTENDING SCHOOL OR COLLEGE, THE HIGHEST LEVEL OF EDUCATION HE/SHE HAS COMPLETED, AND THE FIELD OF ANY COMPLETED UNDERGRADUATE COLLEGE DEGREES ARE USED TO CREATE DATA ABOUT EDUCATION.**

These statistics are used to analyze the characteristics and needs of school-aged children and to understand the continuing education needs of adults.

## SCHOOL ENROLLMENT, EDUCATIONAL ATTAINMENT, AND UNDERGRADUATE FIELD OF DEGREE DATA HELP COMMUNITIES:

### Educate Children and Adults

Knowing how many children and adults depend on services through schools helps school districts make long-term building, staffing, and funding decisions. School enrollment in combination with other information, such as disability status, language spoken at home, and poverty status, helps schools understand the needs of their students and qualify for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

Knowing how many adults do not have a high school diploma or equivalent helps schools understand the needs of adult students and qualify for grants that help fund programs for these students (Workforce Investment Act).

Knowing the major fields of study of adults with bachelor's degrees enables efforts to develop the nation's science, technology, engineering, and mathematics labor force (America COMPETES Reauthorization Act of 2010).

### Ensure Equal Opportunity

Understanding more about the characteristics of people enrolled or not enrolled in school helps government and communities enforce laws, regulations, and policies against discrimination in education (Civil Rights Act).

Knowing the educational attainment of workers compared to those seeking employment in combination with age, gender, race, Hispanic origin, disability, and other data, helps enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964). This information is also used in targeting voting rights enforcement (Voting Rights Act).

## Selected Statutory Uses of School Enrollment, Educational Attainment, and Undergraduate Field of Degree Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 9835(g) |
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, Section 124(c)(5); 42 USC § 15024 |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC § 299a(a)(3),(6),(8); 42 USC § 299b-2(a)(1); 42 USC § 299(c )(1)(A) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Equal Educational Opportunities Act of 1974, 20 USC § 1701 et seq.; Castaneda v. Pickard, 648 F.2d 989 (1981) |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964 (Rights to Public Education and Equal Educational Entitlement), 42 USC § 2000c et seq. |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203; 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III–Labor and Education Matters, Subtitle C–Vocational Rehabilitation Matters, Section 334–Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b) (2) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |

# Selected Monthly Owner Costs (Cost of Utilities, Condominium and Mobile Home Fees, Taxes, Insurance, and Mortgages)

Cost of utilities asked since 1940, condominium and mobile homes fees asked since 1990, taxes asked since 1940,[1] insurance cost asked since 1980, mortgages cost asked since 1940.

**QUESTIONS ABOUT THE USE AND COST OF COMMON UTILITIES, ANY APPLICABLE CONDOMINIUM AND MOBILE HOME FEES, TAXES, UTILITIES, MORTGAGES, AND HOME LOANS ARE USED TO PRODUCE STATISTICS ABOUT SELECTED MONTHLY OWNER COSTS.**

These data are used in government programs that analyze whether adequate housing is affordable for residents and to provide and fund housing assistance programs. These statistics are also used to enforce laws, regulations, and policies against discrimination in government programs and in society.

## SELECTED MONTHLY OWNER COSTS DATA HELP COMMUNITIES:

### Provide Adequate Housing

Comparing housing costs to household income (the combined income of everyone in the household) helps communities understand whether housing is affordable for residents.

When housing is not sufficient or not affordable, housing cost data can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how housing costs change over time can help communities understand changes in local housing markets and to identify opportunities to improve tax, assistance, and zoning policies.

### Ensure Equal Opportunity

Knowing more about the housing costs of people who own homes in the community in combination with age, gender, race, Hispanic origin, disability, and other data about the household residents, helps government and communities enforce laws, such as the 1968 Fair Housing Act designed to eliminate discrimination in housing.

---

[1] Cost of utilities asked since 1940, condominium and mobile homes fees asked since 1990, taxes asked in 1940 and since 1980, insurance cost asked since 1980, mortgages cost asked since 1940.

## Selected Statutory Uses of Selected Monthly Owner Costs Data

| | |
|---|---|
| U.S. Department of Commerce, Bureau of Economic Analysis | 15 USC § 1516; Department Organization Order 35-1A |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC § 11371–11376, 42 USC § 12901; 24 CFR Part 91; 24 CFR Part 576; 24 CFR Part 574 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 (Also appendices A and B) |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC § 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Supplemental Nutrition Assistance Program (SNAP)/Food Stamps

SNAP/food stamps asked since 2005.

**QUESTIONS ABOUT A HOUSEHOLD'S RECEIPT OF FOOD STAMPS/SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP)[1] ARE USED TO CREATE STATISTICS ABOUT PARTICIPATION IN FOOD ASSISTANCE PROGRAMS.**

SNAP data are used in planning and funding government programs that provide food assistance and in evaluating other government programs.

## SNAP DATA HELP COMMUNITIES:

### Provide Food Assistance to School Children

Knowing more about food assistance program participation in combination with school enrollment, income, and poverty status, can help communities streamline administration of the National School Lunch Program and School Breakfast Program by replacing administrative paperwork with American Community Survey estimates of students eligible for free and reduced-price meals.

### Evaluate SNAP

Knowing more about food-assistance program participation is used to evaluate the SNAP program and award bonuses to communities that administer SNAP funds well.

### Understand Changes

State and local agencies use these statistics to assess state food assistance needs and participation rates for eligible families and individuals and to determine gaps in services and programs. Faith-based and other nonprofit organizations use information about food assistance needs to determine where food banks, food kitchens, and other programs could be beneficial and how the needs of their communities can be met with additional resources and services.

---

[1] In 2008, the food stamp program was renamed SNAP, but the question uses both program names to minimize confusion.

## Selected Statutory Uses of SNAP Data

| | |
|---|---|
| U.S. Department of Agriculture | Richard B. Russell National School Lunch Act, 42 USC § 1759a(g) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A) (i) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 9835(g) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8629 (a)(1)–(3) and (5)–(6), 8629 (b), and 8622 (11) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 13 USC § 141 note |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 603(a)(4) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n) (1), and (o)(1) |

# Units in Structure, Rooms, and Bedrooms

Units in structure asked since 1940, rooms asked since 1940, bedrooms asked since 1960.

**QUESTIONS ABOUT THE TYPE OF BUILDING, UNITS IN THE STRUCTURE, NUMBER OF ROOMS, AND NUMBER OF BEDROOMS ARE USED TO CREATE DATA ABOUT HOUSING TYPES AND HOUSING DENSITY.**

These data are used in government programs that analyze whether adequate housing is available and affordable for residents and provide and fund housing assistance programs. The number of rooms in combination with the number of people living in a unit provides a ratio of people to rooms, which can be used to measure the extent of overcrowding among our nation's households. These statistics are also used to enforce laws, policies, and regulations against discrimination in government programs and in society.

## UNITS IN STRUCTURE, ROOMS, AND BEDROOMS DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of housing, and how many people occupy that housing, helps communities understand whether available housing meets the needs of residents. For example, these data are used to measure overcrowding in communities and are used as integral components to set Fair Market Rents for all areas of the country.

When housing is not sufficient, data can help communities enroll eligible households in programs designed to assist them (such as the Low Income Home Energy Assistance Program), and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

These data provide benchmark statistics that measure progress toward the Congressional declaration of goals for a national housing policy—a decent home and suitable living environment for every American family.

### Plan Community Development

These data are used to identify adequate housing and may be useful in identifying types of structures in disaster-prone areas during emergency planning and preparation.

## Selected Statutory Uses of Units in Structure, Rooms, and Bedrooms Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, 1490a, 1490c, 1490d, 1490e, 1490l, 1490m, 1490p-2, 1490r; 7 CFR 1940.560–1940.567, 1940.575; 7 CFR 3550.10, 1980.312, 3560.11; 7 CFR 3550.53(a), 3550.67(b), 3550.68(c); 7 CFR 1980.301(d); 7 CFR 3560.152(a)(2), 3560.254(c) RD Instruction 1980-D, Exhibit C |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629 (a) and (b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8623 (a) (2) and (4), 8629 (a) (1)–(3) and (6), 8629 (b) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Social Security Act, Section 1848e(1)(A) |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended; 25 USC § 4152(b); 24 CFR 1000.324–1000.330 (Also appendices A and B) |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974; 42 USC § 5306(a)(1); 24 CFR 1003.101 |
| U.S. Department of Housing and Urban Development | 12 U.S.C § 1701q; 24 CFR Part 891 |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act; 42 USC §11371–11376; 42 USC § 12901; 24 CFR Part 91; 24 CFR Part 576; 24 CFR Part 574 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93-383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93-383 as amended, 42 USC §§ 5302(a)(6)(D)(iv), (a)(9), (10), (11), (12), (13), (14), (15), (20), and (b) and 5306(a), (b)(1), (2), and (3) and (d)(1); 24 CFR 1003.101 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625' 42 USC § 12705(b)(1)-(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Federal Housing Enterprises Financial Safety and Soundness Act of 1992, section 1338, 12 USC § 4568 |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Vehicles Available

Vehicles available asked since 1960.

> **A QUESTION ABOUT THE VEHICLES AVAILABLE TO EACH HOUSEHOLD IS USED TO CREATE DATA ABOUT VEHICLE ACCESS.**

Vehicle data are used in planning and funding for improvements to road and highway infrastructure, developing transportation plans and services, and understanding how people are traveling in the course of a normal day. These data are also used to evaluate pollution and access to transportation in emergencies.

## VEHICLE AVAILABILITY DATA HELP COMMUNITIES:

### Improve Transportation

Knowing how many households have access to vehicles, in combination with where people commute to and from, and whether they commute with a personal vehicle helps transportation planners create mass transportation and metropolitan plans that are compliant with various regulations.

Local agencies and organizations use these data to plan programs and services for the disabled population, bicycle commuters, carpool and ride-sharers, and many other groups; and to predict future use of new or updated transportation systems based on their understanding of the current users of various transportation options.

### Understand Changes in Vehicle Use

Understanding vehicle availability and use helps communities understand exposure to air pollution and plan programs to help people without vehicles move about the community. Knowing whether people could evacuate using their personal vehicles in an emergency also helps communities plan emergency response.

## Selected Statutory Uses of Vehicles Available Data

| U.S. Department of Energy | Energy Policy Act of 1992, Public Law 102-486, 42 USC § 13385 |
|---|---|
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 42 USC § 1973 et seq.; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94, 49 USC § 5304; 49 CFR Part 613, Subpart B |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94, 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6303(c ), 6304(a), and 6309(a) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(2), (b)(1), and (b)(6) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(1), (b)(6), (b)(7), (e), and (g) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500' 33 USC § 1254 (a)(2), (b)(6), and (s) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Veteran Status, Period of Service, and Department of Veterans Affairs (VA) Service-Connected Disability Rating

Veteran status asked since 1890, period of military service asked since 1890,[1] VA service-connected disability rating asked since 2008.

**QUESTIONS ABOUT A PERSON'S MILITARY SERVICE AND SERVICE-CONNECTED DISABILITY RATING ARE USED TO CREATE ESTIMATES OF VETERANS AND THEIR NEEDS AT THE COMMUNITY LEVEL.**

Data about veterans are used in planning and funding government programs that provide funds or services for veterans and in evaluating other government programs and policies to ensure they fairly and equitably serve the needs of veterans. These statistics are also used to enforce laws, policies, and regulations against discrimination in society. Though the VA maintains veterans' records, these statistics do not provide federal program planners, policymakers, and researchers with additional statistics about all veterans, regardless of whether they use VA services.

## VETERAN STATUS, PERIOD OF SERVICE, AND VA SERVICE-CONNECTED DISABILITY RATING DATA HELP COMMUNITIES:

### Administer Programs for Veterans

Knowing the numbers and characteristics of veterans eligible for federal programs benefiting veterans, such as the VA Home Loan Guarantee program, the Post-9/11 GI Bill, and job training and hiring preference programs can help communities and the federal government estimate the future demand for these programs and services. These data are also used to evaluate these programs to determine whether they are benefiting veterans as intended.

### Provide Health Care for Veterans

Knowing the number of veterans eligible to use VA health care in combination with age, disability, and service-connected disability ratings, can help communities and the federal government estimate the future demand for health care services and facilities. Communities in need of major VA medical facilities throughout the country make a case for new construction projects using these data to estimate the expected usage of new facilities.

### Plan End-of-Life Options for Veterans

Knowing where veterans are living toward the end of their lives is important, as the VA estimates the number of nursing home and domiciliary beds needed based on the concentrations of eligible veterans over age 65. These data are also important for the VA National Cemetery Administration, whose goal is to have a VA burial option within 75 miles of a veteran's residence. These data are used to plan construction of new cemeteries near the communities where veterans choose to live.

### Ensure Equal Opportunity

Knowing the veteran and service-connected disability rating status of people in the community in combination with information about housing, voting, employment, and education, helps government and communities enforce against discrimination based on veteran or disability status.

### Understand New Challenges for Veterans

Knowing more about the characteristics of veterans returning to civilian life is also important to combat specific problems they may face. For example, these data are used in research to understand why veteran status is a predictor of homelessness. Such data have been combined with administrative data produced by shelters in an attempt to understand and document which interventions reduce homelessness among veterans.

---

[1] Veteran status and period of service were not asked in 1920.

## Selected Statutory Uses of Veteran Status, Period of Service, and VA Service-Connected Disability Rating Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2.; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Veterans Affairs | Veterans Millennium Health Care Benefits Act, Public Law 106-117, Section 101; 38 USC § 1710, 8131(1), and 8134(a)(2) |
| U.S. Department of Veterans Affairs | 38 USC § 308(b) |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, Section 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Department of Veterans Affairs | Veterans Millennium Health Care and Benefits Act, Public Law 106-117, Section 613(b)(2) |

# Work Status Last Year

Work status last year asked since 1880.

> **QUESTIONS ABOUT HOW MANY WEEKS A PERSON WORKED IN THE LAST YEAR, AND HOW MANY HOURS HE OR SHE WORKED EACH WEEK ARE USED TO PRODUCE STATISTICS ABOUT FULL-TIME AND PART-TIME WORKERS, AS WELL AS YEAR-ROUND AND SEASONAL WORKERS.**

Data on work status last year are used in planning and funding government programs that provide unemployment assistance and services, and to understand trends and difference in wages, benefits, work hours, and seasonal work. These data are also used to evaluate other government programs and policies to ensure they fairly and equitably serve the needs of all groups, and to enforce laws, regulations, and policies against discrimination in society.

## WORK STATUS LAST YEAR DATA HELP COMMUNITIES:

### Provide Employment Opportunities

Knowing whether programs designed to employ specific groups, such as people with disabilities or veterans, are succeeding is important to employers, federal agencies, and federal government contractors (Vietnam Era Veterans' Readjustment Assistance Act, Rehabilitation Act of 1973).

State and local agencies use these statistics to identify labor surplus areas (areas with people available for hiring and training), plan workforce development programs including job fairs and training programs, and promote business opportunities.

### Ensure Equal Opportunity

Knowing more about people who are employed or looking for work, in combination with age, gender, race, Hispanic origin, disability status, veteran status, and other data, helps governments and communities enforce laws, policies, and regulations against discrimination in employment. For example, data on work status last year are used to enforce laws against discrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964).

### Understand Changes

Knowing the characteristics of people who are working or looking for work is an important part of estimating changes in the economy. Estimates of work status last year are used in funding decisions; to ensure surveys are accurate, including surveys that provide official labor market estimates; and to understand change in other data (Wagner-Peyser Act and Workforce Investment Act).

Case 3:18-cv-02279-RS  Document 39-1  Filed 06/08/18  Page 265 of 440

## Selected Statutory Uses of Work Status Last Year Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, Section 124(c)(5), 42 USC § 15024 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Labor | Workforce Investment Act of 1998, Public Law 105-220; 20 CFR 668.296(b) and 668.440 |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112, 29 USC § 791(b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood v. United States, 433 U.S. 299 (1977) |

# Year Built and Year Moved In

Year built asked since 1940, year moved in asked since 1960.

**QUESTIONS ABOUT WHEN A BUILDING WAS BUILT AND WHEN A PERSON MOVED INTO THAT HOME ARE USED TO CREATE DATA ABOUT HOUSING AGE AND AVAILABILITY.**

These data are used in government programs that analyze whether adequate housing is available and affordable for residents, provide and fund housing assistance programs, and measure neighborhood stability.

## YEAR BUILT AND YEAR MOVED IN DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the ages of housing in a community helps communities understand whether available housing meets the needs of residents.

When housing is not sufficient or older than a certain age, housing data can help communities enroll eligible households in programs designed to assist them (such as the Low Income Home Energy Assistance Program), and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the balance of different ages of homes in combination with whether they are occupied or vacant, can help communities identify opportunities to improve tax, assistance, and zoning policies and to reduce tax revenue losses from vacant or abandoned properties. These data may also be useful in identifying older structures in disaster-prone areas during emergency planning and preparation.

Knowing more about the age of the housing stock in combination with the financial situation of residents, including income, employment, and housing costs, can help communities qualify for loan and grant programs designed to stimulate economic recovery, improve housing, run job-training programs, and define areas as empowerment or enterprise zones.

## Selected Statutory Uses of Year Built and Year Moved In Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629(a) and (b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8623(a)(2) and (4), 8629 (a)(1)–(3) and (6); 42 USC 8629(b) |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113; 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93–383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93-383 as amended, 42 USC § 5302(a)(6)(D)(iv), (a) (9), (10), (11), (12), (13), (14), (15), (20), and (b); 42 USC§ 5306(a), (b)(1), (2), and (3) and (d)(1); 24 CFR 1003.101 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(l), (iii)(l), (iv), and (g); 15 U.S.C § 631 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625, 42 USC § 12747(b)(1)(A) and (B); 24 CFR 92.50(a),(b), and (c) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Appendix:
# Year Current Subjects Planned First Asked in Decennial Census Program

# Year Current Subjects Planned First Asked in Decennial Census Program

| Subjects Planned for 2020 Census and/or ACS | Year Subject First Asked in Decennial Census or ACS | Years Not Asked |
|---|---|---|
| Acreage | 1960 | |
| Age | 1790 | |
| Agricultural Sales | 1960 | |
| Ancestry | 1980 | |
| Bedrooms | 1960 | |
| Citizenship | 1820 | 1840–1860, 1880 |
| Class of Worker | 1910 | |
| Commuting (Journey to Work) | 1960 | |
| Computer and Internet Use | 2013 | |
| Condominium and Mobile Home Fees | 1990 | |
| Cost of Utilities | 1940 | |
| Disability | 1830 | |
| Educational Attainment | 1940 | |
| Ethnicity | 1970 | |
| Fertility | 1890 | |
| Gender | 1790 | |
| Grandparent Caregivers | 2000 | |
| Health Insurance | 2008 | |
| Home Heating Fuel | 1940 | |
| Home Value | 1940 | |
| Income | 1940 | |
| Industry | 1820 | 1830, 1850–1900 |
| Insurance | 1980 | |
| Kitchen Facilities | 1940 | |
| Labor Force Status | 1890 | |
| Language Spoken at Home | 1890 | 1950 |
| Marital History | 1850 | |
| Marital Status | 1880 | |
| Migration (Previous Residence)/Residence 1 Year Ago | 1930 | |
| Mortgages | 1940 | |
| Occupation | 1850 | |
| Period of Military Service | 1890 | 1920 |
| Place of Birth | 1850 | |
| Plumbing Facilities | 1940 | |
| Race | 1790 | |
| Relationship | 1880 | |
| Rent | 1940 | |
| Rooms | 1940 | |
| School Enrollment | 1850 | |

## Year Current Subjects Planned First Asked in Decennial Census Program—Con.

| Subjects Planned for 2020 Census and/or ACS | Year Subject First Asked in Decennial Census or ACS | Years Not Asked |
|---|---|---|
| Supplemental Nutrition Assistance Program (SNAP)/ Food Stamps | 2005 | |
| Taxes | 1940 | 1950–70 |
| Telephone Service | 1960 | |
| Tenure (Owner/Renter) | 1890 | |
| Undergraduate Field of Degree | 2009 | |
| Units in Structure | 1940 | |
| VA Service-Connected Disability Rating | 2008 | |
| Veteran Status | 1890 | 1920 |
| Work Status Last Year | 1880 | |
| Year Built | 1940 | |
| Year Moved In | 1960 | |
| Year of Entry | 1890 | 1940–1960 |



**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

November 4, 2016

John H. Thompson
Director
Economics and Statistics Administration
U.S. Census Bureau
Unites States Department of Commerce
Washington, D.C. 20233-0001

Re:  Legal Authority for American Community Survey Questions

Dear Mr. Thompson:

This letter supplements my letter of July 1, 2016, in which I advised that, at that time, the Department of Justice had no needs to amend the current content and uses or to request new content in the American Community Survey (ACS) for the 2020 Census.  In 2014, the Department affirmed its continuing needs and legal justification for existing subjects and questions in the ACS.  I understand your office recently has been in communication with Department officials regarding new uses sought by the Department relating to LGBT populations.  Consistent with those communications, this letter formally requests that the Census Bureau consider a new topic in the ACS relating to LGBT populations.  The attached spreadsheet accurately reflects the legal authority supporting the necessity for the collection of this information.

Please let me know if you have any questions about this letter or wish to discuss this request.  I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel

Attachment

Cc:  Civil Rights Division
     Office of the Deputy Attorney General

DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

The following statutes enforced by the Department bar discrimination on the basis of sexual orientation, gender identity, or both.

| Statutory Requirement | | | | | |
|---|---|---|---|---|---|
| Title | Citations | Classification | Uses | Lowest geography | Frequency |
| Violence Against Women Reauthorization Act of 2013 | 42 USC 13925(b)(13) | R | Would be used to enforce prohibitions against discrimination in programs or activities receiving financial assistance administered by the Office on Violence Against Women. | Place | Annual |
| Violence Against Women Act of 1994, as amended, Victims of Trafficking and Violence Protection Act of 2000, Violence Against Women and Department of Justice Reauthorization Act of 2005, Violence Against Women Reauthorization Act of 2013 | 42 USC 3796gg(b)(5), 3796gg(b)(19), 3796gg-7(d), 10420(c)(1)(B), 13925(a)(39), 13971(b), 13971(d)(4), 13975(a), 13975(g)(3)(C)(ii), 14041(b)(1), 14041(b)(4), 14045(a)(1), 14045(c)-(d), 14045b(b)(10). | P | Would be used to help administer grants, and plan education about and enforcement of prohibitions against discrimination in programs or activities receiving financial assistance administered by OVW. | Census block group | Annual |
| Title VII of the Civil Rights Act of 1964 | 42 USC 2000e et seq.; 42 USC 2000e-2(k); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) | R | Would be used to enforce the prohibition against unlawful employment discrimination. | Place | Annual |
| Title VII of the Civil Rights Act of 1964 | 42 USC 2000e et seq. | P | Would be used to help plan education and enforcement efforts concerning the prohibition against unlawful employment discrimination. | Census block group | Annual |
| Title IX of the Education Amendments of 1972 | 20 USC 1701 et seq.; 34 CFR 106.21(b)(2), 106.23(b), 106.37(b)(1), 106.51(a)(3)-(4), 106.52, 106.53 | R | Would be used to enforce the prohibition against unlawful discrimination in education programs and activities receiving federal financial assistance. | Place | Annual |

# DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
## REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

| Statutory Requirement | | | | | |
|---|---|---|---|---|---|
| Title | Citations | Classification | Uses | Lowest geography | Frequency |
| Title IX of the Education Amendments of 1972 | 20 USC 1701 et seq. | P | Would be used to help plan education and enforcement efforts concerning the prohibition against unlawful discrimination in education programs and activities receiving federal financial assistance. | Census block group | Annual |
| Fair Housing Act of 1968 | 42 USC 3601 et seq. ; 24 CFR 100.500; Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015). | R | Would be used to enforce the prohibition against unlawful discrimination in housing. | Place | Annual |
| Fair Housing Act of 1968 | 42 USC 3601 et seq.; 24 CFR 100.500. | P | Would be used to help plan education, testing and enforcement efforts to eliminate unlawful discrimination in housing. | Census block group | Annual |
| Equal Credit Opportunity Act | 15 USC 1691 et seq .; 12 CFR 202.6 n.2 | R | Would be used to enforce the prohibition against unlawful discrimination in lending. | Place | Annual |
| Equal Credit Opportunity Act | 15 USC 1691 et seq . | P | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in lending. | Census block group | Annual |
| Omnibus Crime Control and Safe Streets Act of 1968 | 42 USC 3789d(c); 28 CFR 42.203(c), (e) | R | Would be used to enforce the prohibition against unlawful discrimination in criminal justice programs receiving federal financial assistance. | Place | Annual |

000313

# DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
## REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

| Statutory Requirement | | | | | |
|---|---|---|---|---|---|
| Title | Citations | Classification | Uses | Lowest geography | Frequency |
| Omnibus Crime Control and Safe Streets Act of 1968 | 42 USC 3789d(c) | P | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in criminal justice programs receiving federal financial assistance. | Census block group | Annual |
| Juvenile Justice and Delinquency Prevention Act of 1974 | 42 USC 5672(b) | R | Would be used to enforce the prohibition against unlawful discrimination in juvenile justice programs receiving federal financial assistance. | Place | Annual |
| Juvenile Justice and Delinquency Prevention Act of 1974 | 42 USC 5672(b) | P | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in juvenile justice programs receiving federal financial assistance. | Census block group | Annual |
| Civil Rights of Institutionalized Persons Act | 42 USC 1997 et seq. | R | Would be used to enforce the prohibition against egregious or flagrant violations of law for persons residing in or confined to covered institutions. | Census block group | Annual |
| Civil Rights of Institutionalized Persons Act | 42 USC 1997 et seq. | P | Would be used to help plan education and enforcement efforts to eliminate egregious or flagrant violations of law for persons residing in or confined to covered institutions. | Census block group | Annual |

## DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
## REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

| Statutory Requirement | | Classification | Uses | Lowest geography | Frequency |
|---|---|---|---|---|---|
| Title | Citations | | | | |
| Violent Crime Control and Law Enforcement Act of 1994 | 42 USC 14141 | R | Would be used to enforce the prohibition against patterns or practices of unlawful conduct by law enforcement or by officials in the juvenile justice system. | Place | Annual |
| Violent Crime Control and Law Enforcement Act of 1994 | 42 USC 14141 | P | Would be used to help plan education and enforcement efforts to eliminate patterns or practices of unlawful conduct by law enforcement or by officials in the juvenile justice system. | Census block group | Annual |
| Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009 | 18 USC 249 | P | Would be used to help plan education and enforcement efforts to prosecute and deter covered hate crimes against LGBT individuals. | Census block group | Annual |
| Victims of Crime Act of 1984 | 42 USC 10604(e) | P | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in crime victim compensation programs receiving federal financial assistance. | Census block group | Annual |

000316

DEC-14-2017  17:51                                                              P.02/04



**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

**DEC 1 2 2017**

<u>**VIA CERTIFIED RETURN RECEIPT**</u>
*7014 2120 0000 8064 4964*

Dr. Ron Jarmin
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
United States Department of Commerce
Washington, D.C. 20233-0001

Re: Request To Reinstate Citizenship Question On 2020 Census Questionnaire

Dear Dr. Jarmin:

The Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans. In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called "long form" census. This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting. To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected. As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2.

The Supreme Court has held that Section 2 of the Voting Rights Act prohibits "vote dilution" by state and local jurisdictions engaged in redistricting, which can occur when a racial group is improperly deprived of a single-member district in which it could form a majority. See *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Multiple federal courts of appeals have held that, where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district. See, e.g., *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023–24 (5th Cir. 2009); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Negrn v. City of Miami Beach*, 113 F.3d 1563, 1567-69 (11th Cir. 1997); *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990); see also *LULAC v. Perry*, 548 U.S. 399, 423–442 (2006) (analyzing vote-dilution claim by reference to citizen voting-age population).

The purpose of Section 2's vote-dilution prohibition "is to facilitate participation … in our political process" by preventing unlawful dilution of the vote on the basis of race. *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997). Importantly, "[t]he plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens." *Id.* Indeed, courts have reasoned that "[t]he right to vote is one of the badges of citizenship" and that "[t]he dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett*, 141 F.3d at 704. Thus, it would be the wrong result for a legislature or a court to draw a single-member district in which a numerical racial minority group in a jurisdiction was a majority of the total voting-age population in that district but "continued to be defeated at the polls" because it was not a majority of the citizen voting-age population. *Campos*, 113 F.3d at 548.

These cases make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected. From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census. See, e.g., U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Appendix B at B-7 (July 2007), *available at* https://www.census.gov/prod/cen2000/doc/sf3.pdf (last visited Nov. 22, 2017); U.S. Census Bureau, Index of Questions, *available at* https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Nov. 22, 2017). For years, the Department used the data collected in response to that question in assessing compliance with Section 2 and in litigation to enforce Section 2's protections against racial discrimination in voting.

In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, *American Community Survey Information Guide* at 6, *available at* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22, 2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population.

The 2010 redistricting cycle was the first cycle in which the ACS estimates provided the Census Bureau's only citizen voting-age population data. The Department and state and local jurisdictions therefore have used those ACS estimates for this redistricting cycle. The ACS, however, does not yield the ideal data for such purposes for several reasons:

•       Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly.

2

000664

• Because the ACS estimates are rolling and aggregated into one-year, three-year, and five-year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting.

• The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. See U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey), available at* https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunity Survey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population.

• Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. See *American Community Survey Data* 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process.

For all of these reasons, the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates.

Accordingly, the Department formally requests that the Census Bureau reinstate into the 2020 Census a question regarding citizenship. We also request that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census. At the same time, the Department requests that the Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia,* to yield information for the periodic determinations made by the Bureau under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503.

Please let me know if you have any questions about this letter or wish to discuss this request. I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel
Justice Management Division

3

000665

NOT RELEVANT

**From:** Kris Kobach [mailto████████████████]
**Sent:** Monday, July 24, 2017 2:43 PM
**To:** Teramoto, Wendy (Federal) <████████████████>
**Cc:** Alexander, Brooke (Federal) <████████████████>; Hernandez, Israel (Federal) <████████████████>
**Subject:** Re: Follow up on our phone call

Yes.

Sent from my iPhone

On Jul 24, 2017, at 1:39 PM, Teramoto, Wendy (Federal) <████████████████> wrote:

> Kris- can you do a call with the Secretary and Izzy tomorrow at 11 am?  Thanks. Wendy
>
>  **From:** Kris Kobach [mailto:████████████████]
> **Sent:** Monday, July 24, 2017 12:02 PM
> **To:** Teramoto, Wendy (Federal) <████████████████>
> **Subject:** Re: Follow up on our phone call

That works for me.  What number should I call?  Or would you like to call me?

