1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOSEPH H. HUNT
Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director
CARLOTTA P. WELLS
Assistant Director
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 514-9239
Email: kate.bailey@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, *et al.,* <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR L. ROSS, JR. in his official capacity as Secretary of Commerce, *et al.,* <br><br> Defendants. | Civil Action No. 3:18-cv-02279-RS <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:   December 7, 2018 <br> Time:   10:00 a.m. <br> Judge:  Honorable Richard Seeborg <br> Dept.:  3 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on Friday, December 7, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, before The Honorable Richard Seeborg, in Courtroom 3, 17th Floor, of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, the defendants Wilbur L. Ross, Jr., Secretary of Commerce; U.S. Department of Commerce; Ron Jarmin, performing the nonexclusive functions and duties of Director, U.S. Census Bureau; and U.S. Census Bureau will move, and hereby do move, for summary judgment in this action under Rule 56 of the Federal Rules of Civil Procedure. This motion is based on the following Memorandum of Points and Authorities, the other papers and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

Date:  November 2, 2018

                              Respectfully submitted,

                              JOSEPH H. HUNT
                              Assistant Attorney General

                              BRETT A. SHUMATE
                              Deputy Assistant Attorney General

                              JOHN R. GRIFFITHS
                              Director, Federal Programs Branch

                              CARLOTTA P. WELLS
                              Assistant Director

                              */s/ Kate Bailey*
                              KATE BAILEY
                              STEPHEN EHRLICH
                              CAROL FEDERIGHI
                              Trial Attorneys
                              United States Department of Justice
                              Civil Division, Federal Programs Branch
                              20 Massachusetts Ave., NW
                              Washington, DC 20530
                              Tel.: (202) 514-9239
                              Fax: (202) 616-8470
                              Email: kate.bailey@usdoj.gov

                              *Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.      FACTUAL BACKGROUND ....................................................................................2

II.     PROCEDURAL HISTORY .......................................................................................5

LEGAL STANDARD ...........................................................................................................5

ARGUMENT .........................................................................................................................6

I.      Defendants Are Entitled to Summary Judgment Because Plaintiffs Have Not
        Established Their Standing. ........................................................................................6

        A.      Plaintiffs Bear the Burden of Establishing Their Article III Standing.........................7

        B.      Plaintiffs Cannot Show That the Citizenship Question Will Result
                in an Undercount. ................................................................................................8

                1.      Individuals Are Prompted Multiple Times to Respond to the Census,
                        and Their Responses Are Counted Even If They Are Incomplete or
                        Do Not Respond to the Citizenship Question. ........................................9

                2.      Any Households that Do Not Self-Respond Will Be Enumerated by
                        NRFU Efforts............................................................................................ 10

                3.      The Census Bureau's Combined Enumeration Efforts (Encouraging
                        Self-Response, NRFU, Imputation and Proxy Data) Will Correct Any
                        Possible Decline in Initial Self-Response and Completely Enumerate
                        the Population............................................................................................ 11

        C.      Even if an Undercount Occurred, Plaintiffs Cannot Show that It Would
                Affect Them Through Any Material Impact on Apportionment or Federal
                Funding. ..................................................................................................................... 13

        D.      If Any Potential Injuries Existed, Plaintiffs Cannot Show that They Are
                Traceable to the Citizenship Question or Redressable by That Question's
                Removal...................................................................................................................... 14

II.     Defendants Are Entitled to Summary Judgment on the Enumeration Clause Claim
        Because the Secretary Will Conduct a Person-by-Person Enumeration. ................................. 15

III.    The Court Should Grant Judgment to Defendants on the APA Claims Because the
        Secretary's Decision Was Eminently Reasonable and within His Lawful Discretion. ........... 19

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

A.    The Secretary's decision was eminently reasonable and easily survives arbitrary-and-capricious review under the APA................................................ 19

    1.    Agency actions are reviewed only for reasonableness. ...................................... 19

    2.    The Secretary reasonably explained his decision to reinstate a citizenship question on the decennial census..................................... 21

    3.    The Secretary engaged in an appropriate process, including the consideration of alternatives, and explained his rationale............................... 24

B.    The Secretary's decision was not otherwise unlawful.................................... 26

CONCLUSION .................................................................................................... 28

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defs.' Mot. Summ. J.**

1

## TABLE OF AUTHORITIES

2

**CASES**

3
*Am. Bioscience v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) ............................................................... 6

4
*Ams. for Safe Access v. U.S. Dep't of Health & Human Servs.,*
5
    No. 07-cv-1049 (WHA), 2007 WL 4168511 (N.D. Cal. Nov. 20, 2007) ............... 26

6
*Asarco, Inc. v. EPA,*
    616 F.2d 1153 (9th Cir. 1980) ............................................................... 21
7

8
*Baldridge v. Shapiro,*
    455 U.S. 345 (1982) ............................................................... 20

9
*Bennett v. Spear,*
10
    520 U.S. 154 (1997) ............................................................... 15

11
*Bowman Transp., Inc. v. Ark-Best Freight Sys, Inc.,*
12
    419 U.S. 281 (1974) ............................................................... 20

13
*Camp v. Pitts,*
    411 U.S. 138 (1973) ............................................................... 20, 21
14

15
*Carey v. Klutznick,*
    653 F.2d 732 (2d Cir. 1981) ............................................................... 8

16
*Celotex Corp. v. Catrett,*
17
    477 U.S. 317 (1986) ............................................................... 8

18
*Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.,*
    450 F.3d 930 (9th Cir. 2006) ............................................................... 21
19

20
*City of L.A. v. Evans,*
    No. 01-cv-1671, 2001 WL 34125617 (C.D. Cal. Apr. 25, 2001) ............... 18

21
*Clapper v. Amnesty Int'l USA,*
22
    568 U.S. 398 (2013) ............................................................... 7, 9

23
*Ctr. for Envtl. Health v. McCarthy,*
    192 F. Supp. 3d 1036 (N.D. Cal. 2016) ............................................................... 5
24

25
*Ctr. for Bio. Diversity v. Zinke,*
    868 F.3d 1054 (9th Cir. 2017) ............................................................... 19

26
*Encino Motorcars, LLC v. Navarro,*
27
    136 S. Ct. 2117 (2016) ............................................................... 20

28

***City of San Jose v. Ross***, **No. 3:18-cv-2279-RS**
**Defs.' Mot. Summ. J.**

*Family Farm All. v. Salazar*,
   749 F. Supp. 2d 1083 (E.D. Cal. 2010)...........................................................26

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...............................................................................................23

*FERC v. Elec. Power Supply Ass'n*,
   136 S. Ct. 760 (2016).....................................................................................19, 24

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)...............................................................................................20

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006).................................................................................27

*Gaffney v. Cummings*,
   412 U.S. 735 (1973)...............................................................................................18

*Guerrero v. Clinton*,
   157 F.3d 1190 (9th Cir. 1998)...............................................................................27

*Havens RealtyCorp. v. Coleman*,
   455 U.S. 363 (1982)...............................................................................................14

*Herguan Univ. v. ICE*,
   258 F. Supp. 3d 1050 (N.D. Cal. 2017).................................................................20

*In re Dep't of Commerce*,
   __ S. Ct. __, 2018 WL 5259090 (U.S. Oct. 22, 2018)...........................................26

*Jagers v. Fed. Crop Ins. Corp.*,
   758 F.3d 1179 (10th Cir. 2014).............................................................................25

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083, 1088 (9th Cir. 2010)....................................................................14

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005)...............................................................................21

*Love v. Thomas*,
   858 F.2d 1347 (9th Cir. 1988)...............................................................................21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).................................................................................................7

*Marshall Cty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993).............................................................................20

**City of San Jose v. Ross**, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

*McCrary v. Gutierrez,*
    No. C-08-015292, 2010 WL 520762 (N.D. Cal. Feb. 8, 2010) ....................6

*Mendina v. Garcia,*
    768 F.3d 1009 (9th Cir. 2014) ....................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................19, 22, 24

*Nat. Res. Def. Council, Inc. v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988) ....................27

*Nat'l Ass'n of Home Builders v. Norton,*
    340 F.3d 835 (9th Cir. 2003) ....................20

*Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ....................20

*Pacific Dawn LLC v. Pritzker,*
    831 F.3d 1166 (9th Cir. 2016) ....................19

*Proyecto Pastoral at Dolores Mission v. Cty. of L.A.,*
    22 Fed. App'x. 743 (9th Cir. 2001) ....................8

*Raines v. Byrd,*
    521 U.S. 811(1997) ....................7

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009) ....................20

*Renee v. Duncan,*
    686 F.3d 1002 (9th Cir. 2012) ....................27

*Rock Creek All. v. U.S. Fish & Wildlife Serv.,*
    390 F. Supp. 2d 993 (D. Mont. 2005) ....................21

