1  MANATT, PHELPS & PHILLIPS, LLP
   JOHN F. LIBBY (Bar No. CA 128207)
2  E-mail: jlibby@manatt.com
   JOHN W. MCGUINNESS (Bar No. CA 277322)
3  E-mail: jmcguinness@manatt.com
   EMIL PETROSSIAN (Bar No. CA 264222)
4  E-mail: epetrossian@manatt.com
   11355 West Olympic Boulevard
5  Los Angeles, California 90064
   Telephone: (310) 312-4000
6  Facsimile: (310) 312-4224

7  LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
   KRISTEN CLARKE (*Pro Hac Vice* Application Forthcoming)
8  Email: kclarke@lawyerscommittee.org
   JON M. GREENBAUM (Bar No. CA 166733)
9  E-mail: jgreenbaum@lawyerscommittee.org
   EZRA D. ROSENBERG (*Pro Hac Vice*)
10 E-mail: erosenberg@lawyerscommittee.org
   DORIAN L. SPENCE (*Pro Hac Vice*)
11 E-mail: dspence@lawyerscommittee.org
   1401 New York Avenue NW, Suite 400
12 Washington, DC 20005
   Telephone: (202) 662-8600
13 Facsimile: (202) 783-0857

14 *Attorneys for Plaintiffs*
   CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION
15
   [Additional Counsel Listed Below]
16

17              **IN THE UNITED STATES DISTRICT COURT**

                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
18

19 CITY OF SAN JOSE, a municipal        3:18-cv-02279-RS
   corporation; and BLACK ALLIANCE FOR
20 JUST IMMIGRATION, a California       **DECLARATION OF ANDREW CASE**
   nonprofit corporation,               **IN SUPPORT OF PLAINTIFFS'**
21                                       **OPPOSITION TO DEFENDANTS'**
                    Plaintiffs,          **MOTION FOR SUMMARY**
22                                       **JUDGMENT**
            vs.
23                                       Date:       December 7, 2018
   WILBUR L. ROSS, JR., in his official Time:       10:00 a.m.
24 capacity as Secretary of the U.S. Department   Dept:       3
   of Commerce; U.S. DEPARTMENT OF     Judge:      The Hon. Richard Seeborg
25 COMMERCE; RON JARMIN, in his        Trial Date: January 7, 2019
   official capacity as Acting Director of the
26 U.S. Census Bureau; U.S. CENSUS
   BUREAU,
27
                    Defendants.
28

                                        1

I, Andrew Case, declare as follows:

1.   I am an attorney at Manatt, Phelps, & Phillips, LLP, counsel for Plaintiffs City of San Jose and Black Alliance for Just Immigration in the above-captioned litigation.  I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

2.   Attached as **Exhibit A** is a true and accurate copy of a selection of documents produced by the Department of Commerce in this matter, number stamped COM_DISC00017126, COM_DISC00017127, COM_DIS00018588, and COM_DIS00020953.

3.   Attached as **Exhibit B** is a true and accurate copy of a selection of documents produced by the Department of Justice in this matter. These documents were not stamped on the face of the documents but were provided with the file names DOJ0002045, DOJ00020046, and 093_DOJ00032084.

4.   Attached as **Exhibit C** is a true and accurate copy of selections from the August 15, 2018 Deposition of Dr. John Abowd.

5.   Attached as **Exhibit D** is a true and accurate copy of selections from the August 20, 2018 Deposition of Dr. Ron Jarmin.

6.   Attached as **Exhibit E** is a true and accurate copy of selections from the August 28, 2018 Deposition of Karen Dunn Kelley.

7.   Attached as **Exhibit F** is a true and accurate copy of selections from the August 29, 2018 Deposition of Dr. John Abowd as a representative of the Census Bureau.

8.   Attached as **Exhibit G** is a true and accurate copy of selections from the August 30, 2018 Deposition of Earl Comstock.

9.   Attached as **Exhibit H** is a true and accurate copy of selections from the October 12, 2018 Expert Deposition of Dr. John Abowd.

10.   Attached as **Exhibit I** is a true and accurate copy of selections from the October 16, 2018 Deposition of John Gore.

11.   Attached as **Exhibit J** is a true and accurate copy of selections from the October 24, 2018 Deposition of Dr. Stuart Gurrea.

12.  Attached as **Exhibit K** is a true and accurate copy of selections from the October 25, 2018 Deposition of Sahra Park-Su.

13.  Attached as **Exhibit L** is a true and accurate copy of selections from the October 26, 2018 Deposition of David Langdon.

14.  Attached as **Exhibit M** is a true and accurate copy of Defendants' Second Supplemental Responses to Plaintiffs First Set of Interrogatories to Defendants United States Department of Commerce and Wilbur Ross, produced on October 11, 2018 in *New York Immigration Coalition et al. v. United States Department of Commerce et al,*, 18-cv-5025 (S.D.N.Y.).

15.  Attached as **Exhibit N** is a true and accurate copy of Defendants' Objections and Responses to Plaintiffs' Third Set of Interrogatories, produced on October 12, 2018 in *New York Immigration Coalition et al. v. United States Department of Commerce et al,*, 18-cv-5025 (S.D.N.Y.).


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 16th day of November, 2018 in New York, New York.

_____/s/ Andrew Case_____
Andrew Case

1

**FILER'S ATTESTATION**

2       Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, Ana G. Guardado hereby

3   attests that concurrence in the filing of this document has been obtained from all the signatories

4   above.

5   Dated: November 16, 2018                         *s/ Ana G. Guardado*
                                                       Ana G. Guardado
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

*Additional Counsel for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

**PUBLIC COUNSEL**
MARK ROSENBAUM (Bar No. CA 59940)
Email:  mrosenbaum@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  (213) 385-2977
Facsimile:  (213) 385-9089

**CITY OF SAN JOSE**
RICHARD DOYLE, City Attorney (#88625)
NORA FRIMANN, Assistant City Attorney (#93249)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

# EXHIBIT A

**To:** Uthmeier, James (Federal)    PII
**From:** Shambon, Leonard (Federal)
**Sent:** Fri 9/15/2017 8:37:51 PM
**Importance:** Normal
**Subject:** Current version
**Received:**    Fri 9/15/2017 8:37:52 PM
<u>foreigners included in enumeration Aug 21 2017.docx</u>

Leonard M. Shambon

Special Legal Advisor

Office of the Chief Counsel for Economic Affairs

U.S. Department of Commerce

PII

COM_DIS00017126

DRAFT

8/21/2017 3:35 PM

I. **Chronological History**

   Here is the history I've been able to compile, from Census instructions and residence rules, for counting foreign citizens residing in the United States in census enumerations for apportionment.  The language (quoted from the underlying documents) is in reverse chronological order because the instructions became more explicit over time.

Census Year

2020 (proposed):

   3.  Foreign Citizens in the U.S.

   (a)  Citizens of foreign countries living in the U.S. – Counted at the U.S. residence where they live and sleep most of the time.

   (b)  Citizens of foreign countries living in the U.S. who are members of the diplomatic community – Counted at the embassy, consulate, United Nations' facility, or other residences where diplomats live.

   (c)  Citizens of foreign countries visiting the U.S. such as on a vacation or business trip – Not counted in the census.

   . . ..

   10.  College Students

   . . ..

   (e)  College students who are foreign citizens living in the U.S. while attending college in the U.S. (living either on-campus or off-campus) – Counted at the on-campus or off-campus U.S. residence where they live and sleep most of the time.  If they are living in college/university student housing (such as dormitories or residence halls) on Census Day, they are counted at the college/university student housing.

See Proposed 2020 Census Residence Criteria and Residence Situations – Proposed Criteria and request for comment, 81 Fed. Reg. 42577, 42582-83 (June 30, 2016).  Census would know if any comments were submitted in response.  In response to a 2015 Federal Register notice asking for comments on the 2010 residence rule, 80 Fed. Reg. 28950 (May 20, 2015), in anticipation of the 2016 notice, Census 262 comments, but only one dealt with foreigners, specifically how to treat foreign students at U.S. boarding schools.   Under the residence criteria, such students are ascribed to their parents' homes outside the U.S. and therefore not counted.  Census did not directly address the comment in the notice, but rather adhered to its general rule for boarding school students.  See 81 Fed. Reg. at 42578, 42579-80.

COM_DIS00017127

2010:   5.  Visitors on Census day

   . . ..

Citizens of foreign countries who are visiting the U.S. on Thursday April 1, 2010 (Census Day), such as on a vacation or a business trip – Not counted in the census

   8.  Students

   . . .

Foreign students living in the U.S. while attending college in the U.S. (living either on-campus or off-campus) – Counted at the on-campus or off-campus residence where they live and sleep most of the time.

   . . .

   14.  Foreign Citizens in the U.S.

Citizens of foreign countries living in the U.S. – Counted at the U.S. residence where they live and sleep most of the time.

Citizens of foreign countries living in the U.S. who are members of the diplomatic community – Counted at the embassy, consulate, United Nations' facility, or other residences where diplomats live.

Citizens of foreign countries visiting the U.S. such as on a vacation or business trip – Not counted in the census.

2000:  13.  Foreign Citizens

Citizens of foreign countries who have established a household or are a part of an established household in the U.S. while working or studying, including family members with them – Counted at the household.

Citizens of foreign countries who are living in the U.S. at embassies, ministries, legations, or consulates – Counted at the embassy, etc.

Citizens of foreign countries temporarily traveling or visiting in the U.S. – Not included in the census

1990:  17.  Person is a citizen of a foreign country:

   a.   Who has established a household while working or studying, including family members living with them – This household

   b.  Temporarily traveling or visiting in the United States – DO NOT LIST

   c.  Living on the premises of an Embassy, Ministry, Legation, chancellery, or Consulate – DO NOT LIST

1980:  The 1980 census residence rules stipulated, as in the past, that citizens of foreign countries living on the premises of an embassy, legation, chancery, or consulate were not to be

enumerated, but those who were living in housing units elsewhere to be canvassed and included in the census.

<u>1970:</u>    **[Haven't found instructions to enumerators or residence rules]**

<u>1960:</u>    33. Citizens of Foreign Countries Temporarily in the United States

a. <u>Do not list</u> citizens of foreign countries temporarily visiting or traveling in the United States or living on the premises on an Embassy, Ministry, Legation, Chancellery, or Consulate.

b. <u>Do enumerate</u> as residents of your ED [Enumeration District] citizens of foreign countries living here who are students or who are employed here (but not living at the Embassy, etc.) even if they do not expect to remain here. Also enumerate the members of their families if they are living with them in this country.

<u>1950:</u>    V. Citizens of foreign countries temporarily in the United States:

A.    Students and members of their families – Enumerate
B.    Persons employed here and members of their families (but not living at an Embassy, etc.) – Enumerate
C.    Any other visitors from a foreign country not included in A and B – Do not enumerate
D.    Persons living on premises of an Embassy, Ministry, Legation, Chancellory, or Consulate – Do not enumerate

<u>1940:</u>    313. . . .. As a rule, do not enumerate as residents of your district any of the following classes, except as provided in paragraph 314:

. . ..

d.    Persons from abroad temporarily visiting or traveling in the United States and foreign persons employed in the diplomatic or consular service of their country (see par. 331). (Enumerate other persons from abroad who are *students in this country* or who are *employed here*, however, even though they do not expect to remain here permanently.)

331 Diplomatic and Consular Employees of Foreign Governments – Do not enumerate citizens of foreign countries employed in the diplomatic or consular service of their country.

<u>1930:</u>    59. Classes not to be enumerated in your district

. . .    should be enumerated as of your district.

c.    Persons from abroad temporarily visiting or traveling in the United States. (Persons from abroad who are *employed* here should be enumerated, even though they do not expect to remain here permanently.

<u>1920:</u>    63. Citizens abroad at the time of the enumeration –

. . .. This instruction applies only to citizens of the United States and not to aliens who have left this country, as nothing definite can be known as to whether such aliens intend to return. **[By implication, aliens who had not left the country were to be enumerated.]**[1]

---

[1] This exclusion for transitory foreign travelers in the U.S. including transitory businessmen has its genesis as far

<u>1910</u>:    With minor wording difference, same as for 1920

<u>Before 1910</u>:  No instructions found re. enumeration of citizens of foreign countries.


II.        **<u>Court Finding</u>**

In the district court opinion in <u>Federation for American Immigration Reform (FAIR) v. Klutznick</u>, 486 F. Supp. 564 (D.C.D.C. 1980), dismissing the suit on standing ground, the three judge panel wrote:

> The population base used for apportionment purposes consists of a straightforward head count, as accurate as is reasonably possible, of all persons residing within a state on April 1.  This has been the practice since the first census in 1790; everyone is counted except foreign diplomatic personnel living on embassy grounds (which is considered "foreign soil," and thus not within any state) and foreign tourists, who do not "reside" here.  486 F. Supp. at 567, 576. [ <u>See also</u> <u>Ridge v. Verity</u>, 715 F.Supp. 1308 (W.D. Pa. 1989).]

back as 1849.  See Sen. Miscellan. No. 64, 30th Cong., 2d Sess. 24 (Jan. 20, 1849 correspondence from Jesse Chickering to Senator John Davis, primary Senate author of the 1850 census legislation).  Chickering also likely was the source of the place of birth questions included statutory schedule for that census.  See id. 24-27.

**To:**     Comstock, Earl (Federal)                    PII
**From:**   Uthmeier, James (Federal)
**Sent:**   Fri 8/11/2017 8:05:48 PM
**Importance:**         Normal
**Subject:**   Re: Census paper
**Received:**           Fri 8/11/2017 8:05:51 PM
<u>Census Memo Draft Aug 11 2017.docx</u>

Thanks Earl, clean copy attached.  I can swing a call any time after 4:30 today.


James


---

**From:** Comstock, Earl (Federal)
**Sent:** Friday, August 11, 2017 3:40 PM
**To:** Uthmeier, James (Federal)
**Subject:** Re: Census paper


Thanks James.  Please take a look at the attached edits.  If you agree then we can send to the Secretary, who wanted to have a call today to discuss.  Earl


---

**From:** "Uthmeier, James (Federal)" <            PII
**Date:** Friday, August 11, 2017 at 10:18 AM
**To:** "Comstock, Earl (Federal)" <          PII
**Subject:** Re: Census paper


Made a couple small edits for clarity.  Also, I have not yet sent this to Peter.  Just let me know if you want me to loop him in-- I think he is heading out pretty early today, and I'm tied up 11-1, but maybe we can walk through with him early next week.

**From:** Uthmeier, James (Federal)
**Sent:** Friday, August 11, 2017 9:55:52 AM
**To:** Comstock, Earl (Federal)
**Subject:** Re: Census paper

Earl-

A draft, predecisional and privileged memo is attached.  I know he likes short briefing materials, but I wanted to be more thorough given the issue and our uncertainty regarding the exact question(s) being presented.

I will keep working to clean it up and am happy to incorporate any edits.  I am out of the office for some MBDA and infrastructure meetings but can be reached on my cell.  I'll be able to talk today other than 11-1.  Will be working over the next hour to clean this up a bit.

If you want to provide some handwritten comments, you can deliver to Barb (OGC secretary) and she will get them to me quickly.

I have some new ideas/recommendations on execution that I look forward to discussing.  Ultimately, we do not make decisions on how the data should be used for apportionment, that is for Congress (or possibly the President) to decide.  I think that's our hook here.

