# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra,<br><br>       Plaintiff,<br><br>  v.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. Census Bureau; DOES 1-100,<br><br>       Defendants. | Case No. 3:18-cv-01865 |
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California Non-Profit Corporation,<br><br>       Plaintiffs,<br><br>  vs.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,<br><br>Defendants. | Case No. 5:18-cv-02279 |

## DECLARATION OF MATTHEW BARRETO, PhD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Expert report of Matthew A. Barreto, Ph.D.**

**I.      Background and Qualifications**

1.  I am currently a Professor of Political Science and Chicana/o Studies at the University of California, Los Angeles.

2.  Before I joined UCLA in 2015, I was a professor at the University of Washington for more than nine years, where I was promoted to Associate Professor with tenure, and then Full Professor with tenure. At the University of Washington, I was an affiliated faculty member of the Center for Statistics and the Social Sciences, and an adjunct Professor of Law at the UW School of Law. I am also the co-founder of the research firm Latino Decisions.

3.  Throughout my career, I have taught courses on the Voting Rights Act, Racial and Ethnic Politics, Electoral Politics, Public Opinion, Immigration, and Introduction to Statistical Analysis and Advanced Statistical Analysis to Ph.D. students.

4.  I earned a Ph.D. in Political Science at the University of California, Irvine in 2005, with an emphasis on racial and ethnic politics in the United States, political behavior, and public opinion. Professor Bernard Grofman, a well-known expert in voting rights research, served as my principal dissertation advisor.

5.  I have published multiple peer-reviewed academic research papers on public opinion and survey methodology (among other topics).

6.  I have conducted large public opinion surveys in Indiana, Wisconsin, Pennsylvania, Alabama, Texas, and North Dakota in connection with litigation assessing, among other things, how the public responds to, and is affected by, changes in laws and statutes. Courts have accepted these surveys as viable and methodologically accurate instruments to understand how the public responds to changes in state law. In particular, my previous survey research has focused on understanding sub-group analysis to evaluate differential impacts by race and ethnicity. Most recently, the United States District Court for the District of North Dakota stated in *Brakebill v. Jaegger* (No. 1:16-cv-008) that "the Court

gives the findings of the Barreto/Sanchez Survey, and the other studies and data presented by the Plaintiffs, considerable weight."  Previous to this, in 2014 in *Veasey v. Perry* (No. 13-CV-00193), the United States District Court for the Southern District of Texas, and in findings affirmed by the Fifth Circuit Court of Appeals, found that my survey was statistically sound and relied upon my survey findings to evaluate the impact of Texas's voter ID law.  Likewise, in *Frank v. Walker* (No. 2:11-cv-01128), a survey I administered and included as part of my expert report was given full weight by the United States District Court for the Eastern District of Wisconsin in a voter ID case in Wisconsin.

7.  In *Fish v. Kobach* (No. 16-2105-JAR-JPO), the plaintiffs retained me as an expert witness to evaluate the methodology of the defendant's survey, and the United States District Court for Kansas found me to be an expert on best practices of survey research and credible and qualified to discuss survey methodology.

8.  My full professional qualifications and activities are set forth in my curriculum vitae, a true and correct copy of which I have attached hereto as Appendix C.  I am being compensated by plaintiffs at a rate of $300 per hour for the study and testimony in this case.

## II.     Scope of Work

9.  Plaintiffs in this action retained me to evaluate whether the inclusion of a citizenship question on the United States' 2020 decennial census (i) would affect participation in the census, and (ii) would reduce the accuracy of the census. To conduct my evaluation, I reviewed two sources of information. First, I conducted a comprehensive literature review on survey methodology, response rates, sensitive questions and methodology, and census procedures addressing missing data and imputation. Second, I oversaw a large nationwide public opinion survey of 6,309 respondents asking people whether they would participate in the census given the inclusion of a citizenship question.

10. I worked on this project with Mr. Marcel Roman, a Ph.D. student in the department of Political Science at UCLA. Mr. Roman helped me compile sources for the literature review

and prepare tables and graphs for this report.

## III.     <u>Executive Summary</u>

11. Based on the extant literature published in the social sciences, the survey I conducted, and my own experience implementing hundreds of other public opinion surveys, I conclude that the addition of a question about household member's citizenship will significantly reduce participation in the 2020 census, and ultimately will reduce the accuracy of the 2020 census.

12. The published literature is quite clear: a critical component to ensure an accurate response rate on any survey, including the census, is trust between the public and the survey administrator. Without a high degree of trust, the prior published studies conclude that response rates will fall.

13. Trust is particularly important when asking sensitive and private information of any vulnerable population subgroups concerned about the potential misuse of such information. From this perspective, adding the highly sensitive question of citizenship status to the 2020 census will make it much harder to stimulate participation in the census from vulnerable populations such as immigrant[1] and minority communities, if such communities do not trust the census to adequately protect their confidentiality.

14. When sensitive questions are asked on a survey, respondent anonymity is particularly important to ensure higher participation. The census violates anonymity by requiring respondents to list the names of all household members. If respondents do not trust the survey administrator, and there is no anonymity, posing sensitive questions to vulnerable respondents will greatly reduce the accuracy of the survey.

15. If trust is low, attempts to re-interview or re-contact households will not be successful either. Survey respondents must believe that there is no jeopardy or threat of disclosure to ensure their participation in a survey, regardless of how many attempts one might make to

---

[1] Here we mean persons who are foreign-born and emigrated to the United States.

prompt their participation.

16. The survey I conducted shows that levels of trust in immigrant and minority communities in the United States are very low with respect to questions about citizenship. When asked about the protection of sensitive information, including citizenship, of themselves and family members, immigrant respondents were statistically less likely to trust that the Trump administration will protect their information and not share it with other federal agencies (just 35%). Among Latino respondents overall, just 31% trust the Trump administration to protect their personal information, which is statistically lower than among non-Latinos.

17. **In California, trust in the Trump administration to protect their citizenship information on the census is even lower.** Statewide, 48% of respondents think the Trump administration will share their citizenship information with other federal agencies. Among Californians who state they won't respond to the 2020 census, a resounding 80% think the Trump administration will share their citizenship status information across federal agencies. Data from the City of San Jose sample reveal a similar pattern where 49% believe their citizenship information will not be protected.

18. The survey also shows that large percentages of immigrants and minorities are concerned specifically that the citizenship information reported on the census will be shared with Immigration and Customs Enforcement (ICE). Overall, 41% of immigrants surveyed state they are concerned about this, along with 40% of Latinos, results that represent statistically significant differences from the nation as a whole. **This concern is especially high among California residents who said they won't respond to the 2020 census, where 83% said they are concerned that their citizenship information will be shared with ICE.**

19. Comparing the responses to survey questions about a census *without* a citizenship question and a census *with* a citizenship question, this report calculates the expected drop-off rate - or the expected percentage of those who will not respond to the 2020 census in light of the citizenship question. Nationwide, the survey reports an expected drop-off rate between 7.1% and 9.7% in 2020 due to the citizenship question. For immigrants the drop-off rate

is much higher - between 11.3% and 17.8% nationally. For Latinos the drop-off rate is expected to be between 14.1% and 16.6%.[2]

20. **In the state of California, the drop-off rate will be statistically worse than any other state in the country, estimated to be between 12.3% and 18.0% statewide. Further, an even higher rate is reported in San Jose, a city that is nearly 40% immigrant, and between 12.7% and 20.3% state they will not respond to the 2020 census.**

21. The drop-off rate will be exacerbated by the fact that, overall, those respondents who indicate they will not respond to the 2020 census due to the addition of a citizenship question have larger household sizes (3.30 persons) than respondents who indicated they would participate (2.95 persons). Thus each household that does not participate will represent 3.3 persons not participating, amplifying the expected drop-off rate in 2020. When further broken down by subpopulation, this household size effect is most evident in Latino immigrant households. Among Latino immigrants who stated they will participate in the census, the average household size is 3.80; among Latino immigrant who state they won't participate, the average household size is 4.60.

22. When households do not initially self-respond to the census, the Census relies on nonresponse follow up (NRFU) to re-contact households to encourage them to respond. In simulated re-contact, the survey shows that a majority of non-responders to the 2020 census will not switch and become participants when asked again to do so. Among people who said they won't participate if the citizenship question is asked, even after receiving assurances of census confidentiality, only 45% said upon re-contact that they would switch and respond to the census, and 55% did not agree to participate upon re-contact. For respondents who were told during simulated re-contact that no citizenship question would be asked, 84% switched and said they would respond upon re-contact. For immigrants, re-

---

[2] I provide two point estimates for the drop-off rate, explained below in Section 5-B, Paragraph 77. The first rate is calculated by comparing answers to question 1 and question 2 on the survey, and the second rate is comparing answers to question 1 and question 8 on the survey. The first number reported of 7.1% is the estimated drop-off rate comparing question 1 and question 2, while the second number reported of 9.7% is for question 1 and question 8. This is explained in greater detail below.

contact success was even lower, with only 33% stating they would participate in the 2020 census upon re-contact if a citizenship question is present, compared to 80% participation upon re-contact when no citizenship question is present.

23. Larger households will be the most difficult to successfully convert from non-participation to participation if there is a citizenship question, further undermining an accurate count. Among the 33% of immigrants who would take the census upon re-contact, their average household size is 2.91 compared to an average household size of 3.94 for the 67% of immigrants who would not participate upon re-contact, leaving them, and their larger households uncounted.

24. One of the ways Census Bureau officials try to account for people who refuse to respond to the census is to mathematically account for non-responders through statistical methods such as "substitution" or "imputation." Both of these methods use information on responding households to estimate population information on non-responding households. However, non-responding households are statistically different than responding households on a variety of critical demographics, which violates an important assumption of substitution or imputation. For these methods to serve as viable alternatives, missing units and reported units should be roughly equivalent. However, the survey reveals that non-responding households are more likely to be larger in size, be foreign-born, and have different age and educational outcomes than responding households. This will make substitution and imputation inaccurate and unreliable, and makes it highly likely that there will be a net undercount of households refusing to respond to the census due to the citizenship question.

## IV.    Literature Review

### A.    Factors That Impact Survey Response Rates and Accuracy: Trust, Sensitive Questions, and Socio-Political Context

25. The decennial census is a population survey. There have been extensive studies across the

social sciences documenting the best practices and potential pitfalls in collecting accurate survey data. With respect to evaluating the 2020 census there are three key takeaways that are quite clear in the published literature. First, trust between the public and the survey administrator is crucial. Without a high degree of trust, prior studies conclude that response rates will fall, leading to a biased survey project because it excludes people from the data and is no longer representative. Second, highly sensitive questions require assurances of anonymity and confidentiality. Third, the social and political context during survey implementation can greatly impact trust, confidence, and participation rates. This is especially the case for vulnerable populations when they perceive an unwelcoming environment or context. Of these key takeaways, the hallmark of cooperation in any survey is trust. Respondents are more likely to participate in a survey, to complete survey items accurately, and respond fully to survey items when they trust the survey administrator. When respondents are suspicious, uncertain, anxious or untrusting, non-response rates significantly increase. An early study on this topic framed the issue as how much threat potential respondents perceive through the source of the survey as well as the types of questions being asked (Ball 1967; Bradburn et al. 1978). When subjects identify the survey as being implemented on behalf of authorities who they perceive could use their answers against them, they are likely to not-respond, or to respond untruthfully (Ball 1967). By contrast, as Ball (1967) explains, when subjects are asked questions on behalf of an anonymous research study, with trusted confederates who do not represent authorities, they are inclined to participate, and to answer questions honestly. In particular, trust is important when asking sensitive and private information of any vulnerable subgroups of the population that feel at risk. From this perspective, inclusion of a citizenship question on the 2020 census will make securing participation of immigrant communities much harder than if a citizenship question were not included on the decennial census.

26. A research study by the U.S. Government Accountability Office in 2003 (GAO-03-605) laid out the most appropriate approaches to surveying the Latino population specifically.

The report was commissioned because prior government surveys, in particular the Census, were noticing high rates of non-response with Latino respondents. The report stated that distrust – especially of those representing the government – was a leading factor in Latino immigrant non-response. To fix this, they recommend increasing trust so that potential survey respondents are not fearful of their participation, and not suspicious of the census questions being asked, or the census enumerators visiting their community. Including the citizenship question on the 2020 census does precisely the opposite, increasing *dis*trust and, therefore, making it substantially less likely that members of the Latino immigrant subgroups will respond to the census.

27. De la Puente (1995) examined issues related to trust, confidentiality and fear among potential census respondents in El Paso, Texas and found that fear and apprehension on part of the sample area residents led to concealment of information from the Census Bureau and from the ethnographers, due to their belief that the government will not keep their information private or confidential when it comes to highly sensitive questions. This research establishes that the Census already knows it has challenges with trust in some immigrant communities and attempts to overcome those challenges by not asking sensitive questions that make it very difficult to persuade communities with low trust. However, in 2020 the inclusion of a citizenship status questions will result in increased drop-off and problems with trust in such communities.

28. In a follow-up study a decade later, de la Puente (2004) concluded that individuals with unstable immigration statuses were much less likely to trust the government and specifically less likely to fill out the census questionnaire. Indeed, properly counting undocumented immigrants has long been a concern for the Census Bureau. De la Puente's research demonstrated that respondents with irregular immigration statuses are unlikely to directly cooperate with the Census if they perceive their immigration status will be revealed. One respondent in the study, who did have legal status as a student, was afraid to participate in the Census because she feared that at some point in the future she may go out

of status and that the information she provided to the Census Bureau might be used to track her down.  However, if immigrants come to believe that their immigration status cannot be revealed because it will not be collected in the first place, cultural facilitators can help improve participation rates (de la Puente 2004).

29. An important practice that ensures higher participation rates in surveys is respondent anonymity, particularly when sensitive questions are being asked. The census violates anonymity by requiring respondent to list the names of all household members.  If respondents do not trust the survey administrator, and there is no anonymity, posing sensitive questions to vulnerable respondents greatly reduces the accuracy of the survey. Tourangeau and Yan (2007) explain how the "threat of disclosure" on sensitive question can result in non-response.  Generally, people have concerns about the possible consequences of participating in a survey, or giving a truthful answer should information become known to a third party with enforcement powers. The authors explain a question is "sensitive" if it raises fears about the likelihood or consequences of disclosure of the answers to agencies or individuals directly, or not directly involved in the survey. As an example, Tourangeau and Yan (2007) discuss asking a question about marijuana use to a group of teenagers.  If the teens suspect that the answers could be shared with their parents, they opt out of the survey or lie.  But if the survey is completely anonymous and implemented by their peers, they are much more likely to participate and be truthful.  The *perceived* threat of disclosure is what matters.

30. A review of findings across different surveys suggest that the likelihood of survey response largely depends on contextual factors, including the respondent's personal situation and the features of the data collection, such as the degree of privacy it offers.  The exact same question might be highly sensitive and risk non-participation in one setting, but be acceptable and proper in another.  To this point, a comprehensive review of survey environment research indicates that highly sensitive questions will be disruptive to the survey, produce non-response, or result in biased data when the respondent feels any social

pressure of their answers being known. However, if the respondent feels secure and has total privacy and anonymity, they are likely to participate and provide truthful answers (Tourangeau and Smith 1996). In particular, Krysan (1998) found evidence that respondents greatly modified their answers to questions and issues related to views about race, ethnicity or immigration based on how they felt the interviewer would perceive or judge their responses.

31. Concerns about confidentiality are likely to exacerbate the unwillingness of certain communities to respond to a census that includes a question about citizenship. A study of immigrant communities' knowledge and awareness of the census found that one major concern was confidentiality of personal information (Raines 2001). Beyond the Latino immigrant community, this study reported evidence that immigrants from Laos, Somalia, Iraq, Bosnia, and Haiti expressed concerns over anonymity and confidentiality. The general takeaway is that as additional private, personal or sensitive questions are added, the degree of concern over anonymity and confidentiality raises considerably. Even if the Census provides assurances, many may not believe or trust those assurances. In part, this might be due to the current social and political context (laid out below in paragraph 34) or could also be due to prior experiences in their home country with authoritarian regimes and government data collection. Thus, for a population survey to be accurate, it is critical that respondents truly believe their answers to sensitive questions will always remain confidential.

32. Additional ethnographic research has revealed that undocumented immigrants, or mixed-status households are likely to avoid government contact when they suspect it is not safe to participate (de la Puente 1995). This is especially the case when sensitive topics will be potentially discussed or revealed. Velasco (1992) maintains that undocumented immigrants in his sample area in San Diego, CA avoided contact with government. He argues that this avoidance was one of the important contributing factors to census omission and estimates that over half of the sample area residents were undocumented immigrants. Similar

situations were also reported in the Miami, FL sample area (Stepick 1992) and in the 26 rural Marion County, OR sample area (Montoya 1992). However, the ethnographic research all conclude that participation barriers can be overcome by not including worrisome questions about citizenship status and working with community based organizations and cultural facilitators to increase trust and confidence in data privacy.

33. Levels of trust in immigrant and minority communities are very low with respect to questions about citizenship. In the national survey implemented for this report, when asked about protecting sensitive information, including citizenship of themselves and family members, only 35% of immigrants expressed trust that the Trump administration will protect their information and not share it with other federal agencies. Among Latino respondents overall, just 31% trust the Trump administration to protect their personal information, and only 23% of African Americans and 41% of Asian Americans had such trust. According to my national survey, a very large percent of immigrants and minorities believe the Trump administration will share their personal information with other federal agencies, and these lower rates of trust are statistically significant as compared to whites, and U.S. born respondents.[3]

34. Research related to the 2020 census even prior to the addition of the citizenship question has already reported considerable fear and concern in the immigrant community about personal identifying information related to citizenship status. A comprehensive study by the Census Bureau's Center for Survey Measurement presented at the National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting 2017 (Meyers 2017) reported an increase in respondents expressing concerns to researchers and field staff about confidentiality and data access related to immigration, legal residency, and citizenship status, and their perception that certain immigrant groups are unwelcome. There was an observation of increased rates of unusual respondent behaviors during pre-testing and

---

[3] Full details on this survey start below at paragraph 62

production surveys, including item-nonresponse, break-offs, and refusals, especially when the questions involved citizenship status. The most commonly occurring finding was that respondents appeared visibly nervous about disclosing their private information and who would have access to such data. The current political climate was of concern to respondents: in one Spanish interview, a respondent stated, "the possibility that the Census could give my information to internal security and immigration could come and arrest me for not having documents terrifies me."

35. As the finding immediately above makes clear, immigrant communities can be especially vulnerable to the social and political context surrounding the implementation of a survey. A study of immigrants in California and Texas found that respondents' fear over citizenship status correlated with their non-participation in the health sector (Berk and Schur 2001). This study found strong evidence that a threatening context can lead immigrants to withdraw and limit their access to public services, including access to medical care which they greatly needed. Likewise, anxiety and fear over immigration status has been found to reduce utilization of services related to health care, law enforcement, and education (Pedraza and Osorio 2017). In particular, research has identified the context of heightened "immigration policing" as one that erodes trust in other public institutions and creates an environment in which immigrant communities are very selective where, when, and how they engage with government agencies (Cruz Nichols, LeBrón and Pedraza 2018). The finding is not just limited to first generation immigrants themselves; the research also finds a strong spillover effect to U.S.-born Latinos who have immigrant parents, or feel connected to the immigrant community, and also demonstrates non-participation during times of threatening context.

36. Studies have shown that the political context after 2016 and the election of Donald Trump has significantly diminished Latinos' trust of the federal government. For instance, Michelson and Monforti (2018) find that Latinos, including those who are undocumented, were less trusting of government in 2016 than in 2012. In 2012, trust amongst Latinos was

strong across all subgroups of Latino immigrants---citizens, non-citizens with legal status, and undocumented immigrants. Four years later, Latinos registered lower levels of trust in government, with fewer than 1 in 20 Latinos in any subgroup responding that they trust the government "just about always." In addition, Sanchez and Gomez-Aguinaga (2017) report that an overwhelming majority of Latinos described Trump and his policies as scary (74%), dangerous (77%), hostile (78%) and unwelcoming (80%) and they conclude that the current context is creating tension, anxiety, and nervousness among Latinos and immigrants. Thus, this current political context, and the inclusion on the census of a question specifically asking about citizenship status, create conditions that will lead to much higher non-response to the 2020 census in immigrant and Latino communities.

