JOSEPH H. HUNT
Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director
CARLOTTA P. WELLS
Assistant Director
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 514-9239
Email: kate.bailey@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, *et al.*, | Civil Action No. 3:18-cv-02279-RS |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | Date:   December 7, 2018 |
| WILBUR L. ROSS, JR. in his official capacity as Secretary of Commerce, *et al.*, | Time:   10:00 a.m. |
| | Judge:  Honorable Richard Seeborg |
| Defendants. | Dept.:  3 |

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

RESPONSE TO PLAINTIFFS' UNDISPUTED FACTS ................................................2

LEGAL STANDARD ...........................................................................................................3

ARGUMENT ........................................................................................................................3

I.    Plaintiffs Fail to Demonstrate Sufficient Evidence of Standing. ..............................3

    A.    Plaintiffs Fail to Identify Evidence of a Substantial Risk of a Relative
        Undercount. ..............................................................................................5

    B.    Plaintiffs Further Fail to Identify a Substantial Risk of Harm to Them, Even
        If There Was an Undercount. ....................................................................7

    C.    Plaintiffs Also Fail to Identify Evidence Specific Injuries Traceable to the
        Reinstatement of a Citizenship Question. ...............................................8

    D.    The Census Bureau's Continuing Practice of Soliciting National and Regional
        Partners to Perform Outreach About the Census Does Not Establish a
        Substantial Risk of an Undercount, or Any Injury Traceable to the
        Reinstatement of a Citizenship Question. ............................................. 10

II.   Plaintiffs Fail to Demonstrate that Secretary Ross Acted in Excess of Statutory
    Jurisdiction, Authority, or Limitations with Respect to the § 141(f) Reports. ...................... 13

    A.    Secretary Ross's Submission of § 141(f) Reports Is Not
        Judicially Reviewable. .......................................................................... 13

    B.    Secretary Ross's Submission of § 141(f) Reports Was Entirely Proper ...................... 16

III.  Plaintiffs Fail to Establish that the Secretary's Eminently Reasonable Decision to
    Reinstate a Citizenship Question Must Be Set Aside as Arbitrary or Capricious. .................. 17

    A.    The Secretary Reasonably Explained His Decision to Reinstate a Citizenship
        Question after Reviewing DOJ's Request. ............................................ 19

    B.    The Secretary Adequately Considered Issues Related to Testing. ................................ 22

    C.    The Secretary's Explanation for His Decision Drew a Rational Connection to
        the Facts Found through the Decisionmaking Process. ................................................. 25

IV.   If Any Relief Is Appropriate, Remand to the Agency Is the Appropriate Remedy. ............. 29

CONCLUSION ................................................................................................................. 30

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

# TABLE OF AUTHORITIES

**CASES**

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.,*
  175 F.3d 1156 (9th Cir. 1999) ...................................................................... 28

*Bowman Transp., Inc. v. Ark-Best Freight Sys, Inc.,*
  419 U.S. 281 (1974) ...................................................................................... 18

*City of Tacoma v. FERC,*
  460 F.3d 53 (D.C. Cir. 2006) ....................................................................... 28

*Clapper v. Amensty Int'l, USA,*
  133 S. Ct. 1138 (2013) ............................................................................... 4, 7

*Ctr. for Bio. Diversity v. Zinke,*
  868 F.3d 1054 (9th Cir. 2017) ................................................................ 17, 18

*D.C. Fed'n of Civic Ass'ns v. Volpe,*
  459 F.2d 1231 (D.C. Cir. 1971) ................................................................... 22

*Defs. of Wildlife v. EPA,*
  420 F.3d 946 (9th Cir. 2005) ........................................................................ 29

*De Loss v. U.S. Dep't of Hous. & Urban Dev.,*
  714 F. Supp. 1522 (S.D. Iowa 1988) ........................................................... 24

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ............................................................................ 18, 27

*Ergon-W. Va., Inc. v. EPA,*
  896 F.3d 600 (4th Cir. 2018) ........................................................................ 28

*FERC v. Elec. Power Supply Ass'n,*
  136 S. Ct. 760 (2016) ............................................................................. 17, 29

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ...................................................................................... 21

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ........................................................................................ 8

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) .................................................................................... 4

*Go v. Holder,*
  744 F.3d 604 (9th Cir. 2014) ........................................................................ 24

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

*Guerrero v. Clinton*,
  157 F.3d 1190 (9th Cir. 1998) ......................................................................... 14, 15

*Home Box Office, Inc. v. FCC*,
  567 F.2d 9 (D.C. Cir. 1977) ..................................................................................... 20

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392, 1405 (9th Cir. 1995), ........................................................................ 29

*In re Dep't of Commerce*,
  __ S. Ct. __, 2018 WL 5259090 (Oct. 22, 2018) ...................................................... 21

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ..................................................................................... 4

*Jagers v. Fed. Crop Ins. Corp.*,
  758 F.3d 1179 (10th Cir. 2014) ................................................................................ 21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................... 4

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013) .................................................................................... 24

*Moore v. Apfel*,
  216 F.3d 864 (9th Cir. 2000) .................................................................................... 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................ 17, 25, 27

*Mulry v. Driver*,
  366 F.2d 544 (9th Cir. 1966) .................................................................................... 30

*Nat. Resources Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ................................................................................. 15

*Nat'l Ass'n of Home Builders v. Norton*,
  340 F.3d 835 (9th Cir. 2003) .................................................................................... 18

*No Casino in Plymouth v. Zinke*,
  698 Fed. App'x. 531 (9th Cir. 2017) ......................................................................... 4

*Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) .................................................................................. 18

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

- iii -

*Nw. Envtl. Advocates v. EPA,*
   No. C 03-05760 SI, 2006 WL 2669042 (N.D. Cal. Sept. 18, 2006),
   *aff'd,* 537 F.3d 1006 (9th Cir. 2008) ...................................................................... 29

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,*
   18 F.3d 1468 (9th Cir. 1994) .................................................................................. 3

*Pacific Dawn LLC v. Pritzker,*
   831 F.3d 1166 (9th Cir. 2016) ............................................................................... 18

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,*
   898 F. 2d 1410 (9th Cir. 1990) .............................................................................. 28

*Renee v. Duncan,*
   686 F.3d 1002 (9th Cir. 2012) ............................................................................... 15

*Rohnert Park Citizens to Enforce CEQA v. U.S. Dep't of Transp.,*
   No. C 07-4607 , 2009 WL 595384 (N.D. Cal. Mar. 5, 2009),
   *aff'd,* 385 F. App'x 759 (9th Cir. 2010) ................................................................ 10

*Schweiker v. Hansen,*
   450 U.S. 785 (1981) ................................................................................................ 24

*Serv. Women's Action Network v. Mattis,*
   320 F. Supp. 3d 1082 (N.D. Cal. 2018) ................................................................. 9

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) .................................................................................................. 4

*Stop H-3 Ass'n v. Dole,*
   740 F.2d 1442 (9th Cir. 1984) ............................................................................... 28

*United States v. Fifty-Three Eclectus Parrots,*
   685 F.2d 1131 (9th Cir. 1982) ............................................................................... 24

*Valandingham v. Bojorquez,*
   866 F.2d 1135 (9th Cir. 1989) ............................................................................... 3

*W. Radio Servs. Co. v., Espy,*
   79 F.3d 896 (9th Cir. 1996) ................................................................................... 24

*Wilderness Soc'y v. Norton,*
   434 F.3d 584 (D.C. Cir. 2006) .............................................................................. 15

*Wisconsin v. City of New York,*
   517 U.S. 1 (1996) ........................................................................................ 20, 23, 27

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

*Woods Petroleum Corp. v. U.S. Dep't of the Interior,*
    18 F.3d 854 (10th Cir. 1994) ................................................................... 21

**CONSITUTIONAL PROVISIONS**

U.S. Const. art. I, § 2, cl. 3 ....................................................................... 20

**STATUTES**

5 U.S.C. § 701 ............................................................................................ 15

5 U.S.C. § 706 ..............................................................................17, 21, 24

13 U.S.C. § 141 ................................................................................. *passim*

48 U.S.C. § 1904 ....................................................................................... 14

**FEDERAL RULES**

Fed. R. Civ. P. 56 ........................................................................................3

**OTHER AUTHORITIES**

House Committee on Oversight and Government Reform, Progress Report on the 2020 Census,
    https://oversight.house.gov/hearing/progress-report-on-the-2020-census/ ................................. 16

House Committee on Oversight and Government Reform, Progress on the 2020 Census –
    Continued,
    https://oversight.house.gov/hearing/progress-on-the-2020-census-continued/ ........................... 16

Census Integrated Communications Program Summary Assessment Report (ICP Memo),
    Census Planning Memoranda Series No. 223 (Aug. 2, 2012), https://www.census.gov/
    2010census/pdf/2010_Census_ICP_Summary_Assessment.pdf ....................................... 10

Letter from Secretary Ross to Catherine Lhamon, United States Commission on Civil Rights,
    July 5, 2018, https://www.usccr.gov/press/2018/07-17-18-letter.pdf ............................... 12

Secretary Ross, The National Partnership Press Event at the Renaissance Hotel in Washington,
    D.C. on October 2, 2018, https://www.commerce.gov/news/speeches/2018/10/remarks-
    secretary-wilbur-l-ross-us-census-national-partnership-press ............................................. 11

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1

**INTRODUCTION**

2       Plaintiffs, the City of San Jose and the Black Alliance for Just Immigration (BAJI), have

3 brought suit to challenge the decision by the Secretary of Commerce, Wilbur L. Ross, Jr., to reinstate

4 a citizenship question on the 2020 decennial census.  Although their enthusiasm for the accuracy of

5 the census does them credit, their methods are misplaced.