On Mon, Jul 24, 2017 at 9:12 AM, Teramoto, Wendy (Federal) <████████████████> wrote:

We can speak today at 230. Please let me know if that works. W

Sent from my iPhone

On Jul 21, 2017, at 4:34 PM, Kris Kobach <████████████████> wrote:

Wendy,

Nice meeting you on the phone this afternoon.  Below is the email that I sent to Secretary Ross.  He and I had spoken briefly on the phone about this issue, at the direction of Steve Bannon, a few months earlier.

Let me know what time would work for you on Monday, if you would like to schedule a short call.  The issue is pretty straightforward, and the text of the question to be added is in the email below.

000763

Thanks.


Kris Kobach

[REDACTED]


---------- Forwarded message ----------
From: **Kris Kobach** <[REDACTED]>
Date: Fri, Jul 14, 2017 at 9:12 AM
Subject: Follow up on our phone call
To: [REDACTED]


Secretary Ross,

 Kansas Secretary of State Kris Kobach here.  I'm following up on our telephone discussion
from a few months ago.  As you may recall, we talked about the fact that the US census does
not currently ask respondents their citizenship.  This lack of information impairs the federal
government's ability to do a number of things accurately.  It also leads to the problem that aliens
who do not actually "reside" in the United States are still counted for congressional
apportionment purposes.

 It is essential that one simple question be added to the upcoming 2020 census.  That question
already appears on the American Community Survey that is conducted by the Census Burear
(question #8).  A slight variation of that question needs to be added to the census.  It should read
as follows:

**Is this person a citizen of the United States?**

 ☐**Yes, born in the United States**

☐**Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas**

☐**Yes, born abroad of U.S. citizen parent or parents**

☐**Yes, U.S. citizen by naturalization – Print year of naturalization _____**

☐**No, not a U.S. citizen – this person is a lawful permanent resident (green card holder)**

☐**No, not a U.S. citizen – this person citizen of another country who is not a green card
holder (for example holds a temporary visa or falls into another category of non-citizens)**

 Please let me know if there is any assistance that I can provide to accomplish the addition of
this question.  You may reach me at this email address or on my cell phone at [REDACTED]

 Yours,

Kris Kobach

January 26, 2018

The Honorable Wilbur L. Ross
Secretary of Commerce
U.S. Department of Commerce
14th St. and Constitution Avenue, NW
Washington, DC 20230

2018 JAN 29  AM 10: 38

O S EXECUTIVE SECRETARIAT

Dear Secretary Ross:

As former directors of the U.S. Census Bureau, serving under both Republican and Democratic administrations, we want to thank you for the care for the future of the Census Bureau you have displayed. We were, however, troubled to learn that the Department of Justice has recently asked the Bureau to add a new question on citizenship to the 2020 census. We are deeply concerned about the consequences of this possible action and hope that our objective observations provide a useful perspective before a final decision is made on this issue.

We were encouraged by your testimony before the Census Bureau's House and Senate authorizing committees last October. Your frank assessment of the status of 2020 Census preparations and your acknowledgment that the Bureau will need more resources to conduct an acceptably accurate enumeration were correct. Undoubtedly, your substantial private sector experience has informed your approach to the Bureau's mission. Similarly, your experience as a census enumerator many years ago may have helped to shape your appreciation for the importance of the fair and accurate census our Constitution envisions, free from partisan influence and guided by sound, well documented, scientifically driven decisions.[1]

There is a well-proven multi-year process to suggest and test new questions. We strongly believe that adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk. Your observation at the House Oversight and Government Reform Committee hearing on October 12, 2017 — that adding untested questions could reduce response rates — suggests that you have carefully considered respondent burden and other factors that contribute to public acceptance of censuses and surveys, as the window of opportunity to lock down census methods, operations, content, and infrastructure closes quickly.

As you fully appreciate, planning a decennial census is an enormous challenge. Preparations for a census are complex, with each component related to and built upon previous research and tests. The critical

---

[1] We think you will enjoy recalling that Kenneth Prewitt, a signer of this letter, was your crew leader in 1960. You were in the Harvard Business School, and he in the Harvard Divinity School; like you, he wanted to make some extra money over spring break. Ken was appointed a crew leader and recruited enumerators *only* from the HBS, knowing that they would carry out their duties efficiently. Indeed, they (you) did — your crew finished first in Boston, with the highest accuracy score in the city.

1

'dress rehearsal' for the 2020 Census (the 2018 End-to-End Census Test) is starting in Providence County, RI. Adding a citizenship question without a testing opportunity in a contemporary, census-like environment will invalidate the results and lessons learned from the End-to-End test. Key assumptions underlying estimates of self-response, staffing needs, local office sites, and communication strategies will no longer be sound, calling into question cost projections that we know you have worked hard to validate and update. In addition, the Census Bureau would need to modify data capture and processing systems, language assistance and enumerator training materials, and web-based instructions for completing the census in the time remaining before the 2020 Census starts – all without the benefit of field testing.

There are sound reasons that the Census Act requires the Bureau to submit to Congress the topics and actual questions it will include, three and two years, respectively, before Census Day.  It is highly risky to ask untested questions in the context of the complete 2020 Census design. There is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, quality, and truthfulness of response. The effect of adding a citizenship question to the 2020 Census on data quality and census accuracy, therefore, is completely unknown. Also of import, overcoming unexpected obstacles that arise as 2020 Census operations unfold would add to the cost, without assurances that such efforts would yield a more accurate outcome.

In summary, we believe that adding a citizenship question to the 2020 Census will considerably increase the risks to the 2020 enumeration. Because we share your goal of a "full, fair, and accurate census," as the Constitution requires, we urge you to consider a prudent course of action in response to the Justice Department's untimely and potentially disruptive request.

Please let us know if we can answer any questions or be of further assistance.

Sincerely,

Vincent P. Barabba (1973-1976; 1979–1981)

Martha Farnsworth Riche (1994-1998)

Kenneth Prewitt (1998–2001)

Steven H. Murdock (2008-2009)

Robert M. Groves (2009–2012)

John Thompson (2013–2017)

2

001058



# THE UNITED STATES CONFERENCE OF MAYORS

**President:**
MITCHELL J. LANDRIEU
Mayor of New Orleans
**Vice Presidents:**
STEPHEN K. BENJAMIN
Mayor of Columbia, SC
**Second Vice President:**
BRYAN K. BARNETT
Mayor of Rochester Hills
**Past Presidents:**
MICK CORNETT
Mayor of Oklahoma City
ELIZABETH B. KAUTZ
Mayor of Burnsville
**Trustees:**
STEVE ADLER
Mayor of Austin
SHANE T. BEMIS
Mayor of Gresham
J. CHRISTIAN BOLLWAGE
Mayor of Elizabeth
JAMES BRAINARD
Mayor of Carmel, IN
JOY COOPER
Mayor of Hallandale Beach
FRANK COWNIE
Mayor of Des Moines, IA
BILL de BLASIO
Mayor of New York
GREG FISCHER
Mayor of Louisville
JOHN GILES
Mayor of Mesa
KIM McMILLAN
Mayor of Clarksville
MIKE RAWLINGS
Mayor of Dallas
JAMES J. SCHMITT
Mayor of Green Bay
NAN WHALEY
Mayor of Dayton
**Advisory Board:**
JUAN CARLOS BERMUDEZ
Mayor of Doral
MURIEL BOWSER
Mayor of the District of Columbia
ARDELL F. BREDE
Mayor of Rochester, MN
ROY BUOL
Mayor of Dubuque
PETE BUTTIGIEG
Mayor of South Bend
CHRISTOPHER L. CABALDON
Mayor of West Sacramento
BUDDY DYER
Mayor of Orlando
JORGE O. ELORZA
Mayor of Providence
KAREN FREEMAN-WILSON
Mayor of Gary
JOSEPH P. GANIM
Mayor of Bridgeport
OLIVER G. GILBERT, III
Mayor of Miami Gardens
CAROLYN G. GOODMAN
Mayor of Las Vegas
SYLVESTER "SLY" JAMES, JR.
Mayor of Kansas City, MO
HARRY LaROSILIERE
Mayor of Plano
JOSEPH E. McELVEEN, JR.
Mayor of Sumter
LYDIA L. MIHALIK
Mayor of Findlay
JON MITCHELL
Mayor of New Bedford
KENNETH D. MIYAGISHIMA
Mayor of Las Cruces
FRANK C. ORTIS
Mayor of Pembroke Pines
ED PAWLOWSKI
Mayor of Allentown
MIGUEL A. PULIDO
Mayor of Santa Ana
MADELINE ROGERO
Mayor of Knoxville
PAUL SOGLIN
Mayor of Madison, WI
MARK STODOLA
Mayor of Little Rock
SYLVESTER TURNER
Mayor of Houston
BRIAN C. WAHLER
Mayor of Piscataway
MARTIN J. WALSH
Mayor of Boston
ACQUANETTA WARREN
Mayor of Fontana

**CEO and Executive Director**
TOM COCHRAN

January 29, 2018

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

Dear Secretary Ross,

It is hard to exaggerate the importance of a successful decennial census for municipalities across our nation. Census results determine the number of seats each state has in the House of Representatives, are used to draw political districts at federal, state and local levels, and affect the distribution of billions of dollars of federal funding annually to local communities for infrastructure and vital services like hospitals and schools. An inaccurate census leads to underrepresentation and fewer dollars for many of our most vulnerable communities.

We share the goal you have set for a full, fair and accurate 2020 Census. As such, we want to raise three areas of concern with you: adequate funding; qualified Census Bureau leadership; and rejecting untested questions that threaten to undermine census preparations and accuracy.

First, ensuring that the 2020 Census has the necessary resources to meet the challenges of enumerating a geographically, economically, culturally, and linguistically diverse population is foundational to its success. The Census Bureau must be able to implement effectively the range of data collection methods the 2020 Census will include, including new Internet and telephone response options and a traditional paper questionnaire. We were pleased that you requested an additional $187 million for the Census Bureau in Fiscal Year (FY) 2018, for a total of $1.684 billion, in order to fund IT systems development (e.g. scalability; cyber-security systems) and system integration and readiness for the 2018 End-to-End Census Test.

However, this proposed increase does not include any additional funding for the Integrated Partnership and Communications program, which is essential to keeping long term census costs in check, given the growing barriers to a successful census. We are facing unprecedented challenges to a fair, accurate, and cost-effective census. Factors that could depress self-response rates considerably include the perception of cyber-security risks; real cyber-security threats; the digital divide affecting rural, low income, minority, and older households; a growing climate of fear among immigrants, regardless of their legal status; and growing anti- government sentiment in some communities.

To address these challenges, we urge additional resources to increase the number of Partnership Specialists in FY 2018 from the current 43 to 200, to help educate and guide state and local governments and vital "trusted voices" at the local level as they prepare to support the work of the Census Bureau during final preparations and early promotion in 2019 and execution of the count in 2020. Given the lower projected self-response rate embodied in your revised lifecycle cost estimate, we also urge a concurrent increase in the number of Area Census Offices, from the planned 248 to 300, to open in FY 2019. Finally, we believe new Census Bureau research documenting the growing reluctance of immigrants to participate (fully, if at all) in surveys and census tests will require expanded research and testing of effective messages and communications avenues to overcome this significant barrier to an inclusive enumeration.

**We urge to you to work closely with Congress in the coming weeks to ensure that the final FY 2018 omnibus appropriations bill includes not only the additional $1.684 billion adjusted allocation the administration requested for the Census Bureau, but additional funds to expand the number of Partnership Specialists in 2018, expand messaging research and testing *before* the early communications campaign begins at the start of 2019, and a larger field footprint to enhance a projected higher number of households that require personal visits in the Nonresponse Follow-up operation.**

Secondly, the Census Bureau has long benefited from exceptional leadership, helping the agency carry out its mission of serving as the leading source of quality data about the nation's people and economy. The American people must have confidence that the Bureau's leaders will uphold its core principles of protecting confidentiality, sharing expertise, and conducting its work openly and fairly, without regard to partisan interests, and be guided by a commitment to scientific objectivity and excellence and research-based innovation.

Now, more than ever, the Census Bureau needs strong, permanent leadership to steer the agency through crucial preparations and implementation of the 2020 decennial count. To that end, we urge the president to nominate a highly qualified, nonpartisan candidate who is respected on both sides of the political aisle to be Census Director. At the same time, we are troubled by the administration's reported intent to appoint a candidate for Census Bureau deputy director whose body of professional work largely centers around achieving partisan advantage in the use of census data, and who lacks the traditional and requisite experience in managing a large organization like the Census Bureau and the complex operations of the decennial census.

**We urge the administration to put forward candidates for Census Director and Census Bureau Deputy Director who will continue the tradition of strong, nonpartisan, experienced, and strong leadership. Any nomination or appointment that would undermine the credibility of the Bureau's role as a fundamentally nonpartisan statistical agency will further erode already fragile public trust and confidence in the integrity of the 2020 Census and, indeed, the objectivity of all Census Bureau statistics.**

Thirdly, the recent U.S. Department of Justice request to add a question about citizenship to the 2020 Census threatens the Census Bureau's ability to conduct an inclusive enumeration that accurately reflects the diverse fabric of America. The Constitution requires a count of all persons living in the United States on Census Day, *regardless of citizenship or legal status*. Since 1790, the decennial census has been the vehicle for this count and, to this day, Congress has rejected efforts to change the interpretation of this important tenet of the Constitution by basing apportionment on a subset of the population.

The Census Bureau spends years testing alternative questionnaire formats and designs. Changes to the census form at this late stage of 2020 Census planning jeopardize the validity of the operational tests that already have been conducted, put into question the outreach and partnership strategies that have been

designed around different content, and would require changes in training and execution of operations. Robust, iterative testing of census methods and content is crucial to an accurate enumeration, with even the smallest changes to question order and wording potentially having adverse and unintended consequences for the success of operations and the accuracy of the data.

There are logistical and cost implications associated with adding a new question at this late point in the 2020 Census cycle. For example, the 2020 Census Operational Plan bases staffing levels on projected self-response rates that, in turn, the Bureau derived after carefully designed, iterative tests that did not include a question on citizenship. Adding a new question will nullify those prior projections and assumptions. Moreover, experts, elected officials, and community leaders all agree that adding a question on citizenship in particular will lower initial response, leading to an expanded Nonresponse Follow-up operation and increases in the field staff required to conduct door-to-door visits, thereby increasing the cost of the census considerably without improving accuracy.

Adding a citizenship question to the decennial census would not promote the constitutional mandate of the census, but in fact, may compromise it. Such a question would increase the burden on respondents, likely heighten privacy concerns around the census, and lower participation by immigrants who fear the government will use this information to harm them and their families. Furthermore, the Justice Department has not set forth new legal or programmatic reasons for the Census Bureau to collect this information from every household in the country since its initial cataloguing of data requirements for the census and American Community Survey prior to the Census Bureau's submission of 2020 Census and ACS topics to Congress last spring.

**We urge you to reject the Justice Department's request to add a citizenship question to the decennial census and to ensure that the Census Bureau can focus its time and resources on finalizing and executing the current 2020 Census plan.**

Thank you for your attention to our concerns. We look forward to working closely with you to ensure the fair and accurate census our communities expect and deserve.

Sincerely,

Tom Cochran
CEO and Executive Director

February 12, 2018

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

Dear Secretary Ross,

We, the undersigned Attorneys General of New York, Massachusetts, California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Iowa, Maine, Maryland, Mississippi, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, as well as the Governor of Colorado, write to oppose the recent request by the Department of Justice to add a question on citizenship to the questionnaire for the 2020 decennial Census.[1] Adding a citizenship question – especially at such a late date in the 2020 Census planning process – would significantly depress participation, causing a population undercount that would disproportionately harm states and cities with large immigrant communities. This undercount would frustrate the Census Bureau's obligation under the Constitution to determine "the whole number of persons in each state,"[2] threaten our states' fair representation in Congress, dilute our states' role in the Electoral College, and deprive our states of their fair share of hundreds of billions of dollars in federal funds that are allocated in part on decennial Census data. Indeed, as the Census Bureau has itself previously explained, "any effort to ascertain citizenship" in the decennial Census "will inevitably jeopardize the overall accuracy of the population count."[3]

These tremendous harms are not justified by the Justice Department's purported interest in strengthening enforcement of Section 2 of the Voting Rights Act. To the contrary, requesting citizenship data would undermine the purposes of the Voting Rights Act and weaken voting rights enforcement across the board.

For these reasons, we have serious concerns that adding a citizenship question to the 2020 Census at this late date would violate the Census Bureau's obligations under the Constitution, the Administrative Procedure Act, and other federal statutes.

---

[1] *See* Letter from Arthur E. Gary, General Counsel, Justice Management Division, U.S. Dep't of Justice, to Ron Jarmin, Performing the Non-Exclusive Functions and Duties of the Director, U.S. Bureau of the Census, U.S. Dep't of Commerce (Dec. 12, 2017), https://www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html [hereinafter DOJ Letter]. The Justice Department's request that the Bureau "reinstate" a citizenship question on the Census, *see id.* at 1, is misleading, as no citizenship question has been included on the decennial census since 1950. From 1970 to 2000, a citizenship question was included only on the "long form" questionnaire, which was distributed to a sample of about one in six households in lieu of the decennial census questionnaire. Following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey, which is now sent to about one in every 38 households each year.

[2] U.S. Const. amend. XIV, § 2; *see also id.* art. I, § 2, cl. 3.

[3] *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980).

1

001090

Furthermore, the underfunding of the Census Bureau raises concerns that technology and implementation strategies will not be adequately developed before the start of the full 2020 Census. The lack of testing in rural areas is particularly disconcerting. We request your assurances that the Bureau will be able to cope with this funding crisis and provide a full and accurate enumeration of the population of each state.

**I. Adding a citizenship question at this late date would fatally undermine the accuracy of the 2020 Census, harming the states and our residents.** The Justice Department's request should be rejected because adding a citizenship question to the 2020 Census would reduce participation and response rates, threatening the Census Bureau's ability to comply with its obligations under the Constitution and harming the states' interests.

*1. Questions about citizenship would deter participation in the 2020 Census, undermining the constitutional mandate to conduct an "actual Enumeration."* The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers,"[4] which requires "counting the whole number of persons in each State."[5] This count is to be determined by an "actual Enumeration" conducted every ten years.[6] It is well-settled that this "actual Enumeration" includes *all* residents, both citizens and noncitizens.[7] A citizenship question would hinder the Census Bureau's ability to complete this "actual Enumeration" by chilling participation in the 2020 Census by noncitizens and naturalized citizens alike.

The Census Bureau has long recognized the difficulty of counting immigrant and noncitizen communities. In preparing for the 2010 Census, the Bureau identified immigrants as one of several hard-to-count populations, and designed a significant public education campaign to increase participation from that group.[8] Similarly, in the lead up to the current decennial Census, the Bureau organized a working group to recommend strategies to minimize undercounts of undocumented immigrants, as well as immigrant Latinos and Asians.[9]

Notwithstanding these efforts, the difficulty of counting such groups has only increased in the current climate. Recent pretests by the Census Bureau have revealed that immigrant respondents increasingly expressed concerns about confidentiality and data sharing, especially

---

[4] *Id.* art. I, § 2, cl. 3.

[5] *Id.* amend. XIV, § 2.

[6] *Id.* art. I, § 2, cl. 3; *see also* 13 U.S.C. § 4 (delegating to the Secretary of Commerce authority to conduct the decennial census).

[7] *Klutznick*, 486 F. Supp. at 575-77.

[8] U.S. Census Bureau, *2010 Census Integrated Communications Plan*, 21, 75, 191, 223, 278 (Aug. 2008), https://www.census.gov/2010census/partners/pdf/2010_ICC_Plan_Final_Edited.pdf; U.S. Gov't Accountability Office, GAO-09-525T, *Communications Campaign Has Potential to Boost Participation*, 6 (Mar. 6, 2009), https://www.gao.gov/assets/130/122012.pdf.

[9] U.S. Census Bureau, Nat'l Advisory Comm. on Racial, Ethnic, and Other Populations, *Final Report of the Administrative Records, Internet, and Hard to Count Population Working Group*, 2, 8 (July 2016), https://www2.census.gov/cac/nac/reports/2016-07-admin_internet-wg-report.pdf.

001091

when asked questions about citizenship.[10]  Citing fears related to the current discourse on immigration policy, respondents have also refused to respond to questions and have ended interactions with surveyors.[11]  The Census Bureau has recognized that these anxieties might present a barrier to participation in the 2020 Census, and may diminish overall data quality.[12]  Even before the Department of Justice made its request, Census Bureau officials reported that early test surveys showed "an unprecedented groundswell in confidentiality and data-sharing concerns among immigrants or those who live with immigrants" related to the 2020 count.[13]  The Bureau already acknowledges that questions about citizenship in *any* federal statistical survey are sensitive and must be treated with care[14]; adding a citizenship inquiry to the mandatory decennial Census would undoubtedly exacerbate these problems, leading to larger undercounts and less reliable data.

Indeed, in a brief filed with the Supreme Court less than three years ago, four former Directors of the Census Bureau – appointed by Presidents of both political parties – explained based on their experience that "a one-by-one citizenship inquiry would invariably lead to a lower response rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states."[15]  The former Directors explained that "[r]ecent experience demonstrates lowered participation in the Census and increased suspicion of government collection of information in general. Particular anxiety exists among non-citizens.  There would be little incentive for non-citizens to offer to the government their actual status; the result [of inquiring about citizenship status] would be a reduced rate of response overall and an increase in inaccurate responses."[16]

---

[10] Memorandum from the U.S. Census Bureau, Ctr. for Survey Measurement, to Assoc. Directorate for Research and Methodology, 1, 5-7 (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf.

[11] *Id.* at 2.

[12] U.S. Census Bureau, Nat'l Advisory Comm. on Racial, Ethnic, and Other Populations, *Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for 2020 Census*, 2, 12-13, 15 (Nov. 2, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf.

[13] Mica Rosenberg, *U.S. Officials Worry Immigrant Fears Could Make Census Inaccurate*, Reuters (Nov. 30, 2017, 3:10 PM), https://www.reuters.com/article/us-usa-immigration-census/u-s-officials-worry-immigrant-fears-could-make-census-inaccurate-idUSKBN1DU2U7.  These concerns from some federal officials are shared by state-level experts with experience coordinating the administration of the decennial Census in their states.  Massachusetts Secretary of the Commonwealth, William Galvin, for example, recently testified before a state legislative committee that a citizenship inquiry would be a clear deterrent to participating in the 2020 Census.  *See* Christina Prignano, *Mass. secretary of state warns Trump could "sabotage" 2020 Census*, Boston Globe (Feb. 6, 2018), https://www.bostonglobe.com/metro/2018/02/06/mass-secretary-state-warns-trump-could-sabotage-census/HH2b73v0o2dkddzrjYDyUK/story.html.

[14] U.S. Census Bureau, Data Stewardship Exec. Policy Comm., *DS-16: Policy on Respondent Identification and Sensitive Topics in Dependent Interviewing*, 1-2 (Dec. 9, 2014), https://www2.census.gov/foia/ds_policies/ds016.pdf.

[15] Brief of Former Directors of the U.S. Census Bureau as Amici Curiae Supporting Appellees at 25, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (No. 14-940).

[16] *Id.* at 5.

001092

The Census Bureau in fact declined to add a citizenship question to the 2010 Census questionnaire,[17] and has repeatedly warned against adding such a question to the decennial Census because of the risk of lower response rates and reduced accuracy.[18]  As the Census Bureau has explained, questions about "citizenship are particularly sensitive" for individuals who "perceive[] any possibility of the information being used against them," and thus "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count" required by the Constitution.[19]

    *2. This threat to the accuracy of the 2020 Census is magnified by the extreme lateness of the Justice Department's proposal.*  Even assuming it were possible to devise a citizenship inquiry that would not risk an unconstitutional undercount, it is far too late in the planning process for the Census Bureau to test and validate any such approach.  The Bureau must meet a statutory deadline of March 31, 2018 – less than two months away – to submit its final questionnaire for the 2020 Census to Congress.[20]  Two months is insufficient time to design and test a question as sensitive as this one consistent with the guidelines that apply to federal statistical agencies.

By statute, the Office of Management and Budget (OMB) has responsibility for coordinating the federal statistical system, including to ensure "the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes."[21]  OMB is also required to establish government-wide guidelines and policies regarding statistical collection methods.[22]  Consistent with these statutory obligations, OMB has published a number of Statistical Policy Directives that govern the data collection efforts of federal statistical agencies, including the Census Bureau.[23]  These guidelines require, among other obligations, that agencies "ensure that all components of a survey function as intended . . . by conducting a pretest

---

[17] *See* U.S. Census Bureau, *2010 Census Memorandum Planning Series No. 239, 2010 Census Content and Forms Design Program Assessment Report*, 14 (Sept. 25, 2012).

[18] *See Census Equity Act: Hearings Before the Subcomm. on Census & Population of the Comm. on Post Off. & Civ. Serv.* 43-45 (1989) (statement of C. Louis Kincannon, Deputy Director, U.S. Bureau of the Census); *Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing Before the Subcomm. on Post Office & Civil Serv.*, 100th Cong. 50-51 (1988) (testimony of John Keane, Director, U.S. Bureau of the Census) [hereinafter *Census Counts*].

[19] *Klutznick*, 486 F. Supp. at 568.

[20] 13 U.S.C. § 141(f)(2) (providing, with respect to each decennial census, "the Secretary [of Commerce] shall submit to the committees of Congress having legislative jurisdiction over the census . . . not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such a census"); 13 U.S.C. § 141(a) (establishing April 1, 2020 as the decennial census date).

[21] 44 U.S.C. § 3504(e)(1); *see also* 44 U.S.C. § 3501(9); 44 U.S.C. §§ 3504(a)(1)(B)(iii), (e); Office of Mgmt. & Budget, *Statistical Programs of the United States Government, Fiscal Year 2017*, 3-4, 11 (2017).

[22] 44 U.S.C. § 3504(e)(3).

[23] Office of Mgmt. & Budget, *Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, 79 Fed. Reg. 71,610 (Dec. 2, 2014); Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards & Guidelines for Statistical Surveys* (Sept. 2006); Office of Mgmt. & Budget, *Statistical Policy Directive No. 4: Release and Dissemination of Statistical Products Produced by Federal Statistical Agencies*, 73 Fed. Reg. 12,621 (Mar. 7, 2008).

001093

of the survey components or by having successfully fielded the survey components on a previous occasion."[24]   OMB specifically recommends pretesting new components of a survey prior to a field test, and incorporating results into the final design.

In addition, the Census Bureau has further clarified the statistical standards it must utilize to address the agency's unique methodological and operational challenges.[25]   These standards require that all data collection instruments be tested "in a manner that balances data quality and respondent burden," and specifically require pretesting to ensure questions are not "unduly sensitive" and "do not cause undue burden."[26]

These requirements cannot reliably be met in the limited time available before the Census Bureau's March 31 deadline.  The Census Bureau already developed and approved its National Content Test in 2015, which it characterized as its "primary mid-decade opportunity to compare different versions of questions prior to making final decisions for the 2020 Census."[27]   And the 2018 End-to-End Census Test – which the Census Bureau describes as the "culmination" of its years-long process of testing and validating all aspects of the decennial Census design – is already underway, having begun in August 2017.[28]   In short, there is insufficient time for the Census Bureau to conduct the extensive development and testing that would be required to comply with OMB guidelines for adding new questions to the 2020 Census while assuring its validity and accuracy.  And as the Census Bureau has explained, conducting the Census with "untested and unproven procedures" would further undermine the Bureau's ability to conduct "a timely, accurate" enumeration.[29]

These concerns are heightened even further by the Census Bureau's already-precarious fiscal position as it prepares for the 2020 Census.  The Bureau is dramatically underfunded, and the addition of a citizenship question would add significantly to the overall price of completing the Census.  The Bureau's appropriated budget for Fiscal Year 2017 was roughly ten percent below its request, and was finalized seven months late.[30]   And the administration's initial budget request for Fiscal Year 2018 proposed only a two percent increase for the Census Bureau over the previous year – well short of the resources needed for the Bureau to prepare adequately for

---

[24] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2*, § 1.4 at 9 (2006).

[25] *See* U.S. Census Bureau, *Statistical Quality Standards*, ii (Jul. 2013), https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf.

[26] *Id.* at 7-8 reqs. A2-3 & A2-3.3.

[27] U.S. Census Bureau, *Information Collection Request: 2015 National Content Test*, 80 Fed. Reg. 29,609, 29,610 (May 22, 2015).

[28] U.S. Census Bureau, *Frequently Asked Questions for the 2018 End-to-End Census Test* (Dec. 20, 2017), https://www.census.gov/programs-surveys/decennial-census/2018-census-test/faqs.html.

[29] *Census Counts*, at 49-50.

[30] Robert Shapiro, *The 2020 Census May Be Wildly Inaccurate – And It Matters More Than You Think,* Brookings (Aug. 31, 2017), https://www.brookings.edu/blog/fixgov/2017/08/31/the-2020-census-may-be-wildly-inaccurate-and-it-matters-more-than-you-think/.

001094

the decennial Census.[31]  Further exacerbating these budget constraints, the reduced response rates that a citizenship question would cause will result in vastly increased costs overall. Reduced response rates trigger an expensive in-person follow-up process, which could result in an estimated increase of hundreds of millions of dollars to the price tag for the 2020 Census.

Because of inadequate financial resources, unreliable cost estimates, information technology challenges, and other concerns, GAO has already placed the 2020 Census on its "High Risk List" of government programs at greatest risk of fraud, waste, abuse, and mismanagement.[32]  Adding the challenge of testing and validating a question on citizenship to the tremendous operational and planning challenges that the Census Bureau already faces would increase the risk of error and heighten the chance of an undercount in our states.

*3. The states would be irreparably harmed by an inaccurate 2020 Census.*  By deterring participation in the Census, the proposed citizenship question would harm everyone, citizens and non-citizens alike.

First, an inaccurate 2020 Census could result in widespread malapportionment of the states' representation in Congress.  As noted, the Constitution requires that Representatives "shall be apportioned among the several States . . . according to their respective Numbers."[33]  As provided by the Census Act, the Secretary of Commerce is required to use the decennial Census results to tabulate the total population by state and report those results to the President,[34] who must then "transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled."[35]  An undercount that fails accurately to report the "whole number of persons" in each state would result in an incorrect calculation of the number of Representatives to which each state is entitled, in violation of the Census Clause of the Constitution.[36]  Inaccurate data would also jeopardize the ability of the states – and all of our local jurisdictions – to comply with the Fourteenth Amendment's one-person one-vote requirement when drawing district lines for everything from the state legislature to local city councils.[37]  Moreover, there would be no possibility of correcting this harm for at least a decade, when the next decennial Census takes place – and no

---

[31] *See id.* (noting that the Census Bureau's funding increased 60 percent between 2007 and 2008 in advance of the 2010 Census).

[32] U.S. Gov't Accountability Office, GAO-17-317, *High-Risk Series: Progress on Many High-Risk Areas, While Substantial Efforts Needed on Others*, 220-31 (Feb. 2017), https://www.gao.gov/assets/690/682765.pdf.

[33] U.S. Const. art. I, § 2, cl. 3.

[34] 13 U.S.C. § 141(a).

[35] 2 U.S.C. § 2a(a).