*Salmon Spawning & Recovery All. v. Gutierrez,*
    545 F.3d 1220 (9th Cir. 2008) ....................15

*Salt Inst. v. Leavitt,*
    440 F.3d 156 (4th Cir. 2006) ....................26

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ....................21

*Senate of the State of Cal. v. Mosbacher,*
    968 F.2d 974 (1992) ....................18

**City of San Jose v. Ross**, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ............................................................................................... 7

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ......................................................................................... 7

*St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.,*
    610 F. 3d 75 (D.C. Cir. 2010) ............................................................................ 24

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................. 7

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
    671 F.3d 1113 (9th Cir. 2012) ........................................................................... 20

*Utah v. Evans,*
    536 U.S. 452 (2002) ..................................................................................... 18, 20

*Valle de Sol, Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ........................................................................... 14

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ............................................................................................. 6

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................................. 7

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ............................................................................................. 7

*Wild Fish Conservancy v. Jewell,*
    730 F.3d 791 (9th Cir. 2003) ............................................................................. 27

*Wilderness Soc'y v. Norton,*
    434 F.3d 591 (D.C. Cir. 2006) ........................................................................... 28

*Wisconsin* v. City of New York,
    517 U.S 1 (1996). ...................................................................................... *passim*

**City of San Jose v. Ross**, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

**STATUTES**

5 U.S.C. § 551 ......................................................................................................... 27

5 U.S.C. § 706 ............................................................................................... 5, 19, 21

13 U.S.C. § 1 *et seq.* ................................................................................................ 2

13 U.S.C. § 2 ............................................................................................................ 2

13 U.S.C. § 4 ............................................................................................................ 2

13 U.S.C. § 5 ............................................................................................................ 2

13 U.S.C. § 141 ................................................................................... 2, 20, 26, 27

13 U.S.C. § 221 ............................................................................................... 15, 25

44 U.S.C. § 3516 ................................................................................................... 26

Act Providing for the Fourteenth Census, 40 Stat. 1291 (1919) ........................ 17

Census Act of 1790, 1 Stat. 101 (1790) .............................................................. 17

Census Act of 1820, 3 Stat. 548 (1820) .............................................................. 17

Census Act of 1830, 4 Stat. 383 (1830) .............................................................. 17

Census Act of 1850, 9 Stat. 428 (1850) .............................................................. 17

Pub. L. No. 106-554 ............................................................................................. 26

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I .............................................................................................. 2, 16

**RULES**

Fed. R. Civ. P. 56(a) ............................................................................................. 5

Fed. R. Civ. P. 56(e) ............................................................................................. 8

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

1

## OTHER AUTHORITIES

2

*A Federal Assault: African Americans and the Impact of the Fugitive Slave Law of 1850*,
3      68 Chi.-Kent L. Rev. 1179 (1993) ........................................................................... 18

4
2020 Census Operational Plan: A New Design for the 21st Century,
5      https://www2.census.gov/programs-surveys/decennial/2020/
       program-management/planning-docs/2020-oper-plan3.pdf ............................. 9, 10, 11, 18

6
U.S. & World Population Clock,
7       https://www.census.gov/popclock/. ..................................................................... 19

8
U.S. Census Bureau, Archive of American Community Survey Questions,
9       https://www.census.gov/programs-surveys/acs/methodology/
        questionnaire-archive.html.......................................................................................3

10
U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000,
11      https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf............................2, 3, 18

12
U.S. Census Bureau, Questionnaires,
        https://www.census.gov/history/www/through_the_decades/questionnaires/.......................................2

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

# INTRODUCTION

Following a formal request from the Department of Justice, the Secretary of Commerce made an eminently reasonable decision to reinstate a question about citizenship on the decennial census, consistent with historical practice dating back to 1820 and the Secretary's nearly unfettered discretion over the format and content of the census. If included, the citizenship question will be one of several demographic questions (including questions inquiring about race, gender, and relationship status) on the census form sent to every household. Plaintiffs ask this Court to vacate that decision, but lack standing to bring their claims, which in any event are belied by the record.

As a threshold matter, Plaintiffs have suffered no Article III injury traceable to the Secretary's decision. They cannot show that the reinstatement of a citizenship question will result in a differential undercount of the population (and thus putative detrimental effects on apportionment and federal funding), particularly after accounting for the Census Bureau's extensive follow-up operations, massive outreach communications plan, and processes for imputation. Nor can they show that any such potential decline in self-response will result in any material effect on apportionment or federal funding. Plaintiffs' claims of injury are impermissibly speculative and remote, and their claims are not fit for resolution by an Article III court.

But even assuming the Court finds it has jurisdiction, Defendants are entitled to summary judgment on the merits. Plaintiffs' claim under the Enumeration Clause that the inclusion of a citizenship question will interfere with an "actual" Enumeration fails because the Secretary will conduct a person-by-person headcount, and the Enumeration Clause is not implicated by the inclusion of demographic questions, which (including a citizenship question) have appeared uninterrupted since the first census. Plaintiffs' claims under the Administrative Procedure Act (APA) also fail because the Secretary of Commerce articulated a reasonable explanation for his decision to reinstate a citizenship question based on the record before him—that obtaining more precise citizenship data via the decennial census will be useful to the Department of Justice in enforcing the Voting Rights Act. That decision falls well within the Secretary's enormous discretion in overseeing the decennial census and is fully in compliance with the Constitution and applicable laws. The APA

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defs.' Mot. Summ. J.**

requires no more.  Even if the Court were to look behind the Secretary's decision for any additional

motivations, there is no evidence that the Secretary did not believe his stated, reasonable rationale.

Defendants are therefore entitled to summary judgment.

## BACKGROUND

## I.   FACTUAL BACKGROUND

The Constitution requires that an "actual Enumeration" of the population be conducted

every ten years in order to allocate representatives in Congress among the States, and vests Congress

with the authority to conduct that census "in such Manner as they shall by Law direct."  U.S. Const.

art. I, § 2, cl. 3.  The Census Act, 13 U.S.C. § 1 *et seq.*, delegates to the Secretary of Commerce the

responsibility to conduct the decennial census "in such form and content as he may determine," and

"authorize[s] [him] to obtain such other census information as necessary."  *Id.* § 141(a).  The Census

Bureau assists the Secretary in performing this duty.  *See id.* §§ 2, 4.  The Act directs that the Secretary

"shall prepare questionnaires, and shall determine the inquiries, and the number, form, and

subdivisions thereof, for the statistics, surveys, and censuses provided for in this title."  13 U.S.C. § 5.

Nothing in the Act directs the content of the questions included on the decennial census.

With the exception of 1840, decennial censuses from 1820 to 1880 asked for citizenship or

birthplace in some form, and decennial censuses from 1890 through 1950 specifically requested

citizenship information.[1]   In 1960, the Census Bureau asked 25% of the population for the

respondent's birthplace and that of his or her parents.  Measuring America at 72-73.  Between 1970

and 2000, the Bureau distributed a more detailed "long-form questionnaire" to a sample of the

population in lieu of the "short-form questionnaire" sent to the majority of households.  U.S. Census

---

[1]  Beginning in 1820, the census was used to tabulate citizenship by inquiring of each household the number of "foreigners not naturalized."  *See* U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000, at 6-7, https://www2.census.gov/library/publications/ 2002/dec/pol_02-ma.pdf ("Measuring America").  No question regarding birthplace or citizenship status was included in the 1840 Census.  *Id.* at 8.  In the 1850, 1860, and 1880 enumerations, the questionnaires asked for place of birth.  *Id.* at 9, 11, 13.  The census included an express question regarding citizenship in 1870.  *Id.* at 13, 15.  Decennial censuses from 1890 through 1950 specifically requested citizenship information more consistently, including asking for place of birth and (for some respondents) naturalization status and birthplace of parents.  *Id.* at 22-62.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

Bureau, Questionnaires, https://www.census.gov/history/www/through_the_decades/questionnaires/. The long-form questionnaire, which was generally sent to 1 in 6 households, included questions about the respondent's citizenship or birthplace; the short form did not.  Measuring America at 78, 91-92.

Beginning in 2005, the Census Bureau began collecting the more extensive long-form data— including citizenship—through the American Community Survey (ACS), which is sent yearly to about one in 38 households.  *See* U.S. Census Bureau, Archive of American Community Survey Questions, https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html (noting citizenship questions on every ACS questionnaire).  The introduction of the yearly ACS enabled the 2010 census to be a "short-form-only" census.  The 2020 census will also be a "short-form-only" census.  The ACS will continue to collect additional data each year, including information on the citizenship status of respondents.  Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tracts" and "census-block groups."  The decennial census is designed to undertake a full count of the people and produces other, limited information down to the smallest geographic level, known as the "census block."  As in past years, the 2020 census will pose a number of questions beyond the total number of individuals residing at a location, including questions regarding sex, Hispanic origin, race, and relationship status.