Best,

COM_DIS00018589

James

---

**From:** Comstock, Earl (Federal)
**Sent:** Friday, August 11, 2017 8:11:41 AM
**To:** Uthmeier, James (Federal)
**Subject:** Re: Census paper

Great. Thanks!  Earl

Sent from my iPhone

> On Aug 11, 2017, at 7:45 AM, Uthmeier, James (Federal) < [ PII ] > wrote:
>
> Earl-
>
> Finishing this up this morning and will have a memo to you by 930.
>
> James
>
> Sent from my iPhone

COM_DIS00018590

**Questions on the Jan 19 Draft Census Memo on the DoJ Citizenship Question Reinstatement Request**

1.  **With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?**

    Since the collection of this data, whether from administrative records or from an enumerated question, occurs prior to the creation of the Microdata Detail File (MDF) from which all tabulations will be performed, there is no difference in the timing of when the data collected under either alternative B or C could be made available to the public.

2.  **What is the "2020 Census publication phase" (page 1 of the Detailed Analysis for Alternative B) versus Alternative C?  Would there be any difference?**

    The 2020 Census publication phase is a broad window stretching from the release of the apportionment counts by December 31, 2020 through the last data product or report published in FY 2023, the final year of decennial funding for the 2020 Census.  However, as stated in the answer to question 1, this data could be made available to the public on the same schedule as any other post-apportionment tabulated data product regardless of whether alternative B or C is used in its collection.

3.  **What is the non-response rate for: (A) each question on the 2000 and 2010 Decennial Census short form and (B) each question on the 2010 ACS and most recent ACS?**

    The table below shows the item non-response (INR) rate for each question on the 2000 and 2010 Decennial Census short form.  This is the percentage of respondents who did not provide an answer to an item.

Item Nonresponse Rates for 2000 and 2010 Short Form Person Questions

|      | Relationship | Sex | Age | Hispanic Origin | Race | Tenure |
|------|--------------|-----|-----|-----------------|------|--------|
| 2010 | 1.5          | 1.5 | 3.5 | 3.9             | 3.3  | 4.5    |
| 2000 | 1.3          | 1.1 | 3.7 | 3.1             | 2.9  | 4.1    |

Source: Rothhaas, Lestina and Hill (2012) Tables

Notes and Soucre:
Rothhaas, C., Lestina, F. and Hill, J. (2012) "2010 Decennial Census Item Nonresponse and Imputation Assessment Report"   2010 Census Program for Evaluations and Experiments, January 24, 2012.

From report:

The INR rate is essentially the proportion of missing responses before pre-editing or imputation procedures for a given item (i.e., the respondent did not provide an answer to the item). For INR, missing values are included in the rates, but inconsistent responses (i.e., incompatible with other responses) are considered non-missing responses.

Online link to 2010 report that has 2000 information as well.
https://www.census.gov/2010census/pdf/2010_Census_INR_Imputation_Assessment.pdf

See attached spreadsheet for the non-response rates for the ACS.  Note that these are internal use data.

4. **What was the total survey response rate (i.e. percentage of complete questionnaires) for the 2000 long form and the 2000 short form?   Of the incomplete long forms, what percentage left the citizenship question blank? Of the completed long forms, what percentage (if known) contained incorrect responses to the citizenship question?**

5. **For the 2000 long and short forms, what was the percentage unanswered (left blank) for each question (i.e., what percentage of the responses for each question (sex, race, ethnicity, income, citizenship, etc.) were left blank)?**

   For the 2000 shortform, the table in question 3a provides the percentage unanswered for each question.

   For the 2000 longform, Griffin, Love and Obenski (2003) summarized the Census 2000 longform responses.  Allocation rates for individual items in Census 2000 were computed, but because of the magnitude of these data, summary allocation measures were derived. These rates summarize completeness across all data items for occupied units (households) and are the ratio of all population and housing items that had values allocated to the total number of population and housing items required to have a response. These composite measures provide a summary picture of the completeness of all data. Fifty-four population items and 29 housing items are included in these summary measures. The analysis showed that 9.9 percent of the population question items and 12.5 percent of the housing unit question items required allocation.  Allocation involves using statistical procedures, such as within-household or nearest neighbor matrices, to impute missing values.

   https://ww2.amstat.org/sections/srms/Proceedings/y2003/Files/JSM2003-000596.pdf

6. **What was the incorrect response rate for the citizenship question that was asked on the Long Form during the 2000 Decennial Census?  Does the response rate on the 2000 Long Form differ from the incorrect response rate on the citizenship question for the ACS?**

COM_DIS00020954

7. **What is the incorrect response rate on other Decennial or ACS questions for which Census has administrative records available (for example, age, sex or income)?**

Table 7a. shows the agreement rates between the 2010 Census response and the SSA Numident for persons who could be linked and had nonmissing values, and Table 7b shows the agreement rates between the 2010 ACS and the SSA Numident.  Gender has low disagreement (0.4-0.5 percent), and white alone (0.9 percent), black alone (1.7-2 percent), and age (2.1 percent) also have low disagreement rates.  Disagreement rates are greater for other races (e.g., 46.4-48.6 percent for American Indian or Alaska Native alone).  Hispanic origin is not well measured in the Numident, because it contains a single race response, one of which is Hispanic.

Table 7a. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 Census Response | Percent Agreement with SSA Numident |
|---|---|
| Hispanic | 54.2 |
| Not Hispanic | 99.7 |
| White Alone | 99.1 |
| Black Alone | 98.3 |
| American Indian or Alaska Native Alone | 51.4 |
| Asian Alone | 84.3 |
| Native Hawaiian or Other Pacific Islander Alone | 74.4 |
| Some Other Race Alone | 17.7 |
| Age | 97.9 |
| Gender | 99.4 |

Source: Rastogi, Sonya, and Amy O'Hara, 2012, "2010 Census Match Study," 2010 Census Planning Memoranda Series No. 247.

Abowd and Stinson (2013) find correlations of 0.75-0.89 between Survey of Income and Program Participation (SIPP) and SSA Detailed Earnings Record annual earnings between 1990-1999.[1]

---

[1] Abowd, John M., and Martha H. Stinson, 2013, "Estimating Measurement Error in Annual Job Earnings: A Comparison of Survey and Administrative Data," Review of Economics and Statistics, Vol. 95(55), pp. 1451-1467.

8. **How does the Census presently handle responses on the (A) Decennial Census and (B) the ACS when administrative records available to the Census confirm that the response on the Decennial Census or ACS is incorrect? Is the present Census approach to incorrect responses based on practice/policy or law (statute or regulation)?**

We have always based the short form Decennial Census and the ACS on self-response, and while we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaire. This is a long established practice at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census. Title 13 of the U.S. Code allows the Census Bureau to use alternative data sources, like administrative records, for a variety of purposes, and we are using data in new ways in the 2020 Census. While this includes the use of administrative records data to fill in areas where a respondent does not provide an answer, we have not explored the possibility of checking or changing responses that a responding household has provided in response to the questionnaire.

9. **Please explain the differences between the self-response rate analysis and the breakoff rate analysis. The range of breakoff rates between groups was far smaller than the range of self-response rates between groups.**

10. **The NRFU numbers are comparatively small – approximately one additional household for NRFU per Census enumerator. Is this really a significant source of concern?**

Yes, this is a significant concern. First, it gives rise to incremental NRFU cost of at least $27.5 million. This is a lower bound becaues it assumes the households that do not self-respond because we added a question on citizenship have the same follow-up costs as an average U.S. household. They won't because these households overwhelmingly contain at least one noncitzen, and that is one of our acknowledged hard-to-count subpopulations.

11. **Given that the breakoff rate difference was approximately 1 percent, why did Census choose to use the 5.1 percent number for assessing the cost of Alternative B?**

12. **Alternative C states that Census would use administrative data from the Social Security Administration, Internal Revenue Service, and "other federal and state sources." What are the other sources?**

In addition to continuing the acquisition of the Social Security Administration and Internal Revenue Service data, the Census Bureau is in discussion with the U.S. Citizen and Immigration Services (USCIS) staff to acquire additional citizenship data.

13. **Is Census confident that administrative data will be able to be used to determine citizenship for all persons (e.g., not all citizens have social security numbers)?**

We are confident that Alternative C is viable and that we have already ingested enough high-quality citizenship administrative data from SSA and IRS. The USCIS data are not required. They would, however, make the citizenship voting age tabulations better, but the administrative data we've got are very good and better than the data from the 2000 Census and current ACS. The type of activities required for Alternative C already occur daily and routinely at the Census Bureau. We have been doing this for business data products, including the Economic Censuses, for decades. We designed the 2020 Census to use this technology too.

14. **For Alternative C, the memo says, "we assume the availability of these record linkage systems and associated administrative data" – does Census already have in place access to this data or would this need to be negotiated?  If negotiated, for which data sets specifically?**

The Census Bureau has longstanding contractual relationships with the Social Security Administration and the Internal Revenue Service that authorize the use of data for this project. For new data acquired for this project (i.e., USCIS) we would estimate a six month development period to put a data acquisition agreement in place.   That agreement would also include terms specifying the authorized use of data for this project.

15. **Are there any privacy issues / sensitive information prohibitions that might prevent other agencies from providing such data?**

16. **How long would Census expect any negotiation for access to data take?  How likely is it that negotiations would be successful?  Are MOA's needed/required?**

Current data available to the Census Bureau provide the quality and authority to use that are required to support this project.  Additional information potentially available from USCIS would serve to supplement/validate those existing data.   We are in early discussions with USCIS to develop a data acquisition agreement and at this time have no indications that this acquisition would not be successful.

17. **What limitations would exist in working with other agencies like IRS, Homeland Security, etc. to share data?**

The context for sharing of data for this project is for a one-way sharing of data from these agencies to the Census Bureau.  Secure file transfer protocols are in-place to ingest these

COM_DIS00020957

data into our Title 13 protected systems.  For those data already in-place at the Census Bureau to support this project, provisions for sharing included in the interagency agreement restrict the Census Bureau from sharing person-level microdata outside the Census Bureau's Title 13 protections.  Aggregates that have been processed through the Bureau's disclosure avoidance procedures can be released for public use.

18. **If Alternative C is selected, what is Census's backup plan if the administrative data cannot be completely collected and utilized as proposed?**

The backup plan is to use all of the administrative data that we currently have, which is the same set that the analyses of Alternative C used.  We have verified that this use is consistent with the existing MOUs.  We would then use estimation and modeling techniques similar to those used for the Small Area Income and Poverty Estimates (SAIPE) to impute missing citizenship status for those persons for whom we do not have administrative records.  These models would also include estimates of naturalizations that occurred since the administrative data were ingested.

19. **Does Census have any reason to believe that access to existing data sets would be curtailed if Alternative C is pursued?**

No we do not believe that any access to existing data sets would be curtailed if we pursue Alternative C.

20. **Has the proposed Alternative C approach ever been tried before on other data collection projects, or is this an experimental approach? If this has been done before, what was the result and what were lessons learned?**

21. **Is using sample data and administrative records sufficient for DOJ's request?**

The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C.

22. **Under Alternative C, If Census is able to secure interagency agreements to provide needed data sets, do we know how long it would take to receive the data transmission from other agencies and the length of time to integrate all that data, or is that unknown?**

With the exception of the USCIS data, the data used for this project are already integrated into the 2020 Census production schema.  In mid-to late 2018, we plan to acquire the USCIS data and with those data and our existing data begin to develop models and business rules to select citizenship status from the composite of sources and attach that characteristic to

each U.S. person.  We expect the development and refinement of this process to continue into 2019 and to be completed by third quarter calendar year 2019.

23. **Cross referencing Census decennial responses with numerous governmental data sets stored in various databases with differing formats and storage qualities sounds like it could be complicated.  Does Census have an algorithm in place to efficiently combine and cross reference such large quantities of data coming from many different sources?  What cost is associated with Alternative C, and what technology/plan does Census have in place to execute?**

Yes, the 2018 Census End-to-End test will be implementing processing steps to be able to match Census responses to administrative record information from numerous governmental data sets.  The Census Bureau has in place the Person Identification Validation System to assign Protected Identification Keys to 2020 Census responses. The required technology for linking in the administrative records is therefore part of the 2020 Census technology.  This incremental cost factored into the estimate for Alternative C is for integrating the citizenship variable specifically, since that variable is not currently part of the 2020 Census design. No changes are required to the production Person Identification Validation system to integrate the administrative citizenship data.

24. **For section C-1 of the memo, when did Census do the analyses of the incorrect response rates for non-citizen answers to the long form and ACS citizenship question?  Were any of the analyses published?**

The comparisons of ACS, 2000 Decennial Census longform and SSA Numident citizenship were conducted in January 2018. This analysis has not been published.

25. **Has Census corrected the incorrect responses it found when examining non-citizen responses?  If not, why not?**

In the American Community Survey (ACS), and the short form Decennial Census, we do not change self-reported answers.  The Decennial Census and the ACS are based on self-response and we accept the responses provided by households as they are given.  While we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaires.  This is a long established process at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.

26. **Has the Department of Justice ever been made aware of inaccurate reporting of ACS data on citizenship, so that they may take this into consideration when using the data?**

Not exactly.  The Census Bureau is in close, regular contact with the Department of Justice (DOJ) regarding their data requirements.  Our counterparts at DOJ have a solid understanding of survey methodology and the quality of survey data, and they are aware of the public documentation on sampling and accuracy surrounding the ACS.  However, the specific rate of accuracy regarding responses to the ACS question on citizenship has never been discussed.

## 27. Why has the number of persons who cannot be linked increased from 2010 to 2016?

There are several potential reasons a person might not be linked between the ACS and the SSA Numident and ITIN IRS tax filings. There may be insufficient personally identifiable information (PII) in the ACS response for the person to allow a search for the person in the Numident or ITIN IRS tax filings at all. There may be more than one record in the Numident or ITIN IRS tax filings that matches the person's PII. There may be a discrepancy between the PII provided to the ACS and administrative records. Or the person may not be in the Numident or ITIN IRS tax filing databases, either because the person is a citizen without an SSN, or the person is a noncitizen who has not obtained an SSN or ITIN. Very few of the unlinked cases are due to insufficient PII in the ACS or multiple matches with administrative records. The vast majority of unlinked ACS persons have sufficient PII, but fail to match any administrative records sufficiently closely.

The incidence of ACS persons with sufficient PII, but no match with administrative records increased between 2010 and 2016. One contributing factor is that the number of persons linked to ITIN IRS tax filings in 2016 was only 39 percent as large as in 2010, suggesting that either fewer of the undocumented persons in the 2016 ACS had ITINs, or more of them provided PII in the ACS that was inconsistent with their PII in IRS records.

## 28. Independent of this memo, what action does Census plan to take in response to the analyses showing that non-citizens have been incorrectly responding to the citizenship question?

The Census Bureau does not have plans to make any changes to procedures in the ACS. However, we will continue to conduct thorough evaluations and review of census and survey data. The ACS is focusing our research on the potential use of administrative records in the survey.  For instance, we are exploring whether we can use IRS data on income to reduce the burden of asking questions on income on the ACS.  We are concentrating initially on questions that are high burden, e.g., questions that are difficult to answer or questions that are seen as intrusive.