37. Beyond the Latino and immigrant communities, there is also reason to expect that the citizenship question will cause high non-response rates among Arab and Middle Eastern Americans. Research by Oskooii (2016) and Lajevardi and Oskooii (2018) demonstrates that American Muslims and those of Arab and Middle Eastern ancestry currently perceive a high rate of discrimination and an unwelcoming environment. Oskooii (2016) explains how perceived social exclusion can result in withdrawal and non-participation by these communities and documents this fact empirically in his published research. In research by the Center for Survey Measurement, focus groups conducted in Arabic among immigrants from the Middle East revealed the potential for Census non-response due to questions about citizenship status in light of the current political climate. (Meyer 2017). Some focus group participants referred to the "Muslim Ban" when expressing why they would be nervous about reporting their immigration and citizenship status to the federal government.

38. This context is particularly important as it relates to the question about citizenship status, because this is the point of tension for many in the immigrant community today. That is, there is grave concern over providing information to the federal government about the citizenship status of oneself or one's family members given the perceived high rates of immigrant policing. It is because the present distrust and fear right now is directly related

to citizenship status that including a new question on citizenship status will likely result in considerable non-response.

39. A clear implication identified in the relevant literature on surveys is that when respondents perceive threatening questions, if trust is low, non-participation will result in an inaccurate survey. Further, attempts to re-interview or re-contact households will not be successful, and some re-contact may only serve to further erode trust. Survey respondents must believe that there is no potential jeopardy before participating. Once a respondent believes that a question on the survey could bring them harm, and that the survey enumerator is acting on behalf of an official agency, attempts at repeated re-contact typically do not result in a completed survey (Ball 1967). In interviews with the enumerators themselves, there is a sense that the citizenship status question will make their jobs harder, if not impossible (Meyers 2017). In focus groups with enumerators, they specifically identified the political context and the citizenship items as being problematic

   a. "The politics have changed everything recently."

   b. "This may just be a sign of the times, but in recent several months before anything begins, I'm being asked times over, does it make a difference if I'm not a citizen?"

   c. "Three years ago was so much easier to get respondents compared to now because of the government changes…and trust factors…three years ago I didn't have problems with immigration questions."

40. Prior experiences with census data collection efforts that overlapped with anti-immigrant contexts provide evidence that non-response follow-up (NRFU) will be much more difficult in 2020 given the political climate and the inclusion of a citizenship status question. Terry et al. (2017) describe the connection between a threatening context and census non-response in Arizona and Texas among immigrant communities: "the wider social context also had an important role in enumeration. Just before the NRFU enumeration program started in 2010, Arizona passed a very strong anti-immigration law that coincided with legal ordinances in two Dallas-area cities. These ordinances were aimed

at identifying illegal immigrants through police stops or the reporting of immigration status of applicants wishing to rent apartments. The new law provoked heightened tensions around the country, particularly in the Dallas/Fort Worth-area Hispanic site." As a result, these reports conclude that non-response was high and that NRFU was less successful.

41. Already, the social and political context related to deportations and the attempted repeal of the Deferred Action for Childhood Arrivals (DACA) is creating distrust and fear in the immigrant community that information about immigration status reported to the government will be used to track down and deport immigrants (Frost 2017). One implication of the fear and unrest in the immigrant community is the increased mobility which could render any attempt at imputation or substitution incomplete and inaccurate. For imputation to work, the missing unit household cannot be vacant, and likewise cannot be a second home or vacation home of someone already counted. The missing unit household should have someone living there as their primary residence. However, as Frost notes that many undocumented immigrants who receive government letters or notices may pick-up and move their entire family, rather than wait around and figure out a way to interact with public officials. Similarly, this is documented by O'Hare (2017) who notes that Latino children are especially susceptible to being undercounted due to mobility. There is evidence that if immigrants are fearful of attempts by the federal government to obtain the personal information, identities, and citizenship statuses of all members of their household, they may vacate their homes and move to avoid being contacted again (Meyers 2017). To the extent this happens, attempts at imputation or substitution will be inaccurate, both on the national level, but especially on state and local levels.

42. In order to try and design questionnaires mindful of the complexities of trust, sensitive questions, and the problems inherent in imputation or substitution, the census, like all large-scale surveys, has a general practice of piloting and pre-testing any changes or additions to their program to ensure that census surveys are designed to maximize accuracy and maintain high response rates.

43. In this case, adding a highly sensitive question at a very late date, without proper testing or piloting before implementation violates the best practices of social science research and of the Census Bureau itself. Indeed, a key principle in implementing new survey questions or changes to a survey, is pilot testing or pre-testing, which are generally used interchangeably. Pilot testing and pre-testing allows the research team to assess how changes to a survey, including adding new questions, question wording changes, new sampling procedures and more, might impact the eventual larger scale survey that is implemented (Baker 1994). In a review of the literature on survey testing, van Teijlingen and Hundley (2001) write that "One of the advantages of conducting a pilot study is that it might give advance warning about where the main research project could fail, where research protocols may not be followed, or whether proposed methods or instruments are inappropriate or too complicated." Hunt et al. (1982) define pretesting as "the use of a questionnaire in a small pilot study to ascertain how well the questionnaire works." The authors emphasize testing the entire questionnaire, not just a single question, because the survey as a whole must be assessed. While expert-level discussions are often informative, social scientists have concluded that "no amount of intellectual exercise can substitute for testing an instrument designed to communicate with ordinary people'" (Backstrom and Hursch 1963). In fact, a well-known case of a pilot study helping to change and inform an eventual large-scale population count study is the 2001 Census in the United Kingdom. According to the Office of National Statistics (1999), the pilot study "provided essential information on public reaction to new questions and form style as well as assessing the success of collection and processing methods." In sum, the literature on pre-testing is clear: when proposing changes to an established instrument, testing the questionnaire as a whole is crucial, as questions may perform differently on different surveys, depending on layout, mode or different contexts.

44. Four former Census Bureau directors who have served in both Democratic and Republican administrations agree that including a citizenship question will threaten the success of the

2020 census. In an amici curiae brief in *Evenwel v. Abbott* (1:14-cv-00335-LY-CH-MHS), they wrote that asking about citizenship status in the census would "exacerbate privacy concerns and lead to inaccurate responses from non-citizens worried about a government record of their immigration status." In addition to concerns over public trust, the addition of a highly sensitive citizenship status question violates best practices that the Census Bureau has implemented in previous iterations of the census. The administration is including a potentially sensitive question without testing the full questionnaire in the field. According to reports compiled by the Census, pre-testing changes to the instrument should be standard practice and is critical to the overall quality (DeMaio et al. 1993). Census survey designs and instruments are based on years of research and testing, sometimes 13 years in advance. Adding a citizenship status question to the decennial census survey without full-scale testing can undermine the census count (Brown et al. 2018). Although the Census Bureau has tested a citizenship question as part of the American Community Survey (ACS) for decades, the relevance of the experience on the ACS is not directly or fully applicable to how adding a citizenship question on the decennial census would impact the response rates or accuracy of the census. This is because the ACS is not a full and complete enumeration of every single household and is not the exact same survey instrument. It is not just the new question which must be tested, but the entire survey instrument must be tested as a whole, and in the exact same format as it will be implemented in order to understand the reaction within the community.[4] The Census Bureau already acknowledges this and runs a complete end-to-end test each cycle for this exact purpose, and in April 2018 they implemented this crucial testing program in Providence, Rhode Island. However, they ran this test before the citizenship question was added. As a result, the Census Bureau tested the wrong survey questionnaire, and have no relevant data on the new survey they plan to implement.

---

[4] The Census Bureau recognizes the critical importance of pretesting and has its own quality standards. In the Census report "U.S. Census Bureau Statistical Quality Standards" (2013) requires, among other things, that pretesting must verify that questions are "not unduly sensitive and do not cause undue burden."

### B. Non-Response Follow-Up (NRFU) and Imputation of Non-Responding Households

45. The Census is aware that some households will not respond to the initial request for participation, and as such they have long had a program called Non-Response Follow-Up (NRFU) which provides follow-up contact with any households that do not initially respond. In 2010 the Census estimates they conducted follow-up with around 50 million units (Rao 2017). NRFU is critical for the Census to increase participation rates, but it is a costly and difficult undertaking by their own admission. Any increased non-response at initial contact makes NRFU much more difficult, especially if non-responding households come to not trust the survey questions that enumerators are attempting to ask. As discussed in this report, if a citizenship question is included, then Latinos, immigrants, and noncitizens are statistically less likely to self-respond to the 2020 census. These non-responding individuals are also unlikely to respond after household visits by census enumerators because of fear of government interaction. (de la Puente 1995; 2004).

46. Where information about the size of these households is not obtained through self-response or non-response follow-up, the Census Bureau may contend that these households can nevertheless be counted through two methods: (1) matching these households with their administrative records; or (2) whole-person imputation using records and census data from other households in the community. In fact, both methods are likely to disproportionately undercount Latino and immigrant communities—the specific communities that are more likely to choose not to respond to the 2020 census as a result of the citizenship question. While administrative records may be an accurate way to measure aggregate trends they may also be very problematic when used to match and enumerate specific households (Groen 2012). When it comes to matching across different databases, administrative records are difficult and problematic to match with specific individuals or households. In short, the administrative records themselves contain many typographical or clerical errors (Groen 2012). Respondents often use different names, nicknames, maiden names, or new married names which make matching to a separate population survey problematic. In

addition, there are often errors in birth date and street addresses have been found to be either wrong, or used the incorrect abbreviation or misspelled. Thus, while viewed in isolation, an individual database of administrative records might, by itself, be quite accurate for compiling or aggregating total numbers, there is significant difficulty is in assuming they can be neatly matched to a specific individual or household.

47. This problem is particularly acute for noncitizen households, who may be the hardest to match to administrative records. Research by Coutin (2000) documents that many non-citizen immigrants do not have the necessary paperwork in the first place to provide fully accurate information on employment, social security, or IRS forms. In other cases, they may seek to avoid contact with government agencies and provide incorrect or inaccurate household information (Hagan 1994). Thus, even assuming that enumerating households through administrative records could be done reliably, any efforts to match those administrative records to the census would disproportionately miss noncitizen households. The Census Bureau has acknowledged that administrative records useable for purposes of enumeration are more likely to exist for citizens than noncitizen households (Abowd 30(b)(6) Deposition 2018). As such, while administrative records might be used to estimate the citizenship status of a community at an aggregated level, it is likely that the Census Bureau's attempt to use administrative records to count specific noncitizen households that choose not to respond because of the citizenship question will be unsuccessful.

48. In fact, very recent research by Census statisticians finds considerable mismatches and discrepancies between survey data and administrative records when it comes to citizenship (Brown et al. 2018). These authors conclude that "adding a citizenship question to the 2020 census would lead to lower self-response rates in households potentially containing noncitizens, resulting in higher fieldwork costs and lower-quality population count" (Brown et al. 2018), and would actually reduce the quality of administrative records "by lowering the record linkage rate for persons with administrative citizenship data." (Abowd

Memo March 1, 2018). Thus, adding a citizenship question will itself undermine the Census Bureau's efforts to use administrative data to rectify the reduced response rate caused by the addition of the question (Abowd 30(b)(6) Deposition 2018)

49. In addition to trying to match households to their administrative records, the Census Bureau has indicated that it may employ statistical imputation techniques to address nonresponse. During the collection of any survey, two types of nonresponse can emerge: unit nonresponse and item nonresponse. Unit nonresponse concerns an entire missing case resulting from either non-contact, refusal, or inability to participate. Item nonresponse concerns missing values on certain questions in the survey. Bias, or incorrect and faulty data, can emerge from nonresponse when the causes of the nonresponse are linked to the survey statistics being measured, which is referred to as nonignorable nonresponse (Groves et al 2004). By way of illustration, public health officials designed a survey to measure the prevalence of HIV in the population during the early days of the HIV epidemic. Despite incentives, cooperation rates among those who were HIV positive were extremely low because of the stigma of the disease. Thus, the key statistic sought – namely, the percentage of HIV-positive people -  was causally related to the likelihood of self-response; specifically, in that case, those who were HIV-positive did not want to participate in the study at all. Nonignorable nonresponse is particularly egregious because even if the causal influence is known "there is no way that the statistic among respondents can be made free of nonresponse bias (without making heroic assumptions about the status of the nonrespondents)" (Groves et al. 2004). What this means is that if a factor influencing the decision to not respond is correlated with an important outcome variable, imputation is impractical because you cannot observe the existence of the precise variable you are trying to count. In the case of the 2020 Census the key outcome variable is producing an accurate count of total household size; however, the survey in this expert report shows clearly that larger households are more likely to not respond when the citizenship question is present. Thus, the decision whether to respond is correlated with household size, a key outcome

variable of interest

50. Some statistical tools are available to deal with nonresponse. At one end of the spectrum, if every variable of interest is known for the nonrespondent, except one, then we can use these variables to form an imputation model that will predict a value for the missing value – for example, we may know the existence of the respondent and that person's age, but may not know their income level and can use predictive models to impute income for that respondent. At the other end of the spectrum we have entire missing cases (unit nonresponse), where the existence of the person is unknown. Imputation for unit nonresponse, sometimes called "whole person imputation," is used almost exclusively in longitudinal surveys where ample data from prior waves exists for a missing respondent. It is extremely rare to impute for unit nonresponse if little is known about the nonrespondent case (Groves and Couper 1998). Unit nonresponse is typically dealt with by some form of post-stratification or response rate weighting adjustment[5] (Kalton 1983). While imputation can be useful for missing values in an otherwise completed survey form (item nonresponse), it is particularly problematic for imputing the existence of whole persons, and is especially likely to end up with an undercount in vulnerable communities. This is part of the reason that social scientists and government statisticians want the decennial census to be as non-burdensome and non-sensitive as possible, to ensure an overall accurate count through high rates of participation (Wines 2018).

51. In general, whole-person imputation itself relies on a number of assumptions to work correctly. If data is missing completely at random (MCAR) (Rubin 1976), then non-response generally introduces less bias. Models are of less help with nonignorable nonresponse, as noted above, where nonresponse depends on the values of a response variable. In this case, models can help but never eliminate all nonresponse bias (Lohr

---

[5] After the survey data are collected, statisticians can use the known universe of respondent demographics to apply weights and possibly correct for non-response, however this only corrects the dataset for use in a data analysis project or academic research paper, not necessarily population counts, which are supposed to serve as the baseline universe estimate in the first place.

1999).  Indeed, recent reviews of cutting edge imputation procedures like "hot deck imputation" argue that "hot deck" methods for situations where nonresponse is non-ignorable have not been well explored (Andridge and Little 2010).  Whole person imputation, then, has its dangers. The Census currently acknowledges that "whole person substitutions and whole person imputations are not very accurate." (See Abowd 30(b)(6) Deposition 2018)

52. To summarize the problem with imputing non-responding households with the characteristics (including size) of responding households, I present a basic chart outlining the theory of imputation that we can all relate to from elementary school pattern charts.  In essence, imputation is using the surrounding information that we can observe and attempting to infer, or impute the rest of the pattern.  When missing units are not easily reconciled, or depart demographically from their peer units, imputation is inaccurate and unreliable.

**Figure 1: Imputation theory**

## Panel A



## Panel B

## Panel C

## Panel D

53. In panel A, missing data appears to be at random and there are enough similar adjacent units to fill in the blank spaces with the best-educated inference of a blue star or a red square. The same can be said for panel B with respect to imputing whether a purple rectangle or a blue square is missing. However, when the missing data are not so neatly distributed, and instead of clustered or correlated with some other missing trait, then 10 different imputation models can produce 10 entirely different guesses as to how to fill in the blank spaces. The more non-response there is in the first place, the harder inference or imputation will be, to the point that it simply will not work very well. We can think of this as a sliding scale, with the less information we have, the worse our imputations models will be, thus our objective is to preserve as many responding units as possible, and

continually guard against efforts that add more "blank spaces" to our database.

54. With respect to the U.S. census and counts of Latino and immigrant households, previous research has shown that whole person imputation efforts are seriously error-prone. Because family arrangements, housing styles and total household sizes vary considerably, attempts to impute the population of non-respondent households have been shown to undercount the population (Kissam 2017). First, many non-traditional housing units are simply not included in the imputation, leaving them as vacant when in reality they had tenants or dwellers. Second, the household size of missing units tends to be larger, on average, than of reported units. Reports also document differences by socioeconomic status. The end result is that even with imputation, there can still be a significant undercount of the Latino immigrant population.

55. Beyond the raw count being inaccurate, there is also evidence of misattribution of those imputed, because they rely on higher acculturated adjust units for which there is data (i.e. substituting data on US-born, English-speaking and college educated households when in fact missing cases are more likely to be foreign-born, Spanish-speaker, less educated households), suggesting the imputed data do not accurately describe the true population (Kissam 2017). The U.S. Government Accountability Office has itself admitted this is a problem with respect to getting a complete count of Latinos. In the 2003 report on trying to improve the Latino count, they wrote "even with the Bureau's guidelines and training, deciding whether a house is unfit for habitation or merely unoccupied and boarded-up can be very difficult. An incorrect decision on the part of the census worker could have caused the dwelling and its occupants to get missed by the census." U.S GAO Report (2003) (GAO-03-605).

56. By examining our survey data, we can conclude that unit non-response on the 2020 census will not be at random. Households that do not respond and represent missing units, are certain to have very different characteristics and demographics than the households that do respond as noted in Table 1 below. In this event, it makes it nearly impossible to impute

or infer the population totals or any other demographic information about missing units (e.g. missing households) because we do not have enough reliable information on "matched" or similar units. Further, it is quite likely that unit non-response in 2020 will be clustered geographically, meaning that there will be fewer available adjacent units for imputation, and that analysts will have to rely on dissimilar households for imputation, thus violating the most important assumption needed for accurate imputation. Looking at our survey data of non-respondents, it is clear that non-response is not randomly distributed across the United States. In particular, non-responders were found more likely in dense urban areas and locales with high numbers of renters. These factors are known to be related to census undercounts and make NRFU difficult and result in erroneous imputation (U.S. GAO Report, 2003).

57. **Figure 2: Zip Code Map of Non-Respondent due to Citizenship Question**



58. We can approximate a comparison of responding and non-responding households by examining the survey data, and comparing the demographic characteristics of those who

report they will, or will not, take the 2020 census to assess if the two groups are "balanced" or equivalent. A balance test of the survey data reveals that non-responding households are statistically different than responding households on a variety of critical demographics, which violates an important assumption in imputation. For imputation to be successful, missing units and reported units should be roughly equivalent. However, the survey reveals that non-responding households are statistically different on a number of dimensions. They are more likely to be larger in size, be renter-occupied, clustered in urban areas, be foreign-born, have foreign-born parents, be non-white, be Latino, and report differences on average age and language. This will make whole person imputation inaccurate and unreliable.

59. **Table 1: Difference in Characteristics of Responding and Non-Responding Units[6]**

|  | Responders | Non-Responders | DIM | p-value |
|---|---|---|---|---|
| English | 93.398 | 85.045 | -8.353 | 0.000 |
| Spanish | 6.236 | 14.953 | 8.717 | 0.000 |
| White | 67.605 | 51.585 | -16.019 | 0.000 |
| Age | 49.755 | 47.611 | -2.144 | 0.091 |
| Foreign Born | 13.997 | 23.214 | 9.217 | 0.001 |
| Latino | 13.453 | 28.750 | 15.297 | 0.000 |
| HH Size | 2.951 | 3.200 | 0.248 | 0.099 |
| Parents Foreign Born | 24.185 | 41.065 | 16.880 | 0.000 |
| Urbanicity | 0.786 | 0.868 | 0.082 | 0.000 |
| % Rent | 32.088 | 38.527 | 6.439 | 0.000 |

60. It is virtually certain that the reduced self-response caused by the addition of a citizenship question will lead to a net undercount among those populations with lower rates of self-response. Previous census reports have documented that high rates of non-response to the initial questionnaire result in undercounts, and that NRFU is not always successful in converting those cases into respondents. In addition, matching household to administrative records can be an unreliable method of enumerating the household, particularly for

---

[6] Table 1 reports the average, or mean for each demographic characteristic among people who indicate they will respond to the 2020 Census ("Responders") and people who indicate they will not respond to the 2020 Census ("Non-Responders"). The table then reports the difference in these means (DIM) and the p-value, which tells us if the differences are statistically significant or not. In the case of Table 1, all differences are statistically significant.

immigrant communities. Prior census reports have also documented that errors are made in imputation and that undercounts persist even after attempted imputation. Ultimately, the worse the initial non-response is, the worse the initial undercount is, making it increasingly more difficult to convert those cases into responding cases, and increasing more difficult to impute missing units (US Census Bureau 2017b; National Research Council 2002; 2004).