6       First, Plaintiffs lack standing to pursue their claims.  Plaintiffs are not the only ones who care

7 deeply about the accuracy of the census—the Census Bureau has been improving its techniques for

8 administering the decennial census for more than 130 years, or 14 censuses (most of which included

9 a question to collect data about citizenship).  These efforts include the Census Bureau's non-response

10 follow-up program (NRFU) that aims to accomplish a complete enumeration—even of households

11 that do not self-respond—through home visits by enumerators, administrative records, and proxy

12 data, as well as the Census Bureau's imputation procedures.  In 2020, the Census Bureau will begin

13 with $1.5 billion committed to NRFU, with an additional $1.7 billion available in contingency funds.

14 The efficacy of these programs is such that the Census Bureau expects the 2020 decennial census to

15 result in a complete enumeration, and thus Plaintiffs will experience no injury, even if the

16 reinstatement of the citizenship question did result in a decline in initial self-response rates.

17       Rather than engage with the Census Bureau's techniques to prevent an undercount, or present

18 evidence that an undercount will occur, Plaintiffs attempt to establish an injury by focusing instead

19 on their voluntary expenditures to facilitate the 2020 census, such as public outreach.  However,

20 Article III requires that plaintiffs demonstrate incurred expenses to mitigate a *substantial risk* (else any

21 plaintiff could establish standing by unnecessarily laying out funds in response to a nonparanoid fear),

22 and here, Plaintiffs have not demonstrated such a substantial risk of an undercount.

23       Even if Plaintiffs had standing, their APA claims would still fail.  Secretary Ross reasonably

24 decided to reinstate a citizenship question, based on the Department of Justice's request for more

25 accurate citizenship data to enforce the Voting Rights Act, which is all that he is required to do.

26 Secretary Ross acted well within the purview of the APA and his responsibility as decisionmaker

27

28 *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1  when he did not accept the recommendations of career staff at the Census Bureau and chose a

2  different course.  Nor was Secretary Ross's decision unlawful in light of 13 U.S.C. § 141(f), a reporting

3  statute that this Court lacks jurisdiction to review, although its strictures were satisfied in any event.

4  Plaintiffs are not entitled to summary judgment and their motion should be denied.

**Response to Plaintiffs' Undisputed Facts**

6      This case presents primarily a legal dispute and thus, like most APA cases, is appropriate for

7  disposition on summary judgment.  Defendants have previously provided appropriate background

8  in Defendants' Motion for Summary Judgment, but respond to certain instances in which Plaintiffs,

9  after first magnanimously limiting themselves to the administrative record—the proper record for

10  resolving APA claims—have mischaracterized the facts.

11      In their statement of undisputed "facts," Plaintiffs present many claims that are anything but

12  facts.  For example, Plaintiffs include an entire subsection ostensibly about Secretary Ross's reasons

13  for reinstating a citizenship question (Part II.A, "[Secretary] Ross Chose to Add the Citizenship

14  Question for Reasons that Are Not in the Record," Pls.' MSJ at 2, ECF No. 99), which details a

15  variety of contacts, cited to the administrative record, that are not among Secretary Ross's reasons

16  for reinstating a citizenship question (Secretary Ross's reasons are set forth in his decision memo).

17  This listing, however, ultimately reveals nothing except that, as reflected in the supplement to the

18  Administrative Record, AR 1321, Secretary Ross discussed the reinstatement of the question with a

19  variety of individuals.  Likewise, Plaintiffs make much of statements made by Kris Kobach, who, of

20  course, was not the decisionmaker in reinstating a citizenship question to the 2020 census.  Pls.' MSJ

21  at 3-4.

22      Turning to the Department of Justice's (DOJ) involvement, Plaintiffs suggest, without

23  support, that DOJ "[r]everse[d] [c]ourse" in requesting the reinstatement of a citizenship question.

24  Pls.' MSJ at 4.  As Plaintiffs note, in 2016, DOJ sent the Census Bureau a letter indicating that it was

25  not currently requesting the addition of new questions *on the ACS*, then subsequently changed its

26  mind and requested a new topic on LGBT populations on the ACS.  AR 311.  The Gary Letter,

27

28  *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
   **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

which requested the reinstatement of a citizenship question on the decennial census, rather than the ACS, does not contradict DOJ's requests concerning the ACS.  And, if it did, there is nothing unusual in an agency reconsidering its position over time and recognizing the need for additional data—as, indeed, clearly happened concerning the collection of data on LGBT populations on the ACS.  (In contrast to Plaintiffs' characterization of the Gary Letter as a reversal of course, Plaintiffs appropriately characterize DOJ's second letter concerning LGBT populations as a "supplement[]." Pls.' MSJ at 4-5.)

Finally, Plaintiffs reportedly and incorrectly suggest that it was "too late" to reinstate a citizenship question after March 31, 2017.  *See, e.g.*, Pls.' MSJ at 2.  This statement is incorrect for the reasons stated in depth at Part II.F, not least of which is that 13 U.S.C. § 141(f), cited by Plaintiffs, explicitly provides for the submission of proposed questions until March 31, 2018 (which the reinstated citizenship question satisfied), *id.* § 141(f)(2), and clearly contemplates changes after both of those dates, *id.* § 141(f)(3).

## LEGAL STANDARD

Summary judgment is appropriate when, "view[ing] the evidence and inferences . . . in the light most favorable to the party opposing the motion," "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989) (quoting Fed. R. Civ. P. 56(c)).  The Ninth Circuit has endorsed the use of summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure for review of agency actions under the Administrative Procedure Act. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994) (discussing the standards of review under both the APA and Fed. R. Civ. P. 56).

## ARGUMENT

**I.     Plaintiffs Fail to Demonstrate Sufficient Evidence of Standing.**

To proceed with this suit, Plaintiffs must show that they have Article III standing—including demonstrating that they are at imminent risk of injury.  Plaintiffs primarily rely on funds that they

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

have spent or plan to spend preparing for the census to provide this injury and only weakly dispute whether the 2020 census will in fact enumerate every person. Although an organization can, under appropriate circumstances, demonstrate sufficient injury by diverting its resources to avert a threatened harm, Plaintiffs here are stymied because they cannot show that there is a substantial risk of harm that requires mitigation, and they cannot establish with specificity that they have diverted or will divert funds *because of the citizenship question*, above and beyond whatever funds they would otherwise devote to preparing for the census.

It is well settled that, because standing is an "indispensable part of the plaintiff[s'] case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Where, as here, plaintiffs have moved for summary judgment, they "must 'set forth' by affidavit or other evidence 'specific facts'" sufficient to establish there is no genuine issue with regard to their invocation of the court's jurisdiction. *Id.* (citations omitted); *see also No Casino in Plymouth v. Zinke*, 698 F. App'x. 531, 532 (9th Cir. 2017) (quoting *Lujan*, 504 U.S. at 561); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) (a ruling on summary judgment must be based only on admissible evidence). If plaintiffs fail to adduce such evidence, the Court lacks jurisdiction to hear their claims, and "cannot proceed at all" except to "'announc[e] the fact and dismiss[]'" the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (vacating a judgment for plaintiffs who had "alleged that they had such a personal stake in [that] case, but never followed up with the requisite proof"); *No Casino in Plymouth*, 698 F. App'x. at 532 (concluding plaintiffs failed to meet their burden of establishing standing because they did not submit affidavits or other evidence in support of their allegations of injury).

The mere fact that a plaintiff has expended money in response to a fear about the future does not suffice to create standing. As the Supreme Court explained, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1151 (2013) (citation

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

- 4 -

1    omitted).  "If the law were otherwise, an enterprising plaintiff would be able to secure a lower

2    standard for Article III standing simply by making an expenditure based on a nonparanoid fear."  *Id.*

3    Rather, there must be at least a "substantial risk" that the feared harm will occur, which thereby

4    renders plaintiffs' mitigation efforts reasonable.  *See id.* at 1150 n.5 ("Our cases do not uniformly

5    require plaintiffs to demonstrate that it is *literally certain* that the harms they identify will come about.

6    In some instances, we have found standing based on a "substantial risk" that the harm will occur,

7    which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." (emphasis

8    added)).  Plaintiffs must, therefore, make two showings—first, that there is at least a substantial risk

9    that the relative undercount that they fear will come to pass, and second, that they have already or

10   will imminently incur costs traceable to an attempt to mitigate that harm.