[36] *See, e.g.*, *Utah v. Evans*, 536 U.S. 452, 459 (2002) (challenge by the State of Utah and its Congressional delegation to a Census Bureau methodology that resulted in Utah receiving one less Representative in Congress); *Franklin v. Massachusetts*, 505 U.S. 788, 790-91 (1992) (challenge by the Commonwealth of Massachusetts to the Census Bureau's change in the method of counting overseas federal employees, which caused Massachusetts to receive one less seat in the House of Representatives).

[37] *See Reynolds v. Sims*, 377 U.S. 533, 568 (1964); *Baker v. Carr*, 369 U.S. 186, 208-09, 237 (1962).

001095

way to undo the harm the states would suffer from a ten-year deprivation of their constitutional allotment of Representatives.

In addition, a Census undercount could affect state representation in the Electoral College. The Constitution assigns each state a number of electors equal to "the whole number of Senators and Representatives to which the State may be entitled in the Congress."[38] An undercount that affected the apportionment of Representatives would also misrepresent the number of electors each state should receive, thereby miscalculating each state's proper role in selecting the President and Vice President.

This extraordinary harm to the fabric of our federal system would come with equally significant financial harm. Data derived from the decennial Census guide the geographic distribution of hundreds of billions of dollars in federal grant funds to states and local areas. According to one estimate, there are about 300 Census-guided federal grant programs, with total appropriations in Fiscal Year 2015 of approximately $700 billion.[39] These programs include Medicaid, the Supplemental Nutritional Assistance Program (SNAP), Title I grants to local educational agencies under the Elementary and Secondary Education Act, formula grants for highway planning and construction, Section 8 housing choice vouchers, the Low-Income Home Energy Assistance Program, and more.[40] In other words, a Census undercount would jeopardize critical federal funding the states need to provide health insurance, public education funding, food assistance, housing opportunities, energy assistance, and other services and support for millions of residents, regardless of citizenship status. Such widespread underfunding harms everyone, starting with the most vulnerable, including low-income communities and children.

The Census Bureau has both constitutional and statutory obligations to conduct an "actual enumeration." Including a question on the 2020 Census that would manipulate the count by scaring people away from being counted – causing grave harm to the states and our residents – is inconsistent with those obligations.[41]

**II. Adding a citizenship question to the 2020 Census would hamper the goals of the Voting Rights Act.** The Justice Department's request for citizenship data asserts that this information is necessary to ensure compliance with Section 2 of the Voting Rights Act. In fact, voting rights compliance will be undermined – not enhanced – by the addition of a citizenship question to the 2020 Census. Because the Justice Department's request is unsupported by its

---

[38] U.S. Const. art. II, § 2, cl. 2; *see also id.* amend. XII, amend. XXIII (allocating electors to the District of Columbia).

[39] *See* Andrew Reamer, *Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds,* G.W. Inst. Pub. Pol'y (Aug. 22, 2017), https://gwipp.gwu.edu/counting-dollars-role-decennial-census-geographic-distribution-federal-funds.

[40] *See id.*

[41] *Cf. Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 348 (1999) (Scalia, J., concurring) (noting that the purpose of a "genuine enumeration" is to accomplish "the most accurate way of determining population with minimal possibility of partisan manipulation").

001096

stated reason, adding a citizenship question would be arbitrary and capricious under the Administrative Procedure Act.[42]

   *1. Collecting citizenship data would undermine the goal of fair and effective representation for all communities, which the Voting Rights Act was enacted to protect.*  The purpose of the Voting Rights Act is to accomplish "nondiscriminatory treatment by government – both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement."[43]  Any method of enumeration that predictably undercounts some communities – as the Justice Department's proposal would do – will mean that those communities are not fairly represented when legislative seats are apportioned and district lines are drawn.

   The Supreme Court has long made clear that legislators represent all constituents in the districts they serve, regardless of whether any particular individual is a citizen: "[T]he fundamental principle of representative government in this country" is "one of equal representation for equal numbers of people."[44]  The Justice Department's request should be rejected because it would undermine this fundamental principle.

   *2. Citizenship data from the decennial Census is unnecessary to enforce the vote-dilution prohibition in Section 2 of the Voting Rights Act.*  The Justice Department's request should also be rejected because it is unsupported.  The Justice Department contends that it needs a "reliable calculation of citizen voting-age population" (or "CVAP") in order to enforce the vote-dilution prohibition of Section 2.[45]  But the Supreme Court has never held that *citizen* voting-age population is the proper measure for examining whether a minority group can constitute a majority in a single-member district (the first element of proving a vote-dilution claim).[46]  The Justice Department notes that in *LULAC v. Perry*, the Supreme Court "analyz[ed] a vote-dilution claim by reference to citizen voting-age population,"[47] but fails to note that in a subsequent Section 2 case – *Bartlett v. Strickland* – the Court assessed the vote-dilution inquiry in terms of

---

[42] *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that an agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency").

[43] *Katzenbach v. Morgan*, 384 U.S. 641, 652 (1966).

[44] *Reynolds*, 377 U.S. at 560-61; *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1131-32 (2016); *Davis v. Bandemer*, 478 U.S. 109, 132 (1986) (plurality opinion); *Daly v. Hunt*, 93 F.3d 1212, 1226 (4th Cir. 1996) (explaining that "people can affect what their representatives do in another way" besides voting: "through their right to petition their representatives to voice their concerns and interests on particular issues.  This right is available to everyone, even those who are ineligible to vote.").

[45] DOJ Letter at 1.

[46] *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)

[47] DOJ Letter at 1 (citing *LULAC v. Perry*, 548 U.S. 399, 423-442 (2006)).

8

"voting-age population."[48]  The question of the appropriate population measure in Section 2 vote-dilution cases is, at best, unsettled.[49]

In addition, even if citizen voting-age population were required in all cases, adding a citizenship question to the Census would not give the Justice Department the "reliable calculation" of citizenship information it claims to need.  The Census is of course only administered every ten years,[50] so any CVAP figures from the decennial Census would quickly become outdated and less reliable over the course of the subsequent decade as a result of population shifts.  And a citizenship question would not provide information sufficient to ascertain the precise number of eligible voters in a district because district residents might be ineligible to vote for other reasons, such as prior felony convictions.

In any event, the Census Bureau's American Community Survey already collects citizenship data, and these estimates are available for the federal government to use as needed.

Indeed, Congress could not possibly have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data, because such data has never been available at any point since Section 2 has existed: not in 1965 when the Voting Rights Act was first enacted; not in 1982 when the Act was amended to clarify the vote-dilution standard; not in 1986 when the Supreme Court articulated the vote-dilution test in *Thornburg v. Gingles*.  Because the Justice Department's request seeks data that has never before been required in Section 2 litigation – and that cannot reliably be collected in any event – it cannot credibly serve as the basis for major changes to the 2020 Census design that will undercut the accuracy of the constitutionally mandated enumeration.

**III.  The addition of a question regarding citizenship to the 2020 Census is inconsistent with the Census Bureau's Information Quality Guidelines**.  The Information Quality Act ("IQA") requires agencies to ensure that the information they disseminate to the public is accurate, reliable, and objective.[51]  Consistent with this directive, the IQA requires OMB and other federal agencies to issue guidelines "ensuring and maximizing the quality, objectivity, utility, and integrity of information, including statistical information, disseminated by the agency."[52]  Recognizing the critical importance of the information it disseminates, the

---

[48] *Bartlett v. Strickland*, 556 U.S. 1, 12 (2009) ("This case turns on whether the first *Gingles* requirement can be satisfied when the minority group makes up less than 50 percent of the voting-age population in the potential election district."); *see also id.* at 18 ("Unlike any of the standards proposed to allow crossover-district claims, the majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?  That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2.").

[49] *See, e.g.*, *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996) ("Because *Gingles* advances a functional evaluation of whether the minority population is large enough to form a district in the first instance, the Circuits have been flexible in assessing the showing made for this precondition.").

[50] U.S. Const. art. I, § 2, cl. 3; 13 U.S.C. § 141(a).

[51] Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 515, 114 Stat. 2763 (Dec. 21, 2000).

[52] *Id.*; *see also* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8457 (Feb. 22, 2002).

9

001098

Census Bureau has adopted particularly stringent agency-specific IQA guidelines. These guidelines provide detailed requirements that the Census Bureau must meet to ensure the "utility," "objectivity," "integrity," and "transparency" of information from the decennial Census.[53]

The Census Bureau's IQA guidelines disfavor questions that diminish response rates. The Bureau's guideline for ensuring "objectivity," requires collection and dissemination of information that is "accurate, reliable and unbiased."[54] To achieve this end, the guideline requires the Census Bureau to utilize collection methods that "minimiz[e] respondent burden."[55] This concern recognizes that respondents may choose not to respond when confronted by a question that is unduly sensitive or burdensome.[56] Burdensome questions may diminish the accuracy and reliability of data collected in surveys by driving down response rates. Indeed, the Census Bureau has acknowledged this very concern by adopting statistical standards that test for and revise these types of questions.[57]

The addition of a question regarding citizenship will diminish overall response rates. As noted above, many immigrant and citizen groups are likely to be highly sensitive to the citizenship inquiry. Adding this question to the 2020 Census questionnaire would impose a high burden on these groups, dissuade many from responding, and impair the survey's ultimate accuracy and reliability. As a result, by adding a citizenship inquiry to the questionnaire, the Census Bureau would hinder compliance with its own objectivity standard.

Moreover, the Census Bureau has not taken any steps to test the citizenship inquiry and its impact on potential respondents. The objectivity standard applies not only to the utilization of a particular data collection method, but also to the development of that method.[58] As noted above, both OMB and the Census Bureau have adopted statistical standards that require pre-testing in the development of data collection methods and survey questions.[59] To date, the Census Bureau has not engaged in any pretesting of the citizenship question. As a result, adoption of the citizenship question would conflict with the agency's IQA guidelines, and the Census Bureau should reject requests to include that question on the 2020 Census questionnaire.

---

[53] *Information Quality Guidelines*, U.S. Census Bureau (May 12, 2015), https://www.census.gov/about/policies/quality/guidelines.html.

[54] *Information Quality: Objectivity,* U.S. Census Bureau (Apr. 17, 2015), https://www.census.gov/about/policies/quality/guidelines/objectivity.html.

[55] *Id;* Similarly, OMB's statistical standards require the Census Bureau to design its data collection instruments and methods "in a manner that achieves the best balance between maximizing data quality . . . while minimizing respondent burden and cost." Office of Mgmt. & Budget, *Statistical Policy Directive No. 2,* § 2.3 at 11.

[56] U.S. Census Bureau, *Statistical Quality Standards*, at A2-3.3.

[57] *Id.*

[58] U.S. Census Bureau, *Information Quality: Objectivity*.

[59] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2,* § 1.4 at 9; U.S. Census Bureau, *Statistical Quality Standards*, ii.

001099

**IV.  Conclusion.**  Fair, proportionate electoral representation in our democracy depends on valid Census data.  The proposal to add a citizenship question to the 2020 Census questionnaire would defeat that goal, violate the Constitution, and undermine the purposes of the Voting Rights Act that the Justice Department claims it wants to protect.  Because inclusion of a citizenship question would threaten the Census Bureau's ability to conduct its constitutionally-mandated role, and would be arbitrary and capricious under the Administrative Procedure Act – causing significant, direct harm to our states and residents – we urge you to reject the Justice Department's request.

Sincerely,

_____
**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

_____
**MAURA HEALEY**
Attorney General for the Commonwealth of Massachusetts

_____
**XAVIER BECERRA**
Attorney General of the State of California

_____
**JOHN W. HICKENLOOPER**
Governor of the State of Colorado

_____
**GEORGE JEPSEN**
Attorney General of the State of Connecticut

_____
**MATTHEW DENN**
Attorney General of the State of Delaware

_____
**KARL A. RACINE**
Attorney General for the District of Columbia

_____
**RUSSELL SUZUKI**
Acting Attorney General of the State of Hawaii

_____
**LISA MADIGAN**
Attorney General of the State of Illinois

/s Thomas Miller
_____
**THOMAS J. MILLER**
Attorney General of the State of Iowa

_____
**JANET T. MILLS**
Attorney General of the State of Maine

11

**BRIAN FROSH**
Attorney General of the State of Maryland

**JIM HOOD**
Attorney General of the State of Mississippi

**GURBIR GREWAL**
Attorney General of the State of New Jersey

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

**JOSH SHAPIRO**
Attorney General of the Commonwealth of Pennsylvania

*/s Thomas Donovan*

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

**BOB FERGUSON**
Attorney General of the State of Washington

cc:     The Honorable Mick Mulvaney
        Director, Office of Management and Budget

        Arthur E. Gary
        General Counsel, Justice Management Division
        U.S. Department of Justice

        Dr. Ron Jarmin
        Performing the Non-Exclusive Functions and Duties of the Director
        U.S. Bureau of the Census

001101



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Office of the Director
Washington, DC 20233-0001

February 28, 2018

The Honorable Jon Tester
United States Senate
Washington, DC  20510

Dear Senator Tester:

Thank you for your staff's recent inquiry regarding the Department of Justice's request to add a citizenship question to the 2020 Census questionnaire.  We appreciate your taking the time to make me aware of your position on this important matter.

The U.S. Department of Commerce is conducting an orderly review of the Department of Justice's request.  The Department is required by law to submit the proposed final list of questions to Congress by March 31, 2018, which is two years prior to Census Day, April 1, 2020.

Let me underscore my commitment to conduct a complete and accurate 2020 Census.  A high-quality 2020 Census that counts each person, in the place where he or she lives, is my highest priority.

We will keep you apprised of any developments regarding the citizenship question.  If you have any additional questions or would like to discuss this matter further, please contact our Office of Congressional and Intergovernmental Affairs at 301-763-6100.

Sincerely,

Ron S. Jarmin
Performing the Non-Exclusive Functions
and Duties of the Director



PRIVILEGED AND CONFIDENTIAL
PRE-DECISIONAL DRAFT

**As part of his decision-making process, Secretary Ross spoke to a number of different stakeholders about the Department of Justice's request to reinstate the citizenship question on the 2020 Decennial.  These notes attempt to memorialize those conversations.  These are not verbatim transcripts and each summary reflects the recollections of attendees from the Department of Commerce.  Every effort has been made to ensure these notes are an accurate reflection of Secretary Ross's conversations with stakeholders.**

<u>Attorney General Jim Hood (D. MS)</u>

On March 12, 2018, Secretary Ross and his staff spoke with Mississippi Attorney General Jim Hood. The Attorney General expressed his appreciation for the opportunity to provide input on the Department of Justice's request to add the citizenship question to the 2020 Decennial Census.

Attorney General Hood noted that he opposed the reinstatement of a citizenship question on the Decennial Census for the reasons set forth in the February 12, 2018 letter that he signed (but did not write).  He stated that the intent of the census is to count everyone, and that reinstating the citizenship question may lower response rates.  AG Hood expressed concern that a number of migrant workers on sweet potato farms in the hills near Tupelo (in Northeast Mississippi), the sweet potato capital of the world, may be afraid to answer a citizenship question on the 2020 Decennial Census.  AG Hood noted that sweet potato farms were a large source of revenue for Mississippi farmers.  AG Hood noted that migrants come and go, and in addition to those who may be afraid to answer, some may be merely hesitant.  AG Hood noted that he believed that migrants generally hesitate to provide information to the federal government about their immigration status.  AG Hood noted that the intent of the census is to count everyone in the state. AG Hood referenced the portion of the February 12 letter that threatened injunctive relief should the Secretary add a citizenship question to the 2020 Decennial Census and noted that he was not sure he would join such a request.  He stated that the injunctive relief sentiment seemed to come from the larger states, and that an injunction if granted would tie the issue up in litigation, which would not be good for anyone.  AG Hood restated his preference for a simple short form census, and noted that it would be a waste of resources.

AG Hood ended the call by thanking Secretary Ross for taking the time to call him on this issue, noting that during his 14 years as Attorney General, he has never known another Secretary who has dedicated as much time to the census.  AG Hood noted that it was good for the Secretary to take the time to make calls to stakeholders and assess the risks associated with granting DOJ's request.

- Fear in immigrant community
- Government mistrust
- Litigation risk and costs

PRIVILEGED AND CONFIDENTIAL
PRE-DECISIONAL DRAFT

**As part of his decision-making process, Secretary Ross spoke to a number of different stakeholders about the Department of Justice's request to reinstate the citizenship question on the 2020 Decennial.  These notes attempt to memorialize those conversations.  These are not verbatim transcripts and each summary reflects the recollections of attendees from the Department of Commerce.  Every effort has been made to ensure these notes are an accurate reflection of Secretary Ross's conversations with stakeholders.**

<u>Attorney General Tom Miller (D. IA)</u>

On March 12, 2018, Secretary Ross and his staff spoke with Iowa Attorney General Tom Miller. The Attorney General stated his opposition to the addition of a citizenship question to the 2020 Decennial Census. He discussed the importance of the census and Iowa's reliance on its results with total and absolute credibility. His objection to the addition of the question centers around "the human nature of immigrants," and he noted that immigrants feel a significant amount of anxiety about answering this question. They fear giving information to the federal government.

The Attorney General also expressed concern about the lack of testing for a citizenship question. He noted the requirement that there be testing on new questions. And he also noted that there are other ways that DOJ may be able to get citizenship information and conjectured as to whether the information is actually critical.

During the call, Attorney General Miller noted his appreciation of the President's support for DACA reform.

- Fear in immigrant community
- Government mistrust
- Testing

PRIVILEGED AND CONFIDENTIAL
PRE-DECISIONAL DRAFT

**As part of his decision-making process, Secretary Ross spoke to a number of different stakeholders about the Department of Justice's request to reinstate the citizenship question on the 2020 Decennial. These notes attempt to memorialize those conversations. These are not verbatim transcripts and each summary reflects the recollections of attendees from the Department of Commerce. Every effort has been made to ensure these notes are an accurate reflection of Secretary Ross's conversations with stakeholders.**

Dr. Steven Camarota, Director of Research for the Center for Immigration Studies (CIS)

On March 13, 2018, Secretary Ross and members of his staff spoke with Dr. Steven Camarota, Director of Research for the Center for Immigration Studies (CIS). Dr. Camarota thanked the Secretary for the opportunity to share his thoughts on DOJ's request to add the citizenship question to the Decennial Census.

Dr. Camarota noted that as a general matter, researchers like him want to work with the broadest data sets possible because broader data sets allow for higher quality analysis. Dr. Camarota noted that the ACS data does not provide local block level (CVAP) information, and that this information can only be obtained through the Decennial Census. He believes local level data can serve as a benchmark to compare the accuracy of the data obtained through the ACS. Dr. Camarota also noted that any decrease in response rate resulting from the addition of a citizenship question could be mitigated through surveys. Dr. Camarota stated that local level data is necessary because it can inform a wide range of public policy matters, including voter turnout rate, registration rate, and where to locate polling places. It can also help estimate migration and better understand migration patterns.

Dr. Camarota stated that concerns about decreased participation are unfounded and that citizenship questions are currently included on a number of surveys, including the ACS, the Population Survey, and Survey of Income and Program Participation (SIPP). Dr. Camarota noted that this data is used to research issues like unemployment, welfare, healthcare, and others. Dr. Camarota also noted that although he is aware of a general sentiment that the addition of a citizenship question to the Decennial Census would decrease response rates, he has not seen any evidence to that effect. If the Secretary chooses to add the citizenship question, Dr. Camarota suggested that the monthly current population survey could be used to determine whether it was the addition of that question that caused response rates to decrease or whether response rates had already decreased at the start of the current presidential administration.

Finally, Dr. Camarota added that the citizenship question can help localities better plan for the future, and suggested additional data points that could be collected through additional questions about foreign born respondents on future Decennial Censuses.

- More data leads to better analysis
- Current local level data is insufficient
- Question is already asked in other surveys
- Will lead to better benchmarking
- Will not decrease response rate
- Improves public policy decisions



**SAINT PAUL AREA
CHAMBER OF COMMERCE**

March 21, 2018

The Honorable Wilbur Ross                                              VIA EMAIL
Secretary, United States Department of Commerce
1401 Constitution Avenue, N.W.
Washington, DC  20230

Dear Secretary Ross:

As the leader of Minnesota's largest regional Chamber of Commerce, I am deeply concerned about the Department of Justice's request that the Census Bureau include an untested question about citizenship in the 2020 Census questionnaire.

As you know, businesses rely on accurate, complete census data to analyze demographic and economic trends required for business strategy. Businesses use census data to determine where to locate stores and facilities, find qualified workers, and market products and services.

Adding a new question this late in the decennial Census process could reduce the accuracy of the 2020 Census. In addition, adding a new question would incur more delays and costs, and waste taxpayer dollars that have already been spent on designing and planning the 2020 Census.

We respectfully request that the Census Bureau refrain from adding any untested questions -- on citizenship or otherwise -- that could undermine the integrity of this critical data collection tool. We appreciate your leadership on this matter.

Thank you for your consideration.

Sincerely,

*Brenda L. Kyle*

B Kyle
President and CEO
Saint Paul Area Chamber of Commerce

O S EXECUTIVE SECRETARIAT   2018 MAR 22  AM 11: 23



COMMITTEES
Banks
Children and Families
Economic Development, Job Creation,
Commerce and Industry
Local Governments
Mental Health
Transportation

Black, Puerto Rican, Hispanic and
Asian Legislative Caucus

THE ASSEMBLY
STATE OF NEW YORK
ALBANY

KIMBERLY JEAN-PIERRE
Assemblywoman 11ᵗʰ District
Suffolk County

March 21, 2018

The Honorable Wilbur L. Ross, Jr.
Secretary
U.S. Department of Commerce
1401 Constitution Ave, NW
Washington, D.C. 20230

Dear Secretary Ross:

I urge you to reject any attempt to include a question regarding U.S. citizenship in the 2020 Decennial Census. Including such a question will lead to an increase in inaccurate responses and will depress response rates. As a New York State Assembly Member, I rely on accurate census data, and an inaccurate decennial census count will have a devastating impact on my ability to serve my constituents and ensure that they receive the resources they need.

The City of New York estimates that approximately 2.6 percent of its residents, or 225,000 people, were not counted in the 2010 Decennial Census. Administering the decennial census is already a challenge in New York City, which has a high percentage of communities that are deemed "hard-to-count" by the Census Bureau; persons who do not speak English fluently, lower income persons, homeless persons, undocumented immigrants, young mobile persons and children all constitute this group. The 11ᵗʰ Assembly District, which I represent, is comprised of many of these same folks. Recent qualitative data released by the Census Bureau shows that survey respondents expressed "unprecedented" levels of concern with the confidentiality of their data and who has access to their responses as it relates to immigration. These concerns resulted in respondents providing incorrect or incomplete information in an effort to protect themselves and their families. Adding a question about citizenship or immigration status to the 2020 Decennial Census will only exacerbate these existing challenges.

An undercount in the 2020 Decennial Census will have a devastating, decade-long impact on New York State and New York City. Data from the decennial census is used to allocate approximately $700 billion to states and municipalities each fiscal year, and inaccuracies and depressed response rates in survey responses could easily lead to the misallocation of billions of dollars each fiscal year. It is our sincere hope that you will reject any attempt to add a question on citizenship to the 2020 Decennial Census, which would have a real and direct impact on the resources that New York residents receive from the federal government over the next decade.

Thank you for your consideration of this request.

Sincerely,

Kimberly Jean-Pierre
Assemblywoman
11ᵗʰ Assembly District

ALBANY OFFICE: Room 742, Legislative Office Building, Albany, New York 12248 • 518-455-5787, FAX: 518-455-3976
DISTRICT OFFICE: 640 West Montauk Highway, Lindenhurst, New York 11757-5538 • 631-957-2087, FAX: 631-957-2998
EMAIL: jeanpierrek@nyassembly.gov

PRIVILEGED AND CONFIDENTIAL
PRE-DECISIONAL DRAFT

**As part of his decision-making process, Secretary Ross spoke to a number of different stakeholders about the Department of Justice's request to reinstate the citizenship question on the 2020 Decennial. These notes attempt to memorialize those conversations. These are not verbatim transcripts and each summary reflects the recollections of attendees from the Department of Commerce. Every effort has been made to ensure these notes are an accurate reflection of Secretary Ross's conversations with stakeholders.**

<u>Christine Pierce, SVP of Data Science, Nielsen</u>

On March 23, 2018, Secretary Ross and his staff spoke with Christine Pierce, Senior Vice President of Data Science for Nielsen. Ms. Pierce shared that Nielsen uses census data in a lot of important ways, specifically how they recruit and project samples. Ms. Pierce stated that Nielsen needed the census to be accurate and needed the census to be efficient and that the best census is one that produces the highest quality data at the lowest cost. Ms. Pierce stated that her biggest concerns was that the reinstatement of a citizenship question could lead to a lower response rate, and that the mailback rate (or initial response rate) is very important. Costs are lower when people respond the first time. Failure to respond increases costs because Census Bureau needs to deploy enumerators. Ms. Pierce stated that including a question on citizenship could make people less likely to respond, but that there is no data to predict how much lower the response rate might be.

In response to a question, Ms. Pierce stated that the longer a survey is, the less likely people are to respond. She further stated that the more sensitive the question, the more likely people are to be turned off by the question and decline to respond. Ms. Pierce explained that examples of sensitive questions included questions or religion and sexuality. Ms. Pierce stated that Nielsen sometimes chooses to ask sensitive questions even if they believe it will depress response rates. Ms. Pierce stated that Nielsen conducts a cost-benefit analysis to determine whether it is worth asking the question, even if it means having to do more extensive nonresponse follow-up. Ms. Pierce stated that sensitive questions often appeared on longer surveys and that longer surveys generally had lower response rates than shorter ones. Ms. Pierce stated that she was not aware of a short census survey that contained a sensitive question, but that Nielsen has tested some of the ACS questions perceived to be "sensitive" (birthplace and date of arrival in the US) on shorter surveys. Ms. Pierce noted that she and others at Nielsen were concerned about response rates declining due to the presence of the sensitive questions on the short questionnaire, but that Nielsen did not observe lower response rates to the survey. Ms. Pierce noted the importance of testing questions. She also noted that in the only specific situation she was aware of that sensitive questions were tested on a short questionnaire, there was no impact on response rates. Finally, in response to a question, Ms. Pierce stated that Nielsen incentivize participation with low dollar cash reward in the $1-$15 range. Ms. Pierce believed that for the survey referenced above, any incentive would have been at the lower end of the range.

- Lower response rate/higher NRFU
- Higher costs
- Testing



UNITED STATES DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. Census Bureau
Washington, DC 20233-0001

January 19, 2018

MEMORANDUM FOR:      Wilbur L. Ross, Jr.
                      Secretary of Commerce

Through:              Karen Dunn Kelley
                      Performing the Non-Exclusive Functions and Duties of the Deputy
                      Secretary

                      Ron S. Jarmin
                      Performing the Non-Exclusive Functions and Duties of the Director

                      Enrique Lamas
                      Performing the Non-Exclusive Functions and Duties of the Deputy
                      Director

From:                 John M. Abowd
                      Chief Scientist and Associate Director for Research and Methodology

Subject:              Technical Review of the Department of Justice Request to Add
                      Citizenship Question to the 2020 Census

The Department of Justice has requested block-level citizen voting-age population estimates by OMB-approved race and ethnicity categories from the 2020 Census of Population and Housing. These estimates are currently provided in two related data products: the PL94-171 redistricting data, produced by April 1st of the year following a decennial census under the authority of 13 U.S.C. Section 141, and the Citizen Voting Age Population by Race and Ethnicity (CVAP) tables produced every February from the most recent five-year American Community Survey data. The PL94-171 data are released at the census block level. The CVAP data are released at the census block group level.

We consider three alternatives in response to the request: (A) no change in data collection, (B) adding a citizenship question to the 2020 Census, and (C) obtaining citizenship status from administrative records for the whole 2020 Census population.

We recommend either Alternative A or C. Alternative C best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count. Alternative A is not very costly and also does not harm the quality of the census count. Alternative B better addresses DoJ's stated uses than Alternative A. However, Alternative B is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources.



| Summary of Alternatives | | | |
|---|---|---|---|
| | *Alternative A* | *Alternative B* | *Alternative C* |
| *Description* | No change in data collection | Add citizenship question to the 2020 Census (i.e., the DoJ request), all 2020 Census microdata remain within the Census Bureau | Leave 2020 Census questionnaire as designed and add citizenship from administrative records, all 2020 Census microdata and any linked citizenship data remain within the Census Bureau |
| *Impact on 2020 Census* | None | Major potential quality and cost disruptions | None |
| *Quality of Citizen Voting-Age Population Data* | Status quo | Block-level data improved, but with serious quality issues remaining | Best option for block-level citizenship data, quality much improved |
| *Other Advantages* | Lowest cost alternative | Direct measure of self-reported citizenship for the whole population | Administrative citizenship records more accurate than self-reports, incremental cost is very likely to be less than $2M, USCIS data would permit record linkage for many more legal resident noncitizens |
| *Shortcomings* | Citizen voting-age population data remain the same or are improved by using small-area modeling methods | Citizenship status is misreported at a very high rate for noncitizens, citizenship status is missing at a high rate for citizens and noncitizens due to reduced self-response and increased item nonresponse, nonresponse followup costs increase by at least $27.5M, erroneous enumerations increase, whole-person census imputations increase | Citizenship variable integrated into 2020 Census microdata outside the production system, Memorandum of Understanding with United States Citizen and Immigration Services required to acquire most up-to-date naturalization data |

Approved: _____   Date: _____

John M. Abowd, Chief Scientist
and Associate Director for Research and Methodology

# Detailed Analysis of Alternatives

The statistics in this memorandum have been released by the Census Bureau Disclosure Review Board with approval number CBDRB-2018-CDAR-014.

### Alternative A: Make no changes

Under this alternative, we would not change the current 2020 Census questionnaire nor the planned publications from the 2020 Census and the American Community Survey (ACS). Under this alternative, the PL94-171 redistricting data and the citizen voting-age population (CVAP) data would be released on the current schedule and with the current specifications. The redistricting and CVAP data are used by the Department of Justice to enforce the Voting Rights Act. They are also used by state redistricting offices to draw congressional and legislative districts that conform to constitutional equal-population and Voting Rights Act nondiscrimination requirements. Because the block-group-level CVAP tables have associated margins of error, their use in combination with the much more precise block-level census counts in the redistricting data requires sophisticated modeling. For these purposes, most analysts and the DoJ use statistical modeling methods to produce the block-level eligible voter data that become one of the inputs to their processes.

If the DoJ requests the assistance of Census Bureau statistical experts in developing model-based statistical methods to better facilitate the DoJ's uses of these data in performing its Voting Rights Act duties, a small team of Census Bureau experts similar in size and capabilities to the teams used to provide the Voting Rights Act Section 203 language determinations would be deployed.

We estimate that this alternative would have no impact on the quality of the 2020 Census because there would be no change to any of the parameters underling the Secretary's revised life-cycle cost estimates. The estimated cost is about $350,000 because that is approximately the cost of resources that would be used to do the modeling for the DoJ.