On March 26, 2018, the Secretary of Commerce issued a memorandum reinstating a citizenship question on the 2020 census questionnaire.  Administrative Record ("AR") 1313-20.  The Secretary's reasoning and the procedural background are set out in that memorandum and in a supplemental memorandum issued on June 21, 2018.  *Id.* 1321.  The Secretary explained that, "[s]oon after [his] appointment," he "began considering various fundamental issues" regarding the 2020 census, including whether to reinstate a citizenship question.  *Id.*  As part of his deliberative process, he and his staff "consulted with Federal governmental components and inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for the enforcement of the Voting Rights Act."  *Id.*

In a December 12, 2017 letter, DOJ responded that citizenship data is important to its enforcement of Section 2 of the VRA for several reasons, and that the decennial census would

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defs.' Mot. Summ. J.**

- 3 -

provide more-granular citizenship voting age population (CVAP) data than that provided by the annual ACS survey.  AR 663-665 [hereinafter Gary Letter].  In the letter DOJ "formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship."  *Id.* 665.

After receiving DOJ's formal request, the Secretary "initiated a comprehensive review process led by the Census Bureau," AR 1313, and asked the Bureau to evaluate the best means of providing the data identified in the letter.  The Census Bureau initially presented three alternatives.  *Id.* 1277-85.  After reviewing those alternatives, the Secretary asked the Census Bureau to consider a fourth option, which would combine two of the options the Bureau had presented.  *Id.* 1316. Ultimately, the Secretary concluded that this fourth option—reinstating a citizenship question on the census while simultaneously linking available administrative-record data to Census Bureau files—would "provide DOJ with the most complete and accurate CVAP data in response to its request."  *Id.* at 1317.

The Secretary also observed that collecting citizenship data in the decennial census has a long history and that the ACS has included a citizenship question since 2005.  AR 1314.  The Secretary therefore found, and the Census Bureau confirmed, that "the citizenship question has been well tested."  *Id.*  He further confirmed with the Census Bureau that the census-block-level citizenship data requested by DOJ are not available from the ACS.  *Id.*  The Secretary "carefully considered," but was unpersuaded by, concerns that reinstating a citizenship question would negatively impact the response rate for non-citizens.  AR 1317.  While the Secretary agreed that a "significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations," he concluded that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially" as a result of a citizenship question.  *Id.* 1315.  Based on his extensive process of consultation and review, the Secretary determined that, to the best of everyone's knowledge, there is limited empirical data on how reinstating a citizenship question might affect response rates.  *Id.* 1316.

The Secretary also emphasized that "[c]ompleting and returning decennial census questionnaires is required by Federal law," meaning that concerns regarding a decline in response rates were premised on speculation that some will "violat[e] [a] legal duty to respond."  AR 1319.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

- 4 -

1   Despite the hypothesis "that adding a citizenship question could reduce response rates, the Census

2   Bureau's analysis did not provide definitive, empirical support for that belief." *Id.* 1316.   The

3   Secretary further explained that the Census Bureau intends to take steps to conduct respondent and

4   stakeholder outreach in an effort to mitigate any impact on response rates of including a citizenship

5   question. *Id.* 1318.   In light of these considerations, the Secretary concluded that "even if there is

6   some impact on responses, the value of more complete and accurate [citizenship] data derived from

7   surveying the entire population outweighs such concerns." *Id.* 1319.

8   **II.     PROCEDURAL HISTORY**

9          Plaintiffs[2] filed suit against Defendants on April 17, 2018.   ECF No. 1.   Defendants sought

10   dismissal based on Plaintiffs' lack of standing, the political question doctrine, lack of justiciability

11   under the APA, and Plaintiffs' failure to state an Enumeration Clause claim. *See* Defs.' Mot. Dismiss,

12   ECF No. 55.   The Court denied this motion to dismiss.   Order Denying Mots. Dismiss, ECF No.

13   86.   Defendants lodged the Administrative Record ("AR") on June 8, 2018, as supplemented on June

14   21, 2018.   Notice of Filing AR, ECF No. 38; Notice of Filing Supplement to AR, ECF No. 52.   This

15   Motion for Summary Judgment is filed pursuant to the schedule entered by the Court on August 30,

16   2018.   Stip. to Case Sched. & Order as Modified by the Court, ECF No. 89.

17                                **LEGAL STANDARD**

18          "The court shall grant summary judgment if the movant shows that there is no genuine

19   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

20   Civ. P. 56(a).   Where claims call for judicial review under the APA, "summary judgment is an

21   appropriate mechanism for deciding the legal question" presented. *Ctr. for Envtl. Health v. McCarthy*,

22   192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016) (citation omitted).   The court must uphold an agency

23   decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

24   accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction,

25   authority, or limitations, or short of statutory right."   5 U.S.C. § 706(2).

26

27          [2] Plaintiffs are the City of San Jose, and Black Alliance for Just Immigration.

28   ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**
                                  - 5 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**I.     Defendants Are Entitled to Summary Judgment Because Plaintiffs Have Not Established Their Standing.[3]**

Plaintiffs claim that they will be injured because the citizenship question will result in a decrease in self-response rates on the census, which will result in an undercount, which will lead to California being apportioned fewer congressional seats that it should otherwise have, and receiving less federal funding.  Compl. ¶ 11.

Plaintiffs are unable to meet their burden and demonstrate with sufficient certainty that any of these harms will actually come to pass.  Plaintiffs will only be harmed if (1) the citizenship question itself *causes* individuals to neglect their legal duty to respond to the 2020 census, such that a decrease in the initial self-response rate occurs, (2) such a decline is not corrected by the Census Bureau's repeated efforts to encourage self-response, (3) such a decline is not corrected by the Census Bureau's extensive Nonresponse Followup ("NRFU") efforts, (4) such a decline is not corrected by the Census Bureau's use of imputation for any remaining uncounted households after NRFU, (5) if any net undercount remains after these comprehensive operations, Plaintiffs' *particular states and localities* will be undercounted more than others (*i.e.*, there will be a differential net undercount), and (6) any such differential net undercount actually changes the apportionment or funding of Plaintiffs' specific states and localities in light of both the magnitude of the differential net undercount and the national distribution of the differential net undercount. This long chain of necessary events before Plaintiffs

---

[3] In an APA case, "the district judge sits as an appellate tribunal" and all issues—including standing—generally are resolved at summary judgment. *McCrary v. Gutierrez*, No. C-08-015292, 2010 WL 520762, at *2 (N.D. Cal. Feb. 8, 2010) (quoting *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  This case should be no different.  In the event that the Court concludes an evidentiary hearing on standing is appropriate, that hearing should be limited to standing only (rather than the merits).  The question on the merits, of course, is whether the Secretary's action was supported by the administrative record and consistent with the APA standard of review, and Plaintiffs should not be permitted to import their experts' *post hoc* criticisms of the Secretary's decision. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (stating the question in an APA case as "whether the challenged rule . . . finds sufficient justification in the administrative proceedings that it should be upheld by the reviewing court").

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

1   are injured demonstrates the speculative nature of their purported injuries and strains credulity, as

2   well as their inability to attribute those hypothetical injuries to the addition of the citizenship question.

3         **A.**     **Plaintiffs Bear the Burden of Establishing Their Article III Standing.**

4        The doctrine of constitutional standing, an essential aspect of an Article III case or

5   controversy, demands that a plaintiff have "a personal stake in the outcome of the controversy [so]

6   as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975)

7   (internal citation omitted).  At its "irreducible constitutional minimum," the doctrine requires a

8   plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and

9   particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and

10   defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action

11   of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable

12   decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The standing inquiry is "especially

13   rigorous" where "reaching the merits of the dispute would force [the court] to decide whether an

14   action taken by one of the other two branches of the Federal Government was unconstitutional,"

15   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20

16   (1997)).

17        The standing requirement of "injury in fact" requires a plaintiff to establish that it "'has

18   sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action.

19   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).  The injury must be "concrete

20   and particularized," *Lujan*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or

21   'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009)

22   (quoting *Lujan*, 504 U.S. at 560).  Thus, an alleged future injury must be "*certainly* impending";

23   "'[a]llegations of possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore*

24   *v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

25        The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly

26   impending injuries "fairly can be traced to the challenged action of the defendant, and not injury that

27   results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare*

28   ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
      **Defs.' Mot. Summ. J.**

1  *Rights Org.*, 426 U.S. 26, 41-42 (1976).  In the census context, merely a showing of differential net

2  undercount is not enough as there has never been a perfect census count.  *See Carey v. Klutznick*, 653

3  F.2d 732, 735 (2d Cir. 1981).  Plaintiffs instead must prove by a preponderance of the evidence that

4  any differential net undercount is specifically attributable to the citizenship question.