## 29. Did Census make recommendations the last time a question was added?

Since the short form Decennial Census was established in 2010, the only requests for new questions we have received have been for the ACS.  And, in fact, requests for questions prior to 2010 were usually related to the Decennial Census Long Form.  We always work

collaboratively with Federal agencies that request a new question or a change to a question. The first step is to review the data needs and the legal justification for the new question or requested changes. If, through this process, we determine that the request is justified, we work with the other agencies to test the question (cognitive testing and field testing). We also work collaboratively on the analysis of the results from the test which inform the final recommendation about whether or not to make changes or add the question.

**30. Does not answering truthfully have a separate data standard than not participating at all?**

We're not sure what you're asking here. Please clarify the question.

**31. What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?**

Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed bound by past precedent when considering the Department of Justices' request. Rather, the Census Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation. As you are aware, that process is ongoing at your direction.

**32. Has another agency ever requested that a question be asked of the entire population in order to get block or individual level data?**

Not to our knowledge. However, it is worth pointing out that prior to 1980 the short form of the Decennial Census included more than just the 10 questions that have been on the short form since 1990.

**33. Would Census linking of its internal data sets, with other data sets from places like IRS and Homeland Security, have an impact on participation as well (i.e. privacy concerns)?**

The potential that concerns about the use of administrative records could have an impact on participation has always been a concern of ours, and it's a risk that we're managing on our risk register. We've worked closely with the privacy community throughout the decade, and we established a working group on our National Advisory Committee to explore this issue. We've also regularly briefed the Congress about our plans. At this stage in the decade there does not appear to be extensive concerns among the general public about our approach to using administrative records in the Nonresponse Operation or otherwise. We will continue to monitor this issue.

**34. Would Alternative C require any legislation? If so, what is the estimated time frame for approval of such legislation?**

No.

35. **Census publications and old decennial surveys available on the Census website show that citizenship questions were frequently asked of the entire population in the past. Citizenship is also a question on the ACS. What was the justification provided for citizenship questions on the (A) short form, (B) long form, and (C) ACS?**

In 1940, the Census Bureau introduced the use of a short form to collect basic characteristics from all respondents, and a long form to collect more detailed questions from only a sample of respondents. Prior to 1940, census questions were asked of everyone, though in some cases only for those with certain characteristics. For example, in 1870, a citizenship question was asked, but only for respondents who were male and over the age of 21.

Since moving to the short form in 1940, we have never asked a question about citizenship on the short form.

Beginning in 2005, all the long-form questions – including a question on citizenship -- were moved to the ACS. 2010 was the first time we conducted a short-form only census. The citizenship question is included in the ACS to fulfill the data requirements of the Department of Justice, as well as many other agencies including the Equal Employment Opportunities Commission, the Department of Health and Human Services, and the Social Security Administration.

COM_DIS00020962

# EXHIBIT B

## CENSUS CITIZENSHIP QUESTION

**BACKGROUND**

- **NOT PUBLIC:** In 2017, Secretary of Commerce Wilbur Ross requested that the Justice Department send a letter requesting the addition of a citizenship question on the 2020 Census.

- On December 12, 2017, the Justice Department—through Art Gary, General Counsel, Justice Management Division (JMD)—sent the requested letter to the U.S. Census Bureau at the Department of Commerce. The letter "formally request[ed] that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called 'long form' census." The letter stated that citizenship data "is critical to the Department's enforcement of Section 2 of the Voting Rights Act[.]" The letter also noted that numerous federal courts of appeals "have held that, where citizenship rates are at issue in a [Section 2] vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district." Finally, the letter emphasized that every "long form" questionnaire from 1970 to 2000 included a citizenship question.

- In early 2018, JMD erroneously disclosed in a FOIA response internal deliberative emails between JMD and Civil Rights Division officials.

- ProPublica subsequently ran a story that published the emails, including one email from Art Gary that stated the letter was sent "at the request of leadership, working with John [Gore]."

- There are now two pending lawsuits against the Census Bureau and the Commerce Department—one in California, and the other in New York—in which plaintiffs have sued to block the addition of the citizenship question to the 2020 Census.

**EXPECTED QUESTIONS**

- The Department's letter, signed only by a career official, to the Census Bureau was plainly disguised to be apolitical. But internal emails show that political appointees within the Department drafted the letter and that the letter itself was sent "at the request of leadership." Who within the Department or outside the Department requested this letter?

- Including a citizenship question on the 2020 Census will generate inaccurate data, depress participation among immigrants and those who live in mixed-status households, and spread fear among the most vulnerable individuals in our society. Isn't this request nothing more than a partisan move designed to harm minorities and benefit Republicans?

**RECOMMENDED RESPONSE**

- The Department is currently defending the Census Bureau in litigation on this issue across the country. For this reason, it would not be appropriate for me to comment on the issue.

**PREPARED BY**

COMPONENT: Civil Rights Division

POC & DIRECT LINE: Ben Aguiñaga, [ PII ]

| | |
|---|---|
| **From:** | Aguiñaga, Ben (CRT) |
| **Sent:** | Tuesday, June 12, 2018 10:00 AM |
| **To:** | Gore, John (CRT) |
| **Subject:** | QFR responses |
| **Attachments:** | 2020 Census Hearing Gore QFRs - CRT Draft.docx |

Boss:

Attached is a document with draft answers.  OLA generally says that less is more and the draft takes that approach.  Both answers are taken almost verbatim from the transcript of your hearing.  The second draft answer does not directly address the question because the question asks whether this Department agrees with a 2010 OLC opinion and whether any law compels the disclosure of confidential questionnaire responses.  I don't think we want to say too much there in case the issues addressed in the OLC opinion or related issues come up later for renewed debate.  So, I've just said that the Department will abide by all laws requiring confidentiality.  Let me know if you have any questions.  Thanks.

Ben

**J. Benjamin Aguiñaga (AH-gheen-YAH-gah)**
Chief of Staff and Counsel
Office of the Assistant Attorney General
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

PII

1

Responses to Questions for the Record
Mr. John M. Gore
Acting Assistant Attorney General
U.S. Department of Justice
Submitted June 11, 2018

Submitted by The Honorable Jimmy Gomez
Committee on Oversight and Government Reform

**Administrative Records**
On April 25, 2018, Attorney General Session testified in the Senate regarding the citizenship question that people "don't have to answer it, really, I would think that's a very reasonable thing, and I think concerns over it are overblown."

To Mr. Gore:
*Is the Attorney General encouraging people not to respond to the Census, or is he saying that their responses aren't really that important since responses are really not required?*

**RESPONSE:** It is possible that the Attorney General was referring to the fact that the Census Bureau counts incomplete census questionnaires in the total enumeration. That is, even if a person responding to a questionnaire does not answer a particular question, the Census Bureau counts the questionnaire.

**Census Confidentiality**
On January 4, 2010, the Department of Justice issued a Memorandum Opinion for the Department of Commerce[1] that clarifies that no provision of the PATRIOT Act can compel the Secretary of Commerce to disclose confidential census data.

To Mr. Gore:
*Is the DOJ and Attorney General Sessions still in agreement with that opinion? Is there any provision of any law that may compel Census to disclose confidential census data for law enforcement or national security purposes?*

**RESPONSE:** No one should have to fear responding to the census questionnaire or to a citizenship question, if in fact it is included. To that end, the Department is committed to abiding by all laws protecting the confidentiality and nondisclosure of such responses.

# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3      ----------------------------------------

       NEW YORK IMMIGRATION COALITION, ET AL.,

4

                    Plaintiffs,

5          vs.          Case No.  1:18-CF-05025-JMF

6      UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                    Defendants.

       ----------------------------------------

8

9                    Washington, D.C.

10                   Wednesday, August 15, 2018

11     Deposition of:

12                   DR. JOHN ABOWD

13     called for oral examination by counsel for

14     Plaintiffs, pursuant to notice, at the office of

15     Arnold & Porter, 601 Massachusetts Avenue NW,

16     Washington, D.C., before KAREN LYNN JORGENSON,

17     RPR, CSR, CCR of Capital Reporting Company,

18     beginning at 9:08 a.m., when were present on

19     behalf of the respective parties:

20

21

22

Page 280

1    request came from Commerce originally?

2        A    I have not.

3        Q    Had you asked anyone at Census -- have

4    you spoken to anyone at Census that these requests

5    came from Commerce essentially?

6        A    Ron, Enrique and I briefly

7    discussed -- mentioned, whatever you want to call

8    it, the existence of those emails in the

9    administrative record --

10       Q    And what was --

11       A    -- in subsequent discovery.

12       Q    And what did you say?

13       A    All of us were surprised.

14            MR. CASE:  Okay.  I'm going to hand this

15    off.  Thank you.

16            Go off the record.

17            VIDEOGRAPHER:  The time is 5:12 p.m.

18    We're going off the record.

19            (Off the record.)

20            VIDEOGRAPHER:  The time is 5:26 p.m.

21    We're back on the record.

22            Please proceed, Counsel.

1          EXAMINATION BY MS. FIDLER:

2     Q    Good afternoon, Dr. Abowd.  My name is

3  Danielle Fidler, and I'm an assistant attorney

4  general with the State of New York here with the

5  State of New York versus the United States

6  Department of Commerce, Docket

7  Number 1:18-CV-2921.

8          I wanted to follow up on the questions

9  about Question 31 that we were just discussing.

10  So we were discussing Question 31 and the

11  differences between your memo, which contained a

12  copy of the questions that, as you understood it,

13  Census had put together and a standalone version

14  that was part of the administrative record that

15  describes not needing to do any testing.

16          Do you know who wrote the revision -- the

17  standalone revision, which as we understand it, is

18  the later in time -- do you know who wrote that

19  version of Question 31 saying testing wasn't

20  necessary?

21     A    I do not.

22     Q    And does that version comport with your

Page 282

1    view and Census's view of 31 as you attached it to

2    your March 1st memo?

3        A    So I'm operating on the assumption that

4    the one with Bates number 9822 came from the

5    archival files that I supplied in cooperation with

6    the discovery requests.  In which case, this would

7    have been the last one that I was responsible for

8    collecting content on.

9            Until today, I was unaware of any

10   discrepancy between the one at 1286 and this one.

11   So it's hard for me to address the providence of

12   changes without returning to my own files to see

13   if those changes originated in the Census Bureau.

14   As I said, as far as I know, the one with the

15   Bates number I cited first is the last version I

16   worked on.

17       Q    Sitting here today, is it your view that

18   the version you're just seeing today, would you

19   agree with that or do you think that it reflects

20   the Census Bureau's position today?

21           MR. GARDNER:  Objection.  Calls for

22   speculation.

# EXHIBIT D

Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

4

                    Plaintiffs,

5          vs.          Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                    Defendants.

     ----------------------------------------

8

9                    Washington, D.C.

10                   Monday, August 20, 2018

11   Deposition of:

12                   DR. RON JARMIN

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:03 a.m., when were present on

19   behalf of the respective parties:

20                   Veritext Legal Solutions

                     Mid-Atlantic Region

                     1250 Eye Street NW - Suite 350

21                   Washington, D.C.  20005

22

1    systems, the telephone questionnaire assistance

2    center, the iPhones that enumerators use out in

3    the field, all of that.

4        Q    Uh-huh.  Does the Census Bureau test

5    how -- the order of questions?

6        A    Yes.

7        Q    Where?  What?  Which of these tests?

8        A    So like the National Content Test might

9    be a place -- I don't think they did -- I don't

10   think they did in that particular instance, so.

11       Q    Does the end-to-end test test the order

12   of questions?

13       A    No.  The end-to-end test doesn't have any

14   test about the questions, at all.

15       Q    There's no response rates for the

16   end-to-end test?

17       A    We track the response rates, but we're

18   not -- it's not a life measurement exercise.  It's

19   really more of a testing systems exercise.  So

20   tracking response rates while we're live in the

21   field is something we do in 2020, so we do that

22   during the end-to-end test, as well.  For

Page 184

1    operational reasons, not for --

2        Q    So if --

3        A    -- not for quality assessment reasons.

4        Q    If the citizenship question had been on

5    the 2018 end-to-end test, would that provide data

6    as to the response rates for the citizenship

7    question?

8            MS. BAILEY:  Objection.  Calls for

9    speculation.

10           THE WITNESS:  We would have had

11   some -- we could have gained some insight into the

12   item nonresponse rates for that question.

13   BY MS. GOLDSTEIN:

14       Q    And would you have also gained insight

15   into effects on total response rate if this

16   citizenship question was on the test questionnaire

17   for the 2018 end-to-end test?

18           MS. BAILEY:  Objection.  Calls for

19   speculation.

20           THE WITNESS:  That would have to have

21   been a test objective, and we would have to set up

22   an experiment to do that.

1    BY MS. GOLDSTEIN:

2        Q    How would you -- how could you do that?

3            MS. BAILEY:  Objection.  Calls for

4    speculation.

5    BY MS. GOLDSTEIN:

6        Q    How could you set up a test objective

7    that would test response rates with the inclusion

8    of a citizenship question?

9            MS. BAILEY:  Same objection.

10           THE WITNESS:  Some sort of randomized

11   experiment.

12   BY MS. GOLDSTEIN:

13       Q    What would that be?

14       A    I can't tell you exactly what that would

15   be.  We'd have to have some methodologist work on

16   that.

17       Q    But that's the kind of thing the

18   Census Bureau is equipped to do?

19       A    Yes.

20       Q    And it did not happen with the

21   citizenship question, correct?

22       A    No.

Page 211

1      A    No.

2      Q    And does it say that in order to be

3 included, proposals must demonstrate a clear

4 statutory and regulatory need for data?

5      A    It does say legal and regulatory

6 requirements are filled.

7      Q    Does it mention testing, at all?

8      A    No.

9      Q    Does it mention public comment?

10     A    No.

11     Q    Does it mention --

12     A    No -- I don't -- it says all relevant

13 stakeholders.  That includes public comment.

14     Q    Okay.  Does it mention OMB specifically?

15     A    It says relevant stakeholders, so, you

16 know --

17     Q    Does it mention OMB specifically?

18     A    No.  It does not.

19     Q    Okay.  Do you know who wrote the language

20 in Number 31?

21     A    I do not.

22     Q    When was the first time you saw the

Page 220

1    Q   Some are on paper?

2    A   Yes.

3    Q   Some are in person?

4    A   Well, most surveys are multimode --

5    Q   Okay.

6    A   -- any more, so.

7    Q   Is it fair to conclude that a question is

8    going to perform the same way on one survey that

9    it might on a different survey?

10       MS. BAILEY:  Objection.  Calls for

11   speculation.

12       THE WITNESS:  It isn't necessarily.

13   BY MS. GOLDSTEIN:

14   Q   Why not?

15   A   Well, the -- you know, the modes will

16   matter.

17   Q   What else matters?

18   A   The -- you know, the length and

19   complexity of the survey.

20   Q   What other sorts of things can cause a

21   question to perform different ways on different

22   surveys?