61. This problem has been documented to be worse in Latino and immigrant communities where the Census admits the undercount is problematic, and that their efforts at NRFU and imputation have errors (Ericksen and Defonso 1993; O'Hare et al. 2016). One primary reason is that issues related to trust of government officials significantly hampers the NRFU process, and in 2020 the citizenship question will greatly exacerbate issues of trust in immigrant communities (See section below "Perceptions of Trust and Confidentiality" at paragraph 96). In particular, young children in Latino households have been found to be regularly undercounted by previous census efforts and that imputation methods do not appropriately find or count this population. The best assurance for an accurate count is high response rates on the initial census request for participation, which requires high degree of trust (O'Hare et al. 2016; Casey Foundation 2018). Previous self-reports by the Census Bureau are clear: immigrant communities are already at-risk of an undercount because of lower levels of trust of government officials, and have particular anxiety over citizenship information being shared. What's more, these previous census reports have documented that low self-participation on round one of invitations ultimately leads to an undercount that no amount of NRFU, administrative-record matching, or imputation can correct. In 2020, the addition of a citizenship question will only create more problems, more anxiety in immigrant communities, and less self-participation on round one. With nearly 17 million people, including 6 million citizen children who live in households with at least one person who is an undocumented immigrant, the potential for a massive non-response with a new citizenship question in 2020 is enormous (Casey Foundation 2018).

## V.     A National Survey to Estimate 2020 Non-Response

62. The second source of information I relied upon to form my opinions was a national survey of adults.  The survey was administered by telephone to 6,309 respondents nationwide from July 10 – August 10, 2018. Below I outline the validity of survey research in general, and then discuss the methodology of this survey in particular, and finally conclude by presenting the survey results.

63. Survey research is a reliable and trusted method in the social sciences. Within social science research, public opinion and political behavior have been longstanding areas of significant consequence and interest.  The primary reason for using survey research to study the potential response rate to the Census is simple: if you want to know if the population will, or will not participate in the Census, just ask them.  Early on, "pollsters" learned that you could learn a great deal about voter attitudes, and possibly even predict election results through large quantitative surveys of the public.  Over the past decades, the science of public opinion surveys has expanded greatly and great expertise has been developed in how to accurately sample, construct, implement and analyze survey data (Lasswell 1941; Alpert 1956; Groves et al. 2009).  Survey research has become a hallmark of social science research, such that at a typical political science academic conference, more than 500 different research papers using survey data are regularly presented.  When surveys are implemented accurately, results generated from a sample of the population can be extrapolated to the larger population from which the sample is drawn, given the appropriate sampling error, or confidence interval that must always be accounted for (Cassell et al. 1977; Graubard and Korn 1996).  Survey research is a standard and widely accepted practice in social science and government research.  The U.S. government regularly relies on survey methodology exactly like that produced in this expert report, in their collection of data and statistics, such as, the U.S. Census American Community Survey and Current Population Survey, the Bureau of Labor Statistics Unemployment Survey, and data collected by the National Institute of Health, Department of Defense and

the Internal Revenue Service. In fact the Office of Management and Budget has a division called the "Federal Committee on Statistical Methodology" which has reviewed best practices in survey research and recommended random digit dial ("RDD") as a method to avoid non-coverage bias because it samples all known telephone numbers (Federal Committee on Statistical Methodology, 1990). According to Michael Link (2005), formerly a research scientist for the Centers for Disease Control and Prevention, "For more than three decades, RDD telephone surveys have been the predominant method for conducting surveys of the general public."

64. The most important starting point for sound survey research is to acquire an accurate sample frame from which to draw the eventual sample of people interviewed. If the sample is reflective of the larger population, and the survey is administered randomly, without bias, and with an adequate response rate, the eventual survey results can be considered as statistically reliable estimate (Scheaffer et al. 2004; Groves 2004). According to Henry Brady (2000), Professor of Political Science at the University of California, Berkeley, "Scientific surveys are one of these tools, and they have been widely used in the social sciences since the 1940s. No other method for understanding politics is used more, and no other method has so consistently illuminated political science theories with political facts… They provided the gold standard for measuring citizen opinions… No other social science method has proven so valuable."

A. **Principal Focus: Estimating 2020 Census Non-Response**

65. Specifically, this survey was designed to estimate the non-response rate to the 2020 census if a new question about citizenship status is included.

66. In designing a survey, researchers must consider three important topics to ensure their project is of the highest quality and follows social scientific standards. Two of the three relate to the design of the survey. First, the population for which inferences will be made and the method of interacting with that population must be identified. In this case,

inferences will be made about the rates of response and non-response to the 2020 census among adults nationwide and in certain jurisdications. With this in mind, the most accurate and efficient way to contact this population should be determined, and the most common approaches are through the use of (1) random digit dial and (2) household listed samples. The first approach, RDD, takes the known area codes and pre-fixes for a given geographic area, and randomly generates the last four digits of phone numbers and calls those numbers entirely at random. This increases the likelihood that every possible phone number has an equal chance of being called.

67. A second approach that is also used quite extensively is randomly calling listed household samples. For example, rather than calling randomly generated phone numbers which may not even exist, a listed sample starts with the known universe of actual phone numbers for either landline or cell phone subscribers that currently reside in a specific geographic area, or nationally. Listed samples are especially useful if researchers are interested in drilling down into a particular sub-group within the population, such as racial or ethnic minorities, or registered voters. Sample vendors can sell a listed sample of all households in a particular area, or they can provide sample records for just Hispanic households. Likewise, sample vendors sell lists of known cell phone/wireless phone numbers for particular geographic areas, and those can then be randomly dialed as part of a survey. One of the advantages of using a survey firm with extensive experience purchasing lists is that they are able to secure these lists from the most reputable vendors available. This includes being able to secure cell-phone users who may have cell-phone numbers from outside the geographic area, or new cell numbers, or those from non-contract plans, all of which were included here.

68. For this particular survey, three sample components are part of the overall project. First, a random sample of 3,002 adults selected nationwide representative of the full demographics of the United States. This initial sample of 3,002 adults provides the power to analyze internal variation within the overall population and compare across different

subgroups or across states. Second, in order to reach a more reliable sample in certain subgroups or states, we fielded random samples for California (n=1,000), the city of San Jose (n=509), Cameron and Hidalgo Counties in Texas (n=801), and finally a national sample of Latino adults (n=997). These robust samples provide the ability to explore variation within each population as needed, as well as ensures that the margin of errors associated with our results are well within accepted levels. In all instances, the survey reached adults in landline and cell-phone-only households. Sample sizes and configurations are explained in more detail below (see also, table 2).

69. **Table 2: Composition of sample segments by phone type**

|  | Landline | Cell |
|---|---|---|
| National | 1,500 | 1,502 |
| California | 500 | 500 |
| Cameron County, Texas | 200 | 201 |
| Hidalgo County, Texas | 200 | 200 |
| San Jose, California | 255 | 254 |
| Latino (national) | 591 | 406 |
| Total | 3,246 | 3,063 |

70. The second area of importance is the design and construction of the survey questionnaire itself. In designing a questionnaire, researchers should follow best practices established by existing social science research, and groups such as the American Association of Public Opinion Research (AAPOR). It is important that questions are direct, objective, and neutral, and not meant to lead respondents to give one particular answer over another and respondents should have an appropriate range of available answer choices. With modern survey technology, questionnaires should always be programmed to rotate question wording, randomize answer choices, rotate options forward-to-back and more, to ensure that no priming takes place whereby respondents lean towards one type of answer because

it is always read as the first option. For example, if the survey always led with the negative option for a question assessing approval of the President – strongly disapprove – researchers might end up with an over-estimation of respondents who pick strongly disapprove because they hear that first. Not only is randomization important in selecting respondents, but within the survey randomization should be a priority when it appropriately helps avoid introducing any type of response bias. For this project, we strictly followed the best social science practices for designing and implementing a survey.

71. The full questionnaire is included as an appendix to this document (Appendix B) so that readers can see that all of these criteria were followed when designing and implementing this survey. In this instance, the survey questionnaire contained four main sections: first, the screening questions to establish eligibility to participate in the study; second, questions focusing specifically on intended participation in the Census; third, questions aimed at understanding the degree of trust in the Census; and fourth demographic indicators of the sample.

72. The third topic area to ensure high quality survey data is the actual implementation and execution of the survey by a well-established and reputable market research firm. This is the focus of the next section.

73. Once the survey has been designed according to the accepted norms and standards in scientific survey research, the next important step is implementation. In executing the survey, all possible respondents must have an equal chance to respond, participate, and be included. For example, if potential respondents were only called at home at 1:00pm in the afternoon on Fridays, a huge percentage of the potential respondents would never be home to answer the phone in the first place. This would result in a sample that would be different

from the overall population of the U.S., many of whom would not be able to participate in the study because they were at work during the call time. Instead, researchers should take an approach that gives each potential respondent an equal opportunity to be included in the survey.

74. The actual phone calls and implementation of the survey was handled by Pacific Market Research (PMR), a market research firm in Renton, Washington. This is a highly reputable survey firm that has implemented many surveys for applied, legal, and academic research[7] including surveys implementing similar designs as that used here for the purposes of exploring differences in public opinion and voting behavior. Further, Pacific Market Research implemented similar surveys to understand public response to changes in voter ID laws in Texas, North Dakota, Pennsylvania and Wisconsin and in those cases, both state and Federal courts found the data to be reliable and consistent with accepted social science practices.

75. In this project, two sampling approaches were used to answer questions about Census non-participation in 2020. First, PMR implemented a random digit dial to land lines and cell phones, nationwide to produce an overall sample of 3,002 adults across the U.S. Numbers were randomly generated, and then randomly selected phone numbers were dialed. For the targeted samples, PMR procured a listed sample of adults in each of the subgroup areas and then randomly selected phone numbers were dialed to both landlines and cell phones (see table 2). Including a large cell-phone sample ensures that the data can speak to all aspects of the population. In all cases, calls were made from 4pm – 9pm in the local time

---

[7] Pacific Market Research has implemented surveys for the U.S. Internal Revenue Service, the U.S. Department of Defense, to study juror pool knowledge of pending cases, to study public opinion and voter participation among Whites, Hispanics, Blacks, and Asian Americans, and proprietary market research for firms such as Microsoft, AT&T, and T-Mobile.

zone, Monday through Friday, and 12pm – 8pm in the local time zone, Saturday and Sunday, beginning on July 13, 2018, and continuing until August 16, 2018. Landline numbers were auto-dialed and wireless numbers were manually dialed. If a respondent completed the survey, or completely refused to participate they were taken off the call list. Otherwise, phone numbers were dialed and re-dialed up to five times to avoid non-response bias that may result from only making one or two attempts per number. A full analysis of the data indicates that non-response bias did not present any problems in this study, given that up to five call-back attempts were used, and did yield hard to reach respondents. Phone numbers were "released" in small batches and dialed until all numbers were exhausted, and then a second batch was made available, and so on.

76. Respondents had the choice of completing the interview in English, Spanish, Mandarin, Korean, or Vietnamese. Making the survey available in multiple languages is critical, as many Latino and Asian American respondents may prefer to take surveys in Spanish or an Asian language, even if they are able to do so in English, because they feel more comfortable and capable in their primary language. This ensures that the responses provided by respondents are accurate and not biased by communication issues related to language effects.

77. Overall, PMR reported a Response Rate-3 of 28.1 percent and a Cooperation Rate-3 of 41.5 percent, calculated as per the American Association of Public Opinion Research (AAPOR) guidelines.[8]  In the field of survey research, response rates between 20 and 30

---

[8] Response rate and cooperation rate are defined by AAPOR on their website. For more on AAPOR guidelines: http://www.aapor.org/Response_Rates_An_Overview1.htm. The response rate refers to percent of individuals who agreed to take the survey out of the overall number of cases in the sample. In contrast, the cooperation rate refers the percent of individuals who agreed to take the survey out of the overall number of individuals reached by researchers.

percent are considered to be accurate and in an accepted range, and this project falls within that range (Keeter et al. 2006).

78. After collecting the data for the main sample, and the targeted oversamples, underlying demographic characteristics of the respective samples were examined and compared to the known universe estimates for each geographic or area of interest from the 2016 U.S. Census, *American Community Survey*. Where any discrepancies occurred, a weighting algorithm called raking ratio estimation was applied to balance the sample, so that the final samples tabulated for the analysis were consistent with the U.S. Census estimates for the nation, or each targeted sample (Battaglia et al. 2004). For example, it is well known in survey research that younger people, say under 25 years old, are harder to reach than older people who are over age 65. If 8% of survey respondents are 18-24 years old, but census data tells us they are actually 14% of the national population, then each young person needs to be "weighted up" so that collectively they represent 14% of the sample. Overall, the discrepancies between the collected data and the Census population estimates were quite small and the resulting weights that were employed were also quite small. Still, by weighting the data to known ACS demographics for each group, or for the nation at large, we can ensure that the results are reflective of the complete adult population. This helps to ensure that the sample generated for the report is reflective of the overall population, and consequently, that the inferences made regarding response and non-response rates to the 2020 census are reflective of that target population as well. Weighting of survey data is a very common and accepted approach in social science research, especially when inferences are made to the larger population. (Lee and Forthofer 2006).

## B. __National Results: Rates of Non-Response__

79. We asked respondents a series of three questions related to participation in the decennial census that we use to form the basis of the non-response rate estimates. First, respondents were asked if they planned to participate in the Census, describing a census questionnaire similar to 2010 which did not include a question about citizenship status. Next, respondents were asked if they planned to participate in the Census, describing a census similar to the one planned for 2020 which does include a question about citizenship status. Thus, for every single respondent we can provide an estimate of what percentage would participate in a census *without* a citizenship status question, but *would not* participate if a citizenship status question were included. Any individual who said "yes" to question 1 participation, but then changed their answer and no longer said "yes" at question 2 when describing the 2020 census with a citizenship question is counted as a non-respondent. We report this number as our estimated non-response, or "drop-off" rate.

1. The Census is an official population count that is conducted every 10 years by the federal government. It requires all households to list the name, age, and race or ethnicity of every person living in the home and provide that information to the Census Bureau either online, by mail, or in-person with a census taker. The Census is required to keep this information confidential, and every single household in the country is required to participate.

   In March 2020 you will receive an invitation from the U.S. Census to fill out the census form. Do you plan to participate and submit your household information?

   Yes, will participate..........................................................1
   No, will NOT participate .................................................2
   Refused to answer (VOL) ..............................................99

2. In 2020, the federal government is adding a new question to require you to list whether you, and every person in your household is a U.S. citizen, or not a citizen. With the addition of a citizenship question, will you participate and submit your household information, or not?

   Yes, will participate..........................................................1
   No, will NOT participate .................................................2
   Refused to answer (VOL) ..............................................99

80. Overall the survey reports a nationally representative non-response rate of 7.14% from people who stated "yes" to question 1, but stated "no" or refused to answer question 2. The result is a statistically significant drop-off rate at the 99.9% confidence level.[9] This includes the full sample of 6,309 respondents weighted to the national portrait of American adults.

81. Next, after asking some other questions about trust and household composition, we concluded the survey by asking respondents for a third time if they planned to participate in the Census, after giving them assurances about Census confidentiality. This third attempt to ask about response was formulated as a split sample question wording experiment with half of the respondents randomly assigned to a question where they were told there would *not* be a question about citizenship status in 2020, and the other half randomly assigned to a question where they were told there *would* be a question about citizenship status in 2020. This mode of split-sample questioning allows us to directly compare how the addition of the citizenship question could impact non-response rates in 2020.

82. Before analyzing the responses to question 7 and question 8 side-by-side I began my analysis with a comparison between question 1 and question 8, similar to our analysis of question 1 versus question 2. Here we can assess how people who planned to participate in the Census without a citizenship question evaluate the 2020 census with a citizenship question after hearing assurances that the government will keep the information confidential. Overall, 9.7% of respondents who had planned to participate as part of

---

[9] While we have the most confidence in the point estimate in the middle of the distribution, which is 7.14%, all estimates have a lower and upper bound within their confidence interval. In this case the lower bound of 6.31% and the upper bound is 7.97% as reported in Table 3.

question 1 would drop-off and not participate in response to question 8, a difference that is

statistically significant at the 99.9% confidence level.[10]

7. [SPLIT A] Now that you've heard a little bit about the 2020 Census let me ask you one final question about how likely you are to participate.  If the government decides in 2020 to NOT include a question about citizenship status, and instead only asks you to report the race, ethnicity, age, gender of people living in your household, and the government provides assurances that your information will be kept confidential and ONLY used for purposes of counting the total population and nothing more, would you participate and fill out the 2020 Census form, or not?

{**Note to interviewer:** If respondent says "don't know" probe: do you think you probably will, or probably will not participate?"}

Yes, will participate..........................................................1
No, will NOT participate ..................................................2
Refused to answer (VOL) ..............................................99

8. [SPLIT B] Now that you've heard a little bit about the 2020 Census let me ask you one final question about how likely you are to participate.  If the government decides in 2020 to include a question about citizenship status, and asks you to report the race, ethnicity, age, gender and citizenship status of people living in your household, and the government provides assurances that your information will be kept confidential and ONLY used for purposes of counting the total population and nothing more, would you participate and fill out the 2020 Census form, or not?

{**Note to interviewer:** If respondent says "don't know" probe: do you think you probably will, or probably will not participate?"}

Yes, will participate..........................................................1
No, will NOT participate ..................................................2
Refused to answer (VOL) ..............................................99

83. In addition, we can use the split sample items to experimentally test if there is a statistically

significant difference in response rate by question 7 (without citizenship) or question 8

(with citizenship).   Split sample experiments are often used in the social sciences to

"control" an environment and conduct statistical tests if response attitudes or behaviors

change in one condition or another, holding all other variables constant. In this case, the

results indicate that the addition of a citizenship question has a negative effect on

---

[10] The second measure of drop-off between question 1 and question 8 has an estimate of 9.7% drop-off with a lower bound of 8.30% and an upper bound of 11.09% (See Table 4)

participation and the difference is statistically significant at the 95.7% confidence level using a one-tailed test.[11]

C. **National Results by Subgroups**

84. Next we breakout the national results by different racial and ethnic groups. Latinos will have the highest estimated drop-off if a citizenship question is added to the census, at 14.1%. Further, Latinos are estimated to drop-off at 8.16 points more than all non-Latinos, a difference that is statistically significant at the 99.9% confidence level.

85. **Table 3: Estimated non-response (drop-off) rate due to 2020 Citizenship question Results by Race, drop off from Q1 to Q2[12]**

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| National | 7.139 | 6.307 | 7.972 | 0.506 | 99.99 |
| Non-Latino | 5.953 | 5.060 | 6.845 | 0.543 | 99.99 |
| Latino | 14.112 | 11.913 | 16.311 | 1.337 | 99.99 |
|   Foreign Born | 13.709 | 11.202 | 16.216 | 1.524 | 99.99 |
|   US Born | 14.440 | 11.009 | 17.871 | 2.086 | 99.99 |
| Asian | 6.436 | 2.313 | 10.560 | 2.507 | 99.50 |
|   Foreign Born | 6.034 | 1.159 | 10.908 | 2.963 | 97.90 |
|   US Born | 7.702 | 0.079 | 15.324 | 4.634 | 95.20 |
| Black | 7.575 | 4.322 | 10.828 | 1.977 | 99.99 |
| White | 5.541 | 4.609 | 6.474 | 0.567 | 99.99 |
| Other | 8.530 | 4.684 | 12.375 | 2.338 | 99.99 |

86. The same trend exists with respect to measuring drop-off between question 1 and question 8, when additional assurances are given about Census confidentiality, as well as a reminder that the government plans to include a citizenship status question. Latinos have the highest rate of drop-off at 16.6%, and the difference from non-Latinos of 8.09 points is statistically significant at the 99.9% confidence level.

---

[11] Here, we are testing the one-directional hypothesis that the addition of the citizenship question will lead to a lower response rate than a census questionnaire without a citizenship question, thus a one-tailed test is appropriate, and in fact question 8 reveals a statistically significant decline in participation as compared to question 7.

[12] Table 3 reports the estimated non-response, or drop-off rate for the national sample as a whole, as well as by individual racial/ethnic/immigrant groups in the survey. The first column reports the expected non-response rate (Estimate) and the next two columns report the lower and upper confidence bounds of the estimate. Finally, we report the standard error (S.E.) and degree of statistical significance (Sig). Table 4 reports the same information.