11       **A. Plaintiffs Fail to Identify Evidence of a Substantial Risk of a Relative Undercount.**

12           Falling well short of establishing a substantial risk of a differential and relative undercount,

13   Plaintiffs put forth no evidence that the reinstatement of a citizenship question will result in *any*

14   undercount once the Census Bureau's extensive NRFU efforts— including the use of proxy data and

15   administrative records, as well as its use of imputation —are completed.  Defendants, to the contrary,

16   *have* put forth such evidence, in the form of the expert report of Dr. Abowd, the Census Bureau's

17   chief scientist.  *See generally* Decl. of John M. Abowd, Ph.D (Abowd Decl.), Defs.' MSJ, Ex. A, ECF

18   No. 100-1 (describing the Census Bureau's efforts to obtain a complete enumeration, including

19   encouraging self-response, home visits by enumerators, obtaining data from administrative records,

20   and using proxy data provided by nearby households).  Dr. Abowd, who is well versed in the Census

21   Bureau's complex procedures, concluded that "there is no credible quantitative evidence that the

22   addition of the citizenship question would affect the accuracy of the count."  Abowd Decl. ¶ 13.

23           Rather than present expert testimony or substantively engage with the accuracy of the count,

24   Plaintiffs flatly assert that "the risk [certain groups] will not be counted accurately when the Census

25   contains the citizenship question is substantial," Pls.' MSJ at 16, and mentions in passing statistics

26

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

from the Census Bureau.[1]  *See, e.g.*, Pls.' MSJ at 12 (citing the Administrative Record for the Census Bureau's estimated impact of reinstating a citizenship question on initial response rates for noncitizen households).  The question of initial self-response, is, of course, entirely separate from the question of the ultimate accuracy of the census.  *See* Abowd Decl. ¶ 20 ("It is important to stress that the estimated decrease in self-response rates does not translate into an increase in net undercount, and the use of our estimates as if they did is wholly inappropriate.").

Indeed, the Census Bureau is well aware that not every person will initially self-respond and therefore devotes significant effort towards enumerating those who do not initially self-respond.  For the 2020 Census, the Census Bureau has already earmarked approximately $1.5 billion for its NRFU efforts, with possible contingency funds, if necessary.  Abowd Decl. ¶¶ 58, 67.  The Census Bureau expects that these efforts will result in a total enumeration or, in other words, no undercount.  Abowd Decl. ¶ 24.  Plaintiffs also point to a statement in the Administrative Record that households that might choose not to respond because of a citizenship question might also be more likely to decline to speak to an enumerator during NRFU.  Pls.' MSJ at 12.  Of course, as the precise sentence that Plaintiffs quote states, this will "result[] in a proxy response," Pls.' MSJ at 12—in other words, those households will be enumerated through proxy data (or, possibly, administrative records), neither of which requires the household to speak to an enumerator.  And, Dr. Abowd was well aware of the Census Bureau's estimates and of the NRFU process, and the last step of imputation, when he concluded that, even with the reinstatement of a citizenship question, the 2020 census "will result in a complete enumeration."  Abowd Decl. ¶ 24.

Although Plaintiffs suggest that the Census Bureau's projections about its success are "speculation," it is Plaintiffs who present no evidence other than the extrapolation of their counsel

---

[1] Plaintiffs also make occasional reference to anecdotes in which individuals—generally unnamed—state that they personally have concerns about responding to the census due to the reinstatement of a citizenship question. *See, e.g.*, Decl. of Opal Tometi (Tometi Decl.) ¶ 11, ECF No. 99-4; Decl of Jeff Ruster (Ruster Decl.) ¶ 8, ECF No. 99-5.  These hearsay statements are not presented in an admissible form and could not suffice to establish the broader conclusion that the reinstatement of a citizenship question will cause an undercount.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

- 6 -

to suggest that an undercount will actually occur.  Plaintiffs, apparently recognizing that they have not presented evidence sufficient to establish that there will be an undercount, purport to be injured even if the count is completely successful.  *See* Pls.' MSJ at 11 ("Even if the Bureau were to compensate for the lowered self-response rate entirely through the use of NRFU, San Jose will have already diverted funds . . . .").  Yet this phrasing, of course, elides that it is Plaintiffs' burden to demonstrate that the future harm they are expending funds to mitigate is at a substantial risk of occurring.  Certainly Plaintiffs have assembled a story in which the citizenship question could result in an undercount.  However, pointing to a "nonparanoid fear" is not enough—Plaintiffs must actually show, through admissible evidence, that there is a substantial risk of an undercount, and that they have not done.  *Clapper*, 133 S. Ct. at 1151.

**B. Plaintiffs Further Fail to Identify a Substantial Risk of Harm to Them, Even If There Was an Undercount.**

Even if Plaintiffs had presented sufficient evidence to establish a substantial risk of an undercount, they must go further and establish that they would actually be harmed by such an undercount.  For the purposes of losing representation during apportionment or losing federal funds, this would require Plaintiffs to demonstrate that the relative undercount they fear would be large enough to actually change the allocation of representatives or funds.  It is clearly not the case that "[a]ny differential undercount attributable to the citizenship question will harm San Jose to some degree for purposes of standing."  Pls.' MSJ at 16.

Plaintiffs fail to present evidence that the undercount they fear would disadvantage San Jose *relative to other areas* to such an extent as to actually result in a reduction in the funding assigned to San Jose under the programs cited, or to reduce the representational interests of San Jose residents or BAJI members.  Plaintiffs' declarant takes such a relative disadvantage as a given ("Therefore, if the Decennial Census underreports the population of San Jose relative to other Participating Jurisdictions receiving funds from HUD by formula . . ." Decl. Kristen Clements ¶¶ 23, 25, ECF No. 99-2; "if the Census Bureau were to provide lower-than-accurate population data for the City of San Jose relative to other cities receiving WIOA funding, the City o[f] San Jose would receive less funding through

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

WIOA than it would if the data were accurate," Decl. Monique Melchor ¶ 10, ECF No. 99-3). Plaintiffs also gesture, without support, at an argument that San Jose may be susceptible to such a relative undercount by noting that San Jose's population has a larger-than-national-average percentage of Hispanic residents, but present no admissible evidence analyzing other factors influencing the count in San Jose versus in other areas or analyzing the likelihood of such a relative undercount. But these arguments are insufficient to establish standing. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (holding that Massachusetts lacked standing to challenge the accuracy of the data sources used in apportionment when it could not show that it would have received an additional Representative if more accurate data sources had been used).

To the contrary, Defendants have presented expert evidence that, under the scenarios examined by Dr. Gurrea, "congressional apportionment in any state (including California) does not change due to reinstatement of a citizenship question," and the funds that California as a whole will receive under Title I, WIC, and Social Service Block Grants will decline by just 0.01 percent, without considering additional mitigation efforts, such as imputation. Rule 26(A)(2)(B) Expert Report and Declaration of Stuart D. Gurrea, Ph.D. ¶¶ 11, 66-70 (Gurrea Declaration), Defs.' MSJ, Ex. B, ECF No. 100-2.

### C. Plaintiffs Also Fail to Identify Evidence Specific Injuries Traceable to the Reinstatement of a Citizenship Question.

Plaintiffs attempt to satisfy the requirements of Article III by pointing to funds that San Jose and BAJI intend to expend in an attempt to mitigate the allegedly impending undercount. As discussed above, this approach fails because Plaintiffs cannot demonstrate that the harm they seek to mitigate rises to the level of a substantial risk. Furthermore, Plaintiffs fail to present evidence of specific harms traceable *to the reinstatement of a citizenship question*.

San Jose points to funds that it has already expended, and plans to expend, preparing for the 2020 census, including its outreach programs and programs to identify low visibility housing. Ruster Decl. ¶¶ 4, 5, 9, 11, 12. Plaintiffs present no evidence that these resources were expended *because of the citizenship question* (contrary to Plaintiffs' counsel's claim that "San Jose has already spent, and will

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

continue to spend, precious municipal resources to encourage participation in the Census specifically because a citizenship question will be added." Pls. MSJ at 10).  In other words, it appears equally likely that San Jose has so far spent the same amount on census-related outreach that it spends in each decennial census cycle because it values the accuracy of the census for reasons unrelated to the presence of the citizenship question.  San Jose's declarant does state that San Jose's *future* outreach programs "will require the City of San Jose to divert funds and use additional sources of City funding not currently designated for census-related outreach." Ruster Decl. ¶ 10; *see also* Ruster Decl. ¶ 13. This statement, however, is insufficiently specific and makes no attempt to quantify the amount of resources that San Jose intends to divert, or when, or what programs San Jose will use the funds for. Likewise, the declaration addressing BAJI's expenditures allegedly relating to the citizenship question is similarly non-specific.  The declarant states that "BAJI has taken steps to divert some of its essential and limited resources—including time and money . . . to respond to the addition of the citizenship question to the 2020 Decennial Census and to counteract the harmful effects of the question." Tometi Decl. ¶ 12.  The declaration is silent as to how much time or money will be diverted, or when. These non-specific allegations are conclusory, and contain far from the requisite level of detail about the volume of diverted funds and the specific activities which BAJI plans to undertake.  *See Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1100 (N.D. Cal. 2018) (finding that plaintiff's allegations of harm from diversion of resources, including allegations that the organization had to "field complaints" and work on "advocacy initiatives and community programs," were inadequate and conclusory because plaintiff "d[id] not provide any specificity in describing (1) from what and (2) to what its resources have been reallocated").