### Alternative B: Add the question on citizenship to the 2020 Census questionnaire

Under this alternative, we would add the ACS question on citizenship to the 2020 Census questionnaire and ISR instrument. We would then produce the block-level citizen voting-age population by race and ethnicity tables during the 2020 Census publication phase.

Since the question is already asked on the American Community Survey, we would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question. This means that the cost of preparing the new question would be minimal. We did not prepare an estimate of the impact of adding the citizenship question on the cost of reprogramming the Internet Self-Response (ISR) instrument, revising the Census Questionnaire Assistance (CQA), or redesigning the printed questionnaire because those components will not be finalized until after the March 2018 submission of the final questions. Adding the citizenship question is similar in scope and cost to recasting the race and ethnicity questions again, should that become necessary, and would be done at the same time. After the 2020 Census ISR, CQA and printed questionnaire are in final form, adding the citizenship question would be much more expensive and would depend on exactly when the implementation decision was made during the production cycle.

For these reasons, we analyzed Alternative B in terms of its adverse impact on the rate of voluntary cooperation via self-response, the resulting increase in nonresponse followup (NRFU), and the consequent effects on the quality of the self-reported citizenship data. Three distinct analyses support the conclusion of an adverse impact on self-response and, as a result, on the accuracy and quality of the 2020 Census. We assess the costs of increased NRFU in light of the results of these analyses.

### B.1.   Quality of citizenship responses

We considered the quality of the citizenship responses on the ACS. In this analysis we estimated item nonresponse rates for the citizenship question on the ACS from 2013 through 2016. When item nonresponse occurs, the ACS edit and imputation modules are used to allocate an answer to replace the missing data item. This results in lower quality data because of the statistical errors in these allocation models. The analysis of the self-responses responses is done using ACS data from 2013-2016 because of operational changes in 2013, including the introduction of the ISR option and changes in the followup operations for mail-in questionnaires.

In the period from 2013 to 2016, item nonresponse rates for the citizenship question on the mail-in questionnaires for non-Hispanic whites (NHW) ranged from 6.0% to 6.3%, non-Hispanic blacks (NHB) ranged from 12.0% to 12.6%, and Hispanics ranged from 11.6 to 12.3%. In that same period, the ISR item nonresponse rates for citizenship were greater than those for mail-in questionnaires. In 2013, the item nonresponse rates for the citizenship variable on the ISR instrument were NHW: 6.2%, NHB: 12.3% and Hispanic: 13.0%. By 2016 the rates increased for NHB and especially Hispanics. They were NHW: 6.2%, NHB: 13.1%, and Hispanic: 15.5% (a 2.5 percentage point increase). Whether the response is by mail-in questionnaire or ISR instrument, item nonresponse rates for the citizenship question are much greater than the comparable rates for other demographic variables like sex, birthdate/age, and race/ethnicity (data not shown).

### B.2.   Self-response rate analyses

We directly compared the self-response rate in the 2000 Census for the short and long forms, separately for citizen and noncitizen households. In all cases, citizenship status of the individuals in the household was determined from administrative record sources, not from the response on the long form. A noncitizen household contains at least one noncitizen. Both citizen and noncitizen households have lower self-response rates on the long form compared to the short form; however, the decline in self-response for noncitizen households was 3.3 percentage points greater than the decline for citizen households. This analysis compared short and long form respondents, categories which were randomly assigned in the design of the 2000 Census.

We compared the self-response rates for the same household address on the 2010 Census and the 2010 American Community Survey, separately for citizen and noncitizen households. Again, all citizenship data were taken from administrative records, not the ACS, and noncitizen households contain at least one noncitizen resident. In this case, the randomization is over the selection of household addresses to receive the 2010 ACS. Because the ACS is an ongoing survey sampling fresh households each month, many of the residents of sampled households completed the 2010 ACS with the same reference address as they used for the 2010 Census. Once again, the self-response rates were lower in the ACS than in the 2010 Census for both citizen and noncitizen households. In this 2010 comparison, moreover, the decline in self-response was 5.1 percentage points greater for noncitizen households than for citizen households.

In both the 2000 and 2010 analyses, only the long-form or ACS questionnaire contained a citizenship question. Both the long form and the ACS questionnaires are more burdensome than the shortform. Survey methodologists consider burden to include both the direct time costs of responding and the indirect costs arising from nonresponse due to perceived sensitivity of the topic. There are, consequently, many explanations for the lower self-response rates among all household types on these longer questionnaires. However, the only difference between citizen and noncitizen households in our studies was the presence of at least one noncitizen in noncitizen households. It is therefore a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households.

### B.3.    Breakoff rate analysis

We examined the response breakoff paradata for the 2016 ACS. We looked at all breakoff screens on the ISR instrument, and specifically at the breakoffs that occurred on the screens with the citizenship and related questions like place of birth and year of entry to the U.S. Breakoff paradata isolate the point in answering the questionnaire where a respondent discontinues entering data—breaks off—rather than finishing. A breakoff is different from failure to self-respond. The respondent started the survey and was prepared to provide the data on the Internet Self-Response instrument, but changed his or her mind during the interview.

Hispanics and non-Hispanic non-whites (NHNW) have greater breakoff rates than non-Hispanic whites (NHW). In the 2016 ACS data, breakoffs were NHW: 9.5% of cases while NHNW: 14.1% and Hispanics: 17.6%. The paradata show the question on which the breakoff occurred. Only 0.04% of NHW broke off on the citizenship question, whereas NHNW broke off 0.27% and Hispanics broke off 0.36%. There are three related questions on immigrant status on the ACS: citizenship, place of birth, and year of entry to the United States. Considering all three questions Hispanics broke off on 1.6% of all ISR cases, NHNW: 1.2% and NHW: 0.5%. A breakoff on the ISR instrument can result in follow-up costs, imputation of missing data, or both. Because Hispanics and non-Hispanic non-whites breakoff much more often than non-Hispanic whites, especially on the citizenship-related questions, their survey response quality is differentially affected.

### B.4.    Cost analysis

Lower self-response rates would raise the cost of conducting the 2020 Census. We discuss those increased costs below. They also reduce the quality of the resulting data. Lower self-response rates degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates. An erroneous enumeration means a census person enumeration that should not have been counted for any of several reasons, such as, that the person (1) is a duplicate of a correct enumeration; (2) is inappropriate (e.g., the person died before Census Day); or (3) is enumerated in the wrong location for the relevant tabulation (https://www.census.gov/coverage_measurement/definitions/). A whole-person census imputation is a census microdata record for a person for which all characteristics are imputed.

Our analysis of the 2010 Census coverage errors (Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States, Memo G-01) contains the relevant data. That study found that when the 2010 Census obtained a valid self-response (219 million persons),

the correct enumeration rate was 97.3%, erroneous enumerations were 2.5%, and whole-person census imputations were 0.3%. All erroneous enumeration and whole-person imputation rates are much greater for responses collected in NRFU. The vast majority of NRFU responses to the 2010 Census (59 million persons) were collected in May. During that month, the rate of correct enumerations was only 90.2%, the rate of incorrect enumeration was 4.8%, and the rate of whole-person census imputations was 5.0%. June NRFU accounted for 15 million persons, of whom only 84.6% were correctly enumerated, with erroneous enumerations of 5.7%, and whole-person census imputations of 9.6%. (See Table 19 of 2010 Census Memorandum G-01. That table does not provide statistics for all NRFU cases in aggregate.)

One reason that the erroneous enumeration and whole-person imputation rates are so much greater during NRFU is that the data are much more likely to be collected from a proxy rather than a household member, and, when they do come from a household member, that person has less accurate information than self-responders. The correct enumeration rate for NRFU household member interviews is 93.4% (see Table 21 of 2010 Census Memorandum G-01), compared to 97.3% for non-NRFU households (see Table 19). The information for 21.0% of the persons whose data were collected during NRFU is based on proxy responses. For these 16 million persons, the correct enumeration rate is only 70.1%. Among proxy responses, erroneous enumerations are 6.7% and whole-person census imputations are 23.1% (see Table 21).

Using these data, we can develop a cautious estimate of the data quality consequences of adding the citizenship question. We assume that citizens are unaffected by the change and that an additional 5.1% of households with at least one noncitizen go into NRFU because they do not self-respond. We expect about 126 million occupied households in the 2020 Census. From the 2016 ACS, we estimate that 9.8% of all households contain at least one noncitizen. Combining these assumptions implies an additional 630,000 households in NRFU. If the NRFU data for those households have the same quality as the average NRFU data in the 2010 Census, then the result would be 139,000 fewer correct enumerations, of which 46,000 are additional erroneous enumerations and 93,000 are additional whole-person census imputations. This analysis assumes that, during the NRFU operations, a cooperative member of the household supplies data 79.0% of the time and 21.0% receive proxy responses. If all of these new NRFU cases go to proxy responses instead, the result would be 432,000 fewer correct enumerations, of which 67,000 are erroneous enumerations and 365,000 are whole-person census imputations.

For Alternative B, our estimate of the incremental cost proceeds as follows. Using the analysis in the paragraph above, the estimated NRFU workload will increase by approximately 630,000 households, or approximately 0.5 percentage points. We currently estimate that for each percentage point increase in NRFU, the cost of the 2020 Census increases by approximately $55 million. Accordingly, the addition of a question on citizenship could increase the cost of the 2020 Census by at least $27.5 million. It is worth stressing that this cost estimate is a lower bound. Our estimate of $55 million for each percentage point increase in NRFU is based on an average of three visits per household. We expect that many more of these noncitizen households would receive six NRFU visits.

We believe that $27.5 million is a conservative estimate because the other evidence cited in this report suggests that the differences between citizen and noncitizen response rates and data quality will be amplified during the 2020 Census compared to historical levels. Hence, the decrease in self-response for citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census.

*Alternative C: Use administrative data on citizenship instead of add the question to the 2020 Census*

Under this alternative, we would add the capability to link an accurate, edited citizenship variable from administrative records to the final 2020 Census microdata files. We would then produce block-level tables of citizen voting age population by race and ethnicity during the publication phase of the 2020 Census using the enhanced 2020 Census microdata.

The Census Bureau has conducted tests of its ability to link administrative data to supplement the decennial census and the ACS since the 1990s. Administrative record studies were performed for the 1990, 2000 and 2010 Censuses. We discuss some of the implications of the 2010 study below. We have used administrative data extensively in the production of the economic censuses for decades. Administrative business data from multiple sources are a key component of the production Business Register, which provides the frames for the economic censuses, annual, quarterly, and monthly business surveys. Administrative business data are also directly tabulated in many of our products.

In support of the 2020 Census, we moved the administrative data linking facility for households and individuals from research to production. This means that the ability to integrate administrative data at the record level is already part of the 2020 Census production environment. In addition, we began regularly ingesting and loading administrative data from the Social Security Administration, Internal Revenue Service and other federal and state sources into the 2020 Census data systems. In assessing the expected quality and cost of Alternative C, we assume the availability of these record linkage systems and the associated administrative data during the 2020 Census production cycle.

C.1.    *Quality of administrate record versus self-report citizenship status*

We performed a detailed study of the responses to the citizenship question compared to the administrative record citizenship variable for the 2000 Census, 2010 ACS and 2016 ACS. These analyses confirm that the vast majority of citizens, as determined by reliable federal administrative records that require proof of citizenship, correctly report their status when asked a survey question. These analyses also demonstrate that when the administrative record source indicates an individual is not a citizen, the self-report is "citizen" for no less than 23.8% of the cases, and often more than 30%.

For all of these analyses, we linked the Census Bureau's enhanced version of the SSA Numident data using the production individual record linkage system to append an administrative citizenship variable to the relevant census and ACS microdata. The Numident data contain information on every person who has ever been issued a Social Security Number or an Individual Taxpayer Identification Number. Since 1972, SSA has required proof of citizenship or legal resident alien status from applicants. We use this verified citizenship status as our administrative citizenship variable. Because noncitizens must interact with SSA if they become naturalized citizens, these data reflect current citizenship status albeit with a lag for some noncitizens.

For our analysis of the 2000 Census long-form data, we linked the 2002 version of the Census Numident data, which is the version closest to the April 1, 2000 Census date. For 92.3% of the 2000 Census long-form respondents, we successfully linked the administrative citizenship variable. The 7.7% of persons for whom the administrative data are missing is comparable to the item non-response for self-responders in the mail-in pre-ISR-option ACS. When the administrative data indicated that the 2000 Census respondent was a citizen, the self-response was citizen: 98.8%. For this same group, the long-form response was

001283

noncitizen: 0.9% and missing: 0.3%. By contrast, when the administrative data indicated that the respondent was not a citizen, the self-report was citizen: 29.9%, noncitizen: 66.4%, and missing: 3.7%.

In the same analysis of 2000 Census data, we consider three categories of individuals: the reference person (the individual who completed the census form for the household), relatives of the reference person, and individuals unrelated to the reference person. When the administrative data show that the individual is a citizen, the reference person, relatives of the reference person, and nonrelatives of the reference person have self-reported citizenship status of 98.7%, 98.9% and 97.2%, respectively. On the other hand, when the administrative data report that the individual was a noncitizen, the long-form response was citizen for 32.9% of the reference persons; that is, reference persons who are not citizens according to the administrative data self-report that they are not citizens in only 63.3% of the long-form responses. When they are reporting for a relative who is not a citizen according to the administrative data, reference persons list that individual as a citizen in 28.6% of the long-form responses. When they are reporting for a nonrelative who is not a citizen according to the administrative data, reference persons list that individual as a citizen in 20.4% of the long-form responses.

We analyzed the 2010 and 2016 ACS citizenship responses using the same methodology. The 2010 ACS respondents were linked to the 2010 version of the Census Numident. The 2016 ACS respondents were linked to the 2016 Census Numident. In 2010, 8.5% of the respondents could not be linked, or had missing citizenship status on the administrative data. In 2016, 10.9% could not be linked or had missing administrative data. We reached the same conclusions using 2010 and 2016 ACS data with the following exceptions. When the administrative data report that the individual is a citizen, the self-response is citizen on 96.9% of the 2010 ACS questionnaires and 93.8% of the 2016 questionnaires. These lower self-reported citizenship rates are due to missing responses on the ACS, not misclassification. As we noted above, the item nonresponse rate for the citizenship question has been increasing. These item nonresponse data show that some citizens are not reporting their status on the ACS at all. In 2010 and 2016, individuals for whom the administrative data indicate noncitizen respond citizen in 32.7% and 34.7% of the ACS questionnaires, respectively. The rates of missing ACS citizenship response are also greater for individuals who are noncitizens in the administrative data (2010: 4.1%, 2016: 7.7%). The analysis of reference persons, relatives, and nonrelatives is qualitatively identical to the 2000 Census analysis.

In all three analyses, the results for racial and ethnic groups and for voting age individuals are similar to the results for the whole population with one important exception. If the administrative data indicate that the person is a citizen, the self-report is citizen at a very high rate with the remainder being predominately missing self-reports for all groups. If the administrative data indicate noncitizen, the self-report is citizen at a very high rate (never less than 23.8% for any racial, ethnic or voting age group in any year we studied). The exception is the missing data rate for Hispanics, who are missing administrative data about twice as often as non-Hispanic blacks and three times as often as non-Hispanic whites.

*C.2.    Analysis of coverage differences between administrative and survey citizenship data*

Our analysis suggests that the ACS and 2000 long form survey data have more complete coverage of citizenship than administrative record data, but the relative advantage of the survey data is diminishing. Citizenship status is missing for 10.9 percent of persons in the 2016 administrative records, and it is missing for 6.3 percent of persons in the 2016 ACS. This 4.6 percentage point gap between administrative and survey missing data rates is smaller than the gap in 2000 (6.9 percentage points) and 2010 (5.6

percentage points). Incomplete (through November) pre-production ACS data indicate that citizenship item nonresponse has again increased in 2017.

There is an important caveat to the conclusion that survey-based citizenship data are more complete than administrative records, albeit less so now than in 2000. The methods used to adjust the ACS weights for survey nonresponse and to allocate citizenship status for item nonresponse assume that the predicted answers of the sampled non-respondents are statistically the same as those of respondents. Our analysis casts serious doubt on this assumption, suggesting that those who do not respond to either the entire ACS or the citizenship question on the ACS are not statistically similar to those who do; in particular, their responses to the citizenship question would not be well-predicted by the answers of those who did respond.

The consequences of missing citizenship data in the administrative records are asymmetric. In the Census Numident, citizenship data may be missing for older citizens who obtained SSNs before the 1972 requirement to verify citizenship, naturalized citizens who have not confirmed their naturalization to SSA, and noncitizens who do not have an SSN or ITIN. All three of these shortcomings are addressed by adding data from the United States Citizen and Immigration Services (USCIS). Those data would complement the Census Numident data for older citizens and update those data for naturalized citizens. A less obvious, but equally important benefit, is that they would permit record linkage for legal resident aliens by allowing the construction of a supplementary record linkage master list for such people, who are only in scope for the Numident if they apply for and receive an SSN or ITIN. Consequently, the administrative records citizenship data would most likely have both more accurate citizen status and fewer missing individuals than would be the case for any survey-based collection method. Finally, having two sources of administrative citizenship data permits a detailed verification of the accuracy of those sources as well.

*C.3.    Cost of administrative record data production*

For Alternative C, we estimate that the incremental cost, except for new MOUs, is $450,000. This cost estimate includes the time to develop an MOU with USCIS, estimated ingestion and curation costs for USCIS data, incremental costs of other administrative data already in use in the 2020 Census but for which continued acquisition is now a requirement, and staff time to do the required statistical work for integration of the administrative-data citizenship status onto the 2020 Census microdata. This cost estimate is necessarily incomplete because we have not had adequate time to develop a draft MOU with USCIS, which is a requirement for getting a firm delivery cost estimate from the agency. Acquisition costs for other administrative data acquired or proposed for the 2020 Census varied from zero to $1.5M. Thus the realistic range of cost estimates, including the cost of USCIS data, is between $500,000 and $2.0M

## Questions on the Jan 19 Draft Census Memo on the DoJ Citizenship Question Reinstatement Request

1. **With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?**

   Since the collection of this data, whether from administrative records or from an enumerated question, occurs prior to the creation of the Microdata Detail File (MDF) from which all tabulations will be performed, there is no difference in the timing of when the data collected under either alternative B or C could be made available to the public. The exact date for completion of the MDF is still being determined as the 2020 Census schedule is matured.  However, the 2020 Census is working towards publishing the first post-apportionment tabulation data products as early as the first week of February 2021.

2. **What is the "2020 Census publication phase" (page 1 of the Detailed Analysis for Alternative B) versus Alternative C?  Would there be any difference?**

   The 2020 Census publication phase is a broad window stretching from the release of the apportionment counts by December 31, 2020 through the last data product or report published in FY 2023, the final year of decennial funding for the 2020 Census.  However, as stated in the answer to question 1, these data could be made available to the public on the same schedule as any other post-apportionment tabulated data product regardless of whether alternative B or C is used in its collection.

3. **What is the non-response rate for: (A) each question on the 2000 and 2010 Decennial Census short form and (B) each question on the 2010 ACS and most recent ACS?**

   The table below shows the item non-response (INR) rate for each question on the 2000 and 2010 Decennial Census short form.  This is the percentage of respondents who did not provide an answer to an item.

   Item Nonresponse Rates for 2000 and 2010 Short Form Person Questions

   |      | Relationship | Sex | Age | Hispanic Origin | Race | Tenure |
   |------|--------------|-----|-----|-----------------|------|--------|
   | 2010 | 1.5          | 1.5 | 3.5 | 3.9             | 3.3  | 4.5    |
   | 2000 | 1.3          | 1.1 | 3.7 | 3.1             | 2.9  | 4.1    |

   Source:  Rothhaas, Lestina and Hill (2012) Tables

   Notes and Soucre:
   Rothhaas, C., Lestina, F. and Hill, J. (2012) "2010 Decennial Census Item Nonresponse and Imputation Assessment Report"  2010 Census Program for Evaluations and Experiments, January 24, 2012.

1

001286

From report:

The INR rate is essentially the proportion of missing responses before pre-editing or imputation procedures for a given item (i.e., the respondent did not provide an answer to the item). For INR, missing values are included in the rates, but inconsistent responses (i.e., incompatible with other responses) are considered non-missing responses.

Online link to 2010 report that has 2000 information as well.
https://www.census.gov/2010census/pdf/2010_Census_INR_Imputation_Assessment.pdf

See attached spreadsheet for the item allocation rates by questions for the ACS for 2010, 2013, and 2016.

4. **What was the total survey response rate (i.e., percentage of complete questionnaires) for the 2000 long form and the 2000 short form?   Of the incomplete long forms, what percentage left the citizenship question blank?  Of the completed long forms, what percentage (if known) contained incorrect responses to the citizenship question?**

We do not have measures of total survey response rates from the 2000 long form and 2000 short form available at this time.  The mail response rate in 2000 was 66.4 percent for short forms and 53.9 percent for long forms.  No analysis that we were aware of was conducted on the incomplete long forms that left the citizenship question blank.  The Census 2000 Content Reinterview Survey showed low inconsistency of the responses to the citizenship question.  Only 1.8 percent of the respondents changed answers in the reinterview.

Source for 2000 mail response rates:
https://www.census.gov/pred/www/rpts/A.7.a.pdf

Source for 2000 Content Reinterview Survey.  Page 32 source.
https://www.census.gov/pred/www/rpts/B.5FR_RI.PDF

5. **For the 2000 long and short forms, what was the percentage unanswered (left blank) for each question (i.e., what percentage of the responses for each question (sex, race, ethnicity, income, citizenship, etc.) were left blank)?**

For the 2000 shortform, the table in question 3a provides the percentage unanswered for each question.

For the 2000 longform, Griffin, Love and Obenski (2003) summarized the Census 2000 longform responses.  Allocation rates for individual items in Census 2000 were computed, but because of the magnitude of these data, summary allocation measures were derived.

2

These rates summarize completeness across all data items for occupied units (households) and are the ratio of all population and housing items that had values allocated to the total number of population and housing items required to have a response. These composite measures provide a summary picture of the completeness of all data.  Fifty-four population items and 29 housing items are included in these summary measures. The analysis showed that 9.9 percent of the population question items and 12.5 percent of the housing unit question items required allocation.  Allocation involves using statistical procedures, such as within-household or nearest neighbor matrices, to impute missing values.

https://ww2.amstat.org/sections/srms/Proceedings/y2003/Files/JSM2003-000596.pdf

**6.  What was the incorrect response rate for the citizenship question that was asked on the Long Form during the 2000 Decennial Census?  Does the response rate on the 2000 Long Form differ from the incorrect response rate on the citizenship question for the ACS?**

In the 2000 long form, 2.3 percent of persons have inconsistent answers, 89.4 percent have consistent answers, and 8.2 percent have missing citizenship data in the SSA Numident and/or the 2000 long form. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2000 long form, 2.6 percent have inconsistent answers and 97.4 percent have consistent answers.

In the 2010 ACS, 3.1 percent of persons have inconsistent answers, 86.0 percent have consistent answers, and 10.8 percent have missing citizenship data in the SSA Numident and/or the 2010 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2010 ACS, 3.6 percent have inconsistent answers and 96.4 percent have consistent answers.

In the 2016 ACS, 2.9 percent of persons have inconsistent answers, 81.2 percent have consistent answers, and 15.9 percent have missing citizenship data in the SSA Numident and/or the 2016 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2016 ACS, 3.5 percent have inconsistent answers and 96.5 percent have consistent answers.

These ACS and 2000 Census long form rates are based on weighted data.

This shows that inconsistent response rates are higher in the 2010 and 2016 ACS than in the 2000 long form.

**7.  What is the incorrect response rate on other Decennial or ACS questions for which Census has administrative records available (for example, age, sex or income)?**

Table 7a shows the agreement rates between the 2010 Census response and the SSA Numident for persons who could be linked and had nonmissing values, and Table 7b shows

3

001288

the agreement rates between the 2010 ACS and the SSA Numident.  Gender has low disagreement (0.4-0.5 percent), and white alone (0.9 percent), black alone (1.7-2 percent), and age (2.1 percent) also have low disagreement rates.  Disagreement rates are greater for other races (e.g., 46.4-48.6 percent for American Indian or Alaska Native alone).  Hispanic origin is not well measured in the Numident, because it contains a single race response, one of which is Hispanic.

Table 7a. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 Census Response | Percent Agreement with SSA Numident |
| --- | --- |
| Hispanic | 54.2 |
| Not Hispanic | 99.7 |
| White Alone | 99.1 |
| Black Alone | 98.3 |
| American Indian or Alaska Native Alone | 51.4 |
| Asian Alone | 84.3 |
| Native Hawaiian or Other Pacific Islander Alone | 74.4 |
| Some Other Race Alone | 17.7 |
| Age | 97.9 |
| Gender | 99.4 |

Source: Rastogi, Sonya, and Amy O'Hara, 2012, "2010 Census Match Study," 2010 Census Planning Memoranda Series No. 247.

Table 7b. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 ACS Response | Percent Agreement with SSA Numident |
| --- | --- |
| White Alone | 99.1 |
| Black Alone | 98.0 |
| American Indian or Alaska Native Alone | 53.6 |
| Asian Alone | 82.9 |
| Native Hawaiian or Other Pacific Islander Alone | 72.9 |
| Some Other Race Alone | 17.2 |
| Age 0-2 Date of Birth | 95.2 |
| Age 3-17 Date of Birth | 95.6 |
| Age 18-24 Date of Birth | 95.2 |
| Age 25-44 Date of Birth | 95.8 |
| Age 45-64 Date of Birth | 95.9 |
| Age 65-74 Date of Birth | 96.5 |
| Age 75 and older Date of Birth | 92.7 |
| Male | 99.5 |
| Female | 99.5 |

4

001289

Source: Bhaskar, Renuka, Adela Luque, Sonya Rastogi, and James Noon, 2014, "Coverage and Agreement of Administrative Records and 2010 American Community Survey Demographic Data," CARRA Working Paper #2014-14.

Abowd and Stinson (2013) find correlations of 0.75-0.89 between Survey of Income and Program Participation (SIPP) and SSA Detailed Earnings Record annual earnings between 1990-1999.[1]

8. **How does the Census presently handle responses on the (A) Decennial Census and (B) the ACS when administrative records available to the Census confirm that the response on the Decennial Census or ACS is incorrect?  Is the present Census approach to incorrect responses based on practice/policy or law (statute or regulation)?**

We have always based the short form Decennial Census and the ACS on self-response, and while we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaire.  This is a long established practice at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.  Title 13 of the U.S. Code allows the Census Bureau to use alternative data sources, like administrative records, for a variety of purposes, and we are using data in new ways in the 2020 Census.  While this includes the use of administrative records data to fill in areas where a respondent does not provide an answer, we have not explored the possibility of checking or changing responses that a responding household has provided in response to the questionnaire.

9. **Please explain the differences between the self-response rate analysis and the breakoff rate analysis.  The range of breakoff rates between groups was far smaller than the range of self-response rates between groups.**

Self-response means that a household responded to the survey by mailing back a questionnaire or by internet, and a sufficient number of core questions were answered so that an additional field interview was not required.

A breakoff occurs when an internet respondent stops answering questions prior to the end of the questionnaire. In most cases the respondent answers the core questions before breaking off, and additional fieldwork is not required. The breakoff rates are calculated separately by which question screen was the last one reached before the respondent stopped answering altogether.

The share of Hispanic respondents who broke off at some point before the end of the questionnaire (17.6 percent) is much higher than for non-Hispanic whites (9.5 percent).

---

[1] Abowd, John M., and Martha H. Stinson, 2013, "Estimating Measurement Error in Annual Job Earnings: A Comparison of Survey and Administrative Data," Review of Economics and Statistics, Vol. 95(55), pp. 1451-1467.

001290

Spreading the overall breakoff rates over 134 screens in the questionnaire works out to quite small rates per screen. It works out to an average breakoff rate of 0.131 percent per screen for Hispanics and 0.066 percent for non-Hispanic whites.

**10. The NRFU numbers are comparatively small – approximately one additional household for NRFU per Census enumerator.  Is this really a significant source of concern?**

Yes, this is a significant concern.  First, it gives rise to incremental NRFU cost of at least $27.5 million.  This is a lower bound becaues it assumes the households that do not self-respond because we added a question on citizenship have the same follow-up costs as an average U.S. household.  They won't because these households overwhelmingly contain at least one noncitzen, and that is one of our acknowledged hard-to-count subpopulations.

**11. Given that the breakoff rate difference was approximately 1 percent, why did Census choose to use the 5.1 percent number for assessing the cost of Alternative B?**

If a household breaks off an internet response at the citizenship, place of birth, or year of entry screens, this means it would have already responded to the core questions. This would not trigger follow-up fieldwork and thus would not involve additional fieldwork costs. In contrast, if a household does not mail back a questionnaire or give an internet response, fieldwork will be necessary and additional costs will be incurred. Thus, the 5.1 percent number for differential self-response is more appropriate for estimating the additional fieldwork cost of adding a citizenship question.

**12. Alternative C states that Census would use administrative data from the Social Security Administration, Internal Revenue Service, and "other federal and state sources."  What are the other sources?**

In addition to continuing the acquisition of the Social Security Administration and Internal Revenue Service data, the Census Bureau is in discussion with the U.S. Citizen and Immigration Services (USCIS) staff to acquire additional citizenship data.

**13. Is Census confident that administrative data will be able to be used to determine citizenship for all persons (e.g., not all citizens have social security numbers)?**

We are confident that Alternative C is viable and that we have already ingested enough high-quality citizenship administrative data from SSA and IRS.  The USCIS data are not required.  They would, however, make the citizenship voting age tabulations better, but the administrative data we've got are very good and better than the data from the 2000 Census and current ACS.  The type of activities required for Alternative C already occur daily and routinely at the Census Bureau.  We have been doing this for business data products,

6

including the Economic Censuses, for decades.  We designed the 2020 Census to use this technology too.

**14. For Alternative C, the memo says, "we assume the availability of these record linkage systems and associated administrative data" – does Census already have in place access to this data or would this need to be negotiated?  If negotiated, for which data sets specifically?**

The Census Bureau has longstanding contractual relationships with the Social Security Administration and the Internal Revenue Service that authorize the use of data for this project.  For new data acquired for this project (i.e., USCIS) we would estimate a six-month development period to put a data acquisition agreement in place.   That agreement would also include terms specifying the authorized use of data for this project.

**15. Are there any privacy issues / sensitive information prohibitions that might prevent other agencies from providing such data?**

There are no new privacy or sensitivity issues associated with other agencies providing citizenship data. We have received such information in the past from USCIS. We are currently authorized to receive and use the data from SSA and IRS that are discussed in Alternative C.

**16. How long would Census expect any negotiation for access to data take?  How likely is it that negotiations would be successful?  Are MOA's needed/required?**

Current data available to the Census Bureau provide the quality and authority to use that are required to support this project.   Additional information potentially available from USCIS would serve to supplement/validate those existing data.   We are in early discussions with USCIS to develop a data acquisition agreement and at this time have no indications that this acquisition would not be successful.