5          "[T]here can be no genuine issue as to any material fact" where a party "fails to make a

6  showing sufficient to establish the existence of an element essential to that party's case, and on which

7  [it] [bears] . . . the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Thus, "[a]t the

8  summary judgment stage," plaintiffs "[a]re required to come forward with evidence demonstrating

9  concrete injury . . . based on the challenged action," *Proyecto Pastoral at Dolores Mission v. Cty. of L.A.*,

10  22 Fed. App'x. 743, 744 (9th Cir. 2001), or else "Rule 56(c) mandates the entry of summary judgment"

11  against them.  *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(e)).

12          **B.**     **Plaintiffs Cannot Show That the Citizenship Question Will Result in an**

13                  **Undercount.**

14          As an initial matter, Plaintiffs cannot show that the months-long census process will result in

15  an undercount, even assuming, *arguendo*, that the citizenship question resulted in any additional

16  hesitancy to respond among certain individuals.  First, those who choose not to respond to the

17  citizenship question alone, or who cease completing questions on the census after they reach the

18  citizenship question, will still be enumerated and thus would not contribute to any undercount.

19  Second, the Census Bureau has extensive techniques to encourage individuals who did not initially

20  respond to respond through one of five additional opportunities.  Third, for those who still have not

21  responded, the Census Bureau will employ its NRFU process, one of the largest peacetime

22  mobilizations in our Nation's history in which includes sending enumerators out to collect

23  information from non-responders in person.  Fourth, where enumeration efforts still fail, the Census

24  Bureau uses high-quality administrative records from other federal agencies to enumerate

25  individuals.  As the Census Bureau's Chief Scientist and Associate Director for Research and

26  Methodology therefore concluded in his expert report, "there is no credible quantitative evidence

27  that the addition of the citizenship question would affect the accuracy of the count."  Declaration of

28  *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
   **Defs.' Mot. Summ. J.**

John M. Abowd, Ph.D. ¶ 13 (Abowd Declaration), Ex. A; *see also id.* at 4 ("It is important to stress

that the estimated decrease in self-response rates does not translate into an increase in net

undercount, and the use of our estimates as if they did is wholly inappropriate.").  As discussed

below, these extensive procedures will ameliorate any risk of injury to Plaintiffs.  Plaintiffs'

speculative claimed injuries are far from "certainly impending" because they will come to pass only if

every step described below fails.  *Clapper*, 568 U.S. at 409.

> **1.      *Individuals Are Prompted Multiple Times to Respond to the Census,***
> ***and Their Responses Are Counted Even If They Are Incomplete or Do***
> ***Not Respond to the Citizenship Question.***

Even before beginning its NRFU efforts, the Census Bureau has comprehensive plans in

place to maximize self-response.  Instructions to complete the census online or by telephone will

initially be sent to most households, with the remaining households (those deemed less likely to have

internet access) receiving a paper questionnaire in the first mailing.  2020 Census Operational Plan:

A New Design for the 21st Century, at 18, 21, 91, 95 (Sept. 2017, v.3.0),

https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-

docs/2020-oper-plan3.pdf ("2020 Census Operational Plan"); Abowd Declaration ¶¶ 25-29.  All

households will receive a letter reminding them to respond as a second contact.  Abowd Declaration

¶ 29.  If households do not initially self-respond, they will receive a postcard as the third contact, a

letter and the paper version of the questionnaire as the fourth contact, and another postcard as the

fifth contact.  Abowd Declaration ¶ 30; 2020 Census Operational Plan at 99.  Each household can

thus receive up to six mailings.  2020 Census Operational Plan at 99; *see also* Abowd Declaration ¶ 30.

In addition to online instructions, all mailings also include a toll-free number that provides assistance

in self-responding.  Abowd Declaration ¶ 30.  In addition, the 2020 census will be the first to rely

extensively on digital methods and automation, and it will be the first census where individuals are

encouraged to respond online.  2020 Census Operational Plan at 15, 18-19, 26, 88.  The Census

Bureau also engages in advertising and outreach efforts to inform people about the census and

1    encourage them to self-respond.  2020 Census Operational Plan at 21, 92-94; Abowd Declaration

2    ¶ 61 & n.52.

3          Furthermore, the actual enumeration could only be affected by households that completely

4    choose not to respond—if a household simply skips the citizenship question (i.e., so-called "item

5    nonresponse," where a person does not respond to a particular item on the questionnaire) or stops

6    filling out the census questionnaire once they reach the citizenship question (i.e., "breakoff") they

7    will nonetheless be fully counted.  *See* Abowd Declaration ¶ 35-38.

8          **2.     *Any Households that Do Not Self-Respond Will Be Enumerated by***

9                ***NRFU Efforts.***

10         If a household does not self-respond during the steps described above, which span six weeks,

11   it does not mean that that household will not be enumerated.  Instead, the Census Bureau's extensive

12   NRFU operations will kick in, starting with the assignment of an enumerator to each nonresponding

13   household address.    Abowd  Declaration  ¶¶ 38-39;  2020  Census  Operational  Plan  at  114.

14   Enumerators physically visit housing unit addresses in order to enumerate households through an in-

15   person interview.  Abowd Declaration ¶ 39.  Enumerators are dispatched utilizing a state-of-the-art

16   optimizer that efficiently assigns cases and provides routes for field work.[4]  Census Operational Plan

17   at 114; *see also* Abowd Declaration ¶ 45-51.   The Census Bureau "considers the demographic

18   characteristics of each unique geographic area" in selecting enumerators, and works to retain local

19   enumerators, as well as enumerators with the language skills required to communicate with residents

20   in each area.  Abowd Declaration ¶¶ 49-50.   Enumerators also have access to remote translation

21   services for 59 non-English languages.  Abowd Declaration ¶ 50.  If an enumerator is not able to

22   connect with a resident during an in-person visit, the enumerator will leave a Notice of Visit form

23   providing information about how the household can complete the 2020 census.  Abowd Declaration

24   ¶ 51.  A household may be visited by an enumerator up to 6 times.  Abowd Declaration ¶ 53 & n.43.

25

26

27          [4] The increased efficiency from these technological advances will enable the Census Bureau
     to target advertising and NRFU resources toward areas with low response rates.

28   ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**

1    If the enumerator is unable to make contact with a household, and the household does not

2    complete the 2020 census questionnaire as per the Notice of Visit, the Census Bureau will still

3    enumerate that household.  Using its "final attempt" procedures, the Census Bureau will impute data

4    for a non-responding household if reliable administrative records are available.  Census Operational

5    Plan at 22, 114, 117; Abowd Declaration ¶ 53.  If such reliable data is not available, then the

6    enumerator will attempt to contact a nearby proxy (such as a neighbor or building manager), and will

7    enumerate the non-responding household through data provided by that proxy.  Abowd Declaration

8    ¶ 53 & n.41.  As necessary, the most experienced and effective enumerators will be tasked to identify

9    proxies.  Census Operation Plan at 22, 114, 117; Abowd Declaration ¶ 53.  Although imputation and

10   proxy efforts may result in lower quality data for demographic questions relative to data from self-

11   responses, they should not cause an *undercount*.  *See* Abowd Declaration ¶ 53 ("The Census Bureau is

12   not aware of any credible quantitative evidence suggesting that proxies in the census provide a greater

13   net undercount or differential net undercount in comparison to self-response or in-person

14   interviews."); Abowd Declaration ¶ 56 ("The Census Bureau is not aware of any credible quantitative

15   data suggesting that imputation in the census leads to a greater net undercount or differential net

16   undercount in comparison to self-response or in-person interviews.").

17   The Census Bureau's NRFU operations are dynamic, and will be adjusted in real-time based

18   on self-response rates to ramp up media efforts and hire additional enumerators in areas of

19   demonstrated need.  Abowd Declaration ¶¶ 64-67.  If necessary, the Census Bureau can also assign

20   enumerators to work overtime, shift enumerators between geographic regions, and even extend the

21   NRFU period to obtain a full enumeration.  Abowd Declaration ¶¶ 66-67.

22        **3.    The Census Bureau's Combined Enumeration Efforts (Encouraging**

23               **Self-Response, NRFU, Imputation and Proxy Data) Will Correct Any**

24               **Possible Decline in Initial Self-Response and Completely Enumerate**

25               **the Population.**

26   The Census Bureau expects that the completion of the exhaustive NRFU efforts described

27   above "will result in a complete enumeration," Abowd Declaration ¶ 24—in other words, there will

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**

1   be no undercount, differential or not.  And, the Census Bureau has more than sufficient resources

2   available to complete these steps, even in a worst-case scenario for self-response.  *See* Abowd

3   Declaration ¶ 78 ("The Census Bureau is prepared to conduct the 2020 Census NRFU operation and

4   believes that those efforts will result in a complete enumeration.").