Page 221

```
 1      A    You know, we talked earlier about, you

 2   know, changing attitudes about the government and

 3   stuff like that.  So if one survey is seen as --

 4   as, you know, coming from the government or a part

 5   of the government that they have bigger issues

 6   with, it may perform differently than, you

 7   know -- so Census Bureau does pretty well with the

 8   surveys because the public generally tends to

 9   trust the Census Bureau, so.

10      Q    But even within the same survey, can a

11   changing political climate impact how a question

12   performs?

13           MS. BAILEY:  Objection.  Calls for

14   speculation.

15           THE WITNESS:  Again, it might.  There's

16   been no analysis to say that, one way or the

17   other.

18   BY MS. GOLDSTEIN:

19      Q    And that's my next question.  Has the

20   Census Bureau performed any analysis as to whether

21   or not the citizenship question will perform the

22   same way on the short form as it has on the ACS?
```

Page 222

1      A    No.  We don't -- but I'll come back to

2    say we don't have a good way of doing that.

3      Q    Would the National -- if the citizenship

4    question had been included in the

5    National Content Test --

6      A    So that -- go ahead.

7      Q    I'm sorry.

8           If the citizenship question had been

9    included in the National Content Test, would that

10   have given the Census Bureau any information as to

11   response rates?

12          MS. BAILEY:  Objection.  Hypothetical.

13          THE WITNESS:  Most likely not.  So you

14   have to remember that the context of the decennial

15   census is done as a nationwide activity with a

16   huge advertising outreach and partnership campaign

17   that you're never going to replicate in a small

18   scale test.  You're not going to replicate it on

19   the ACS.  To the degree that you think the

20   political environment is something that might

21   impact response rates to a particular question,

22   you need to mimic the political environment that

1  will exist when they're doing it.  And the -- you

2  know, the amount of exposure that the census will

3  get during the live census is, you know, part of

4  that environment, and we just can't test that.  So

5  the only thing we can test right now is whether

6  people understand the question, and whether they

7  can answer it, and whether they answer it at a

8  rate sufficient to provide high-quality data.  The

9  answer to those questions is all in the

10  affirmative.

11  BY MS. GOLDSTEIN:

12     Q    In the context of the ACS, correct?

13     A    In the context of the ACS.  Or in the

14  context of -- of that 2018 end-to-end test.  We

15  wouldn't have learned anything in addition to

16  that, so.

17     Q    The -- if the citizenship question had

18  been included in the 2018 end-to-end test, would

19  you have gotten item nonresponse rate data?

20          MS. BAILEY:  Objection.  Calls for

21  speculation.

22          THE WITNESS:  Yes.  We would have gotten

1  item nonresponse rate data.  It would not

2  have -- it would not have answered the question of

3  what things would look like during the 2020

4  census, no more than the ACS does.

5  BY MS. GOLDSTEIN:

6      Q    Why do you say that?

7      A    Because they're both done outside of that

8  context.

9      Q    So the race and ethnicity proposed

10  changes were tested, correct?

11      A    They were tested to see if people

12  understood and could answer the question and what

13  the relative data quality of the different

14  questions was.  The experiment was against the

15  different questions.

16      Q    Is it possible to test a survey -- so --

17      A    We could have tested two versions of a

18  citizenship question --

19      Q    And the census --

20      A    -- that might have been informative, but

21  not whether a, you know, citizenship question

22  versus no citizenship question.

Page 234

```
1        A     Uh-huh.

2        Q     I'm sorry?

3        A     Yes.

4        Q     And if we look at F, explore nonfederal

5    surveys for research on the impact of citizenship

6    questions on survey response rates, do know you if

7    the Census Bureau has done that?

8        A     I -- I don't know.

9        Q     And, again, would Ms. Battle be the

10   person who knows this?

11       A     Yes.

12       Q     Anyone else?

13       A     Well, members of her team.

14       Q     Sure.  And what would nonfederal surveys

15   for research on the impact of citizenship

16   questions on survey response rates tell us?

17       A     Same thing that E would, what other

18   people have experienced.

19       Q     And let's look at G, conduct a

20   National Content Test with a split sample where

21   half the respondents received the citizenship

22   question and half do not.  Comparing the response
```

Page 235

1   rates across the two groups would be the primary

2   way to test the impact of the citizenship question

3   on survey response rates.

4          Has this sort of test been run for the

5   citizenship question?

6      A    It has not, as far as I know.

7      Q    And do you agree that this methodology

8   set forth in Subparagraph G would be a way to test

9   the impact of the citizenship question on survey

10   response rates?

11          MS. BAILEY:  Objection.  Form.

12          THE WITNESS:  It -- yes.  It could be.

13   BY MS. GOLDSTEIN:

14      Q    Do you know of any plans to test the

15   citizenship question in this form?

16      A    No, I do not.

17      Q    I'll take that back.  Thank you.

18          Part of your job, Dr. Jarmin, is to

19   appoint people to advisory committees; is that

20   correct?

21      A    Yes.

22      Q    And what is the role of advisory

Page 259

1          I'd like to follow up on something you

2    said earlier.  I believe your testimony was that

3    it's difficult to simulate the decennial census

4    because it's unique.  Is that a fair

5    characterization?

6          A    Correct.

7          Q    Okay.  But, in fact, that the

8    Census Bureau does the multiyear testing program

9    to prepare for the census; is that correct?

10         A    That's correct.

11         Q    Do you know when that testing process

12   started?

13         A    2013.

14         Q    So seven years in advance of the

15   decennial census, correct?

16         A    Correct.

17         Q    And from that testing, the Census Bureau

18   determines -- obtains various pieces of

19   information that are useful for development of the

20   2020 census?

21         A    Correct.

22         Q    For example, self-response rates?

Page 260

1     A    That's one thing that --

2     Q    Okay.

3     A    So a testing self-response rate is not

4   that indicative of a census self-response rate

5   because of the lack of advertising and --

6     Q    But, in fact, you do do tests to

7   determine self-response rates in preparation for

8   the decennial census?

9     A    I don't think we did any tests whose

10  purpose it was to determine what the self-response

11  rate was.

12    Q    Do you also use these tests to determine

13  or to obtain information about nonresponse

14  follow-up procedures?

15    A    About procedures, yes.

16    Q    And about the use of administrative

17  records?

18    A    And about -- yes.

19    Q    And about the use of data capture systems

20  or the functionality of the those systems?

21    A    Correct.

22    Q    How about for language support

Page 261

1    systems --

2              (Conference call interruption.)

3              THE WITNESS:  Okay.  All right.  Please

4    say the question again.

5    BY MR. TILAK:

6        Q    And how about language support systems or

7    translations services?

8              MS. BAILEY:  Objection.  Vague.

9              THE WITNESS:  So there was some stuff

10   done with language, yes.

11   BY MR. TILAK:

12       Q    So in short, this multiyear testing

13   program does provide meaningful information that

14   the Census Bureau uses to prepare for the 2020

15   census?

16       A    Yes.

17       Q    Did you do any tests where the sole

18   purpose was not self-response rates but one of the

19   items that was looked at was self-response rates?

20             MS. BAILEY:  Objection.  Form.

21             THE WITNESS:  So we always look at the

22   self-response rate as a matter of course.

1    A    He did not.

2    Q    Grandparents as caregivers?

3    A    We don't -- weren't discussing that,

4    though.

5    Q    Has he ever -- has anyone from Commerce

6    ever expressed concern about imputed data for

7    items on the ACS that weren't on the short form?

8         MS. BAILEY:  Objection.  Foundation.

9         THE WITNESS:  No.

10   BY MR. CASE:

11   Q    In either of the meetings that you had

12   where Secretary Ross was present, did he say that

13   he had been interested in the question before the

14   DOJ letter?

15   A    He did not.

16   Q    Did he say that the Census Department had

17   reached out to DOJ to create that letter?

18        MS. BAILEY:  Objection.  Assumes facts

19   not in evidence.

20        THE WITNESS:  That the Census Department

21   had reached out --

22   BY MR. CASE:

Page 401

1     Q    The Commerce Department.  Sorry.

2     A    No.  He did not.

3     Q    Do you remember the 35 questions you were

4  asked about this morning?

5     A    Uh-huh.

6          (Plaintiffs' Exhibit 38, Email, was

7  marked.)

8  BY MR. CASE:

9     Q    I'm going to show you Number 38, if I

10  may.  This is an email Bates stamp 9190.  Do you

11  recall this email?

12     A    Not off the top of my head, no.

13     Q    I'm -- who is Sahra or Sahra Park-Su?

14     A    So she's -- works at the Department.

15     Q    And did you have communications with

16  Ms. Park-Su regarding the 35 questions?

17     A    I imagine she would have been in the

18  chain on this, yeah.

19     Q    And does this question at the bottom of

20  the email look familiar?

21     A    Yeah.

22     Q    What is it?

# EXHIBIT E

Page 1

1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - -

     NEW YORK IMMIGRATION COALITION, ET AL.,

4

               Plaintiffs,

5         vs.          Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7               Defendants.

     - - - - - - - - - - - - - - - - - - - - - - -

8

9                    Washington, D.C.

10                Tuesday, August 28, 2018

11   Deposition of:

12               KAREN DUNN KELLEY

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:04 a.m., when were present on

19   behalf of the respective parties:

20            Veritext Legal Solutions

               Mid-Atlantic Region

              1250 Eye Street NW - Suite 350

21            Washington, D.C.  20005

22

Page 128

1      A    Who are you speaking to, sir?

2      Q    Well, let me ask, first, Secretary Ross?

3      A    Not that I recall.

4      Q    What about Mr. Comstock?

5      A    Not -- he could have.  Could not have.  I

6    can't -- what I have said is that I knew the

7    conversations were going on about the citizenship

8    question.  If somebody briefed me, I don't know

9    who it was, when it was.  It was not on the top of

10   my radar.  It was a back-burner issue that I knew

11   at some point would need to possibly be addressed

12   from the -- again, the work I was doing, which was

13   the budgetary work, the operational/technical

14   work, as well as the leadership work.

15     Q    Were you surprised when the letter came

16   over in December 2017, that it was sort of out of

17   the blue?

18     A    As we got closer to the letter coming,

19   there was a discussion that we thought we were

20   going to get a letter, and then a letter came,

21   and --

22     Q    Okay.  Who -- who had that discussion

1      Q   Let me just review a couple things to see

2   if it refreshes your recollection.

3          You knew the Secretary was interested in

4   reviewing -- adding a citizenship question at

5   least by the summer of 2017, correct?

6          MR. GARDNER:  Did you say summer or

7   December?

8          MR. GROSSI:  Summer.

9          MR. GARDNER:  Summer.  Objection.

10         THE WITNESS:  Oh, summer.  I thought you

11  said December.

12         MR. GARDNER:  I thought you did, too.

13  You're saying summer?  Mischaracterizes the

14  witness's testimony.

15  BY MR. GROSSI:

16     Q   We talked earlier that by the summertime,

17  you knew that the Secretary was interested in

18  adding a question to the census or at least

19  considering that, right?

20         MR. GARDNER:  Objection.

21  Mischaracterizes the witness's testimony.

22         THE WITNESS:  I have said that he was

1    interested in considering the question.

2    That -- that's two very different things that you

3    said, so thank you for clarifying.

4    BY MR. GROSSI:

5        Q    Okay.  He was, at least, considering the

6    question as of the summer, correct?

7        A    Yeah.

8        Q    And you know, now, certainly, that in

9    August, September, October, November, he and

10   Mr. Comstock attempted to get the

11   Department of Justice to request that, correct?

12           MR. GARDNER:  Objection.  Lack of

13   foundation.

14   BY MR. GROSSI:

15       Q    You know that for a fact?

16           MR. GARDNER:  Objection.  Lack of

17   foundation.

18           THE WITNESS:  That's what you've been

19   telling me.  I'm not --

20   BY MR. GROSSI:

21       Q    You have no knowledge of whether they

22   were requesting --

# EXHIBIT F

Page 1

1             UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3 ----------------------------------------

  NEW YORK IMMIGRATION COALITION, ET AL.,

4

                      Plaintiffs,

5         vs.          Case No.  1:18-CF-05025-JMF

6 UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                   Defendants.

  ----------------------------------------

8

9                   Washington, D.C.

10                  Wednesday, August 29, 2018

11 Deposition of:

12                  DR. JOHN ABOWD

13 called for oral examination by counsel for

14 Plaintiffs, pursuant to notice, at the office of

15 Arnold & Porter, 601 Massachusetts Avenue NW,

16 Washington, D.C., before KAREN LYNN JORGENSON,

17 RPR, CSR, CCR of Capital Reporting Company,

18 beginning at 9:06 a.m., when were present on

19 behalf of the respective parties:

20             Veritext Legal Solutions

                Mid-Atlantic Region

               1250 Eye Street NW - Suite 350

21            Washington, D.C.  20005

22

Page 24

1   testing has not been conducted without a nativity

2   question preceding the citizenship question.

3   BY MR. HO:

4       Q   So you're not aware of any testing -- any

5   cognitive testing of the citizenship question

6   without a preceding question about nativity; is

7   that right, Dr. --

8       A   I'm not aware of -- sorry.  I'm not aware

9   of any, no.

10      Q   Are you aware of any prior census in

11  which cognitive testing of the full short form

12  questionnaire had not been conducted before using

13  that questionnaire for the actual census?

14      A   I am not aware of any -- well, let me be

15  careful.

16          Many censuses were conducted without

17  cognitive testing, the equivalence of cognitive

18  testing existed for much of the 20th century.  In

19  preparing for this deposition, I reviewed the

20  generic answer to the question, how was this

21  tested, and in some cases, that question elicited

22  some cognitive testing, for example, the

Page 142

1  field period.

2  BY MR. HO:

3       Q    Thank you.  And this would have been the

4  only testing of the 2020 decennial questionnaire

5  with a citizenship question in it, correct?

6       A    This is the only field testing with and

7  without citizenship question, directly analyzing

8  the citizenship question that we have considered

9  at the Census Bureau.

10           I also verified that the 2010 census

11  questionnaire had full cognitive and field

12  testing.  That the 2020 questionnaire without the

13  citizenship question had -- so I asked him the

14  same way you asked me, was adequately, cognitively

15  tested; yes.

16       Q    I'm sorry.  Who did you ask whether or

17  not?

18       A    I asked my staff -- the same group that I

19  had been asking generally about the testing, I

20  specifically asked about the cognitive testing for

21  the 2020 questionnaire, with and without the

22  citizenship question, and their answer was that it

Page 143

1    was adequately tested with the citizen- -- without

2    the citizenship question, but not adequately

3    tested with the citizenship question, cognitive

4    testing.

5        Q    Thank you.

6        A    Okay.

7            And, thirdly, in this table, Exhibit 12,

8    the third panel, the CAPI response rate, I

9    confirmed, so I can now say the way the tract was

10   put into deciles was based on the five-year

11   American Community Survey for the middle five

12   years of the table, so 2011 through 2015.  That

13   the CAPI response rate is just the CAPI response

14   rate in the nonresponse follow-up system, okay.

15           I think those were all the things we had

16   unresolved.  If you think there were others -- we

17   went over our notes, but I think I've answered the

18   questions that that were unresolved.

19           MR. HO:  I don't have any others right

20   now, so I'm going to pass you along to one of the

21   other lawyers for one of the other plaintiff

22   groups, subject, of course, to the issue that I've

Page 198

1    A    Yes.

2    Q    Now, for -- have any of the tests to date

3    in the 2020 census testing program, have any of

4    them included a citizenship question?

5    A    No.

6    Q    And so none of these tests, to the extent

7    that they were used to project staffing levels or

8    to refine the projections, would have accounted

9    for the citizenship question?