87. **Table 4: Estimated non-response (drop-off) rate due to 2020 Citizenship question Results by Race, drop off from Q1 to Q8**

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| National | 9.697 | 8.304 | 11.091 | 0.847 | 99.99 |
| Non-Latino | 8.513 | 6.990 | 10.035 | 0.926 | 99.99 |
| Latino | 16.588 | 13.275 | 19.900 | 2.014 | 99.99 |
|   Foreign Born | 14.950 | 11.089 | 18.811 | 2.347 | 99.99 |
|   US Born | 17.805 | 12.779 | 22.831 | 3.055 | 99.99 |
| Asian | 15.505 | 4.756 | 26.253 | 6.534 | 99.10 |
|   Foreign Born | 17.558 | 2.587 | 32.529 | 9.101 | 97.30 |
|   US Born | 10.772 | -1.098 | 22.641 | 7.216 | 93.20 |
| Black | 11.946 | 6.934 | 16.958 | 3.047 | 99.99 |
| White | 7.383 | 5.812 | 8.954 | 0.955 | 99.99 |
| Other | 10.868 | 4.781 | 16.955 | 3.701 | 99.80 |

88. The non-response to the 2020 census will be amplified by the fact that non-responders have larger household sizes. Overall, it is estimated that between 28.7 million and 35.6 million persons will not participate and will not voluntarily be counted in the 2020 census as a direct result of the citizenship status question (Tables 5-6). Household size was calculated from the Census Bureau Current Population Survey and American Community Survey for 2016.

89. **Table 5: Estimated number of non-respondents by race and household size Q1-Q2**

|  | Estimate | HH size | Total HH | Total impacted |
|---|---|---|---|---|
| National | 7.14 | 3.20 | 125,819,000 | 28,744,589 |
| Latinos | 14.11 | 4.31 | 16,667,000 | 10,137,330 |
|   US Born | 14.44 | 4.09 | 7,266,812 | 4,291,747 |
|   Foreign | 13.71 | 4.59 | 9,400,188 | 5,914,973 |
| AAPI | 6.44 | 4.06 | 6,328,000 | 1,653,563 |
|   US Born | 7.70 | 4.34 | 1,075,760 | 359,569 |
|   Foreign | 6.03 | 3.94 | 5,252,240 | 1,248,574 |
| Black | 7.57 | 2.59 | 16,539,000 | 3,244,772 |
| White | 5.54 | 2.64 | 84,445,000 | 12,353,687 |
| Other | 8.53 | 3.43 | 1,840,000 | 538,316 |

90. **Table 6: Estimated number of non-respondents by race and household size Q1-Q8**

|  | Estimate | HH size | Total HH | Total impacted |
|---|---|---|---|---|
| National | 9.697 | 2.92 | 125,819,000 | 35,627,311 |
| Latinos | 16.59 | 4.04 | 16,667,000 | 11,169,187 |
|    US Born | 17.80 | 3.85 | 7,266,812 | 4,981,292 |
|    Foreign | 14.95 | 4.36 | 9,400,188 | 6,127,304 |
| AAPI | 15.50 | 3.43 | 6,328,000 | 3,365,260 |
|    US Born | 10.77 | 4.34 | 1,075,760 | 502,900 |
|    Foreign | 17.56 | 3.94 | 5,252,240 | 3,633,347 |
| Black | 11.95 | 2.37 | 16,539,000 | 4,682,517 |
| White | 7.38 | 2.41 | 84,445,000 | 15,025,243 |
| Other | 10.87 | 3.71 | 1,840,000 | 741,898 |

## D.  Simulated Follow-Up

91. Next, it is possible to simulate what a possible non-response follow-up might look like and whether or not the Census Bureau will be able to secure its goal of complete participation by comparing how respondents to the survey answered either question 7 or question 8 which serve as a simulated re-contact effort.  We focus here on those respondents who reported that they will not participate in the 2020 census as a result of the citizenship question, but they had planned to participate in the 2020 census without a citizenship question ("Non-Responders" are those who change from yes on Q1 to not-yes on Q2). There are the respondents who answered "yes" to question 1, but changed and did not answer yes to question 2.  As reported above, this represents 7.14% of the adult population nationally. But all respondents were asked again if they would participate in the Census, essentially a re-contact effort, at either question 7 or question 8.  In addition, we added an extra assurance of confidentiality stating "and the government provides assurances that your information will be kept confidential and ONLY used for purposes of counting the total population and nothing more," which the Census has reported they plan to do (Abowd 30(b)(6) Deposition 2018).  Therefore, comparing how previous non-responders react when asked again to participate allows us to assess whether respondents will become trusting of the Census and eventually participate, or if they remain non-responders.

92. **Table 7: Percent of Non-Responders Who Change to Responders at Q7 / Q8**

|  | Total | White | Latino | Black | AAPI | Other |
|---|---|---|---|---|---|---|
| Q8 Yes – with citizenship | 45.2 | 49.5 | 38.9 | 62.2 | 0.2 | 17.2 |
| Q7 Yes – without citizenship | 84.3 | 89.3 | 80.1 | 78.6 | 53.3 | 94.9 |
| Difference | -39.1 | -39.7 | -41.2 | -16.5 | -53.1 | -77.7 |

93. As the results in Table 7 make clear, a majority of those who initially refuse to participate in the 2020 census because of the citizenship status question, remain opposed to participating in the Census upon re-contact and learning more information. As explained below, this is primarily due to low levels of trust in the Trump administration to keep the information confidential and high levels of concern that personal information about citizenship status will be shared with immigration authorities. Even after providing respondents with assurances that the government was required to keep their information confidential, a majority of respondents would not agree to participate in the 2020 census with a citizenship question. However, as compared to question 7, which stated there would be no such citizenship question, a significantly higher share of people changed their mind and said they would agree to participate, fully 84%. This is more direct evidence that the citizenship question will not only create non-response problems in the first place, but it will hamper re-contact efforts leading to a significant undercount.

94. While the question 7 and question follow-up are not *exactly* the same as NRFU, they are a very good proxy for a number of reasons. First, additional assurance of confidentiality and privacy were provided at two instances following the initial questions regarding census participation. This was done at question 3 and then again as part of both questions 7 and 8. Second, they mimic an attempt at re-contact in the real world in a condensed telephone interview setting, by allowing some time to pass, and then asking the same subjects their willingness to participate a second or third time. Finally, the split sample nature of question 7 versus question 8 demonstrates the most important outcome, that re-contact success will

be statistically much lower in the face of a citizenship question, as opposed to requests without a citizenship question.

95. The failure of re-contact is more noticeable among Latino, Asian American, and foreign born respondents. Among Latinos, just 38.9% of previous non-responders say they would change and become responders. Among foreign born, just 33.4% say they would change and become responders. And among Asian Americans who did not respond at question 2, less than 1% say they would respond upon re-contact.

96. The results in Table 7 also provide further evidence that the social and political context of fear or mistrust in immigrant communities does not mean the Census is doomed to failure regardless of whether a citizenship question is included. Instead, this context directly interacts with the inclusion of a new citizenship question which causes people to withdraw. As we see in the follow-up questions 7 and 8, by emphasizing there would not be a citizenship question, 84% of prior non-responders change their mind and agree to participate. However, when the citizenship question is included, only 45% changed their mind and agreed. This 39-point difference is clear evidence that the citizenship question in particular will push away respondents from participating in 2020.

**E. Perceptions of Trust and Confidentiality**

97. As described earlier in this report, the existing literature is quite clear that trust and confidence are critical to getting a high response rate, successful follow-up contact, and an accurate survey. If respondents do not trust the survey to protect their personal information, especially when it comes to sensitive questions, the survey will suffer greatly from non-response. To assess whether or not respondents trusted the Census we asked two questions about their expectations of privacy and their degree of concern over information being shared with immigration authorities specifically. The first item is represented in question 3 on the survey:

3.  It is against the law for the Census Bureau to disclose, make public, or share with anyone including other federal agencies the personal information collected from anyone including their citizenship status. According to the law, the Census Bureau can only disclose information gathered in the census for the purpose of producing statistical counts.

    Do you trust the Trump administration to protect your personal information, including the citizenship of you and members of your household, or do you think they will share this information with other federal agencies?

    Trust them to protect my information ........................... 1
    I think they will share my information........................... 2
    Don't know (VOL) ............................................................ 3
    It depends (VOL) ............................................................. 4
    Refused to answer (VOL) .............................................. 99

98. Question 3 makes it very clear to the respondents that the Census Bureau cannot disclose, share, release, or make public any personal information they collect as part of the Census survey. While this might be the law, in terms of gaining public trust, perception is more important than anything. Overall, only 42% of survey respondents say they trust the Trump administration to protect their personal information, including the citizenship status of people in their household. Instead, 43.4% say they do not trust them and believe they will share the information and additional 14.6% say they don't know. The levels of trust are lowest among Latinos (31.1%) and immigrants (35%).

99. **Table 8: Trust the Trump administration to protect your personal information, including citizenship status on the 2020 Census**

|  | Total | White | Latino | Black | AAPI | Other |
|---|---|---|---|---|---|---|
| Trust them to protect | 42.0 | 48.2 | 31.1 | 23.4 | 40.8 | 45.6 |
| I think they will share | 43.4 | 38.9 | 47.3 | 63.9 | 39.1 | 41.3 |
| Don't know | 11.5 | 9.9 | 16.9 | 10.4 | 17.0 | 11.1 |
| It depends | 1.8 | 1.7 | 2.5 | 1.6 | 1.3 | 1.0 |
| Refused to answer | 1.3 | 1.2 | 2.1 | 0.7 | 1.9 | 1.0 |

100. However, the more critical constituency to evaluate is people who said they will not agree to participate in the 2020 census due to the citizenship question. If non-responders have low levels of trust it confirms the existing published research on survey response rates and

participation in light of sensitive questions, and further it gives us very strong evidence that these non-responders will not change their mind and suddenly agree to respond. As demonstrated in Table 9 below, only 12.9% of non-responders (Q1-Q2) say they trust the Trump administration to keep their information private and 78.9% think their information, including citizenship status will be shared. What is more, if we just focus in on the people who said "no" once again on question 8, the simulated re-contact effort, 0.6% said they trust the Trump administration to protect their Census information and 98.8% said they do not trust them. In light of these low levels of trust and confidence in the Trump administration to keep their personal information, especially related to citizenship status confidential and private, it is clear that the census will have a significant problem with trust in the face of a new citizenship status question.

101. **Table 9: Trust among non-responders**

|  | Non-Responder | No on Q8 |
|---|---|---|
| Trust them to protect | 12.9 | 0.6 |
| I think they will share | 78.9 | 98.7 |
| Don't know | 6.0 | 0.4 |
| It depends | 0.8 | 0.0 |
| Refused to answer | 1.3 | 0.3 |

102. The survey contained a second question that gets to the notion of trust, specifically asking if people were concerned that their answers to the citizenship status question would be shared with Immigration and Customs Enforcement (ICE). Overall, among people who state they won't respond to the 2020 census (Q1-Q2), a clear majority of 64.4% say they are concerned that their answers to the citizenship question will be shared with ICE. The degree of concern was highest among immigrants and Latinos.

44

103. **Table 10: Degree of Concern about Citizenship Being Shared with ICE among Non-responders (Q1-Q2)**

|  | Total | White | Latino | Black | AAPI | Other | Foreign born |
|---|---|---|---|---|---|---|---|
| Very concerned | 47.9 | 58.2 | 43.7 | 22.0 | 16.8 | 31.1 | 42.8 |
| Somewhat concerned | 16.6 | 6.6 | 26.2 | 17.4 | 83.1 | 17.8 | 35.7 |
| Not too concerned | 10.3 | 6.8 | 8.5 | 40.1 | 0.0 | 0.0 | 5.9 |
| Not at all concerned | 23.5 | 26.8 | 19.8 | 20.5 | 0.1 | 40.6 | 12.0 |
| Refused to answer | 1.8 | 1.7 | 1.9 | 0.0 | 0.0 | 10.6 | 3.5 |
| **Total concerned** | **64.4** | **64.8** | **69.9** | **39.4** | **99.9** | **48.8** | **78.5** |

## F. How response rates might change as respondents learn more about the census

104. We can also assess how many new or additional people change their mind and become non-responders after they have thought a bit more about the 2020 census. As more information becomes available, including the outreach that the federal government and Trump administration are doing on behalf of the 2020 census, the general public will start to learn more, and think more about exactly what is at stake with the 2020 census. As the tables above indicate, there is considerable distrust and concern that the Trump administration will share their personal information with other agencies and not keep that information private. Through the passage of time, the public may start to think more about the citizenship question. So even if the Census is able to convert some of the initial non-responders into participants, other people who initially planned to participate may change their mind and now opt out as they become concerned, anxious, or nervous about the citizenship question. These results are reported in Table 11 on the next page.

105. **Table 11: Additional non-response after passage of time and more information**

| | Q1 to Q2 decision | | |
| --- | --- | --- | --- |
| | Will Respond (Q1=Yes; Q2=Yes) | Won't Respond (Q1=Yes; Q2≠Yes) | |
| Q8 = Yes | a) 2,490 *87.4%* | b) 84 *3.0%* | Total 2,575 |
| Q8 = Not Yes | c) 175 *6.1%* | d) 102 *3.6%* | 276 |
| Total | 2,665 | 186 | 2,851 *100.0%* |

106. Using both the raw counts of survey respondents, as well as the overall cell percentages, the data in Table 11 is very discouraging for efforts to re-contact. Overall, 84 respondents, or 3.0% of the entire sample (quadrant b) converts to becoming responders upon re-contact. However, among the people who were initially planning to respond, an even larger share, 175 respondents or 6.1% of the sample (quadrant c) changed their mind and became non-responders. Thus, as the respondents learned even more about the 2020 census, even with assurances of confidentiality, the net result is that a larger non-response or drop-off is likely to occur. The conclusion to be drawn is that as people hear and learn more about the 2020 census and the citizenship status question, it makes it more difficult to get an accurate count, and *more* people will become non-responders. The survey reported here has instructed respondents that the Census must maintain confidentiality, that it is against the law to share information, and that their information will be kept private – all outreach activities the Census Bureau claims they will be doing. Yet despite these assurances, we still report a statistically significant drop-off rate, and one that grows larger as the survey respondents hear more and learn more about the Census. Simply put, large percentages of respondents do not believe the Trump administration will protect their information or keep

it private when it comes to a question about citizenship status, and this will result in millions of people opting out of the 2020 census and not being counted. No amount of follow-up, re-contact, or imputation can correct for this non-response bias.

107. **Table 12: Additional non-response after passage of time and more information among foreign born respondents**

|  | Q1 to Q2 decision | | |
|---|---|---|---|
|  | Will Respond (Q1=Yes; Q2=Yes) | Won't Respond (Q1=Yes; Q2≠Yes) |  |
| Q8 = Yes | a)<br>609<br>*78.9%* | b)<br>25<br>*3.3%* | Total<br>634 |
| Q8 = Not Yes | c)<br>87<br>*11.2%* | d)<br>50<br>*6.5%* | 137 |
| Total | 696 | 75 | 771<br>*100.0%* |

108. Among foreign born respondents, the possibility of additional drop-off at re-contact or as respondents learn and think more about the Census is even greater. When we asked again about taking the 2020 census with a citizenship question, providing additional assurances of confidentiality, only 25 foreign born respondents changed their mind and agreed to participate, representing 3.3% of the overall foreign born sample (quadrant b). However, among those who said they had originally planned to participate in the 2020 census, 87 total respondents, or 11.2% of the overall sample (quadrant c) said they now planned to NOT participate – more than three times more people were lost than were converted at re-contact.

109. A final point of concern is that the households which remain non-responders are larger in size and not directly comparable to the households that might change their stance and eventually respond. Overall, the respondents in our survey who changed and said they

would respond had an average household size of 3.26 versus those who will not be persuaded by re-contact had an average household size of 3.48.

## G. California Results

110.   The survey also allows for an in-depth analysis of the results in California. In this section I examine the same trends as above, but isolating the effects for the state of California. California is the most populated state in the country (39.5 million as per 2017 ACS), and has the largest immigrant population in the country (11.2 million as per 2017 ACS), and the largest Latino population in the country (15.5 million as per 2017 ACS). Thus, whatever non-response associated with ethnicity and immigration status that occurs at a national level in the 2020 census has the potential to be even larger impact in California.

111.   The first inquiry is whether, and to what degree does the non-response rate as a result of the citizenship question differ in California, as compared to the rest of the country.  To estimate the rates by state, we rely on a couple different methods for statistical analysis. First, we ran a series of 51 regressions where the outcome variable was the non-response rate, and each state was an independent variable to assess whether or not all 50 states and Washington D.C. have about the same non-response rates, or if any states have a statistically worse non-response rate.  We examined both change in response from question 1 to question 2 (Q1-Q2) as well as question 1 to question 8 (Q1-Q8) after additional confidentiality assurances had been provided to respondents.

112.   The regression results indicate that California is the only state which has a statistically higher non-response rate as a result of the citizenship question than the national average (see Charts 1-2, Appendix A).  Most states are consistent with the national average, suggesting they follow similar patterns of non-response, depending on the demographic and size of the immigrant population in their state.  However, California has an even larger expected non-response rate, even beyond the fact that they have a larger Latino and larger immigrant population.  The data suggest that even among Latinos and immigrants, those

in California are expected to not-respond at higher rates than Latinos and immigrants in the rest of the country.

113.     The survey suggests immigrants in particular will experience higher non-response as a result of the citizenship question. While the sample size of Black immigrants is smaller than Latino and Asian immigrants, regression analysis confirms that Black immigrants in California are not statistically distinguishable from all immigrants and will likewise experience similar high rates of non-response due to a citizenship question in 2020. This trend is true in California, as well as in the national dataset.

114.  **Table 13: Non-Response Rate for California vs. all other states**

Estimated Drop-off Rate From Q1-Q2

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| California | 12.278 | 10.506 | 14.05 | 1.077 | 99.99 |
| Not California | 6.492 | 5.584 | 7.40 | 0.552 | 99.99 |

Estimated Drop-off Rate From Q1-Q8

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| California | 18.010 | 14.873 | 21.147 | 1.907 | 99.99 |
| Not California | 8.696 | 7.187 | 10.204 | 0.917 | 99.99 |

115.  **Table 13B: Non-Response Rate for City of San Jose**

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| Q1 to Q2 (SJ) | 12.71 | 9.59 | 15.81 | 1.584 | 99.99 |
| Q1 to Q8 (SJ) | 20.34 | 14.76 | 25.92 | 2.832 | 99.99 |

116. Overall, California is expected to have a non-response rate of 12.28% comparing individual level change from question 1 to question 2, compared to 6.49% for all other non-California states.  This difference of 5.79 is statistically significant at the 99.9% level (Table 14).   After more information is provided to respondents about confidentiality assurances, the expected non-response for California is 18.01% (Q1-Q8) compared to

8.70% for non-California. This difference of 9.31 is statistically significant at the 99.9% level (Table 14). In the city of San Jose which is nearly 40% immigrant, the non-response rate is expected to be even higher, between 12.71% (Q1-Q2) and 20.34% (Q1-Q8).

117. **Figure 3: Plot of estimated non-response in California vs. all other states (Q1-Q2)**



118. **Figure 4: Plot of estimated non-response in California vs. all other states (Q1-Q8)**



119. **Table 14: Difference in means for California vs. all other states**

|  | Non-California Avg. | California Avg. | Difference in Means | p-value |
|---|---|---|---|---|
| Yes to Not Yes | 6.492 | 12.278 | 5.79 | 0.000 |
| Yes to Not Yes (Q8) | 8.696 | 18.01 | 9.31 | 0.000 |

120. Just as we did with the national dataset, we can approximate a comparison of responding and non-responding households in California by examining the survey data, and comparing the demographic characteristics of those who report they will, or will not, take the 2020 census if it includes a citizenship question to assess if the two groups are "balanced" or equivalent. A balance test of the survey data reveals that non-responding households are statistically different than responding households on a variety of critical demographics, which violates an important assumption in imputation. For imputation to be successful, missing units and reported units should be roughly equivalent. However, the survey reveals that non-responding households are statistically different on a number of dimensions. They are more likely to be larger in size, be renter-occupied, clustered in urban areas, be higher in population density, be foreign-born, have foreign-born parents, be non-white, be Latino, and report differences on average age and language. This will make whole person imputation inaccurate and unreliable for the California sample.