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

**D. The Census Bureau's Continuing Practice of Soliciting National and Regional Partners to Perform Outreach About the Census Does Not Establish a Substantial Risk of an Undercount, or Any Injury Traceable to the Reinstatement of a Citizenship Question.**

Plaintiffs appear to suggest that their outreach efforts are more salient here, or more traceable to the citizenship question, because of the Census Bureau's longstanding practice of encouraging such outreach.  Not so.

In the lead-up for each census, the Census Bureau reaches out to community organizations and others to encourage them to be partners in the upcoming census.  These programs are a well-established part of the Integrated Communications Program (ICP), and occurred even when no citizenship question appeared on the census.  *See, e.g.*, Census Integrated Communications Program Summary Assessment Report at 1 (ICP Memo), Census Planning Memoranda Series No. 223 (Aug. 2, 2012), https://www.census.gov/2010census/pdf/2010_Census_ICP_Summary_Assessment.pdf[2] (noting that, for the ICP prior to the 2010 census, "[a]pproximately 257,000 partnerships were forged between the U.S. Census Bureau and businesses, faith-based groups, community organizations, groups of elected officials, ethnic organizations, etc.").  The 2010 ICP included national partnerships with "external organizations such as federal governmental agencies, nongovernmental organizations, businesses, and corporations" in order "to ensure accurate and complete population enumeration and to meet the data needs for the next decade" by having those national partners "assist in getting an increased mail response from those who most likely would not respond to the census."  ICP Memo at 6.

The 2010 ICP also included regional partnerships that "engag[ed] regional and national partners as trusted voices in [hard-to-count (HTC)] areas" in order to "communicate the importance

---

[2] The Court make take judicial notice pursuant to Federal Rule of Evidence 201(b) of the Census Bureau's public descriptions of its 2010 ICP activities.  *See, e.g.*, *Rohnert Park Citizens to Enforce CEQA v. Dep't of Transp.*, No. C 07-4607, 2009 WL 595384, at *3 (N.D. Cal. Mar. 5, 2009) ("Under Federal Rule of Evidence 201(b), '[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' 'A court shall take judicial notice if requested by a party and supplied with the necessary information.'"), *aff'd*, 385 F. App'x 759 (9th Cir. 2010).

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS

**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

of the census in the communities and to encourage households to respond to the census."  ICP

Memo at 7.  These partnerships were significant—"[r]egional partners in HTC areas provided 97.4

million dollars in value added to 2010 Census operations."  ICP Memo at 8.

Indeed, the city of San Jose participated in these efforts in the lead-up to the 2010 census.

City / County Compendium Report at 4, http://www3.sanjoseca.gov/clerk/Agenda/20101015/

20101015_4compendium.pdf ("The City of San Jose and the County of Santa Clara, along with the

Valley Transportation Authority, formed the Census 2010 Partnership Network in late 2008,

dedicating resources of staff and budget to ensure an accurate Census count.").[3]  As part of those

efforts, San Jose was involved in distributing toolkits to elected officials; holding community

workshops; providing action plans and materials to other cities for outreach; supplementing the

Census Bureau's existing advertising; sending a tri-lingual bill insert to San Jose residents; performing

outreach through Head Start, Adult Education, and Migrant Education; and hosting an event to

enumerate homeless people.  *Id.* at 4-7.

Plaintiffs' suggestion that the Census Bureau's solicitation of partners somehow makes their

expenditure of funds into an injury cognizable under Article III is thus incorrect.  The Census

Bureau's partnership programs are not traceable to the reinstatement of a citizenship question, as the

Census Bureau has been seeking outreach partners since at least the 2010 census, and Secretary Ross's

comments are not to the contrary.  For example, Plaintiffs seek to rely on a speech Secretary Ross

gave at the National Partnership Press Event at the Renaissance Hotel in Washington, D.C. on

October 2, 2018, https://www.commerce.gov/news/speeches/2018/10/remarks-secretary-wilbur-

l-ross-us-census-national-partnership-press, yet this speech makes no reference whatsoever to the

addition of a citizenship question.  Instead, it simply describes the Census Bureau's continuing

strategy of entering into partnerships with national organizations.

---

[3] The City / County Compendium Report was presented and accepted at the October 15, 2010 Joint City Council / Redevelopment Agency / County Board of Supervisors.  Meeting Agenda at 1, http://www3.sanjoseca.gov/clerk/Agenda/20101015/20101015a.pdfas; Meeting Minutes at 3, http://www3.sanjoseca.gov/clerk/Agenda/20101015/20101015min.pdf.    The City / County Compendium Report is appropriate for judicial notice pursuant to Federal Rule of Evidence 201(b).

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    Similarly, Plaintiffs cite a letter from Secretary Ross, in which he responded to concerns about

2    the reinstatement of the citizenship question.  Secretary Ross re-stated some of his reasoning for his

3    decision, and also addressed "troubling reactions" to the decision, including "those that encourage

4    non-participation in the 2020 Census," noting that "[t]he law is clear—the answers a person provides

5    on the Census form may not be used for law enforcement or any other purpose that would reveal

6    . . . how an individual responded to a question" and that persons with access to such confidential

7    census data "swear[] an oath to keep those data confidential for life."  Letter from Secretary Ross to

8    Catherine Lhamon, United States Commission on Civil Rights, July 5, 2018, https://www.usccr.gov/

9    press/2018/07-17-18-letter.pdf.  Next, Secretary Ross stated that he was "asking Federal, state, and

10   local leaders to reassure the public of these facts.  Such public encouragement and reassurance would

11   help achieve the goal that we are all working very hard to achieve: a complete and accurate Census.

12   By encouraging non-citizens, their friends, and their families to respond to the Census, you can help

13   the Census Bureau conduct a complete and accurate count."  *Id.*  In that context it is clear that

14   Secretary Ross was responding to concerns by reiterating the standard position that outreach from

15   federal, state, and local organizations may be helpful to the census—in any year, regardless of the

16   specific questions included in the census.[4]  Plaintiffs' claim that "[a]ware that adding the citizenship

17   question to the Census will depress self-response rates, the Bureau and Commerce have publicly

18   stated that local communities need to do more than they have in past decades to protect their interest

19   in a full count," Pls.' MSJ at 10, is thus completely unsupported.  In addition, of course, even if

20   Plaintiffs chose to take up the Census Bureau's invitation to perform outreach, there is no reason

21   that they needed to expend funds to do so—their leaders and others could simply have relayed

22   relevant facts about participation in the census during existing public appearances or statements.

23        In addition, the key question is not whether the Census Bureau requested help from outside

24   organizations (as it typically does), or even whether the reason given for needing help was the

25

26        [4] Plaintiffs also cite to a presentation which listed the citizenship question as one of several
     obstacles to the 2020 census, Pl.'s MSJ at 11, that was "prepared by the County of Santa Clara," not
27   the Census Bureau.  Ruster Decl. ¶ 7.

     *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
28   **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

- 12 -

citizenship question—the key question, rather, is whether Plaintiffs have provided evidence of a substantial risk of an undercount stemming from the citizenship question.  The Census Bureau's longstanding partnerships with national and regional organizations do not constitute relevant evidence on that question, because they pre-date the reinstatement of the citizenship question, and because the Census Bureau may seek help to increase initial self-response rates even if it is aware that any households that do not self-respond will still ultimately be enumerated.  For example, increasing the initial self-response has the additional benefits—separate and apart from aiding in enumeration— of increasing the accuracy of the demographic questions on the census and reducing the costs of NRFU.  Plaintiffs have produced no evidence tending to show, for example, that the Census Bureau informed San Jose that, if it did not participate sufficiently in a partnership program, it would be disadvantaged due to a relative undercount of its inhabitants and therefore that it would suffer negative consequences through either apportionment or loss of federal funds.

II.     **The Court Lacks Jurisdiction to Review Plaintiffs' Claim that Secretary Ross Violated the Reporting Requirement of § 141(f)(3), Which in Any Event is Without Merit.**

Plaintiffs argue that Secretary Ross's decision to reinstate a citizenship question was in violation of law because he allegedly did not submit a report to Congress describing the changed circumstances which necessitated the question, as required by 13 U.S.C. § 141(f)(3).  Pls.' MSJ at 18-21.  This argument must fail for several reasons.  First, whether Secretary Ross satisfied § 141(f) is beyond the scope of this Court's jurisdiction and, in any event, any injury stemming from such an omission could be remedied directly by Congress, but not by this Court.  Second, Secretary Ross did meet the requirements of § 141(f) through his § 141(f)(2) report.