**17. What limitations would exist in working with other agencies like IRS, Homeland Security, etc. to share data?**

The context for sharing of data for this project is for a one-way sharing of data from these agencies to the Census Bureau.  Secure file transfer protocols are in-place to ingest these data into our Title 13 protected systems.  For those data already in-place at the Census Bureau to support this project, provisions for sharing included in the interagency agreement restrict the Census Bureau from sharing person-level microdata outside the Census Bureau's Title 13 protections.  Aggregates that have been processed through the Bureau's disclosure avoidance procedures can be released for public use.

**18. If Alternative C is selected, what is Census's backup plan if the administrative data cannot be completely collected and utilized as proposed?**

The backup plan is to use all of the administrative data that we currently have, which is the same set that the analyses of Alternative C used.  We have verified that this use is consistent with the existing MOUs.  We would then use estimation and modeling techniques similar to those used for the Small Area Income and Poverty Estimates (SAIPE) to impute missing citizenship status for those persons for whom we do not have administrative records.  These models would also include estimates of naturalizations that occurred since the administrative data were ingested.

**19. Does Census have any reason to believe that access to existing data sets would be curtailed if Alternative C is pursued?**

No we do not believe that any access to existing data sets would be curtailed if we pursue Alternative C.

**20. Has the proposed Alternative C approach ever been tried before on other data collection projects, or is this an experimental approach? If this has been done before, what was the result and what were lessons learned?**

The approach in Alternative C has been routinely used in processing the economic censuses for several decades. The Bureau's Business Register was specifically redesigned for the 2002 Economic Census in order to enhance the ingestion and use of administrative records from the IRS and other sources. The data in these administrative records are used to substitute for direct responses in the economic censuses for the unsampled entities. They are also used as part of the review, edit, and imputation systems for economic censuses and surveys. On the household side, the approach in Alternative C was used extensively to build the residential characteristics for OnTheMap and OnTheMap for Emergency Management.

**21. Is using sample data and administrative records sufficient for DOJ's request?**

The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C.

**22. Under Alternative C, If Census is able to secure interagency agreements to provide needed data sets, do we know how long it would take to receive the data transmission from other agencies and the length of time to integrate all that data, or is that unknown?**

With the exception of the USCIS data, the data used for this project are already integrated into the 2020 Census production schema.  In mid-to late 2018, we plan to acquire the USCIS data and with those data and our existing data begin to develop models and business rules to select citizenship status from the composite of sources and attach that characteristic to

8

each U.S. person.  We expect the development and refinement of this process to continue into 2019 and to be completed by third quarter calendar year 2019.

**23. Cross referencing Census decennial responses with numerous governmental data sets stored in various databases with differing formats and storage qualities sounds like it could be complicated.  Does Census have an algorithm in place to efficiently combine and cross reference such large quantities of data coming from many different sources?  What cost is associated with Alternative C, and what technology/plan does Census have in place to execute?**

Yes, the 2018 Census End-to-End test will be implementing processing steps to be able to match Census responses to administrative record information from numerous governmental data sets.  The Census Bureau has in place the Person Identification Validation System to assign Protected Identification Keys to 2020 Census responses. The required technology for linking in the administrative records is therefore part of the 2020 Census technology.  This incremental cost factored into the estimate for Alternative C is for integrating the citizenship variable specifically, since that variable is not currently part of the 2020 Census design. No changes are required to the production Person Identification Validation system to integrate the administrative citizenship data.

**24. For section C-1 of the memo, when did Census do the analyses of the incorrect response rates for non-citizen answers to the long form and ACS citizenship question?  Were any of the analyses published?**

The comparisons of ACS, 2000 Decennial Census longform and SSA Numident citizenship were conducted in January 2018. This analysis has not been published.

**25. Has Census corrected the incorrect responses it found when examining non-citizen responses?  If not, why not?**

In the American Community Survey (ACS), and the short form Decennial Census, we do not change self-reported answers.  The Decennial Census and the ACS are based on self-response and we accept the responses provided by households as they are given.  While we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaires.  This is a long established process at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.

**26. Has the Department of Justice ever been made aware of inaccurate reporting of ACS data on citizenship, so that they may take this into consideration when using the data?**

9

Not exactly.  The Census Bureau is in close, regular contact with the Department of Justice (DOJ) regarding their data requirements.  Our counterparts at DOJ have a solid understanding of survey methodology and the quality of survey data, and they are aware of the public documentation on sampling and accuracy surrounding the ACS.   However, the specific rate of accuracy regarding responses to the ACS question on citizenship has never been discussed.

**27. Why has the number of persons who cannot be linked increased from 2010 to 2016?**

The linkage between the ACS and administrative data from the SSA Numident and IRS ITIN tax filings depends on two factors: (a) the quality of the personally identifiable information (PII) on the ACS response and (b) whether the ACS respondent is in the SSN/ITIN universe.

With respect to the quality of the PII on the ACS, there may be insufficient information on the ACS due to item nonresponse or proxy response for the person to allow a successful match using the production record linkage system. There may also be more than one record in the Numident or ITIN IRS tax filings that matches the person's PII. Finally, there may be a discrepancy between the PII provided to the ACS and the PII in the administrative records.

Alternatively, the person may not be in the Numident or ITIN IRS tax filing databases because they are out of the universe for those administrative systems. This happens when the person is a citizen without an SSN, or when the person is a noncitizen who has not obtained an SSN or ITIN.

Very few of the unlinked cases are due to insufficient PII in the ACS or multiple matches with administrative records. The vast majority of unlinked ACS persons have sufficient PII, but fail to match any administrative records sufficiently closely. This means that most of the nonmatches are because the ACS respondent is not in the administrative record universe.

The incidence of ACS persons with sufficient PII but no match with administrative records increased between 2010 and 2016. One contributing factor is that the number of persons linked to ITIN IRS tax filings in 2016 was only 39 percent as large as in 2010, suggesting that either fewer of the noncitizens in the 2016 ACS had ITINs, or more of them provided PII in the ACS that was inconsistent with their PII in IRS records.

**28. Independent of this memo, what action does Census plan to take in response to the analyses showing that non-citizens have been incorrectly responding to the citizenship question?**

The Census Bureau does not have plans to make any changes to procedures in the ACS. However, we will continue to conduct thorough evaluations and review of census and survey data. The ACS is focusing our research on the potential use of administrative records

001295

in the survey.  For instance, we are exploring whether we can use IRS data on income to reduce the burden of asking questions on income on the ACS.  We are concentrating initially on questions that are high burden, e.g., questions that are difficult to answer or questions that are seen as intrusive.

**29. Did Census make recommendations the last time a question was added?**

Since the short form Decennial Census was established in 2010, the only requests for new questions we have received have been for the ACS.  And, in fact, requests for questions prior to 2010 were usually related to the Decennial Census Long Form.  We always work collaboratively with Federal agencies that request a new question or a change to a question. The first step is to review the data needs and the legal justification for the new question or requested changes.  If, through this process, we determine that the request is justified, we work with the other agencies to test the question (cognitive testing and field testing).  We also work collaboratively on the analysis of the results from the test which inform the final recommendation about whether or not to make changes or add the question.

**30. Does not answering truthfully have a separate data standard than not participating at all?**

We're not sure what you're asking here.  Please clarify the question.

**31. What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?**

Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed bound by past precedent when considering the Department of Justices' request.  Rather, the Census Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation.  As you are aware, that process is ongoing at your direction.

**32. Has another agency ever requested that a question be asked of the entire population in order to get block or individual level data?**

Not to our knowledge.  However, it is worth pointing out that prior to 1980 the short form of the Decennial Census included more than just the 10 questions that have been on the short form since 1990.

**33. Would Census linking of its internal data sets, with other data sets from places like IRS and Homeland Security, have an impact on participation as well (i.e., privacy concerns)?**

11

The potential that concerns about the use of administrative records could have an impact on participation has always been a concern of ours, and it's a risk that we're managing on our risk register.  We've worked closely with the privacy community throughout the decade, and we established a working group on our National Advisory Committee to explore this issue.  We've also regularly briefed the Congress about our plans.  At this stage in the decade there does not appear to be extensive concerns among the general public about our approach to using administrative records in the Nonresponse Operation or otherwise.  We will continue to monitor this issue.

**34. Would Alternative C require any legislation?  If so, what is the estimated time frame for approval of such legislation?**

No.

**35. Census publications and old decennial surveys available on the Census website show that citizenship questions were frequently asked of the entire population in the past.  Citizenship is also a question on the ACS.  What was the justification provided for citizenship questions on the (A) short form, (B) long form, and (C) ACS?**

In 1940, the Census Bureau introduced the use of a short form to collect basic characteristics from all respondents, and a long form to collect more detailed questions from only a sample of respondents.  Prior to 1940, census questions were asked of everyone, though in some cases only for those with certain characteristics.  For example, in 1870, a citizenship question was asked, but only for respondents who were male and over the age of 21.

Beginning in 2005, all the long-form questions – including a question on citizenship -- were moved to the ACS.  2010 was the first time we conducted a short-form only census.  The citizenship question is included in the ACS to fulfill the data requirements of the Department of Justice, as well as many other agencies including the Equal Employment Opportunities Commission, the Department of Health and Human Services, and the Social Security Administration.

001297



UNITED STATES DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. Census Bureau
Washington, DC 20233-0001

March 1, 2018

MEMORANDUM FOR:      Wilbur L. Ross, Jr.
                     Secretary of Commerce

Through:             Karen Dunn Kelley
                     Performing the Non-Exclusive Functions and Duties of the Deputy
                     Secretary

                     Ron S. Jarmin
                     Performing the Non-Exclusive Functions and Duties of the Director

                     Enrique Lamas
                     Performing the Non-Exclusive Functions and Duties of the Deputy
                     Director

From:                John M. Abowd
                     Chief Scientist and Associate Director for Research and Methodology

Subject:             Preliminary analysis of Alternative D (Combined Alternatives B and C)

See attached.

Approved: _____   Date: _____
          John M. Abowd, Chief Scientist
          and Associate Director for Research and Methodology



United States
**Census**
Bureau

**Preliminary Analysis of Alternative D**

At the Secretary's request we performed a preliminary analysis of combining Alternative B (asking the citizenship question of every household on the 2020 Census) and Alternative C (do not ask the question, link reliable administrative data on citizenship status instead) in the January 19, 2018 draft memo to the Department of Commerce into a new Alternative D. Here we discuss Alternative D, the weaknesses in Alternative C on its own, whether and how survey data could address these weaknesses, implications of including a citizenship question for using administrative data, and methodological challenges.

*Description of Alternative D:* Administrative data from the Social Security Administration (SSA), Internal Revenue Service (IRS), U.S. Citizenship and Immigration Services (USCIS), and the State Department would be used to create a comprehensive statistical reference list of current U.S. citizens. Nevertheless, there will be some persons for whom no administrative data are available. To obtain citizenship information for this sub-population, a citizenship question would be added to the 2020 Census questionnaire. The combined administrative record and 2020 Census data would be used to produce baseline citizenship statistics by 2021. Any U.S. citizens appearing in administrative data after the version created for the 2020 Census would be added to the comprehensive statistical reference list. There would be no plan to include a citizenship question on future Decennial Censuses or American Community Surveys. The comprehensive statistical reference list, built from administrative records and augmented by the 2020 Census answers would be used instead. The comprehensive statistical reference list would be kept current, gradually replacing almost all respondent-provided data with verified citizenship status data.

*What are the weaknesses in Alternative C?*

In the 2017 Numident (the latest available), 6.6 million persons born outside the U.S. have blank citizenship among those born in 1920 or later with no year of death.  The evidence suggests that citizenship is not missing at random. Of those with missing citizenship in the Numident, a much higher share appears to be U.S. citizens than compared to those for whom citizenship data are not missing. Nevertheless, some of the blanks may be noncitizens, and it would thus be useful to have other sources for them.

A second question about the Numident citizenship variable is how complete and timely its updates are for naturalizations. Naturalized citizens are instructed to immediately apply for a new SSN card. Those who wish to work have an incentive to do so quickly, since having an SSN card with U.S. citizenship will make it easier to pass the E-Verify process when applying for a job, and it will make them eligible for government programs. But we do not know what fraction of naturalized citizens actually notify the SSA, and how soon after being naturalized they do so.

A third potential weakness of Numident citizenship is that some people are not required to have a Social Security Number (SSN), whether they are a U.S. citizen or not. It would also be useful to have a data source on citizenship that did not depend on the SSN application and tracking process inside SSA. This is why we proposed the MOU with the USCIS for naturalizations, and why we have now begun pursuing an MOU with the State Department for data on all citizens with passports.

IRS Individual Taxpayer Identification Numbers (ITIN) partially fill the gap in Numident coverage of noncitizen U.S. residents. However, not all noncitizen residents without SSNs apply for ITINs. Only those making IRS tax filings apply for ITINs. Once again, it would be useful to have a data source that did not depend on the ITIN process. The USCIS and State Department MOUs would provide an alternative source in this context as well.

U.S. Citizenship and Immigration Services (USCIS) data on naturalizations, lawful permanent residents, and I-539 non-immigrant visa extensions can partially address the weaknesses of the Numident. The USCIS data provide up-to-date information since 2001 (and possibly back to 1988, but with incomplete records prior to 2001). This will fill gaps for naturalized citizens, lawful permanent residents, and persons with extended visa applications without SSNs, as well as naturalized citizens who did not inform SSA about their naturalization. The data do not cover naturalizations occurring before 1988, as well as not covering and some between 1988-2000. USCIS data do not always cover children under 18 at the time a parent became a naturalized U.S. citizen. Such children automatically become U.S. citizens under the Child Citizenship Act of 2000. The USCIS receives notification of some, but not all, of these child naturalizations. Others inform the U.S. government of their U.S. citizenship status by applying for U.S. passports, which are less expensive than the application to notify the USCIS. USCIS visa applications list people's children, but those data may not be in electronic form.

U.S. passport data, available from the State Department, can help plug the gaps for child naturalizations, blanks on the Numident, and out-of-date citizenship information on the Numident for persons naturalized prior to 2001. Since U.S. citizens are not required to have a passport, however, these data will also have gaps in coverage.

Remaining citizenship data gaps in Alternative C include the following categories:

1.      U.S. citizens from birth with no SSN or U.S. passport. They will not be processed by the production record linkage system used for the 2020 Census because their personally identifiable information won't find a matching Protected Identification Key (PIK) in the Person Validation System (PVS).

2.      U.S. citizens from birth born outside the U.S., who do not have a U.S. passport, and either applied for an SSN prior to 1974 and were 18 or older, or applied before the age of 18 prior to 1978. These people will be found in PVS, but none of the administrative sources discussed above will reliably generate a U.S. citizenship variable.

3.      U.S. citizens who were naturalized prior to 2001 and did not inform SSA of their naturalization because they originally applied for an SSN after they were naturalized, and it was prior to when citizenship verification was required for those born outside the U.S. (1974). These people already had an SSN when they were naturalized and they didn't inform SSA about the naturalization, or they didn't apply for an SSN. The former group have inaccurate data on the Numident. The latter group will not be found in PVS.

4.      U.S. citizens who were automatically naturalized if they were under the age of 18 when their parents became naturalized in 2000 or later, and did not inform USCIS or receive a U.S. passport. Note that such persons would not be able to get an SSN with U.S. citizenship on the card without either a U.S. passport or a certificate from USCIS. These people will also not be found in the PVS.

001310

5.      Lawful permanent residents (LPR) who received that status prior to 2001 and either do not have an SSN or applied for an SSN prior to when citizenship verification was required for those born outside the U.S. (1974). The former group will not be found in PVS. The latter group has inaccurate data in Numident.

6.      Noncitizen, non-LPR, residents who do not have an SSN or ITIN and who did not apply for a visa extension. These persons will not be found in PVS.

7.      Persons with citizenship information in administrative data, but the administrative and decennial census data cannot be linked due to missing or discrepant PII.

*Can survey data address the gaps in Alternative C?*

One might think that survey data could help fill the above gaps, either when their person record is not linked in the PVS, and thus they have no PIK, or when they have a PIK but the administrative data lack up-to-date citizenship information. Persons in Category 6, however, have a strong incentive to provide an incorrect answer, if they answer at all. A significant, but unknown, fraction of persons without PIKs are in Category 6. Distinguishing these people from the other categories of persons without PIKs is an inexact science because there is no feasible method of independently verifying their non-citizen status. Our comparison of ACS and Numident citizenship data suggests that a large fraction of LPRs provide incorrect survey responses. This suggests that survey-collected citizenship data may not be reliable for many of the people falling in the gaps in administrative data. This calls into question their ability to improve upon Alternative C.

With Alternative C, and no direct survey response, the Census Bureau's edit and imputation procedures would make an allocation based primarily on the high-quality administrative data. In the presence of a survey response, but without any linked administrative data for that person, the edit would only be triggered by blank citizenship. A survey response of "citizen" would be accepted as valid. There is no scientifically defensible method for rejecting a survey response in the absence of alternative data for that respondent.

How might inclusion of a citizenship question on the questionnaire affect the measurement of citizenship with administrative data? Absent an in-house administrative data census, measuring citizenship with administrative data requires that persons in the Decennial Census be linked to the administrative data at the person level. The PVS system engineered into the 2020 Census does this using a very reliable technology. However, inclusion of a citizenship question on the 2020 Census questionnaire is very likely to reduce the self-response rate, pushing more households into Nonresponse Followup (NRFU). Not only will this likely lead to more incorrect enumerations, but it is also expected to increase the number of persons who cannot be linked to the administrative data because the NRFU PII is lower quality than the self-response data. In the 2010 Decennial Census, the percentage of NRFU persons who could be linked to administrative data rate was 81.6 percent, compared to 96.7 percent for mail responses. Those refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well, resulting in a proxy response. The NRFU linkage rates were far lower for proxy responses than self-responses (33.8 percent vs. 93.0 percent, respectively).

Although persons in Category 6 will not be linked regardless of response mode, it is common for households to include persons with a variety of citizenship statuses. If the whole household does not self-

respond to protect the members in Category 6, the record linkage problem will be further aggravated. Thus, not only are citizenship survey data of suspect quality for persons in the gaps for Alternative C, collecting these survey data would reduce the quality of the administrative records when used in Alternative D by lowering the record linkage rate for persons with administrative citizenship data.

*What methodological challenges are involved when combining these sources?*

Using the 2020 Census data only to fill in gaps for persons without administrative data on citizenship would raise questions about why 100 percent of respondents are being burdened by a citizenship question to obtain information for the two percent of respondents where it is missing.

Including a citizenship question in the 2020 Census does not solve the problem of incomplete person linkages when producing citizenship statistics after 2020. Both the 2020 decennial record and the record with the person's future location would need to be found in PVS to be used for future statistics.

In sum, Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce.



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

To:     Karen Dunn Kelley, Under Secretary for Economic Affairs

From:  Secretary Wilbur Ross

Date:   March 26, 2018

Re:     Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire

Dear Under Secretary Kelley:

As you know, on December 12, 2017, the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census to provide census block level citizenship voting age population ("CVAP") data that are not currently available from government survey data ("DOJ request"). DOJ and the courts use CVAP data for determining violations of Section 2 of the Voting Rights Act ("VRA"), and having these data at the census block level will permit more effective enforcement of the Act. Section 2 protects minority population voting rights.

Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond. To that end, the Department of Commerce ("Department") immediately initiated a comprehensive review process led by the Census Bureau.

The Department and Census Bureau's review of the DOJ request – as with all significant Census assessments – prioritized the goal of obtaining *complete and accurate data*. The decennial census is mandated in the Constitution and its data are relied on for a myriad of important government decisions, including apportionment of Congressional seats among states, enforcement of voting rights laws, and allocation of federal funds. These are foundational elements of our democracy, and it is therefore incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census.

At my direction, the Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations. As part of the process, I also met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, my questions about accuracy and response rates, and their recommendations. At present, the Census Bureau leadership are all career civil servants. In addition, my staff and I reviewed over 50 incoming letters from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census, and I personally had specific conversations on

1

the citizenship question with over 24 diverse, well informed and interested parties representing a broad range of views. My staff and I have also monitored press coverage of this issue.

Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA. By law, the list of decennial census questions is to be submitted two years prior to the decennial census – in this case, no later than March 31, 2018.

The Department's review demonstrated that collection of citizenship data by the Census has been a long-standing historical practice. Prior decennial census surveys of the entire United States population consistently asked citizenship questions up until 1950, and Census Bureau surveys of sample populations continue to ask citizenship questions to this day. In 2000, the decennial census "long form" survey, which was distributed to one in six people in the U.S., included a question on citizenship. Following the 2000 decennial census, the "long form" sample was replaced by the American Community Survey ("ACS"), which has included a citizenship question since 2005. Therefore, the citizenship question has been well tested.

DOJ seeks to obtain CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA. The Census Bureau has advised me that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which as noted earlier does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA. The ACS is sent on an annual basis to a sample of approximately 2.6 percent of the population.

To provide the data requested by DOJ, the Census Bureau initially analyzed three alternatives: Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial census, which goes to every American household; and Option C was not placing a question on the decennial census and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data that Census has agreements with other agencies to access for statistical purposes.

**Option A** contemplates rejection of the DOJ request and represents the status quo baseline. Under Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data. Additionally, the block-group level CVAP data currently obtained through the ACS has associated margins of error because the ACS is extrapolated based on sample surveys of the population. Providing more precise block-level data would require sophisticated statistical modeling, and if Option A is selected, the Census Bureau advised that it would need to deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data. But the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy. Regardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and

001314

completeness. Any future modeling from these incomplete data would only compound that problem.

Option A would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods. Therefore, I have concluded that Option A is not a suitable option.

The Census Bureau and many stakeholders expressed concern that **Option B**, which would add a citizenship question to the decennial census, would negatively impact the response rate for non-citizens. A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations. However, neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially. In discussing the question with the national survey agency Nielsen, it stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates. Further, the former director of the Census Bureau during the last decennial census told me that, while he wished there were data to answer the question, none existed to his knowledge. Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses.

When analyzing Option B, the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses. However, such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys. For example, ACS self-response rates were 3.1 percentage points less than self-response rates for the 2010 decennial census. The Bureau attributed this difference to the greater outreach and follow-up associated with the Constitutionally-mandated decennial census. Further, the decennial census has differed significantly in nature from the sample surveys. For example, the 2000 decennial census survey contained only eight questions. Conversely, the 2000 "long form" sample survey contained over 50 questions, and the Census Bureau estimated it took an average of over 30 minutes to complete. ACS surveys include over 45 questions on numerous topics, including the number of hours worked, income information, and housing characteristics.

The Census Bureau determined that, for 2013-2016 ACS surveys, nonresponses to the citizenship question for non-Hispanic whites ranged from 6.0 to 6.3 percent, for non-Hispanic blacks ranged from 12.0 to 12.6 percent, and for Hispanics ranged from 11.6 to 12.3 percent. However, these rates were comparable to nonresponse rates for other questions on the 2013 and 2016 ACS. Census Bureau estimates showed similar nonresponse rate ranges occurred for questions on the ACS asking the number times the respondent was married, 4.7 to 6.9 percent; educational attainment, 5.6 to 8.5 percent; monthly gas costs, 9.6 to 9.9 percent; weeks worked in the past 12 months, 6.9 to 10.6 percent; wages/salary income, 8.1 to 13.4 percent; and yearly property insurance, 23.9 to 25.6 percent.

001315

The Census Bureau also compared the self-response rate differences between citizen and non-citizen households' response rates for the 2000 decennial census short form (which did not include a citizenship question) and the 2000 decennial census long form survey (the long form survey, distributed to only one in six households, included a citizenship question in 2000). Census found the decline in self-response rates for non-citizens to be 3.3 percent greater than for citizen households. However, Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey (it contained over six times as many questions covering a range of topics). Indeed, the Census Bureau analysis showed that for the 2000 decennial census there was a significant drop in self response rates overall between the short and long form; the mail response rate was 66.4 percent for the short form and only 53.9 percent for the long form survey. So while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief.

**Option C**, the use of administrative records rather than placing a citizenship question on the decennial census, was a potentially appealing solution to the DOJ request. The use of administrative records is increasingly part of the fabric and design of modern censuses, and the Census Bureau has been using administrative record data to improve the accuracy and reduce the cost of censuses since the early 20th century. A Census Bureau analysis matching administrative records with the 2010 decennial census and ACS responses over several more recent years showed that using administrative records could be more accurate than self-responses in the case of non-citizens. That Census Bureau analysis showed that between 28 and 34 percent of the citizenship self-responses for persons that administrative records show are non-citizens were inaccurate. In other words, when non-citizens respond to long form or ACS questions on citizenship, they inaccurately mark "citizen" about 30 percent of the time. However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population. Thus, using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture. In the 2010 decennial census, the Census Bureau was able to match 88.6 percent of the population with what the Bureau considers credible administrative record data. While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide.

I therefore asked the Census Bureau to develop a fourth alternative, **Option D**, which would combine Options B and C. Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data. This approach would maximize the Census Bureau's ability to match the decennial census responses with administrative records. Accordingly, at my direction the Census Bureau is working to obtain as many additional Federal and state administrative records as possible to provide more comprehensive information for the population.

001316

It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people. For the approximately 90 percent of the population who are citizens, this question is no additional imposition. And for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition since census responses by law may only be used anonymously and for statistical purposes. Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so.

**Consideration of Impacts**   I have carefully considered the argument that the reinstatement of the citizenship question on the decennial census would depress response rate. Because a lower response rate would lead to increased non-response follow-up costs and less accurate responses, this factor was an important consideration in the decision-making process. I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.

Importantly, the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially. Concerns about decreased response rates generally fell into the following two categories – distrust of government and increased burden. First, stakeholders, particularly those who represented immigrant constituencies, noted that members of their respective communities generally distrusted the government and especially distrusted efforts by government agencies to obtain information about them. Stakeholders from California referenced the difficulty that government agencies faced obtaining any information from immigrants as part of the relief efforts after the California wildfires. These government agencies were not seeking to ascertain the citizenship status of these wildfire victims. Other stakeholders referenced the political climate generally and fears that Census responses could be used for law enforcement purposes. But no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates among those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement. Rather, stakeholders merely identified residents who made the decision not to participate regardless of whether the Census includes a citizenship question. The reinstatement of a citizenship question will not decrease the response rate of residents who already decided not to respond. And no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did (although many believed that such residents had to exist). While it is possible this belief is true, there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.

5

A second concern that stakeholders advanced is that recipients are generally less likely to respond to a survey that contained more questions than one that contained fewer. The former Deputy Director and Chief Operating Officer of the Census Bureau during the George W. Bush administration described the decennial census as particularly fragile and stated that any effort to add questions risked lowering the response rate, especially a question about citizenship in the current political environment. However, there is limited empirical evidence to support this view. A former Census Bureau Director during the Obama Administration who oversaw the last decennial census noted as much. He stated that, even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion. This same former director noted that, in the years preceding the decennial census, certain interest groups consistently attack the census and discourage participation. While the reinstatement of a citizenship question may be a data point on which these interest groups seize in 2019, past experience demonstrates that it is likely efforts to undermine the decennial census will occur again regardless of whether the decennial census includes a citizenship question. There is no evidence that residents who are persuaded by these disruptive efforts are more or less likely to make their respective decisions about participation based specifically on the reinstatement of a citizenship question. And there are actions that the Census Bureau and stakeholder groups are taking to mitigate the impact of these attacks on the decennial census.

Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen. When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added. Similarly, the former Deputy Director and COO of the Census during the George W. Bush Administration shared an example of a citizenship-like question that he believed would negatively impact response rates but did not. He cited to the Department of Homeland Security's 2004 request to the Census Bureau to provide aggregate data on the number of Arab Americans by zip code in certain areas of the country. The Census Bureau complied, and Census employees, including the then-Deputy Director, believed that the resulting political firestorm would depress response rates for further Census Bureau surveys in the impacted communities. But the response rate did not change materially.

Two other themes emerged from stakeholder calls that merit discussion. First, several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years. Second, other stakeholders who opposed reinstatement did so based on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate, thereby obviating the need to ask the question on the decennial census. But as discussed above, the Census Bureau estimates that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are non-citizens were inaccurate. Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

001318

Finally, I have considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise. The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that the citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions. Additionally, changes to the Internet Self-Response instrument, revising the Census Questionnaire Assistance, and redesigning of the printed questionnaire can be easily implemented for questions that are finalized prior to the submission of the list of questions to Congress.

The Census Bureau also considered whether non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs. As noted above, this estimate was difficult to assess given the Census Bureau and Department's inability to determine what impact there will be on decennial census survey responses. The Bureau provided a rough estimate that postulated that up to 630,000 additional households may require NRFU operations if a citizenship question is added to the 2020 decennial census. However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

Inclusion of a citizenship question on this country's decennial census is not new – the decision to collect citizenship information from Americans through the decennial census was first made centuries ago. The decision to include a citizenship question on a national census is also not uncommon. The United Nations recommends that its member countries ask census questions identifying both an individual's country of birth and the country of citizenship. *Principals and Recommendations for Population and Housing Censuses (Revision 3)*, UNITED NATIONS 121 (2017). Additionally, for countries in which the population may include a large portion of naturalized citizens, the United Nations notes that, "it may be important to collect information on the method of acquisition of citizenship." *Id.* at 123. And it is important to note that other major democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few.

The Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness. However, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns. Completing and returning decennial census questionnaires is required by Federal law, those responses are protected by law, and inclusion of a citizenship question on the 2020 decennial census will provide more complete information for those who respond. The citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond.

7

To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request.  To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form.

Please make my decision known to Census Bureau personnel and Members of Congress prior to March 31, 2018.  I look forward to continuing to work with the Census Bureau as we strive for a complete and accurate 2020 decennial census.


CC:    Ron Jarmin, performing the nonexclusive functions and duties of the Director of the Census Bureau

       Enrique Lamas, performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau

001320



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

## Supplemental Memorandum by Secretary of Commerce Wilbur Ross
## Regarding the Administrative Record in Census Litigation

This memorandum is intended to provide further background and context regarding my March 26, 2018, memorandum concerning the reinstatement of a citizenship question to the decennial census. Soon after my appointment as Secretary of Commerce, I began considering various fundamental issues regarding the upcoming 2020 Census, including funding and content. Part of these considerations included whether to reinstate a citizenship question, which other senior Administration officials had previously raised. My staff and I thought reinstating a citizenship question could be warranted, and we had various discussions with other governmental officials about reinstating a citizenship question to the Census. As part of that deliberative process, my staff and I consulted with Federal governmental components and inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act.

Ultimately, on December 12, 2017, DOJ sent a letter formally requesting that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship. My March 26, 2018, memorandum described the thorough assessment process that the Department of Commerce conducted following receipt of the DOJ letter, the evidence and arguments I considered, and the factors I weighed in making my decision to include the citizenship question on the 2020 Census.