5          The 2020 Census Life Cycle Cost Estimate ("LCCE") includes an estimated fiscal year 2020

6   cost for NRFU of approximately $1.5 billion.  Abowd Declaration ¶ 58.  This estimate is based on

7   numerous factors, including the self-response rate at the start of the operation; self-responses

8   received after the start of the operation; occupied, vacant and non-existent cases in the workload that

9   are removed using administrative information; late additions to the workload; the number of days

10  worked by enumerators; the average hours the enumerators work per day; the number of contact

11  attempts to conduct the interview; training hours for enumerators; mileage travelled by enumerators;

12  and other miscellaneous expenses. Abowd Declaration ¶ 58.  In fiscal year 2020, there will also be an

13  additional $1.7 billion in contingency funding that may be spent on NRFU.  Abowd Declaration ¶ 59.

14         The self-response rate built into the LCCE is in the range of 55.5% to 65.5%.  And although

15  the Census Bureau expects a self-response rate of 60.5%, all NRFU planning—including hiring of

16  field staff and enumerators—is based on the lower bound of this estimate, 55.5%.  For each

17  percentage point increase or decrease in the overall self-response rate, the LCCE estimates $55

18  million will be saved or spent.  Abowd Declaration ¶ 60.  This estimate includes, for example, the

19  cost of additional or lowered field supervisors and enumerators, hours in the field, mileage, training

20  costs, provisioning and usage of handheld devices, and impacts on printing, postage, and paper data

21  capture operations.[5]

22         Under any conceivable scenario in which self-response rates decline due to the citizenship

23  question, the Census Bureau is fully equipped and funded to enumerate all those who would be

24  enumerated absent a citizenship question.  For example, even if there is a 10% decline in self-response

25

26
27         [5] The estimate assumes that the increased or decreased percentage of housing unit addresses
    self-responding is not easier or harder to count than a representative percentage of those not
    responding to the census.

28  *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
    **Defs.' Mot. Summ. J.**
                                    - 12 -

1    among potential noncitizen households in 2020, and if 28.6% of households in the country match

2    that description (a high estimate), Abowd Declaration ¶ 69, then the predicted increase in the NRFU

3    workload would be approximately 3.6 million addresses, which would increase NRFU costs by $137.5

4    million, far below the $1.7 billion in fiscal year 2020 contingency funding.

5         **C.      Even if an Undercount Occurred, Plaintiffs Cannot Show that It Would Affect**

6              **Them Through Any Material Impact on Apportionment or Federal Funding.**

7         As discussed in detail above, the Census Bureau's plans to encourage self-response, and to

8    use NRFU efforts—including personal visits by enumerators and, eventually, imputation—to

9    supplement that self-response will result in a complete enumeration, and thus Plaintiffs will not be

10   injured.  Even if, however, there was some undercount, Plaintiffs cannot show that it would be

11   differential such that their specific states and localities would see a negative effect in apportionment

12   or funding.

13        Plaintiffs raise two theories as to how they would be harmed by a differential undercount:

14   (1) a differential undercount will cause Plaintiffs to cause a dilution of their legislative representation,

15   and (2) a differential undercount will cause harm in the form of a loss of federal funding under certain

16   federal programs that use census data in part to determine funding amounts.  *See, e.g.*, Compl. ¶ 11.

17   However, Plaintiffs cannot prove, as they must, that there is an imminent, concrete risk of either

18   harm.

19        Indeed, to the contrary, Defendants' expert Dr. Stuart Gurrea has shown that there would

20   likely be no effect on apportionment, and only a negligible effect on funding.  Dr. Gurrea concluded

21   that if the 2020 NRFU efforts were as successful as the 2010 NRFU efforts, "congressional

22   apportionment in any state (including California) does not change due to reinstatement of a

23   citizenship question," even without considering additional mitigation efforts, such as imputation.

24   Rule 26(A)(2)(B) Expert Report and Declaration of Stuart D. Gurrea, Ph.D. ¶¶ 11, 66-70 (Gurrea

25   Declaration), Ex. B.  Similarly, assuming the 2010 NRFU success rate and no additional imputation,

26   "the distribution of federal funds to the State of California is estimated to decline by 0.01 percent"

27   for Title I LEA Grants, WIC Supplemental Foods Grants, and Social Services Block Grants. Gurrea

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**

1    Declaration ¶ 11.  This would hardly represent a material change.  In light of this evidence, Plaintiffs

2    cannot meet their burden to show an imminent, nonspeculative injury by a preponderance of the

3    evidence based on either apportionment or funding.

4         Similarly, the Court previously concluded that BAJI had sufficiently alleged standing to

5    survive a motion to dismiss based on the premise that "the inclusion of a citizenship question on the

6    2020 Census . . . will disproportionately depress the response rates of immigrant communities," such

7    that "these communities stand to lose political representation and access to federal funding.  Order

8    Denying Motion to Dismiss at 16, ECF No. 86.  BAJI's claims of harm arising from the alleged

9    diversion of resources "to combat any resulting political dilution, loss of federal funding, and other

10   harmful effects suffered by the communities it serves," Compl. ¶ 12, are all predicated on the fact of

11   a differential undercount.  But as discussed above, there will be no harmful effects of the citizenship

12   question, and thus no need to divert resources to redress those imaginary effects, or otherwise to

13   educate BAJI's members about the census. BAJI cannot show that it would be required to divert any

14   resources, much less sufficient resources to "'perceptibly impair[]' [its] ability to carry out [its]

15   missions." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018-19 (9th Cir. 2013) (quoting *Havens Realty*

16   *Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).   Absent an actual differential undercount, any

17   expenditures by BAJI cannot be attributed to Defendants, as BAJI "cannot manufacture the injury

18   [needed for standing] by incurring litigation costs or simply choosing to spend money fixing a

19   problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake*

20   *Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

21        **D.     If Any Potential Injuries Existed, Plaintiffs Cannot Show that They Are**

22               **Traceable to the Citizenship Question or Redressable by That Question's**

23               **Removal.**

24        Finally, Plaintiffs cannot show that any injury—if one existed—is traceable to the addition of

25   the citizenship question, or would be redressed if the question were removed.  First, Plaintiffs'

26   supposition that the citizenship question will cause an undercount relies on individuals violating their

27   legal duty to respond to the census.  As the Secretary emphasized in his decision memo, "[c]ompleting

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**
                                                    - 14 -

and returning decennial census questionnaires is required by Federal law." AR 1319; 13 U.S.C. § 221. Defendants should not be held to blame such hypothetical illegal acts. *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008) (finding that plaintiffs lacked causation for their claims against the United States when the United States merely continued to participate in a treaty, while plaintiffs were allegedly harmed by illegal overfishing outside the treaty).  Second, Plaintiffs must show that their claimed concerns will lead households who would currently respond to the census if it did not include a citizenship question to not respond to *any part* of the census due to the inclusion of a citizenship question at the end of the form.  In other words, if households exist that have confidentiality concerns in the current political climate such that they will decide not to respond to the census with or without a citizenship question, any resulting undercount is not attributable to the Secretary's decision to add a citizenship question.  And, as discussed above, households that leave the citizenship question blank but otherwise respond or breakoff at the citizenship question will still be enumerated, avoiding Plaintiffs' purported harms.  Plaintiffs cannot show, absent "speculation or guesswork," that the addition of a citizenship question is a "substantial factor" motivating any decrease in initial non-response. *Mendina v. Garcia*, 768 F.3d 1009, 1012-13 (9th Cir. 2014), citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)).  Indeed, Plaintiffs refer to concerns about the "political climate" as a whole and "[r]umors of ICE raids." Compl. ¶¶ 55, 81 (internal citations omitted). Of course, concerns driven by the overall political climate, ICE enforcement actions, and events other than the presence of a citizenship question on the census are not traceable to Secretary Ross's actions and would not be redressed by the outcome of this lawsuit.

## II.     Defendants Are Entitled to Summary Judgment on the Enumeration Clause Claim Because the Secretary Will Conduct a Person-by-Person Enumeration.

The Court should grant judgment in favor of Defendants on the Enumeration Clause claim.[6]

---

[6] [For San Jose Comp] Although Plaintiffs also assert a claim under the Apportionment Clause, Compl. ¶¶ 97–104, this claim merely duplicates Plaintiffs' claim under the Enumeration Clause; both claims argue that reinstatement of a citizenship question on the 2020 census may have some impact on congressional apportionment. Compare Compl. ¶ 93 with ¶ 100. Indeed, this Court recognized that these claims "rise and fall together." Order Denying Motions to Dismiss at 2 n.2,

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

Plaintiffs allege that Defendants violate the Enumeration clause by including the citizenship question on the 2020 census because the question will diminish the response rates of non-citizens and their citizen relatives.  Compl. ¶ 92.  This argument is fatally flawed because the Constitution neither requires nor prohibits the census from asking whether a person is a U.S. citizen.  Rather, the Constitution's reference to "actual Enumeration" requires only that the population be determined by a person-by-person headcount, rather than through estimate or conjecture.  U.S. Const. art. I, § 2, cl. 3.  There is no dispute that the 2020 census seeks to do a person-by-person headcount.  *See* Compl. ¶ 62.  Therefore, the Enumeration Clause is satisfied.