10   A    Directly, no.

11   Q    Would they have done so indirectly?

12   A    Well, we used -- we didn't use evidence

13   from a test, but we used evidence similar to the

14   evidence generated in the test to make indirect

15   inferences.  But directly, no.

16   Q    What was -- what were the sources you

17   used for the indirect inferences?

18   A    These are the experiments that I

19   described -- the natural experiments that I

20   described in my fact witness testimony.

21        Do you want to go through them again?

22   Q    Are those the ones discussed in your

Page 199

1  January 19th memo?

2      A   The ones that existed at that point in

3  time are discussed in the memo, yes.

4      Q   And since then, are there any other ones

5  that have been done?

6      A   There are more extensive ones that have

7  been done in the full version of the technical

8  paper that was developed after the memo was

9  written.

10     Q   Is that the document that was just

11  produced to us yesterday?

12     A   Yes.

13     Q   And besides those two sources, are there

14  any other -- let me rephrase.

15         Besides the sources discussed in those

16  two documents, are there any other sources that

17  you used to develop indirect inferences?

18     A   They haven't been used yet, but we intend

19  to examine the field operation data from the

20  end-to-end test, because it occurred as the

21  information about the citizenship question was

22  becoming public.  It's not clear how useful it

Page 200

1    would be, but that would be another form of

2    indirect inference.  There was no citizenship

3    question, but there were environmental factors

4    that intervene.

5        Q    Besides that, are there any other

6    sources?

7        A    None that I'm aware of.

8             Sorry.  From our test operations.

9        Q    And so to the extent that any tests

10   conducted to date have been used to project the

11   number of offices that the Census Bureau will open

12   in 2020, those projections would not have

13   accounted from the citizenship question, correct?

14       A    In general, that's correct, yes.

15       Q    And to the extent the tests were used to

16   test the adequacy or amount of enumerator

17   training, they would not have accounted for the

18   citizenship question, correct?

19       A    That's correct.

20       Q    And the same question with respect to the

21   testing of NRFU protocols.  To the extent that

22   testing has been used to test the adequacy of

Page 201

1  those protocols, they would not have accounted for

2  the citizenship question, correct?

3      A   That's correct.

4      Q   And the same question with respect to the

5  census questionnaire assistance.  To the extent

6  the testing was used to develop a projection about

7  call loads for peak operations, those projections

8  would not account for the citizenship question,

9  correct?

10     A   That's correct.

11     Q   In light of the Secretary's decision to

12  add the citizenship question, will the

13  Census Bureau conduct any testing on the impact of

14  that question on staffing levels?

15         MR. EHRLICH:  Objection.  Form.

16         THE WITNESS:  It's hard to imagine what

17  kind of testing we might do, other than on a

18  relatively small scale.  However, we are working

19  closely with the integrated communication

20  campaign, which the Secretary has recommended

21  increasing the budget to 500 million.  They are

22  developing messaging and other tools that we fully

Page 225

1   citizenship question may make modifications.

2          Those modifications will have to be made

3   relatively soon.  The field operations actually

4   start with address canvass and address canvases

5   start next summer.  So we don't have a lot of

6   time.  But the final forms of the training

7   materials and the final onboarding of those

8   activities hasn't happened.  So we do have the

9   scope to make modifications, and we are intending

10  to analyze the data from the end-to-end test and

11  other data as they became available to us in order

12  to optimize that.

13       Q    And the end-to-end didn't test

14  citizenship, right?

15       A    There was no citizenship question on the

16  form.

17       Q    And these additional data you mentioned

18  with respect to citizenship, those are possible

19  small scale tests that the Census might do, right?

20       A    What I said was that the focus groups

21  from CBAMS were small scale tests and the in place

22  testing of instruments would necessarily be small

Page 264

1    when we evaluate it whether we were successful.

2        Q    Do you agree that adding the citizenship

3    question will make it more difficult to achieve

4    that goal of reducing undercount for hard-to-count

5    populations?

6             MR. EHRLICH:  Objection.  Form.

7             THE WITNESS:  It will make it more

8    difficult to correct -- to collect accurate data

9    on the enumeration, which will complicate the

10   assessment of net undercount, because the

11   indicators, the right-hand side variables, won't

12   be as accurate as they are if you get more

13   self-responses.

14            MR. TALIK:  We can go off record.

15            VIDEOGRAPHER:  We're going off the

16   record.  The time on the video is 4:19 p.m.

17            (Off the record.)

18            VIDEOGRAPHER:  We're back on the record.

19   The time on the video is 4:20 p.m.

20            EXAMINATION BY MR. ADAMS:

21       Q    Good afternoon, Dr. Abowd.  My name is

22   Rory Adams.  I represent the City of San Jose and

# EXHIBIT G

Page 1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

4

                        Plaintiffs,

5           vs.          Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                       Defendants.

     ----------------------------------------

8

9                       Washington, D.C.

10                      Thursday, August 30, 2018

11   Deposition of:

12              EARL COMSTOCK

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:08 a.m., when were present on

19   behalf of the respective parties:

20

21

22

Page 104

1    we don't ask the question.

2        Q    And you testified earlier that the

3    Secretary is the first person who raised it to

4    you?

5        A    In my employment at the Department of

6    Commerce, yes.

7        Q    Do you recall discussing it before you

8    worked at the Commerce Department?

9        A    Probably sometime in the last 30-odd

10   years, I'm in -- you know, in political science

11   and politics, so I'm sure I discussed at.

12       Q    But the first time in 2017 that you

13   recall considering this issue is when the

14   Secretary raised it with you?

15       A    Correct.

16       Q    And this memo says the Secretary began

17   considering it soon after his appointment?

18       A    Correct.

19       Q    And his appointment was February 28th

20   we've established --

21       A    That's correct.

22       Q    -- of 2017?

Page 110

1    a citizenship question could be warranted?

2        A    Again, my formulation of a -- of a

3    decision that it could be warranted is largely

4    based on common sense.

5        Q    Okay.  I just want to make sure that I

6    understand.  That as to the part of your answer

7    that related to the practices of other countries,

8    in the spring of 2017, you formed that view by

9    Googling it?

10       A    I may have asked if other countries did

11   it or I may have gotten online and looked.  I

12   don't recall.

13       Q    Who would you have asked if you asked?

14       A    I likely would have asked somebody from

15   Census or I might have asked David Langdon.

16       Q    And if you asked, would that be reflected

17   in your -- in your email or your memo somewhere?

18       A    If it was, you could have found the

19   email.  So I, obviously, did not send an email if

20   I asked that question.

21       Q    Okay.  The --

22            MR. GARDNER:  Matt, I'm sorry.  I didn't

Page 153

1        A    That part of the process, yes.

2        Q    And that email says we need to work with

3    Justice to get them to request that citizenship be

4    added back as a census question; is that right?

5        A    That's right.

6        Q    Why would you say you needed to work with

7    the Justice Department to get them to request that

8    citizenship be added back?

9        A    Because based on a very preliminary

10   review, they appeared to be the most likely

11   government body that would have a specific need

12   for the information that would support adding a

13   citizenship question to the decennial census.

14       Q    Who conducted that preliminary review?

15       A    We were told by the Census Bureau that

16   the Justice Department was the person that had

17   requested the citizenship question on the ACS and

18   that they utilized the ACS data for Voting Rights

19   Act information.

20       Q    Who in the Census Bureau told you that?

21       A    I couldn't tell you.

22       Q    And why did you need a request from

Page 154

1   Justice?

2       A   Again, based on the preliminary review,

3   the understanding we had was questions are added,

4   based on requests from a government agency.  There

5   is such a thing as the Paperwork Reduction Act

6   where you have to justify to OMB why do I need

7   this information?  That has to get cleared.  So

8   there are certain hurdles you have to get through.

9   So if at the end of the day the Secretary decided

10  to pursue this question, we would need to clear

11  certain legal thresholds.

12      Q   Why not just tell the Census Bureau to

13  add the citizenship question and say the Secretary

14  wanted it?

15      A   Because I'm not sure that that would be

16  the process they would necessarily agree to

17  follow.

18      Q   So you had to have it come from DOJ in

19  order for the Census Bureau to agree to follow it?

20      A   Again, that was a preliminary conclusion

21  based on a cursory analysis.

22      Q   Your email then says, "We have the court

Page 181

1   there's -- what their explanation would be, but

2   they were obviously not our first choice.

3       Q   So you were looking for an agency to make

4   this ask?

5       A   Again, my understanding of the process,

6   based on the research I've been able to do, and

7   consequently was advising the Secretary was an

8   agency needed to make the request; therefore, you

9   have to find an agency that would have a reason to

10  be using this information.  And Justice,

11  obviously, was the primary recipient of the CVAP

12  data from the ACS, so they were the logical place

13  to start.  Justice then says go to

14  Homeland Security, and I say, okay, maybe there's

15  something about Homeland Security that I don't

16  know about that might justify this data.  So you

17  follow up on a call, get more information, informs

18  your decision, you might change it.

19      Q   And so my question was:  So you were

20  looking for an agency to make this ask and --

21      A   Correct.  In order to implement the

22  process that had been outlined to us, you needed

Page 190

1   was that?

2       A    A call from the Secretary to talk to the

3   Attorney General about whether or not Justice

4   would be interested in a citizenship question.

5       Q    And why was the Secretary talking to the

6   Attorney General about whether or not Justice

7   would be interested in the citizenship question?

8       A    Again, if -- if the -- if the

9   Justice Department was not going to request the

10  question, had no use for the information, then

11  that would probably put an end to the citizenship

12  question.

13      Q    And the Secretary wanted the citizenship

14  question?

15      A    I think he felt -- well, I don't know

16  what he felt.  Yes.  He was continuing to explore

17  that possibility.

18          MS. BOUTIN:  I'm sorry.  Can you speak

19  up?

20          THE WITNESS:  I don't know what he felt,

21  but he was continuing to explore the possibility.

22  BY MR. COLANGELO:

Page 294

1      Q    All right.  And this is where she asks

2  you -- withdraw this.  Isn't what I want --

3           Let me direct your attention to Lines 2

4  through 5, okay.

5      A    All right.  Let me read the context of

6  which Lines 2 through 5 appear.

7      Q    Let me ask your question and then you can

8  read whatever you need.

9      A    All right.  Very good.

10     Q    On Lines 2 through 5, Ms. Norton asked

11  you, "My question to the two of you" -- and you

12  were there with Mr. Jarmin; is that right?

13     A    Correct.

14     Q    She says, "My question to the two of you

15  is:  Why did this question, which was dropped for

16  70 years, suddenly appear on the decennial census?

17  What was the point?"

18           And then you answered, "Thank you very

19  much, Congresswoman, for the question.  We

20  received a request from the Department of Justice

21  for this, and their rationale was that the level

22  of the information that they needed to enforce the

Page 295

1    Voting Rights Act was not available."

2            That's the testimony you gave, correct?

3        A    Again, this is not the official

4    transcript, but presuming your person transcribed

5    this correctly, that appears to be what I said.

6        Q    And this squares with your memory of what

7    you said, right?

8        A    Correct.

9        Q    And when she says, why did this question

10   get added, and you say, we received a request from

11   the Department of Justice, that's not the whole

12   truth; is it?

13       A    That's a -- that's a factual statement.

14       Q    It's a factual statement that you

15   received a request from Department of Justice,

16   right?

17       A    Correct.

18       Q    But the reason the Department of Justice

19   made the request is because you guys at the

20   Department of Commerce put them up to it; isn't

21   that right?

22       A    I don't agree with that characterization.

Page 298

1     A    Okay.

2     Q    Didn't you say to the

3   Department of Justice when you were talking to

4   them, in words or substance, we would appreciate

5   it if you would ask us to include a citizenship

6   question?

7     A    I never made such a request.

8     Q    And I take it, based on your prior

9   testimony, you don't know what conversation

10   occurred between the Secretary and the Attorney

11   General?

12     A    That's correct.

13     Q    Did you understand that Ms. Teramoto was

14   on that call between the Secretary and the

15   Attorney General?

16     A    I don't know who was on the call.

17     Q    In any case, however we word it, you

18   didn't tell Representative Norton when she asked

19   why is this question being added, that you had

20   gone to the Department of Justice and suggested

21   that this might be something they'd be interested

22   in?

Page 299

1      A    That's correct.

2      Q    Why is that?

3      A    Again, because until the department makes

4    its independent decision to request this

5    information, that was the -- there was no question

6    that was going to be added.

7      Q    When Representative Norton says, why is

8    the question being added?  Don't you think it's

9    relevant that the Secretary of Commerce wanted

10   this question added independent of the

11   Department of Justice's request?

12           MR. GARDNER:  Objection.  Form.

13           THE WITNESS:  Again, now --

14           MR. GARDNER:  What's your -- withdrawn.

15           MR. GERSCH:  What's your objection?

16           MR. GARDNER:  I didn't understand that

17   question.  Is it relevant to Secretary -- or I'm

18   sorry -- Representatives Norton Holmes question

19   that the Secretary had requested DOJ to ask?  I

20   didn't even --

21           MR. GERSCH:  I got it.

22   BY MR. GERSCH:

Page 411

1   would be more appropriately handled by the

2   Department of Justice, you said that the

3   interaction ceased; is that correct?

4        A    Well --

5        Q    From you?

6        A    My efforts at that point to track down

7   somebody ceased because they had run into a dead

8   end.  I mean, our initial conclusion was that

9   Department of Justice was the right place to go.

10  They seemed occupied on other matters, so they

11  referred us to DHS.  DHS referred us back, so now

12  I'm back to where I started.

13       Q    So once you were referred back to DOJ,

14  you didn't ask another follow-up as to who in the

15  voting section would be more appropriate to talk

16  about this particular issue?

17       A    Again, I was working on literally dozens

18  of issues that consumed a lot of time.  And so I

19  had put the time into it that I could afford to

20  put into it and had come up empty.  So I reported

21  that to my boss, and basically, said if absent

22  some instruction from higher up, it appears that

# EXHIBIT H

Dr. John M. Abowd , Ph.D.

Page 1

1                UNITED STATES DISTRICT COURT

                 SOUTHERN DISTRICT OF NEW YORK

2

 - - - - - - - - - - - - - - -x

3     NEW YORK IMMIGRATION          :

      COALITION, et al.,            :

4                                   :

         Plaintiffs,                :

5                                   :  Case No.

         v.                         :

6                                   :  1:18-CF-05025-JMF

      UNITED STATES DEPARTMENT      :

7     OF COMMERCE, et al.,          :

                                    :

8        Defendants.                :

 - - - - - - - - - - - - - - -x

9                               Friday, October 12,2018

                                    Washington, D.C.

10

11

12   Videotaped Deposition of:

13              JOHN  M. ABOWD, Ph.D.,

14   called for oral examination by counsel for the

15   Plaintiffs, pursuant to notice, at the law offices of

16   Arnold & Porter Kaye Scholer, LLP, 601 Massachusetts

17   Avenue, Northwest, Washington, D.C. 20001-3743,

18   before Christina S. Hotsko, RPR, CRR, of Veritext

19   Legal Solutions, a Notary Public in and for the

20   District of Columbia, beginning at 9:06 a.m., when

21   were present on behalf of the respective parties:

22

Dr. John M. Abowd , Ph.D.

Page 288

1   increase the net undercount or increase

2   differential net undercounts for identifiable

3   subpopulations?

4          MS. WELLS:  Object to the form.

5          THE WITNESS:  Because we believe the

6   qualitative analysis that we've already produced

7   is sufficient to justify our recommendation not to

8   ask the question.