121. **Table 15: Difference in Characteristics of Responding and Non-Responding Units in California sample[13]**

|  | Responders | Non-Responders | DIM | p-value |
|---|---|---|---|---|
| English | 80.028 | 70.674 | -9.354 | 0.039 |
| Spanish | 16.509 | 29.319 | 12.811 | 0.004 |
| White | 45.788 | 35.214 | -10.574 | 0.025 |
| Age | 49.008 | 45.890 | -3.118 | 0.059 |
| Latino | 30.784 | 53.543 | 22.758 | 0.000 |
| HH Size | 3.212 | 3.620 | 0.407 | 0.048 |
| Parents Foreign Born | 47.217 | 59.232 | 12.015 | 0.014 |
| Urbanicity | 0.926 | 0.965 | 0.039 | 0.001 |
| % Rent | 43.277 | 49.228 | 5.950 | 0.002 |
| Pop. Dens | 125.786 | 188.318 | 62.532 | 0.000 |

122. Most notably, non-responders in California have a larger total household size of 3.62 compared to 3.21 for responding households. The potential impact in California for non-

---

[13] Table 15 reports the average, or mean for each demographic characteristic among people who indicate they will respond to the 2020 Census ("Responders") and those who will not respond to the 2020 Census ("Non-Responders"). The table then reports the difference in these means (DIM) and the p-value, which tells us if the differences are statistically significant or not. In the case of Table 15, all differences are statistically significant.

response as a result of a citizenship question is very large.  Overall, California has an estimated 14.2 million households according to the census Current Population Survey.  The table below calculates the total number of persons who will not be counted in California, given total number of households, and average household size of non-responders.  There are two calculations based on the estimated non-response at Q1-Q2 and then for Q1-Q8. In the city of San Jose, we estimate between 133,496 – 210,408 people will not be counted by the census due to the citizenship question. In addition to the overall impact, we calculate the differential impact in California, of how much worse the non-response and undercount can be in California.  These results are presented in Table 16 below.

123.  **Table 16: Estimated number of non-respondents by state and household size**

| Q1-Q2 | Estimate | HH size | Total HH | Total impacted |
|---|---|---|---|---|
| California | 12.28 | 3.62 | 14,176,670 | 6,302,040 |
| Non - CA | 6.49 | 3.10 | 111,642,330 | 22,461,320 |
| *Differential* | *5.79* | *3.62* | *14,176,670* | *2,971,402* |
| | | | | |
| Q1-Q8 | | | | |
| California | 18.01 | 3.53 | 14,176,670 | 9,012,860 |
| Non - CA | 8.70 | 2.77 | 111,642,330 | 26,904,685 |
| *Differential* | *9.31* | *3.53* | *14,176,670* | *4,659,063* |

124.  **Table 16B: Estimated number of non-respondents in City of San Jose**

| | Estimate | HH size | Total HH | Total impacted |
|---|---|---|---|---|
| Q1 to Q2 (SJ) | 12.71 | 3.31 | 317,317 | 133,496 |
| Q1 to Q8 (SJ) | 20.34 | 3.26 | 317,317 | 210,408 |

125.  Table 16 estimates that between 6.3 – 9.0 million people will not be counted as a result of the citizenship question being added in 2020.  What's more, even if we just examine the differential, that is, the rate at which the undercount is worse in California than the rest of the nation, we estimate that between 2.9 – 4.7 million additional people will not be counted

in California. The data shows clearly and with a high degree of statistical confidence that this negative impact is greater on California than on any other state.

126. We can also examine the split sample question wording experiment at question 7 versus question 8 to assess the degree of statistical likelihood that non-response in 2020 will be the direct result of a citizenship question on the census form. The results below in table 17 indicate that the addition of the citizenship question will cause a statistically higher non-response rate. In the case of California, this additional non-response is proven through a randomized control-treatment experiment and is statistically significant with 98.5% confidence, in a one-tailed test. Not only that, but the effect is much larger in California than in other states. The difference-in-difference also demonstrates that the effect of a citizenship question will be much worse in California. The difference of -3.92 is statistically significant at the 90.5% level in a one-tailed test.

127. **Table 17: Statistical test of Q7-Q8 experiment in California vs. all other states**

|  | Difference-in-Means | p-value |
|---|---|---|
| National Sample | -2.28 | 0.043 |
| California Sample | -5.87 | 0.015 |
| Non-Cali Sample | -1.95 | 0.090 |

|  | DID Estimate | p-value |
|---|---|---|
| California vs. Non-California | -3.92 | 0.095 |

128. Just as with the national dataset, it is possible to estimate what non-response follow-up might look like in California using the question 7 and question 8 split sample experiment as compared to how people answered question 1 and question 2 (see paragraph 90 above). Among residents of California who initially said they would not respond to a citizenship question on the 2020 census, Table 18 reports how many change their position and state they will respond upon follow-up. Overall, for both California and non-California states, 84.3% of previous non-responders state they would respond if there was not a citizenship

question (question 7). However, for those who were randomized into question 8 and told about the citizenship question, 29.7% of California respondents said they would respond, while for non-California residents 49.3% said they would respond. Overall, the presence of a citizenship question will result in a NRFU success rate that is 54.6% lower in California, than if no citizenship question was asked. For non-Californians, there is an expected reduction in NRFU effectiveness of 35.0% due to the citizenship question. Not only will NRFU be much more difficult in California and non-California states, but the difference-in-difference of 22.0% greater NRFU non-response in California is also statistically significant. Thus, to the extent Californians are already more likely to not-respond (as Table 14 shows to be the case), the NRFU process could actually exacerbate the gap in the undercount, because it is estimated to be less effective in converting non-responders into responders in California, than in other states, by 22 percentage points.

129. **Table 18: Percent of Non-Responders Who Change to Responders at Q7 / Q8 California vs. all other states**

|  | Q7 | Q8 | Q8-Q7 | p-values |
|---|---|---|---|---|
| California. | 84.31 | 29.66 | -54.64 | 0.000 (DIM p-value 1) |
| Non-California. | 84.32 | 49.29 | -35.03 | 0.000 (DIM p-value 2) |
| DID Estimate |  |  | -21.99 | 0.062 (DID p-value) |

130. Both the initial non-response, and difficulties in NRFU in California are a result of low levels of trust in the Census Bureau to protect respondents' citizenship information. When asked at question 3 if they trust the Trump administration to protect their citizenship status on the census, overall 48.3% of Californians said they do not trust them and instead they believe the Trump administration will share this information with other federal agencies. This was especially high among residents of California who state they will not respond to the census in 2020 because of the citizenship question. Among non-responders, 80.5% state that they do not trust the Trump administration to protect their citizenship status information. Among people who said they will not participate in the census for a second

time, when asked again at question 8 there was almost universal distrust with 95.3% of this group stating they do not trust the Trump administration to protect their information. Likewise, similar low levels of trust were reported in San Jose. Overall only 30.9% trust their citizenship information will be protected. Among those not planning to respond, an overwhelming 88.2% in San Jose say they think the Trump administration will share their citizenship information across other federal agencies.

131. **Table 19: Trust the Trump administration to protect your personal information, including citizenship status on the 2020 Census – California sample**

|  | CA Total | Non-responders | CA Latino | Latino non-resp | CA Immig | Immig non-resp | No on Q8 |
|---|---|---|---|---|---|---|---|
| Trust them to protect | 35.6 | 11.3 | 25.3 | 16.8 | 32.2 | 13.4 | 2.2 |
| I think they will share | 48.3 | 80.5 | 56.9 | 72.0 | 46.5 | 73.0 | 95.3 |
| Don't know | 11.3 | 5.1 | 13.7 | 6.2 | 15.4 | 9.9 | 1.3 |
| It depends | 2.6 | 1.3 | 2.5 | 2.5 | 2.2 | -- | -- |
| Refused to answer | 2.2 | 1.8 | 1.6 | 2.6 | 3.8 | 3.7 | 1.2 |

132. **Table 19B: Trust the Trump administration to protect your personal information, including citizenship status on the 2020 Census – City of San Jose**

|  | SJ Total | Non-responders | SJ Latino | Latino non-resp | SJ AAPI | AAPI non-resp |
|---|---|---|---|---|---|---|
| Trust them to protect | 30.9 | 3.0 | 8.8 | 0.0 | 37.3 | 0.0 |
| I think they will share | 49.4 | 88.2 | 70.5 | 78.9 | 41.7 | 100.0 |
| Don't know | 16.2 | 5.0 | 18.7 | 9.7 | 18.8 | -- |
| It depends | 2.0 | -- | -- | -- | 0.7 | -- |
| Refused to answer | 1.9 | 3.9 | 2.0 | 11.5 | 1.6 | -- |

133. In addition to low levels of trust over the citizenship question, California respondents also expressed a high degree of concern that their citizenship information would be shared directly with Immigration and Customs Enforcement (ICE). In response to question 9, a very large majority of Californians, 83.2%, said they were concerned about their citizenship information being shared with ICE. Likewise, very high percentages of Latino non-responders (79.1%), and immigrant non-responders (77.0%) in California are concerned about their citizenship information being shared with ICE. The results for the

San Jose oversample are quite similar with 60.2% of all non-responders concerned, and higher rates of concern among Latino (76.9%) and Asian American (74.6%) non-responders.

134. **Table 20: Degree of Concern about Citizenship Being Shared with ICE among Non-responders (Q1-Q2) – California sample**

|  | All CA non-resp | Latino non-resp | Immig non-resp |
|---|---|---|---|
| Very concerned | 63.3 | 50.5 | 51.6 |
| Somewhat concerned | 19.9 | 28.6 | 25.4 |
| Not too concerned | 6.9 | 12.6 | 6.3 |
| Not at all concerned | 8.4 | 5.6 | 13.4 |
| Refused to answer | 1.5 | 2.7 | 3.4 |
| **Total concerned** | **83.2** | **79.1** | **77.0** |

135. **Table 20: Degree of Concern about Citizenship Being Shared with ICE among Non-responders (Q1-Q2) – City of San Jose**

|  | All Non-Resp | Latino non-Resp | AAPI non-resp |
|---|---|---|---|
| Very concerned | 34.6 | 44.1 | 22.3 |
| Somewhat concerned | 25.6 | 32.8 | 52.3 |
| Not too concerned | 4.6 | 11.7 | -- |
| Not at all concerned | 19.1 | -- | 25.4 |
| Refused to answer | 15.1 | 11.4 | -- |
| **Total concerned** | **60.2** | **76.9** | **74.6** |

136. For the California sample, it is possible to assess how many new or additional people change their mind and become non-responders after they have thought a bit more about the 2020 census. As more information becomes available, including the outreach that the federal government and Trump administration are doing on behalf of the 2020 census, the general public will start to learn more, and think more about exactly what is at stake with the 2020 census. As the tables above indicate, there is considerable distrust and concern in California that the Trump administration will share their personal information with other agencies and not keep that information private. Through the passage of time, the public may start to think more about the citizenship question. So even if the Census is able to

convert some of the initial non-responders into participants, other Californians who initially planned to participate may change their mind and now opt out as they become concerned, anxious, or nervous about the citizenship question. In Table 21 below we report these results.

137. **Table 21: Additional non-response after passage of time and more information Results for California sample**

|  | Q1 to Q2 decision | | |
|---|---|---|---|
|  | Will Respond (Q1=Yes; Q2=Yes) | Won't Respond (Q1=Yes; Q2≠Yes) |  |
| Q8 = Yes | a)<br>770<br>*73.8%* | b)<br>34<br>*3.3%* | Total<br>804 |
| Q8 = Not Yes | c)<br>158<br>*15.1%* | d)<br>82<br>*7.8%* | 240 |
| Total | 928 | 116 | 1,044<br>*100.0%* |

138. Using both the raw counts of survey respondents, as well as the overall cell percentages, the data in Table 21 is very discouraging for efforts to re-contact. Overall, 34 respondents, or 3.0% of the California sample (quadrant b), convert to becoming responders upon re-contact. However, among the people who were initially planning to respond, an even larger share, 158 respondents or 15.1% of the sample (quadrant c) changed their mind and became non-responders. Thus, as the respondents learned even more about the 2020 census, even with assurances of confidentiality, the net result is that a larger non-response or drop-off is likely to occur. The conclusion to be drawn is that as Californians hear and learn more about the 2020 census and the citizenship status question, it makes it more difficult to get an accurate count, and *more* people will become non-responders. The survey reported here has instructed respondents that the Census must maintain confidentiality, that it is against

the law to share information, and that their information will be kept private – all outreach activities the Census Bureau claims they will be doing. Yet despite these assurances, we still report a statistically significant drop-off rate, and one that grows larger as the California respondents hear more and learn more about the Census. Simply put, large percentages of respondents do not believe the Trump administration will protect their information or keep it private when it comes to a question about citizenship status, and this will result in millions of people opting out of the 2020 census and not being counted. Follow-up, re-contact, and imputation cannot correct for this non-response bias.

139. Table 22 below reports the same trends for foreign born respondents in California and the potential for additional drop-off is even greater among immigrants. While 3.5% of the overall sample of California immigrants can be regained during re-contact, an alarming 23.7% of those initially planning to respond change their minds and become non-responders as they learn more about the census.

140. **Table 22: Additional non-response after passage of time and more information among foreign born respondents – California sample**

|  | Q1 to Q2 decision | | |
|---|---|---|---|
|  | Will Respond (Q1=Yes; Q2=Yes) | Won't Respond (Q1=Yes; Q2≠Yes) |  |
| Q8 = Yes | a) 271 *66.8%* | b) 14 *3.5%* | Total 285 |
| Q8 = Not Yes | c) 96 *23.7%* | d) 24 *6.0%* | 120 |
| Total | 367 | 38 | 405 *100.0%* |

**H.  Conclusion**

141.  This report has considered the impact that adding citizenship status question will have on the overall response rate to the 2020 census, and importantly, how this might affect the accuracy of the overall population count.  I have relied on two primary sources of information to form my opinion.  The first was a review of the relevant literature on survey research, census research, sensitive questions, and research on imputation.  The second was an original national survey of 6,309 respondents to assess how people will participate in the 2020 census given the addition of a citizenship question. Finally, I have relied upon my own experience as a social scientist who regularly conducts and reviews survey research as part of academic research engagements.  In section 3 above, I have offered an executive summary of my findings and here I further summarize those to three key conclusions.

142.  First, the extant literature on survey research suggests that adding a highly sensitive, and untested question on citizenship status to the 2020 census will result in heightened rates of non-response.  This is particularly the case because the current social and political context in the United States surrounding immigration enforcement and concerns in the immigrant community about revealing personal information that could result in significant harm – namely deportation and the separation of families – if they participate in the Census and report their citizenship status.

143.  Second, the extant literature on Non-Response Follow-Up (NRFU) and methods of imputation both indicate that neither approach is likely to be successful in 2020, given the higher rates of non-response in the first place, and the non-random patterns of non-response.  Further, NRFU and imputation have never been tried before in the presence of a highly sensitive citizenship question. When large percentages of households are missing and do not report any information to the Census, and the missing households are not completely at random, NRFU and imputation are not reliable.

144.  Third, the survey data shows clear and statistically significant evidence that the citizenship status question will result in high rates of non-response in 2020, and that

immigrant and Latino communities will be disproportionately undercounted and disadvantaged.

145.   Finally, the negative consequences of a citizenship question on the 2020 census will be more severe in California than the rest of the nation, where the expected non-response rate will be between 5.8 and 9.3 points higher than in the rest of the country. In addition, efforts at re-contact are estimated to be less effective in California than anywhere else compounding the initial non-response problem.

146.   After reviewing defendants report(s), I plan to offer rebuttal opinions as requested by plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 15, 2018.

_____
Matthew A. Barreto

# References

Abowd, John, March 1, 2018 Memo, Administrative Record 1308.

Abowd, John, Depositions on August 15, 2018 (hereinafter Abowd Deposition) and August 29, 2018 (Abowd 30(b)(6).

Alpert, Harry . 1956. "Public Opinion Research as Science." Public Opinion Quarterly. 20(3).

Andridge, Rebecca R. and Little, Roderick J. 2010. "A Review of Hot Deck Imputation for Survey Non-Response." International Statistical Review 78(1): 40-64.

Backstrom, Charles and G.D. Hursch. 1963. Survey Research. Evanston, IL: Northwestern University Press.

Baker, T.L. (1994), Doing Social research (2nd Ed.) New York: McGraw-Hill Inc

Ball, John C. 1967. "The Reliability and Validity of Interview Data Obtained from 59 Narcotic Drug Addicts." *American Journal of Sociology* 72(6): 650–654.

Battaglia, Michael et al. 2004. "Tips and Tricks for Raking Survey Data (a.k.a. Sample Balancing)" Proceedings of the Survey Research Methods Section, American Statistical Association.

Berk, Marc L., and Claudia L. Schur. 2001. "The Effect of Fear on Access to Care among Undocumented Latino Immigrants." *Journal of immigrant health* 3(3): 151–156.

Boudreaux, Michel H. et al. 2015. "Measurement Error in Public Health Insurance Reporting in the American Community Survey: Evidence from Record Linkage." *Health services research* 50(6): 1973–1995.

Bradburn, Norman M., Seymour Sudman, Ed Blair, and Carol Stocking. 1978. "Question Threat and Response Bias." *Public Opinion Quarterly* 42(2): 221–234.

Brady, Henry. 2000. "Contributions of Survey Research to Political Science." PS.

Brown, David et al. 2018. "Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census."

Casey Foundation. 2018. "2018 Kids Count Data Book."

Center for Survey Measurement. 2017. "MEMORANDUM FOR Associate Directorate for Research and Methodology (ADRM)."

Claes-Magnus Cassell et al., 1977. Foundations of inference in survey sampling.

Coutin, Susan Bibler. 2003. *Legalizing Moves: Salvadoran Immigrants' Struggle for US Residency*. University of Michigan Press.

De La Puente, Manuel. 1995. "Using Ethnography to Explain Why People Are Missed or Erroneously Included by the Census: Evidence from Small Area Ethnographic Studies." *Center for Survey Methods Research, US Census Bureau*.

———. 2004. *Census 2000 Ethnographic Studies*. Bureau of the Census.

DeMaio, Thomas, Nancy Mathiowetz, Jennifer Rothgeb, Mary Ellen Beach, Sharon Durant. 1993. "Protocol for Pretesting Demographic Surveys at the Census Bureau." Report of the Pretesting Committee. June 1993.

Ericksen, Eugene P., and Teresa K. Defonso. 1993. "Guest Commentary: Beyond the Net Undercount: How to Measure Census Error." *Chance* 6(4): 38–14.

Federal Committee on Statistical Methodology. 1990. Statistical Working Paper 17 – Survey Coverage. http://www.fcsm.gov/working-papers/wp17.html

Frost, Amanda. 2017. "Can the Government Deport Immigrants Using Information It Encouraged Them to Provide?"

Graubard, Barry and Edward Korn. 1996. "Survey inference for subpopulations." American Journal of Epidemiology. 144(1).

Groen, Jeffrey A. 2012. "Sources of Error in Survey and Administrative Data: The Importance of Reporting Procedures." *Journal of Official Statistics (JOS)* 28(2).

Groves, Robert M. And Mick P. Couper. 1998. Nonresponse in Household Interview Surveys. New York, NY: John Wiley and Sons

Groves, Robert . 2004. Survey Errors and Survey Costs, 2nd ed.

Groves, Robert, Floyd J. Fowler Jr., Mick P. Couper James M. Lepkowski, Eleanor Singer, and Roger Tourangeau. 2004. Survey Methodology. New York, NY: John Wiley and Sons. (Cites 3873)

Groves, Robert et al. 2009. Survey Methodology, 2nd ed.

Hagan, Jacqueline Maria. 1994. *Deciding to Be Legal: A Maya Community in Houston*. Temple University Press.

Hunt, Shelby, Richard D. Sparkman, and James B. Wilcox. 1982. "The Pretest in Survey Research: Issues and Preliminary Findings." Journal of Marketing Research. 19(2).

Kalton, Graham. 1983. "Compensation for Missing Survey Data." University of Michigan Survey Research Center Research Report Series.

Lasswell, Harold . 1941. Democracy Through Public Opinion.

Lee, Eun Sul and Ronald Forthofer. 2006. Analyzing Complex Survey Data. Sage Publications.

Link, Michael W. et al. 2006. "Address-Based versus Random-Digit-Dial Surveys: Comparison of Key Health and Risk Indicators." *American Journal of Epidemiology* 164(10): 1019–25.

Lohr, Sharon L. 1999. Sampling: Design and Analysis. New York, NY: Brooks/Cole.

Kapteyn, Arie, and Jelmer Y. Ypma. 2007. "Measurement Error and Misclassification: A Comparison of Survey and Administrative Data." *Journal of Labor Economics* 25(3): 513–551.