A.     **Secretary Ross's Submission of § 141(f) Reports Is Not Judicially Reviewable.**

As an initial matter, the Ninth Circuit has clearly held that congressional reporting requirements—like § 141(f)—are beyond the courts' jurisdiction.  That is for two reasons.  First, the courts cannot redress any injury resulting from an inadequate report, because it is Congress's sole decision how to respond to a report, adequate or inadequate.  Second, submitting an informational report to Congress is not the type of "final agency action" covered by APA review because it does

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

not determine rights or obligations or trigger legal consequences. In *Guerrero v. Clinton*, the plaintiff sought to challenge the failure of an executive branch official to provide annual reports to Congress, as mandated by 48 U.S.C. § 1904(e)(2). 157 F.3d 1190, 1191 (9th Cir. 1998). Although the reports were supposed to be provided annually, no reports at all had been submitted for six consecutive years (and plaintiff also sought to challenge insufficiencies in the report that was eventually submitted). *Id.* at 1192. Notwithstanding these clear violations of the statutory text, the Ninth Circuit concluded both that plaintiffs lacked a redressable injury, and that the adequacy of the reports was not judicially reviewable under the APA. *Id.* at 1196.

As to the lack of a redressable injury, the Ninth Circuit held that "only Congress" could address the problems plaintiff identified based on the report "and nothing that we could order with respect to the reports or their adequacy can make Congress do anything." *Id.* at 1194. Likewise, here, to the extent that Plaintiffs would be harmed by Secretary Ross's purported omission, Congress holds the reins and can already address or ignore the situation as it chooses. Therefore, as in *Guerrero*, if the Court ordered the Secretary to submit a different report, that relief "cannot make any legal difference that will redress" Plaintiffs' alleged injuries, because Congress will continue to be free to act or not act. *Id.* at 1195.

As to the lack of final agency action, the Ninth Circuit held that the submission of an informational report to Congress did not quality as a final agency action because "no legal consequences flow from the report. No matter what it says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone act upon." *Id.* at 1194. Here, likewise, the § 141(f) reports do not determine Plaintiffs' rights or obligations; they simply convey information to Congress.

For both of those reasons the Ninth Circuit concluded in *Guerrero* that judicial review of the failure to submit reports or the inadequacy of submitted reports would be inappropriate—"[h]aving requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Id.*; *see also id.* at 1196 ("[T]his issue seems to us quintessentially within the province

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1  of the political branches to resolve as part of their ongoing relationships." (quoting *Nat. Resources Def.*

2  *Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988)).  In this case, as in *Guerrero*, the Court

3  should conclude that evaluation of the sufficiency of § 141(f) reports is "a judgment peculiarly for

4  Congress to make in carrying on its own functions in our constitutional system, not for non-

5  congressional parties to carry on as an ersatz proxy for Congress itself," especially given that "the

6  most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to

7  Legislative directives." *Id.* at 1195-96 (quoting *Hodel*, 865 F.2d at 318-19).  This Court might also be

8  equally driven to "despair at formulating judicially manageable standards by which to gauge the

9  fidelity of the Secretary's response' to the statutory strictures."  *Id.* at 1196 (quoting *Hodel*, 865 F.2d

10  at 319)).  Judicial review of Secretary Ross's § 141(f) reports is thus improper.  *See also, e.g., Renee v.*

11  *Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012) (explaining that the courts could not redress an injury

12  based on an alleged violation of a requirement "to file an annual report to Congress"); *Wilderness Soc'y*

13  *v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006).  For all of these reasons, the submission of § 141(f)

14  reports is not judicially reviewable.[5]

15  **B.  Secretary Ross's Submission of § 141(f) Reports Was Entirely Proper**

16  Furthermore, § 141(f) has been fully satisfied.  Pursuant to 13 U.S.C. § 141(f)(2), the intended

17  questions for the 2020 decennial census have been submitted to Congress.  Questions Planned for

18  the 2020 Census and American Community Survey (Mar. 29, 2018), https://www2.census.gov/

19  library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.[6]        Notably,

20

21  [5] Furthermore, even if § 141(f) represented a substantive requirement rather than a reporting requirement, it would not be reviewable under the APA.  Under 5 U.S.C. § 701(a), APA review is precluded where "Congress expressed an intent to prohibit judicial review." *Webster v. Doe*, 486 U.S. 592, 599 (1988).  Congress has expressed its intent to prohibit judicial review of the Secretary's compliance with § 141(f) in two ways.  First, § 141(f)(3) explicitly leaves the  decision of when to modify questions or topics to the Secretary.  *See* § 141(f)(3) (calling for a report "*if the Secretary finds* new circumstances exist").  Second, § 141(f)(3) does *not* require the Secretary to actually inform Congress of the new circumstances, just of the resulting modifications, and therefore the courts would necessarily have little to review.  *See* § 141(f)(3) (requiring the Secretary to submit "a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified").

26  [6] The proposed subjects of the 2020 decennial census were previously submitted to Congress. AR 194-270.

27  *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
28  **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    § 141(f)(3)—which is triggered by new circumstances—does not require the Secretary to actually

2    inform Congress of the new circumstances, just of the resulting modifications.  *See* § 141(f)(3)

3    (requiring the Secretary to submit "a report containing the Secretary's determination of the subjects,

4    types of information, or questions as proposed to be modified").  That submission clearly expanded

5    the subjects listed in the § 141(f)(1) report by reinstating the citizenship question, and thus satisfies

6    the requirements of § 141(f)(3).  *Id.* at 7.  As a result, Congress is fully informed, and indeed the

7    House Committee on Oversight and Government Reform has already held hearings at which the

8    reinstatement of the citizenship question was addressed.  *See, e.g.*, House Committee on Oversight

9    and Government Reform, Progress Report on the 2020 Census, https://oversight.house.gov/

10   hearing/progress-report-on-the-2020-census/ (video of May 8, 2018 hearing); House Committee on

11   Oversight and Government Reform, Progress on the 2020 Census – Continued, https://

12   oversight.house.gov/hearing/progress-on-the-2020-census-continued/ (video of May 18, 2018

13   hearing).

14           Furthermore, even if the requirements of § 141(f)(3) had *not* been met, because the provision

15   is only a reporting requirement, as addressed above, its violation would not additionally render the

16   addition of a question unlawful—it would merely give Congress grounds to respond to the missing

17   report in the manner of Congress's choosing.  In any event, Secretary Ross could remedy any error

18   by simply submitting a § 141(f)(3) report at any time between now and the 2020 census.  *See* 13 U.S.C.

19   § 141(f)(3) (permitting submission of such a report at any time after the submission of a § 141(f)(1)

20   or (2) report and "before the appropriate census date").  New circumstances to justify the inclusion

21   of an additional topic exist in the form of DOJ's request to the Census Bureau, and Secretary Ross's

22   recent understanding of the value of block-level CVAP data to enforce the Voting Rights Act.[7]

23

24           [7] The Gary Letter could represent a "new" circumstance, because Secretary Ross had not
     previously been aware of DOJ's desire for citizenship data from the decennial census.  As Plaintiffs'
     case states, new circumstances can include "new information or circumstances . . . that may not have
25   been appreciated or considered" at the time of the decision."  Pls.' MSJ at 21 (quoting *N. Idaho Cmty.
     Action Network v. Dep't of Transp.*, 545 F.3d 1147, 1155 (9th Cir. 2008)).  Here, of course, Secretary
26   Ross fully appreciated DOJ's views only after the Gary Letter was sent—when the initial § 141(f)(1)

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

### III.   Plaintiffs Fail to Establish that the Secretary's Reasonable Decision to Reinstate a Citizenship Question Must Be Set Aside as Arbitrary or Capricious.

Plaintiffs also contend that the Secretary's reasonable decision to reinstate a citizenship question must be set aside under the APA as arbitrary and capricious.  5 U.S.C. § 706(2)(a).  In addressing this claim, the ultimate issue for the Court to resolve is whether the Secretary's decision "was the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This inquiry, while searching, should not be confused with an assessment of the Secretary's ultimate judgment as to the appropriate policy choice.  The APA does not convert an Article III court into a forum through which private litigants can seek to achieve their preferred policy outcomes outside of the normal political process.  For that reason, the cases make abundantly clear that a court "cannot substitute its judgment for that of the agency."  *Ctr. for Bio. Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017).  Indeed, as the Supreme Court emphasized just two years ago, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives."  *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Those questions are properly reserved to politically accountable officials in the Executive Branch and play no role in the resolution of an arbitrary-and-capricious claim under the APA.

Rather than a wholesale revisiting of policy judgments, the APA authorizes district courts to engage in a limited review of agency action to determine whether the agency decisionmaker followed a process so far outside the bounds of reasoned decisionmaking as to be deemed arbitrary and capricious.  In conducting this review, the Court's default posture must be one of significant deference, "presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016).  Indeed, the Ninth Circuit has made clear "[t]he only question before [the Court] is whether the [agency], in reaching its

---

report had already been submitted to Congress.  Because the Department of Commerce and the Census Bureau rely on other agencies to inform them about those agency's needs for census data, "newness" is appropriately measured by the Secretary's knowledge, rather than how long facts have existed that the agencies might rely on, although, in this case, as the Gary Letter explained, DOJ was also still in the process of understanding the challenges of working with data from the 2010 decennial census, which was the first recent census not to include a "long form" questionnaire with a citizenship question, AR 664.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1   ultimate finding, 'considered the relevant factors and articulated a rational connection between the

2   facts found and the choices made.'" *Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145

3   (9th Cir. 2007) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).  Given

4   how closely the substance of the ultimate policy choice may be intertwined with the agency's

5   decisionmaking process, a court must be cautious not to stray beyond the limited scope of the proper

6   APA inquiry and accept a plaintiff's invitation to "substitute its judgment for that of the agency." *Ctr.*

7   *for Bio. Diversity*, 868 F.3d at 1057.