Wilbur Ross
June 21, 2018

001321

**From**: AWillard@doc.gov [AWillard@doc.gov]
**Sent**: 1/11/2018 5:00:17 PM
**To**: Platt, Mike (Federal) [████████@doc.gov]; Lenihan, Brian (Federal) [████████@doc.gov]; Mason, Jacque (Federal) [jmason@doc.gov]
**Subject**: Fwd: Steering Committee Read Ahead -- Citizenship
**Attachments**: CB18-RTQ.01 Census Bureau Statement on Adding Citizenship Status Question_revised.docx; ATT00001.htm; Citizenship 3 January 2018.pdf; ATT00002.htm; Template for response to Senator Harris_citizenship question_v.2.docx; ATT00003.htm

Sent from my iPhone

Begin forwarded message:

**From:** "Burton H Reist (CENSUS/ADDC FED)" <burton.h.reist@census.gov>
**Date:** January 10, 2018 at 6:23:44 PM EST
**To:** "Willard, Aaron (Federal)" <AWillard@doc.gov>, "Kevin Quinley (CENSUS/DEPDIR FED)" <kevin.quinley@census.gov>, "Park-Su, Sahra" <████████@doc.gov>
**Cc:** "Ron S Jarmin (CENSUS/ADEP FED)" <Ron.S.Jarmin@census.gov>, "Ron S Jarmin (CENSUS/ADEP FED)" <Ron.S.Jarmin@census.gov>, "Albert E Fontenot (CENSUS/ADDC FED)" <Albert.E.Fontenot@census.gov>, "Joanne Crane (CENSUS/CFO FED)" <joanne.crane@census.gov>, "Stephen L Buckner (CENSUS/ADCOM FED)" <Stephen.L.Buckner@census.gov>
**Subject: Steering Committee Read Ahead -- Citizenship**
This is the first of three emails I'm forwarding providing the read ahead materials for tomorrow's Steering Committee meeting.

**Burton Reist**
Chief, Decennial Communications and Stakeholder Relations
Decennial Programs Directorate, U.S. Census Bureau
301.763.4155 (office)
████████ (cell)
burton.h.reist@census.gov

---

**From:** Christine E Taylor (CENSUS/PIO FED)
**Sent:** Wednesday, January 10, 2018 6:17 PM
**To:** Burton H Reist (CENSUS/ADDC FED); Stephen L Buckner (CENSUS/ADCOM FED)
**Cc:** Erika H Becker Medina (CENSUS/ADDC FED); Jennifer Shopkorn (CENSUS/ADCOM FED); Kimberly E Higginbotham (CENSUS/ADDC FED)
**Subject:** Citizenship Materials

Here are the materials on citizenship. They include:

- PIO RTQ
- Draft Response Letter
- History of Citizenship in Census

Please let me know if you need anything else or any changes made to the documents.
Chris
**Christine Taylor**
Assistant Division Chief
Public Information Office
U.S. Census Bureau


301.763.5652 (direct)
██████████ cell)


Christine.E.Taylor@census.gov


census.gov
Connect with us on Social Media

**From**:    Comstock, Earl (Federal) ███████@doc.gov]
**Sent**:    5/4/2017 11:58:40 AM
**To**:    ████████████@usdoj.gov
**Subject**:    Call today to discuss DoC Issues


Hi Mary Blanche –


Contacts over the White House said that you would be the best person for me to talk to at DoJ on Commerce issues.  I am the new Director of Policy and Strategic Planning at Commerce and was the confirmation Sherpa on the transition for Secretary Ross.


If you or your assistant could let me know a couple of times today that work for you for a call I would appreciate it.


Thank you in advance,


Earl


Earl W. Comstock

Director

Office of Policy and Strategic Planning

United States Department of Commerce

███████████

**To:**       Wilbur Ross ████████████
**Cc:**       Branstad, Eric (Federal)[EBranstad@doc.gov]
**From:**     Comstock, Earl (Federal)
**Sent:**     Fri 3/10/2017 8:31:29 PM
**Importance:**     Normal
**Subject:**  Your Question on the Census
**Received:**       Fri 3/10/2017 8:31:30 PM

I was not able to catch anyone at their desk when I called the numbers I have for the Census Bureau from their briefing.  However, the

Census Bureau web page on apportionment is explicit and can be found at
https://www.census.gov/population/apportionment/about/faq.html#Q16  It says:

> **Are undocumented residents (aliens) in the 50 states included in the apportionment population counts?**
>
> Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts.

 Further, this WSJ blog post from 2010 confirms that neither the 2000 nor the 2010 Census asked about citizenship.
http://blogs.wsj.com/numbers/the-pitfalls-of-counting-illegal-immigrants-937/

THE NUMBERS

The Pitfalls of Counting Illegal Immigrants



By CARL BIALIK

May 7, 2010 7:05 pm ET

The debate over Arizona's immigration law has included several estimates of the state's illegal-immigrant population, at "almost half a million," "half a million" or "more than half a million." Arguing against the law, Homeland Security chief Janet Napolitano — who is the former governor of Arizona — pointed to decreasing illegal immigration in the state.

 These estimates and claims rest on several annual efforts to count illegal immigrants in the U.S. The nonpartisan Pew Hispanic Center estimated that in 2008 the nationwide population was 11.9 million, and half a million in Arizona. The federal Department of Homeland Security and the Center for Immigration Studies, a Washington, D.C., research group that opposes increased immigration, agree on a figure of 10.8 million for 2009, with DHS putting the Arizona population at 460,000, down from 560,000 a year earlier.

 But as my print column notes this week, these estimates are limited by several factors that make it difficult for researchers to count this population. No major government survey, including the decennial census now under way, asks Americans about their citizenship status. Thus estimates of the number of illegal immigrants in the country are indirect and possibly far off from the correct count.

 These studies rely on census surveys, and assume that about 10% of illegal immigrants aren't counted in these surveys. But that figure largely is based on a 2001 survey of Mexican-born people living in Los Angeles. "I do not advise use of my estimated undercounts for the 2000 census outside of L.A. county, nor for migrants from other nations," said study co-author Enrico Marcelli, assistant professor of sociology at San Diego State University. "However, demographers do not have any other empirical evidence at the moment with which to proceed."

One concern is that the nearly two in five households who didn't respond to the 2001 survey may have included a

disproportionately large number who also didn't respond to census interviewers. Marcelli said further study would be needed to test that possibility, but he noted the extent of the efforts to select a representative sample and to put respondents at ease in order to elicit honest answers.

 "As far as I know, there has not been a new, serious attempt to estimate the undercount of illegal immigrants in the census," said Steven Camarota, director of research for the Center for Immigration Studies.

 In 2005, Robert Justich, then a portfolio manager for Bear Stearns, co-authored a report suggesting the population of illegal immigrants "may be as high as 20 million people." Jeffrey Passel, senior demographer for the Pew Hispanic Center, disputed that finding. For one thing, other data sources, such as U.S. birth rates and Mexico's own census, don't corroborate such a large number. If there were really so many more immigrants, than there would be more women of child-bearing age, and more births. And if instead the missing millions are mostly Mexican men working in the U.S. and sending money home, the flip side of that influx would be reflected as a gap in the Mexican census numbers.

 "Definitely the number is not as high as 20 million," said Manuel Orozco, senior associate of the Inter-American Dialogue, a Washington, D.C., policy-analysis group.

Justich, who now owns a music and film production firm, countered that immigrants from countries other than Mexico may make up the rest. However, he added that the number is no longer as high as 20 million.

 Larger estimates also sometimes are based on border-patrol counts of apprehensions, which are far from reliable proxies. No one is sure of how many people are missed for each one who is caught trying to cross into the U.S. illegally. Many of those who do get through may return quickly, or cross back and forth. Also, some people are caught more than once, inflating the count.  "It seems like we're not missing that many bodies in the United States," said Camarota, referring to the gap between the 20 million figure and his own.

The immigrant counters generally have seen a decline in the illegal-immigration population. "Economic drivers are very, very powerful" in lowering the illegal-immigrant population, said Hans Johnson, associate director of the Public Policy Institute of California. Others point to stepped-up enforcement efforts.

 However, because of all the assumptions baked into these numbers, such drops come with so much statistical uncertainty that they may not be statistically significant. "The methodology for doing these estimates is not really designed to measure year-to-year change," Passel said.

 One key difference between his count and the federal agency's: Homeland Security uses the Census Bureau's American Community Survey, which has a much larger sample size than the Current Population Survey, which Passel used. "I developed all of my methodology and all of the things that go with it when there wasn't an ACS," Passel said, "and I haven't gotten around to shifting to the new survey."

 The ACS was introduced after the 2000 census, and may help overcome a problem with census numbers exposed in the last decennial census. Many more foreign-born residents were counted in 2000 than was expected based on annual estimates produced by the bureau. Census officials think these estimates have improved since 2000 thanks to the annual ACS surveys of three million households. "That's the source we're using to estimate the movement" of the foreign-born population, said Howard Hogan, the Census Bureau's associate director for demographic programs. "It's a huge improvement over anything we had available in the '90s."

 Still, the Census Bureau doesn't ask people about their immigration status, in part because such questions may drive down overall response rates. Robert M. Groves, director of the Census Bureau, said he'd like to test that hypothesis. "We're sort of data geeks here," Groves said. "What we'd like to do to answer that question is an experiment."

 That doesn't mean that census interviewers don't try to find and enumerate illegal immigrants. Groves compares counting that group to efforts to track another population that is hard to count, though not necessarily because of willful avoidance: people who are homeless. Census interviewers spend three days visiting soup kitchens, shelters and outdoor gathering spots such as under certain highway overpasses in Los Angeles. "You don't have to look at that operation very long to realize that though it's a heroic effort, there are all sorts of holes in it," Groves said. As a result, the Census Bureau includes anyone counted in that effort in the overall population, but doesn't break out a separate estimate of homeless people.

"We would like to do estimates that have the smallest number of assumptions we can't test," Groves said. When it comes to counting illegal immigrants, "there are a set of assumptions that we know we can't test. When we find ourselves in that situation, then we're uncomfortable giving a Census Bureau estimate that is subject to all of those debates."

 Further reading: Passel outlined methods for counting the illegal-immigrant population, while this paper analyzed some difficulties with the estimates. Earlier the Christian Science Monitor and I have examined these numbers. Immigration statistics have become a subject of debate in the U.K., as well.

**From:** Alexander, Brooke (Federal)
**Sent:** Wed 4/5/2017 4:24:19 PM
**Importance:** Normal
**Subject:** tonight
**Received:** Wed 4/5/2017 4:24:00 PM

Mrs. Ross,

Do you have plans following the Newseum?  I'm asking because Steve Bannon has asked that the Secretary talk to someone about the Census and around 7-7:30 pm is the available time.  He could do it from the car on the way to a dinner …

  Brooke V Alexander

Executive Assistant to the Secretary

The U.S. Department of Commerce

Washington, D.C.  20230

balexander@doc.gov

202-482-███ office

 cell

**From:** Cutrona, Danielle (OAG) ██████████████

**Sent:** 9/18/2017 1:05:14 AM

**To:** Teramoto, Wendy (Federal) ████████████

**Subject:** Re: Call

Excellent. Thanks.

Sent from my iPhone

On Sep 17, 2017, at 8:25 PM, Teramoto, Wendy (Federal) ████████████████> wrote:

They connected. Thanks for the help. Wendy

Sent from my iPhone

On Sep 17, 2017, at 12:10 PM, Cutrona, Danielle (OAG) <█████████████████> wrote:

Wendy,

The Attorney General is available on his cell. His number is ██████████ He is in Seattle so he is 3 hours behind us. From what John told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication. The AG is eager to assist. Please let me know if you need anything else. You can reach me at ██

████

Thanks,

Danielle

Sent from my iPhone

On Sep 17, 2017, at 10:08 AM, Cutrona, Danielle (OAG) <████████████████> wrote:

Checking now. Will let you know as soon as I hear from him.

Sent from my iPhone

On Sep 16, 2017, at 6:29 PM, Teramoto, Wendy (Federal) <███████████████> wrote:

Thanks. Danielle-pls let me know when the AG is available to speak to Secretary Ross. Thanks. Anytime on the weekend is fine too. W

Sent from my iPhone

On Sep 16, 2017, at 3:55 PM, Gore, John (CRT) <███████████████> wrote:

Wendy:

By this email, I introduce you to Danielle Cutrona from DOJ.  Danielle is the person to connect with about the issue we discussed earlier this afternoon.

Danielle:

Wendy's cell phone number is ██████████

Thanks.

Sent from my iPhone

On Sep 13, 2017, at 4:57 PM, Teramoto, Wendy (Federal) ██████████████ > wrote:
Yes. CC'ing macie to set up. Look forward to connecting. W

Sent from my iPhone

On Sep 13, 2017, at 4:44 PM, Gore, John (CRT) < ████████████ > wrote:
Wendy:

My name is John Gore, and I am an acting assistant attorney general in the Department of Justice.  I would like to talk to you about a DOJ-DOC issue.  Do you have any time on your schedule tomorrow (Thursday) or Friday for a call?

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
██████████
████████████

**From**:      Comstock, Earl (Federal) ██████████████
**Sent**:      5/4/2017 12:27:32 AM
**To**:        Branstad, Eric (Federal) [EBranstad@doc.gov]
**Subject**:   Re: DOJ contact

Thanks Eric!  Earl

Sent from my iPhone

On May 3, 2017, at 8:10 PM, Branstad, Eric (Federal) <██████████████> wrote:


Eric D Branstad
Senior White House Advisor
Department of Commerce
███████████████
(202) 531-1620


Begin forwarded message:
**From:** "Flynn, Matthew J. EOP/WHO" <██████████████████████>
**Date:** May 3, 2017 at 7:15:56 PM EDT
**To:** "Branstad, Eric (Federal)" <███████████████>
**Subject: RE: DOJ contact**
DOJ    Mary Blanche    Hankey    ██████████   █████████████████████
-----Original Message-----
From: Branstad, Eric (Federal) ████████████████
Sent: Wednesday, May 3, 2017 3:41 PM
To: Flynn, Matthew J. EOP/WHO █████████████████████
Subject: DOJ contact

Who is best counterpart to reach out to at DOJ - Regarding Census and Legislative issue?

Thanks
Eric


Branstad, Eric (Federal)
Senior White House Advisor
Department of Commerce
(202) 531-1620
████████████████

| | |
|---|---|
| **From**: | Comstock, Earl (Federal) |
| **Sent**: | 5/2/2017 2:19:11 PM |
| **To**: | Wilbur Ross |
| **CC**: | Herbst, Ellen (Federal) |
| **Subject**: | Re: Census |

I agree Mr Secretary.

On the citizenship question we will get that in place. The broad topics were what were sent to Congress earlier this year as required. It is next March -- in 2018 -- when the final 2020 decennial Census questions are submitted to Congress. We need to work with Justice to get them to request that citizenship be added back as a census question, and we have the court cases to illustrate that DoJ has a legitimate need for the question to be included.  I will arrange a meeting with DoJ staff this week to discuss.

Earl


Sent from my iPhone

> On May 2, 2017, at 10:04 AM, Wilbur Ross                wrote:
>



                                                                    Worst of all they emphasize
that they have settled with congress on the questions to be asked.  I am mystified why nothing have been done in response to my months old request that we include the citizenship question. Why not?



> Sent from my iPhone

| | |
|---|---|
| **From**: | Comstock, Earl (Federal) [⬚ PII ⬚] |
| **Sent**: | 1/30/2018 11:50:49 PM |
| **To**: | Ron S Jarmin (CENSUS/ADEP FED) [Ron.S.Jarmin@census.gov]; Enrique Lamas (CENSUS/ADDP FED) [Enrique.Lamas@census.gov] |
| **CC**: | Kelley, Karen (Federal) [⬚ PII ⬚]; Willard, Aaron (Federal) [⬚ PII ⬚]; Uthmeier, James (Federal) [⬚ PII ⬚]; Davidson, Peter (Federal) [⬚ PII ⬚] |
| **Subject**: | Questions on the January 19 Alternatives Memo |
| **Attachments**: | Questions on the 19 Jan Draft Census Memo 01302017.docx |

**Importance**:   High


Hi Ron and Enrique –


Thank you for a good start on the draft memo for the Secretary on the citizenship question.  As you know, with Karen's absence ⬚ PII ⬚ I have been working with Aaron, James and David to review the draft.  Attached are questions that are raised by the memo.  The answers will provide additional information to inform the Secretary that should be included in a revised memo.


Please answer as many of the questions as possible by 10:30 am tomorrow.  <mark>In particular, if you could provide a response to questions 24, 25, and 26 by 10:30 am tomorrow (Wednesday, Jan. 31) that would be greatly appreciated.</mark>


If you have questions you can reach me at ⬚ PII ⬚ or contact Karen.


Thanks again!


Earl

Adding Content to the American Community Survey

The American Community Survey (ACS) is part of the Decennial Census Program and has replaced the "long form" questionnaire used in the five censuses prior to 2010. The long form was distributed to a sample of the population every decade and collected more detailed population and housing characteristics. In 2005, the Census Bureau began using the ACS to collect this detailed information from a sample of the nation's population on an annual basis, providing more accurate and timely data than the less frequent long form.

The Census Bureau continues to be guided by the longstanding principles that historically constrained the long form's content. The Census Bureau has always tried to balance the demands of the country for information about its economy and its people with the desire to protect privacy and limit the burden on respondents. Keeping the ACS to a manageable length helps improve the data quality by increasing survey response rates as well as item response.

When determining whether to add to the ACS, the Census Bureau and the Department of Commerce (the Department) assess the need for the proposed new content. Specifically, the Census Bureau and the Department classify proposed new content as: (1) "mandatory"— the content is required by law to come from the ACS or the decennial census, (2) "required"— the content is required by law or by a decision of a federal court, though the information need not come from the ACS or the decennial census specifically, or (3) "programmatic"—the content has no explicit mandate or requirement but is sought for program planning, implementation, or evaluation.

In order to better achieve the balance between the need for information with the need to reduce the burden on respondents to provide that information, the Census Bureau has prioritized mandatory and required content. Programmatic content—which may be useful but by definition is not required—faces a higher threshold to be deemed sufficiently essential to outweigh the additional burden placed on respondents by a longer survey and the associated likelihood for lower response rates and reduced data quality.

In addition, an interagency review panel, headed by OMB and the Census Bureau, evaluates proposed new questions.[1] According to the charter for a subcommittee of the interagency review panel, if the Chief Statistician of the United States and the Director of the Census Bureau approve a proposed question to be added to the decennial census or ACS, the proposed question undergoes extensive cognitive and field testing to ensure it results in the proper data being collected without imposing too high of a burden on respondents. After successful testing, the Census Bureau formally submits a request for OMB approval.

To comply with the Paperwork Reduction Act and its implementing regulations, when adding new content to any survey or census, the Census Bureau publishes a *Federal Register* notice,

---

[1] For more information on the interagency review, please see the enclosed Charter of the Interagency Council on Statistical Policy Subcommittee on the American Community Survey, also available at https://www2.census.gov/programs-surveys/acs/operations_admin/ICSP_Charter.pdf.

which (1) informs the public of an intent to ask OMB for clearance for the collection of information and (2) solicits comments for a 60-day period.  The Census Bureau then responds to comments, makes any needed revisions, and prepares an Information Collection Request (ICR) to OMB describing the information the Census Bureau would collect, why it is needed, how it will be collected, and how much it will cost the respondents and the government to collect the information.  Concurrently with preparation of the ICR, the Census Bureau prepares a second *Federal Register* notice to notify the public that the clearance request will be submitted to OMB and to provide the public with a 30-day opportunity to comment on the final design.  After the 30-day comment period has elapsed, OMB has 30 days to review the ICR and public comments and decide whether to authorize the ICR, including the proposed change.

As was the case with the long form, other federal agencies also play a part in the process of determining the ACS content.  While the Secretary of Commerce has significant discretion in determining the form and content of the Census Bureau's surveys pursuant to Title 13 of the U.S. Code, the Secretary and the Director of the Census Bureau have generally sought input on the content of the decennial census and ACS from other agencies when considering adding or removing content.  For example, in 2014, the Census Bureau undertook one of its periodic content reviews to determine whether the burden of questions outweighed their benefits and sent letters to other federal agencies asking for submissions to justify existing data uses for content on the ACS.  The Census Bureau analyzed these submissions, considering factors such as federal agency uses for the data and alternative data sources.  The Census Bureau also looked at the time to respond to the question and complaints received about the question.  As a result of this process and following notice and comment in the *Federal Register* (80 FR 30655, May 29, 2015), two questions—one concerning a business or medical office on the property and the other about flush toilets—were removed from the ACS in 2016.

With respect to the content of the ACS for the Decennial Census Program (considered in conjunction with the 2020 Census content), in the spring of 2016 the Census Bureau sent to other agencies the information they provided for the 2014 content review and asked the agencies to confirm that they still had authority for the questions and still needed the information.  The Census Bureau also invited agencies to propose any new questions to be included on the ACS.  Federal agencies then evaluated their data needs and proposed additions or changes to current questions in the summer (June and July) of 2016.  To propose new content, the agencies had to identify the statute creating the need for the data and specify the frequency and geographic precision needed, as well as any other sources of the data.

**From:** Ron.S.Jarmin@census.gov
**Sent:** Wed 2/14/2018 3:40:51 PM
**Importance:** Normal
**Subject:** Re: Question
**Received:** Wed 2/14/2018 3:40:52 PM

Good suggestions

Sent from my iPhone

On Feb 14, 2018, at 10:16 AM, Christa Jones < ███████████ > wrote:

> Yes. Fascinating. (I would still think they really should know that AEI would not look favorably at the proposal—AEI is important to other administration priorities.). People in favor are Mark Krikorian and Steve Camorrota. There is also likely someone at Heritage. I can check.
>
>
> Sent from my iPhone
>
> On Feb 14, 2018, at 9:26 AM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:
>
>
>> Fascinating....
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** "Ron S Jarmin (CENSUS/ADEP FED)" <Ron.S.Jarmin@census.gov>
>>> **Date:** February 13, 2018 at 3:46:46 PM EST
>>> **To:** "Michael R. Strain" < ███████████ AEI.org>
>>> **Subject:** Re: Question
>>>
>>>
>>> Thanks Michael. We are trying to find someone who can give a professional expression of support for the proposal in contrast to the many folks we can find to give professional statements against the proposal. Interesting, but perhaps not so surprising, that no one at AEI is willing to do that.
>>>
>>>
>>>
>>> Thanks for your help.

0008325

**Ron Jarmin, PhD.**

Associate Director for Economic Programs, and

Performing the Non-Exclusive Functions and Duties of the Director

U.S. Census Bureau

Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov Connect with us on Social Media

---

**From:** Michael R. Strain <███████████@AEI.org>
**Sent:** Tuesday, February 13, 2018 3:31:38 PM
**To:** Ron S Jarmin (CENSUS/ADEP FED)
**Subject:** RE: Question

Hi Ron,

Great to hear from you. I hope you are well.

None of my colleagues at AEI would speak favorably about the proposal. Is it important that the person actually be in favor of the proposal?

All the best,

Michael

**From:** Ron S Jarmin (CENSUS/ADEP FED) [mailto:Ron.S.Jarmin@census.gov]
**Sent:** Tuesday, February 13, 2018 1:48 PM
**To:** Michael R. Strain <█████████@AEI.org>
**Subject:** Question

Hi Michael,

Hope all is well.  We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders.  Most stakeholders will speak against the proposal.  We're looking to find someone thoughtful who can speak to the pros of adding such a question or perhaps addressing the fundamental data need some other way (e.g., admin records).

Do you know of anyone at AEI, or elsewhere, that could do this sometime over the next couple weeks?

Thanks

**Ron Jarmin, PhD.**

Associate Director for Economic Programs, and

Performing the Non-Exclusive Functions and Duties of the Director

U.S. Census Bureau

Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov  Connect with us on Social Media



UNITED STATES DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. Census Bureau
Washington, DC 20233-0001

March 1, 2018

MEMORANDUM FOR:          Wilbur L. Ross, Jr.
                         Secretary of Commerce

Through:                 Karen Dunn Kelley
                         Performing the Non-Exclusive Functions and Duties of the Deputy
                         Secretary

                         Ron S. Jarmin
                         Performing the Non-Exclusive Functions and Duties of the Director

                         Enrique Lamas
                         Performing the Non-Exclusive Functions and Duties of the Deputy
                         Director

From:                    John M. Abowd
                         Chief Scientist and Associate Director for Research and Methodology

Subject:                 Preliminary analysis of Alternative D (Combined Alternatives B and C)

See attached.

Approved: _____  Date: _____
                 John M. Abowd, Chief Scientist
                 and Associate Director for Research and Methodology



### Preliminary Analysis of Alternative D

At the Secretary's request we performed a preliminary analysis of combining Alternative B (asking the citizenship question of every household on the 2020 Census) and Alternative C (do not ask the question, link reliable administrative data on citizenship status instead) in the January 19, 2018 draft memo to the Department of Commerce into a new Alternative D. Here we discuss Alternative D, the weaknesses in Alternative C on its own, whether and how survey data could address these weaknesses, implications of including a citizenship question for using administrative data, and methodological challenges.

*Description of Alternative D:* Administrative data from the Social Security Administration (SSA), Internal Revenue Service (IRS), U.S. Citizenship and Immigration Services (USCIS), and the State Department would be used to create a comprehensive statistical reference list of current U.S. citizens. Nevertheless, there will be some persons for whom no administrative data are available. To obtain citizenship information for this sub-population, a citizenship question would be added to the 2020 Census questionnaire. The combined administrative record and 2020 Census data would be used to produce baseline citizenship statistics by 2021. Any U.S. citizens appearing in administrative data after the version created for the 2020 Census would be added to the comprehensive statistical reference list. There would be no plan to include a citizenship question on future Decennial Censuses or American Community Surveys. The comprehensive statistical reference list, built from administrative records and augmented by the 2020 Census answers would be used instead. The comprehensive statistical reference list would be kept current, gradually replacing almost all respondent-provided data with verified citizenship status data.

*What are the weaknesses in Alternative C?*

In the 2017 Numident (the latest available), 6.6 million persons born outside the U.S. have blank citizenship among those born in 1920 or later with no year of death. The evidence suggests that citizenship is not missing at random. Of those with missing citizenship in the Numident, a much higher share appears to be U.S. citizens than compared to those for whom citizenship data are not missing. Nevertheless, some of the blanks may be noncitizens, and it would thus be useful to have other sources for them.

A second question about the Numident citizenship variable is how complete and timely its updates are for naturalizations. Naturalized citizens are instructed to immediately apply for a new SSN card. Those who wish to work have an incentive to do so quickly, since having an SSN card with U.S. citizenship will make it easier to pass the E-Verify process when applying for a job, and it will make them eligible for government programs. But we do not know what fraction of naturalized citizens actually notify the SSA, and how soon after being naturalized they do so.

A third potential weakness of Numident citizenship is that some people are not required to have a Social Security Number (SSN), whether they are a U.S. citizen or not. It would also be useful to have a data source on citizenship that did not depend on the SSN application and tracking process inside SSA. This is why we proposed the MOU with the USCIS for naturalizations, and why we have now begun pursuing an MOU with the State Department for data on all citizens with passports.

IRS Individual Taxpayer Identification Numbers (ITIN) partially fill the gap in Numident coverage of noncitizen U.S. residents. However, not all noncitizen residents without SSNs apply for ITINs. Only those making IRS tax filings apply for ITINs. Once again, it would be useful to have a data source that did not depend on the ITIN process. The USCIS and State Department MOUs would provide an alternative source in this context as well.

U.S. Citizenship and Immigration Services (USCIS) data on naturalizations, lawful permanent residents, and I-539 non-immigrant visa extensions can partially address the weaknesses of the Numident. The USCIS data provide up-to-date information since 2001 (and possibly back to 1988, but with incomplete records prior to 2001). This will fill gaps for naturalized citizens, lawful permanent residents, and persons with extended visa applications without SSNs, as well as naturalized citizens who did not inform SSA about their naturalization. The data do not cover naturalizations occurring before 1988, as well as not covering and some between 1988-2000. USCIS data do not always cover children under 18 at the time a parent became a naturalized U.S. citizen. Such children automatically become U.S. citizens under the Child Citizenship Act of 2000. The USCIS receives notification of some, but not all, of these child naturalizations. Others inform the U.S. government of their U.S. citizenship status by applying for U.S. passports, which are less expensive than the application to notify the USCIS. USCIS visa applications list people's children, but those data may not be in electronic form.

U.S. passport data, available from the State Department, can help plug the gaps for child naturalizations, blanks on the Numident, and out-of-date citizenship information on the Numident for persons naturalized prior to 2001. Since U.S. citizens are not required to have a passport, however, these data will also have gaps in coverage.

Remaining citizenship data gaps in Alternative C include the following categories:

1.      U.S. citizens from birth with no SSN or U.S. passport. They will not be processed by the production record linkage system used for the 2020 Census because their personally identifiable information won't find a matching Protected Identification Key (PIK) in the Person Validation System (PVS).

2.      U.S. citizens from birth born outside the U.S., who do not have a U.S. passport, and either applied for an SSN prior to 1974 and were 18 or older, or applied before the age of 18 prior to 1978. These people will be found in PVS, but none of the administrative sources discussed above will reliably generate a U.S. citizenship variable.

3.      U.S. citizens who were naturalized prior to 2001 and did not inform SSA of their naturalization because they originally applied for an SSN after they were naturalized, and it was prior to when citizenship verification was required for those born outside the U.S. (1974). These people already had an SSN when they were naturalized and they didn't inform SSA about the naturalization, or they didn't apply for an SSN. The former group have inaccurate data on the Numident. The latter group will not be found in PVS.

4.      U.S. citizens who were automatically naturalized if they were under the age of 18 when their parents became naturalized in 2000 or later, and did not inform USCIS or receive a U.S. passport. Note that such persons would not be able to get an SSN with U.S. citizenship on the card without either a U.S. passport or a certificate from USCIS. These people will also not be found in the PVS.

5.      Lawful permanent residents (LPR) who received that status prior to 2001 and either do not have an SSN or applied for an SSN prior to when citizenship verification was required for those born outside the U.S. (1974). The former group will not be found in PVS. The latter group has inaccurate data in Numident.

6.      Noncitizen, non-LPR, residents who do not have an SSN or ITIN and who did not apply for a visa extension. These persons will not be found in PVS.

7.      Persons with citizenship information in administrative data, but the administrative and decennial census data cannot be linked due to missing or discrepant PII.

*Can survey data address the gaps in Alternative C?*

One might think that survey data could help fill the above gaps, either when their person record is not linked in the PVS, and thus they have no PIK, or when they have a PIK but the administrative data lack up-to-date citizenship information. Persons in Category 6, however, have a strong incentive to provide an incorrect answer, if they answer at all. A significant, but unknown, fraction of persons without PIKs are in Category 6. Distinguishing these people from the other categories of persons without PIKs is an inexact science because there is no feasible method of independently verifying their non-citizen status. Our comparison of ACS and Numident citizenship data suggests that a large fraction of LPRs provide incorrect survey responses. This suggests that survey-collected citizenship data may not be reliable for many of the people falling in the gaps in administrative data. This calls into question their ability to improve upon Alternative C.