Rather than challenging the 2020 census for failing to do a person-by-person headcount, the only requirement under the Enumeration Clause, Plaintiffs make the novel argument that the "effect" of the citizenship question is so sensitive in the current political climate that it interferes with the actual enumeration.  Compl. ¶ 73; *see also* ECF No. 75 at 27.  This theory, taken to its logical conclusion, would mean that the Enumeration Clause prohibits any demographic questions that may theoretically reduce response rates and cause some differential undercount.[7]  But, from the beginning, the census has asked demographic questions that may disproportionately deter respondents in certain

---

*City of San Jose, et al. v. Ross, et al.*, 18-cv-2279 (N.D. Cal. Aug. 17, 2018), ECF No. 86. This Court should therefore grant judgment in favor of Defendants on Plaintiffs' Apportionment Clause for the same reasons as Plaintiffs' Enumeration Clause claim.

[7] To the extent Plaintiffs rely on the *Wisconsin* standard for this proposition, it is inapposite here.  As Judge Furman recognized:

> To read *Wisconsin* as Plaintiffs suggest would, therefore, lead ineluctably to the conclusion that each and every census—from the Founding through the present—has been conducted in violation of the Enumeration Clause. That would, of course, be absurd, and leads the Court to conclude instead that the *Wisconsin* standard applies only to decisions that bear directly on the actual population count. Notably, the Supreme Court's own language supports that limitation, as it held only that "the Secretary's decision not to adjust" the census count "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population." [*Wisconsin*,] 517 U.S. at 20 (emphasis added). That is, the Court did not purport to announce a standard that would apply to a case such as this one.

*New York, et al. v. Dep't of Commerce, et al.*, 18-cv-2921 (S.D.N.Y. July 26, 2018), ECF No. 215 at 58; *NYIC, et al. v. Dep't of Commerce, et al.*, 18-cv-5025 (S.D.N.Y. July 26, 2018), ECF No. 70 at 58. This Court should likewise reject *Wisconsin* for this proposition.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

- 16 -

areas of the country.[8]  *See* Census Act of 1790, § 1, 1 Stat. 101 (1790) (specifying six questions, including the number of slaves). This includes citizenship-related questions—as early as 1820—that may have had a disproportionately deterrent effect similar to what Plaintiffs allege will result from the 2020 census citizenship question.  For example, the census has previously asked questions relating to the "[n]umber of foreigners not naturalized," even though such people would not be equally distributed across the United States.  *See, e.g.*, Census Act of 1820, 3 Stat. 548 (1820) (question on the "[n]umber of foreigners not naturalized"); Census Act of 1830, 4 Stat. 383 (1830) (question on "[t]he number of White persons who were foreigners not naturalized"); Census Act of 1850, 9 Stat. 428 (1850) (governing the censuses of 1850–1870 and asking place of birth); Act Providing for the Fourteenth Census, 40 Stat. 1291 (1919) (questions on place of birth and parents' places of birth; if foreign-born, what year the person immigrated and the person's naturalization status).

The "current political climate" does not alter this analysis, nor have Plaintiffs put forth evidence that the citizenship question in fact will preclude an actual enumeration in the current political climate.  There is no support for the proposition that an otherwise constitutional census question becomes unconstitutional due to the political climate at a particular time.  Quite the opposite, citizenship-related questions have been asked to some or all of the population, in varying political climates, for nearly two hundred years.  And no one contends that citizenship questions—asked since 1820—and race-related questions—asked in every census since 1790—were

---

[8] As Judge Furman noted, "the longstanding practice of asking questions about the populace of the United States without a direct relationship to the constitutional goal of an 'actual Enumeration' has been blessed by all three branches of the federal government." *New York, et al. v. Dep't of Commerce, et al.*, 18-cv-2921 (S.D.N.Y. July 26, 2018), ECF No. 215 at 51; *NYIC, et al. v. Dep't of Commerce, et al.*, 18-cv-5025 (S.D.N.Y. July 26, 2018), ECF No. 70 at 51.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

1    unconstitutional prior to the Civil War,[9] during World War II,[10] or during the Cold War,[11] all turbulent

2    political times when census demographic questions allegedly would diminish response rates.

3              To the extent the Court is concerned about the accuracy of the enumeration, the Census

4    Bureau's comprehensive NRFU procedures, set forth above, will attempt to contact nearly every

5    person in the country, utilizing up to six mailings and multiple in-person visits by an enumerator.

6    2020 Census Operational Plan, at 88-92, 112-21.  The operations in place for 2020 are more wide-

7    ranging and more advanced than the operations performed in any previous census.  Moreover, the

8    Census Bureau is fully prepared and budgeted to conduct its extensive NRFU operations.  As

9    discussed above, Plaintiffs cannot sufficiently establish that—even if the citizenship question caused

10   a decline in initial self-response—the Census Bureau's NRFU efforts, including imputation and proxy

11   data, would not correct the decline and result in a complete enumeration.

12             While the possibility of an undercount exists in every census, the Constitution does not

13   require perfection.  *See Utah v. Evans*, 536 U.S. 452, 504 (2002) (Thomas, J., concurring in part and

14   dissenting in part) (canvassing the history of census undercounts, including the first census in 1790);

15   *Wisconsin v. City of New York*, 517 U.S. 1, 6 (1996) ("Although each [of the 20 past censuses] was

16   designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is

17   recognized as having been wholly successful in achieving that goal."); *Gaffney v. Cummings*, 412 U.S.

18   735, 745 (1973) (census data "are inherently less than absolutely accurate"); *Senate of the State of Cal. v.*

19   *Mosbacher*, 968 F.2d 974, 979 (1992) (describing the 1990 census as "one of the best ever taken in this

20   country" despite counting "approximately 98 percent of the population"); *City of L.A. v. Evans*, No.

21   01-cv-1671, 2001 WL 34125617, at *2 (C.D. Cal. Apr. 25, 2001) ("Like all of its predecessors, Census

22

---

23        [9] Census Act of 1850, 9 Stat. 428 (1850) (1850 census questions); *see also* James Oliver Horton
     & Lois E. Horton, *A Federal Assault: African Americans and the Impact of the Fugitive Slave Law of 1850*,
24   68 Chi.-Kent L. Rev. 1179, 1183 (1993) ("Blacks who grew to maturity under the shadow of the
     eighteenth-century law, even if they themselves had not been threatened with capture, were aware
25   that both fugitive slaves and free blacks were in danger.").

26        [10] U.S. Census Bureau, *Measuring America: The Decennial Censuses From 1790 to 2000, at 62*,
     https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf  ("Measuring America")
27   (1940 census questions).

         [11] *Measuring America* at 66-69 (1950 census questions), 72-73 (1960 census questions).

28   ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**

2000 produced less than perfect results."). As long as the Secretary has established procedures for counting every resident of the United States—and there is no dispute of material fact that he has not—any undercount is a constitutionally permissible result of attempting to enumerate upwards of 325 million people across 3.8 million square miles. *See* U.S. & World Population Clock, https://www.census.gov/popclock/. Accordingly, the Court should grant judgment in favor of Defendants on Plaintiffs' Enumeration Clause claim.

III. **The Court Should Grant Judgment to Defendants on the APA Claims Because the Secretary's Decision Was Eminently Reasonable and within His Lawful Discretion.**

The Court should grant judgment in favor of Defendants on the Plaintiffs' claims under the APA. The complaint alleges that the Secretary's decision to reinstate a citizenship question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2); *see, e.g.*, Compl. ¶¶ 106, 113. But Plaintiffs' claims fail because the Secretary's decision was eminently reasonable and fully in accord with the Constitution and relevant statutes.

A. **The Secretary's decision was eminently reasonable and easily survives arbitrary-and-capricious review under the APA.**

1. ***Agency actions are reviewed only for reasonableness.***

In deciding an arbitrary-and-capricious claim, the question for the Court is whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) (citation omitted). Put simply, the Court "cannot substitute its judgment for that of the agency." *Ctr. for Bio. Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017); *see also FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives."). "The only question before [the Court] is whether

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

- 19 -

the [agency], in reaching its ultimate finding, 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)). And "[t]hat requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Bowman Transp., Inc. v. Ark-Best Freight Sys, Inc.*, 419 U.S. 281, 286 (1974).