9   BY MR. FREEDMAN:

10         Q.  Has anybody within the Census Bureau

11  proposed doing that additional analysis to produce

12  credible qualitative evidence that the addition of

13  a citizenship question in the 2020 census will

14  increase the net undercount or increase the

15  differential net undercounts for identifiable

16  subpopulations?

17         A.  Yes.

18         Q.  Who?

19         A.  Me.

20         Q.  And what happened?

21         A.  Well, I had to do a feasibility study by

22  discussing it with the experts and determining

Dr. John M. Abowd , Ph.D.

Page 289

1   whether they had artifacts that might be useful

2   for that or, if not, whether the methods that we

3   are experienced in implementing for dual system

4   estimation could be used for that.

5          I consulted internal experts, including

6   the person I consider to be the world's biggest

7   expert on this, and they didn't think that we

8   could do it.

9       Q.  Is that still an open question, whether

10  you can do it?

11      A.  It's not an open question as to whether I

12  should devote staff research time to doing it.

13  I'd say it's an open question as to whether the

14  coverage measurement program could be used for

15  that purpose.  Yes.

16      Q.  So whose decision was it not to undertake

17  any analysis to see if the --

18      A.  So we don't make decisions like that,

19  like chain of command on things like that.  It was

20  within my scope of authority to assemble the team

21  to do that.  I would have had to pull most of them

22  off their current 2020 operations and divert them

Dr. John M. Abowd , Ph.D.

Page 290

1    from other research projects that are directly

2    related to other interests.

3            And as I've said, we didn't believe that

4    credible quantitative information about net

5    undercounts was necessary for our recommendation

6    to the Secretary or to defend our current

7    mitigation.

8            All of the components are going to be

9    affected.  And they could drive the net

10   undercounts way up or they could drive them way

11   down.  And I wish that I had a better assessment

12   of that, but it is my expert opinion that the

13   resources required to do that are better deployed

14   in making the 2020 census work.

15       Q.   In terms of the OMB clearance package,

16   who is responsible for approving the package to

17   send to OMB at the Census Bureau?

18       A.   So the responsibility for preparing it

19   lies with the program area that wants to do the

20   activity.  So the responsibility for preparing it

21   lies with the associate director for decennial

22   census.

# EXHIBIT I

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -x

NEW YORK IMMIGRATION          :

COALITION, et al.,            :

                             :

     Plaintiffs,             :

                             :  Case No.

     v.                      :

                             :  1:18-CF-05025-JMF

UNITED STATES DEPARTMENT      :

OF COMMERCE, et al.,         :

                             :

     Defendants.             :

- - - - - - - - - - - - - - -x

                          Friday, October 16, 2018

                          Washington, D.C.


Videotaped Deposition of:

                    JOHN GORE,

called for oral examination by counsel for the

Plaintiffs, pursuant to notice, at the law offices of

Covington & Burling, LLP, One City Center, 850 Tenth

Street, Northwest, Washington, D.C. 20001-4956,

before Christina S. Hotsko, RPR, CRR, of Veritext

Legal Solutions, a Notary Public in and for the

District of Columbia, beginning at 9:05 a.m., when

were present on behalf of the respective parties:

1        A.   That's -- more or less.   Yeah.

2        Q.   Prior to coming to the Department of

3   Justice, with respect to all of the cases that you

4   litigated under Section 2 of the Voting Rights

5   Act, you represented defendants, correct?

6        A.   That's correct.

7        Q.   In all of your experience representing

8   defendants in cases under Section 2 of the Voting

9   Rights Act, you never took the position that the

10  plaintiffs block-level CVAP data was insufficient

11  to establish the first Gingles precondition

12  because it was a statistical estimate, correct?

13       A.   When I was in private practice, I was

14  representing a client, so my clients took various

15  positions.   And as a lawyer, I pursued those

16  positions on behalf of clients in court.   I can't

17  recall an instance where a client of mine took

18  that position.

19       Q.   And in all of your experience litigating

20  cases under Section 2 of the Voting Rights Act,

21  you're not aware of, in any of your cases, a

22  situation where a court held that block-level CVAP

1   data was insufficient to satisfy the first Gingles

2   precondition because it was a statistical

3   estimate, correct?

4        A.   You're talking about cases I actually was

5   involved in?

6        Q.   That's correct.

7        A.   As a litigant or as attorney?

8        Q.   As an attorney.

9        A.   As an attorney.   No, I'm not aware of any

10  such case.

11       Q.   Do you have any experience drawing

12  districts for purposes of complying with the first

13  Gingles precondition?

14       A.   That's a -- that's a fair question.   In

15  one of our cases, we did have a case that went to

16  a remedial phase.   I wouldn't say I was involved

17  in drawing the district, but I was certainly

18  involved in reviewing various remedial proposals

19  and other proposals that were submitted to the

20  court in the course of litigation.

21       Q.   So let me clarify my question.   My

22  question is about the technical aspects of

Page 18

1    actually getting the census data, taking the

2    mapping software, and drawing a district.

3            You don't have any experience doing that,

4    correct?

5        A.   That's correct.  I've never sat in front

6    of a computer with Maptitude and drawn a district.

7        Q.   Okay.  You don't have any experience --

8    so that would mean you don't have any experience

9    drawing districts using ACS data, correct?

10       A.   That's correct.

11       Q.   And you don't have any experience taking

12   census block-group level data and performing an

13   estimation procedure to produce block-level data,

14   correct?

15       A.   No, I don't have that experience.

16       Q.   You're currently acting assistant

17   attorney general for civil rights at the U.S.

18   Department of Justice, correct?

19       A.   Correct.

20       Q.   And when did you become the acting AAG

21   for civil rights?

22       A.   July 28th, 2018.

Page 67

1    issue of reinstating a citizenship question on the

2    census questionnaire.  Beyond that, I can't

3    answer.

4    BY MR. HO:

5        Q.  What was your understanding of who

6    initiated those conversations?

7        A.  My understanding was that those

8    conversations were initiated by the Department of

9    Commerce.

10       Q.  Those initial conversations that are

11   referred to in this memo, your testimony is that,

12   to the best of your knowledge, those conversations

13   were not initiated by the Department of Justice,

14   correct?

15       A.  Again, I wasn't a party to those

16   conversations, but that's been my working

17   understanding.

18       Q.  And your working understanding is that

19   the Department of Justice did not reach out to the

20   Department of Commerce to initiate those

21   conversations for the purposes of obtaining better

22   data to enforce the Voting Rights Act, correct?

Page 68

1          MR. GARDNER:  Objection.  Lack of

2   foundation.

3          THE WITNESS:  Again, I wasn't a party to

4   those conversations, but that's been my working

5   understanding.

6   BY MR. HO:

7      Q.  The second paragraph in this memo reads,

8   "I spoke several times with James McHenry by phone

9   and, after considering the matter further, James

10  said that Justice staff did not want to raise the

11  question, given the difficulties Justice was

12  encountering in the press at the time, the whole

13  Comey matter.  James directed me to Gene Hamilton

14  at the Department of Homeland Security."

15          So were you aware, before I read that,

16  that as of September 8th, 2017, Justice staff did

17  not want to raise the citizenship question?

18          MR. GARDNER:  Objection.  Lack of

19  foundation.

20          THE WITNESS:  Before you read that, yes,

21  I was aware of that.

22

1  BY MR. HO:

2      Q.  Okay.  When did you become aware -- so --

3  I'm sorry.  Let me start that question.

4          So your understanding is that, as of

5  September 8th, 2017, Justice staff did not want to

6  raise the citizenship question, correct?

7      A.  Yes, that's my understanding, although it

8  wasn't my understanding on September 8th; it was

9  an understanding that I acquired later.

10     Q.  When did you acquire the understanding

11  that, as of September 8th, Justice staff did not

12  want to raise the issue of a citizenship question?

13     A.  Again, I think it was along the same

14  timeline that I learned that these conversations

15  had taken place, the conversations referenced in

16  the first paragraph and the second paragraph

17  involving Mr. McHenry.  And I believe I became

18  aware of those sometime after September 8th and

19  before the letter was sent from the Department of

20  Justice.

21     Q.  How did you become aware of the fact

22  that, as of September 8th, 2017, the Department of

1    BY MR. HO:

2        Q.  When did you first become involved in

3    deliberations about whether or not to request a

4    citizenship question on the decennial census

5    questionnaire?

6        A.  I first became involved in either late

7    August or early September of 2017.

8        Q.  You can't get more precise than late

9    August or early September?

10       A.  Well, I think it was either a day or two

11   before Labor Day in 20 -- the Labor Day weekend in

12   2017 which I think that year may have fallen in

13   late August.

14       Q.  So as of September 8th, 2017, the date of

15   Mr. Comstock's memo, your best recollection is

16   that, as of that date, you were already involved

17   in deliberations over whether or not to include a

18   -- to request a citizenship question for the 2020

19   census questionnaire?

20       A.  That is correct.  And I don't know --

21   Mr. Comstock's memo is dated September 8th.  He

22   doesn't give any dates for any of these

1    conversations, so I don't know if this memo was

2    contemporaneous to conversations or related back

3    to prior conversations he'd had.

4           But yes, that's my recollection, that, as

5    of September 8th, I would have been involved in

6    those deliberations.

7       Q.  How did you become involved in

8    deliberations over whether or not to request the a

9    citizenship question be included on the

10   2020 census questionnaire?

11          MR. GARDNER:  Objection.

12          To the extent that that answer would

13   cause you to reveal information subject to

14   deliberative process privilege, I instruct you not

15   to answer.  To the extent you can answer that

16   question without divulging such information, you

17   may do so.

18          THE WITNESS:  I became involved through a

19   conversation I had with two individuals at the

20   Department of Justice.

21   BY MR. HO:

22      Q.  Which two individuals at the Department

Page 75

1    of Justice?

2         A.   The attorney general and Mary Blanche

3    Hankey.

4         Q.   Roughly when did your conversations with

5    Mary Blanche Hankey and the attorney general

6    occur?

7              MR. GARDNER:  Objection.  Compound.

8              THE WITNESS:  It was the day or two

9    before the Labor Day weekend.  The reason I

10   remember that is that the attorney general is a

11   college football fan, and he's a fan of the Auburn

12   Tigers, so I ended the call with the cry for War

13   Eagle, since the Auburn Tigers were playing their

14   first game of the season that weekend.

15   BY MR. HO:

16        Q.   What was communicated to you during that

17   conversation with Attorney General Sessions?

18             MR. GARDNER:  Objection.  Calls for

19   information subject to deliberative process

20   privilege.

21             I instruct you not to answer.

22             THE WITNESS:  Consistent with that

1    Yes.

2        Q.  Your working understanding is not that

3    the attorney general initiated a conversation with

4    the Secretary of Commerce about the citizenship

5    question, correct?

6        A.  That's correct.

7        Q.  You responded to Mr. Gary's e-mail by

8    asking him to give you a call.  Did you have a

9    conversation with Mr. Gary?

10       A.  I don't know.  I don't know if I had a

11   conversation with him with specific reference to

12   this e-mail.  I can't -- I don't recall that.

13       Q.  After receiving this e-mail, did you

14   learn more from Mr. Gary about what he was

15   referring to when he talked about concerns that

16   the Commerce Secretary had?

17       A.  I don't recall -- as I said, I don't

18   recall discussing this with Mr. Gary.  Obviously,

19   we had some short e-mail correspondence, as this

20   document lays out, but that's all I recall about

21   it at this time.

22       Q.  Mr. Gary said in this e-mail that he

Page 152

1    from whom you received input on the letter was

2    from Mr. Herren, correct?

3        A.   That's correct.

4        Q.   After that period of early November

5    of 2017 when you had drafted the initial draft of

6    that letter, Mr. Herren gave you some edits,

7    correct?

8        A.   That's correct.

9        Q.   After that time, did you receive any

10   further edits from Mr. Herren to the draft letter?

11       A.   I don't recall one way or the other.

12       Q.   So you have no recollection of receiving

13   input from career civil rights division staff on

14   the letter requesting a citizenship question other

15   than that one occasion in early November around

16   the time of the first draft from Mr. Herren,

17   correct?

18       A.   I believe that's correct.  Yeah.

19       Q.   You continued to revise the letter after

20   early November of 2017 with input from different

21   people.  But after that first round of edits from

22   Mr. Herren, you received no subsequent edits from

Page 175

1          A.   Correct.

2          Q.   And -- so it would be accurate to say

3     that even when there was a citizenship question on

4     the census long form, the Department of Justice,

5     when it was using citizenship data for purposes of

6     VRA enforcement, it was using data that were

7     statistical estimates based on a sample, correct?

8          A.   I believe that's correct, if I follow

9     your question.

10          Q.   So it's accurate to say that the

11     Department of Justice, for as long as it's been

12     enforcing the Voting Rights Act, when it's needed

13     citizenship data, it has always relied on

14     statistical estimates rather than hard count data,

15     correct?

16               MR. GARDNER:   Objection.   Lack of

17     foundation.

18               THE WITNESS:   To the best of my

19     knowledge, I think that's correct.

20     BY MR. HO:

21          Q.   You're not aware of any period of time in

22     which the Department of Justice had access to hard

1    statistical estimates when it was actually

2    collecting the responses to the long form

3    questionnaire.

4         Q.  Thank you.

5              The letter doesn't mention that the

6    Department of Justice has always relied on

7    statistical estimates of citizenship with margins

8    of error for purposes of VRA enforcement, does it?

9         A.  I believe that's correct.  Again, the

10   letter speaks for itself.

11        Q.  Okay.  You're not aware of a single filed

12   case by the Department of Justice where the

13   Department of Justice was unable to succeed on a

14   VRA claim because of the fact that the CVAP data

15   on which DOJ was relying was a statistical

16   estimate with a margin of error that increases as

17   the geographic area decreases, correct?

18        A.  I am not aware of any such filed case.

19        Q.  You're not aware of any case where a

20   plaintiff was unable to succeed on a VRA claim

21   because of the fact the five-year ACS citizenship

22   data have a margin of error associated with them,

Page 204

1    correct?

2          A.  Five-year estimates?  That's correct.

3          Q.  Okay.  You're not aware of any case where

4    plaintiffs, other than DOJ, declined to bring a

5    VRA case -- let me start that question again.

6                You're not aware of any case where

7    plaintiffs declined to bring a VRA claim because

8    ACS data are statistical estimates with a margin

9    of error, correct?

10         A.  That is correct.  I am aware of one case

11   in which a court held that the one-year ACS

12   estimate, because of its associated margin of

13   error, was insufficiently reliable to allow the

14   plaintiff in that case to proceed with a Section 2

15   claim.

16         Q.  Right.  That's the Benavidez case, right?

17         A.  That is correct.

18         Q.  We'll talk about that in a bit, but I

19   want to talk about something else first.

20                (Gore Deposition Exhibit 19 marked for

21                 identification and attached to the

22                 transcript.)