Keeter, Scott et al. 2006. "Gauging the Impact of Growing Nonresponse on Estimates from a National RDD Telephone Survey," Public Opinion Quarterly. 70(5)

Kissam, Edward. 2017. "Differential Undercount of Mexican Immigrant Families in the US Census." *Statistical Journal of the IAOS* 33(3): 797–816.

Krysan, Maria. 1998. "Privacy and the Expression of White Racial Attitudes: A Comparison across Three Contexts." *Public Opinion Quarterly*: 506–544.

Lajevardi, Nazita, and Kassra AR Oskooii. 2018. "Old-Fashioned Racism, Contemporary Islamophobia, and the Isolation of Muslim Americans in the Age of Trump." *Journal of Race, Ethnicity and Politics* 3(1): 112–152.

National Research Council. 2002. *The 2000 Census: Interim Assessment*. National Academies Press.

———. 2004. *The 2000 Census: Counting under Adversity*. National Academies Press.

Meyers, Mikelyn. 2017. "Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census."

Michelson, Melissa R., and Jessica L. Lavariega Monforti. 2018. "Back in the Shadows, Back in the Streets." *PS, Political Science & Politics* 51(2): 282

Montoya, Martin. 1992. "Ethnographic Evaluation of the Behavioral Causes of Undercount: Woodburn, Oregon." Ethnographic Evaluation of the 1990 Decennial Census Report #25. Prepared under Joint Statistical Agreement 90-06 with the University of Oregon. Bureau of the Census, Washington D.C.

Mulry, Mary H. et al. 2006. "Evaluation of Estimates of Census Duplication Using Administrative Records Information." *Journal of official statistics* 22(4): 655.

Cruz Nichols, Vanessa, Alana MW LeBrón, and Francisco I. Pedraza. 2018. "Spillover Effects: Immigrant Policing and Government Skepticism in Matters of Health for Latinos." *Public Administration Review* 78(3): 432–443.

Office for National Statistics. 1999 General Register Office for Scotland, Northern Ireland Statistical & Research Agency: (15).

O'Hare, William, Yeris Mayol-Garcia, Elizabeth Wildsmith, and Alicia Torres. 2016. "The Invisible Ones: How Latino Children Are Left Out of Our Nation's Census Count."

Oskooii, Kassra AR. 2016. "How Discrimination Impacts Sociopolitical Behavior: A Multidimensional Perspective." *Political Psychology* 37(5): 613–640.

Pedraza, Francisco I., and Maricruz Ariana Osorio. 2017. "Courted and Deported: The Salience of Immigration Issues and Avoidance of Police, Health Care, and Education Services among Latinos." *Aztlan: A Journal of Chicano Studies* 42(2): 249–266.

Rubin, Donald B. 1976. "Inference and Missing Data." Biometrika 63(3): 581-592.

Raines, Marvin D. 2001. "Gaining Cooperation from a Multi-Cultural Society of Respondents: A Review of the US Census Bureau's Efforts to Count the Newly Immigrated Population." *Statistical Journal of the United Nations Economic Commission for Europe* 18(2, 3): 217–226.

Rao, Krishna. 2017. "Discussion of 2018 End-to-End Census Test: Nonresponse Follow-up" Census Scientific Advisory Committee. Fall 2017 Meeting.

Sanchez, Gabriel R., and Barbara Gomez-Aguinaga. 2017. "Latino Rejection of the Trump Campaign." *Aztlán: A Journal of Chicano Studies* 42(2).

Scheaffer, Richard et al. 2012. Elementary Survey Sampling, 7th ed.

Stepick, Alex. 1992. "Ethnographic Evaluation of the 1990 Decennial Census Report Series." Ethnographic Evaluation of the 1990 Decennial Census Report #8. Prepared under Joint Statistical Agreement #90-08 with Florida International University. Bureau of the Census, Washington D.C.

Terry, Rodney L. et al. 2017. "Exploring Inconsistent Counts of Racial/Ethnic Minorities in a 2010 Census Ethnographic Evaluation." *Bulletin of Sociological Methodology/Bulletin de Méthodologie Sociologique* 135(1): 32–49.

Tourangeau, Roger, and Tom W. Smith. 1996. "Asking Sensitive Questions: The Impact of Data Collection Mode, Question Format, and Question Context." *The Public Opinion Quarterly* 60(2): 275–304.

Tourangeau, Roger, and Ting Yan. 2007. "Sensitive Questions in Surveys." *Psychological bulletin* 133(5): 859.

U. S. Government Accountability Office. 2003. "Decennial Census: Lessons Learned for Locating and Counting Migrant and Seasonal Farm Workers." (GAO-03-605). https://www.gao.gov/products/GAO-03-605 (April 18, 2018).

U.S. Census Bureau. 2013. "U.S. Census Bureau Statistical Quality Standards" July 2013. https://www.census.gov/about/policies/quality/standards.html

———. 2017b. "Investigating the 2010 Undercount of Young Children – Analysis of Census Coverage Measurement Results."

van Teijlingen, Edwin R.  and Vanora Hundley. 2001. "The importance of pilot studies." Social Research Update. 35.

Velasco, Alfredo. 1992. "Ethnographic Evaluation of the Behavioral Causes of Undercount In The Community of Sherman Heights, San Diego, California." Ethnographic Evaluation of the 1990 Decennial Census Report #22. Prepared under Joint Statistical Agreement 89-42 with the Chicano Federation of San Diego County. Bureau of the Census, Washington, D.C.

Wines, Michael. 2018. "Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question." New York Times. March 30

**Other Materials Considered**

I considered the Administrative Record and other materials produced by the Commerce Department and Census Bureau in this lawsuit; the authorities cited in this report; and the deposition testimony of Dr. Ron Jarmin on August 20, 2018.

## Appendix A:

## Auxiliary Tables of Results

Table 1: Latinos and Immigrants are Less Likely to Trust Trump To Protect Their Information

|  | Trust Trump | Trust Trump |
| --- | --- | --- |
| Intercept | 0.44*** | 0.43*** |
|  | (0.01) | (0.01) |
| Latino | −0.13*** |  |
|  | (0.02) |  |
| Foreign Born |  | −0.08** |
|  |  | (0.03) |
| R$^2$ | 0.01 | 0.00 |
| Adj. R$^2$ | 0.01 | 0.00 |
| Num. obs. | 6309 | 6309 |
| RMSE | 0.40 | 0.40 |

***$p < 0.001$, **$p < 0.01$, *$p < 0.05$

Table 2: Latinos and Immigrants Are More Concerned That Census Answers Will Be Shared With ICE

|  | Concern ICE | Concern ICE |
| --- | --- | --- |
| Intercept | 0.29*** | 0.29*** |
|  | (0.02) | (0.02) |
| Latino | 0.10*** |  |
|  | (0.03) |  |
| Foreign Born |  | 0.12*** |
|  |  | (0.04) |
| R$^2$ | 0.01 | 0.01 |
| Adj. R$^2$ | 0.01 | 0.01 |
| Num. obs. | 3161 | 3161 |
| RMSE | 0.37 | 0.37 |

***$p < 0.001$, **$p < 0.01$, *$p < 0.05$

Table 3: Latinos and Immigrants Drop-Off More Than National Average

| | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q8 | Q1/Q8 | Q1/Q8 | Q1/Q8 |
|---|---|---|---|---|---|---|---|---|
| Intercept | 0.07*** | 0.14*** | 0.06*** | 0.06*** | 0.10*** | 0.17*** | 0.09*** | 0.08*** |
| | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.02) | (0.01) | (0.01) |
| Non-Latino | | −0.08*** | | | | −0.08*** | | |
| | | (0.01) | | | | (0.02) | | |
| Latino | | | 0.08*** | | | | 0.08*** | |
| | | | (0.01) | | | | (0.02) | |
| Foreign Born | | | | 0.05*** | | | | 0.09** |
| | | | | (0.01) | | | | (0.03) |
| $R^2$ | -0.00 | 0.01 | 0.01 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 |
| Adj. $R^2$ | -0.00 | 0.01 | 0.01 | 0.00 | 0.00 | 0.01 | 0.01 | 0.01 |
| Num. obs. | 5683 | 5683 | 5683 | 5683 | 2851 | 2851 | 2851 | 2851 |
| RMSE | 0.21 | 0.21 | 0.21 | 0.21 | 0.24 | 0.24 | 0.24 | 0.24 |

Intercept Model = National Drop-off

Table 4: Non-Responders = Bigger HH Size, Especially Amongst Latinos

| | HH Size (Full) | HH Size (Lat. Sample) | HH Size (Lat. Foreign Sample) |
|---|---|---|---|
| Intercept | 2.95*** | 3.70*** | 3.80*** |
| | (0.05) | (0.08) | (0.10) |
| Switch Q1/Q2 | 0.25 | 0.61* | 0.80** |
| | (0.15) | (0.24) | (0.28) |
| $R^2$ | 0.00 | 0.01 | 0.02 |
| Adj. $R^2$ | 0.00 | 0.01 | 0.02 |
| Num. obs. | 5683 | 2029 | 1164 |
| RMSE | 1.56 | 1.01 | 0.93 |

$^{***}p < 0.001$, $^{**}p < 0.01$, $^{*}p < 0.05$

Table 5: Recontacting With Citizenship Question Worse than Recontacting Without It

| | Respond (Full) | Respond (Immig) | Respond (White) | Respond (Latino) | Respond (Black) | Respond (Asian) | Respond (Other) |
|---|---|---|---|---|---|---|---|
| Intercept | 0.84*** | 0.80*** | 0.89*** | 0.80*** | 0.79*** | 0.53 | 0.95*** |
| | (0.04) | (0.08) | (0.04) | (0.06) | (0.15) | (0.38) | (0.05) |
| Citizenship | −0.39*** | −0.47*** | −0.40*** | −0.41*** | −0.16 | −0.53 | −0.78*** |
| | (0.06) | (0.11) | (0.07) | (0.10) | (0.23) | (0.38) | (0.18) |
| $R^2$ | 0.17 | 0.22 | 0.19 | 0.18 | 0.03 | 0.35 | 0.63 |
| Adj. $R^2$ | 0.17 | 0.22 | 0.19 | 0.17 | -0.01 | 0.31 | 0.61 |
| Num. obs. | 550 | 200 | 224 | 254 | 23 | 18 | 31 |
| RMSE | 0.30 | 0.24 | 0.32 | 0.25 | 0.58 | 0.31 | 0.14 |

$^{***}p < 0.001$, $^{**}p < 0.01$, $^{*}p < 0.05$

Table 6: Imputation Will Fail — Non-Responders Different on Several Characteristics (Amongst those Q1 = Yes)

| | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Intercept | 0.07*** | 0.15*** | 0.07*** | 0.10*** | 0.09*** | 0.07*** | 0.06*** | 0.06*** | 0.06*** | 0.07*** | 0.03** | 0.02* | 0.07*** |
| | (0.01) | (0.02) | (0.01) | (0.01) | (0.02) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) |
| Married | −0.00 | | | | | | | | | | | | |
| | (0.01) | | | | | | | | | | | | |
| English | | −0.08*** | | | | | | | | | | | |
| | | (0.02) | | | | | | | | | | | |
| Spanish | | | 0.09*** | | | | | | | | | | |
| | | | (0.02) | | | | | | | | | | |
| White | | | | −0.05*** | | | | | | | | | |
| | | | | (0.01) | | | | | | | | | |
| Age | | | | | −0.00 | | | | | | | | |
| | | | | | (0.00) | | | | | | | | |
| Income | | | | | | 0.00 | | | | | | | |
| | | | | | | (0.00) | | | | | | | |
| Foreign | | | | | | | 0.05*** | | | | | | |
| | | | | | | | (0.01) | | | | | | |
| Latino | | | | | | | | 0.08*** | | | | | |
| | | | | | | | | (0.01) | | | | | |
| HH Size | | | | | | | | | 0.00 | | | | |
| | | | | | | | | | (0.00) | | | | |
| Foreign Parents | | | | | | | | | | 0.05** | | | |
| | | | | | | | | | | (0.02) | | | |
| % Urban | | | | | | | | | | | 0.05*** | | |
| | | | | | | | | | | | (0.01) | | |
| % Rent | | | | | | | | | | | | 0.14*** | |
| | | | | | | | | | | | | (0.03) | |
| Population Density | | | | | | | | | | | | | 0.00 |
| | | | | | | | | | | | | | (0.00) |
| R² | 0.00 | 0.01 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Adj. R² | −0.00 | 0.01 | 0.01 | 0.01 | 0.00 | −0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Num. obs. | 5683 | 5683 | 5683 | 5683 | 5356 | 4149 | 5683 | 5683 | 5683 | 5683 | 5118 | 5118 | 5118 |
| RMSE | 0.21 | 0.21 | 0.21 | 0.21 | 0.20 | 0.21 | 0.21 | 0.21 | 0.21 | 0.21 | 0.20 | 0.20 | 0.20 |

***$p < 0.001$, **$p < 0.01$, *$p < 0.05$

Table 7: Experimental Results: Including Citizenship Question Reduces Response Rate

| | Respondent (National) | Respondent (Latino) | Respondent (Immigrant) |
|---|---|---|---|
| Intercept | 0.89*** | 0.82*** | 0.82*** |
| | (0.01) | (0.02) | (0.03) |
| Treatment | −0.02* | −0.06* | −0.08* |
| | (0.01) | (0.03) | (0.04) |
| R² | 0.00 | 0.01 | 0.01 |
| Adj. R² | 0.00 | 0.01 | 0.01 |
| Num. obs. | 6309 | 2346 | 1873 |
| RMSE | 0.27 | 0.21 | 0.25 |

One-sided p-values, at least 1 * = p < .05

**Chart 1: Non-Response rate by state (Q1 to Q2)**



OLS coefficients with 95% confidence intervals

**Chart 2: Non-Response rate by state (Q1 to Q8)**



OLS coefficients with 95% confidence intervals

## Table 8: California has a statistically higher drop-off rate

|  | Q1/Q2 | Q1/Q8 |
|---|---|---|
| (Intercept) | 0.887*** | 0.830*** |
|  | (0.009) | (0.018) |
| California | −0.023* | −0.059* |
|  | (0.013) | (0.027) |
| R$^2$ | 0.001 | 0.005 |
| Adj. R$^2$ | 0.001 | 0.005 |
| Num. obs. | 6309 | 2156 |
| RMSE | 0.268 | 0.189 |

$^{***}p < 0.001$, $^{**}p < 0.01$, $^{*}p < 0.05$

## Table 9: There is imbalance between responders and non-responders in California

| | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 | Q1/Q2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Intercept) | 0.125*** | 0.170*** | 0.106*** | 0.143*** | 0.167*** | 0.116*** | 0.113*** | 0.086*** | 0.089*** | 0.098*** | 0.012 | 0.019 | 0.082*** |
| | (0.015) | (0.027) | (0.011) | (0.016) | (0.036) | (0.025) | (0.013) | (0.011) | (0.019) | (0.013) | (0.028) | (0.032) | (0.013) |
| Married | −0.006 | | | | | | | | | | | | |
| | (0.022) | | | | | | | | | | | | |
| English | | −0.060* | | | | | | | | | | | |
| | | (0.030) | | | | | | | | | | | |
| Spanish | | | 0.093** | | | | | | | | | | |
| | | | (0.033) | | | | | | | | | | |
| White | | | | −0.046* | | | | | | | | | |
| | | | | (0.021) | | | | | | | | | |
| Age | | | | | −0.001 | | | | | | | | |
| | | | | | (0.001) | | | | | | | | |
| Income | | | | | | 0.001 | | | | | | | |
| | | | | | | (0.008) | | | | | | | |
| Foreign Born | | | | | | | 0.033 | | | | | | |
| | | | | | | | (0.023) | | | | | | |
| Latino | | | | | | | | 0.110*** | | | | | |
| | | | | | | | | (0.025) | | | | | |
| HH Size | | | | | | | | | 0.010 | | | | |
| | | | | | | | | | (0.006) | | | | |
| Parents Foreign Born | | | | | | | | | | 0.052* | | | |
| | | | | | | | | | | (0.022) | | | |
| Urbanicity | | | | | | | | | | | 0.117*** | | |
| | | | | | | | | | | | (0.033) | | |
| % Rent | | | | | | | | | | | | 0.233** | |
| | | | | | | | | | | | | (0.080) | |
| Population Density | | | | | | | | | | | | | 0.030*** |
| | | | | | | | | | | | | | (0.008) |
| R$^2$ | 0.000 | 0.006 | 0.012 | 0.005 | 0.003 | 0.000 | 0.002 | 0.025 | 0.004 | 0.006 | 0.005 | 0.014 | 0.019 |
| Adj. R$^2$ | -0.000 | 0.005 | 0.011 | 0.004 | 0.003 | -0.001 | 0.002 | 0.024 | 0.004 | 0.006 | 0.004 | 0.013 | 0.018 |
| Num. obs. | 1906 | 1906 | 1906 | 1906 | 1774 | 1429 | 1906 | 1906 | 1906 | 1906 | 1721 | 1721 | 1721 |
| RMSE | 0.154 | 0.154 | 0.153 | 0.154 | 0.150 | 0.151 | 0.154 | 0.152 | 0.154 | 0.154 | 0.154 | 0.153 | 0.153 |

$^{***}p < 0.001$, $^{**}p < 0.01$, $^{*}p < 0.05$

Table 10: Experimental Results Q7 v Q8

|  | Full Sample | California Subsample | Non-California Subsample | DID |
|---|---|---|---|---|
| (Intercept) | 0.887*** | 0.830*** | 0.895*** | 0.895*** |
|  | (0.009) | (0.018) | (0.010) | (0.010) |
| Citizenship Question | −0.023* | −0.059* | −0.020 | −0.020 |
|  | (0.013) | (0.027) | (0.015) | (0.015) |
| California |  |  |  | −0.066*** |
|  |  |  |  | (0.021) |
| California x Citizenship Question |  |  |  | −0.039 |
|  |  |  |  | (0.031) |
| $R^2$ | 0.001 | 0.005 | 0.001 | 0.008 |
| Adj. $R^2$ | 0.001 | 0.005 | 0.001 | 0.008 |
| Num. obs. | 6309 | 2156 | 4153 | 6309 |
| RMSE | 0.268 | 0.189 | 0.300 | 0.267 |

***$p < 0.001$, **$p < 0.01$, *$p < 0.05$, The p-values for this table reflect one-tailed tests.

Table 11: Recontact is Worse in California

|  | Full Sample | California Sample | Non-California Sample | DID Estimate |
|---|---|---|---|---|
| (Intercept) | 0.843*** | 0.843*** | 0.843*** | 0.843*** |
|  | (0.035) | (0.052) | (0.042) | (0.042) |
| Treatment | −0.391*** | −0.546*** | −0.350*** | −0.350*** |
|  | (0.061) | (0.081) | (0.073) | (0.073) |
| California |  |  |  | −0.000 |
|  |  |  |  | (0.067) |
| Treatment x California |  |  |  | −0.196* |
|  |  |  |  | (0.109) |
| $R^2$ | 0.170 | 0.304 | 0.141 | 0.183 |
| Adj. $R^2$ | 0.168 | 0.301 | 0.138 | 0.178 |
| Num. obs. | 550 | 235 | 315 | 550 |
| RMSE | 0.302 | 0.194 | 0.359 | 0.300 |

***$p < 0.001$, **$p < 0.01$, *$p < 0.05$, p-values reflect one-tailed tests

Table 12: California Subset — Estimated Drop-off Rate From Q1-Q2 (Only Among Those Who Say Yes on Q1)

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| Full Sample | 0.1227786 | 0.1050600 | 0.1404971 | 0.0107712 | 99.99 |
| Non-Latino | 0.0858753 | 0.0680105 | 0.1037401 | 0.0108601 | 99.99 |
| Latino | 0.1957771 | 0.1580658 | 0.2334883 | 0.0229248 | 99.99 |
| Foreign Born | 0.1937608 | 0.1530296 | 0.2344921 | 0.0247606 | 99.99 |
| US Born | 0.1977544 | 0.1344262 | 0.2610825 | 0.0384974 | 99.99 |
| Asian | 0.0429115 | 0.0100142 | 0.0758089 | 0.0199984 | 98.40 |
| Foreign Born | 0.0319674 | -0.0005842 | 0.0645191 | 0.0197882 | 94.70 |
| US Born | 0.0754759 | -0.0116071 | 0.1625589 | 0.0529380 | 92.30 |
| Black | 0.0313627 | -0.0015218 | 0.0642473 | 0.0199906 | 94.20 |
| White | 0.0971811 | 0.0746701 | 0.1196920 | 0.0136845 | 99.99 |
| Other | 0.1980445 | 0.0810896 | 0.3149994 | 0.0710972 | 99.70 |

Table 13: Non-California — Estimated Drop-off Rate From Q1-Q2 (Only Among Those Who Say Yes on Q1)

|  | Estimate | Lower | Upper | S.E. | Sig |
|---|---|---|---|---|---|
| Full Sample | 0.0649230 | 0.0558447 | 0.0740014 | 0.0055187 | 99.99 |
| Non-Latino | 0.0570172 | 0.0473925 | 0.0666420 | 0.0058509 | 99.99 |
| Latino | 0.1220957 | 0.0956436 | 0.1485477 | 0.0160803 | 99.99 |
| Foreign Born | 0.1145051 | 0.0835845 | 0.1454257 | 0.0187967 | 99.99 |
| US Born | 0.1278796 | 0.0875983 | 0.1681609 | 0.0244871 | 99.99 |
| Asian | 0.0730746 | 0.0160719 | 0.1300772 | 0.0346521 | 98.30 |
| Foreign Born | 0.0716425 | 0.0037076 | 0.1395775 | 0.0412978 | 95.90 |
| US Born | 0.0776782 | -0.0258946 | 0.1812511 | 0.0629622 | 89.10 |
| Black | 0.0784156 | 0.0439822 | 0.1128490 | 0.0209322 | 99.99 |
| White | 0.0520339 | 0.0421279 | 0.0619398 | 0.0060218 | 99.99 |
| Other | 0.0622659 | 0.0236780 | 0.1008539 | 0.0234577 | 99.60 |

Table 14: Black Immigrants Behave Similarly as Non-Black Immigrants

|  | Full Foreign-Born Sample | California Foreign-Born Sample |
|---|---|---|
| (Intercept) | 0.112*** | 0.146*** |
|  | (0.013) | (0.020) |
| Black | 0.016 | −0.033 |
|  | (0.066) | (0.116) |
| $R^2$ | 0.000 | 0.000 |
| Adj. $R^2$ | -0.000 | -0.001 |
| Num. obs. | 1574 | 664 |
| RMSE | 0.187 | 0.157 |

***$p < 0.001$, **$p < 0.01$, *$p < 0.05$

# Appendix B: Census 2020 Telephone Survey Instrument

Scr1. Hello, my name is _____.  This is not a sales call. I am calling on behalf of Pacific Market Research, as part of an academic research project.  We are conducting a short public opinion survey about important issues in the state of [INSERT STATE]. This survey is completely anonymous and confidential.