8        Here, Plaintiffs present to the Court a litany of complaints about the Secretary's decision to

9   reinstate a citizenship question that are rooted in their disagreement with the Secretary's policy choice

10  rather than an inability to trace the Secretary's decision to the record before him—the only proper

11  inquiry in an APA case.  The Supreme Court has recently reaffirmed that an agency's obligation to

12  draw an adequate connection between the agency record and its ultimate decision "is satisfied when

13  the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars,*

14  *LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Bowman Transp., Inc. v. Ark-Best Freight Sys, Inc.*,

15  419 U.S. 281, 286 (1974)).  And this Court's assessment of the legal adequacy of the Secretary's

16  explanation for his decision must be further informed by the broad discretion—indeed, "virtually

17  unlimited discretion"—afforded to the Secretary in conducting the decennial census. *Wisconsin v. City*

18  *of New York*, 518 U.S. 1, 19 (1996).   Congress has authorized the Secretary to "take a decennial census

19  of population . . . in such form and content as he may determine," 13 U.S.C. § 141(a), and the

20  Secretary's decision must be considered against that backdrop.

21  **A. The Secretary Reasonably Explained His Decision to Reinstate a Citizenship Question after Reviewing DOJ's Request.**

22

23       Plaintiffs' first line of attack focuses on the Secretary's explanation for his decision, arguing

24  that the Secretary's stated reason for reinstating a citizenship question on the decennial census was

25  both implausible and pretextual.  Pls.' MSJ at 22-23.  This argument is both factually and legally

26  incorrect.  Plaintiffs suggest that the primary reason for reinstating a citizenship question described in

27  the Secretary's memorandum—to provide DOJ with citizen voting age population (CVAP) data at the

28  *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
    **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

block level—was not the "actual" reason that the Secretary decided to reinstate the question. Pls.' MSJ at 22-23. Rather, Plaintiffs suggest, the Secretary secretly decided to reinstate a citizenship question "at a minimum" to accomplish the ulterior goal of removing noncitizens from the census in order to affect congressional apportionment. Pls.' MSJ at 22-23. And in pursuit of this furtive goal, the argument goes, the Secretary covertly reached out to other agencies in search of false pretenses, eventually enticing DOJ to play a role in his purportedly illicit plot. *See id.* Not only is this fanciful narrative unsupported, but the central premise for Plaintiffs' arguments—that this Court should inquire into the Secretary's subjective thought process rather than evaluate whether his stated reasons are supported by the record—is incorrect as a matter of law under the APA.

As an initial matter, Plaintiffs mischaracterize both the Secretary's decisionmaking process and the explanation of his reasoning in the decision memorandum, as supplemented. Plaintiffs suggest that the Secretary's consideration of a citizenship question emerged from a vacuum when, in fact, the inclusion of a citizenship question has been common both historically and in comparative international perspective. AR 1313-20. As the Secretary observed in his decision memorandum, "the decision to collect citizenship information from Americans through the decennial census was first made centuries ago." *Id.* 1319. Thus, as the Secretary has explained, his consideration of various issues related to the 2020 census unremarkably included some contemplation of whether to reinstate a citizenship question—an issue that had, in fact, been discussed among other government officials. *Id.* 1321.[8] Unsurprisingly, then, the Secretary sought to gain a better understanding of whether this information would be useful to other federal government agencies and requested his staff to investigate the issue through discussions with other officials. *Id.* It was against this backdrop that the Secretary solicited DOJ's views and in December 2017 received DOJ's formal request "that the

---

[8] Plaintiffs' suggestion that Secretary Ross illicitly concealed his consultation with other components of the federal government and thus "fail[ed] to disclose the substance of other relevant information that [was] presented to [him]" is confusing. Pls.' MSJ at 23 (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54-55 (D.C. Cir. 1977)). Plaintiffs cite to the administrative record produced by the government to identify the purportedly undisclosed information, and this information was included as part of the Secretary's explanation for his action. AR 1321.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship." *Id.* 663.

2    The Secretary then engaged in a thorough review process and ultimately concluded that a citizenship

3    question would be appropriate, in conjunction with administrative records, to provide DOJ with the

4    requested data.

5         That the Secretary engaged in wide-ranging consultation about a contemplated policy choice

6    is far from nefarious.  What Plaintiffs have described is actually the sort of mundane interagency

7    process that is entirely routine in policymaking.  It is utterly unremarkable for an agency head to enter

8    office with predispositions toward certain policy choices, and the fact that the Secretary considered

9    this issue early in his tenure before engaging in a full-blown policy process can hardly be considered

10   an unlawful sequence of events.  To adopt the contrary view would have the perverse effect of

11   disallowing high-level officials from pursuing policies unless they unexpectedly land on the official's

12   desk from some independent source, effectively prohibiting political leadership of federal agencies

13   from instituting any sort of policy agenda.[9]  Thus, the fact that the Secretary thought reinstatement of

14   a citizenship question "could be warranted," AR 1321, and asked his staff to explore such an action,

15   is no basis to conclude that the Secretary engaged a covert plot of deception and intrigue.  As Justice

16   Gorsuch has explained, "there's nothing unusual about a new cabinet secretary coming to office

17   inclined to favor a different policy direction, soliciting support from other agencies to bolster his

18   views, disagreeing with staff, or cutting through red tape." *In re Dep't of Commerce*, __ S. Ct. __, 2018

19   WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring in part and dissenting in part).

20        Moreover, Plaintiffs' suggestion that the Court should investigate the Secretary's inner

21   thoughts on a policy issue rather than evaluating his stated reasons against the record is contrary to

22   basic standards of review under the APA and raises significant separation-of-powers concerns.  After

23   all, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C.

24

25        [9]  In this context, Plaintiffs' apparent rule would prevent any new Secretary of Commerce
     from investigating the inclusion of a new question on the census unless that question were first
26   suggested by the Census Bureau or another agency.  That outcome would subvert an express
     congressional decision to lodge "virtually unlimited discretion" over the census with the Secretary.
27   *Wisconsin*, 517 U.S. at 19 (citing U.S. Const. art I, § 2, cl. 3).

     *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
28   **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

                                    - 20 -

§ 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). So long as an agency decisionmaker sincerely believes the stated grounds on which he ultimately bases his decision, and does not irreversibly prejudge the decision or act on a legally forbidden basis, neither initial inclinations nor additional subjective motives constitute bad faith or improper bias. *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). Here, so long as the Secretary sincerely believed that reinstating a citizenship question on the census would aid DOJ in enforcing the VRA by providing block-level citizenship data, the Secretary's subjective deliberative process in reaching that conclusion is irrelevant to APA review. To hold otherwise would be to stray into evaluating the Secretary's judgment—inevitably leading the Court to substitute its own policy judgment about what is wise or proper. And here, regardless whatever other motives Plaintiffs may impute to the Secretary, there is no evidence that the Secretary's rationale "[was] concocted for no reason except to 'provide a pretext for the ulterior motive' of the decision-maker." Pls.' MSJ at 23 (quoting *Woods Petroleum Corp. v. Dep't of the Interior*, 18 F.3d 854, 859 (10th Cir. 1994)).

Lastly, Plaintiffs seem to suggest that the Secretary did not actually believe that providing DOJ with block-level citizenship data from the census would aid VRA enforcement, and that this justification for the Secretary's decision was fabricated from whole cloth. Pls.' MSJ at 22. In so doing, Plaintiffs level a charge of brazen and egregious government misconduct rooted almost entirely in innuendo. In their motion, Plaintiffs argue that the Secretary "collu[ded]" with Stephen Bannon and Kris Kobach and that his advisor, Earl Comstock, ran a "covert . . . scheme" to identify a pretext. Pls.' MSJ at 24. But far from "distort[ion] by extraneous pressures," *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1237 (D.C. Cir. 1971), the record shows only that the Secretary consulted with Mr. Bannon and Mr. Kobach; it is not unlawful for a cabinet secretary to consult with a presidential advisor or a state official, regardless what their views may be. That others might have supported the

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

- 21 -

1   reinstatement of a citizenship question for different reasons is no proof that the reasons given by the

2   actual decisionmaker—the Secretary—were pretextual or improper.  Indeed, the Secretary flatly

3   rejected Mr. Kobach's proposed question, which focused on legal status, AR 763-64, and instead

4   adopted the same formulation of the question used in the American Community Survey (ACS).  Again,

5   Plaintiffs' view of the APA would have bizarre consequences, effectively prohibiting officials from

6   speaking to anyone with inconsistent views lest those third parties' motives be imputed to any actual

7   decision and infect the actual decisionmaker's reasoning.  Plaintiffs' baseless assertions of a covert

8   "scheme" to "collude" with other officials to commit a fraud on the public finds no support in the

9   record and should be rejected.