With Alternative C, and no direct survey response, the Census Bureau's edit and imputation procedures would make an allocation based primarily on the high-quality administrative data. In the presence of a survey response, but without any linked administrative data for that person, the edit would only be triggered by blank citizenship. A survey response of "citizen" would be accepted as valid. There is no scientifically defensible method for rejecting a survey response in the absence of alternative data for that respondent.

How might inclusion of a citizenship question on the questionnaire affect the measurement of citizenship with administrative data? Absent an in-house administrative data census, measuring citizenship with administrative data requires that persons in the Decennial Census be linked to the administrative data at the person level. The PVS system engineered into the 2020 Census does this using a very reliable technology. However, inclusion of a citizenship question on the 2020 Census questionnaire is very likely to reduce the self-response rate, pushing more households into Nonresponse Followup (NRFU). Not only will this likely lead to more incorrect enumerations, but it is also expected to increase the number of persons who cannot be linked to the administrative data because the NRFU PII is lower quality than the self-response data. In the 2010 Decennial Census, the percentage of NRFU persons who could be linked to administrative data rate was 81.6 percent, compared to 96.7 percent for mail responses. Those refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well, resulting in a proxy response. The NRFU linkage rates were far lower for proxy responses than self-responses (33.8 percent vs. 93.0 percent, respectively).

Although persons in Category 6 will not be linked regardless of response mode, it is common for households to include persons with a variety of citizenship statuses. If the whole household does not self-

respond to protect the members in Category 6, the record linkage problem will be further aggravated. Thus, not only are citizenship survey data of suspect quality for persons in the gaps for Alternative C, collecting these survey data would reduce the quality of the administrative records when used in Alternative D by lowering the record linkage rate for persons with administrative citizenship data.

*What methodological challenges are involved when combining these sources?*

Using the 2020 Census data only to fill in gaps for persons without administrative data on citizenship would raise questions about why 100 percent of respondents are being burdened by a citizenship question to obtain information for the two percent of respondents where it is missing.

Including a citizenship question in the 2020 Census does not solve the problem of incomplete person linkages when producing citizenship statistics after 2020. Both the 2020 decennial record and the record with the person's future location would need to be found in PVS to be used for future statistics.

In sum, Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce.

0009817

**Summary Analysis of the Key Differences Between Alternative C and Alternative D**

This short note describes the Census Bureau's current assumptions about two alternatives to address the need for block level data on citizen voting age populations. The goal is to measure the citizenship status of all people enumerated in the 2020 Decennial Census. Both alternatives utilize administrative data on the citizenship status of individuals, however one option, Alternative D, proposes to also include the current American Community Survey (ACS) question on citizenship status on the 2020 Decennial Census short form.

In both alternatives described here, the methodology requires linking 2020 census response data and administrative records. However, as illustrated both alternatives would also need to assign/impute citizenship for a portion of the population. The Census Bureau will have to assign citizenship in cases of questionnaire non-response and item non-response. Additionally, it is important to note, that even when a self-response is available it is not always possible to link response data with administrative records data. Poor data quality (e.g., name and age) and nonresponse or incomplete 2020 Census responses mean that we will not have a direct measure of citizenship status for all residents enumerated in 2020. The Census Bureau will to need employ an imputation model for these cases.

One of the key differences between to the two alternatives described below is the number of cases requiring imputation. The other key difference is the impact of errors in the citizenship status reported on the 2020 Census.

In the most recent version of the 2020 Decennial Life Cycle Cost Estimate, the Census Bureau projects counting 330 million residents in 2020. Figure 1 summarizes how citizenship status will be measured under Alternative C that does not employ a citizenship question on the 2020 Census. Figure 2 summarizes how this will be done using both administrative records and a 2020 citizenship question under Alternative D.

Alternative C is a simplified process for assigning citizenship through direct linkage and modelling, without including the question on the 2020 Census. The Census Bureau will link the responses for the 330 million census records to administrative records that contain information on the citizenship status of individuals. The Census Bureau expects to successfully link and observe this status for approximately 295 million people. The Census Bureau would need to impute this status for approximately 35 million people under Alternative C whose 2020 responses cannot be linked to administrative data. Although the Census Bureau has fully developed and tested the imputation model, it has high confidence that an accurate model can be developed and deployed for this purpose. Further, we will most likely never possess a fully adequate truth deck to benchmark it to.

Measuring citizenship status is slightly more complex under Alternative D where all U.S. households will be given the opportunity to provide the citizenship status of each household member. Based on response data for the ACS citizenship and other response data research, we know that not all households that respond to the 2020 Census will answer this question, leaving the question blank or with otherwise invalid responses. Additionally, Alternative D, must also account for those households that do not respond at all or will have proxy responses. Due to these reasons, we estimate that we will get 2020 citizenship status responses for approximately 294.6 million people, a slightly higher estimate

0009818

than Alternative C. For the 35.4 million people without a 2020 citizenship response, the Census Bureau will employ the same methodology as in Alternative C, linking the 2020 Census responses to the administrative records. The Census Bureau estimates that it will be able to link these cases to administrative records where we observe citizenship status for approximately 21.5 million people. For the remaining 13.8 million will be imputed through a model as described above. Thus, there will be a need for imputing many cases across either alternative.

The Census Bureau will link the 294.6 million records from the 2020 Census with the administrative records. This will be done both for potential quality assurance purposes and to improve the quality of future modeling uses. Based on the current research from the ACS, the Census Bureau expects to successfully link approximately 272.5 million of these cases. Of these, 263 million will have citizenship statuses that agree across the 2020 response and administrative record. The Census Bureau estimates there will be 9.5 million cases where there is disagreement across the two sources. Historic Census Bureau practice is to use self-reported data in these situations. However, the Census Bureau now knows from linking ACS responses on citizenship to administrative data that nearly one third of noncitizens in the administrative data respond to the questionnaire indicating they are citizens, indicating that this practice should be revisited in the case of measuring citizenship. Finally, for those 22.2 million cases that do not link to administrative records (non-linkage occurs for the same data quality reasons discussed above), the Census Bureau will use the observed 2020 responses. Again, Census Bureau expect some quality issues with these responses. Namely, the Census Bureau estimates that just under 500 thousand noncitizens will respond as citizens.

The relative quality of Alternative C versus Alternative D will depend on the relative importance of the errors in administrative data, response data, and imputations. To be slightly more but not fully precise consider the following description of errors under both alternatives. First note that all possible measurement methods will have errors. Under Alternative C, there will be error in the administrative records, but we believe these to be relatively limited dues to the procedure following by SSA, USCIS and State. In both Alternative, the modeled cases will be subject to prediction error. Prediction error occur when the model returns the incorrect status of a case. As there are more models cases in Alternative C, prediction error will be a bigger issue there. Alternative D has an additional source or error, response error. This is where 2020 respondent give the incorrect status. Statisticians often hope these error are random and cancel out. However, we know from prior research that citizenship status responses are systematically biased for a subset of noncitizens. Response error is only an issue in alternative D. Unfortunately, the Census Bureau cannot quantify the relative magnitude of the errors across the alternatives  at this time.

Figure 1





0009820

Figure 2



## Questions on the Jan 19 Draft Census Memo on the DoJ Citizenship Question Reinstatement Request

1. **With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?**

   Since the collection of this data, whether from administrative records or from an enumerated question, occurs prior to the creation of the Microdata Detail File (MDF) from which all tabulations will be performed, there is no difference in the timing of when the data collected under either alternative B or C could be made available to the public. The exact date for completion of the MDF is still being determined as the 2020 Census schedule is matured.  However, the 2020 Census is working towards publishing the first post-apportionment tabulation data products as early as the first week of February 2021.

2. **What is the "2020 Census publication phase" (page 1 of the Detailed Analysis for Alternative B) versus Alternative C?  Would there be any difference?**

   The 2020 Census publication phase is a broad window stretching from the release of the apportionment counts by December 31, 2020 through the last data product or report published in FY 2023, the final year of decennial funding for the 2020 Census. However, as stated in the answer to question 1, these data could be made available to the public on the same schedule as any other post-apportionment tabulated data product regardless of whether alternative B or C is used in its collection.

3. **What is the non-response rate for: (A) each question on the 2000 and 2010 Decennial Census short form and (B) each question on the 2010 ACS and most recent ACS?**

   The table below shows the item non-response (INR) rate for each question on the 2000 and 2010 Decennial Census short form.  This is the percentage of respondents who did not provide an answer to an item.

Item Nonresponse Rates for 2000 and 2010 Short Form Person Questions

|      | Relationship | Sex | Age | Hispanic Origin | Race | Tenure |
|------|--------------|-----|-----|-----------------|------|--------|
| 2010 | 1.5          | 1.5 | 3.5 | 3.9             | 3.3  | 4.5    |
| 2000 | 1.3          | 1.1 | 3.7 | 3.1             | 2.9  | 4.1    |

Source:  Rothhaas, Lestina and Hill (2012) Tables

Notes and Soucre:
Rothhaas, C., Lestina, F. and Hill, J. (2012) "2010 Decennial Census Item Nonresponse and Imputation Assessment Report"  2010 Census Program for Evaluations and Experiments, January 24, 2012.

0009822

From report:

The INR rate is essentially the proportion of missing responses before pre-editing or imputation procedures for a given item (i.e., the respondent did not provide an answer to the item). For INR, missing values are included in the rates, but inconsistent responses (i.e., incompatible with other responses) are considered non-missing responses.

Online link to 2010 report that has 2000 information as well.
https://www.census.gov/2010census/pdf/2010_Census_INR_Imputation_Assessment.pdf

See attached spreadsheet for the item allocation rates by questions for the ACS for 2010, 2013, and 2016.

4. **What was the total survey response rate (i.e., percentage of complete questionnaires) for the 2000 long form and the 2000 short form?   Of the incomplete long forms, what percentage left the citizenship question blank?  Of the completed long forms, what percentage (if known) contained incorrect responses to the citizenship question?**

We do not have measures of total survey response rates from the 2000 long form and 2000 short form available at this time.  The mail response rate in 2000 was 66.4 percent for short forms and 53.9 percent for long forms.  No analysis that we were aware of was conducted on the incomplete long forms that left the citizenship question blank.  The Census 2000 Content Reinterview Survey showed low inconsistency of the responses to the citizenship question.  Only 1.8 percent of the respondents changed answers in the reinterview.

Source for 2000 mail response rates:
https://www.census.gov/pred/www/rpts/A.7.a.pdf

Source for 2000 Content Reinterview Survey.  Page 32 source.
https://www.census.gov/pred/www/rpts/B.5FR_RI.PDF

5. **For the 2000 long and short forms, what was the percentage unanswered (left blank) for each question (i.e., what percentage of the responses for each question (sex, race, ethnicity, income, citizenship, etc.) were left blank)?**

For the 2000 shortform, the table in question 3a provides the percentage unanswered for each question.

For the 2000 longform, Griffin, Love and Obenski (2003) summarized the Census 2000 longform responses.  Allocation rates for individual items in Census 2000 were computed, but because of the magnitude of these data, summary allocation measures were derived.

2

0009823

These rates summarize completeness across all data items for occupied units (households) and are the ratio of all population and housing items that had values allocated to the total number of population and housing items required to have a response. These composite measures provide a summary picture of the completeness of all data. Fifty-four population items and 29 housing items are included in these summary measures. The analysis showed that 9.9 percent of the population question items and 12.5 percent of the housing unit question items required allocation. Allocation involves using statistical procedures, such as within-household or nearest neighbor matrices, to impute missing values.

https://ww2.amstat.org/sections/srms/Proceedings/y2003/Files/JSM2003-000596.pdf

6. **What was the incorrect response rate for the citizenship question that was asked on the Long Form during the 2000 Decennial Census? Does the response rate on the 2000 Long Form differ from the incorrect response rate on the citizenship question for the ACS?**

In the 2000 long form, 2.3 percent of persons have inconsistent answers, 89.4 percent have consistent answers, and 8.2 percent have missing citizenship data in the SSA Numident and/or the 2000 long form. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2000 long form, 2.6 percent have inconsistent answers and 97.4 percent have consistent answers.

In the 2010 ACS, 3.1 percent of persons have inconsistent answers, 86.0 percent have consistent answers, and 10.8 percent have missing citizenship data in the SSA Numident and/or the 2010 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2010 ACS, 3.6 percent have inconsistent answers and 96.4 percent have consistent answers.

In the 2016 ACS, 2.9 percent of persons have inconsistent answers, 81.2 percent have consistent answers, and 15.9 percent have missing citizenship data in the SSA Numident and/or the 2016 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2016 ACS, 3.5 percent have inconsistent answers and 96.5 percent have consistent answers.

These ACS and 2000 Census long form rates are based on weighted data.

This shows that inconsistent response rates are higher in the 2010 and 2016 ACS than in the 2000 long form.

7. **What is the incorrect response rate on other Decennial or ACS questions for which Census has administrative records available (for example, age, sex or income)?**

Table 7a shows the agreement rates between the 2010 Census response and the SSA Numident for persons who could be linked and had nonmissing values, and Table 7b shows

3

the agreement rates between the 2010 ACS and the SSA Numident. Gender has low disagreement (0.4-0.5 percent), and white alone (0.9 percent), black alone (1.7-2 percent), and age (2.1 percent) also have low disagreement rates. Disagreement rates are greater for other races (e.g., 46.4-48.6 percent for American Indian or Alaska Native alone). Hispanic origin is not well measured in the Numident, because it contains a single race response, one of which is Hispanic.

Table 7a. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 Census Response | Percent Agreement with SSA Numident |
| --- | --- |
| Hispanic | 54.2 |
| Not Hispanic | 99.7 |
| White Alone | 99.1 |
| Black Alone | 98.3 |
| American Indian or Alaska Native Alone | 51.4 |
| Asian Alone | 84.3 |
| Native Hawaiian or Other Pacific Islander Alone | 74.4 |
| Some Other Race Alone | 17.7 |
| Age | 97.9 |
| Gender | 99.4 |

Source: Rastogi, Sonya, and Amy O'Hara, 2012, "2010 Census Match Study," 2010 Census Planning Memoranda Series No. 247.

Table 7b. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 ACS Response | Percent Agreement with SSA Numident |
| --- | --- |
| White Alone | 99.1 |
| Black Alone | 98.0 |
| American Indian or Alaska Native Alone | 53.6 |
| Asian Alone | 82.9 |
| Native Hawaiian or Other Pacific Islander Alone | 72.9 |
| Some Other Race Alone | 17.2 |
| Age 0-2 Date of Birth | 95.2 |
| Age 3-17 Date of Birth | 95.6 |
| Age 18-24 Date of Birth | 95.2 |
| Age 25-44 Date of Birth | 95.8 |
| Age 45-64 Date of Birth | 95.9 |
| Age 65-74 Date of Birth | 96.5 |
| Age 75 and older Date of Birth | 92.7 |
| Male | 99.5 |
| Female | 99.5 |

0009825

Source: Bhaskar, Renuka, Adela Luque, Sonya Rastogi, and James Noon, 2014, "Coverage and Agreement of Administrative Records and 2010 American Community Survey Demographic Data," CARRA Working Paper #2014-14.

Abowd and Stinson (2013) find correlations of 0.75-0.89 between Survey of Income and Program Participation (SIPP) and SSA Detailed Earnings Record annual earnings between 1990-1999.[1]

8.  **How does the Census presently handle responses on the (A) Decennial Census and (B) the ACS when administrative records available to the Census confirm that the response on the Decennial Census or ACS is incorrect? Is the present Census approach to incorrect responses based on practice/policy or law (statute or regulation)?**

    We have always based the short form Decennial Census and the ACS on self-response, and while we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaire. This is a long established practice at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census. Title 13 of the U.S. Code allows the Census Bureau to use alternative data sources, like administrative records, for a variety of purposes, and we are using data in new ways in the 2020 Census. While this includes the use of administrative records data to fill in areas where a respondent does not provide an answer, we have not explored the possibility of checking or changing responses that a responding household has provided in response to the questionnaire.

9.  **Please explain the differences between the self-response rate analysis and the breakoff rate analysis. The range of breakoff rates between groups was far smaller than the range of self-response rates between groups.**

    Self-response means that a household responded to the survey by mailing back a questionnaire or by internet, and a sufficient number of core questions were answered so that an additional field interview was not required.

    A breakoff occurs when an internet respondent stops answering questions prior to the end of the questionnaire. In most cases the respondent answers the core questions before breaking off, and additional fieldwork is not required. The breakoff rates are calculated separately by which question screen was the last one reached before the respondent stopped answering altogether.

    The share of Hispanic respondents who broke off at some point before the end of the questionnaire (17.6 percent) is much higher than for non-Hispanic whites (9.5 percent).

---

[1] Abowd, John M., and Martha H. Stinson, 2013, "Estimating Measurement Error in Annual Job Earnings: A Comparison of Survey and Administrative Data," Review of Economics and Statistics, Vol. 95(55). pp. 1451-1467.

0009826

Spreading the overall breakoff rates over 134 screens in the questionnaire works out to quite small rates per screen. It works out to an average breakoff rate of 0.131 percent per screen for Hispanics and 0.066 percent for non-Hispanic whites.

10. **The NRFU numbers are comparatively small – approximately one additional household for NRFU per Census enumerator. Is this really a significant source of concern?**

Yes, this is a significant concern. First, it gives rise to incremental NRFU cost of at least $27.5 million. This is a lower bound becaues it assumes the households that do not self-respond because we added a question on citizenship have the same follow-up costs as an average U.S. household. They won't because these households overwhelmingly contain at least one noncitzen, and that is one of our acknowledged hard-to-count subpopulations.

11. **Given that the breakoff rate difference was approximately 1 percent, why did Census choose to use the 5.1 percent number for assessing the cost of Alternative B?**

If a household breaks off an internet response at the citizenship, place of birth, or year of entry screens, this means it would have already responded to the core questions. This would not trigger follow-up fieldwork and thus would not involve additional fieldwork costs. In contrast, if a household does not mail back a questionnaire or give an internet response, fieldwork will be necessary and additional costs will be incurred. Thus, the 5.1 percent number for differential self-response is more appropriate for estimating the additional fieldwork cost of adding a citizenship question.

12. **Alternative C states that Census would use administrative data from the Social Security Administration, Internal Revenue Service, and "other federal and state sources." What are the other sources?**

In addition to continuing the acquisition of the Social Security Administration and Internal Revenue Service data, the Census Bureau is in discussion with the U.S. Citizen and Immigration Services (USCIS) staff to acquire additional citizenship data.

13. **Is Census confident that administrative data will be able to be used to determine citizenship for all persons (e.g., not all citizens have social security numbers)?**

We are confident that Alternative C is viable and that we have already ingested enough high-quality citizenship administrative data from SSA and IRS. The USCIS data are not required. They would, however, make the citizenship voting age tabulations better, but the administrative data we've got are very good and better than the data from the 2000 Census and current ACS. The type of activities required for Alternative C already occur daily and routinely at the Census Bureau. We have been doing this for business data products,

0009827

including the Economic Censuses, for decades.  We designed the 2020 Census to use this technology too.

14. **For Alternative C, the memo says, "we assume the availability of these record linkage systems and associated administrative data" – does Census already have in place access to this data or would this need to be negotiated?  If negotiated, for which data sets specifically?**

The Census Bureau has longstanding contractual relationships with the Social Security Administration and the Internal Revenue Service that authorize the use of data for this project.  For new data acquired for this project (i.e., USCIS) we would estimate a six-month development period to put a data acquisition agreement in place.   That agreement would also include terms specifying the authorized use of data for this project.

15. **Are there any privacy issues / sensitive information prohibitions that might prevent other agencies from providing such data?**

There are no new privacy or sensitivity issues associated with other agencies providing citizenship data. We have received such information in the past from USCIS. We are currently authorized to receive and use the data from SSA and IRS that are discussed in Alternative C.

16. **How long would Census expect any negotiation for access to data take?  How likely is it that negotiations would be successful?  Are MOA's needed/required?**

Current data available to the Census Bureau provide the quality and authority to use that are required to support this project.   Additional information potentially available from USCIS would serve to supplement/validate those existing data.   We are in early discussions with USCIS to develop a data acquisition agreement and at this time have no indications that this acquisition would not be successful.

17. **What limitations would exist in working with other agencies like IRS, Homeland Security, etc. to share data?**

The context for sharing of data for this project is for a one-way sharing of data from these agencies to the Census Bureau.  Secure file transfer protocols are in-place to ingest these data into our Title 13 protected systems.  For those data already in-place at the Census Bureau to support this project, provisions for sharing included in the interagency agreement restrict the Census Bureau from sharing person-level microdata outside the Census Bureau's Title 13 protections.  Aggregates that have been processed through the Bureau's disclosure avoidance procedures can be released for public use.

7

0009828

18. If Alternative C is selected, what is Census's backup plan if the administrative data cannot be completely collected and utilized as proposed?

The backup plan is to use all of the administrative data that we currently have, which is the same set that the analyses of Alternative C used. We have verified that this use is consistent with the existing MOUs. We would then use estimation and modeling techniques similar to those used for the Small Area Income and Poverty Estimates (SAIPE) to impute missing citizenship status for those persons for whom we do not have administrative records. These models would also include estimates of naturalizations that occurred since the administrative data were ingested.

19. Does Census have any reason to believe that access to existing data sets would be curtailed if Alternative C is pursued?

No we do not believe that any access to existing data sets would be curtailed if we pursue Alternative C.

20. Has the proposed Alternative C approach ever been tried before on other data collection projects, or is this an experimental approach? If this has been done before, what was the result and what were lessons learned?

The approach in Alternative C has been routinely used in processing the economic censuses for several decades. The Bureau's Business Register was specifically redesigned for the 2002 Economic Census in order to enhance the ingestion and use of administrative records from the IRS and other sources. The data in these administrative records are used to substitute for direct responses in the economic censuses for the unsampled entities. They are also used as part of the review, edit, and imputation systems for economic censuses and surveys. On the household side, the approach in Alternative C was used extensively to build the residential characteristics for OnTheMap and OnTheMap for Emergency Management.

21. Is using sample data and administrative records sufficient for DOJ's request?

The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C.

22. Under Alternative C, if Census is able to secure interagency agreements to provide needed data sets, do we know how long it would take to receive the data transmission from other agencies and the length of time to integrate all that data, or is that unknown?

With the exception of the USCIS data, the data used for this project are already integrated into the 2020 Census production schema. In mid-to late 2018, we plan to acquire the USCIS data and with those data and our existing data begin to develop models and business rules to select citizenship status from the composite of sources and attach that characteristic to

8

each U.S. person. We expect the development and refinement of this process to continue into 2019 and to be completed by third quarter calendar year 2019.

23. **Cross referencing Census decennial responses with numerous governmental data sets stored in various databases with differing formats and storage qualities sounds like it could be complicated. Does Census have an algorithm in place to efficiently combine and cross reference such large quantities of data coming from many different sources? What cost is associated with Alternative C, and what technology/plan does Census have in place to execute?**

Yes, the 2018 Census End-to-End test will be implementing processing steps to be able to match Census responses to administrative record information from numerous governmental data sets. The Census Bureau has in place the Person Identification Validation System to assign Protected Identification Keys to 2020 Census responses. The required technology for linking in the administrative records is therefore part of the 2020 Census technology. This incremental cost factored into the estimate for Alternative C is for integrating the citizenship variable specifically, since that variable is not currently part of the 2020 Census design. No changes are required to the production Person Identification Validation system to integrate the administrative citizenship data.

24. **For section C-1 of the memo, when did Census do the analyses of the incorrect response rates for non-citizen answers to the long form and ACS citizenship question? Were any of the analyses published?**

The comparisons of ACS, 2000 Decennial Census longform and SSA Numident citizenship were conducted in January 2018. This analysis has not been published.

25. **Has Census corrected the incorrect responses it found when examining non-citizen responses? If not, why not?**

In the American Community Survey (ACS), and the short form Decennial Census, we do not change self-reported answers. The Decennial Census and the ACS are based on self-response and we accept the responses provided by households as they are given. While we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaires. This is a long established process at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.

26. **Has the Department of Justice ever been made aware of inaccurate reporting of ACS data on citizenship, so that they may take this into consideration when using the data?**

0009830

Not exactly.  The Census Bureau is in close, regular contact with the Department of Justice (DOJ) regarding their data requirements.  Our counterparts at DOJ have a solid understanding of survey methodology and the quality of survey data, and they are aware of the public documentation on sampling and accuracy surrounding the ACS.  However, the specific rate of accuracy regarding responses to the ACS question on citizenship has never been discussed.

### 27. Why has the number of persons who cannot be linked increased from 2010 to 2016?

The linkage between the ACS and administrative data from the SSA Numident and IRS ITIN tax filings depends on two factors: (a) the quality of the personally identifiable information (PII) on the ACS response and (b) whether the ACS respondent is in the SSN/ITIN universe.

With respect to the quality of the PII on the ACS, there may be insufficient information on the ACS due to item nonresponse or proxy response for the person to allow a successful match using the production record linkage system. There may also be more than one record in the Numident or ITIN IRS tax filings that matches the person's PII. Finally, there may be a discrepancy between the PII provided to the ACS and the PII in the administrative records.

Alternatively, the person may not be in the Numident or ITIN IRS tax filing databases because they are out of the universe for those administrative systems. This happens when the person is a citizen without an SSN, or when the person is a noncitizen who has not obtained an SSN or ITIN.

Very few of the unlinked cases are due to insufficient PII in the ACS or multiple matches with administrative records. The vast majority of unlinked ACS persons have sufficient PII, but fail to match any administrative records sufficiently closely. This means that most of the nonmatches are because the ACS respondent is not in the administrative record universe.

The incidence of ACS persons with sufficient PII but no match with administrative records increased between 2010 and 2016. One contributing factor is that the number of persons linked to ITIN IRS tax filings in 2016 was only 39 percent as large as in 2010, suggesting that either fewer of the noncitizens in the 2016 ACS had ITINs, or more of them provided PII in the ACS that was inconsistent with their PII in IRS records.

### 28. Independent of this memo, what action does Census plan to take in response to the analyses showing that non-citizens have been incorrectly responding to the citizenship question?

The Census Bureau does not have plans to make any changes to procedures in the ACS. However, we will continue to conduct thorough evaluations and review of census and survey data. The ACS is focusing our research on the potential use of administrative records

0009831

in the survey. For instance, we are exploring whether we can use IRS data on income to reduce the burden of asking questions on income on the ACS. We are concentrating initially on questions that are high burden, e.g., questions that are difficult to answer or questions that are seen as intrusive.

**29. Did Census make recommendations the last time a question was added?**

Since the short form Decennial Census was established in 2010, the only requests for new questions we have received have been for the ACS. And, in fact, requests for questions prior to 2010 were usually related to the Decennial Census Long Form. We always work collaboratively with Federal agencies that request a new question or a change to a question. The first step is to review the data needs and the legal justification for the new question or requested changes. If, through this process, we determine that the request is justified, we work with the other agencies to test the question (cognitive testing and field testing). We also work collaboratively on the analysis of the results from the test which inform the final recommendation about whether or not to make changes or add the question.

**30. Does not answering truthfully have a separate data standard than not participating at all?**

We're not sure what you're asking here. Please clarify the question.

**31. What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?**

The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation.

The Census Bureau and the Office of Management and Budget (OMB) have laid out a formal process for making content changes.

- First, federal agencies evaluate their data needs and propose additions or changes to current questions through OMB.
- In order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations.
- Final proposed questions result from extensive cognitive and field testing to ensure they result in the proper data, with an integrity that meets the Census Bureau's high standards.
- This process includes several opportunities for public comment.
- The final decision is made in consultation with OMB.

11

0009832

- If approved, the Census Bureau implements the change.

**32. Has another agency ever requested that a question be asked of the entire population in order to get block or individual level data?**

Not to our knowledge. However, it is worth pointing out that prior to 1980 the short form of the Decennial Census included more than just the 10 questions that have been on the short form since 1990.

**33. Would Census linking of its internal data sets, with other data sets from places like IRS and Homeland Security, have an impact on participation as well (i.e., privacy concerns)?**

The potential that concerns about the use of administrative records could have an impact on participation has always been a concern of ours, and it's a risk that we're managing on our risk register. We've worked closely with the privacy community throughout the decade, and we established a working group on our National Advisory Committee to explore this issue. We've also regularly briefed the Congress about our plans. At this stage in the decade there does not appear to be extensive concerns among the general public about our approach to using administrative records in the Nonresponse Operation or otherwise. We will continue to monitor this issue.

**34. Would Alternative C require any legislation? If so, what is the estimated time frame for approval of such legislation?**

No.

**35. Census publications and old decennial surveys available on the Census website show that citizenship questions were frequently asked of the entire population in the past. Citizenship is also a question on the ACS. What was the justification provided for citizenship questions on the (A) short form, (B) long form, and (C) ACS?**

In 1940, the Census Bureau introduced the use of a short form to collect basic characteristics from all respondents, and a long form to collect more detailed questions from only a sample of respondents. Prior to 1940, census questions were asked of everyone, though in some cases only for those with certain characteristics. For example, in 1870, a citizenship question was asked, but only for respondents who were male and over the age of 21.

Beginning in 2005, all the long-form questions – including a question on citizenship -- were moved to the ACS. 2010 was the first time we conducted a short-form only census. The citizenship question is included in the ACS to fulfill the data requirements of the Department of Justice, as well as many other agencies including the Equal Employment Opportunities Commission, the Department of Health and Human Services, and the Social Security Administration.

0009833

**To:**      Wilbur Ross ███████
**From:**   Davidson, Peter (Federal)
**Sent:**    Tue 11/28/2017 12:53:51 AM
**Importance:**    Normal
**Subject:**  Re: Census. Questions
**Received:**      Tue 11/28/2017 12:53:52 AM

I can brief you tomorrow...no need for you to call. I should have mentioned it this afternoon when we spoke.

Sent from my iPhone

On Nov 27, 2017, at 7:23 PM, Wilbur Ross < ███████ > wrote:

> Census is about to begin translating the questions into multiple languages and has let the printing contact. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must have this resolved.  WLR
>
>
> Sent from my iPhone

*** INTERNAL CENSUS USE ONLY***                                                          1

# Alternative Sources of Citizenship Data for the 2020 Census

| | |
|---|---|
| Prepared for: | John M. Abowd |
| Through: | John L. Eltinge |
| Prepared by: | Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi |
| Disclosure review: | Amy Lauger (CBDRB-2017-CDAR-001) The statistics in this report may be released to the public. |
| Date: | December 22, 2017 |

## Introduction

The Census Bureau has provided estimates of the Citizen Voting Age Population by Race and Ethnicity (CVAP)[1] and data to support redistricting under Public Law 94-171 (PL94) and Section 2 of the Voting Rights Act.[2]  This paper examines alternative sources for the citizenship data, specifically the addition of a question on the 2020 decennial instrument or the integration of administrative records on citizenship into the 2020 Census Edited File (CEF).  In 2011, when they were released, the PL94 data from the 2010 Census had a reference date of April 1, 2010. The CVAP data released in February 2011 were based on the 5-year American Community Survey (ACS) data from 2005-2009. In addition, the 2011 CVAP data were based on Census 2000 block group geography while the PL94 data were based on 2010 Census block geography. The difficulty in integrating these two data tools for redistricting and enforcement of the Voting Rights Act was directly cited by the Department of Justice in its December 12, 2017 letter to Dr. Ron Jarmin, who was performing the non-exclusive functions and duties of the Director on that date.