Moreover, the Court's review must be particularly deferential here because Plaintiffs challenge the Secretary's broad discretion over the census. "The text of the Constitution vests Congress with *virtually unlimited discretion* in conducting the decennial 'actual Enumeration,'" and "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides." *Wisconsin v. City of New York*, 517 at 19 (quoting art. 1, § 2, cl. 3) (emphasis added); *see also, e.g.*, *Baldrige v. Shapiro*, 455 U.S. 345, 361 (1982) (discussing the broad congressional authority in the area of the census). Congress, in turn, "has delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)). The Census Act authorizes the Secretary to "take a decennial census of population . . . in such form and content as he may determine" and "obtain such other census information as necessary." 13 U.S.C. 141(a); *see also, e.g.*, *Utah*, 536 U.S. at 472. Given this broad grant of discretion, "so long as the Secretary's conduct of the census is 'consistent with the constitutional language and the constitutional goal of equal representation,' it is within the limits of the Constitution." *Wisconsin*, 517 U.S. at 19 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992)).

The Court's review of Plaintiffs' APA claim should be confined to the record before the Secretary. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Herguan Univ. v. ICE*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). Thus, the Court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Id.* (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)); *see also, e.g. Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*). To the extent Plaintiffs seek to introduce expert

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

- 20 -

testimony going to the merits, that testimony is not a proper subject of APA review because it was not before the Secretary and irrelevant to his decision. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (concluding that the district court abused its discretion "when it used several extra-record declarations to question [the agency's] scientific judgments" and "opening the administrative for the experts to debate the merits of the [agency action]"); *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160-61 (9th Cir. 1980).

That this Court authorized extra-record discovery on a finding of bad faith likewise is of no moment in applying the APA standard of review. The Supreme Court has made clear that the subject of a federal court's review is the existing record before the agency. *See, e.g.*, *Camp*, 411 U.S. at 142 (holding that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Thus, materials produced in discovery (which Defendants contend was improper here) are not a proper subject of APA review unless those materials were part of the record before the agency. 5 U.S.C. § 706. The bad-faith exception to record review simply "operate[s] to identify and plug holes in the administrative record." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *see also e.g.*, *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130-31 (9th Cir. 2012) ("[E]xceptions to the normal rule regarding consideration of extra-record materials 'only appl[y] to information available at the time, not post-decisional information.'" (quoting *Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 390 F. Supp. 2d 993, 1002 (D. Mont. 2005)); *Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (explaining that postdecisional information "may not be advanced as a new rationalization either for sustaining *or attacking* an agency's decision" because "it inevitably leads the reviewing court to substitute its judgment for that of the agency").

## 2. The Secretary reasonably explained his decision to reinstate a citizenship question on the decennial census.

Here, the record establishes that the Secretary articulated a satisfactory explanation for his eminently reasonable decision, including a "rational connection between the facts found and the

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
Defs.' Mot. Summ. J.

1   choice made." *State Farm*, 463 U.S. at 43.  The Secretary explained in his decision memorandum that

2   the census is an accepted means of collecting citizenship data.  AR 1313-20.  The Commerce

3   Department's review of the issue showed "that collection of citizenship data by the census has been

4   a long-standing historical practice," including through regular inclusion in the decennial census

5   through 1950, in the long-form census through 2000, and in the ACS since 2005.  *Id.* at 1314.  As the

6   Secretary observed, "the decision to collect citizenship information from Americans through the

7   decennial census was first made centuries ago."  *Id.* at 1319.  Further, the inclusion of a citizenship

8   question is far from unusual in comparative perspective; the United Nations recommends that

9   nations inquire about citizenship and other countries include a citizenship question on their censuses.

10  *Id.*  Given the ubiquity of citizenship questions, the reinstatement of a question on the 2020 census

11  was a subject under consideration by various government officials.  *Id.*

12          Against this backdrop, the Secretary solicited DOJ's views on the subject and, in December

13  2017, received DOJ's formal request "that the Census Bureau reinstate on the 2020 Census

14  questionnaire a question regarding citizenship."  AR 663.  The Gary Letter explains that citizenship

15  data is "critical" to DOJ's Voting Rights Act enforcement because DOJ "needs a reliable calculation

16  of the citizen voting-age population in localities where voting rights violations are alleged or

17  suspected."  According to the Gary Letter, collecting such data through the decennial census, which

18  would provide block-level CVAP data, is preferable to currently available ACS data for several

19  reasons.  *Id.* at 664-65.  The Gary Letter therefore concluded that "the decennial census questionnaire

20  is the most appropriate vehicle for collecting [citizenship] data, and reinstating a question on

21  citizenship will best enable the Department to protect all American citizens' voting rights under

22  Section 2."  *Id.* at 663.

23          The Secretary "set out to take a hard look at the request" and ensure that he "considered all

24  facts and data relevant to the question."  AR 1313.  The Commerce Department and the Census

25  Bureau "began a thorough assessment that included legal, program, and policy considerations."  *Id.*

26  This review included, for example, the preparation by the Census Bureau of a technical review of the

27  request, *id.* at 1277-85; a detailed exchange between the Commerce Department and the Census

28  ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
    **Defs.' Mot. Summ. J.**

Bureau about the technical review, *id.* at 1286-97; multiple meetings between the Secretary and Census Bureau leadership to discuss the Census Bureau's "process for reviewing the DOJ request, their data analysis, [the Secretary's] questions about accuracy and response rates, and their recommendations," *id.* at 1313; and extensive engagement with stakeholders, *id.* at 763-1276. At the conclusion of this process, the Secretary determined that the "census-block-level citizenship data requested by DOJ [was] not available" from existing surveys conducted by the Census Bureau. *Id.* at 1314. The Secretary also reasonably accepted DOJ's determination that, because "DOJ and the courts use CVAP data for determining violations of Section 2" of the VRA, "having these data at the census block level will permit more effective enforcement." *Id.* at 1313.

The Secretary thus proceeded to evaluate the available options. AR 1317. Through extensive consultation with the Census Bureau, the Secretary identified four alternatives: making no change in data collection but assisting DOJ with statistical modeling ("Option A"); reinstating a citizenship question on the decennial census ("Option B"); obtaining citizenship data from administrative records for the whole census population ("Option C"); and, at the request of the Secretary after receiving the Census Bureau's analysis, a combination of reinstating a question on the census and utilizing administrative-record data ("Option D"). *Id.* at 1314-17. With the goal of "obtaining *complete and accurate data*" on citizenship, *id.* at 1313, the Secretary concluded that Option D—"placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records"—would "provide DOJ with the most complete and accurate CVAP data in response to its request." *Id.* at 1317.

Thus, the Secretary traced the steps from the facts found during the agency's extensive review of DOJ's request to his ultimate decision. AR 1313-20. This reasonable explanation of the decisionmaking process is all that is required to survive arbitrary-and-capricious review. Even if the Court doubts that the Secretary's conclusions necessarily follow from the facts found, the Court "should 'uphold a decision of less than ideal clarity if the [Secretary's] path may reasonably be discerned.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted). And here, the Secretary's path is readily understood from his memorandum, including a "rational

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defs.' Mot. Summ. J.**

- 23 -

1   connection between the facts found and the choices made." *State Farm*, 463 U.S. at 43.

2          3.      **The Secretary engaged in an appropriate process, including the**

3                  **consideration of alternatives, and explained his rationale.**

4          To the extent Plaintiffs suggest that the Secretary's decision was arbitrary and capricious

5   because he "relied on factors which Congress has not intended [him] to consider," "failed to consider

6   an important aspect of the problem" or "offered an explanation for its decision that runs counter to

7   the evidence before the agency," *id.*, those claims are clearly belied by the record.  The Secretary

8   engaged in a process that identified various issues, considered alternative proposals, and explained

9   his rationale for rejecting or accepting the different options presented based on the evidence before

10  him.  What matters for APA review is that the Secretary engaged in this process and deliberately

11  considered the options—not whether his decision was "the best one possible or even whether it [was]

12  better than the alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782.

13         First, Plaintiffs cannot show that the Secretary failed to consider alternatives.  The Secretary

14  considered four proposals and reasonably concluded that Option D would provide DOJ with the

15  most complete and accurate CVAP data.  AR 1314-17.  That the Census Bureau recommended

16  Options A or C, *id.* at 1277, and expressed reservations about Option D, *id.* at 1312, does not render

17  the Secretary's decision unreasonable.  Given the broad deference afforded the Secretary by virtue of

18  the congressional delegation of broad discretion over the census, "the mere fact that the Secretary's

19  decision overruled the views of some of his subordinates is by itself of no moment in any judicial

20  review of his decision." *Wisconsin*, 517 U.S. at 23.  The Secretary, "like all agency heads, usually makes

21  decisions after consulting subordinates, and those subordinates often have different views." *St.*

22  *Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 83 (D.C. Cir. 2010).  All that

23  is required is that the Secretary consider the important issues—including those highlighted by his

24  subordinates—and provide a rational explanation for his decision. *State Farm*, 463 U.S. at 43.

25         Plaintiffs also cannot show, for example, that the Secretary failed to consider effects on the

26  response rates.  Compl. ¶¶ 63, 71-83.  The Secretary reviewed the available materials and concluded

27  that "no one provided evidence that reinstating a citizenship question on the decennial census would

28  ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
    **Defs.' Mot. Summ. J.**

1   materially decrease response rates." AR 1315, 1317.  The Secretary further explained that the Bureau

2   could address any nonresponse through NRFU and, in any event, "the value of more complete and

3   accurate data derived from surveying the entire population outweighs such concerns." *Id.* at 1319.