Page 256

1    Jarmin to Mr. Gary reads, "Arthur, thank you for

2    your letter dated 12/12/2017 regarding improving

3    the quality of citizenship information for DOJ

4    enforcement of the Voting Rights Act.  Let me

5    start by saying the bureau is fully supportive of

6    providing DOJ with the highest quality statistical

7    information possible.  To that end, I directed

8    staff to review all possible ways to address the

9    needs expressed in the letter.  They have now

10   briefed me, and their findings suggest that the

11   best way to provide PL94 block-level data with

12   citizen voting population by race and ethnicity

13   would be through utilizing a linked file of

14   administrative and survey data the Census Bureau

15   already possesses.  This would result in higher

16   quality data produced at lower cost.  I suggest we

17   schedule a meeting of census and DOJ technical

18   experts to discuss the details of this proposal.

19   We look forward to working with you on this

20   important statistical matter."

21          From this e-mail, do you understand that

22   the Census Bureau director, or acting director, is

1   that --

2          MR. GARDNER:  Decision as to whether to

3   pursue that proposal.

4          MR. HO:  Okay.  That's what I just wanted

5   to clarify because --

6          MR. GARDNER:  Yeah.  Okay.

7          MR. HO:  -- it wasn't clear to me.

8          MR. GARDNER:  Sorry.  I thought that was

9   clear.  I apologize.  Yeah, that's the decision.

10  BY MR. HO:

11     Q.  Okay.  So the conversation with the

12  attorney general included a discussion about

13  whether or not to pursue the Census Bureau's

14  proposal to produce block-level CVAP data for DOJ

15  for VRA enforcement purposes without including a

16  citizenship question, correct?

17     A.  That is correct.  And just to clarify, I

18  wasn't familiar with all the particulars of their

19  proposal.

20     Q.  That's fine.

21         The decision was made not to pursue the

22  Census Bureau's alternative proposal for producing

Page 272

1    block-level CVAP data for purposes of VRA

2    enforcement through a means other than including a

3    citizenship question on the census, correct?

4         A.   That is correct.

5         Q.   Who made that decision?

6         A.   The attorney general.

7         Q.   When was that decision made?

8         A.   Around this time.  I don't know exactly

9    when it was made.  I can't remember the specific

10   date.

11        Q.   When you say "around this time," you mean

12   around January of 2018, correct?

13        A.   That is correct.

14        Q.   Are the reasons for that decision

15   memorialized anywhere?

16        A.   Not to my knowledge.

17        Q.   Were those reasons ever communicated to

18   you?

19        A.   Yes.

20        Q.   What were those reasons?

21             MR. GARDNER:  Objection.  Calls for

22   information subject to deliberative process

Page 274

1    decision?

2         A.   It would have been around this

3    January 29th date, I believe.  But I don't recall

4    specifically.

5         Q.   And who informed you that the Department

6    of Justice should not meet with the Census Bureau

7    to discuss the Census Bureau's alternative

8    proposal for producing block-level CVAP data?

9         A.   The attorney general.

10        Q.   You received this e-mail thread from

11   Arthur Gary, which includes the initial e-mail

12   from Dr. Jarmin describing the alternative

13   proposal for collecting CVAP data at higher

14   quality produced at lower cost on January 29th,

15   2018, correct?

16        A.   On this e-mail chain, that's correct.  I

17   don't know whether I received it before then or

18   not.  But yes, this e-mail -- the e-mail dated

19   January 29th, 2018, at 2:33 p.m., is the first

20   e-mail in this chain where Mr. Gary sent me that

21   information.

22        Q.   When you told Congress on May 21st, 2018,

1   December 12 letter, the Gary letter, did not use

2   the word "necessary" with respect to the inclusion

3   of a citizenship question on the 2020 census,

4   correct?

5        A.  Yes, I have just noted that in my

6   testimony.  I will say I don't know -- I have no

7   recollection of what this comment is referring to.

8        Q.  You agree, right, Mr. Gore, that CVAP

9   data collected through the census questionnaire is

10  not necessary for DOJ's VRA enforcement efforts?

11       A.  I do agree with that.  Yes.

12       Q.  I'm going to show you another document.

13  We'll mark this as 26 and 27.

14            (Gore Deposition Exhibits 26 and 27

15             marked for identification and attached to

16             the transcript.)

17  BY MR. HO:

18       Q.  26 is an e-mail from Mr. Aguinaga to you

19  dated June 12th, 2018, correct?

20       A.  Yes, it is.

21       Q.  And the subject is, QFR responses,

22  correct?

# EXHIBIT J

STUART GURREA, PH.D.                                    October 24, 2018
STATE OF CALIFORNIA vs WILBUR L. ROSS, J.R.                            1

1               IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                  SAN FRANCISCO DIVISION

3

STATE OF CALIFORNIA, by and
4    through Attorney General
     Xavier Becerra,
5
                    Plaintiff,
6
          vs.                         Case No.
7                                     3:18-cv-01865
     WILBUR L. ROSS, JR., in his
8    official capacity as Secretary
     of the U.S. Department of
9    Commerce; et al.,

10                  Defendants.
     _____
11   CITY of SAN JOSE, a municipal
     corporation; et al.,
12
                    Plaintiffs,
13
          vs.                         Case No.
14                                    5:18-cv-02279
     WILBUR L. ROSS, JR., in his
15   official capacity as Secretary
     of the U.S. Department of
16   Commerce; et al.,

17                  Defendants.
     _____
18

19       VIDEO DEPOSITION OF STUART D. GURREA, PhD

20                  October 24, 2018

21                   10:06 a.m.

22            101 Mission Street, Suite 1000

23               San Francisco, California

24

25   Reported by:   QUYEN N. DO, CSR No. 12447



1  BY MS. BOUTIN:

2      Q    Okay.  So I'll ask my next question.

3      A    Okay.

4      Q    Do you have any opinions about any

5  variation in nonresponse rate, as a result of the

6  citizenship question, across either -- either

7  geographic areas or demographic groups?

8      A    So I haven't formed any independent

9  opinions on that issue.  I'm familiar with what I

10  have read in this -- as part of my preparation for

11  this report.

12      Q    Okay.  And what -- can you think of any

13  articles in particular that have related to the

14  subjects that you've reviewed?

15      A    No.

16      Q    Okay.  Do you have any opinions on how

17  effective the Census Bureau's nonresponse follow-up

18  efforts are likely to be for the 2020 census?

19           MS. FEDERIGHI:  Objection.  Vague.

20           THE WITNESS:  No.

21  BY MS. BOUTIN:

22      Q    Okay.  And this is a little -- little bit

23  related to the last one.  Do you have any opinions

24  on how effective the Census Bureau's nonresponse

25  follow-up efforts -- and I'm going to -- I'm going



1          Could there be a full enumeration and yet

2    also effects on congressional seats apportionment or

3    distribution of federal assistance programs?

4          A     If everybody is -- is counted, no.   If

5    simply there's errors in one direction and another

6    that -- that offset each other and result in a --

7    a -- a -- a total that doesn't change, then that is

8    possible.

9          Q     Okay, paragraph 54, you state in the

10   second -- you state that "Defendants asked me to

11   recalculate Plaintiffs' predictions assuming NRFU

12   would have the same success rate as it had in the

13   2010 census:   98.58 percent ('Historical NRFU-Rate

14   Scenario')."

15          And you cite, for that, a memorandum from

16   John Abowd and David Brown, September 28th, 2018.

17          Other than that memorandum, is there any

18   other basis that you're aware of for the

19   98.58 percent Historical NRFU-Rate Scenario?

20         A     No.

21         Q     Did you read the September 28th Abowd and

22   Brown memo?

23         A     Yes.

24         Q     Did you agree with its analysis?

25         A     I didn't assess the -- the validity of the



```
 1  analysis.
 2      Q    Okay.  Is it fair to say that you took the
 3  number that was provided with you and just applied
 4  it to the data that you were working with?
 5      A    Yeah.  That's my assignment.
 6      Q    Okay.  Since -- since, I believe, you
 7  stated earlier that you have not spoken about
 8  this -- these cases with anyone at the Census
 9  Bureau, is it fair to say you did not discuss the
10  Historical NRFU-Rate Scenario with anyone at the
11  Census Bureau?
12      A    That's correct.
13      Q    Okay.  Did you communicate about it in any
14  other way with the Census Bureau other than --
15      A    No.
16      Q    -- through the memo?
17      A    Just -- other than through the memo, I --
18  I mean, I -- I guess, yeah, I -- I -- I wasn't
19  communicating.  I'm -- I did receive it.  I guess it
20  is a communication.
21      Q    Okay.
22      A    Yes, no --
23      Q    Okay.
24      A    -- nothing else.
25      Q    Okay.  Are you aware whether the memo was
```



1                    it will fully mitigate any decline in

2                    self-response rates attributable to a

3                    citizenship question through NRFU and

4                    imputation."

5              Do you have any opinion on whether or not

6    the Census Bureau will fully mitigate any decline in

7    self-response rates attributable to a citizenship

8    question through NRFU and imputation?

9         A    No.

10        Q    Okay.  In the analysis that you conducted

11   by applying historical NRFU rate, what demographic

12   groups does that rate apply to?

13        A    The assumption that I took was to apply a

14   hypothetical NRFU across demographics in all the

15   different scenarios that I considered.

16        Q    Okay.

17        A    These scenarios involved noncitizen

18   households and in the Maryland case, Hispanic,

19   noncitizen, non-Hispanic households.  I think that's

20   about it.

21        Q    Okay.  Do you know whether it is

22   reasonable to assume that historical NRFU rate would

23   apply to all demographic groups in 2020?

24        A    I -- I don't know one way or another.

25        Q    Do you know whether in 2010 the NRFU



# EXHIBIT K

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CITY OF SAN JOSE, et al.,:
                    :
     Plaintiffs,     :
                    : Case No.
    vs.             : 3:18-cv-2279-RS
                    :
WILBUR ROSS, JR., et al.,:
                    :
     Defendants.     :

Thursday, October 25, 2018

     Videotape Deposition of SAHRA PARK-SU,

taken at the Law Offices of Manatt, Phelps &

Phillips, LLP, 1050 Connecticut Avenue NW,

Washington, D.C., beginning at 9:40 a.m.,

before Ryan K. Black, a Registered Professional

Reporter, Certified Livenote Reporter and Notary

Public in and for the District of Columbia.

Veritext Legal Solutions
Mid-Atlantic Region
1250 Eye Street NW - Suite 350
Washington, D.C.  20005

1      BY MR. ADAMS:

2           Q.   And Question 31 appears on Page 11.

3           A.   Mm-hmm.

4           Q.   What is the process that was used

5      in the past to get questions added to the

6      Decennial Census, or do we have something

7      similar where a precedent was established?

8           A.   Mm-hmm.

9           Q.   And as we saw in Exhibit 17, the

10     Department of Commerce responded with your name

11     when asked for all people who worked on any

12     draft of the response.

13          A.   Yep.

14          Q.   And what work did you do on a draft of

15     re -- of the response to this question?

16          A.   Yes.  It goes back to what I mentioned

17     earlier.  Census, based off of our understanding

18     of our meetings with them, had indicated that

19     there was a distinction between the process

20     that's used at questions to the American

21     Community Survey, which they had shared with

22     us, and that the Decennial Census did not

23     necessarily have a similar process, to their

24     knowledge, that they could point to.

25     And, therefore, it would not be an accurate

1    characterization to say that it was the same.

2              And so based off of that, Census was

3    to go about -- my understanding from the meeting

4    was that Census was going to go back and work on

5    the draft response to Question 31.

6              Now, as I mentioned, these were

7    extremely busy times.  And I think a few days,

8    if not a week or so had gone by, and this was

9    not updated.  And I was in a meeting with Mike

10   Walsh, we had a call with Census in lieu of an

11   in-person meeting that we typically have, and

12   had a hard copy of this and had asked Mike

13   Walsh, our Deputy General Counsel, based off

14   of his recollection of our meeting with Census,

15   could he draft together a draft response so that

16   I can send it to Census for clearance, comments

17   or edits so I could get the ball rolling so we

18   can finalize these answers.

19             Mike Walsh then handwrote the draft

20   response for me on my paper, which then I then

21   went back and typed it up and sent it to Census.

22   I sent it to -- by e-mail to Ron Jarmin, I

23   believe Enrique Lamas, Christa, which those are,

24   typically, the people that I'll e-mail asking

25   for their comments, suggestions or clearance on

1          this.

2                    And that was my involvement regarding

3          this question and answer.

4              Q.    When was -- so Census sent a draft

5          response to Question 31 to Commerce?

6              A.    Mm-hmm.

7              Q.    And you asked at some point for a

8          revision to that response?

9              A.    I don't recall myself asking.  I

10         remember at the meeting the understanding was

11         Census was going to go back, because I don't

12         believe this was the only one where they were

13         going to revisit.  This was one of some that

14         Census was supposed to come back with their

15         revision.

16             Q.    Do you recall when Census was first

17         asked to revisit their initial response to

18         Question 31?

19             A.    I don't.  I would imagine it

20         probably wasn't too long after they provided

21         this response, and it was probably during the

22         course of one of our subsequent meetings with

23         them, either weekly or biweekly, or even a phone

24         conversation -- no, it was an in-person meeting.

25         Excuse me.

Page 159

1      or feedback from Mr. Jarmin, Mr. Lamas or

2      Ms. Jones about this proposed response?

3           A.   No.  And the reason why Christa is

4      always copied on any e-mail to Ron and Enrique

5      is so that she can also ping them and check with

6      them in the event that they missed an e-mail

7      from us.

8                And so Christa was my liaison

9      over there to ensure that we could get a timely

10     response from Census, and, if she responded,

11     then that was good as -- as what census was

12     going forward with, so that was my

13     understanding.

14          Q.   So your understanding -- was it

15     your understanding that Census had reviewed and

16     approved of the language that Mr. Walsh wrote on

17     your hard copy and you retyped here?

18          A.   That's what I took it as.

19          Q.   Following -- following this exchange,

20     did Commerce send to you any other revisions to

21     a response to Question 31?

22          A.   No, not that I can recall.

23          Q.   Can you recall -- do you know whether

24     they -- whether Census sent anyone within the

25     Department of Commerce a further revision of the

Page 160

1   response to Question 31?

2          A.   I do not know.  As far as I was

3   concerned, this was done and over and we can

4   move on.

5          Q.   From your perspective, you said it's

6   done and over and we can move on, so you view

7   this language as having been approved final

8   language for the response to Question 31?

9          A.   With regards to Census's review, that

10  was my understanding.

11         Q.   Was there further review of the

12  response within the Department of Commerce?

13         A.   I do not know.  At this point there

14  are a lot of e-mails going back and forth,

15  so ...

16              MR. ADAMS:  I'd like to show you

17  what's been marked as Exhibit Number 22, and

18  this is Bates Number 9812.

19              (Deposition Exhibit No. 22, a document

20  Bates Numbered 9812, was marked.)

21              MR. ADAMS:  Before we go to this

22  exhibit, I want to go back to what we were just

23  discussing and show you Exhibit 23.

24              (Deposition Exhibit No. 23, a document

25  Bates Numbered 3403, was marked.)

Page 169

1      response in Exhibit 21 to the version that's in

2      Exhibit 18, --

3              A.   Okay.

4              Q.   -- I just want to go back to 21

5      and make sure I understand what, if anything,

6      happened to this version of the response after

7      February 23rd, 2018.  Did you make any further

8      revisions to the response to Question 31?

9              A.   No.

10             Q.   To your knowledge, did Mr. Walsh

11     make any further revisions to the response?

12             A.   No.

13             Q.   To your knowledge, did Secretary Kelly

14     make any revisions to this version?