Scr2. Record language of survey

Spanish ......................................................................... 1
English .......................................................................... 2
Chinese ........................................................................ 3
Korean .......................................................................... 4
Vietnamese ................................................................... 5

Scr3.   Thank you for your time. All of your answers are completely confidential and anonymous. Please answer every question as truthfully as possible, this is no right or wrong answer, we just want to hear from you.

Okay, are you currently age 18 or over?

Yes, 18 or over ............................................................. 1
Not, under age 18 ......................................................... 2

Scr4.   [IF SCR3=UNDER 18] Is there someone 18 or older in the household who can take this survey?

Yes / HAND-OFF CALL .................................................... 1
Yes / ARRANGE CALL-BACK ............................................ 2
No ................................................................................ 3

Scr5.   In order to make sure we have a representative sample of everyone across America, let's start with a few basic demographic questions to ensure this study is inclusive of everyone.  What do you consider your race or ethnicity to be? [OPEN END, CODE TO LIST]
[ALLOW MULTIPLE, RECORD ORDER OR MENTION]

White, not-Hispanic ...................................................... 1
Hispanic or Latino ........................................................ 2
Black or African American .............................................. 3
Asian American ............................................................. 4
Middle Eastern or Arab .................................................. 5
American Indian/Native American ................................... 6
Other [SPECIFY] ............................................................ 7

Scr5B. [IF SCR3=OTHER] SPECIFY _____

Scr6.   What is your current state of residence?

Drop down with all 50 states + DC

Scr7.    [IF HIDALGO/CAMERON SAMPLE].  In what county do you live here in Texas?

Cameron County ........................................................... 1
Hidalgo County ............................................................. 2
Other County in TX [TERM] ........................................... 3

Scr8.    And finally, can you verify your 5-digit zip code?  __ __ __ __ __

**MAIN SURVEY**

1.  The Census is an official population count that is conducted every 10 years by the federal
    government. It requires all households to list the name, age, and race or ethnicity of every person
    living in the home and provide that information to the Census Bureau either online, by mail, or in-
    person with a census taker. The Census is required to keep this information confidential, and
    every single household in the country is required to participate.

    In March 2020 you will receive an invitation from the U.S. Census to fill out the census form.  Do
    you plan to participate and submit your household information?

Yes, will participate ...................................................... 1
No, will NOT participate ................................................. 2
Refused to answer (VOL) ............................................ 99

2.  In 2020, the federal government is adding a new question to require you to list whether you,
    and every person in your household is a U.S. citizen, or not a citizen. With the addition of a
    citizenship question, will you participate and submit your household information, or not?

Yes, will participate ...................................................... 1
No, will NOT participate ................................................. 2
Refused to answer (VOL) ............................................ 99

3.  It is against the law for the Census Bureau to disclose, make public, or share with anyone including
    other federal agencies the personal information collected from anyone including their citizenship
    status. According to the law, the Census Bureau can only disclose information gathered in the
    census for the purpose of producing statistical counts.

    Do you trust the Trump administration to protect your personal information, including the
    citizenship of you and members of your household, or do you think they will share this
    information with other federal agencies?

Trust them to protect my information.......................... 1
I think they will share my information .......................... 2
Don't know (VOL) ......................................................... 3
It depends (VOL) .......................................................... 4
Refused to answer (VOL) ............................................ 99

4. Including you, how many total people, children and adults, currently live in your household?  ____

5. How many total people age 18 or older live in your household?  ____

6. How many total people UNDER the age of 18 live in your household?  ____

7. [SPLIT A] Now that you've heard a little bit about the 2020 Census let me ask you one final question about how likely you are to participate.  If the government decides in 2020 to NOT include a question about citizenship status, and instead only asks you to report the race, ethnicity, age, gender of people living in your household, and the government provides assurances that your information will be kept confidential and ONLY used for purposes of counting the total population and nothing more, would you participate and fill out the 2020 Census form, or not?

   {**Note to interviewer:** If respondent says "don't know" probe: do you think you probably will, or probably will not participate?"}

   Yes, will participate ........................................................ 1
   No, will NOT participate .................................................. 2
   Refused to answer (VOL) ............................................. 99

8. [SPLIT B] Now that you've heard a little bit about the 2020 Census let me ask you one final question about how likely you are to participate.  If the government decides in 2020 to include a question about citizenship status, and asks you to report the race, ethnicity, age, gender and citizenship status of people living in your household, and the government provides assurances that your information will be kept confidential and ONLY used for purposes of counting the total population and nothing more, would you participate and fill out the 2020 Census form, or not?

   {**Note to interviewer:** If respondent says "don't know" probe: do you think you probably will, or probably will not participate?"}

   Yes, will participate ........................................................ 1
   No, will NOT participate .................................................. 2
   Refused to answer (VOL) ............................................. 99

9. [IF RESPONDENT WAS ASSIGNED TO SPLIT A IN QUESTION #7] But let's suppose the federal government does put the citizenship question on the census survey, which they intend to do. How concerned, or not concerned are you that census answers about the citizenship status of you or your family could be shared with Immigration and Customs Enforcement

   Very concerned ............................................................. 1
   Somewhat concerned .................................................... 2
   Not too concerned ....................................................... 3
   Not at all concerned ..................................................... 4
   Refused to answer (VOL) ............................................. 99

Okay, just a few final demographic questions to ensure that we have an accurate and representative sample of all Americans. All questions on this survey are completely anonymous and confidential, but important to make sure the research is accurate. Thank you for help.

10. [IF Scr5=Latino] Hispanics and Latinos have their roots in many different countries in Latin America. To what country do you or your family trace your ancestry? [OPEN-ENDED WITH LIST OF ALL COUNTRIES]

Argentina ............................... 1
Bolivia ................................... 2
Chile ...................................... 3
Colombia............................... 4
Costa Rica.............................. 5
Cuba...................................... 6
Dominican Republic .............. 7
Ecuador ................................. 8
El Salvador ............................ 9
Guatemala ............................ 10
Honduras .............................. 11
Mexico .................................. 12
Nicaragua .............................. 13
Panama ................................. 14
Paraguay ............................... 15
Peru ...................................... 16
Puerto Rico ........................... 17
Uruguay ................................. 18
Venezuela ............................. 19
Spain / Spanish...................... 20
United States / America......... 21
Other country ....................... 22
Don't know ........................... 88

11b. [IF Q10 = 20 – 88] Do you consider any part of your family ancestry to be of Mexican, or Mexican-American descent?

Yes, Mexican or Mexican-American............................... 1
No ................................................................................ 2

11. [IF Scr5=Asian] Asian Americans have their roots in many different countries in Asia. To what country do you or your family trace your ancestry? [OPEN-ENDED WITH LIST OF ALL COUNTRIES]

China ........................................................................... 1
Taiwan.......................................................................... 2
India............................................................................. 3
Korea............................................................................ 4
The Philippines.............................................................. 5
Vietnam........................................................................ 6
Japan............................................................................ 7
Pakistan........................................................................ 8
Thailand........................................................................ 9
Iran...............................................................................10
Bangladesh....................................................................11
Laos...............................................................................12
Cambodia.......................................................................13
Other: SPECIFY..............................................................14

12. Were you born in the United States, [IF Latino "on the island of Puerto Rico,"] or in another country?

United States ................................................................ 1
Puerto Rico ................................................................... 2
Other Country ............................................................... 3

13. [IF Q12=1]. How about your parents, were they born in the United States, [IF LATINO "in Puerto Rico,"] or in another country?

Both parents born in U.S................................................ 1
Both parents born in another country .......................... 2
Both parents born in Puerto Rico ................................. 3
1 parent born in U.S. & 1 parent born abroad .............. 4
Don't know .................................................................. 88

14. What is the highest level of education you completed?

Grades 1 - 8.................................................................. 1
Some High School ......................................................... 2
High School graduate..................................................... 3
Some college / technical school..................................... 4
College graduate............................................................ 5
Post-graduate degree .................................................... 6

15. In what year were you born?      __ __  __ __

16. What was your total combined household income in 2017 before taxes?  This question is completely confidential and just used to help classify the responses, but it is very important for our research.

Less than $20,000 .............................. 1
$20,000 to $29,999 ............................ 2
$30,000 to $39,999 ............................ 3
$40,000 to $49,999 ............................ 4
$50,000 to $59,999 ............................ 5
$60,000 to $69,999 ............................ 6
$70,000 to $79,999 ............................ 7
$80,000 to $89,999 ............................ 8
$90,000 to $99,999 ............................ 9
$100,000 to $149,999 ....................... 10
$150,000 to $199,999 ....................... 11
More than $200,000 .......................... 12
Don't know ......................................... 88
Refused to answer (VOL)......................99

17. Which best describes your current status?

Single ................................................................ 1
Not married, but living with partner ............................. 2
Married ................................................................ 3
Widowed ............................................................ 4
Separated or divorced .................................... 5
Something else ............................................. 6
Refused to answer (VOL) ............................ 99

# MATT A. BARRETO – BARRETOM@UCLA.EDU
## UNIVERSITY OF CALIFORNIA, LOS ANGELES, 3345 BUNCHE HALL, LOS ANGELES CA 90095

**EMPLOYMENT:**

**Professor**, Political Science, University of California Los Angeles (2015 – present)
**Professor,** Chicana/o Studies, University of California Los Angeles (2015 – present)
**Co-Founder & Director**, UCLA Latino Policy & Politics Initiative

Dept. Political Science, University of Washington
 **Professor** (2014 – 2015)
 **Associate Professor** (2009 – 2014)
 **Assistant Professor** (2005 – 2009)
 **Co-Founder & Director,** Washington Institute for the Study of Ethnicity and Race
 **Founding Director,** Center for Democracy and Voting Rights, UW School of Law

Affiliated Research Centers

Latino Policy & Politics Initiative (LPPI), University of California, Los Angeles

Chicano Studies Research Center (CSRC), University of California, Los Angeles

Center for the Study of Los Angeles (CSLA), Loyola Marymount University

**PERSONAL:**

Born: June 6, 1976
San Juan, Puerto Rico

High School: 1994, Washburn Rural HS, Topeka, KS

**EDUCATION:**

**Ph.D., Political Science, June 2005**
University of California – Irvine
Sub Fields: American Politics / Race, Ethnicity and Politics / Methodology
Thesis: Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation
Thesis Committee: Bernard Grofman (chair), Louis DeSipio, Katherine Tate, Carole Uhlaner
Thesis Awards: *Ford Foundation Dissertation Fellowship for Minorities, 04-05*
   *University of California President's Dissertation Fellowship, 04-05*
   *University of California Institute for Mexico & the U.S. Dissertation Grant, 04-05*

**Master of Science, Social Science, March 2003**
University of California – Irvine

**Bachelor of Science, Political Science, May 1998**
Eastern New Mexico University, Portales, NM
Minor: English.  Cumulative GPA: 3.9, *Summa Cum Laude*

# PUBLICATION RECORD

Google Scholar citation indices:   Cites: 2,777     h-index: 26     i10-index: 44     Years post-PhD: 13     Cites/year: 214

## *BOOK MANUSCRIPTS:*

Barreto, Matt and Christopher Parker. nd. <u>The Great White Hope: Donald Trump, Race, and the Crisis of American Politics.</u> Under Contract, University of Chicago Press. *expected 2019*

Barreto, Matt and Gary Segura. 2014. <u>Latino America: How America's Most Dynamic Population is Poised to Transform the Politics of the Nation.</u> Public Affairs Books. (Sept)

Barreto, Matt and David Leal, editors. 2018. <u>Race, Class, and Precinct Quality in American Cities.</u> Springer Press.

Christopher Parker and Matt Barreto. 2013. <u>Change They Can't Believe In: The Tea Party and Reactionary Politics in America.</u>  Princeton University Press. *Winner: APSA Best Book Award for Race, Ethnicity, Politics, 2014*

Barreto, Matt. 2010. <u>Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation</u>. University of Michigan Press

## *PEER-REVIEWED ARTICLES*

60. Barreto, Matt. 2018. "The cycle of under-mobilization of minority voters: A comment on 'Selective recruitment of voter neglect?'" *Journal of Race, Ethnicity, and Politics*

59. Ocampo, Angela, Karam Dana and Matt Barreto. 2018. "The American Muslim Voter: Community Belonging and Political Participation." *Social Science Research.* 69(4).

58. Barreto, Matt, Lorrie Frasure-Yokley, Edward Vargas, Janelle Wong. 2018. "Best practices in collecting online data with Asian, Black, Latino, and White respondents: evidence from the 2016 Collaborative Multiracial Post-election Survey." *Politics, Groups & Identities.*. 6(1).

57. Barreto, Matt, Tyler Reny and Bryan Wilcox-Archuleta.  2017. "A debate about survey research methodology and the Latina/o vote: why a bilingual, bicultural, Latino-centered approach matters to accurate data." *Aztlán: A Journal of Chicano Studies.* 42(2).

56. Barreto, Matt and Gary Segura.  2017. "Understanding Latino Voting Strength in 2016 and Beyond: Why Culturally Competent Research Matters." *Journal of Cultural Marketing Strategy.* 2:2

55. Dana, Karam, Bryan Wilcox-Archuleta and Matt Barreto.  2017. "The Political Incorporation of Muslims in America: The Mobilizing Role of Religiosity in Islam." *Journal of Race, Ethnicity & Politics*.

54. Collingwood, Loren, Kassra Oskooii, Sergio Garcia-Rios, and Matt Barreto.  2016. "eiCompare: Comparing Ecological Inference Estimates across EI and EI: RxC." *The R Journal*. 8:2 (Dec).

53. Garcia-Rios, Sergio I. and Matt A. Barreto. 2016. "Politicized Immigrant Identity, Spanish-Language Media, and Political Mobilization in 2012" *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 2(3): 78-96.

52. Barreto, Matt, Collingwood, Loren, Christopher Parker, and Francisco Pedraza.  2015. "Racial Attitudes and Race of Interviewer Item Non-Response." *Survey Practice*. 8:3.

51. Barreto, Matt and Gary Segura 2015. "Obama y la seducción del voto Latino." *Foreign Affairs Latinoamérica*. 15:2 (Jul).

50. Barreto, Matt and Loren Collingwood 2015. "Group-based appeals and the Latino vote in 2012: How immigration became a mobilizing issue." *Electoral Studies*. 37 (Mar).

49. Collingwood, Loren, Matt Barreto and Sergio García-Rios. 2014. "Revisiting Latino Voting: Cross-Racial Mobilization in the 2012 Election" *Political Research Quarterly*. 67:4 (Sep).

48. Bergman, Elizabeth, Gary Segura and Matt Barreto. 2014. "Immigration Politics and Electoral Consequences: Anticipating the Dynamics of Latino Vote in the 2014 Election" *California Journal of Politics and Policy*. (Feb)

47. Barreto, Matt and Sergio García-Rios. 2012. "El poder del voto latino en Estados Unidos en 2012" *Foreign Affairs Latinoamérica*. 12:4 (Nov).

46. Collingwood, Loren, Matt Barreto and Todd Donovan. 2012. "Early Primaries, Viability and Changing Preferences for Presidential Candidates." *Presidential Studies Quarterly*. 42:1(Mar).

45. Barreto, Matt, Betsy Cooper, Ben Gonzalez, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?." *Political Power and Social Theory*. 22:1(Jan).

44. Dana, Karam, Matt Barreto and Kassra Oskooi. 2011. "Mosques as American Institutions: Mosque Attendance, Religiosity and Integration into the American Political System." *Religions*. 2:2 (Sept).

43. Barreto, Matt, Christian Grose and Ana Henderson. 2011. "Redistricting: Coalition Districts and the Voting Rights Act." *Warren Institute on Law and Social Policy*. (May)

42. Barreto, Matt and Stephen Nuño. 2011. "The Effectiveness of Co-Ethnic Contact on Latino Political Recruitment." *Political Research Quarterly*. 64 (June). 448-459.

41. Garcia-Castañon, Marcela, Allison Rank and Matt Barreto. 2011 "Plugged in or tuned out? Youth, Race, and Internet Usage in the 2008 Election." *Journal of Political Marketing*. 10:2 115-138.

40. Barreto, Matt, Victoria DeFrancesco, and Jennifer Merolla. 2011 "Multiple Dimensions of Mobilization: The Impact of Direct Contact and Political Ads on Latino Turnout in the 2000 Presidential Election." *Journal of Political Marketing*. 10:1

39. Barreto, Matt, Loren Collingwood, and Sylvia Manzano. 2010. "Measuring Latino Political Influence in National Elections" *Political Research Quarterly*. 63:4 (Dec)

38. Barreto, Matt, and Francisco Pedraza. 2009. "The Renewal and Persistence of Group Identification in American Politics." *Electoral Studies*. 28 (Dec) 595-605

37. Barreto, Matt and Dino Bozonelos. 2009. "Democrat, Republican, or None of the Above? Religiosity and the Partisan Identification of Muslim Americans" *Politics & Religion* 2 (Aug). 1-31

36. Barreto, Matt, Sylvia Manzano, Ricardo Ramírez and Kathy Rim. 2009. "Immigrant Social Movement Participation: Understanding Involvement in the 2006 Immigration Protest Rallies." *Urban Affairs Review*. 44: (5) 736-764

35. Grofman, Bernard and Matt Barreto. 2009. "A Reply to Zax's (2002) Critique of Grofman and Migalski (1988): Double Equation Approaches to Ecological Inferences." *Sociological Methods and Research*. 37 (May)

34. Barreto, Matt, Stephen Nuño and Gabriel Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana." *PS: Political Science & Politics*. 42 (Jan)

33. Barreto, Matt, Luis Fraga, Sylvia Manzano, Valerie Martinez-Ebers, and Gary Segura. 2008. "Should they dance with the one who brung 'em? Latinos and the 2008 Presidential election" *PS: Political Science & Politics*. 41 (Oct).

32. Barreto, Matt, Mara Marks and Nathan Woods. 2008. "Are All Precincts Created Equal? The Prevalence of Low- Quality Precincts in Low-Income and Minority Communities." *Political Research Quarterly*. 62

31. Barreto, Matt. 2007. "*Sí Se Puede!* Latino Candidates and the Mobilization of Latino Voters." *American Political Science Review*. 101 (August): 425-441.