10      **B. The Secretary Adequately Considered Issues Related to Testing.**

11          Plaintiffs next suggest that the Secretary deviated from mandatory procedures concerning

12   testing when he decided to reinstate a citizenship question.  Pls.' MSJ at 24.  The thrust of this

13   argument is that the Census Bureau has certain standards for pre-testing before including a new

14   question on a decennial census and that the Secretary both failed to follow these procedures and

15   conspired to obscure that fact by improperly altering the administrative record.  *Id.*  Again, Plaintiffs

16   are wrong on both the facts and the law.  The Secretary properly addressed the question of testing,

17   and Plaintiffs have identified no mandatory protocol that the Secretary failed to follow.  Lacking a

18   proper claim, Plaintiffs seek to obtain a judgment that the Secretary violated the law based on little

19   more than a motivated reading-between-the-lines of documents that the government produced in the

20   administrative record.  That cannot suffice as a basis to intrude on the Secretary's virtually unlimited

21   discretion with respect to the conduct of the decennial census.  *Wisconsin*, 517 U.S. at 19.

22          As an initial matter, the Secretary acknowledged and addressed the issue of testing in his

23   decision memorandum.  When the Census Bureau receives a request from other agencies for a new

24   question on the ACS, the Bureau typically "work[s] with the other agencies to test the question

25   (cognitive testing and field testing)."  AR 1296.  In reviewing DOJ's request to reinstate a citizenship

26   question, *the Bureau* concluded that, "[s]ince the question is already asked on the American Community

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
    **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    Survey, [it] would accept the cognitive research and questionnaire testing from the ACS instead of

2    independently retesting the citizenship question." *Id.* 1279.  In short, the question already had been

3    thoroughly vetted through its regular inclusion, in the exact same wording, on the ACS.  In his

4    memorandum, the Secretary thus reasonably concluded that "the citizenship question has already

5    undergone the cognitive research and questionnaire testing required for new questions." *Id.* 1319.

6    Plaintiffs are incorrect to suggest that the Secretary deviated from standard Census Bureau practice,

7    as confirmed by the Census Bureau itself.  Plaintiffs also baselessly suggest that the Secretary

8    "distorted" the record by improperly altering a description of the Bureau's process included in the

9    Bureau's response to questions from the Department of Commerce.  Pls.' MSJ at 25 (citing AR 1296).

10   The relevant response—to Question 31—explains that "no new questions ha[d] been added to the

11   Decennial Census (for nearly 20 years)" and the Bureau accordingly "did not fee[l] bound by past

12   precedent."  AR 1296.  This description is accurate—Plaintiffs have not suggested otherwise—and

13   Plaintiffs yet again cite nothing to support their sensational insinuations of government malfeasance.

14   Further, documentation in the record shows that the change in language for the answer to Question

15   31 was approved for inclusion by Census Bureau leadership.  AR 13023.

16          Regardless, Plaintiffs' efforts to enforce internal agency guidance through an APA action are

17   misguided.  The gravamen of Plaintiffs' claims of procedural irregularity is that the Secretary deviated

18   from the Census Bureau's Statistical Quality Standards when he directed the Bureau to reinstate a

19   citizenship question on the 2020 census without conducting additional testing.  Pls.' MSJ at 24-25

20   (citing U.S. Census Bureau, Statistical Quality Standards (July 2013), https://www. census.gov/

21   content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-

22   standards/Quality_Standards.pdf).  Plaintiffs are incorrect.  As the very requirement Plaintiffs cite

23   makes clear, "[p]retesting is not required for questions that performed adequately in another survey."

24   *Id.* at 8 (Sub-Requirement A2-3.3).  And as the Census Bureau made clear to the Secretary, the

25   proposed citizenship question had been adequately tested through its regular inclusion, with the same

26   wording, in the ACS.  AR 1279, 1319.

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1       In any event, the Statistical Quality Standards, while a vital means of ensuring consistency

2   within the Census Bureau's program areas, do not create judicially enforceable rights in third parties.

3   Because these standards are guidance, not duly promulgated rules issued through notice and comment

4   procedures, they lack the force of law and cannot be enforced against the government.  *See, e.g.*,

5   *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (*per curiam*) (concluding that agency failed to follow its

6   own manual but that manual had "no legal force" and "d[id] not bind the [agency]"); *Go v. Holder*, 744

7   F.3d 604, 613 (9th Cir. 2014) (Wallace, J., concurring specially); *McMaster v. United States*, 731 F.3d 881,

8   888-89 (9th Cir. 2013); *W. Radio Servs. Co. v., Espy*, 79 F.3d 896, 900 (9th Cir. 1996).  Creating judicially

9   enforceable rights in widely used internal manuals—particularly those as detailed as the Statistical

10  Quality Standards—would put the government at peril of injunction from every minor deviation.  *See*

11  *Schweiker*, 450 U.S. at 789-90.  Accordingly, Plaintiffs cannot bring an APA claim for noncompliance

12  with internal standards under 5 U.S.C. § 706(2)(A).  Indeed, the Ninth Circuit has declined to enforce

13  a manual that was "an internal agency guide" and therefore "not entitled to the force and effect of law

14  against the government."  *United States v. Fifty-Three Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982);

15  *see also, e.g.*, *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (concluding that the court "will not review

16  allegations of noncompliance with [a] manual").  Against the weight of clear authority from the Ninth

17  Circuit, Plaintiffs muster only one dubious decision from an out-of-circuit district court.  *See* Pls.' MSJ

18  at 25 (citing *De Loss v. Dep't of Hous. & Urban Dev.*, 714 F. Supp. 1522, 1534 (S.D. Iowa 1988)).

19      Lastly, Plaintiffs argue that reinstating the citizenship question without testing will have

20  "unpredictable adverse consequences."  Pls.' MSJ at 25-26.  This argument is again rooted in the faulty

21  premise that the Secretary did not adequately consider the issue of testing, but in any event, Plaintiffs

22  further complain that the Secretary failed to consider that "the context and form" of the question

23  determines whether additional testing is necessary.  *Id.* at 26.  As an initial matter, Plaintiffs implicitly

24  seem to agree that there already has been ample testing of a citizenship question through its regular

25  inclusion in different forms on the census and the ACS.  Plaintiffs oddly quarrel with any reliance on

26  comparisons to, for example, the 1820 census because the question was not an exact match, but have

27

28  *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
    **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

nothing to say about the far more recent 1950 census.  *Id.*  Nor do they grapple with the fact that the wording of the question on the ACS is exactly the same, instead discounting the Bureau's voluminous testing of the question through the ACS because, on that survey, the citizenship question follows a question about birthplaces that "contextualizes" it.  *See id.*  For Plaintiffs, only a test of the question in the exact same form on the exact same survey will suffice; anything else is illegal.  That obviously cannot be the case.  The Secretary is permitted to defer to the expertise of the Bureau on what testing is adequate, and the Bureau concluded that "independently retesting the citizenship question" was not necessary.  AR 1279.  The Court may appropriately do the same.

**C.  The Secretary's Explanation for His Decision Drew a Rational Connection to the Facts Found through the Decisionmaking Process.**

Nor was Secretary Ross's decision "counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.[10]  Secretary Ross did consider the analysis of the Census Bureau in making his decision. AR 1313.  Secretary Ross explicitly considered concerns that reinstating a citizenship question "would negatively affect the response rate for non-citizens."  AR 1315.  But, as stated in his decision memo, "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially," and he has discussed the matter—including with the former Census Bureau director, but "no empirical data existed on the impact of a citizenship question on responses." AR 1315.  Plaintiffs appear to criticize Secretary Ross for insufficiently considering findings taken *from the ACS* about the possible effect of a citizenship question on response rates and break-off rates, Pls.' MSJ at 27.  This argument is disingenuous, given that Plaintiffs previously argued that the ACS was not comparable to the decennial census for purposes of testing the citizenship question.  In any event, Plaintiffs' argument rests on a false premise because Secretary Ross did in fact address the findings from the ACS, concluding that "comparative analysis [between the decennial census and ACS] was challenging, as response rates generally vary between decennial census and other census sample surveys."  AR 1315.  In light of the findings from the ACS and other sources, Secretary Ross

---

[10]  Plaintiffs also cite the standard applicable when an agency changes its policy, which is inapplicable here because the agency did not reverse course.  Pls.' MSJ at 27.

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    acknowledged that "there is widespread belief among many parties that adding a citizenship question

2    could reduce response rates, [but] the Census Bureau's analysis did not provide definitive, empirical

3    support for that belief."  AR 1316.

4         Plaintiffs also claim that Secretary Ross misused the concept of the "burden" associated with

5    reinstating a citizenship topic, which, according to Plaintiffs, includes the "direct time costs of

6    responding" and the "indirect costs arising from nonresponse."  Pls.' MSJ at 27.  In addressing

7    concerns that some households may be afraid to respond to a citizenship question, Secretary Ross

8    noted that there would be "no additional imposition" on those who are citizens.  AR 1317.  Secretary

9    Ross clearly recognizes, in that sentence and others, that there may be a burden caused by nonresponse

10   (such as that some households may not respond, impacting the self-response rate).  In addition,

11   Secretary Ross also considered the inherent burden in viewing a question, explicitly considering the

12   concern that "recipients are generally less likely to respond to a survey that contained more questions

13   than one that contained fewer."  AR 1318.