## Data from Household Questionnaires and Administrative Sources

The Census Bureau currently has four surveys containing citizenship questions. Citizenship is collected on the American Community Survey (ACS), the Current Population Survey (CPS), the American Housing Survey (AHS), and the Survey of Income and Program Participation (SIPP), and all persons in the household are in universe. The ACS, CPS, and AHS distinguish between citizens born in the United States, in U.S. territories, abroad to U.S. parents, and of foreign nativity but naturalized. SIPP collapses citizenship into a binary indicator of whether or not one is a citizen.[3]  Table 1 shows how much of the 2010 Census these sources cover.  By linking citizenship data collected from the household surveys listed below to the 2010 Census, we can identify directly reported citizenship for approximately 14.4% of the total population.

The integration of these surveys with the 2010 Census is based on the Protected Identification Key (PIK) added to all files using the Person Identification Validation System (PVS). From 2000 to

---

[1] https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html
[2] https://www.census.gov/rdo/data/2010_census.html
[3] This information is from the Master Demographic Pilot Report.

0011634

2015, a small number of the PIKs in these surveys do not match records in the 2010 Census. The nonmatch rate is less than 0.2% for all years, with a minimum of less than 0.1% in 2010.

**Table 1. Citizenship in Household Surveys Linked to the 2010 Decennial by Demographics**

| | Household Surveys Linked to 2010 Decennial | | | | | | | 2010 Decennial | |
| | Noncitizen | | Citizen | | Missing | | Total | | | |
| | N | (%) | N | (%) | N | (%) | (%) | N | (%) |
|---|---|---|---|---|---|---|---|---|---|
| Total Population | 1,523,000 | | 43,090,000 | | 1,192,000 | | **100.0** | 308,745,538 | **100.0** |
| | | | | | | | | *Coverage* | *14.4* |
| **Sex** | | | | | | | | | |
| Female | 785,000 | 1.7 | 22,380,000 | 48.9 | 613,000 | 1.3 | **51.9** | 157,000,000 | **50.8** |
| Male | 738,090 | 1.6 | 20,710,000 | 45.2 | 579,000 | 1.3 | **48.1** | 151,800,000 | **49.2** |
| **Race** | | | | | | | | | |
| White | 729,000 | 1.6 | 35,320,000 | 77.1 | 837,000 | 1.8 | **80.5** | 227,200,000 | **73.6** |
| Black | 127,000 | 0.3 | 4,157,000 | 9.1 | 172,500 | 0.4 | **9.7** | 40,400,000 | **13.1** |
| American Indian, Aleut Eskimo | 14,800 | 0.0 | 562,000 | 1.2 | 15,780 | 0.0 | **1.3** | 4,007,000 | **1.3** |
| Asian or Pacific Islander | 364,000 | 0.8 | 1,688,000 | 3.7 | 93,000 | 0.2 | **4.7** | 16,770,000 | **5.4** |
| Other | 286,800 | 0.6 | 1,358,000 | 3.0 | 74,650 | 0.2 | **3.8** | 20,400,000 | **6.6** |
| **Ethnicity** | | | | | | | | | |
| Hispanic/Spanish | 675,000 | 1.5 | 4,046,000 | 8.8 | 198,100 | 0.4 | **10.7** | 50,480,000 | **16.4** |
| Non-Hispanic/Spanish | 848,000 | 1.9 | 39,040,000 | 85.2 | 994,300 | 2.2 | **89.3** | 258,300,000 | **83.7** |

Source: 2010 Decennial Census and Master Demographics, U.S. Census Bureau.
Note: Household survey data unweighted. The reported population total is the official count from the 2010 Census. All other counts have been rounded.

The Census Bureau has acquired multiple national administrative record sources that include citizenship data, as shown in Table 2.

**Table 2. National Administrative Record Sources with Citizenship Fields**

| Currently In Census Inventory | Universe |
|---|---|
| Social Security Administration Numident | Quarterly Transactions |
| Temporary Assistance to Needy Families | Program Applicants |
| Bureau of Prisons | Federal Prison Inmates |
| **Potential New Acquisitions** | **Universe** |
| USCIS Citizen Data | Population |
| Real ID Act Data | Driver's License Applicants |
| FHA Loan Applications | Loan Applicants |
| State Department Expatriates | Students studying aboard and embassies registrations |
| Medicare/Medicaid Loan Applications | Program Applicants |

Whether or not citizenship data are collected on the 2020 Census questionnaire, it would be consistent treatment to use administrative records to edit and/or impute the citizenship variable, when necessary.

From the sources in Table 2, the Census Numident is the most complete and reliable administrative record source of citizenship data currently available. The Numident file is a record of applications for Social Security cards. Unique, life-long SSNs are assigned to individuals based on these applications. A full record of all changes to the information (such as change of name) is also maintained. To obtain a Social Security Number, the applicant must provide documented identifying information to the Social Security Administration (SSA). Through the "enumeration at birth" program, children can be issued a Social Security Number (SSN) when they are born. Examples of data elements on a Numident record include name, date and place of birth, parents' names, and date of death.

As shown in Table 3, 90 percent of persons in the 2010 Census can be matched to the Protected Identification Key (PIK).[4] Once a PIK is assigned, virtually every record is matched to the Census Numident (>99%). Nearly all the PIKs not in the Numident are Individual Taxpayer Identification Numbers (ITIN), which are held by noncitizens for IRS tax filing reasons. Among persons with non-blank citizenship in the Numident, 91 percent are U.S. citizens. Around 21 percent of the Numident records have a blank for citizenship. The Social Security Administration did not require evidence of citizenship until 1972.[5] Many older persons thus did not report citizenship when applying for an SSN. We investigate this issue further below.

---

[4] See NORC (2011) and Layne, Wagner and Rothhaas (2014) for details about the process used to assign and the quality of the PIKs used in data linkage at the Census Bureau.
[5] A detailed history of the SSN is available at https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html (Exhibit 1).

**Table 3. PIK Coverage of the 2010 Decennial Census and Numident Citizenship Distribution**

|  | Count | Percent of Decennial Population | Percent of Matched Sample |
|---|---|---|---|
| No PIK, not sent to PVS | 10,367,975 | 3.4 |  |
| No PIK, failed in PVS | 19,198,234 | 6.2 |  |
| PIK, but not in Numident, not ITIN | 8,871 | 0.0 |  |
| PIK, but not in Numident, is ITIN | 1,566,645 | 0.5 |  |
| Blank Citizenship | 57,914,337 | 18.8 | 20.9 |
| U.S. Citizen | 200,422,211 | 64.9 | 72.2 |
| Legal Alien, authorized to work | 18,198,545 | 5.9 | 6.6 |
| Legal Alien, not authorized to work | 444,727 | 0.1 | 0.2 |
| Other | 259,674 | <0.1 | <0.1 |
| Alien Student, restricted work authorized | 184,673 | <0.1 | <0.1 |
| Conditionally Legalized Alien | 179,646 | <0.1 | <0.1 |
| Total | 308,745,538 | 100.00 | 100.00 |

PVS is the Person Identification Validation System.

One of the reasons why some person records fail to receive a PIK is insufficient personally identifiable information, which is the case for the 3.4 percent of records not sent to the Person Identification Validation System (PVS), as shown in Table 3. It is thus likely that many of the same records for which it is not possible to link in citizenship information due to a lack of a PIK also have imputed values for other demographic variables. Tables 4A-4C show that imputation rates are much higher for 2010 Decennial Census person records lacking a PIK, especially for date of birth (a characteristic which may be hard for proxy respondents to report on behalf of their neighbors, for example).

**Table 4A. 2010 Decennial Census Gender Source, PIK vs. non-PIK Records**

|  | With PIK | No PIK |
|---|---|---|
| As reported | 98.7 | 75.4 |
| From first name | 1.3 | 1.4 |
| Value edited for household consistency | <0.1 | 0.4 |
| Allocated from hot deck | 0.0 | 2.1 |
| Allocated from consistency check | <0.1 | <0.1 |
| Substituted | <0.1 | 20.7 |
| Percent of Sample | 90.9 | 9.1 |

The number of observations is 304,450,000. Group Quarters are excluded.

0011637

**Table 4B. 2010 Decennial Census Date of Birth Source, PIK vs. non-PIK Records**

|  | With PIK | No PIK |
|---|---|---|
| Fully reported date of birth | 96.0 | 35.7 |
| Only day of month allocated | 0.2 | 0.5 |
| Month and day both allocated | 0.3 | 1.7 |
| Year of birth created from two-digit year | 0.7 | 0.5 |
| DOB allocated consistent with reported age | 1.6 | 16.4 |
| DOB allocated consistent with allocated age | 1.3 | 24.7 |
| Substituted | 0.0 | 20.7 |
| Year of birth of householder or spouse adjusted to be consistent with number of children | <0.1 | <0.1 |
| Percent of Sample | 90.9 | 9.1 |

The number of observations is 304,450,000. Group Quarters are excluded.

0011638

**Table 4C. 2010 Decennial Census Race Source, PIK vs. non-PIK Records**

|  | With PIK | No PIK |
|---|---|---|
| As reported | 96.6 | 68.6 |
| Code changed through consistency edit | <0.1 | <0.1 |
| Assigned race from response in Hispanic question | <0.1 | <0.1 |
| Allocated from within household | 1.5 | 4.1 |
| Allocated from hot deck | 0.7 | 5.9 |
| Substituted | 0.0 | 20.7 |
| Assigned race from previous census response | 1.2 | 0.7 |
| Percent of Sample | 90.9 | 9.1 |

The number of observations is 304,450,000. Group Quarters are excluded.

**The Estimated Effects of Including a Citizenship Question on the 2020 Census**

We also study how including the citizenship question might affect response rates by comparing first mailing response rates in the 2010 Decennial and the 2010 ACS for the same housing units. An important difference between the two questionnaires is that the ACS questionnaire contains citizenship questions, and the Decennial Census does not. Households with noncitizens could be particularly sensitive to the inclusion of citizenship questions. Here we focus on housing units that received a mailing (housing units in the initial mailing and that did not have mail returned as Undeliverable as Addressed (UAA)) and which were not classified as a vacant or delete. The housing units are divided into two groups, those where at least one person is a noncitizen in the Census Numident and has been assigned to this housing unit in the 2010 Census Match Study's administrative records person-place (PIK-MAFID) crosswalk, and those where all of the persons are citizens in the Census Numident.

Table 5 shows the 2010 Census and ACS response rates for these two groups. The self-response rate is higher for 2010 Census than for the ACS for both citizenship categories, presumably reflecting the higher burden of the ACS. The citizens[6] response rate is greater than the noncitizen rate in each survey, suggesting that noncitizens have a lower participation rate in general. Most important for this study is understanding how the difference in self-response rate across groups varies between the 2010 Census and ACS. While the self-response rate for citizen households is 13.8 percentage points lower in the ACS than in the 2010 Census, the self-response rate for households with at least one noncitizen is 18.9 percentage points lower for the ACS than the self-response rate to the 2010 Census, which is a 5.1 percentage point difference between the two

---

[6] Citizens include those born in the U.S., those born abroad to U.S. parents, and naturalized.

categories. Though there could be other reasons why households with noncitizens are particularly unwilling to respond to the ACS, this evidence is consistent with citizenship questions being more sensitive for households with noncitizens.

**Table 5. Comparison of 2010 ACS and 2010 Decennial Census Response Rates, by 2010 Numident Citizenship Status**

|  | Response rate (%) |  | Difference | Row Percent |
|---|---|---|---|---|
| (Numident Status) | Census | ACS |  |  |
| Citizen | 79.9 | 66.1 | 13.8 | 94.1 |
| Not Citizen | 71.5 | 52.6 | 18.9 | 5.9 |

The sample size is 929,000 households.

Other proxy measures for understanding response sensitivity to questions of citizenship can be examined with longitudinal data. Using the 2014 SIPP longitudinal panel waves 1 and 2, Table 6 shows household response rates for citizens and noncitizens. Noncitizens made up around 6% of the 2014 SIPP survey. Of persons living in households where at least one individual did not respond to the survey questionnaire, noncitizens made up around 8%.

**Table 6. Noncitizens and Non-Response in the 2014 Survey of Income and Program Participation**

|  | Wave 1 | | Wave 2 | |
|---|---|---|---|---|
|  | (%) | (se) | (%) | (se) |
| Noncitizens | 6.1 | (0.144) | 5.7 | (0.096) |
| At least one member in the noncitizen household did not respond | 7.9 | (0.473) | 8.5 | (0.351) |

Source: 2014 SIPP, Waves 1 and 2
Note: Citizenship status refers to status in Wave 1.

To get a sense of the quality of the survey and administrative citizenship data, we compared ACS and Census Numident responses for the same PIKs. Table 7A shows that over 99 percent of the blanks are U.S. citizens in the ACS, so it is highly likely that persons with blanks for citizenship in the Numident are U.S. citizens. Among those who are legal resident noncitizens in the Numident, roughly 40 percent say they are U.S. citizens, nearly all via naturalization. This suggests that either the Numident citizenship data are out of date, or that there is a tendency for noncitizen ACS respondents to report being U.S. citizens. To provide context for these discrepancies, note that the share of the stock of legal permanent residents who became naturalized citizens was 8.3 percent, 6.0 percent, and 4.9 percent in 2008, 2009, and 2010, respectively, suggesting that the Numident data would need to be several years out of date to explain the observed discrepancies, if

0011640

the ACS data are accurate.[7] If the Census Bureau obtains the U.S. Citizen and Immigration Services (USCIS) citizenship file, we would be able to measure how up to date the Numident citizenship information is.

One way discrepancies can occur between the ACS and Numident citizenship information is incorrect PIK linkages. In Table 7B we include only PIKs that have median or above PVS scores in the linking attempt matching on the most information (geosearch pass 1). The discrepancies are smaller for the cases where the PIK is a citizen in the Numident, but they are larger where the PIK is a noncitizen in the Numident. This suggests that the significant discrepancies with the ACS when the PIK is a noncitizen in the Numident are not due to linkage errors with the PIKs.

---

[7] The data on naturalizations come from
https://www.dhs.gov/sites/default/files/publications/Naturalizations_2010.pdf, and estimates for the stock of legal permanent residents come from https://www.dhs.gov/immigration-statistics/population-estimates/LPR.

0011641

**Table 7A. Comparison of 2010 ACS and 2010 Numident Citizenship, All PIKs**

| ACS\Numident | Blank | A=U.S. Citizen | B=Legal Alien, authorized to work | C=Legal Alien, not authorized to work | D=other | E=Alien Student, restricted work authorized | F=Conditionally legalized alien | Row Percent |
|---|---|---|---|---|---|---|---|---|
| Yes, Born Citizen | 95.1 | 96.6 | 3.8 | 3.6 | 11.6 | 2.0 | 5.6 | 91.0 |
| Yes, Naturalized | 4.1 | 3.2 | 36.9 | 37.3 | 11.0 | 47.2 | 42.4 | 5.3 |
| Not a Citizen | 0.8 | 0.3 | 59.3 | 59.1 | 77.3 | 50.7 | 51.9 | 3.7 |
| Column Percent | 24.8 | 69.5 | 5.3 | 0.1 | <0.1 | <0.1 | <0.1 | |

The number of observations is 4,022,000.

**Table 7B. Comparison of 2010 ACS and 2010 Numident Citizenship, Higher Quality PIKs**

| ACS\Numident | Blank | A=U.S. Citizen | B=Legal Alien, authorized to work | C=Legal Alien, not authorized to work | D=other | E=Alien Student, restricted work authorized | F=Conditionally legalized alien | Row Percent |
|---|---|---|---|---|---|---|---|---|
| Yes, Born Citizen | 97.2 | 97.9 | 2.7 | 2.8 | 26.4 | 2.4 | 8.6 | 95.4 |
| Yes, Naturalized | 2.4 | 2.0 | 44.0 | 40.9 | 17.4 | 45.8 | 47.1 | 3.1 |
| Not a Citizen | 0.4 | <0.1 | 53.3 | 56.4 | 56.2 | 51.9 | 44.3 | 1.5 |
| Column Percent | 28.1 | 69.5 | 2.3 | <0.1 | <0.1 | <0.1 | <0.1 | |

The number of observations is 2,168,000. Only PIKs with a median or above score in the Person Identification Validation System (PVS) geosearch module pass 1 are included here.

001642

Table 8 shows the ACS citizenship response distribution for ITINs. About 7 percent report being citizens, though only noncitizens should have ITINs.

**Table 8. 2010 ACS Citizenship Responses for ITINs**

|                     | ITIN |
|---------------------|------|
| Yes, Born Citizen   | 4.9  |
| Yes, naturalized    | 2.4  |
| Not a citizen       | 92.7 |

The number of observations is 42,000.

We next examine how the discrepancies between the ACS and Numident citizenship responses vary by whether the household responds to the first mailing vs. different kinds of follow-up. We restrict the ACS sample to the population of individuals in households that received a mail-in form. A self-response in our sample refers to an individual being part of a household that successfully responded to a first ACS mailing. An individual is classified as a "Mail Follow-up" (Mail FU) if that person responded to a follow-up mailing. Lastly, an individual is classified as CATI/CAPI if that person did not respond to the initial mailing and ended up receiving a telephone or in-person follow-up interview. To assess the reported citizenship in the ACS, we consider individuals in our ACS sample who also match to the Numident, giving us an additional source of citizenship information. In the Numident, we classify all citizen categories as well as missing citizenship as citizens, for the reasons given above.

Table 9 shows the distribution of ACS outcomes for individuals who are also classified as citizen or noncitizen in the Numident. Regardless of the response mode, individuals classified as citizens in the Numident also reply that they are citizens in the ACS, while nearly half of those classified as noncitizens in the Numident report being citizens. Thus, the patterns shown in Table 7 vary little by response mode.

**Table 9. Comparison of 2010 ACS and 2010 Numident Citizenship by Response Type**

| ACS\Numident              | Citizen | Not Citizen | Row Percent |
|---------------------------|---------|-------------|-------------|
| Citizen, (Resp.)          | 63.9    | 22.7        | 61.6        |
| Not Citizen, (Resp.)      | 0.2     | 29.2        | 1.8         |
| Citizen, (Mail FU)        | 21.1    | 9.9         | 20.5        |
| Not Citizen, (Mail FU)    | 0.1     | 13.9        | 0.9         |
| Citizen, (CATI/CAPI)      | 14.6    | 8.5         | 14.2        |
| Not Citizen, (CATI/CAPI)  | 0.1     | 15.8        | 1.0         |
| Column Percent            | 94.4%   | 5.6%        |             |

The number of observations is 3,752,000 individuals. Mail FU is Mail Follow-up, CATI is Computer-Assisted Telephone Interview, and CAPI is Computer-Assisted In-Person Interview.

**Other Potential Administrative Record Sources of Citizenship Data**

There are several additional administrative sources of citizenship information that the Census Bureau could consider trying to obtain. Most important are the USCIS citizenship and noncitizen

*** INTERNAL CENSUS USE ONLY***

legal resident files. The citizenship file could be used to evaluate the quality of the Numident citizenship data, and in particular, how quickly it is updated. The legal nonresident file could serve as an additional reference file, so that more noncitizens can be given Census PIKs.

Another likely useful source of citizenship is state drivers' license data. The REAL ID Act of 2005 requires evidence of citizenship to obtain a driver's license. This has been fully implemented in 28 states, and the others have waivers. The Department of Homeland Security is overseeing implementation of the law. Starting January 22, 2018, passengers with a driver's license issued by a state that is still not compliant with the REAL ID Act (and has not been granted an extension) will need to show an alternative form of acceptable identification for domestic air travel to board their flight. Each state must agree to share its motor vehicle database with all other states. This database must include, at a minimum, all the data printed on the state driver's licenses and ID cards, plus drivers' histories.[8] These databases could become an important source of citizenship data.

Other potential sources include FHA loan applications and Medicare and Medicaid applications.

It would also be useful to obtain data on U.S. expatriates from the U.S. State Department. The State Department may have data on students studying abroad and expatriates registering with embassies. These data would prevent these PIKs from being mistakenly included in the administrative record person-place crosswalk.

It is worth noting that others who are interested in noncitizens have used administrative records to estimate stay rates and other relevant characteristics. Finn (2014) developed stay rates for students in science education by linking social security numbers of students enrolled in science programs with the Internal Revenue Service (IRS) tax records.

Not only is using administrative records potentially a more accurate measure of citizenship, but it is also cost efficient. The Bureau already acquires SSA Numident information on a quarterly basis. To collect that information through self-report by adding questions to the 2020 decennial would require additional unnecessary costs and burden to the Bureau.

**Implementation for the 2020 Census**

The direct solution to supporting redistricting in the manner requested by the Department of Justice is to make a citizenship variable available on the 2020 Census Edited File (CEF), the internal, confidential data file from which the PL94 tabulations are produced. If citizenship were available on that file, the PL94 tabulations could be restructured to include direct estimates of the citizen voting age population by race and ethnicity at the block level. These tabulations would have essentially the same accuracy as current PL94 and Summary File 1 (SF1) data. We recommend provisioning the citizenship variable onto the CEF by record linkage using the national administrative data discussed above.

---

[8] There is some debate about whether a national database is being created from these data. DHS says this isn't the case, but see https://papersplease.org/wp/2016/02/11/how-the-real-id-act-is-creating-a-national-id-database/.

Once the citizen tabulation variable is added to the CEF, it would be available to the 2020 Disclosure Avoidance Subsystem (DAS) for inclusion in a modified version of the proposed P2 table "Race/Ethnicity for the Population Age 18 and Over" where "Population Age 18 and Over" would be replaced by "Citizen Population Age 18 and Over." This revision would allow the use of the same disclosure avoidance methodology, state-of-the-art differential privacy, currently available for the 2018 End-to-End Test and the enhanced methods, integrated PL94 and SF1 protection, planned for the 2020 Census itself. This version of P2 would be the first PL94 data produced at the block-level with estimates of the citizen voting age population by race and ethnicity and with accuracy comparable to the accuracy of the P1 "Total population" table. The P1 and P2 tables would tabulate race and ethnicity in the same manner as currently proposed. Tables P42 "Group Quarters Population by Group Quarters Type" and H1 "Occupancy Status" would not be modified. The 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly.

**References**

Finn, Michael G., 2014, "Stay Rates of Foreign Doctorate Recipients from U.S. Universities, 2011," Oak Ridge Institute for Science and Education. https://pdfs.semanticscholar.org/7a4c/49e7878730b587201548338aa6052e2401b7.pdf.

Layne, Mary, Deborah Wagner, and Cynthia Rothhaas, 2014, "Estimating Record Linkage False Match Rate for the Person Identification Validation System," CARRA Working Paper #2014-02.

NORC, 2011, "Final Report: Assessment of the U.S. Census Bureau's Person Identification Validation System," University of Chicago: Bethesda, MD.



**UNITED STATES DEPARTMENT OF COMMERCE**
Economics and Statistics Administration
**U.S. Census Bureau**
Washington, DC 20233-0001

December 22, 2017

MEMORANDUM FOR     Ron S. Jarmin
                   Performing the Non-exclusive Functions and Duties of the Director

From:              John M. Abowd
                   Chief Scientist and Associate Director for Research and Methodology

Subject:           Feasibility of Enhancing the PL94-171 Redistricting Data

[This memorandum and the accompanying white paper contain no confidential data. The tables in the white paper and the estimates in this memo were cleared for release to the public under CBDRB-2017-CDAR-001.]

**Summary**

Based on balanced consideration of multiple factors of quality, cost and feasibility, we recommend that the citizenship data for Department of Justice Voting Rights Act enforcement be obtained through the use of administrative records and not through the addition of a question to the decennial census instrument.

Citizenship, race, and ethnicity data for the voting-age population are essential to designing legislative districts that meet the criteria for nondiscrimination according to Section 2 of the Voting Rights Act. The Census Bureau currently supports this requirement with two distinct publications: the PL94-171 redistricting data (PL94), which must be released by April 1st of the year following a decennial census, and the Citizen Voting Age Population by Race and Ethnicity (CVAP) data, which are published annually in February using the most current 5-year American Community Survey (ACS) data. The Department of Justice and redistricting experts, partisan and bi-partisan, combine these data to produce estimates of the citizen voting age population by race and ethnicity at the lowest feasible level of geography, usually a census block. Neither the PL94 nor the CVAP tabulations contain estimates of the citizen voting age population by race and ethnicity at the block level. For PL94, this is because there is no citizen variable on the census questionnaire. For CVAP, this is because the 5-year ACS estimates do not go below the block-group level, and even there often have margins of error that make them difficult to use for creating block-level estimates in combination with PL94 via statistical methods.

The direct solution to this problem is to make a citizenship variable available on the 2020 Census Edited File (CEF), the internal, confidential data file from which the PL94 tabulations are produced. If citizenship were available on that file, the PL94 tabulations could be restructured to include direct estimates of the citizen voting age population by race and ethnicity at the block level. These tabulations would have essentially the same accuracy as current PL94 and Summary File 1 (SF1) data. There are two alternative methods for accomplishing the addition of citizenship to the CEF. The first method is to ask the question

on the 2020 Census, just as we currently do on the ACS and used to do on the decennial census long form. The second method is to load the citizenship variable onto CEF by record linkage using administrative data. There are advantages and disadvantages to both methods.

The advantages of directly asking the question are (1) the provenance of the data is transparent and (2) the data are contemporaneous with the census by construction. The disadvantages are (1) potential negative impact on voluntary cooperation with the census, and (2) poorer quality citizenship data than would be available through administrative records. The advantages of using administrative records are (1) better quality data than result from directly asking citizenship, and (2) cost savings to the census from avoiding the need to redesign questionnaires and increase nonresponse follow-up due to lower voluntary compliance. The disadvantages of using administrative data are (1) some risk of differential incomplete coverage due to incompleteness of these data for some foreign-born subpopulations, and (2) additional processing complexity during the critical period between the closeout of the Decennial Response File (DRF), the end of data acquisition from the census operations, and the delivery of the Census Edited File.

**Analysis**

We were not able to find any randomized controlled trials of the census or ACS questionnaires with and without the citizenship question. We conducted a limited analysis of the incremental field burden using the following natural experiment. Compare the first mailing response rates in the 2010 Census and the 2010 ACS for the same housing units. Response rates for citizens and noncitizen households are both lower in the ACS than in the 2010 Census, however the response rate for the noncitizen households falls by 5.1 percentage points more than the decline for citizens. Assuming that the number of households with at least one noncitizen is about 7,435,000 (+/- 47,000),[1] this implies an incremental burden of 380,000 households in non-response follow-up. 380,000 is approximately 0.3% of the 2016 Population estimate of 117,700,000 households in the U.S. At $100,000,000 incremental NRFU cost per 1% decline in first mailing response rates, this translates to approximately $32,000,000 cost due to the decline in response rates from including the citizenship question.

The cost of implementing our recommended solution has not been fully vetted. Accounting for ten cycles of processing between January 1, 2018 and April 1, 2020 and two senior staff FTEs to do the required modeling, the cost is less than $1,000,000. These estimates include the burden on the 2020 Census processing of the Census Unedited File.

We investigated the availability of directly reported citizenship data on all household surveys. The white paper concludes that there is insufficient data collected between 2000 and 2015 to use this source alone. It also concludes that the administrative record data are superior to the direct reports in several important dimensions. First, using historical direct reports creates problems with the timeliness of the citizenship status for naturalized citizens who acquired that status between the time that they

---

[1] 2011 estimate from https://www.census.gov/prod/2013pubs/acsbr11-15.pdf. The 7,435,000 estimate is for households with a noncitizen head. The estimate for households with at least one noncitizen is necessarily greater.

responded and the reference date for the 2020 Census. Second, we document that there is good evidence that citizenship is accurately reported by citizens, but less accurately self-reported by household responders. This accuracy deficit in the self-responses may be due to the inherent difficulty of securing such information from the householder or proxies when they pertain to someone other than the respondent. The accuracy deficit may also be due to the sensitivity of the citizenship question itself. The white paper documents with preliminary evidence that acquiring citizenship status from administrative records is very likely to produce more accurate and timely data overall than asking the question directly, and then handling the item nonresponse in the edit and imputation phase of the 2020 Census. Nevertheless, we note that if the question is asked, the administrative data sources discussed in the white paper could be a valuable supplement to that phase.

**Recommendation**

The accompanying white paper proposes the creation of PL94 block-level data with citizen voting age population by race and ethnicity, in addition to the total population by race and ethnicity, using citizenship data that have been linked from (i) a collection of high quality national administrative data that the Census Bureau has already integrated into 2020 Census systems and (ii) data from the United States Citizen and Immigration Services (USCIS) that would be acquired by executing a Memorandum of Understanding with USCIS. We would develop our own edit and imputation system for the citizenship variable. The tabulation variable would be added to CEF and available to the 2020 Disclosure Avoidance Subsystem (DAS) for inclusion in a modified version of the proposed P2 table "Race/Ethnicity for the Population Age 18 and Over" where "Population Age 18 and Over" would be replaced by "Citizen Population Age 18 and Over." This revision would allow the use of the same disclosure avoidance methodology, state-of-the-art differential privacy, currently available for the 2018 End-to-End Test and the enhanced methods, integrated PL94 and SF1 protection, planned for the 2020 Census itself. This version of P2 would be the first PL94 data produced at the block-level with estimates of the citizen voting age population by race and ethnicity and with accuracy comparable to the accuracy of P1 "Total population." The P1 and P2 tables would tabulate race and ethnicity in the same manner as currently proposed. Tables P42 "Group Quarters Population by Group Quarters Type" and H1 "Occupancy Status" would not be modified. The 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly.

0011649

September 8, 2017

To:     Secretary Wilbur Ross

Fr:     Earl Comstock

Re:     <u>Census Discussions with DoJ</u>


In early May Eric Branstad put me in touch with Mary Blanche Hankey as the White House liaison in the Department of Justice.  Mary Blanche worked for AG Sessions in his Senate office, and came with him to the Department of Justice.  We met in person to discuss the citizenship question.  She said she would locate someone at the Department who could address the issue.  A few days later she directed me to James McHenry in the Department of Justice.

I spoke several times with James McHenry by phone, and after considering the matter further James said that Justice staff did not want to raise the question given the difficulties Justice was encountering in the press at the time (the whole Comey matter).  James directed me to Gene Hamilton at the Department of Homeland Security.

Gene and I had several phone calls to discuss the matter, and then Gene relayed that after discussion DHS really felt that it was best handled by the Department of Justice.

At that point the conversation ceased and I asked James Uthmeier, who had by then joined the Department of Commerce Office of General Counsel, to look into the legal issues and how Commerce could add the question to the Census itself.