4   That judgment was informed by the fact that there is a legal duty to respond to the census, 13 U.S.C.

5   § 221, and the Secretary concluded that the value of providing accurate data to DOJ was "of greater

6   importance than any adverse effect that may result from people violating their legal duty to respond."

7   AR 1319.  Regardless, to help minimize any effect on response rates, the Secretary decided that the

8   citizenship question should be the last question on the form. *Id.* at 1320.

9       Plaintiffs also cannot show that the Secretary failed to consider the issue of testing for the

10   reinstatement of a citizenship question.  Compl. ¶¶ 40, 45, 114.  When the Census Bureau receives a

11   request from other agencies for a new question on the ACS, the Bureau typically "work[s] with the

12   other agencies to test the question (cognitive testing and field testing)." AR 1296.  In reviewing

13   DOJ's request to reinstate a citizenship question, the Bureau concluded that, "[s]ince the question is

14   already asked on the American Community Survey, [it] would accept the cognitive research and

15   questionnaire testing from the ACS instead of independently retesting the citizenship question." *Id.*

16   at 1279.  In his memorandum, the Secretary thus reasonably concluded that "the citizenship question

17   has already undergone the cognitive research and questionnaire testing required for new questions."

18   *Id.* at 1319.

19       Lastly, to the extent Plaintiffs suggest the Secretary's decision was pretextual, they cannot

20   demonstrate that he did not believe the rationale set forth in his decision memorandum or that his

21   initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and

22   capricious.  Even if the Secretary had *additional* reasons for reinstating a citizenship question or

23   expressed interest in adding a question before hearing from DOJ, the APA analysis would remain

24   unchanged. *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that

25   "the agency's subjective desire to reach a particular result must necessarily invalidate the result,

26   regardless of the objective evidence supporting the agency's conclusion").  It is utterly unremarkable

27   for an agency head to enter office with predispositions toward certain policy choices.  That the

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
    Defs.' Mot. Summ. J.

1    Secretary thought reinstatement of a citizenship question "could be warranted," AR 1321, asked his

2    staff to explore such an action, and decline to accept some of his staff's recommendations is neither

3    unexpected nor evidence of improper decisionmaking.  *Wisconsin*, 517 U.S. at 23 ("[T]he mere fact

4    that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment

5    in any judicial review of his decision.").  As Justice Gorsuch explained, "there's nothing unusual about

6    a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting

7    support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape."

8    *In re Dep't of Commerce*, __ S. Ct. __, 2018 WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring

9    in part and dissenting in part).

10       **B.    The Secretary's decision was not otherwise unlawful.**

11       Plaintiffs also argue that the Secretary's decision was unlawful because it did not conform to

12   the requirements of the Constitution or federal statute.  To the extent Plaintiffs again argue that the

13   Secretary will fail to conduct an "actual Enumeration" or otherwise violate constitutional mandates,

14   Compl. ¶¶ 107-08, those claims are unavailing for the reasons set forth above.  Likewise, Plaintiffs'

15   claim that the Secretary's decision violates his duty to "take a decennial census of population" under

16   13 U.S.C. § 141(a), Compl. ¶ 114, is unconvincing for the same reasons.  Plaintiffs cannot claim that

17   the congressional delegation in the Census Act narrowed the Secretary's discretion beyond that

18   afforded by the Constitution itself.  *See Wisconsin*, 517 U.S. at 19.

19       Plaintiffs also contend that the Secretary violated the Information Quality Act (IQA), Pub. L.

20   No. 106-554, § 1(a)(3) (Dec. 21, 2001) (published at 44 U.S.C. § 3516 note), and a provision of the

21   Census Act governing the contents of certain reports to Congress, 13 U.S.C. § 141(f)(3).  Compl. ¶¶

22   65, 106, 113.  First, as to the IQA, that statute neither informs the Secretary's exercise of discretion

23   over the questions on the census nor provides a private right of action or a basis for APA review.  *See,*

24   *e.g.*, *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006) ("By its terms, this statute creates no legal

25   rights in any third parties.");  *Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1092 (E.D. Cal. 2010)

26   ("[T]he IQA itself contains absolutely no substantive standards, let alone any standards relevant to the

27   claims brought in this case.");  *Ams. for Safe Access v. U.S. Dep't of Health & Human Servs.*, No. 07-cv-

28   ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**

1    1049 (WHA), 2007 WL 4168511, at *4 (N.D. Cal. Nov. 20, 2007) ("[T]he IQA and OMB guidelines

2    do not create a duty to perform legally required actions that are judicially reviewable.").  There is no

3    means by which the Court can enforce the IQA in this APA cause of action, and Plaintiffs have not

4    even attempted to demonstrate how the correction of a putative IQA violation would address any

5    alleged injury.  Thus, Plaintiffs have neither standing nor a cause of action under the APA to pursue

6    a claim of a putative IQA violation, and Defendants are entitled to judgment as a matter of law on

7    any such claim.

8           Plaintiffs' allegations of purported violations of 13 U.S.C. § 141(f)(3), meanwhile, are both

9    factually incorrect and beyond the scope of this Court's jurisdiction.  Defendants submitted the

10   required reports to Congress, and the Secretary explained the basis for including a citizenship question.

11   In any event, it is Congress itself, not third-party litigants, that oversees agency reports to Congress.

12   Such reports are neither "agency action" subject to judicial review; "Agency action" is a term of art,

13   defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or

14   denial thereof, or failure to act."  5 U.S.C. § 551(13).  "[W]hile this definition is 'expansive,' federal

15   courts 'have long recognized that the term [agency action] is not so all-encompassing as to authorize

16   [courts] to exercise judicial review over everything done by an administrative agency.'"  *Wild Fish*

17   *Conservancy v. Jewell*, 730 F.3d 791, 800-01 (9th Cir. 2013) (quoting *Fund for Animals, Inc. v. U.S. Bureau*

18   *of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)).  Here, a report to Congress is not "an agency rule,

19   order license, sanction, [or] relief," as those terms are defined, nor is it "the equivalent . . . thereof."  5

20   U.S.C. § 551.   A report does not determine Plaintiffs' rights or obligations; rather, it conveys

21   information to Congress.  *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *see also, e.g.*, *Nat. Res.*

22   *Def. Council, Inc. v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988).  In any event, any purported defects

23   in Defendants' reports do not create the sort of redressable Article III injury necessary to sustain the

24   Court's jurisdiction.  Any relief addressed at a putative violation of a reporting requirement cannot be

25   shown to have any concrete effect on Congress that would redress an alleged injury.  *Guerrero*, 157

26   F.3d at 1194 (explaining that "nothing that [the Court] could order with respect to the reports or their

27   adequacy can make Congress do anything"); *see also, e.g.*, *Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th

28   ***City of San Jose v. Ross***, No. 3:18-cv-2279-RS
     **Defs.' Mot. Summ. J.**

1   Cir. 2012) (explaining that the courts could not redress an injury based on an alleged violation of a

2   requirement "to file an annual report to Congress"); *Wilderness Soc'y v. Norton*, 434 F.3d 584, 591 (D.C.

3   Cir. 2006).  There is no dispute of material fact that prevents the Court from entering judgment for

4   Defendants on these purely legal issues.

5                                                    **CONCLUSION**

6           For the foregoing reasons, summary judgment should be granted in Defendants' favor on

7   Plaintiffs' claims, and this case should be dismissed with prejudice.

8   Date:  November 2, 2018                          Respectfully submitted,

9                                                    JOSEPH H. HUNT
10                                                   Assistant Attorney General

11                                                   BRETT A. SHUMATE
12                                                   Deputy Assistant Attorney General

13                                                   JOHN R. GRIFFITHS
                                                     Director, Federal Programs Branch

14                                                   CARLOTTA P. WELLS
15                                                   Assistant Director

16                                                     */s/ Kate Bailey*
                                                     KATE BAILEY
17                                                   STEPHEN EHRLICH
                                                     CAROL FEDERIGHI
18                                                   Trial Attorneys
                                                     United States Department of Justice
19                                                   Civil Division, Federal Programs Branch
20                                                   20 Massachusetts Ave., NW
                                                     Washington, DC 20530
21                                                   Tel.: (202) 514-9239
                                                     Fax: (202) 616-8470
22                                                   Email: kate.bailey@usdoj.gov

23                                                   *Attorneys for Defendants*

24

25

26

27

28  **City of San Jose v. Ross**, No. 3:18-cv-2279-RS
    Defs.' Mot. Summ. J.

1

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.


*/s/ Kate Bailey*

KATE BAILEY

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS, Defs.' Mot. Summ. J.