15             A.   No.

16             Q.   Are you aware of anyone who made

17     revisions to this version of Question 31 after

18     February 23rd?

19             MS. BAILEY:  Objection.  Asked and

20     answered.

21             THE WITNESS:  No.

22     BY MR. ADAMS:

23             Q.   If we could compare Exhibit 21 with

24     Exhibit 18, --

25             A.   Okay.

# EXHIBIT L

Page 1

1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MARYLAND

3    - - - - - - - - - - - - - - - x

4    ROBYN KRAVITZ, et al.,          :

              Plaintiffs,            :

5        vs.                         : Civil Action No.

     U.S. DEPARTMENT OF COMMERCE,    : 8:18-cv-01041-GJH

6    et al.,

              Defendants.            :

7    - - - - - - - - - - - - - - - x

     LA UNION DEL PUEBLO ENTERO,     :

8    et al.,                         :

              Plaintiffs,            :

9        vs.                         : Civil Action No.

     WILBUR L. ROSS, sued in his     : 8:18-CV-01570-GJH

10   official capacity as U.S.       :

     Secretary of Commerce, et al.,:

11            Defendants.            :

     - - - - - - - - - - - - - - - x

12     VIDEOTAPED DEPOSITION OF: DAVID SANFORD LANGDON

13   DATE:        Friday, October 26, 2018

14   TIME:        9:08 a.m.

15   LOCATION:    Covington & Burling

16                850 Tenth Street, D.C.

17                Washington, D.C.

18   REPORTED BY: Denise M. Brunet, RPR,

19                Reporter/Notary

20                Veritext Legal Solutions

21            1250 Eye Street, D.C., Suite 350

22                Washington, D.C.  20005

Page 243

1    making in your previous answer?  How --

2       A    That it's not easy.  It's not easy.  It

3    takes a lot of work.  And you have to -- the

4    reason it takes a lot of work is because the

5    administrative data may not measure what you think

6    it's measuring, how you think it's measuring it.

7       Q    Are you aware of any testing that's been

8    done to evaluate the effects of including a

9    citizenship question on the 2020 decennial on

10   response rates or the accuracy of -- and quality

11   of survey data?

12      A    So the -- no, so there hasn't been.

13   There hasn't been any testing to date.  And the

14   time frame wouldn't -- the Secretary's decision

15   wouldn't -- you know, wouldn't accommodate that

16   kind of testing.

17          That said, the Census Bureau presented a

18   reasonable -- very reasonable alternative to get

19   at those kinds of issues, which was looking at,

20   you know, the impacts -- there was no change.

21   Citizenship has always been part of the American

22   Community Survey, but nonetheless, looking at

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>Defendants. | No. 1:18-cv-5025 (JMF) |

## DEFENDANTS' SECOND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS UNITED STATES DEPARTMENT OF COMMERCE AND WILBUR ROSS

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Defendants United States Department of Commerce and Wilbur Ross submit these second supplemental objections and responses to Plaintiffs' First Set of Interrogatories to Defendants United States Department of Commerce and Wilbur Ross, as modified by Plaintiffs' counsel by email dated August 27, 2018.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1.** With regard to the document found in the Administrative Record at 1321, please IDENTIFY:

a. the "senior Administration officials" who "previously raised" reinstating the citizenship question;

b. the "various discussions with other government officials about reinstating a citizenship question to the Census";

c. the consultations Secretary and his staff participated in when they "consulted with Federal governmental components";

d. the date on which the "senior Administration officials" who "previously raised" reinstating the citizenship question first raised this subject; and

e. all PERSONS with whom the "senior Administration officials had previously raised" reinstating the citizenship question.

**Objections:**

Defendants object to this interrogatory to the extent that it seeks (a) communications or information protected by the attorney-client privilege or (b) communications or information protected by the deliberative-process privilege.

Defendants further object to this interrogatory as vague and overbroad to the extent it seeks information about meetings or conversations with government officials and other persons whose identities are immaterial to the claims in this litigation, and because the burden of responding is disproportionate to the needs of this case.

**Response:**

After conducting a diligent search, Defendants do not distinguish among the terms used synonymously in the Secretary's Supplemental Memorandum: "senior Administration officials," "other government officials," and officials at other "Federal governmental components." In order to respond as fully as possible to this interrogatory, Defendants therefore will construe subparts a, b, and c, as coextensive and will identify, as a single group, the individuals within the executive branch but outside the Department of Commerce who, before the December 12, 2017 Department of Justice letter, and as referenced in the Secretary's Supplemental Memorandum, either (a) discussed the citizenship question with Secretary Ross, (b) had raised or discussed whether to reinstate a citizenship question, or (c) were consulted by Secretary Ross or his staff regarding whether the Department of Justice would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act. In accordance with that interpretation, and subject to and without waiving the above objections, Defendants identify the following individuals.

Mary Blanche Hankey, James McHenry, Gene Hamilton, Danielle Cutrona, John Gore, and Jefferson Sessions. Although Kris Kobach is not a "government official" within the meaning of the Supplemental Memorandum, the Defendants identify him

nonetheless for the sake of completeness. Secretary Ross recalls that Steven Bannon

called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be

willing to speak to then-Kansas Secretary of State Kris Kobach about Secretary

Kobach's ideas about a possible citizenship question on the decennial census. The

Defendants therefore are also listing Mr. Bannon for the sake of completeness.

In addition, Secretary Ross discussed the possible reinstatement of a citizenship

question on the 2020 decennial census with Attorney General Sessions in the Spring

of 2017 and at subsequent times.


As to Interrogatories, see Verification page *infra.*

As to objections:

Dated: October 11, 2018                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JOHN R. GRIFFITHS
                                           Director, Federal Programs Branch

                                           CARLOTTA P. WELLS
                                           Assistant Director, Federal Programs Branch

                                            /s/ Stephen Ehrlich
                                           KATE BAILEY
                                           GARRETT COYLE
                                           STEPHEN EHRLICH
                                           CAROL FEDERIGHI
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, N.W.
                                           Washington, DC  20005
                                           Tel.:  (202) 305-9803
                                           Email:  stephen.ehrlich@usdoj.gov

                                           *Counsel for Defendants*

## CERTIFICATION OF EARL COMSTOCK

I certify under penalty of perjury that the foregoing second supplemental response to Plaintiffs' Interrogatory No. 1 is true and correct to the best of my knowledge, information, belief, understanding, or recollection, with the understanding that the Department of Commerce is continuing to research its responses to Plaintiffs' interrogatories and reserves the right to further supplement its responses.

Dated: October 11, 2018

_____
Earl Comstock

# EXHIBIT N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, *et. al*,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et. al*,<br><br>        Defendant. | Civil Action No. 1:18-cv-05025-JMF<br><br>Hon. Jesse M. Furman |

## DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' THIRD SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of this Court Defendants, the United States Department of Commerce and Wilbur Ross, Secretary of Commerce, in his official capacity, by and through their attorneys of record, provide the following objections and response to Plaintiffs' third set of interrogatories.

### OBJECTIONS WHICH APPLY TO ALL REQUESTS FOR ADMISSION

1.      Separate and apart from the specific objections set forth below, Defendants object to any discovery taking place in this case to the extent such discovery is brought pursuant to claims purportedly under the Administrative Procedure Act, as resolution of any such claims should be based upon the administrative record in this case.

2.      Each and every response contained herein is subject to the above objection, which applies to each and every response, regardless of whether a specific objection is interposed in a specific response.  The making of a specific objection in response to a particular request is not intended to constitute a waiver of any other objection not specifically referenced in the particular response.

1

## OBJECTIONS TO DEFINITIONS

1.     Defendant object to the inclusion of definitions for any term not relied on in these interrogatories.  Any requirement that Defendant respond to such definitions in the abstract is not proportional to the needs of the case and the burden of such a response outweighs its likely benefit, which is none.  Defendant does not hereby waive any future objection to the definition of such terms, or waive the right to employment of Defendant's own definition of such terms.

## OBJECTION TO INSTRUCTIONS

1.     Defendants object to instructions number 1, 3, 4, 5 to the extent they seek to impose requirements beyond those required by Federal Rules of Civil Procedure.

2.     Defendants object to instruction number 3 to the extent it requires Defendants to "identify each PERSON or organization having knowledge of the factual basis, if any, upon which the objection, privilege, or other ground is asserted," as such an instruction exceeds the requirements of Federal Rule of Civil Procedure 33 and constitutes a discrete subpart.

3.     Defendants object to instruction numbers 1, 4 and 5, to the extent they seek the production of documents, which goes beyond the scope of the requirements of Federal Rule of Civil Procedure 33.  Defendants will not produce documents in response to Plaintiffs' third set of interrogatories.  Defendants further object to instructions 4 and 5 to the extent they seeks information in a privilege log that exceeds the requirements of Federal Rule of Civil Procedure 26(b)(5).

## DEFENDANTS' RESPONSES TO PLAINTIFFS' INTERROGATORIES

## INTERROGATORY NO. 5

With regard to draft and final response to Question 31 in the "Questions on the Jan 19 Draft Census Memo on the DoJ Citizenship Reinstatement Request" found at AR 2303-2304 and AR 196, please IDENTIFY:

a.  all persons who worked on any draft of the response;

b.  all persons outside the CENSUS BUREAU who worked on any draft of the response;

2

c. the date on which each person outside the CENSUS BUREAU who worked on the response first worked on the response; and

d. the person or persons responsible for removing discussion of the "well-established process" when adding or changing content of the DECENNIAL CENSUS.

**OBJECTIONS:** Defendants incorporate by reference the above objections to the definitions and instructions. Defendants further object that this request is irrelevant to any claim or defense and not proportionate to the needs of the case. Defendants further object to Plaintiffs' interrogatory number five on the grounds that it constitutes four discrete subparts. Accordingly, Defendants will treat this interrogatory as four discrete interrogatories.

**RESPONSE:**

a. Ron Jarmin, Enrique Lamas, Burton Reist, Christa Jones, Michael Walsh, and Sahra Park-Su.

b. Michael Walsh and Sahra Park-Su.

c. On or about February 23, 2018.

d. Once Census and the Department of Commerce started to confer on the question and realized that there was no process for adding such a question to the 2020 Decennial because it had not been done in recent memory, the individuals identified in response to part "a" of this interrogatory collectively approved the final language.

### INTERROGATORY NO. 6

For each Request for Admission, to the extent that your responses is anything other than unqualified admissions, for each such response please identify with specificity all facts upon which you base your denial or qualified admission of any portion of the requested admission, including identifying with specificity all documents, events, occurrences, or conduct on which you base your denial or qualified admission.

3

**OBJECTIONS**:  Defendants incorporate by reference the above objections to the definitions and instructions.  Defendants further incorporate by reference each and every objection made to Plaintiffs' request for admissions.  Defendants further object that this interrogatory asks for the basis for responses that are "anything other than unqualified admissions" to requests for admissions that are not relevant to any claim or defense and not proportionate to the needs of the case.  Many of Plaintiffs' requests for admissions have no relevance as to whether the Secretary of Commerce's decision to reinstate a citizenship question is arbitrary or capricious or whether his decision violates equal protection principles.

Defendants further object to this interrogatory as constituting multiple, discrete subparts.  *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445-46 (C.D. Cal. 1998) (holding that an interrogatory that asks for the basis for the denial of each request for admission constitutes multiple interrogatories); *Jovanovich v. Redden Marine Supply, Inc.*, No. C10-924, 2011 WL 4459171,*2-3 (W.D. Wash. Sept. 26, 2011) (same); *Estate of Manship v. United States*, 232 F.R.D. 552, 557 (M.D. La. 2005) (same); *American Chiropractic Assoc. v. Trigon Healthcare, Inc.*, No. 1:00-CV-00113, 2002 WL 534459, *3 (W.D. Va. 2002) (same); *Commodores Enter. Corp. v. McClary*, No. 6:14-cv-1335, 2015 WL 12843874 (S.D. Fla. Nov. 6, 2015) (same).  Furthermore, Plaintiffs' request that Defendants provide up to 141 separate interrogatory responses is unduly burdensome and not proportionate to the needs of the case.  Accordingly, because Defendants do not stipulate to responding to more than 25 interrogatories in total, *see* Federal Rule of Civil Procedure 33(a)(1), and interrogatory 5 constitutes four discrete subparts, Defendants will only respond to the first sixteen requests for admissions that are not unqualified admissions.

**RESPONSES:**

**Interrogatory No. 9 (request for admission no. 1):**  The reason Defendants did not provide an unqualified admission to request for admission number 1 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

4

**Interrogatory No. 10 (request for admission no. 2):** The reason Defendants did not provide an unqualified admission to request for admission number 2 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 11 (request for admission no. 3):** The reason Defendants did not provide an unqualified admission to request for admission number 3 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 12 (request for admission no. 4):** The reason Defendants did not provide an unqualified admission to request for admission number 4 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 13 (request for admission no. 5):** The reason Defendants did not provide an unqualified admission to request for admission number 5 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 14 (request for admission no. 6):** The reason Defendants did not provide an unqualified admission to request for admission number 6 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 15 (request for admission no. 7):** The reason Defendants did not provide an unqualified admission to request for admission number 7 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 16 (request for admission no. 8):** The reason Defendants did not provide an unqualified admission to request for admission number 8 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 17 (request for admission no. 9):** The reason Defendants did not provide an unqualified admission to request for admission number 9 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 18 (request for admission no. 10):** The reason Defendants did not provide an unqualified admission to request for admission number 10 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 19 (request for admission no. 11):** The reason Defendants did not provide an unqualified admission to request for admission number 11 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 20 (request for admission no. 12):** The reason Defendants did not provide an unqualified admission to request for admission number 12 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 21 (request for admission no. 13):** The reason Defendants did not provide an unqualified admission to request for admission number 13 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 22 (request for admission no. 14):** The reason Defendants did not provide an

unqualified admission to request for admission number 14 is because Defendants lack any reasonable means of verifying the accuracy of statements purportedly made by a private party not within the control of the United States at the time the statement is said to have been made.

**Interrogatory No. 23 (request for admission no. 15):**  The reason Defendants did not provide an unqualified admission to request for admission no. 15 is that Defendants lack any reasonable means of verifying whether statements attributed to President Donald J. Trump as reported by TIME Magazine are accurately reported.

**Interrogatory No. 24 (request for admission no. 16):**  The reason Defendants did not provide an unqualified admission to request for admission no. 16 is because is that Defendants lack any reasonable means of verifying whether statements attributed to President Donald J. Trump as reported by the media are accurately reported.

**Interrogatory No 25 (request for admission 17):**  The reason Defendants did not provide an unqualified admission to request for admission no. 17 is because the request for admission did not accurately characterize President Donald J. Trump's January 27, 2017 executive order.  An accurate characterization of that executive order is reflected in Defendants' response to Plaintiffs' request for admission no. 17.

As to Interrogatories, see Verification page *infra*.

As to objections:

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch

 /s/ Stephen Ehrlich
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 305-9803
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*

Dated:  October 23, 2018

## CERTIFICATION OF EARL COMSTOCK

I certify under penalty of perjury that the foregoing responses to Plaintiffs' Interrogatories No. 5 and 6, both of which contain multiple discrete subparts that are not separately numbered, are true and correct to the best of my knowledge, information, belief, understanding, and recollection.


Dated: 10/12/2018

Earl Comstock