30. Barreto, Matt and David Leal. 2007. "Latinos, Military Service, and Support for Bush and Kerry in 2004." *American Politics Research.* 35 (March): 224-251.

29. Barreto, Matt, Mara Marks and Nathan Woods. 2007. "Homeownership: Southern California's New Political Fault Line?" *Urban Affairs Review.* 42 (January). 315-341.

28. Barreto, Matt, Matt Streb, Fernando Guerra, and Mara Marks. 2006. "Do Absentee Voters Differ From Polling Place Voters? New Evidence From California." *Public Opinion Quarterly.* 70 (Summer): 224-34.

27. Barreto, Matt, Fernando Guerra, Mara Marks, Stephen Nuño, and Nathan Woods. 2006. "Controversies in Exit Polling: Implementing a racially stratified homogenous precinct approach." *PS: Political Science & Politics.* 39 (July) 477-83.

26. Barreto, Matt, Ricardo Ramírez, and Nathan Woods. 2005. "Are Naturalized Voters Driving the California Latino Electorate? Measuring the Impact of IRCA Citizens on Latino Voting." *Social Science Quarterly.* 86 (December): 792-811.

25. Barreto, Matt. 2005. "Latino Immigrants at the Polls: Foreign-born Voter Turnout in the 2002 Election." *Political Research Quarterly.* 58 (March): 79-86.

24. Barreto, Matt, Mario Villarreal and Nathan Woods. 2005. "Metropolitan Latino Political Behavior: Turnout and Candidate Preference in Los Angeles." *Journal of Urban Affairs.* 27(February): 71-91.

23. Leal, David, Matt Barreto, Jongho Lee and Rodolfo de la Garza. 2005. "The Latino Vote in the 2004 Election." *PS: Political Science & Politics.* 38 (January): 41-49.

22. Marks, Mara, Matt Barreto and Nathan Woods. 2004. "Harmony and Bliss in LA? Race and Racial Attitudes a Decade After the 1992 Riots." *Urban Affairs Review.* 40 (September): 3-18.

21. Barreto, Matt, Gary Segura and Nathan Woods. 2004. "The Effects of Overlapping Majority-Minority Districts on Latino Turnout." *American Political Science Review.* 98 (February): 65-75.

20. Barreto, Matt and Ricardo Ramírez. 2004. "Minority Participation and the California Recall: Latino, Black, and Asian Voting Trends 1990 – 2003." *PS: Political Science & Politics.* 37 (January): 11-14.

19. Barreto, Matt and José Muñoz. 2003. "Reexamining the 'politics of in-between': political participation among Mexican immigrants in the United States." *Hispanic Journal of Behavioral Sciences.* 25 (November): 427-447.

18. Barreto, Matt. 2003. "National Origin (Mis)Identification Among Latinos in the 2000 Census: The Growth of the "Other Hispanic or Latino" Category." *Harvard Journal of Hispanic Policy.* 15 (June): 39-63.

*Edited Volume Book Chapters*

17. Gutierrez, Angela, Angela Ocampo and Matt Barreto. 2018. "Obama's Latino Legacy: From Unknown to Never Forgotten" In Andrew Rudalevige and Bert Rockman (eds.) The Obama Legacy. Lawrence, KS: University of Kansas Press.

16. Barreto, Matt, Thomas Schaller and Gary Segura. 2017. "Latinos and the 2016 Election: How Trump Lost Latinos on Day 1" In Larry Sabato, Kyle Konkik, Geoffrey Skelley (eds.) Trumped: The 2016 Election that Broke All the Rules. New York: Rowman & Littlefield.

15. Walker, Hannah, Gabriel Sanchez, Stephen Nuño, Matt Barreto 2017. "Race and the Right to Vote: The Modern Barrier of Voter ID Laws" In Todd Donovan (ed.) Election Rules and Reforms. New York: Rowman & Littlefield.

14. Barreto, Matt and Christopher Parker. 2015. "Public Opinion and Reactionary Movements: From the Klan to the Tea Party" In Adam Berinsky (ed.) New Directions in Public Opinion. 2nd edition. New York: Routledge Press.

13. Barreto, Matt and Gabriel Sanchez. 2014. "A 'Southern Exception' in Black-Latino Attitudes?." In Anthony Affigne, Evelyn Hu-Dehart, Marion Orr (eds.) Latino Politics en Ciencia Política. New York: New York University Press.

12. Barreto, Matt, Ben Gonzalez, and Gabriel Sanchez. 2014. "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Josh Kun and Laura Pulido (eds.) <u>Black and Brown in Los Angeles: Beyond Conflict and Coalition</u>. Berkeley, CA: University of California Press.

11. Barreto, Matt, Loren Collingwood, Ben Gonzalez, and Christopher Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election" In William Miller and Jeremy Walling (eds.) <u>Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections</u>. Rowman & Littlefield Publishing Group.

10. Jason Morin, Gabriel Sanchez and Matt Barreto. 2011. "Perceptions of Competition Between Latinos and Blacks: The Development of a Relative Measure of Inter-Group Competition." In Edward Telles, Gaspar Rivera-Salgado and Mark Sawyer (eds.) <u>Just Neighbors? Research on African American and Latino Relations in the US</u>. New York: Russell Sage Foundation.

9. Grofman, Bernard, Frank Wayman and Matt Barreto. 2009. "Rethinking partisanship: Some thoughts on a unified theory." In John Bartle and Paolo Bellucci (eds.) <u>Political Parties and Partisanship: Social identity and individual attitudes</u>. New York: Routledge Press.

8. Barreto, Matt, Ricardo Ramírez, Luis Fraga and Fernando Guerra. 2009. "Why California Matters: How California Latinos Influence the Presidential Election." In Rodolfo de la Garza, Louis DeSipio and David Leal (eds.) <u>Beyond the Barrio: Latinos in the 2004 Elections</u>. South Bend, ID: University of Notre Dame Press.

7. Francisco Pedraza and Matt Barreto. 2008. "Exit Polls and Ethnic Diversity: How to Improve Estimates and Reduce Bias Among Minority Voters." In Wendy Alvey and Fritz Scheuren (eds.) <u>Elections and Exit Polling</u>. Hoboken, NJ: Wiley and Sons.

6. Adrian Pantoja, Matt Barreto and Richard Anderson. 2008. "Politics *y la Iglesia*: Attitudes Toward the Role of Religion in Politics Among Latino Catholics" In Michael Genovese, Kristin Hayer and Mark J. Rozell (eds.) <u>Catholics and Politics</u>. Washington, D.C: Georgetown University Press..

5. Barreto, Matt. 2007. "The Role of Latino Candidates in Mobilizing Latino Voters: Revisiting Latino Vote Choice." In Rodolfo Espino, David Leal and Kenneth Meier (eds.) <u>Latino Politics: Identity, Mobilization, and Representation</u>. Charlottesville: University of Virginia Press.

4. Abosch, Yishaiya, Matt Barreto and Nathan Woods. 2007. "An Assessment of Racially Polarized Voting For and Against Latinos Candidates in California." In Ana Henderson (ed.) <u>Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power:</u>. Berkeley, CA: UC Berkeley Public Policy Press.

3. Barreto, Matt and Ricardo Ramírez. 2005. "The Race Card and California Politics: Minority Voters and Racial Cues in the 2003 Recall Election." In Shaun Bowler and Bruce Cain (eds.) <u>Clicker Politics: Essays on the California Recall</u>. Englewood-Cliffs: Prentice-Hall.

2. Barreto, Matt and Nathan Woods. 2005. "The Anti-Latino Political Context and its Impact on GOP Detachment and Increasing Latino Voter Turnout in Los Angeles County." In Gary Segura and Shawn Bowler (eds.) <u>Diversity in Democracy: Minority Representation in the United States</u>. Charlottesville: University of Virginia Press.

1. Pachon, Harry, Matt Barreto and Frances Marquez. 2004. "Latino Politics Comes of Age in the Golden State." In Rodolfo de la Garza and Louis DeSipio (eds.) <u>Muted Voices: Latino Politics in the 2000 Election</u>. New York: Rowman & Littlefield

| | | |
|---|---|---|
| April 2018 | Democracy Fund & Wellspring Philanthropic<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$200,000 – 18 months* |
| March 2018 | AltaMed California<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$250,000 – 12 months* |
| Dec 2017 | California Community Foundation<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$100,000 – 12 months* |
| July 2013 | Ford Foundation<br>UW Center for Democracy and Voting Rights | *$200,000 – 12 months* |
| April 2012 | American Values Institute [With Ben Gonzalez]<br>Racial Narratives and Public Response to Racialized Moments | *$40,000 – 3 months* |
| Jan 2012 | American Civil Liberties Union Foundation [With Gabriel Sanchez]<br>Voter Identification Laws in Wisconsin | *$60,000 – 6 months* |
| June 2011 | State of California Citizens Redistricting Commission<br>An Analysis of Racial Bloc Voting in California Elections | *$60,000 – 3 months* |
| Apr 2011 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? A national conference on the political and social<br>incorporation of American Muslims | *$50,000 – 18 months* |
| Jan 2011 | impreMedia [With Gary Segura]<br>Latino public opinion tracking poll of voter attitudes in 2011 | *$30,000 – 6 months* |
| Oct 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>Measuring Latino Influence in the 2010 Elections | *$128,000 – 6 months* |
| Oct 2010 | We Are America Alliance (WAAA) [With Gary Segura]<br>Latino and Asian American Immigrant Community Voter Study | *$79,000 – 3 months* |
| May 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>A Study of Latino Views Towards Arizona SB1070 | *$25,000 – 3 months* |
| Apr 2010 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? The influence of religiosity in Muslim political incorporation | *$50,000 – 18 months* |
| Oct 2009 | American Association of Retired Persons (AARP) [With Gary Segura]<br>Health care reform and Latino public opinion | *$25,000 – 3 months* |
| Nov 2008 | impreMedia & National Association of Latino Elected Officials (NALEO)<br>[With Gary Segura] 2008 National Latino Post-Election Survey, Presidential Election | *$46,000 – 3 months* |
| July 2008 | National Association of Latino Elected Officials (NALEO) [With Gary Segura]<br>Latino voter outreach survey – an evaluation of Obama and McCain | *$72,000 – 3 months* |
| June 2008 | The Pew Charitable Trusts, Make Voting Work Project<br>[with Karin MacDonald and Bonnie Glaser] Evaluating Online Voter Registration<br>(OVR) Systems in Arizona and Washington | *$220,000 – 10 months* |
| April 2008 | National Association of Latino Elected Officials (NALEO) &<br>National Council of La Raza (NCLR), 2008 Latino voter messaging survey | *$95,000 – 6 months* |

| | | |
|---|---|---|
| Dec. 2007 | Research Royalty Fund, University of Washington<br>2008 Latino national post-election survey | *$39,000 – 12 months* |
| Oct. 2007 | Brenan Center for Justice, New York University<br>[with Stephen Nuño and Gabriel Sanchez]  Indiana Voter Identification Study | *$40,000 – 6 months* |
| June 2007 | National Science Foundation, Political Science Division [with Gary Segura]<br>American National Election Study – Spanish translation and Latino oversample | *$750,000 – 24 months* |
| Oct. 2006 | University of Washington, Vice Provost for Undergraduate Education<br>Absentee voter study during the November 2006 election in King County, WA | *$12,000 – 6 months* |
| Mar. 2006 | Latino Policy Coalition Public Opinion Research Grant [with Gary Segura]<br>Awarded to the Washington Institute for the Study of Ethnicity and Race | *$40,000 – 18 months* |
| 2005 – 2006 | University of Washington, Institute for Ethnic Studies, Research Grant | *$8,000 – 12 months* |
| Mar. 2005 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Conduct Exit Poll during Los Angeles Mayoral Election, Mar. 8 & May 17, 2005<br>Awarded to the Center for the Study of Los Angeles | *$30,000 – 6 months* |
| 2004 – 2005 | Ford Foundation Dissertation Fellowship for Minorities | *$21,000 – 12 months* |
| 2004 – 2005 | University of California President's Dissertation Fellowship | *$14,700 – 9 months* |
| 2004 – 2005 | University of California Mexico-US (UC MEXUS) Dissertation Grant | *$12,000 – 9 months* |
| Apr – 2004 | UC Regents pre-dissertation fellowship, University of California, Irvine, | *$4,700 – 3 months* |
| 2003 – 2004 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Awarded to the Center for the Study of Los Angeles | *$20,000 – 12 months* |
| 2002 – 2003 | Ford Foundation Grant on Institutional Inequality [with Harry Pachon]<br>Conducted longitudinal study of Prop 209 on Latino and Black college admittance<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 12 months* |
| 2002 – 2003 | Haynes Foundation Grant on Economic Development [with Louis Tornatzky]<br>Knowledge Economy in the Inland Empire region of Southern California<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 18 months* |
| 2001 – 2002 | William F Podlich Graduate Fellowship, Center for the Study of Democracy,<br>University of California, Irvine | *$24,000 – 9 months* |

_**RESEARCH UNDER REVIEW/WORKING PAPERS**_:

Barreto, Matt, and Christopher Parker. <u>The Great White Hope: Donald Trump, Race, and the Crisis of American Politics.</u> Under Contract, University of Chicago Press, *expected 2019*

Barreto, Matt, Loren Collingwood, Sergio Garcia-Rios and Kassra Oskooii. "Estimating Candidate Support: Comparing Iterative EI and EI-RxC Methods" <u>Revise and Resubmit</u>

Barreto, Matt and Christopher Parker. "The Great White Hope: Existential Threat and Demographic Anxiety in the Age of Trump." <u>Revise and Resubmit.</u>

Barreto, Matt, Natalie Masuoka, Gabe Sanchez and Stephen El-Khatib. "Religiosity, Discrimination and Group Identity Among Muslim Americans" <u>Revise and Resubmit</u>

Barreto, Matt, Gabe Sanchez and Barbara Gomez. "Latinos, Blacks, and Black Latinos: Competition, Cooperation, or Indifference?" <u>Revise and Resubmit</u>

Chouhoud, Youssef, Karam Dana, and Matt Barreto. "American Muslim Political Participation: A Comprehensive Demographic Analysis Politics and Religion" <u>Revise and Resubmit</u>.

Barreto, Matt, Stephen Nuño, Gabriel Sanchez, and Hannah Walker. "Race, Class and Barriers to Voting in the 21st Century: The Unequal Impact of Voter ID Laws." <u>Revise and Resubmit</u>

Walker, Hannah, Matt Barreto, Stephen Nuño, and Gabriel Sanchez. "A comprehensive review of access to valid photo ID and the right to vote in America" [Under review]

Gutierrez, Angela, Angela Ocampo, Matt Barreto and Gary Segura. "From Proposition 187 to Donald Trump: New Evidence that Anti-Immigrant Threat Mobilizes Latino Voters." [Under Review]

Collins, Jonathan, Matt Barreto, Gregory Leslie and Tye Rush. "Racial Efficacy and Voter Enthusiasm Among African Americans Post-Obama" [Under Review]

Oskooii, Kassra, Matt Barreto, and Karam Dana. "No Sharia, No Mosque: Orientalist Notions of Islam and Intolerance Toward Muslims in the United States" [Under Review]

Barreto, Matt, David Redlawsk and Caroline Tolbert. "Framing Barack Obama: Muslim, Christian or Black?" [Working paper]

**_EXPERT DEPOSITION OR TESTIMONY, LAST 4 YEARS_:**

- Dallas County, TX, 2017, Expert for Defense in Section 2 VRA lawsuit, Harding v. Dallas County

- Kansas, 2016, Expert for Plaintiffs in Kansas voter registration lawsuit, Fish v. Kobach 2:16-cv-02105-JAR

- North Dakota, 2015, Expert for Plaintiffs in North Dakota voter ID lawsuit, Brakebill v. Jaeger 1:16-cv-00008-CSM

- Texas, 2014, Testifying Expert for Plaintiffs in Texas voter ID lawsuit, Veasey v. Perry 2:13-cv-00193

| ***TEACHING EXPERIENCE:*** | UCLA & UW | 2005 – Present |
|---|---|---|

- Minority Political Behavior (Grad Seminar)
- Politics of Immigration in the U.S. (Grad Seminar)
- Introduction to Empirical/Regression Analysis (Grad Seminar)
- Advanced Empirical/Regression Analysis (Grad Seminar)
- Qualitative Research Methods (Grad Seminar)
- Political Participation & Elections (Grad Seminar)
- The Voting Rights Act (Law School seminar)
- Research methodology II  (Law School Ph.D. program seminar)
- U.S. Latino Politics
- Racial and Ethnic Politics in the U.S.
- Politics of Immigration in the U.S.
- Introduction to American Government
- Public Opinion Research
- Campaigns and Elections in the U.S.
- Presidential Primary Elections

**Teaching Assistant**
University of California, Irvine                                     2002 – 2005

- Intro to American Politics (K. Tate)
- Intro to Minority Politics (L. DeSipio)
  **Recognized as Outstanding Teaching Assistant, Winter 2002**
- Statistics and Research Methods (B. Grofman)
  **Recognized as Outstanding Teaching Assistant, Winter 2003**

**Founding Partner**
Latino Decisions                                                         2007 – Present

**Senior Research Fellow**
Center for the Study of Los Angeles, Loyola Marymount University     2002 – Present

**Board of Advisors**
American National Election Study, University of Michigan             2010 – Present

**Advisory Board**
States of Change: Demographics & Democracy Project                  2014 – Present
*CAP, AEI, Brookings Collaborative Project*

**Research Advisor**
American Values Institute / Perception Institute                    2009 – 2014

**Expert Consultant**
State of California, Citizens Redistricting Committee               2011 – 2012

**Senior Scholar & Advisory Council**
Latino Policy Coalition, San Francisco, CA                          2006 – 2008

**Board of Directors**
CASA Latina, Seattle, WA                                            2006 – 2009

**Faculty Research Scholar**
Tomás Rivera Policy Institute, University of Southern California    1999 – 2009

**_PHD STUDENTS_**        UCLA & UW

### Committee Chair or Co-Chair
- Francisco I. Pedraza – University of California, Riverside (UW Ph.D. 2009)
- Loren Collingwood – University of California, Riverside (UW Ph.D. 2012)
- Betsy Cooper – Public Religion Research Institute, Washington DC (UW Ph.D. 2014)
- Sergio I. Garcia-Rios – Cornell University (UW Ph.D. 2015)
- Hannah Walker – Rutgers University (UW Ph.D. 2016)
- Kassra Oskooii – University of Delaware (UW Ph.D. 2016)
- Angela Ocampo – Arizona State University (UCLA Ph.D. 2018)
- Ayobami Laniyonu – University of Toronto (UCLA Ph.D. 2018)
- Adria Tinin – *in progress* (UCLA ABD)
- Bang Quan Zheng – *in progress* (UCLA ABD)
- Bryan Wilcox-Archuleta – *in progress* (UCLA ABD)
- Tyler Reny – *in progress* (UCLA ABD)
- Angie Gutierrez – *in progress* (UCLA)
- Shakari Byerly-Nelson – *in progress* (UCLA)
- Vivien Leung – *in progress* (UCLA)

### Committee Member
- Jessica Stewart – Emory University (UCLA Ph.D. 2018)
- Jonathan Collins – Brown University (UCLA Ph.D., 2017)
- Lisa Sanchez – University of Arizona (UNM Ph.D., 2016)
- Nazita Lajevardi – Michigan State University (UC San Diego Ph.D., 2016)
- Kiku Huckle – Pace University (UW Ph.D. 2016)
- Patrick Rock (Social Psychology) – (UCLA Ph.D. 2016)
- Raynee Gutting – Loyola Marymount University (Stony Brook Ph.D. 2015)
- Christopher Towler – Sacramento State University (UW Ph.D. 2014)
- Benjamin F. Gonzalez – San Diego State University (UW Ph.D. 2014)
- Marcela Garcia-Castañon – San Francisco State University (UW Ph.D. 2013)
- Justin Reedy (Communications) – University of Oklahoma (UW Ph.D. 2012)
- Dino Bozonelos – Cal State San Marcos (UC Riverside Ph.D. 2012)
- Brandon Bosch – University of Nebraska (UW Ph.D. 2012)
- Karam Dana (Middle East Studies) – UW Bothell (UW Ph.D. 2010)
- Joy Wilke – *in progress* (UCLA ABD)
- Erik Hanson – *in progress* (UCLA)
- Christine Slaughter – *in progress* (UCLA)