14        Plaintiffs also criticize Secretary Ross's choice of Option D (reinstating the citizenship

15   question and also linking administrative records), on the grounds that he failed to appreciate the

16   strength of available data from administrative records and failed to appreciate the risks of inaccurate

17   data.  Plaintiffs are wrong on both counts.  Secretary Ross chose Option D, which uses both the

18   citizenship question on the decennial census, *and* administrative records, for precisely those reasons.

19   Plaintiffs do not dispute that there are drawbacks to using administrative records, as Secretary Ross

20   recognized, including that "the Bureau does not yet have a complete administrative records data set

21   for the entire population" and about 25 million voting age people lacked credible administrative data.

22   AR 1316.  Secretary Ross noted that Option D would allow the Census Bureau to "compare the

23   decennial census responses with administrative records" in order to establish the most accurate data.

24   AR 1317. Option D would also "give[] each respondent the opportunity to provide an answer" to the

25   citizenship question, potentially reducing the amount of imputation that the Census Bureau would be

26   required to do relative to an option using only administrative data.  AR 1317.  Secretary Ross did

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    recognize that some of those answers might be inaccurate, which is why he stated that the Census

2    Bureau would compare the response with administrative records, where available.   To the extent that

3    combining both into Option D might increase the cost of implementing the census above using either

4    option alone, that is a weighing within Secretary Ross's "virtually unlimited discretion" in conducting

5    the census. *Wisconsin*, 517 at 19.

6          Plaintiffs, in this section, seek to argue not that Secretary Ross did not consider the appropriate

7    and relevant evidence but that, faced with those concerns, he did not decide the issue in the way that

8    they would have preferred.   However, an agency action is not arbitrary and capricious because

9    plaintiffs—or even a judge—disagrees with the decision on the merits.   Instead, as long as the agency's

10   "path may reasonably be discerned," the action should be upheld.   *Encino Motorcars*, 136 S. Ct. at 2125

11   (citation omitted).   Here, Secretary Ross has clearly considered the important issues, including those

12   issued flagged here by plaintiffs, and provided a rational explanation for his decision.   *State Farm*, 463

13   U.S. at 43.   Nothing more is required.

14         Lastly, Plaintiffs argue that the Secretary's decision was arbitrary and capricious because DOJ's

15   request to reinstate a citizenship question in order to obtain block-level CVAP data for purposes of

16   enforcing the VRA was "flawed and incredible."   Pls.' MSJ at 29.   But the reasonableness of the Gary

17   Letter is not before the Court.   The case law in this Circuit is clear: in a challenge to one agency's

18   action, a court does not review the lawfulness of another agency's decision.   *See, e.g.*, *Aluminum Co. of

19   Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir. 1999); *Pyramid Lake Paiute Tribe of

20   Indians v. Dep't of the Navy*, 898 F. 2d 1410, 1415 (9th Cir. 1990).   When reviewing an agency's decision

21   to rely on the views of another agency, "the critical question is whether the action agency's reliance

22   was arbitrary and capricious."   *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006).   And in that

23   regard, "an action agency need not undertake a separate, independent analysis in the absence of new

24   information not considered by the [other] agency."   *Aluminum Co. of Am.*, 175 F.3d at 1161 (citing *Stop

25   H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984)).   As indicated by the authority cited by Plaintiffs,

26   an agency's reliance on another agency's report is arbitrary and capricious only when the underlying

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1    report is "facially-flawed." *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 610 (4th Cir. 2018); *see generally id.*

2    (analyzing whether purported flaws in the underlying report were "apparent on the face" of the

3    report).

4          Plaintiffs first seek to challenge the Gary Letter because, as addressed above, DOJ had

5    previously requested a topic about LGBT populations on the ACS—which, of course, casts no

6    aspersions on DOJ's need for CVAP data from the decennial census.   Nor do Plaintiff seriously

7    contest the merits of the Gary Letter—it is undisputed that DOJ has a need for CVAP data in order

8    to enforce Section 2 of the Voting Rights Act.   Plaintiffs also appear to complain that the Gary Letter

9    requests block-level CVAP data but insufficiently explains why that data should come through a

10   question on the decennial census.   Based on DOJ's experience after the 2010 redistricting cycle—

11   which was the first with CVAP data provided only from the ACS rather than from the long-form

12   census—ACS data was not ideal because (1) it is in a separate data set than the total population data

13   from the census, (2) ACS data does not align in time with the census, because the ACS data is offered

14   in rolling one-, three-, or five-year estimates, (3) ACS estimates are reported with a confidence interval,

15   and have an increasing margin of error at small geographic areas, and (4) ACS data is not provided at

16   the block level. AR 664-65.   And, of course, while Secretary Ross properly deferred to DOJ as to its

17   need for the information, he did not blindly defer to DOJ's preference of mode, as evidenced by

18   Secretary Ross's exploration of four different options for providing such data to DOJ (of which only

19   one, Option B, was to simply add a citizenship question to the decennial census).   After considering

20   these options, and their benefits, Secretary Ross reasonably concluded that the combination of a

21   question on the decennial census and administrative records was the best way to move forward.

22   Although Secretary Ross recognized that there may be a negative impact on self-response rates, he

23   was within his authority to weigh that concern against the other important and incommensurable

24   concerns, including the need for complete and accurate data and the legal duty of individuals to

25   respond to the census, and conclude that "the citizenship data provided to DOJ will be more accurate

26   with the question than without it, which is of greater importance than any adverse effect that may

27

28   *City of San Jose v. Ross*, No. 3:18-cv-2279-RS
     **Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

result from people violating their legal duty to respond." AR 1319. When the agency has "engaged in reasoned decisionmaking" by "weigh[ing] competing views" and explaining the reasons for its choice, it satisfies the requirements of arbitrary and capricious review. *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. at 784.

## IV.    If Any Relief Is Appropriate, Remand to the Agency Is the Appropriate Remedy.

In the event that this Court concludes that Plaintiffs' claims have merit, which they do not, the appropriate remedy would be remand to the Department of Commerce. As Plaintiffs acknowledge, "[t]ypically, when an agency violates the Administrative Procedure Act, the appropriate response is to 'vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Nw. Envtl. Advocates v. EPA*, No. C 03-05760 SI, 2006 WL 2669042, at *7 (N.D. Cal. Sept. 18, 2006), *aff'd* 537 F.3d 1006 (9th Cir. 2008) (quoting *Defs. of Wildlife v. EPA*, 420 F.3d 947, 978 (9th Cir. 2005)). In particular, remand without vacatur would be appropriate here because, when "equity demands, the regulation can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). Here, the Census Bureau is diligently at work preparing for the 2020 census, and remand without vacatur would permit them to continue doing so while the agency remedies any procedural error and reconsiders whether to reinstate a citizenship question.

Plaintiffs attempt to argue that remand would be inappropriate here, misleadingly citing a fifty-year old case. Pls.' MSJ at 29 (quoting *Mulry v. Driver*, 366 F.2d 544, 550 (9th Cir. 1966)). *Mulry*, however, says nothing about the remand of agency action *to the agency under the APA*. In *Mulry*, the Ninth Circuit considered whether or not jurisdiction existed for the courts to hear a challenge to agency action. 366 F.2d at 547. The Ninth Circuit decided not to reach the jurisdictional question, because, based on a peek at the merits, the agency's decision was so well-founded that district court review was unnecessary. *See id.* at 550 ("Now, if we were to remand this case with directions to entertain the application for review of the Administrator's action in adopting this regulation, there is only one thing which *the district court could decide* and that would be that in adopting this regulation there

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

was a rational basis for the conclusions of the Administrator and warrant in the record for his

judgment.  Under no conceivable circumstance could the district court on such a remand be justified,

no matter how much the court disagreed with the Administrator, in setting aside or nullifying the

Administrator's policy decision. Accordingly, we find no occasion for remanding the cause [to the

district court] with directions to review the Administrator's action in prescribing this regulation. For

this reason, though it differs from that assigned by the district court, the action must be dismissed.").

Plaintiffs therefore have no support for their position that remand would be inappropriate (nor do

they present an alternative, other than for this Court to sign the agency's name to a policy of the

Court's devising).

      Although Plaintiffs' concern about the timing of remand is commendable, the agency is best

placed to consider the limited time available prior to the 2020 decennial census in deciding how to

proceed.  (And, as the voluminous record in this case demonstrates, the agency has already produced

significant materials analyzing the reinstatement of a citizenship question, and remand should

therefore proceed efficiently.)   Nor would it be appropriate to disqualify Secretary Ross from

participation on remand, as, for the reasons discussed above, Plaintiffs have not shown that his mind

is inalterably closed, much less all other Commerce officials.

<strong>CONCLUSION</strong>

      For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied.

Date:  November 16, 2018                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Kate Bailey*
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel.: (202) 514-9239
Fax: (202) 616-8470
Email: kate.bailey@usdoj.gov

*Attorneys for Defendants*

*City of San Jose v. Ross*, No. 3:18-cv-2279-RS
**Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment**

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on the 16th day of November, 2018, I electronically transmitted the

3   foregoing document to the Clerk of Court using the ECF System for filing.

4

5                                             _/s/ Kate Bailey_

6                                          KATE BAILEY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28