MANATT, PHELPS & PHILLIPS, LLP
JOHN F. LIBBY (Bar No. CA 128207)
E-mail:  jlibby@manatt.com
JOHN W. MCGUINNESS (Bar No. CA 277322)
E-mail:  jmcguinness@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail:  epetrossian@manatt.com
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

*Attorneys for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE
FOR JUST IMMIGRATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California Non-Profit Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; et al., <br><br> Defendants. | Case No. 3:18-cv-02279 <br><br> **TRIAL AFFIDAVIT OF MARGO ANDERSON** <br><br> Dept:      3 <br> Judge:     The Honorable Richard G. Seeborg <br> Trial Date:  January 7, 2019 <br> Complaint Filed: April 17, 2018 |

Pursuant to 28 U.S.C. § 1746(2), I, Margo Anderson, declare as follows:

Introduction

1.      I am a Distinguished Professor Emerita in History and Urban Studies at the University of Wisconsin, Milwaukee. I received a Ph.D. in History from Rutgers University in 1978. I have written numerous articles and books on the demographic history of the United States and on the Census.

2.      Relevant book publications include the second edition of *The American Census: A Social History* (Yale University Press, 2015); *Encyclopedia of the U.S. Census: From the*

1    *Constitution to the American Community Survey (ACS)*, 2d ed. (Washington, D.C.: CQ Press,

2    2011), coedited with Constance F. Citro and Joseph J. Salvo; Margo Anderson and William

3    Seltzer, "After Pearl Harbor: the Proper Role of Population Data Systems in Time of War,"

4    (2001), Margo Anderson and Stephen E. Fienberg, *Who Counts? The Politics of Census-Taking*

5    *in Contemporary America* (New York: Russell Sage Foundation, 2001); Margo Anderson and

6    William Seltzer, "Census Confidentiality under the Second War Powers Act (1942-1947)"

7    (2007); Margo Anderson and William Seltzer, "Challenges to the Confidentiality of U.S. Federal

8    Statistics, 1910-1965," *Journal of Official Statistics*, 23 (2007):1-34; and Margo Anderson and

9    William Seltzer, "Federal Statistical Confidentiality and Business Data: Twentieth Century

10    Challenges and Continuing Issues," *Journal of Privacy and Confidentiality* 1 (Spring 2009): 7-52;

11    Comment on Article by Anderson and Seltzer, by C. L. Kincannon, 53-54; Rejoinder, by M.

12    Anderson and W. Seltzer, 55-5.

13        **3.**    I have received research fellowships from the National Endowment for the

14    Humanities, the American Council of Learned Societies, and the Woodrow Wilson International

15    Center for Scholars. In 2012-2013, I was an ASA-NSF-Census Bureau Fellow in Residence at the

16    Census Bureau. I served as the President of the Social Science History Association (2006).

17        **4.**    In the past four years, I have not testified as an expert at trial or by deposition. For

18    my work on this matter, I am being compensated at a rate of $100 per hour, plus reimbursement

19    for expenses. My compensation does not depend on the outcome of this litigation, the opinions I

20    express, or the testimony I provide.

21        **5.**    I submitted an expert report by declaration in this matter dated September 19,

22    2018, and a revised version of that declaration was submitted to the Court on November 16, 2018

23    in support of Plaintiffs' motion for partial summary judgment. The revised declaration is attached

24    hereto as **Exhibit 1** and incorporated by reference herein. I submit this declaration to summarize

25    and supplement the attached report and in lieu of direct testimony should I not be called to testify

26    at trial.

27

28

Summary of Opinions

6.      While questions that relate in some way to citizenship have appeared on a number of different Census Bureau instruments, the language, mode of administration, and possible answers to these questions have changed repeatedly over the course of American history.

7.      Driven by innovations in survey methodology – primarily, sampling to obtain demographic information in addition to the enumeration required by the U.S. Constitution  – the 1950 census was the last time a citizenship or naturalization question appeared on the complete count census.

8.      Unlike other questions appearing on the complete count census since 1960, citizenship questions have been the subject of limited technical and cognitive research to reconcile known problems and ambiguities in the data, and thus improve data quality. Indeed, the only scientific evaluation of the quality of complete count data for a question on citizenship in the U.S. census dates to the 1950 census.

9.      From 1790 to 1960, the Census Bureau collected data directly from households by in-person enumerators. The introduction of mail self-enumeration questionnaires in 1970 changed the Census Bureau's data collection techniques and changed the impact that any particular question could have on response rates.

10.      In 1970, the bureau introduced the mail questionnaire for about 60% of the residential addresses in the country. The bureau expanded the mail census in later decades to almost universal coverage as the address lists improved.  They used a "short form" questionnaire, with few questions, to most households, and a "long form" questionnaire with additional questions to the remaining smaller number of households, ranging from 5% to 25% of households in different years.

11.      The "long form" questionnaire was replaced with the continuous measurement American Community Survey ("ACS") in the early 2000's.

12.      While the "long form" questionnaire and the ACS included a citizenship question, the "short form" has never included a citizenship question.

**13.**     A citizenship question has therefore never been posed on a Census "short form" questionnaire mailed to U.S. households.

**14.**     Posing a question on citizenship to respondents of the 2020 Decennial Census, as Secretary Ross directed in his March 26, 2018 memorandum, (AR1313) would break from historical census practice.

**15.**     The Census Bureau has previously disclosed information about individual respondents to other federal agencies, most notably to the Department of Treasury's Secret Service and the Department of Justice's Federal Bureau of Investigations during 1942-44 under Section 1402 of the Second War Powers Act, which temporarily repealed the privacy provisions of the Fifteenth Decennial Census Act (Pub. L. No. 13, 1929). Although these provisions were in effect when the 1940 census was conducted, the information about individual respondents to was subsequently disclosed when those provisions were superseded by the Second War Powers Act.

Disclosures of Population Data during World War II

**16.**     Beginning in the late 1990s, I conducted archival research to determine the role that the U.S. Census Bureau played in the "internment" of over 100,000 Japanese Americans then living in the Pacific Coast States during World War II following President Roosevelt's 1942 Executive Order.

**17.**     With my co-author, William Seltzer of Fordham University, I published multiple papers on my findings, including "Federal Statistical Confidentiality and Business Data: Twentieth Century Challenges and Continuing Issues," (attached hereto as **Exhibit 2**) and "Challenges to the Confidentiality of U.S. Federal Statistics, 1910-1965," (attached hereto as **Exhibit 3**).

**18.**     It is not disputed that the Census Bureau provided, small area data ("mesodata") in support of identifying Japanese Americans living in the United States early in World War II in order to facilitate the President's internment order.

**19.**     The special reports issued by the Census Bureau on December 10, 11, and 19, 1941 providing data on the number of Japanese Americans in specific cities and counties,

signaled to military authorities that the bureau was prepared to provide a measure of operational assistance to those trying to locate the whereabouts of individual Japanese Americans.

**20.**     Our archival research confirmed that the Bureau provided microdata—names and addresses—in response to inter-agency requests under the Second War Powers Act, and uncovered records in which Bureau personnel express support for such disclosure.

**21.**     For example, in January of 1942, when the Bureau was already providing tract level data to the military, Census Bureau director J.C. Capt said at a Census Advisory Committee that "[i]f the defense authorities found 200 Japs [*sic*] missing and they wanted the names of the Japs [*sic*] in that area, I would give them further means of checking individuals."

**22.**     Further, in late 1942, the Provost Marshal General's office asked the Commerce Department Solicitor, South Trimble, for lists of names and addresses of Japanese Americans on the West Coast. The Provost Marshal General's office wanted "detailed information from the 1940 Census records, culminating in a list of individual Japanese Americans by name and address." In subsequent phone conversations between PMG Allan Gullion and Census Director J. C. Capt, Capt offered to provide technical assistance to the Western Defense Command.

**23.**     Shortly thereafter, Dr. Calvert Dedrick, then the chief statistician of the Census Bureau, was sent to San Francisco to assist Western Defense Command first in alien registration and subsequently in the planning of the forced evacuation of the Japanese Americans.[1],[2]

**24.**     Dr. Dedrick, along with others at the Census Bureau, provided technical support and services to the Western Defense Command and the War Department. Dedrick worked under the direct supervision of Colonel Karl. R. Bendetsen from late February 1942 through March 1943, where by his own account he developed procedures for the registration, logistics of evacuation, and detention of Japanese Americans.

---

[1] Bohme, Frederick G. 1975. Letter to Roger Daniels, dated December 3, 1975. Records relating to the War History Project (item 156); US Census Bureau, Record Group 29; National Archives Building, Washington, DC.
[2] Dedrick, Calvert. 1946. Memorandum to [John V.] Dobbin. "Activities of the Bureau of the Census relating to the War Department evacuation of Japanese from the west coast," July 1. Records relating to the War History Project (item 156); US Census Bureau, Record Group 29; National Archives Building, Washington, DC.

TRIAL AFFIDAVIT OF MARGO ANDERSON

25.    Before the Decennial Census was conducted in 1940, President Roosevelt issued a proclamation that stated, in part, "The sole purpose of the census is to secure general statistical information regarding the population, business activities and resources of the country, and replies are required from individuals only to enable to compilation of such general statistics.  No person can be harmed in any way by furnishing the information required.  The census has nothing to do with taxation, with military or jury service, with the compulsion of school attendance, with the regulation of immigration or with the enforcement of any national, State or local law or ordinance.  There need be no fear that any disclosure will be made regarding any individual or his affairs." Federal Register, Vol. 5 No. 30 at 653 (Feb. 13, 1940).

26.    The Second War Powers Act, passed by Congress in March of 1942, authorized the release of Commerce Department data to other federal agencies, including micro data collected under a pledge of confidentiality, for use "in connection with the war." (U.S. Code Congressional Service, 1943, P.L. 507, 77th Congress, 2d Session (S2208).

27.    Archival research of some 15 data releases from 1942 to 1947 documents the administrative procedures put in place between 1942 and 1947 to provide both economic and demographic microdata to other federal agencies.

28.    At least six of these disclosures involved population and housing information; the requesting agencies were the Justice Department (the FBI and possibly other Justice Department agencies), the Labor Department (Bureau of Labor Statistics), and the Treasury Department (Secret Service).

29.    A 1943 letter from the Secretary of the Treasury to the Secretary of Commerce requested "a list of the Japanese residing in the Metropolitan Area of Washington, D.C., as reported in the 1940 Census, including information as to addresses, occupations and whether citizens or aliens." Three days later, the acting Secretary of Commerce responded that the list would be sent "within a week."

30.    The Secretary of Labor requested confidential Census data on August 29 and September 6, 1944, and archival evidence shows that the request was fulfilled.

TRIAL AFFIDAVIT OF MARGO ANDERSON

**31.**    In a letter to President Roosevelt, dated January 19, 1945 discussing the Department of Commerce's contribution to the war effort, outgoing Secretary of Commerce Jesse E. Jones wrote, "The Bureau of the Census provided much of the basic factual data needed for nearly every phase of planning for total war. It has been drawn upon for such statistical material by nearly every other agency of the Government; and the factual material which it was able to supply time and time again disclosed the location of facilities and man-power which would be employed for war production. Procurement agencies, through the assistance of the Bureau of the Census, have been able to obtain both speedy and accurate economic information needed for hundreds of major decisions. From its population records, the Bureau of the Census was able to establish the citizenship of hundreds of thousands of workers who needed this proof in order to be employed in our plants; and, immediately after Pearl Harbor, was in a position to **give the military services the name and residence of all Japanese nationals[3] residing in proscribed West Coast areas**." (emphasis added). A copy of this letter is attached hereto as **Exhibit 4.**

**32.**    After the war, correspondence from the Secretary of Commerce confirmed that during the war, the Bureau of the Census and the Department of Commerce had provided "confidential data from the 1939 Census of Manufactures and other records collected by the Census Bureau." The letter indicates that the Bureau had used an expedited process during the war and suggested reverting to the "original procedure" of individual requests to the Secretary.

**33.**    As late as 1947, until the Second War Powers Act expired, the FBI sought to obtain confidential Census Bureau data.

**34.**    Reports by Bureau employees suggest that efforts in 1948 and later to restore the pre-war norms of confidentiality protections were met with surprise by other agencies, suggesting that the disclosure of information under the Second War Powers Act was routine.

---

[3] To be clear, Jones was discussing the agency's capacity to  release data on the "Issei" (Japanese immigrants). At the time, Asians were "aliens ineligible for citizenship" so all Asian immigrants remained "aliens" or foreign "nationals" no matter how long they were in the U.S. The actual evacuation and incarceration also included the "Nisei" and "Sansei," American citizens of Japanese ancestry.

TRIAL AFFIDAVIT OF MARGO ANDERSON

1        **35.**     Thus, there is historical precedent for the Census Bureau's disclosure of

2    information on individual respondents, even when that information was protected by statutory

3    privacy language at the time it was collected. A release to law enforcement of personal

4    information, including names and addresses, pursuant to a new law or a new interpretation of

5    existing law, would unfortunately be consistent with the Census Bureau's World War II-era

6    practices.

7        I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is

8        true and correct.

9        Signed this 27 of December, 2018 in Milwaukee, Wisconsin.

11                                                      Margo Anderson

TRIAL AFFIDAVIT OF MARGO ANDERSON

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California nonprofit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,<br><br>Defendants. | Case No. 3:18-cv-2279-RS<br><br>**EXPERT REPORT OF MARGO ANDERSON, PH.D.** |

## I.    Qualifications and Professional Experience

My name is Margo Anderson. My background, experience, and list of publications from the last 10 years are summarized in my curriculum vitae, which is attached as **Exhibit A** to this report.

In brief, I am a Distinguished Professor Emerita in History and Urban Studies at the University of Wisconsin, Milwaukee. I received a Ph.D. in History from Rutgers University in 1978. I have written numerous articles and books on the demographic history of the United States and on the Census. Relevant book publications include the second edition of *The American Census: A Social History* (Yale University Press, 2015); *Encyclopedia of the U.S. Census: From the Constitution to the American Community Survey (ACS)*, 2d ed. (Washington, D.C.: CQ Press, 2011), coedited with Constance F. Citro and Joseph J. Salvo; and Margo Anderson and Stephen E. Fienberg, *Who Counts? The Politics of Census-Taking in Contemporary America* (New York: Russell Sage Foundation, 2001). I have received research fellowships from the National Endowment for the Humanities, the American Council of Learned Societies, and the Woodrow Wilson International Center for Scholars. In 2012-2013, I was an ASA-NSF-Census Bureau Fellow in Residence at the Census Bureau. I served as the President of the Social Science History Association (2006).

1

In the past four years, I have not testified as an expert at trial or by deposition. For my work on this matter, I am being compensated at a rate of $100 per hour, plus reimbursement for expenses. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

## II.    Summary of Findings

I was retained by plaintiffs in *City of San Jose, et al. v. Ross, et al.* to evaluate the nature of the Department of Commerce's decision to add a question on citizenship to the 2020 decennial census in the context of the history of the United States Census.

In forming my conclusions, I considered the Administrative Record and other materials produced by the Commerce Department and Census Bureau in this lawsuit;[1] the authorities cited in this report; and the technical and administrative literature on taking the census available in the scholarly canon, Congressional documents, and census publications, both print and digital. Materials that I consulted not footnoted in this report are listed in **Exhibit B** attached hereto. I have discussed the historical record of census procedures with Dr. Joseph Salvo, Director of the Population Division, New York City Department of City Planning (with whom I also co-edited the 2d edition of the *Encyclopedia of the U.S. Census*). I have also relied on my years of experience as an historian of the U.S. federal statistical system generally and the census in particular, as set out in my curriculum vitae.

Based on my analysis, I have formed the following opinions:

1. The language, mode of administration, and possible answers to questions regarding citizenship status posed on the census (a "citizenship question" or a "question on citizenship") have changed repeatedly over the course of American history.

2. Driven by innovations in survey methodology – primarily, sampling – the 1950 census was the last time a citizenship or naturalization question appeared on the complete count census.

3. Unlike many other questions appearing on complete count censuses, citizenship questions have been the subject of limited technical and cognitive research to reconcile known problems and ambiguities in the data, and thus improve data quality. Indeed, the only scientific evaluation of the quality of complete count data for a question on citizenship dates to the 1950 census.

4. Posing a question on citizenship to respondents of the 2020 Decennial Census, as Secretary Ross directed in his March 26, 2018 memorandum, (AR1313) would break from historical census practice.

---

[1] I have focused particular attention on the historical justifications for including the question set forth in Secretary Ross's March 26, 2018 memorandum (AR1313) and the Census Bureau's statement that "[b]ecause no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feel bound by past precedent when considering the Department of Justices' request," (AR1296).

III.     **Citizenship Questions on the American Census**

    A.     <u>Overview</u>

The proposal by Secretary Ross to include a question on citizenship on the 2020 decennial census questionnaire has prompted much discussion on the historical experience of collecting information on the citizenship of American residents. This review traces that history to shed light on the applicability of historical analogies from past practice on the current proposal.

The U.S. government has included questions on citizenship in some form for several different reasons, with different wording, and using different statistical methodologies in 14 of the 23 decennial censuses since 1790.

The question first appeared in 1820, was repeated in 1830, and next appeared in 1870. Thereafter, it was asked continuously from 1890 to 1950 and again from 1970 to 2000 on the census long form sample survey. This "on again, off again" experience is not unusual for census questions, as the salience of social, political, and economic issues changes over time.

The U.S. government has also changed the method of taking the census over time. From 1790 to 1960, enumerators collected census information directly from households. From 1970 onward, the primary mode of data collection changed. The Census Bureau began mailing questionnaires to households. If the Bureau did not receive a response to the mailed form, an enumerator was dispatched to the address to collect the data or to find out if the housing unit was vacant.

The administrative structures for the census have also changed over time. Until 1902, the "Census Office" was a temporary agency in the State Department (1790-1840) or the Interior Department (1850-1900), established and mothballed each decade. Congress wrote and rewrote the census statute, including the actual questionnaire, every ten years. Congress established a permanent agency in 1902, and relocated it in the Department of Commerce and Labor in 1903. Between 1910 and 1930 the Census Office took on more of the burden of questionnaire design. The 1929 Census Act acknowledged the shift, authorizing the Census Director to manage technical issues of administration. Congress shifted that authority to the Secretary of Commerce in 1954.

The Census Bureau has been a pioneer in the development of both the science of statistics and survey methodology. Machine tabulation of survey data (1890), the introduction of probability sampling methods for population measurement (1940), computerization of census administration (1950), digital mapping of the addresses of the nation (1980s) – to name just a few innovations – were arguably invented or elaborated on by the Census Bureau.

To understand the relevance of the history of past queries on citizenship, one must place those queries in the context of the technical, demographic, political, and statistical worlds of the past. The most relevant experiences are 1) the long "run" starting in 1890 and ending

3

in 1950, and 2) the changing practices to propose, test, and finalize census questions before each enumeration.

Secretary Ross' memorandum asserts that "several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years." While this statement suggests substantial historical continuity regarding the citizenship question, in fact the question language, the mode of administration, and the requested answers changed over time.

  B.  <u>Citizenship-Related Questions Appeared Sporadically from 1790 to 1890</u>

    1.  *Early Nineteenth Century Censuses*

The U.S. Constitution mandated that a census be conducted every ten years, counting free persons and "other persons" (*i.e.*, slaves) and charged Congress with implementing it. It provided no other guidance on how to conduct the count. Early census procedures were hashed out on the floor of the House and Senate, and stuck quite closely to the constitutional mandate for the first 30 years. There were some small additions or interpretations of the constitutional mandate (*e.g.*, asking for crude breakdowns of the age and sex of the white population), but by and large, Congress was reluctant to risk further efforts for fear of jeopardizing the apportionment functions, which were the original justification of the count. Since there was no federal government bureaucracy to speak of at the time, Congress authorized U.S. marshals to appoint assistants to act temporarily as census enumerators.

By 1820, a more adventurous Congress added more questions. Congress had requested 13 pieces of information of a household in 1810 but asked for 32 in 1820. Sixteen of the new inquiries were for age and sex breakdowns of the "free colored" and slave population. All told, 27 of the inquiries defined the age and sex cohorts of Americans. The other five questions called for the "names of heads of families," three questions for the "number of persons engaged in" "Agriculture," "Commerce," and/or "Manufactures," in a household, and for "Foreigners not naturalized." The form did not ask for the name of any member of a household beyond the "head," so "Foreigners not naturalized" were not identified by name.

In 1830, for the first time, the federal government printed forms to be used for the census and sent them to the marshals and their assistants. A protean census office of a clerk or two made modifications to the 1820 questions, clarifying that the question for "ALIENS – foreigners not naturalized" applied to "White Persons" only.[2]

Inquiries related to citizenship, alien status, or naturalization then disappeared from the censuses of 1840, 1850 and 1860.

---

[2] https://www.census.gov/history/pdf/1830-2-042018.pdf

2.    *Citizenship Questions on the 1870 Census*

When a citizenship question did reappear on the 1870 census, the country was in the throes of Reconstruction. Congress grappled with issues that ranged from how to reintegrate the rebel states into the Union to how to protect the civil, economic, and political rights of the newly emancipated "freedmen."

The end of slavery also meant the end of the Three-Fifths Compromise, which ironically would have increased congressional representation for former slave states without Congressional intervention. Former slaves would be fully counted for apportionment, giving southern states increased political power even as they denied freedmen a mechanism for participating in politics. Section 2 of the Fourteenth Amendment attempted to address that problem by providing a new apportionment standard:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. ***But when the right to vote*** at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, ***is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged***, except for participation in rebellion, or other crime, ***the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State***.

In summary, southern states could continue to bar freedmen from the franchise, but if they did, they would lose seats in the House. Congress determined the mechanism to collect the information to enforce this new constitutional provision was to be the 1870 census.

The 1870 census forms as printed thus asked the enumerator to check a box under the heading "Constitutional Relations" if the person was a "male citizen of the United States of 21 years or upwards." A second box asked if the person was a "male citizen of the United States of 21 years or upwards whose right to vote is denied or abridged on other grounds than rebellion or other crime."

In February 1870, the Fifteenth Amendment provided that the "right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Census officials interpreted the new provision to mean that any state law denying the right to vote to freedmen was legally

void and thus did not "come within the view of marshals and their assistants in respect to the census."[3] Accordingly, questions about voting were not repeated in later censuses.

C.  Citizenship Questions Appeared from 1890 through 1950 to Investigate the Assimilation of Immigrants

The modern form of the citizenship question dates back to the 1890 census, when Congress added a set of questions about American migration patterns to address how well the foreign-born were assimilating. The census had asked household heads about the place of birth (state or foreign country) of household members since 1850. During a substantial wave of European immigration to the U.S. in the late-19th and early-20th century, officials added questions for the foreign-born population on language spoken, year of immigration, citizenship, and mother tongue. During this time period, the U.S. had relatively few restrictions on immigration and few mechanisms to track immigrants once they arrived.

During this period, the census asked all respondents where they were born and where their parents were born. It asked whether respondents could speak English, and which languages were spoken by everyone aged 10 or older. But from 1890 to 1920 only foreign-born males aged 21 or above were asked about "naturalization" because only adult men had political rights.

During this period the census was conducted solely by traveling enumerators who had been provided written instructions explaining what questions to ask and how to mark the forms. The 1890 instructions, for example, simply told the enumerator to mark "yes" or "no" in a box to indicate if the adult foreign-born male was "naturalized." The word "citizenship" did not appear on the form or in the instructions. In other words, the question was designed to measure a foreign-born adult male's effort to become a naturalized citizen.

In 1930, the census expanded the question to all foreign-born residents, not just adult men. By then, adult women had political rights. The expanded universe of respondents complicated the enumerator's task.[4] Minor foreign-born children gained citizenship if a

---

[3] See the 1870 enumerator instructions, available at U.S. Bureau of the Census, *Twenty Censuses, Population and Housing Questions, 1790-1980* (Washington, D.C.: GP, 1979), 19. For Congressional debate on the implications of emancipation for census taking, See Margo Anderson, *The American Census: A Social History*, 2d ed. (New Haven: Yale University Press, 2015).

[4] "Column 23. Naturalization.-This question applies to all foreign-born persons, male and female, or whatever age. Prior to September 22, 1922, a foreign-born woman became a citizen when her husband was naturalized. Since that date, she must take out papers in her own name, and if she does not do this she remains an alien even though her husband becomes naturalized. The question should be answered, therefore, for every person whose birthplace was in a foreign country, as follows:

180. For a foreign-born male 21 years of age and over write "Na" (for "naturalized") if he has either (1) taken out second or final naturalization papers, or (2) become naturalized while under the age of 21 by the naturalization of either parent.

181. For a foreign-born female 21 years of age and over write "Na" if she has either (1) taken out final papers, or (2) become naturalized through the naturalization of either parent while she was under the age of 21, or (3) if she became naturalized prior to 1922 by the naturalization of her husband. (See par. 179.)

parent naturalized. Before 1922, a married woman was naturalized if her husband naturalized or she married an American citizen. After 1922, she had to file on her own. There were other wrinkles, too, since a minor alien could not file for naturalization until the age of 18. The question was titled "naturalization" and included under a subheading titled "CITIZENSHIP, ETC." which also included questions on when the person immigrated to the U.S. and whether he or she could speak English. The Bureau instructed the enumerator to write in the box "Na" for naturalized; "Pa" for someone who had taken out first papers – that is, had started to apply for naturalization; and "Al" for alien, for anyone else. For residents born in the U.S., the question was left blank.

In 1940 for foreign-born residents, the Bureau instructed the enumerators to enter "Na" "(for naturalized) if the persons has become an American citizen, either by taking out second or final naturalization papers or through the naturalization of either parent;" "Pa" "(for first papers) if the person has declared intention to become an American citizen and has taken out 'first papers;'" "Al" "(for alien) if the person has neither become naturalized nor taken out first papers;" or "Am Cit" "(for American citizen born abroad) if the foreign-born person or person born at sea was an American citizen at birth." For native-born residents, the column was left blank.[5]

The 1950 instructions told the enumerator to write "Yes" in the box for the question "Is he naturalized?" "if the person has become an American citizen, either by taking out final naturalization papers or through the naturalization of either parent;" or "No" "if the person has neither become naturalized through naturalization of a parent nor taken out final papers. Enter 'No' if the person has taken out first papers only." A new category, "AP," was implemented for those persons "born of American parents abroad or at sea."[6]

The 1950 census was the last time a citizenship or naturalization question appeared on the complete count census.

---

182. For a foreign-born person under 21 years of age write "Na" if either parent has been naturalized. This applies to infants and young children as well as to older persons under 21.

183. For all foreign-born persons who have not been naturalized but have taken out first papers write "Pa" (for "papers"). Note that a person must be at least 18 years of age in order to take out first papers. Minor children should not be returned "Pa" merely because their parents have taken out first papers.

184. For all foreign-born persons neither naturalized nor having first papers, write "Al" (for "alien");" Minnesota Population Center, IPUMS USA, U.S. Census Data For Social, Economic, And Health Research, https://usa.ipums.org/usa/voliii/inst1930.shtml.  The instructions for other years are available at: https://usa.ipums.org/usa/voliii/tEnumForm.shtml.

[5] IPUMS USA, https://usa.ipums.org/usa/voliii/inst1940.shtml
[6] IPUMS USA, https://usa.ipums.org/usa/voliii/inst1950.shtml

D.    Changes in Immigration Law and Migration Patterns from 1924-1965 Led to Removal of the Question from the 1960 Census

The U.S. dramatically restricted foreign immigration via the national Origins Act of 1924. Discriminatory quotas based on the "national origin" of the potential immigrant, enforced with new visa requirements, signaled the end to America's historically open immigration policy. Depression and war further dampened international migration. By mid-century, America's foreign-born population had declined from about 14 million people in 1920-1930 to about 10 million from 1950-1970, even as the total population grew from 106 million in 1920 to 203 million in 1970. As noted above, census questions for the foreign-born population monitored immigrant assimilation. The Bureau reported that about half of foreign-born immigrants were naturalized in 1920. By 1950, that proportion rose to 80 percent.[7]

By the 1950s, it looked as if waves of immigrants coming to the U.S. were truly a thing of the past. A panel of population experts acknowledged as much in the mid-1950s while considering calls for new census questions for the 1960 census. "The Committee is aware of pressures to reduce the amount of information on ethnic status, on the assumption that the proportion of foreign stock in the population will continue to decrease." But the panel cautioned against hasty removal of all the questions on this population, and added that:

> [I]t is almost as important to measure the decline in the extent of ethnic differentiation – if, indeed, it is declining – as to have a historical record of the period of heavy immigration. The experience of the United States in the assimilation of a diversity of ethnic groups is virtually without parallel in the modern world, and the record of that experience should not be truncated by a failure to describe the terminal, as well as the early and middle, phases of the cycle of immigration and assimilation.

It thus recommended the retention of the place of birth of parents question, and the reinstatement of the question on mother tongue. The question on mother tongue, the panel noted, "will enable the identification of certain important groups – *e.g.*, Spanish-Americans that have retained a degree of ethnic distinctiveness despite residence of several generations in the United States."[8]

In a related article, Census Bureau official Paul Glick reported that the citizenship/naturalization question would not be included on the 1960 census "because of the lack of evidence of extensive use of the item from the 1950 Census for research purposes."[9] For example, E.P. Hutchinson's study, *Immigrants and Their Children, 1850-*

---

[7] Figures from Campbell Gibson, "Chapter 12 – Foreign-Born Population, American Demographic History Chartbook: 1790 to 2010," www.demographicchartbook.com, accessed August 17, 2018.
[8] Otis Dudley Duncan, "Report of the Committee on the 1960 Census, Population Association of America," *Population Index*, Vol. 23, No. 4 (Oct., 1957), 293-305, at 300-01, Stable URL: http://www.jstor.org/stable/2731681, accessed March 9, 2018 17:30.
[9] Paul Glick, "Plans for the 1960 Census of Population," *Population Index*, Vol. 25, No. 4 (Oct., 1959), 289-301, at 295. Stable URL: https://www.jstor.org/stable/2731190, accessed: 17-08-2018.

*1950* focused on the geographic and occupational patterns and the countries of origin of America's immigrants. There were no analysis of citizenship patterns.[10] In other words, leading up to the 1960 census, a question on immigrant citizenship was not one that drew the interest of researchers, politicians, or the public.

There things stood in the early 1960s, but the political landscape soon changed. In 1965, Congress repealed the National Origins Act and overhauled American immigration policy. The Civil Rights Act of 1964 and the Voting Rights Act of 1965 signaled the end of legal discrimination on the basis of race, ethnicity, religion, national origin, and sex in public accommodations, employment, and political participation. The Supreme Court, in a series of landmark rulings, voided apportionment systems in violation of the new principle of "one man, one vote." Census data would be crucial to the implementation of these new policies.

E.    The Sampling Revolution Addressed New Data Needs in 1960 and Beyond

Census officials approached these new data demands through their experience with statistical and administrative innovations – notably sampling, computerization, and the mail census – already underway. Indeed, officials felt they were well-situated to respond to calls for new data collections and tabulations and pointed to the innovations they had developed to meet the challenges of the Great Depression and world wars. Those events had prompted major technical innovations in the census to measure living standards, track mass unemployment, and provide economic information for the new system of national accounts. In 1939, Congress added a census of housing to the decennial count, for example, roughly doubling the number of questions asked in 1940 compared to 1930, thus putting additional burdens on both the public, and the processing capacities of the Census Bureau.

Probability sampling proved its power in measuring unemployment. Unemployment is a rapidly changing phenomenon ill-suited to full count census methods designed to measure slower, long-term trends. Frequent repeated probability samples of the working age population became the solution. The small samples could be collected, tabulated, and reported frequently to monitor changing phenomena. After using experimental surveys in the late 1930s, the Bureau instituted a "Monthly Report on the Labor Force" in the early 1940s and renamed it the Current Population Survey after World War II.

Federal Statistical experience with probability sampling for unemployment measurement then opened up a whole new world of possibilities for population measurement, as officials recognized that samples could be added to the complete count enumeration to measure data quality and accuracy, enumerator bias, and data processing issues such as coding efficiency. The period from the 1940s through the 1960s saw the flowering of this new field. Officials began experimenting with sampling in the decennial census in 1940, putting some "supplemental questions" to only 5 percent of the population to reduce the burden on respondents and save tabulation time. In 1950 a "post-enumeration survey" for a small sample of households was designed to assess the accuracy and completeness of the count.

---

[10] New York: John Wiley & Sons, Inc, 1956.

By 1960, with 20 years of sampling experience, census officials shifted all but the most basic questions to a 25 percent sample form. Never again would the Census Bureau ask every American household in the country to respond to dozens of questions. The "long form," as it came to be called in 1970 – with its several dozen questions on social and economic characteristics – would burden only a quarter or fewer American households. Officials assured the public that the new probability sampling methods would produce data that was just as accurate, more cheaply and efficiently.

Thus, as census officials approached the data needs stemming from the legislative and court decisions of the 1960s, they assured Congress and the public that they were ready for the new challenges. In mid-1967, for example, Census Director A. Ross Eckler testified before the Subcommittee on Census and Statistics of the House Committee on Post Office and Civil Service on plans for the 1970 population questions. He reported that the only questions planned to be asked of everyone would be name, address, sex, age, race, relationship to household head, and marital status. Questions on the situation of the foreign-born would be asked of a 25 percent sample, and would include queries on birthplace, parental birthplace, and mother tongue.

Eckler acknowledged that the Bureau was still consulting with its advisory committees and collecting public input, and noted that the Bureau was discussing a 5 percent sample with additional questions. "The leading candidates for use in a subsample," he noted, were "additional detail to identify 'other income;' a question on the presence of disability which limits the amount or kind of work a person can do; citizenship; year of immigration; and ethnic origin."[11] A 5 percent sample would produce data for states and large metropolitan areas only.

> F.    Census Added the Question to a 5 Percent Sample in 1970 to Obtain Accurate Data

Census official Ed Goldfield, writing in the summer of 1969 in the American Political Science Association publication, *PS*, reported that the 1970 census would reinstate the citizenship question on a 5 percent sample, as hinted by Eckler's 1967 testimony.[12] Goldfield explained that "[o]ver 5 million immigrants have come to the United States since 1950 so there is need for basic data on citizenship and the characteristics of aliens. Information on citizens is useful in the measurement of the extent to which people entitled to vote actually do so and of the assimilation of various categories of the foreign born by naturalization." He continued by discussing how the changes in immigration patterns were prompting new approaches to such questions on the census:

---

[11] Hearing, "1970 Census Plans," May 23, Jun. 20-22, 1967, before the Subcommittee on Census and Statistics; Committee on Post Office and Civil Service. House, Committee Serial Number: Committee on Post Office and Civil Service Serial No. 90-16, Y4.P84/10:90-16, pp. 50-52.

[12] Edwin D. Goldfield, "Relevant Data for Political Science in the 1970 Census," *PS*, Vol. 2, No. 3 (Summer, 1969), 308-314, Stable URL: https://www.jstor.org/stable/418367, accessed August 17, 2018. Quotes from 309.

For many users of the statistics, this kind of information on ethnic origin has become inadequate, because, as the era of mass immigration moves further into history, the questions touch smaller proportions of the population. In the 1960 census, only 5 percent of the population was reported as foreign-born and only 14 percent as native of foreign or mixed parentage. Some additional ethnic information was provided by identifying persons with Spanish surnames in the Southwestern States. Puerto Ricans were identified by their birthplace and the birthplace of their parents. In 1970, a new item on Mexican or Spanish origin or descent will help further to delineate the characteristics of Mexican, Puerto Rican, Cuban, and other groups of Spanish descent . . . .

Also in 1970, the question on year of immigration, which was last included foreign born as long-term residents or recent arrivals. There is now particular interest in the effect of the labor force provision in the Immigration Act of 1965, and those concerned may use the data to evaluate the effect of previous legislation by comparing the characteristics of immigration before and after the law became effective.

The Bureau also reported on the federal agencies that had requested new or revised questions for the 1970 census. They reported that the Department of Labor and the Immigration and Naturalization Service had requested the citizenship and year of immigration questions.[13]

Thus the citizenship question once again became a standard question on the "long-form" census, as a sample question in 1970 through 2000. In the early 21st century, when the Bureau replaced the decennial "long form" census with the continuous measurement American Community Survey, the citizenship question shifted to that instrument.

Goldfield expected that the 1970 census information on citizenship and what he called "ethnic origin" would provide guidance on the impact of the 1965 changes in immigration law, patterns of voter participation, and the "'assimilation' of various categories of the foreign born by naturalization." What officials did not anticipate was how the changes in the 1965 law, particularly for immigrants from the Western Hemisphere, as well as the technical change to the mail census and self response, would complicate their capability to measure the number and characteristics of immigrants in the U.S.

G.    Since the Introduction of the "Long Form" Census in 1970, the Citizenship Question Has Appeared Only There

The 1970 and later censuses confirmed the use of sampling for all but the most basic census questions. The Bureau marked the change by coining the terms "short form" and "long form" to describe the different questionnaires. The Bureau also introduced the mail

---

[13]  House Committee On Post Office and Civil Service, 91st Cong., 1st Sess., April 1, 24, May 8, June 16, 17, 1969, "1970 Census And Legislation Related Thereto, Part 1," Hearings before the Subcommittee on Census And Statistics of the Committee on Post Office and Civil Service, Serial 91-8 (Washington, D.C.: GPO, 1969), 25.

census in 1970 for about 60 percent of households, making "self-response" the most common response mode to either the "short" or "long form" from then on. The restored citizenship question was placed on the "long form" 5 percent sample in 1970. Only the foreign-born were to answer the question. The form provided check boxes to indicate "Is this person naturalized?" The possible answers were "Yes, naturalized;" "No, alien;" or "Born abroad of American parents."

The simplified response options in the mail census, compared to the more complex listings and instructions of the complete count enumerator era noted above, eliminated the information that had been provided to the enumerators on how to handle complicated cases, and put the burden on the respondent to puzzle out how to respond to the question.

From the 1950s on, the Bureau also routinely conducted evaluation studies to measure bias, coding, or other errors for particular questions. They reported, for example, that of the 10.3 million foreign-born residents in 1950, about 7 percent (slightly more than 730,000 people), had "unknown" citizenship status.[14] Additionally, the technical supporting materials from the 1950 census evaluation reported that about 8 percent of the reported citizenship responses of the foreign-born were likely in error.[15]

The Content Reinterview Study of the 1970 census selected a sample of cases for an intensive in-person reinterview to see if the answers would be the same. For the citizenship question, the Bureau reported that the "naturalized" foreign-born was "overestimated" by about 2.6 percent and that the "alien" foreign-born was "understated" by about 2.2 percent. These findings, however, did not draw much concern from the officials. As they commented, "[i]n general, the direction of the bias in the 'naturalized' and 'alien' categories is what one would expect recognizing that persons undergoing the naturalization process but not having completed it might tend to report themselves as naturalized and that unregistered aliens might also tend to report themselves as naturalized."[16]

The citizenship question on the 1980 "long form" census was similar to the 1970 version. Only foreign-born residents were to answer, indicating whether the individual was "Yes, a naturalized citizen;" "No, not a citizen;" or "Born abroad of American parents." The instructions continued: "Fill the 'Yes, a naturalized citizen' circle only if the person has completed the naturalization process and is now a citizen."[17] But even subtle changes in language and instructions confused respondents.[18] The Bureau reported that:

---

[14] U.S. Bureau of the Census *Historical Statistics of the United States, Colonial Times to 1970, Bicentennial Edition*, Part 1 (Washington, D.C.: GPO, 1975), 116. The table indicated similar "unknown citizenship" in censuses from 1920-1940.

[15] U.S. Bureau of the Census, 1950 Census of Population, Volume IV, *Special Reports, No. 3A, Nativity and Parentage*, 3A-6, available at
https://www2.census.gov/prod2/decennial/documents/41601756v4p3_TOC.pdf

[16] U.S. Bureau of the Census, *1970 Census of Population And Housing: Evaluation And Research Program: Accuracy of Data For Selected Population Characteristics As Measures By Reinterviews* (Washington, D.C.: GPO, 1974), 26.

[17] a. Is this person a naturalized citizen of the United States?

> 22 percent of people who entered a U.S. State in the birthplace question (11) [that is, were birth citizens] reported themselves as 'Naturalized citizens' in the citizenship question (12). The erroneous entries required a substantial amount of editing . . . . These examples of misreporting suggested that many respondents apparently did not follow the instructions that only persons born in foreign countries should answer the question.

Accordingly, the Bureau once again reworded the citizenship question on the "long form." In 1990, 2000, and the ACS, the question was asked of everyone in the sample, not just the foreign-born. Moreover, it was rewritten to read "Is this person a CITIZEN [*sic*] of the United States?" rather than inquire about the naturalization behavior of the foreign-born. Answer options included citizen by birth in the U.S.; citizen by birth in a U.S. territory; citizen by birth to American parents or parent abroad; citizen by naturalization. A residual fifth answer option was simply, "No, not a citizen of the United States" with no further detail about whether a foreign-born individual was pursuing naturalization.[19]

Therefore, while censuses has asked respondents about their citizenship status, the form and context of the question have varied considerably over time. Moreover, since the introduction of the "short form" census in 1970, the citizenship question has never appeared on the "short form" instrument.

IV. **Adding the Citizenship Question to the 2020 "Short Form" Census Without Additional Testing Would Depart from Historical Census Practice and Would Not Correct Known Data Issues**

    A.    <u>The Counterintuitive Finding that Sampling Produced More Accurate Statistical Data than Complete Count Data</u>

As census officials and the larger social science research community continued to refine the theory and practice of probability sampling, they confronted questions from the lay public and even some skeptical survey researchers about why they were sure that sample data produced better statistical results than complete count data. It was fairly easy to see that a sample data collection saved money by contacting fewer respondents, and thus reduced response burden. Officials, however, felt they needed to provide more explanation on the claim to accuracy. Thus the social science journal literature is replete with discussions on these matters in the mid-20th century. By the late 1960s, when Bureau officials felt their methods were indeed robust, they published a series of articles directed to an academic audience which recounted their experience with the development of sampling, the

---

[] Yes, a naturalized citizen
[] No, not a citizen
[] Born abroad of American parents
[18] U.S. Bureau of the Census, 1990 Census of Population and Housing, *History*, Part D (Washington, D.C.: 1996), 14-20.
[19] Ibid.

measurement of bias, and accuracy in the census in the context for their plans for 1970.[20] Hansen and Waksberg, for example, noted:

> Sampling was first introduced to obtain some of the information in the 1940 Census and for some of the detailed tabulations. Its use was considerably expanded in the 1950 Census, which was the first one to rely significantly on sampling for the collection of basic data. However, in that census there still were a number of restrictions that were imposed on the determination of what items should be collected on a sample basis. Information on such items as labor force, occupation and industry, citizenship, and place of birth were retained on a 100 percent basis primarily because it was felt unwise to move too far towards dependence on sampling without additional experience.

The Bureau's experience evaluating the 1950 census, as confirmed by the additional use of sampling in the 1960 census, led to several surprising conclusions. Hansen and Waksberg wrote:

> (a) The 1950 evaluation program – in particular the CPS Census Match and the various response variance studies – provided evidence that for most census statistics, the introduction of a moderate sampling error would have only a minor effect on the total mean square error. In other words, the errors resulting from simple response and enumerator variance, and the biases arising from the use of enumerators (with the kind of training and control they could be given in a massive census operation) were already so large that sampling error could be introduced, even in small areas, with very little additional impact on the quality, (b) Substantial savings in cost could be achieved, and (c) The results could be compiled and made available on a more timely basis.

In brief, the sample data were of higher quality than complete count data.

Hansen and Waksberg and Waksberg and Pritzker also reported that their research revealed new technical issues for the decennial census, notably that there were undercount problems in the census (estimated at 3 percent in 1960) and that the undercount was differential – that is, that the overall count missed particular demographic groups, especially minorities and the poor in both urban and rural areas. Innovations planned for 1970 – including the introduction of the mail census and special outreach programs – were designed to get control of those issues and improve the accuracy of the basic enumeration.[21]

---

[20] See for example, Joseph Waksberg and Leon Pritzker, "Changes in Census Methods," *Journal of the American Statistical Association*, Vol. 64, No. 328 (Dec., 1969), pp. 1141-1149, Stable URL: https://www.jstor.org/stable/2286056, accessed August 17, 2018; Morris Hansen and Joseph Waksberg, "Research on Non-Sampling Errors in Censuses and Surveys," *Revue de l'Institut International de Statistique / Review of the International Statistical Institute*, Vol. 38, No. 3 (1970), 317-332, Stable URL: https://www.jstor.org/stable/1402198, accessed August 17, 2018.

[21] See also Eckler's testimony on undercount, ibid., pp. 68 ff.

B.    Adding the Question Would Depart from Historical Practice

From the 1950s on, new testing systems were extended to all aspects of census processing – from questionnaire design, to coding accuracy, to content reinterview, as well as undercount measurement. As noted above, the evaluation studies of the 1950, 1970, and 1980 censuses documented non-response on the citizenship/naturalization question; positive bias in naturalization reporting; negative bias in alien reporting for the foreign-born; and misreporting of citizenship status by the native-born.

Recent studies of non-response or misreporting associated with the citizenship question indicate that issues of bias remain. This review of the longer history indicates that the question also includes a great deal of technical and wording change over the decades, much of which the Bureau has long been aware of. Unlike many other important census questions, however, citizenship has been subject of much more limited technical and cognitive research. And the Bureau has not produced reliable estimates of non-response, bias, and misreporting in the data over the 120 year period since 1890 akin to the research it has produced on differential undercount measurement.[22]

Even the Secretary hinted at the potential problems. The Secretary acknowledged that the question has not been tested in a census context, even noting that it should go last on 2020 decennial census questionnaire to minimize confusion and non-compliance.[23] That proposal has not, however, been tested to date.

C.    Congressional and Census Efforts to Address the Data Needs on Citizenship Since 1980

There were several points in the late 1970s and 1980s when Congress and the Bureau debated issues surrounding the measurement of the citizenship status of the immigrant population. This experience revealed both the complex methodological issues surrounding data collection, the political controversies that surrounded the debates, and hints at why neither census officials nor Congress proposed moving the question to the "short form."

1.    *Political Issues*

As evidence of a resurgence in immigration and the impact of the 1965 immigration reform became clearer in the 1970s, some anti-immigrant organizations and members of Congress called on the Census Bureau to produce more data estimating the size and characteristics of foreign-born residents. Legal and legislative challenges focused on estimating the size of

---

[22] The most obvious comparison is the undercount controversies which were very much on the public and technical agenda from 1970 to 2000. They produced legislative and political and technical changes in census methods, court decisions clarifying the relationship between the census functions and the apportionment and redistricting processes, and heightened public awareness of the importance of the census to American life. See for example, Margo Anderson and Stephen E. Fienberg, *Who Counts? The Politics of Census Taking and Contemporary America*, rev. ed. (New York: Russell Sage Foundation, 2001).
[23] AR 1314; 1320

the undocumented population, and stumbled both in federal courts and Congress as census officials explained what a research program to improve immigration data would entail. Indeed, the occasion of these proposals prompted the Bureau to produce a research statement on the "state of the art" at the time in estimating the undocumented population,[24] as well as the larger issues involved in measuring the characteristics of the foreign-born population.

Director Vincent Barabba, in particular, provided eloquent Congressional testimony on the issues in the months leading up to the 1980 census, when it was also clear that the overall size of the foreign-born population was growing again. The 1980 census would report over 14 million foreign-born residents, roughly a 40 percent increase compared to the 1950-1970 period, though still a significantly smaller proportion of the total population compared to the early 20th century.

On March 26, 1980, the Senate Subcommittee on Energy, Nuclear Proliferation, and Federal Services, Committee on Governmental Affairs held a hearing addressing the issues raised by S. 2366, a bill sponsored by Walter D. Huddleston (D-KY), to "require adjustments in census population figures for aliens in the United States illegally so as to prevent distortions in the reapportionment of the House of Representatives, the legislative apportionment and districting of the States, and the allocation of funds under Federal assistance programs."[25]

Two days later, Census Bureau Director Barabba testified again on these matters at a hearing of the Senate Subcommittee on State, Justice, Commerce, and the Judiciary Appropriations, Committee on Appropriations.[26] Responding to a series of questions from

---

[24] A detailed report by Jacob Siegel, Jeffrey Passel, and Greg Robinson, included in the hearing records, see note 25 below, served as a benchmark of technical knowledge going into the 1980 census data collection. Siegel, Passel and Robinson's "Preliminary Review of Existing Studies of the Number of Illegal Residents to the United States," concluded that their "review of the existing studies on illegal residents in the United States finds that there are currently no reliable estimates of the number of illegal residents in the country or of the net volume of illegal immigration to the United States in any recent past period." Recognizing that such a conclusion would receive not receive a welcome response from Congress, they continued:

> Although the number of illegal residents in the United States remains uncertain, the authors are willing to make some inferences from the available studies with regard to the possible magnitude of the numbers. They offer the following cautious speculations. The total number of illegal residents in the United States for some recent year, such as 1978, is almost certainly below 6.0 million, and maybe substantially less, possibly only 3.5 to 5.0 million. The existing estimates of illegal residents based on empirical studies simply do not support the claim that there are very many millions (i.e., over 6 million) of unlawful residents in the United States.

[25] U.S. Senate, Subcommittee on Energy, Nuclear Proliferation, and Federal Services, Committee on Governmental Affairs, "1980 Census: Counting Illegal Aliens," March 26, 1980 (Washington, D.C. GPO, 1980). Huddleston was also a plaintiff in *Federation for Am. Imm. Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980). Census Director Vincent Barabba testified against the bill, and Congress took no action on the measure. Barabba served as Census Bureau Director in the Nixon and Carter administrations.

[26] State, Justice, Commerce, the Judiciary, and Related Agencies Appropriations, FY81, Part 3, March 28, 1980 (Washington, D.C., 1980), 256-59.

Senator Dennis DeConcini (D-AZ), Barabba testified to the larger issues involved in Senator Huddleston's bill. Barabba acknowledged that the Census Bureau had the technical expertise to undertake a research program to address the issues of estimating the size and characteristics of the citizen and alien – including illegal alien – population. He emphasized, however, that the Bureau needed time and funding to undertake such a complex project:

> One of the points I tried to make . . . relative to the legislation and concerns about the census is part of our authority under title 13 which is delegated to us by the Congress, and it is very explicit. Three years prior to the taking of the census we should come forward and give our general approach to the census program. Two years prior we come with the specific questions and procedures. And we have done that. For somebody to come at the last minute and say find a way of solving the problem is quite wrong. I think Congress was wise in saying you let us know what you are doing.

DeConcini pressed: "Would you agree that with the Census Bureau's vast expertise in statistical methodology that it would seem to be the most logical place for the Federal Government to conduct such a study?" Barabba agreed and added more for Congress to consider: "There is a question in my mind whether it is, from the point of view of the perception that this thing is a law enforcement problem. There is some concern in my mind, whether our reputation of being able to keep information confidential, would in any way be tarnished in this kind of a program." At another point in his testimony, he addressed additional implications of entangling the census in immigration policy and undocumented immigration. "The census is just not designed for this particular problem," he commented. When pressed by DeConcini, he continued:

> There would be a tremendous concern on my part that we would have to install a procedure which I am not sure society is ready for, as they do in other countries – registration lists, or even closing society down and holding everybody in place. I am not too sure Congress is ready to resource those bureaus with that authority, nor am I sure too many would agree.

    2.    *Technical Processes*

Another relevant analogy for the 2020 question is the experience of expanding the citizenship question to all sample respondents on the 1990 census. It is important to note once more that even during the "complete count era" through 1950, the citizenship question was not a universal population query. Between 1890-1920, it was asked of foreign-born adult men. From 1930-1950, it was asked of everyone who was foreign-born. And in 1970 and 1980, only the foreign born were to answer it on the sample.

The 1990 change, however, was not the result of any public, legal, or legislative clamor to get an answer on citizenship from all sample respondents. Rather, the Bureau changed the question because, as noted above, in 1980 the form of the question led to significant misreporting. Specifically, 22 percent of people who reported they were born in a U.S. state,

also reported they were "naturalized citizens." That is, they misunderstood the instruction that the question was only for the foreign-born. Left uncorrected, these responses would have radically inflated the number of naturalized citizens in the 1980 census. The Bureau "fixed" the problem for the 1980 data with a processing edit to remove someone who was born in a U.S. state from the "naturalized citizen" tally. Even so, the misreporting was a processing headache for the Bureau.

In the content tests for the 1990 census, the Bureau tested five different revisions of the question and found that version that was ultimately used in 1990 an "improvement in accuracy." As they explained:[27]

> Of persons reporting a U.S. State in the NCT (National Content Test) place of birth question, a higher proportion responded, "Yes, born in the United States" in the new citizenship question than was categorized as such in the modified 1980 version. Also, a lower proportion of persons responded, "Yes, U.S. citizen by naturalization" to the new question than to the modified version. **Although the new question did impose an added response burden and produced a somewhat higher nonresponse rate, it was recommended given the improvement in accuracy. This improvement, in turn, would lead to a substantial reduction in the amount of editing needed to eliminate incorrect responses**.

In other words, there were tradeoffs: the Bureau's internal processing considerations ("a substantial reduction in the amount of editing") versus respondent burden and non-response.

The 1990 version of the question is the version that remains on the ACS today.

## V.    Conclusion

Secretary Ross claimed that "Concerns about decreased response rates generally fell into the following two categories - distrust of government and increased burden."  The 1990 citizenship question revision process documented a third issue of data quality:  the editing of incorrect responses generated when the public misunderstands a question.  In the 1990 experience, the data processing issues, rather than accuracy and respondent burden, determined the outcome.

Barabba's warnings, and another failed lawsuit (Ridge v. Verity) before the 1990 census, raised the same technical, ethical and political issues that are raised by Secretary Ross' decision to put a citizenship question on the 2020 decennial census questionnaire. The technical tradeoffs raised by the 1990 census question revision remain.  But the silence from Congress, the courts, and the public, since the 1980s on the issue is revealing.  The

---

[27] U.S. Bureau of the Census, 1990 Census of Population and Housing, *Content Determination Reports: Birthplace, Citizenship, Year of Entry, and Language, 1990 CDR-7* (Washington, D.C.: GPO October 1990), 11-12.

issue was not a prominent debate for the 1990, 2000, and 2010 censuses. Recalling Barabba's testimony, and the record of questionnaire design and testing, demonstrate the kind of concrete research and legislative action that would still be necessary to fundamentally modify the current methods to measure the patterns of citizenship in the U.S. population, as well as the propriety of doing so.

Secretary Ross' decision to add a citizenship question to the 2020 census without proper testing and public vetting does not properly take into account the historical complexity of the country's experience with the question.  There is little evidence in the Secretary's review of the question to indicate the administration is aware of the varied formats for the question, the technical limitations in the data and their sources, or the complex administrative processes that guide adding, removing, or modifying a census question.

A citizenship question last appeared on a complete count census in 1950 as the proportion of foreign-born residents was declining substantially. The 1950 census was an enumerator based census and the question was asked only foreign-born residents. Detailed instructions for enumerators explained how to report the householder's responses. That year, the Census Bureau reported a 7 percent item non-response rate for the question and that 8 percent of the responses were biased.

On the heels of reform to immigration law in 1965, the Labor Department, the Immigration and Naturalization Service, and the demographic research community asked for the reinstatement of the question for the 1970 census. It was reinstated, but on a sample, where it has remained since. Evaluation studies of the quality of the data continue to report response bias.

Indeed, substantial misreporting of citizenship status in the 1980 census sample prompted the Bureau to research and test different versions of the question and to revise the question for 1990. The revision resulted in great response accuracy, but also increased response burden and item non-response. The format was used for the "long form" 2000 census and continues to appear on the ACS. Its appearance on the ACS does not diminish problems associated with the question's addition to the "short form" in the 2020 decennial.

Secretary Ross' rejection of stakeholder concerns was accompanied with the claim that the historical record indicated that "the citizenship question has been well tested." He wrote that "there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination." This report details the substantial yet unacknowledged "information available" both in terms of the varied formats of the questions and the known bias in responses, and a great deal of information about the "mechanisms" the Census Bureau uses to determine whether, how, and why to ask a particular question.

Director Barabba acknowledged in 1980, when pressed on whether the census could provide estimates of the undocumented population, that Congress could mandate that the Bureau estimate the undocumented population.  But he also added, "I think somebody

should tell us that right now so we can put all the procedures required in place so we can do it in 1990, because I think it would require major changes in the legislation and how people record themselves in this country." Almost 40 years later, we stand at a comparable moment, and would do well to heed Barabba's call to take the time to open a serious research program and public conversation about the statistical measurement of the characteristics of foreign-born residents in the U.S.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 19th day of September, 2018

_____

Margo Anderson, Ph.D.

# EXHIBIT 2

The Journal of Privacy and Confidentiality (2009)      **1**, Number 1, pp. 7–52

# Federal Statistical Confidentiality and Business Data: Twentieth Century Challenges and Continuing Issues

Margo Anderson[*] and William Seltzer[†]

**Abstract.**   The roots of the modern concept of statistical confidentiality in the US federal statistical system can be traced directly back to the late nineteenth century efforts of statisticians to ensure full and accurate responses by businesses to statistical inquiries. Officials argued that such confidentiality guarantees were needed to ensure that the providers of enterprise and establishment data could be confident that the statistical agencies could not be forced to share their responses with others, such as regulatory or tax authorities, congressional investigators, prying journalists, and competitors, who might use this information to the detriment of the data provider. Nevertheless, over the years, the principle of statistical confidentiality with respect to information provided by businesses in statistical inquiries has been repeatedly challenged by other executive branch departments, independent regulatory agencies, the courts, Congress, and members of the public, with quite varied results.

The paper uses the published record and archival research to examine the history of challenges to statistical confidentiality, and the responses of the statistical agencies, the federal statistical system as a whole, including the office of the chief statistician in OMB (and its predecessors), executive department and independent non-statistical agencies, the courts, and Congress as well as representatives of the business community. Long-term trends and the implications for maintaining and strengthening the confidentiality protections for establishment- and enterprise-level business data provided to federal agencies for statistical purposes are discussed.

**Keywords:** Confidential Information Protection and Statistical Efficiency Act (CIPSEA), Federal Reports Act, Statistical Policy

## 1   Introduction

Statistical confidentiality is an essential principle of modern demographic and economic data-gathering and related statistical research. Today, the term "statistical confidentiality" encompasses in shorthand form a bundle of now widely-recognized activities. These may include legal protections, standards of professional conduct, a set of non-disclosure assurances provided to respondents, or compilation and dissemination practices designed to protect data providers from improper use of their answers.

It wasn't always this way. As we and others have discussed, the practice of statistical confi-

---

[*]University of Wisconsin, Milwaukee, WI, mailto:margo@uwm.edu
[†]Fordham University, New York, NY, mailto:seltzer@fordham.edu

© 2009 CyLab

dentiality has a history. Generations of statisticians and social scientists came to define the principles and practices we take as givens as they built the data production infrastructure of official statistics and social science that evolved in the nineteenth and twentieth centuries.

The roots of the modern concept of federal statistical confidentiality can be traced directly back to the late nineteenth century. In the United States, for example, the efforts of such statisticians as Carroll Wright, first Commissioner of the Department of Labor, ensured full and accurate responses by businesses to statistical inquiries (Goldberg and Moye 1985). Officials in the precursor agency of the Australian Bureau of Statistics recognized that blurring the line between government data collection and regulatory actions would undermine the quality of the data collected; they were willing to destroy individual level schedules in order to protect the confidentiality of responses (Hayter 1892, 19). The leaders of the emerging statistical profession argued that such confidentiality guarantees were needed to ensure that the providers of enterprise and establishment data could be confident that the statistical agencies could not be forced to share original survey responses with others, such as regulatory or tax authorities, congressional investigators, prying journalists, or competitors, who might use this information to the detriment of the data provider.[1]

It is widely recognized in the federal statistics community and by knowledgeable members of the business community that the logic of this position is as true today as when it was first articulated over a century ago. Indeed, in the United States the principle of statistical confidentiality based on analogous reasoning was subsequently extended to information provided by persons beginning with President Taft's proclamation issued in connection with the 1910 decennial census (Anderson and Seltzer 2007). Nevertheless, over the years, the principle of statistical confidentiality with respect to information provided by businesses in statistical inquiries has been repeatedly challenged, and in a number of instances, successfully breached, by other executive branch departments, independent regulatory agencies, the courts, members of Congress, and the public.

We review this history of challenges in the United States. We also examine the responses of the affected statistical agencies and the Office of the Chief Statistician in the Office of Management and Budget (OMB) and its predecessors, as well as those in the executive departments and independent non-statistical agencies, focusing specifically on the period from 1910 to 1965. Finally, we explore how the courts, Congress, and representatives of the business community responded to those challenges. Standard historical treatments of the federal statistical system, (for example, Eckler 1972; Barabba 1975) generally mention the St. Regis Paper case from the late 1950s and early 1960s, which involved a controversy about the level of protection that could be afforded to file copies of Census Bureau questionnaires maintained by a respondent. Yet a number of other important episodes are apparently unremembered, for reasons we discuss below. The St. Regis case culminated in an adverse decision by the Supreme Court in 1961 and an act of Congress in 1962, effectively overturning that decision and reaffirming the principle of statistical confidentiality.

---

[1] In this paper we do not directly discuss the important issue of the similarities and differences that may characterize issues of the confidentiality of business and personal data. These similarities and differences have important technical, policy, and political implications.

## 1.1   Outline of the Paper

Section 2 reviews the emergence of the concept of statistical confidentiality for micro data collected from business or other economic enterprises in the late nineteenth century, and traces the development of law and administrative practice from the late nineteenth century to 1940. Section 3 traces the legislative history of two statutes passed in 1942 which changed the prevailing legal and administrative practice. Section 1402 of the Second War Powers Act, passed in March 1942, explicitly set aside the confidentiality provisions of the Census Act, and permitted the Commerce Secretary to provide micro data collected in the Commerce Department to agencies across the government if the data were necessary for use "in connection with the conduct of the war." The second law, the Federal Reports Act, passed in December 1942, authorized the Director of the Bureau of the Budget to require one federal agency to provide individual level data to another federal agency, encouraged confidential data sharing across federal agencies, and defined the terms under which such data sharing arrangements could take place.

Section 4 traces the implementation of data sharing under the two laws and a number of specific disclosures of confidential microdata on businesses that took place in the 1940s and 1950s, arising from the efforts of federal law enforcement and regulatory agencies to use Section 1402 of the Second War Powers Act and the data sharing provisions of the Federal Reports Act to circumvent statistical confidentiality. The provisions of Section 1402 of the Second War Powers Act expired when the laws was repealed in 1947. The business data disclosures under Section 1402 seem primarily addressed toward war planning and procurement and appear to have been generally accepted by the business community. The disclosures and denied disclosure requests under the authorization of the Federal Reports Act involved a broader set of issues and caused ongoing controversy between the statistical system and the Justice Department, eventually drawing data providers and the Courts and Congress into the dispute. Section 5 traces the eruption of the controversies about data sharing into public view with the litigation surrounding the anti trust case against the St. Regis Paper Company. That case resulted in a defeat for statistical confidentiality in the Supreme Court in 1961 and Congressional action in 1962 to restore the confidential standard of the Census Act. Section 6 brings the story to the present and discusses the context of these historical controversies on current statistical policy.

## 1.2   A Note on Evidence

This article traces the development of the policy, law, and administrative practice of statistical confidentiality for business data in the U.S. Federal Statistical System. One part of the story is very visible, as the agency leaders promulgated and explained their positions and put in place the practices and rules known today. Much of that story has been told before, though not, we suggest, with the precision and contextual background necessary to fully understand particular developments. We attempt to enhance that history by providing additional context and detail.

Less visible were the challenges, breaches, and controversies that prompted particular innovations, such as legislative or policy changes, or in the case of the legislative removal of the confidentiality protections of the Census Act during World War II, the evidence of the use of microdata for non-statistical purposes. In fact, as discussed below, in a number of instances, the evidence has either been forgotten, deliberately hidden, obfuscated, or otherwise lost to later generations of officials in the statistical system and the general public.

The research in this article involved archival retrieval of material that was literally buried in the voluminous records of federal agencies or the private papers of public officials. And because that evidence can be scattered across several agencies, housed in archives across the country, and even then be incomplete, we emphasize at the outset that the treatment below is not exhaustive, and a number of relevant archival sources were not examined. As such, the present paper should be considered a report on ongoing research. In addition, it is our goal to bring to a much broader audience the evidence that these controversies existed and had a major effect on the character of the statistical system. We provide additional discussion of the evidentiary base of the analysis at relevant points in the discussion below.

## 2    Drawing the Line between Statistical Data and Administrative Data

National states have always had to collect information on the people, property, and social and economic activities of their societies in order to raise revenue, provide services, police, and defend the state. Early "statists" as they were then called, recognized that the resulting tabular records could be the basis for a new form of knowledge, that such records had value apart from their administrative functions. In the development of statistical data analysis, they pioneered the analysis of patterns of aggregates, and eventually called for governments to collect tabular data "for statistical purposes" only.

Thus, there has been a close and often confusing administrative relationship between state data collection for what we call "statistical purposes", or for "public informational purposes", and for the purposes of surveillance, tax collection, benefits administration, or even military control of people.[2] By the early nineteenth century, when "information came of age" (Headrick 2000), individuals and agencies involved in "statistical" analysis developed their own practices, logic, and rules to guarantee the integrity of their new form of knowledge. Officials in statistical agencies recognized that the quality of the data they collected and the credibility of the analyses derived from such data could be compromised if they were seen to be part of an administrative activity of the state. Thus, they strove to separate the statistical agencies of government from those of the administrative agencies involved in the normal regulatory, surveillance, and policing activities of the state. They justified such a divorce on the grounds that without autonomy to collect data and protect the responses from administrative action, they could not provide reliable and trustworthy information and statistical analysis for the proper functioning of the state.

Over the past century, official statistical agencies have developed practices guaranteeing respondent confidentiality (for business, institutional, or individual respondents) both for ethical and practical reasons (such as promoting high response rates and truthful reporting). In current official statistical practice, there is a sharp distinction between data collected for an administrative purpose and data collected for a statistical or research purpose. "Administrative data" fundamentally serve administrative purposes. An agency collects identifiable information on individual respondents in order to secure the administration of taxes, programs, or services. "Statistical data" are anonymous and concerned with distributions, patterns, and

---

[2] The literature on the history of state surveillance does not distinguish well between the practices of statistical data collection and administrative data collection. See for example, Dandeker 1990; Lyon 2001; Parenti 2004. For a more discriminating treatment see Higgs 2004.

averages; individual identifiers function only then to guarantee data integrity and perhaps to facilitate statistical analysis, but not to identify individual respondents for administrative actions. Administrative data which are to be analyzed for statistical purposes are stripped of their identifiers and anonymized.

While these principles are well known inside the statistical and data analysis professions, they are not obvious to most government officials charged with enforcing the laws, providing the benefits, and collecting the taxes necessary to run the government. The latter, therefore, have repeatedly sought access to the individual level responses to "statistical data" collected from businesses and other institutional entities for regulatory or enforcement purposes. These claims of access have led to conflicts between the statistical system and the rest of government. In turn, the conflicts have forced officials in the statistical system to articulate the principles of statistical confidentiality and then codify them in administrative practice and policy, law, and standards of professional ethics.

## 2.1   Early Challenges

For most of the nineteenth century, the limited regulatory activities of the United States federal government and the ad hoc nature of most statistical data collections tended to preclude requests to use statistical data for administrative purposes. Indeed, the limited nineteenth century evidence of public concern that statistical data collections would be improperly disclosed suggests that the concern reflected fears that responses to official statistical inquiries would be revealed to the press or private publishers. In 1880, for example, Census Superintendent Francis Amasa Walker went on record to "dispose of the ridiculous slander" that "there is some mysterious connection between the Census Office and the Bradstreet Commercial Agency." Walker assured the public that "no commercial agency or person ...has had or will have access to a single figure in the returns of any manufacturer....Such returns are in their nature confidential, and that confidence will be held inviolable at this office" (*New York Times* 10/14/1880, p. 8).

Late in the nineteenth century, however, new issues emerged. Congress authorized the federal government to investigate antitrust violations and regulate railroad rates and other forms of interstate commerce. They also created new agencies to undertake this work, including the Interstate Commerce Commission and the Department of Labor. The establishment of these permanent agencies prompted the question of exactly where to draw the line between administrative data and statistical data, and thus, what statistical confidentiality was and how it was to be protected. In particular, the controversy erupted in the new Department of Commerce and Labor in the early years of the twentieth century as Congress placed within the Department ambitious new regulatory agencies, such as the Bureau of Corporations, and older statistical agencies, such as the Bureau of Labor Statistics and the Census Bureau.

Congress had established the Census Bureau as a permanent agency in the Interior Department in 1902. The agency moved to the new Department of Commerce and Labor in 1903. The new Department of Commerce and Labor was an unwieldy amalgam of agencies that included many small federal offices, such as the Coast and Geodetic Survey, the Light-House Board, the Bureau of Standards, the Steamboat Inspection Service, and the Bureau of Fisheries. Many of the offices that moved into the new Department had statistical reporting functions as well as regulatory functions, and for many federal officials and members of Congress, the lines between the two were not well drawn (Anderson 1988). The new Bureau of Corporations, in particular,

was charged with investigating and reporting upon the operations of corporations engaged in interstate commerce during a period when there was widespread public concern about the excessive power of trusts and large corporations. President Theodore Roosevelt made trust busting one of his major administrative initiatives. Within this environment, officials from the Bureau of Corporations challenged the confidentiality of manufacturing census returns. Officials in the Census Bureau resisted. The position of the statistical agencies in resisting the demands of the regulatory officials was not settled until it reached the level of a cabinet discussion. As Walter Willcox recalled (1914, 452-53) while reviewing the experience of the Census Bureau's first decade as a permanent agency:

> And, unless my memory or my information is at fault, when the secretary [of Commerce and Labor] directed that the census schedules of manufacturing establishments should be open to the inspection of officials belonging to another bureau within the same department (the Bureau of Corporations) and the director [of the Census Bureau] refused to obey this order of his superior, because of the pledge of secrecy under which the information had been obtained, the matter was debated in the cabinet and the decision reached that the information on these schedules should not be so used by the government.

In the plans for the 1910 Census, the bureau took steps to codify their understanding of the need for confidentiality of business returns. They proceeded on two fronts. First, the 1909 statute defining the procedures for the 1910 census contained new forceful language assuring business owners and corporations that the information supplied to the bureau would not be accessible to regulators. The new Section 25 (U.S. Census Bureau 1917) stated:

> That the information furnished [on an "establishment of productive industry"] shall be used only for the statistical purposes for which it is supplied. No publication shall be made by the Census Office whereby the data furnished by any particular establishment can be identified, nor shall the Director of the Census permit anyone other than the sworn employees of the Census Office to examine the individual reports.

The second innovation built confidentiality guarantees into the promotional materials for the 1910 Census. Most notable was the use of the presidential census proclamation, a practice which has continued to the present (Bohme and Pemberton 1991). Designed both to advertise the census and reassure the public about the uses of the data, President William Howard Taft's proclamation stated:

> The census has nothing to do with taxation, with army or jury service...or with the enforcement of any national, State, or local law or ordinance, nor can any person be harmed in any way by furnishing the information required (Quoted in Barabba 1975, 27).[3]

In other words, the statistical data collected were not to be used for enforcement or taxation purposes. The individual respondent should suffer no direct harm because of an answer on a

---

[3] For the full text, see Records of the Office of Statistical Standards, 1940-1968 (40.7), Entry 147, Box 52, File: Census Proclamations, RG51, NARA. The full text was widely reported in the press. See for example, *The Chicago Defender*, April 9, 1910, p. 3.

census form. The proclamation forcefully represented the understanding among census officials and other statisticians within government that they were drawing a bright line between their work—providing statistical tabulations and descriptions of society—and the work of other government agencies, whose jobs included collecting taxes, enforcing the law, and administering benefit programs.

The regulatory agencies and some members of Congress, however, were not necessarily reconciled to the position of the statistical agencies. The bright line was challenged during World War I. For example, the non-disclosure language in the 1909 statute applied to economic data, not population data, and Wilson administration officials argued that Taft's proclamation did not have the force of law. Thus, officials used the individual level responses to the 1910 census to investigate and prosecute those who failed to register for the military draft in World War I (Anderson and Seltzer 2007).

In the 1920s, census officials acknowledged that they continued to receive inquiries from operating agencies, and that they sometimes they acceded to requests for individual level information from population census responses, even when those responses would be used to tax businesses. Census Director William Mott Steuart was clearly dissatisfied with the practices, but he admitted to Walter Willcox in 1922 that the bureau was "regularly furnishing to the Internal Revenue Bureau information as to the ages of children, for the enforcement of the tax on establishments employing child labor" (Steuart 1922). In another incident, Herman Byer, Assistant Commissioner of Labor Statistics in the late 1940s, described how the Commissioner of Labor Statistics from 1920 to 1932, Ethelbert Stewart, was said to have responded to congressional pressure in the 1920s to reveal identifiable data. According to Byer, Stewart was asked at a Congressional hearing to reveal the data on individual automobile manufacturers to Congress, and he refused on grounds of confidentiality. When the committee chair threatened Stewart, "Mr. Stewart, our committee will subpoena those records," Stewart responded, "You do, and I'll burn them first" (Duncan and Shelton 1978, 168).

These continuing challenges led to further clarification of policy and law. In 1929, with the support of officials in the Census Bureau, Congress extended the confidentiality protections in the census statute to include unit level responses to census questions for businesses and individuals. In 1930, the Census Bureau requested and received an opinion from the Attorney General that upheld the agency's authority to refuse to release a "list of the names, addresses, occupations, and employment status of women living in Rochester, NY" to the Women's Bureau, Department of Labor (U.S. Census Bureau, 2004, 14).

Thus, from 1880 to 1930, officials in the U.S. Federal Statistical System articulated and publicized the policy of statistical confidentiality, wrote it into statutory law on the census, and found support for their practices and interpretations in a ruling from the Attorney General. Nevertheless, the legal and administrative understanding on the strength of the confidentiality standard continued to be precarious, and officials in the regulatory agencies and some members of Congress continued to ask why it was necessarily to restrict access to individual level statistical responses if there was a compelling public need for the information.

# 3    Challenges of Depression and War

The economic crisis of the Great Depression and the looming international tensions in Europe once again prompted Congress and government officials to question the necessity for and limits on "statistical confidentiality." Efficiency and modernization were watchwords of statistical policy proposals from 1933 onward, when President Franklin Roosevelt created the Central Statistical Board in order to coordinate federal statistical activities in terms of uniform survey practices, question wording, and classification schemes. In 1939, the functions of the Central Statistical Board were moved into the Bureau of the Budget (BOB). Stuart Rice became the Director of the new Division of Statistical Standards (DSS), and the new office began to wrestle with the issue of confidentiality in the context of broader reform of the federal statistical system.[4] Rice and other New Deal officials pressed for better data sharing procedures among the agencies of the decentralized statistical system. Should the Bureau of Labor Statistics, for example, be collecting the same industry data as the Census Bureau or the Bureau of Mines? Couldn't one questionnaire be used by several agencies and the responses shared for tabulation and publication? In the late 1930s, Rice proposed legislation to clarify standards for sharing identifiable survey responses across the statistical system. The problem was that when the statistical agencies suggested such sharing, not surprisingly, officials from the enforcement agencies, for example in the antitrust division of the Department of Justice, asked why they too couldn't "share" survey responses. Rice and his colleagues responded by drafting legislation which would define legitimate data sharing for statistical purposes and restrict sharing for purposes of "taxation, regulation, or investigation."

The bills introduced in Congress to provide statutory authority for further coordination and data sharing among statistical agencies opened the confidentiality debate anew, but in the context of other administration initiatives, involved arcane issues of administrative practice that were not high on the legislative agenda. No legislation had passed when war broke out in Europe in September 1939. Almost immediately, the military and civilian agencies charged with national defense proposed gaining access to information in the statistical system for the promotion of "national defense." Wouldn't it be more efficient if the information collected within the statistical agencies could be shared with the defense planning and mobilization agencies, the surveillance authorities in military intelligence, and the FBI, or with the regulatory authorities in the Department of Justice? Rice and the officials in the statistical agencies continued to stress the importance of the separation of statistical data from administrative functions and resisted any modification of confidentiality policy or law.

## 3.1    The Second War Powers Act

In the fall of 1939, the Justice Department went on the offensive and proposed its own modification of statistical confidentiality practices in the Census Bureau. Officials from the FBI proposed an amendment to the Census statute to permit the sharing of individual level survey

---

[4] The office exists today in the Office of Management and Budget (OMB) as the Statistical Policy Branch, Office of Information and Regulatory Affairs, headed by Chief Statistician, Katherine Wallman. The Division of Statistical Standards was renamed the Office of Statistical Standards with no change in function in 1952. From the late 1960s on, it was variously titled the Office of Statistical Policy, the Statistical Policy Division, and the Office of Federal Statistical Policy and Standards. The office was moved to the Commerce Department in the late 1970s and returned to the Office of Management and Budget in the early 1980s. See Duncan and Shelton 1978.

responses with the intelligence agencies (Naval Intelligence, Army Intelligence and the Federal Bureau of Investigation). The Census Bureau and the Commerce Department objected strenuously to the proposed legislation to the Division of Statistical Standards. After several months of wrangling within the administration, and with the 1940 Census looming, President Roosevelt, on the recommendation of Harold D. Smith, Director of the BOB and Stuart Rice's immediate supervisor, agreed that the bill not be introduced in Congress (Anderson and Seltzer 2007).

The controversy about the draft legislation from the Justice Department quieted after the census went into the field and the election season opened, but it did not die. Once Roosevelt had won reelection to an unprecedented third term, officials renewed their agenda to strengthen the nation's defenses. In late 1940 and 1941, the Roosevelt administration created a series of temporary defense agencies designed to ready the United States for war. For example, the Office of Production Management was set up in December 1940 and the Office of Price Administration in April 1941. At the highest levels of the Roosevelt administration, officials still hoped to deploy the individual level information collected by the statistical system for national defense.

Census Director William Lane Austin had mobilized opposition to the Justice Department's draft legislation in late 1939 and early 1940. In early 1941 after the 1940 Presidential election, the administration forced Austin's retirement as Director. His replacement, Mr. J.C. Capt, was a long-time administrative and political functionary, first in the Works Progress Administration (WPA) and then as a confidential assistant to Austin handling political patronage appointments in connection with the 1940 Census. Within days of his confirmation, Capt arranged to have this legislative effort revived. In May 1941, J. C. Capt proposed an amendment to the Census statute which would permit sharing census reports with the defense agencies. The provision became Section 3 of Senate bill 1627 (Congressional Record 1941) and provided:

> That notwithstanding any other provision of law, any individual census report or any information contained therein may be used in connection with the national defense program under such rules and regulations as may be prescribed, with the approval of the President, by the Secretary of Commerce. No person shall disclose or make use of any individual census report or any information contained therein contrary to such rules and regulations; and anyone violating this provision shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding $500 or be imprisoned not exceeding six months or both.

The bill passed the Senate in August 1941 but languished in a suspicious House Census Committee in the fall of 1941 despite strong efforts from the Census Director and other administration officials to press the legislation (U. S. House of Representatives, 1941).

When war broke out in December and economic mobilization intensified, the U.S. economy was put fully on a war footing and the statistical agencies also mobilized to provide the statistical information needed to prosecute the war. As we have described elsewhere (Anderson and Seltzer 2007), in February 1942, at the suggestion of Census Director Capt, the census confidentiality repeal provision was added to the Second War Powers bill which was passed in late March 1942. The provision (Section 1402 or Title XIV) read:

> That notwithstanding any other provision of law, any record, schedule, report,

or return, or any information or data contained therein, now or hereafter in the possession of the Department of Commerce, or any bureau or division thereof, may be made available by the Secretary of Commerce to any branch or agency of the Government, the head of which shall have made written request therefor for use in connection with the conduct of the war.... (U.S. Code Congressional Service 1943).

Section 1402 of the Second War Powers Act thus authorized access to data produced by the Commerce Department "for use in connection with the conduct of the war."

The statutory language specified that "The President shall issue regulations with respect to the making available of any such record, schedule, report, return, information or data, and with respect to the use thereof after the same has been made available." These regulations were provided in the form of a Presidential Executive Order (# 9157), "Regulations with respect to the Making Available of Records, Schedules, Reports, Returns and Other Information by the Secretary of Commerce, and with respect to the Use Thereof After the Same Have Been Made Available," dated May 9, 1942, about a month and half after the law's enactment.

The Executive Order prescribed the proper form for such requests and specified arrangements for reimbursing the Commerce Department for the costs incurred while providing the requested information. The Executive order also provided that

> If the information requested [from the Census Bureau] by the head of the department or agency is of a statistical character, a copy of the request shall be submitted to the Division of Statistical Standards of the Bureau of the Budget [the predecessor of OMB's Office of Statistical Policy] at the time the request is submitted to the Secretary of Commerce

and

> the Secretary of Commerce shall inform the Division of Statistical Standards of his action upon each request made, under section 1 of this order, if the information is of a statistical character. (U. S. Code Congressional Service 1943)

## 3.2   The Federal Reports Act

Section 1402 of the Second War Powers Act applied only to statistical data collected in the Commerce Department. Thus, for example, it did not apply to data collected by the Bureau of Labor Statistics or the Immigration and Naturalization Service, nor did it apply to sharing data across agencies for non-defense purposes. It did, however, provide a model. Census Director Capt had used the outbreak of the war to achieve passage of his proposal for the abrogation of confidentiality for war purposes. In the summer of 1942, Stuart Rice and colleagues in the Division of Statistical Standards along with supporters in Congress revived the statistical policy bills from the late 1930s and considered coordination of federal statistical policy and confidentiality more broadly. The Federal Reports Act passed on December 24, 1942, and included standardization of the rules governing the sharing of data, including confidential

statistical data, among federal agencies (U. S. Code Congressional Service 1943). The relevant language read in part:

> Sec. 3. (e) For the purpose of this Act, the Director [that is, the BOB Director] is authorized to require any Federal agency to make available to any other Federal agency any information which it has obtained from any person after the data of enactment of this Act, and all such agencies are directed to cooperate to the fullest practicable extent at all times in making such information available to other such agencies.... [with exemptions applying to IRS, and other Treasury agencies...]

> Sec. 4. (a) In the event that any information obtained in confidence by a Federal agency is released by that agency to another Federal agency, all the provisions of law (including penalties) which relate to the unlawful disclosure of any such information shall apply to the officers and employees of the agency to which such information is released to the same extent and in the same manner as such provisions apply to the officers and employees of the agency which originally obtained such information; and the officers and employees of the agency to which the information is released shall in addition be subject to the same provisions of law (including penalties) relating to the unlawful disclosure of such information as if the information had been collected directly by such agency.

> (b) Information obtained by a Federal agency from any person or persons may, pursuant to this Act, be released to any other Federal agency only if 1. the information shall be released in the form of statistical totals or summaries; or 2. the information as supplied by persons to a Federal agency shall not, at the time of collection, have been declared by that agency or by any superior authority to be confidential; or 3. the persons supplying the information shall consent to the release of it to a second agency by the agency to which the information was originally supplied; or 4. the Federal agency to which another Federal agency shall release the information has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information.

Thus, by the end of 1942, legislatively defined mechanisms existed to share confidential data across all agencies of the federal government. Section 1402 was a war measure, specifically addressing the perceived pressing needs for security, procurement, and planning during wartime. The Federal Reports Act was a more general statute designed to improve the efficiency of the federal statistical system overall. Under the new laws, authority for administering such data sharing and monitoring the provisions of Section 1402 of the Second War Powers Act apparently lay with Stuart Rice, as the Director of Statistical Standards in the Bureau of the Budget. Section 1402 was in effect from the spring of 1942 to the end of March 1947, when it was allowed to lapse, along with many other provisions of the Second War Powers Act. The tighter standards of the 1929 Census Act then again became the law governing statistical confidentiality at the Census Bureau. However, after 1947, the Federal Reports Act continued in place. The officials in the statistical system believed that the Federal Reports Act in particular would solve the problems they faced protecting confidentiality while sharing data. They soon found out it did not.

# 4    Implementation:  Evidence on Disclosures and Data Sharing

To date, there has been no systematic analysis of the use and impact of Section 1402 of the Second War Powers Act or the data sharing provisions of the 1942 Federal Reports Act, particularly with respect to data on businesses. In fact, there has been a considerable dispute about the extent of their actual use, for disclosure of either business or demographic data. For example, members of the Japanese American community have often asserted that micro-data from the 1940 Population Census was used to target them (see, for example, Okamura 1981). Other historians also raised questions about the involvement of the Census Bureau in actions directed against the Japanese Americans (see, for example, Daniels 1982). On the other hand, Census Bureau leadership and staff have generally denied that any such disclosures at the micro-level occurred, although from time to time over the years individual census staff have explicitly acknowledged in unpublished papers and correspondence that business data were disclosed (see, for example, Clemence 1986 and Jones 2005).

Similarly, there has been, to our knowledge, no systematic analysis of the relationship between the provisions of Section 1402 and the somewhat similar data sharing provisions of the Federal Reports Act. The statutory language of Section 1402 and corresponding regulations in EO9157 implied that the Commerce Department and the Census Bureau would keep written records of the requests for and transmissions of confidential data. When the requests were of a "statistical character," the Commerce Secretary had an additional reporting requirement to the Division of Statistical Standards in the Bureau of the Budget. Such reporting requirements should have made it possible to audit the uses made of Section 1402 for statistical purposes.[5]

For the data sharing provisions of the Federal Reports Act, the Director of the Bureau of the Budget was explicitly identified as the official authorized to oversee any sharing among agencies. Again, records should have logically been found in the Office of Statistical Standards of the Bureau of the Budget. In fact, the records that were kept and archived seem to be very uneven. Thus, the analysis that follows is not based upon a thorough audit of the archival record in the Bureau of the Budget, the Commerce Department, or the Census Bureau, since we have not found such a record.

We found the evidence of the Section 1402 disclosures discussed below in the records of the Chief Clerk of the Commerce Department.  These records are in the General Records of the

---

[5] It is unclear if these reporting requirements represented an effort by Stuart Rice, then the Assistant Director for Statistical Standards in the Bureau of the Budget, to control Census Director Capt's enthusiasm to open the records of the Bureau to the war agencies or simply an effort by Rice to advance his long-time goal of promoting the role of his office in statistical coordination. Unfortunately, since the most egregious violations of statistical confidentiality were not for statistical purposes, it was not necessary to provide information reports to the Office of Statistical Standards in these cases. Moreover, it should be noted that we have not been able so far to locate any reference to the filing of an information report as required under Executive Order 9157 in the archive files for the Bureau of the Budget even for the section 1402 disclosures that were of a purely statistical character. As more fully described below, we did find three letters from Rice among his papers at the Harry Truman Presidential Library to different federal agencies pointing out their failure to notify his office of such requests as required by EO 9157. We were also able to locate a single instance of such a report in the archive files of the Department of Commerce (Taylor, 1944a). This letter pertained to a 1944 request from the Defense Plants Corporation for plant specific production data from the 1939 Biennial Census of Manufacturing for certain specified chemical products.

Department of Commerce, Office of the Secretary, General Correspondence, Record Group 40 (RG40), in the National Archives in College Park, Maryland. Administrative procedure required that interdepartmental communications be routed through the Chief Clerk's office. Section 1402 directed that agencies seeking confidential census information make their requests to the Secretary of Commerce. We do not believe the Chief Clerk's files are complete. The Commerce Department records indicate that originals and file copies were also housed in the Census Bureau records. We have not found any of these materials in the archived records of the Census Bureau (Record Group 29) in the National Archives. We have not, as yet, followed the disclosures of business data discussed below into the records of the receiving agencies, e.g., the War Production Board, though we have followed the paper trail in the case of some disclosures of population data (Seltzer and Anderson 2007a). We make no evidentiary claims as to how the microdata was used or preserved in the receiving agency. Finally, as noted below, once the data transmissions of Section 1402 became routine, it appears that even the Commerce Department reporting channel was dropped, and requesting agencies often contacted Census officials directly.

For the evidence and debates surrounding the non statistical disclosures of business data made under the provisions of the Federal Reports Act, we have relied on the records of the Division of Statistical Standards of the Bureau of the Budget. These records are housed in Record Group 51 (RG51) in the National Archives in College Park, Maryland. We have not found a systematic record of data sharing requests, granted or not, and we are not prepared to state that such records do not exist. They may yet turn up with additional research in RG51. Nor have we systematically followed the controversies discussed below into the records of the operating and regulatory agencies, e.g., the Bureau of Mines (Interior Department), the Federal Trade Commission, or the Department of Justice. Rather, we have relied on the DSS files documenting particular controversies. These voluminous files provide sufficient evidence that the disclosures took place, as well as the efforts by officials in the statistical system to manage the controversies and forestall additional ones.

## 4.1  Disclosures of Business Data under Section 1402 of the Second War Powers Act

Table A contains a summary listing of nine disclosure episodes related to Section 1402 of the Second War Powers Act that we have documented so far in Commerce Department records. These documented disclosures occurred between August 1942 and November 1945. Each episode is based on documentation involving correspondence from the Department of Commerce to a requesting agency forwarding the requested confidential material or conveying a policy decision that the requested confidential information would be released. From other evidence we also know that our list of nine cases over a 40 month period is a lower bound and that Section 1402 disclosures appear to be far more extensive. The upper bound is still very much in doubt, but a hint of the extent of the use of the provision can be seen in Assistant Director for Statistical Standards Director Stuart Rice's correspondence. On August 14, 1942, Rice wrote to officials in the War Production Board, the Tariff Commission, and the Office of Price Administration reminding them that EO 9157 required the requesting agency to copy the Division of Statistical Standards when making requests for confidential information of a statistical character. He listed 26 requests made by the War Production Board between May 9, 1942, the day EO 9157 was signed, and July 30, 1942 (Rice, 1942a); he also listed a July 22

request from the U.S. Tariff Commission on "oil sulphonating establishments" (Rice, 1942b), and 4 requests made by the Office of Price Administration between May 27 and July 30, 1942 (Rice, 1942c). In other words, there were at least 31 requests in the 96 days between the promulgation of the Executive Order and Rice's letter, a rate of about one every three days.[6]

The requesting agencies were the Department of Agriculture (Food Distribution Agency and the Bureau of Agricultural Economics), the Department of Labor, the Treasury Department, the Tennessee Valley Authority, and four war-time agencies, the War Production Board, the Office of Price Administration, the Defense Plants Corporation, and the Civilian Production Administration. Five of the nine requests for information related to businesses pertained to mailing list information (i.e., company names and addresses), in a few cases clearly designed to assist in the statistical data-gathering operations of the requesting agency. In the remaining cases, specific production data pertaining to individual plants were requested. Many of these disclosures of business-related information appear to involve wartime economic planning or procurement.

The first request for confidential Census Bureau information that we have identified so far was contained in a letter from Donald M. Nelson, Chairman of the War Production Board, to Jesse Jones, Secretary of Commerce, dated August 17, 1942. Nelson, citing Section 1402 of the Second War Powers Act and Executive Order No. 9157, requested that "confidential industrial and economic information in possession of the Bureau of the Census needed by the War Production Board for use in the conduct of the war" be provided to his agency (Nelson, 1942). Nelson indicated that detailed specifications for the "documents and information desired" would be provided by Stacy May, Director of the Statistics Division of the War Production Board; he concluded by stating that "any conditions and restrictions imposed by you upon the use of the documents or information so furnished will be followed." A reply dated August 21, and prepared for Jones' signature, but actually signed by Wayne C. Taylor as Acting Secretary, stated that "this Department is very glad to comply with your request" (Taylor, 1942). However, on August 18, even before the reply to Nelson was signed, Malcolm Kerlin, Administrative Assistant to the Secretary of Commerce, sent a routing slip to Census Director Capt, marking the request "for appropriate action" (Kerlin, 1942).

The next documented request was from the Assistant Secretary of Agriculture to the Secretary of Commerce. It was dated February 1, 1943, and sought mailing lists maintained by the Census Bureau for use by the Agriculture Department's Food Distribution Administration. On February 4, 1943, Wayne C. Taylor, Under Secretary of Commerce replied

> The Department of Commerce will be very glad to comply with your request. These lists will be furnished you pursuant to Section 1402 of the Second War Powers Act ... and ... Executive Order 9157 ... with the understanding that the information contained therein will be kept strictly confidential and will not be published in any form. (Taylor, 1943a)

Unlike the letter to Nelson, which had been drafted by the Commerce Department's Assistant Solicitor, E. T. Quigley, the file copy of Taylor's reply to Hill indicates the letter was drafted by Ray Hurley, who later in his career at the Census Bureau headed the Bureau's agriculture statistics program from 1946 to 1968; it carried the distinctive initials of Census Director J.

---

[6] If requests for disclosures continued at this rate for the five years that Section 1402 was in force, approximately 600 disclosure requests would have been made for business data alone.

C. Capt ("JC") and Malcolm Kerlin ("mk"). This file copy also indicates that in accord with normal administrative practice, all the supporting papers sent forward with the letter for signature were returned to the originating Bureau—in the present case, the Census Bureau.

On February 20, 1943, the Executive Director of the Treasury Department's War Savings Staff wrote Secretary Jones requesting mailing lists from the files of the 1939 Census of Business; on February 27, the Under Secretary of Commerce replied indicating (a) that to comply with Executive Order 9157 the request should be resubmitted under the signature of the Secretary of the Treasury and (b) that "to avoid delays, the lists are being prepared and forwarded" as instructed (Taylor, 1943b). Almost three weeks later, the needed letter from Treasury Secretary Morgenthau was forthcoming (Morgenthau, 1943). In addition to specifying the types of businesses in which the War Savings staff was interested (for example, Department Stores, Men's Furnishings, Hats, Clothing Stores, Women's Ready-to-Wear, Shoes, Furniture Stores), the letter stated why the lists were wanted ("mailing War Bond and Stamp posters and other materials"). Two days later, on March 18, Taylor (1943d) replied to Morgenthau writing that as he had indicated in his initial response to Sloan, the materials had already been provided as requested.[7]

Subsequent correspondence indicates the requests for individual-level plant, establishment, or farm data were made by the Defense Plants Corporation (Taylor, 1944a and 1944b), the Tennessee Valley Authority (TVA) (Wallace, 1945a and 1945c), the Department of Agriculture (Wallace, 1945b), the Department of Labor (Wallace, 1945d), and the Civilian Production Authority (Wallace, 1945e) under the provisions of Section 1402 of the Second War Powers Act. Except for the request made by the TVA, all requests for disclosures were granted as requested. In the case of the TVA, a problem arose because a substantial portion of the data were collected privately by a business association, and while the Commerce Department and the Census Bureau were willing to disclose the information obtained by the Census Bureau, they were reluctant to disclose the privately-gathered information. As the Commerce Secretary put it, "the collection problems with some producers were such that the Bureau of the Census might be subject to severe criticism from the Industry, if the suggested information were made available to the Tennessee Valley Authority" (Wallace, 1945c). After informal consultations, the TVA decided to withdraw its request.

Overall, the extant record of disclosures of confidential business data by the Census Bureau under Section 1402 indicates ongoing and wide ranging requests, and that the requested information was provided in a fairly routine manner between 1942 and 1945. Many agencies made requests, and the available correspondence indicates easy communication between the Commerce Department, the Census Bureau, and the requesting agencies. Moreover, even after Section 1402 was allowed to lapse in 1947, several regulatory and investigative agencies continued to be keenly interested in obtaining information on individual firms provided to the Census Bureau under the confidentiality protections of Title 13.

In the short run, agencies strove to find ways to obtain such information directly from the Census Bureau. In one instance, in late 1947, the Federal Munitions Board sought to receive confidential information from the Bureau's Census of Manufactures. After considerable

---

[7] This request from the Treasury Department and the Bureau's response was not unprecedented. During World War I, Treasury requested and the Bureau provided similar materials to assist in the promotion of Victory Bonds.

correspondence between the Commerce Department and the Attorney General's office (and extensive consultations involving the Justice Department, the Budget Bureau, the Commerce Department, the Census Bureau, and the Munitions Board), an agreement was reached that disclosures would only be made after the Census Bureau secured affirmative waivers of confidentiality from the individuals and firms who provided the information to the Census Bureau (Foster, 1947; 1948a; 1948b). In another instance, in July 1948, the Census Bureau proposed a similar approach in a letter to the Secretary of Commerce, drafted by W. P. McInerny and A. Ross Eckler of the Census Bureau. In it, they asked for a response to a request by the Internal Revenue Service that it be provided information collected by the Census Bureau from the Zigler Canning Company, which the new Secretary of Commerce, after some hesitation, signed (Sawyer, 1948).[8]

## 4.2   Debating Data Sharing under the Federal Reports Act

Disclosures under Section 1402 had already begun during the summer and fall of 1942 as Congress and the administration debated the legislation that became the Federal Reports Act. Members of the business community were supportive of the legislation, but raised concerns over the data sharing provisions. For example, in November 1942, Bruce A. Fleming, Assistant to the President of the Edwin L. Wiegand Company (makers of electrical heating equipment) wrote to Harold D. Smith, Director of the Bureau of the Budget, expressing his general support for the bill, and offering to approach their Congressmen to lobby for its passage. He also urged that all government questionnaires be authorized for a specific time and carry an expiration date. But Fleming (1942) was also dubious about the confidentiality of statistical reports and commented:

> As to the confidential handling of reports, I can assure you there is grave doubt in the minds of many business men as to just how "confidentially" the reports are actually handled by the Bureau receiving them. There is a strong feeling on the part of many business men that financial reports sent to the Treasury Department have a habit of finding their way to the Labor Department. This may or not be true and, if not, any steps you can take to dispel this idea would be a step in the right direction.

Smith (1942) responded to Fleming on November 17, thanking him for his support and suggestions. He also reassured Fleming on "the use of confidential reports." Smith noted that "the strict and rather unimaginative observance" of confidentiality "has been a serious impediment to the elimination of duplication." "That is," he continued, "Agency A has held that it could not disclose certain confidential business information to Agency B, which has then been compelled to collect the same information all over again." He concluded that "one

---

[8] Commerce Secretary Charles Sawyer's hesitation was based on general arguments of government efficiency and his lack of appreciation of the importance of statistical confidentiality (he had been in office only two months at this point). In seeking guidance from the Departmental Solicitor, he asked (Easton, 1948) "if this is good government practice. In other words... if the prohibition against giving this information applies to the heads of other government departments—such as the Commissioner of Internal Revenue."

advantage" of the proposed law "would be the authority given to the Director of the Budget in such situations." Fleming's concerns of improper use of confidential data were the same ones expressed over the years by the business community and officials in the statistical system. Smith's assurances were designed to encourage support by guaranteeing the protection of the data and highlighting the advantages of data sharing among agencies.

During the war, by and large, the business community was willing to accept assurances like Smith's response to Fleming that the framework defined in Sections 3 and 4 of the Federal Reports Act would protect confidentiality and provide for proper data sharing among federal agencies - regulatory as well as statistical.[9] The data sharing was in response to war planning. Nevertheless, even before the war ended, the Bureau of the Budget discovered that there were ambiguities in the statutory language. What exactly did Section 4(b) mean when it provided that confidential statistical information collected by one agency could be released to another agency if the second agency "has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information." As the provision was written, the statistical agencies understood this provision to mean that one statistical agency could share survey lists or survey responses if both agencies had the authority to collect the data. That is, the statistical agencies understood the provision to reduce the respondent burden on businesses asked to supply the same information to two statistical agencies, as Smith suggested.

It soon became clear that the regulatory agencies read the language of Section 4(b) of the Federal Reports Act as a broader authorization for data sharing. It also became clear that the statutory language was not explicit in defining the precise channels of authority for deciding which agencies could share data with one another.

In 1945, while the disclosures under the authorization of Section 1402 were still occurring, the Division of Statistical Standards (DSS) recognized the emerging problem. In a series of memoranda involving reconversion plans, DSS officials noted that Justice Department officials had requested "individual-company data" on oil companies from the War Production Board (WPB) and the Bureau of Mines (an agency of the Interior Department that included a well-recognized statistical data-gathering function), and intended to provide the data to the Antitrust Division. The Justice Department, in effect, was asking that the non-statistical data sharing provision of Section 1402 be applied to the data sharing provisions of the Federal Reports Act. If the WPB and the Bureau of Mines acceded to the request, individual-level firm data throughout the entire federal statistical system would be open to examination and use by investigative, regulatory, and law enforcement agencies.

Clem C. Linnenberg of the Division of Statistical Standards wrote a long memorandum to DSS Director, Stuart A. Rice, disentangling the complex questions of the authority of the Division of Statistical Standards, the Bureau of Mines, and the Department of Justice in regards to the transfer of any information from the WPB and Mines to Justice and its Antitrust Division (Linnenberg 1945). Both the WPB and the Bureau of Mines were inclined to resist the Justice Department requests and sought support from the DSS to buttress their reluctance to interpret the reconversion authority of the Justice Department to expand using individual data in the Antitrust Division. One question for DSS was whether the Justice Department

---

[9] For similar concerns in Congress, see the February 1942 debates in the House of Representatives on Section 1402 of the Second War Powers Act, quoted in Anderson and Seltzer 2007.

had the authority under Section 4(b) to access the data. A second was who could make the decision to release or withhold the data from the Justice Department.

Linnenberg recognized that DSS was facing a new situation. He realized that while the Federal Reports Act was designed to facilitate data sharing among federal statistical agencies, its language did not unambiguously define data sharing or protect statistical agencies from demands for data sharing for nonstatistical purposes. "While I think we lack the power," Linnenberg wrote,

> even if we had the inclination to require the Bureau of Mines to furnish to the Department of Justice the information desired by it, on the other hand, I see nothing in the Reports Act which empowers the Budget Bureau to direct the Department of Justice to stop pestering the Bureau of Mines or any other agency in this matter, and nothing which empowers the Budget Bureau to direct the Bureau of Mines not to supply the information.

Linnenberg did note that he thought the Division of Statistical Standards might discourage the data transfer by threatening to revoke the approval of the forms necessary to collect such data in the future if the Bureau of Mines complied with the Justice Department requests. But Linnenberg recognized that was a weak reed to lean on. Rather, he proposed a bit of jawboning to try to mediate the situation:

> Certainly the DSS has a broad enough responsibility in the field of Federal Statistics that it would be within its right if it intervened in the Justice-Interior controversy, to try to persuade the Justice Department that the latter's wishes, if complied with, will do serious harm to Bureau of Mines statistical work and will involve bad faith on the part of the Government – both of these factors being very significant from a public policy standpoint. The DSS has a right to intervene in this way, irrespective of whether it can <u>force</u> [emphasis in original] any one to do or not to do anything.

He noted that the only authority the Justice Department might claim to meet the standards for data transfer in Section 4(b) was its subpoena power. That is, the law read that the data was transferable if "the Federal agency to which another Federal agency shall release the information has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information." But he didn't think that such an interpretation accorded with the intent of the statute. "The Department of Justice is not in this position as regards the information here under discussion," Linnenberg noted. "The most it can do is to recommend to a grand jury (which is not a part of the Department, but an arm of the court) to request the court to issue a <u>subpoena duces tecum</u> (an order by fine or imprisonment, to furnish specified information)."

After the war, however, it became clear that the Justice Department did interpret Section 4(b) to include subpoena power to meet the requirements for data sharing. The Federal Trade Commission and the antitrust division of the Justice Department read the provision to mean that they could access confidentially collected statistical information in the context of an investigation of possible trade or antitrust violations. Harking back to their position in 1939 that the FBI should have access to individual level data from the Census Bureau for "national defense," the Justice Department argued that since the attorneys for the FTC or the Antitrust Division had the authority to collect individual level information from companies and to subpoena materials for a grand jury investigation or prosecution, they should have free access to firm level responses to statistical inquiries from the statistical agencies, such as the Census Bureau or the Bureau of Mines. The statistical agencies and the officials in the Office of Statistical Standards in the Bureau of the Budget continued to resist such an interpretation.

Through the late 1940s and early 1950s, the issue simmered. It emerged publicly in 1953 during the review and appraisal of Bureau of the Census programs by the Intensive Review Committee appointed by the Secretary of Commerce. The Intensive Review Committee, informally called the Watkins Committee after its chair, Ralph Watkins, took testimony from other government agencies about their use of census data. The Federal Trade Commission submitted a memorandum in October 1953 complaining strenuously about the confidentiality restrictions on census filings. FTC Chairman Edward F. Howrey (1953) noted that the agency was authorized "1. to prevent unfair competition, restraint of trade, and monopoly, and 2. to obtain and make available to the President, the Congress, and the public factual data concerning economic and business conditions for the guidance and protection of the public and as a basis for remedial legislation."

He continued:

> Although the Federal Trade Commission has the statutory authority to obtain from individual corporations the kind of information reported to the Bureau of

the Census, the latter has refused to make its data available to the commission except on the same basis as they are available to the general public.

The result, he noted, was either duplication of effort as the FTC sought the same information already collected by the Census Bureau, or the inability of the agency "to possess itself of information essential to the discharge of its statutory duties." Howrey detailed what he saw as the obstructionist practices of the Census Bureau and asked the Committee to recommend changes in law and practice in order to facilitate the transfer of information to the FTC.

The Intensive Review Committee (1953) took note of the issue in a section of its report on "Disclosure Rule," and conceded that the Census Bureau might do more to share with the operating agencies:

> The Bureau has maintained stringent administrative controls to assure that individual information is not disclosed and has earned the reputation among respondents for respecting the confidentiality of the intimate records submitted to it. This is an asset of great significance and facilitates the taking of the several censuses....

> The Committee believes, however, that in certain respects the law has been interpreted with undue rigidity. Specifically, we believe that a reasonable interpretation of the law would not prevent the Bureau from making available to other Federal agencies for statistical purposes lists of names and addresses of business establishments classified by industries under the Standard Industrial Classification.

But the Committee concluded, "A somewhat different problem is presented when another Federal agency having the authority to collect information on a mandatory basis wishes access to census returns to save both government and business concerns the cost of a duplicating survey. Clearly, the Bureau cannot grant that wish." The Committee did recommend that a business could request in writing that a copy of the company's responses be sent to another government agency.

The Watkins Committee Report affirmed the understandings of officials in the statistical system, but neither the FTC nor the Justice Department retreated from their positions. The issue finally came to a head in the late 1950s in a series of confrontations between the statistical agencies and the Justice Department. The first incident pitted the Bureau of Mines and the Office of Statistical Standards (OSS) on one side and the Antitrust Division of the Department of Justice on the other.[10] The second incident was renewed conflict between the Census Bureau and the Justice Department. In all the cases, the antitrust division of the Department of Justice sought access to company filings protected by pledges of statistical confidentiality. The interagency conflicts were complex, and stretched over several years. The outcome of the conflict was an administrative and judicial defeat for statistical confidentiality and the Office of Statistical Standards. In 1958, the Bureau of Mines was forced to permit lawyers from the Justice Department access to company records collected under a pledge of statistical confidentiality. This precedent further emboldened the Justice Department as they pressed their position further and won a test case in the Supreme Court in 1961.

---

[10] The Division of Statistical Standards became the Office of Statistical Standards in 1952. See note 4 above.

## 4.3   Accessing Confidential Petroleum Data Collected by the Bureau of Mines

The Suez Oil Crisis was the triggering event that led to the confrontation between the Bureau of Mines and the Justice Department. In 1956, Egypt seized the Suez Canal from an Anglo-French consortium that managed the canal, and the supply of oil was cut to western Europe. In response, the Eisenhower administration facilitated special efforts by the major oil companies to redirect crude oil supply to Europe in the late fall of 1956, what was called "the oil lift program" (Frankel 1959; Engler 1961; Kovaleff 1980). At the same time, the Justice Department was investigating the major oil companies for antitrust violations involving manipulation of supply and price fixing. As far back as the Truman administration, the national security needs of a regular oil supply overrode the efforts to stop unfair trade practices among the major oil companies of the United States. Thus, a conflicting set of reporting procedures existed for the petroleum industry. On the one hand, the Interior Department was charged with collecting routine statistical information through the Bureau of Mines and of overseeing any efforts that might be needed to maintain the free flow of oil to the western world. On the other, the Justice Department was charged with the enforcement of the antitrust laws which prohibited collusion over production, distribution, and sale of oil products.

In January 1957, the price of gasoline at the pump rose sharply, and Congress accused the administration of bungling both the response to the Suez Crisis and the protection of the American consumer. A series of highly publicized Congressional hearings in February 1957 made Interior Department officials look particularly inept (U.S. Senate 1957; Kaufman 1977). Under sharp questioning from Senator Estes Kefauver, Assistant Secretary of the Interior Felix Wormser claimed that although the companies had antitrust immunity while transporting oil during the crisis, that immunity did not extend to coordinating prices to protect the consumer. Kefauver pressed Wormser on the point, asking if he "would do anything about" a 10 cent per gallon gas price rise. Wormser responded that he could do "nothing at all" about such a situation. Kefauver pressed him further, asking about a "fifty cents a gallon" rise. When Wormser again responded he had no authority, Kefauver responded "That is the most outrageous statement I have ever heard" (U.S. Senate 1957, 95; Kaufman 1977, 956).

Seeking to repair the public relations damage, Secretary of the Interior Fred Seaton testified on February 14, 1957, that he understood Congress' concern and that he would cooperate with the Justice Department on the ongoing antitrust investigations of the oil industry. Five days later, on February 19, Attorney General Herbert Brownell took the Secretary up on his offer (Brownell 1957a). Thanking him for his support, Brownell then requested

> that the Department of the Interior make available to the agents of the Federal Bureau of Investigation and other authorized representatives of the Department of Justice for inspection and copying all of your Department's petroleum files, including, but not limited to, all files of the Oil and Gas Division, the petroleum and petroleum products files of the Bureau of Mines, and all files of the National Petroleum Council.

Brownell concluded by noting that the grand jury would convene in Alexandria, Virginia on March 4, 1957.

The Bureau of Mines used a voluntary system of reporting ( Ankeny 1957a). Questionnaires included a statement:

> <u>INDIVIDUAL COMPANY DATA–CONFIDENTIAL</u> If permission to disclose is withheld by checking the box marked "NO" in question immediately preceding the signature, the data furnished in this report will be treated in confidence by the Department of the Interior, except that they may be disclosed to defense agencies.

> MAY THE BUREAU OF MINES DISCLOSE YOUR INDIVIDUAL DATA?
> YES___ NO ___

In early March, Marling Ankeny, Director of the Bureau of Mines, tried to stop the release of confidential responses to Mines inquiries by noting the provisions of the Federal Reports Act and that the Bureau relied heavily on voluntary reporting ( Ankeny 1957a). He asked that the Department's response also include a statement on the importance of confidentiality:

> The Bureau is concerned over the effects on the respondents of the release of individual company data to the Department of Justice and believes that the letter should indicate the effect that the violation of the promise of confidentiality would have on the Bureau's program....If the respondents were to conclude that the promise not to reveal individual company information does not apply to the Department of Justice, the Bureau's fact-finding program would be placed in serious jeopardy. The precedent established could also disrupt similar voluntary programs of other agencies both inside and outside the government.

The Interior Department supported Ankeny's request, and denied the Justice Department access to the confidential company files of the Bureau of Mines.

But the Justice Department was not satisfied, and in the summer of 1957, reissued its request (Brownell 1957b). Brownell wrote to Seaton suggesting that since "only a small portion of the requested information might require disclosure to the grand jury or the public," Seaton should "authorize the requested release for the purpose of study and analysis by my staff." He again insisted that he needed "access to all of the records in question" and proposed that "after a tentative selection has been completed by my staff, the appropriateness of using that information would be discussed between representatives of our Departments."

Again Director Ankeny strenuously opposed the Justice request and emphatically noted, "Anything that disturbs the pledge of confidentiality made to the respondents at the time of gathering the data would be seriously disruptive of the Bureau's collection program" ( Ankeny 1957b). This time, however, Ankeny's superiors did not support him. This was not surprising, given that Attorney General Brownell was a powerful figure in the Eisenhower administration and his key domestic policy adviser between 1953 and 1957. He had served as chairman of the Republican National Committee and was widely credited with securing Eisenhower the Republican nomination in 1952, later overseeing his successful election campaign that year ("Herbert Brownell Jr., Eisenhower Attorney General, Dies at 92," The New York Times, 5/3/1996, p. A29).

Reversing its earlier refusal, acting Interior Secretary Hatfield Chilson responded to Brownell on September 5, 1957, and said the Interior Department "will be guided by your opinion" and that he had "instructed the Directors of the Bureau of Mines and of the Office of Oil and Gas...to permit access to the files of their respective agencies" (Chilson 1957).

In the months following, Justice officials gained access to the Mines files according to the parameters expressed in Brownell's August 1957 letter to Seaton. In April 1958, Justice officials pressed further and escalated their requests, asking for "formal release to the Department of Justice of copies of certain individual company returns on Bureau of Mines' standard statistical survey report forms for the years 1956 and 1957" (Ankeny 1958). Ankeny pleaded with officials in the Secretary's office not to accede to the release, noting that the release would set a "Government-wide precedent" and jeopardize the entire statistical system. He pointed out that production was concentrated in the firms covered by their inquiries. If a single large firm refused to cooperate, the resulting statistics would be worthless. Ankeny suggested that the Secretary's office propose that the Justice Department subpoena the information they needed from the firms themselves. He also asked that the other agencies affected, "including the Budget Bureau", be consulted "before a final decision is reached."

While Ankeny continued to try to stall the Justice Department's request, on May 29, 1958, the Alexandria grand jury returned an indictment against 29 oil companies charging them "of having conspired to raise and fix crude oil and gasoline prices after the Suez Canal crisis" (Lewis 1958). The indictments brought increasing pressure on the Bureau of Mines. By the summer of 1958, Ankeny again faced orders from his superiors to give the Justice officials access to the materials.

At this point, the officials in the Office of Statistical Standards, who had been monitoring the controversy for the past year, intervened directly. Raymond Bowman, Assistant Director for Statistical Standards (and Stuart Rice's successor), wrote identical letters to the Secretary of the Interior and the Attorney General on August 27, 1958, asking that representatives from both departments meet with him "before any information....is released" (Bowman 1958). He also raised the issue of the impact of the release on the rest of the statistical system, and asked if there were "other means available of accomplishing that Department's objectives." A series of meetings took place in the fall of 1958, but did not resolve the situation. Officials in the Office of Statistical Standards pointed out to the officials in both the Interior and the Justice Departments that OSS had the authority under the Federal Reports Act to facilitate and adjudicate requests for confidential data between different federal departments. But the OSS officials also recognized that such authority was unenforceable in the absence of willingness on the part of the Interior Secretary and the Attorney General to acknowledge it. Even more worrisome was the lack of a general policy on these conflicts and the danger of establishing a worse precedent by having the Office of Statistical Standards a party to the release.

On November, 28, 1958, officials from the Office of Statistical Standards acknowledged failure. In a particularly blunt memorandum titled "Confidentiality of statistical data - Justice/Interior transfer of data," OSS staff member Peyton Stapp described the situation to Elmer Staats, then Deputy Director, Bureau of the Budget (Stapp 1958a). The memorandum deserves to be read in its entirety to capture both the frustrations of the officials in the statistical system, and the dilemmas of the larger situation:

> Accepting the position that it is too late in the negotiations between Justice-

Antitrust and Interior for the Bureau of the Budget to attempt authoritatively to stop access to Bureau of Mines statistical reports in view of the uncertainty as to our legal authority to prevent it, I will follow the course outlined below if it is agreeable to you.

We will <u>not</u> [emphasis in original] write a letter to the Secretary of Interior expressing disagreement with his decision: to give Justice access to reports which were collected under a pledge of confidentiality because the Grand Jury with which Justice lawyers were working had power to subpoena the records. Such a letter would either have to be backed up with the will to say he should not follow through on his commitment, which I understand we are not prepared to do, <u>or</u> [emphasis in original] with some form of acquiescence in transferring these data under the circumstances now existing. The latter position seems undesirable for us to take—that is I prefer not to have any form of concurrence, even such reluctant acquiescence as this would imply. Instead, I will call Assistant Secretary Hardy[11] (I asked him last week to delay carrying through on their commitment to Justice) and say we interpose no further objection, but I will also indicate our feeling and proposed course of action as per next paragraphs.

We have not enunciated a clear cut policy on this matter because I know of no previous case in which confidential data of this sort have been turned over to law-enforcing agencies.[12] This case violates a time-honored practice. There is in fact a previous provision of law which presumably protected respondents, Section 1905, Title 18. However, the Federal Reports Act does provide for the release of confidential information to another Federal agency if the receiving agency has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information. (We had assumed this power rested in the Budget Bureau and so could be kept under control, that is we could order such release or not order it as the occasion justified, and in my own mind at least such occasions would always involve other statistical uses, or specifically cases where there would be no damage to the individual respondent through use of his individual report.)

It now appears that power to release confidential information rests in the hands of the collector if this condition is met. The practical danger is not only that the individual respondents in this case will not cooperate in statistical requests in the future, but that <u>all respondents to all statistical requests</u> [emphasis in original] will be uncooperative if they cannot depend on the Government's promise that their answers will be held confidential. We should now undertake to issue a policy statement to the effect that <u>no</u> [emphasis in original] collector of statistical data should disclose individual reports to another government agency when they will be used against the respondent for law-enforcement, regulation, taxation, etc., and that any request for access to confidential statistical reports should be cleared with the Bureau of the Budget.

---

[11] Assistant Secretary, Mineral Resources, Department of the Interior.

[12] Stapp's asserted ignorance of prior disclosures, if true, is an indication of how quickly the disclosures under Section 1402 of the Second War Powers Act seemed to have disappeared from the institutional memory of the Office of Statistical Standards.

> Such a procedure, involving issuance of a policy statement <u>de novo</u>, so to speak, avoids acquiescence in any previous violation and also avoids calling any attention to such cases. The fewer people who know about this Interior case the better, for it if were widely known an indeterminate amount of damage to the statistical system woul (sic) be done.

In early December, Stapp requested that the Interior Department stipulate that if the records were to be introduced in evidence at trial, the Justice Department would subpoena them from the company (Stapp 1958b). That is, the conflict between Mines, OSS, and Justice revolved around the meaning of the language in Section 4(b)4 which provided that confidential statistical information collected by one agency could be released to another agency if the second agency "has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information." Stapp wanted to force this conflict to the fore so it could be resolved by action in OSS. To clarify that he noted, "<u>no</u> collector of statistical data should disclose individual reports to another government agency when they will be used against the respondent for law-enforcement, regulation, taxation, etc., and that any request for access to confidential statistical reports should be cleared with the Bureau of the Budget." Stapp also followed up with Elmer Staats, discussing how to issue a regulation to make the position clear. Staats (1958), however, responded to Stapp's proposal by noting that "my impression on this is that the Bureau [of the Budget] does not have such authority at the present time." He proposed a policy statement instead "outlining the considerations involved and the difficulties presented in the disclosure of individual reports for purposes of law enforcement activity against the company or companies reporting." "In other words," he continued, "such a statement would have as its purpose to dissuade the law enforcement agencies rather than to prevent them from subpoenaing such records from other government agencies. This would leave the door open to them to obtain the same records from the companies concerned."

In short, at the end of 1958, officials in the Office of Statistical Standards had conceded they could not prevent Justice Department officials from using the Federal Reports Act to access individual level records gathered through statistical data collections. Their major hope at the time was to prevent this situation from becoming publicly known, so that they could work toward developing a policy to discourage the Justice Department from using its power to subpoena company level statistical responses.[13]

## 4.4 Accessing Confidential Company Data at the U.S. Census Bureau

It soon became clear that the Justice Department was not willing to defer to the statistical agen-

---

[13] The outcome of Justice Department case against the 29 oil companies was a defeat for the government in February 1960. Against the wishes of the Justice Department, the companies were successful in moving the trial to Tulsa, Oklahoma, in September 1958. The case went to trial on February 1, 1960, and was expected to last several months. On February 12, after the prosecution rested its case, the companies moved for a judgment of acquittal. The judge granted the motion the next day. See *New York Times*, September 12, 1958, p. 15; September 19, 1958., p. 55; January 31, 1960, p. 72; February 2, 1960, p. 29; February 3, 1960, p. 22; February 4, 1960, p. 20; February 9, 1960, p. 14; February 10, 1960, p. 24; February 13, 1960, p. 11; February 14, 1960, p. 34. We have no evidence that the behind the scenes conflict over the Bureau of Mines data figured in the trial phase of the case.

cies and relinquish what it thought was its authority to access confidential statistical reports for investigatory purposes. While the Mines controversy still brewed, the Justice Department forced the issue in other antitrust cases with the Census Bureau.

Because the Census Bureau micro records were specifically protected by the provisions of Title 13, the Federal Trade Commission and the Justice Department could not gain access to such records through the Federal Reports Act. Ed Goldfield, Assistant Director at the Census Bureau in the 1950s, remembered well in his 1991 oral history interview how these agencies responded to this situation (Goldfield 1991):

> In the latter 1950's, the Federal Trade Commission was engaging in what some people might called a "fishing expedition" or a "witch hunt." What they were doing was looking for evidence of anti-trust procedures in certain industries. Some of their emissaries came to me and said: "We have a list of companies in this industry that we would like to check out, and we would like to see the records that you have from the census of manufactures and whatever else you have from these companies." I said: "No, you cannot see them," as was the case in all the face-offs I had with the Federal Bureau of Investigation, the Secret Service, and others. They were surprised and appalled, and could not believe that I was telling them that the Census Bureau was not going to help them do the work that was important to the welfare of the country. I was insistent about it, however, and I told them (as I had told the representatives of other such agencies): "Go back and check with your legal authority, and I think you will find that I am right." They did so, and they found that the census records, particularly from the census of manufactures, which they were especially interested in, could not be given to them by the Census Bureau, even for a worthy cause. I said to them: "You are a regulatory agency; you are armed with legislation that gives you the authority to compel any companies, firms, or establishments that you are interested in to give you information that is appropriate to your regulatory responsibility. You can take a blank census form and copy it over and put your name on it, and say: 'This is what we are demanding of you,' and send it to whatever company you want and get the same information."

> They said: "No, that would not be satisfactory. If we get a form that the company gave to the Census Bureau, we would believe that it would have been honestly filled out under the guarantee of confidentiality that the Census gave. The [company officials] would have responded to the census because they felt that no harm would result, and that they were interested in helping to produce good statistics for their industry. But if the Federal Trade Commission asked for the same answers for the same questions in our own name, this is like asking them to testify against themselves. We will not get results that are as credible [as the census]. We want to be able to walk into court and wave a copy of a census questionnaire and say: 'Here is what the company honestly reported against itself, and it shows it is unduly dominant in this industry or whatever.'" My response to the Federal Trade Commission was not satisfactory to it.

> Then they learned that when the Census Bureau took economic censuses, the material suggested to respondents that they keep a copy of the questionnaire that

they sent back to the Bureau. More precisely, firms received an extra blank questionnaire copy for this purpose which said: "If we have any questions about your return, you will have a copy to look at while we are asking you these questions; or, when you get the next questionnaire for the next census or survey, you can look at how you filled out the previous one." So, a lot of the companies kept copies as a general practice. The Federal Trade Commission got to thinking: "Well, if we cannot get the questionnaires from the Census Bureau, we will subpoena the copies from the company." They did so in a number of cases, some of them were brought to court because the companies challenged the subpoenas on the grounds that their census returns were supposed to be confidential. One of the cases that went to the courts was one involving Beatrice Foods, another involved the Borden Company, and another involved the St. Regis Paper Company. These cases first came under the jurisdiction of U.S. district courts, and then to U.S. appellate courts in various parts of the United States which handed down conflicting conclusions. In a couple of the cases, the Federal Trade Commission's position was upheld, and in other cases, the company was upheld. That is, the courts said, in effect (I think I am quoting one of the decisions), "The United States has given its word and it should not be overturned...."

In the Beatrice Foods case, the appeals court sided with the company and upheld the confidentiality of the file copy of the company's census files (Federal Trade Commission v. Dilger 1960). In the St. Regis case, a conflicting appeals court decision sided with the FTC, and the issue then came before the Supreme Court for resolution.

# 5   St. Regis Paper Case

In the second half of the 1950s, the Federal Trade Commission was investigating possible antitrust violations at the St. Regis Paper Company. The Commission opened an inquiry in September 1956, and made numerous requests for documents from the company, including file copies of the company's census forms. The FTC met stiff resistance from the company. In July 1959, the Commission declared St. Regis in default on its obligations to report, and initiated proceedings to fine the company $100 a day for noncompliance. St. Regis complied with all requests by April 1960, except for the requests for the file copies of the company's 1958 census reports. St. Regis went to court to appeal the fines and to protect the file copies of its census forms. St. Regis relied on the language of Title 13, Section 9 (a) which required that the Census Bureau not:

1. use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or

2. make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or

3. permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

The Second Circuit Court of Appeals ruled in December 1960 that the file copies held by the company were not protected by the confidentiality protections of Title 13, Section 9 (a), and ordered the company to turn over the files to the Federal Trade Commission. Since the Seventh

Circuit Court of Appeals had ruled that the file copies were confidential, St. Regis appealed the decision to the Supreme Court in early 1961, and the Supreme Court accepted the case to clarify the law.

The St. Regis case brought into public view the behind the scenes bureaucratic struggle between the regulatory agencies and the statistical agencies that had been brewing since the passage of the Federal Reports Act. On the surface, the case appeared to be a minor dispute about arcane issues of the forms of evidence and the powers of the Federal Trade Commission to regulate unfair trade practices. But for the statistical agencies, and for those insiders aware of the context of the almost 20 year struggle to define the boundaries of statistical confidentiality, the case loomed very large indeed. For these officials, the St. Regis case was all the more distressing, since the FTC was challenging the oldest and strongest confidentiality provisions in American law, namely the guarantees of Title 13. The Bureau of Mines had relied on its administrative practice to resist the Justice Department. If the FTC prevailed in its interpretation of Title 13, then statistical data collections could indeed be jeopardized across the government.

The different readings of the issues involved can perhaps be seen by comparing the internal court memoranda on the case at the Supreme Court with the discussions inside the statistical agencies and the Office of Statistical Standards. The statistical agencies were extraordinarily troubled by the prospect of a Supreme Court decision voiding the confidentiality protections of Title 13. In June 1961, for example, while the St. Regis case was pending, the Director of the Bureau of the Census, Richard Scammon, wrote to Lee Lovinger, Assistant Attorney General, pleading with him to take action to stop further efforts by the antitrust division to subpoena confidential Census of Business reports (Scammon 1961):

> Andrew Kilcarr [of the Justice Department] has been kind enough to informally advise us of the intention of the Anti-Trust Division to subpoena a respondent's file copy of a confidential Census of Business report in connection with an action involving a company in the banana business....

> This raises again, Lee, this whole problem of the confidentiality of census returns and I'd like to re-emphasize the seriousness with which we here view these legal actions....

> It is a matter of fact that the Beatrice and St. Regis cases have caused widespread suspicion of our Census Bureau representations with respect to confidentiality – representations which we make to companies as part of the inducement to file reports promptly, often voluntarily, and on a uniform statistical basis without regard to the varieties of formal records maintained by individual businesses. We are now lacking reports from some of our largest companies in a few of our basic series, and there is evidence of increased reluctance to supply data voluntarily.

Scammon continued by explaining that the bureau requires "reports before final audited records are available" and "prompt returns without having them pass through the hands of legal counsel for consideration of their implications of other laws". Scammon emphatically stated that "the attempt to break into the confidential relationship between the respondent and the central statistical agency will erode the basic sources of information" and "will impair our democratic processes by limiting the variety and accuracy of the statistical information needed if the

decisions made by the people and the Government are to be based on an adequate knowledge of the facts." Noting that he felt that "great harm can come to the country" if the antitrust division continued to subpoena statistical reports, he offered to meet "at any time" and find an "acceptable conclusion".

The conflict between the Justice Department and the statistical agencies also spilled out in the briefs to the Supreme Court in the St. Regis case. The Commerce Department submitted a brief opposing the FTC action, and the Bureau of the Budget also opposed the FTC attempt to use its subpoena power to gain access to the company copies of the census forms.

Still, the Justice Department did not relent, and the St. Regis case moved to decision before the Supreme Court in the fall of 1961. Within the Supreme Court, many of the Justices had a quite different perspective from the statistical agencies on the issues involved. For a number of the Justices, the principle of statistical confidentiality seemed to be a side issue and the recalcitrance of the St. Regis Paper Company was the central issue of the case. Justice Tom C. Clark was the author of the majority opinion in the case. It is clear from his court files that the members of the court did not see the statistical confidentiality issues as terribly important, and that the case was overall a relatively minor one. In the late 1930s and 1940s, Clark had served in the Antitrust Division of the Justice Department, headed the War Frauds Unit of the Justice Department during World War II, and served as Attorney General in the Truman administration. This experience gave him major experience in the complex issues of antitrust, and he showed little sympathy for what he considered as the company's stalling. In November 1961, Clark wrote a memorandum to the court's conference proposing that the court affirm the court of appeals decision (Clark 1961):

> A careful study of this record convinces me that St. Regis, through its attorney Horace Lamb, for three years openly defied the Orders of the Federal Trade Commission, was contemptuous of its officers and did everything possible to obstruct the investigation.

In his eight page memorandum, Clark devoted seven pages to detailing the recalcitrance of St. Regis and untangling the complex questions of whether the company should be fined for non compliance. Only in his last page of discussion, did he turn to the question of the confidentiality of the census reports:

> There can be no doubt that literally construed the provisions of Section 9 (a) of the Census Act do not render confidential the copies of the reports made by corporations and retained in their files....The suppression of otherwise competent evidence is serious business and statutes doing so are strictly construed. To say that the language here makes the copies confidential would open up a field not heretofore considered restricted.

He acknowledged that the briefs of the Solicitor General had noted the opposition of the Bureau of the Budget and the Census Bureau to this interpretation, and he conceded that such a decision might not be prudent public policy. But, he concluded, the court should not so rule. "After all," he noted, "Congress can amend the statute."

The next day, Chief Justice Earl Warren responded to Clark ( Warren 1961). "I am persuaded

by your memorandum in the above case that the penalties for failure to answer the questions should be sustained," Warren wrote. "I am still somewhat up in the air on the copies of the census reports," he continued, and he reported that by his count, the court was split on the issue. But he continued, "I think this is not so terribly important however, because as I understand it the information is available to the Commission, if not through these reports, through spade work. Copies are not required to be kept, and I suppose anyone who wanted to thwart the Commission could just destroy the copies, and if they wanted to produce them they would do so without controversy." In the next several days, the Justices cast their votes on the case, and it became clear that Clark's opinion carried the majority. In December, the court ruled six to three that the file copies of census forms were not confidential. The court ordered St. Regis Paper turn over the file copies to the FTC.

Clark prepared the opinion delivered in December. He based his majority opinion on a strict reading of the Census statute: "Congress did not prohibit the use of the reports per se but merely restricted their use while in the hands of those persons receiving them, i.e., government officials. Indeed, where Congress has intended like reports not to be subject to compulsory process, it has said so" (*St. Regis Paper Company vs the United States*, 1961; quoted in Rubin, 1962, 28). He again noted that Congress could modify the statute if appropriate.

In a dissenting opinion, Mr. Justice Black supported the statistical agencies and criticized Clark for missing the point. He argued that the majority opinion made a mockery of the agency's pledge printed on its forms that any information given would not be used "for purposes of taxation, investigation, or regulation." Black noted that the

> Census Bureau and the President promised that the Census Bureau would keep Census reports particularly confidential. . . .Quite plainly, the promised protection was against governmental "taxation, investigation, or regulation" generally, and to protect the integrity of that promise, it is, of course, necessary that all of the particular arms of Government which are engaged in those activities be bound by the Government's pledges. Our Government should not, by picayunish haggling over the scope of its promise, permit one of its arms to do that which, by any fair construction, the government has given its word that no arm will do (quoted in Rubin 1962, 28).

Once the decision was announced, the Census Bureau and other officials of the federal statistical system mobilized to counter its impact, since they knew that the outcome of the case would have an extraordinarily damaging impact on compliance with its censuses and surveys. In early 1962, the issue moved to Congress, as a number of bills were introduced to clarify the meaning of the confidentiality pledge in Title 13. The debate was extraordinarily broad and to our knowledge was the first time in the twentieth century that Congress undertook a full examination of the purposes of and potential limitations on statistical confidentiality. In the summer of 1962, the House Committee on Post Office and Civil Service conducted far reaching hearings and heard from dozens of witnesses on all sides (U.S. House of Representatives, 1962). Once again, positions aired both supporting and opposing strong standards of statistical confidentiality. Defending the standard as it had developed over the past 50 to 75 years, Census Bureau Director Richard Scammon testified:

> Once you start saying that material is not confidential, that material may be used to your disadvantage, that this material may be used to your disinterest, then you

are going to get just as dubious a set of reports as the imagination of man can devise and I would suggest that this imagination is a pretty far reaching thing (U.S. House of Representatives 1962, 23; also quoted in Rubin 1962, 28).

On the other side of the argument were the defenders of a government that could efficiently investigate and prosecute unlawful business practices. Echoing the logic of coordination underlying the Federal Reports Act, Emmanuel Celler (D-NY), Chair of the House Judiciary Committee, came before the House Post Office and Civil Service Committee to testify in favor of the Supreme Court majority view. Celler had also been a member of the House Judiciary Committee in the 77th Congress, and participated in the debates about Title XIV of the Second War Powers Act (U.S. House of Representatives 1962, 34, 38, 39). He thought that the St. Regis decision should be taken further:

> As a general rule, information in the files of one agency should be available to other agencies of the executive branch in the enforcement of the laws. The administration of justice should not be reduced to the level of blind man's buff, played by different departments of the same government.

> If the Bureau of the Census has in its files information relevant to a violation of the antitrust laws, it seems to me as a general proposition that such information should be available to the Department of Justice and the Federal Trade Commission – the agencies charged with antitrust enforcement.

> It would be more appropriate, therefore, to repeal the secrecy presently accorded the original census returns in the possession of the Bureau of the Census than to extend the shroud of secrecy to file copies of census returns retained by reporting companies.

Celler derided the statistical agencies' claims for the need for confidentiality. He charged that the claims were smokescreens for bureaucratic self protection: "These bills are symptomatic of a dangerous climate of secrecy among Government agencies. Among the worst offenders, I am told, are the Bureau of the Census, the Bureau of Mines and the Bureau of the Budget." Celler did not mention the controversy surrounding the Bureau of Mines petroleum data, but clearly the Bureau of Mines and the Bureau of the Budget had suffered in reputation with this powerful House committee chairman. Celler raised an opposing argument defending his position that statistical data should not be covered with a pledge of confidentiality: "The right of the people to know what their Government knows is indispensable to that informed public opinion which alone can make our democracy work." "These bills promote an abuse of secrecy," he continued:

> Secrecy so abused in this instance is a threat to our free enterprise system–a system whose freedom depends upon the ability of our Government to enforce the antitrust laws.

Advocates for both sides of the debate found support in the basic principles of democracy, open government, and the integrity of the free enterprise system. In commenting on the St. Regis case and the Congressional response, Corcoran (1963, 39) observed that

Although understanding the motivation behind Representative Celler's remarks, the Subcommittee could not agree that the confidence accorded census information should be repealed . . .  The high degree of confidence now held by the general public for the Census has been earned over the years – few other Government agencies have such a high repute in the business community.  The statements presented at the Subcommittee hearings by trade associations, businessmen, economists, statisticians, and many others attest to this fact.

## 5.1   Reestablishing the Confidentiality Standard

In the late summer and early fall of 1962, Congress accepted the arguments of the statistical agencies and the industry representatives who testified in July.  They rejected the Justice Department and Celler's position and amended Title 13 to provide a confidentiality guarantee for the file copies retained by companies filing census reports (Title 13, U.S.C, Section 9; Public Law 87-813).  The new language read:

> No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual.  Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding.

President Kennedy signed the bill on October 15.  The Cuban missile crisis began the next day, and census confidentiality was swept from the attention of Congress and the public.

# 6   Since 1965

We conclude with a brief review of what has changed and what has remained the same over the past 40 years with respect to the confidentiality of business data.  In so doing, we hope to highlight some of the implications of our story for current statistical practice and identify continuing issues about statistical confidentiality since the St. Regis decision.

The 1962 amendment to Title 13 ended the period of intense struggle between the Justice Department and the Census Bureau over the meaning of the Federal Reports Act and the reach of the regulatory agencies' access to confidential statistical information on businesses gathered by the Bureau.  Moreover, the arguments advanced by those who supported Congressional action to amend Title 13 to prevent the use of firm-level business data collected by the Census Bureau to aid in the investigation, prosecution, or regulation of the involved firms would seem to apply with equal validity to such information collected by other federal statistical agencies and programs. Since Congress accepted this position and amended Title 13, some presumption of Congressional intent in these matters could be reasonably inferred.

Nevertheless, there is evidence that the Justice Department and the regulatory agencies still

maintain their position, that statistical confidentiality laws and respondent assurances notwith-standing, the federal statistical system is an appropriate source of evidence about individual firms. Furthermore, as was the case of Herbert Brownell under President Eisenhower and Robert Kennedy under President Kennedy, Attorneys General have been politically well-connected and powerful figures in many subsequent administrations.

In the late 1980s and early 1990s, for example, amidst price rises occasioned by the December 1989 Heating Oil Crisis and the Persian Gulf Crisis, Department of Justice officials opened investigations of alleged price-fixing by oil companies. The Justice Department asked the Energy Information Agency (EIA), which collects statistical data on the oil industry, to provide individual level firm data to the Justice Department for the investigation. The EIA refused and the Justice Department initially closed its investigation without gaining access to the data (Duncan, et al. 1993; U.S. General Accounting Office 1993, 130). The EIA believed that as a statistical agency, any "proprietary data" it collected was covered by a shield of statistical confidentiality and should not be used for law enforcement purposes. However, the Justice Department disagreed, reopened the matter, and in March 1991 issued a decision, which still stood as policy on the EIA website until 2005, that the EIA was required by statute to release any data it collects, including company-specific proprietary information, to any federal agency requesting the data for official use, including to the Justice Department for law enforcement purposes. Whether there are further examples of efforts—successful or unsuccessful—to use the federal statistical system to gather evidence against individual responding firms certainly merits further research and perhaps Congressional examination, particularly given the 1962 action by Congress to strengthen Title 13.

There has been, in fact, relatively little public discussion about the confidentiality of firm level data in the federal statistical system in the years after 1962. Part of this may have been due to the organizational changes affecting the federal statistical system over the past four decades. The Bureau of Mines, for example, was abolished in 1996, and its functions dispersed to the Geological Survey (Interior Department) and the Departments of Energy and Health and Human Services. The Office of Statistical Standards has undergone several periods of institutional migration and restructuring since the 1960s. It now resides in the Office of Management and Budget (successor to the Bureau of the Budget) as it did from the 1940s to the 1960s.

For whatever reason, most recent discussions about statistical confidentiality have focused on threats and protections related to data on persons. For example, in the late 1960s, Congressman Jackson Betts (R-OH) mounted a challenge, ultimately unsuccessful, to the mandatory nature of the questions in the 1970 census. Similarly, proposals to begin the creation of what was called at the time a "National Data Bank" foundered on fears of "Big Brother" and an overreaching national government (Eckler 1972; Eckler; President's Commission on Federal Statistics 1971). And in the early 1970s, privacy became a major public issue for the federal government as Congress passed the Privacy Act of 1974 to protect individual information from government intrusion. The impact of these and other developments seemed to strengthen the priority being accorded to confidentiality protections for personal data in the federal statistical system at least through September 11, 2001.

As described elsewhere (Seltzer and Anderson 2002; 2007b), the crisis of 9/11 prompted Congress to weaken statistical confidentiality related to personal data collected by the National Center for Education Statistics in provisions of the Patriot Act. In 2002, in seemingly

contradictory legislative efforts, Congress passed a recodification of that weakening in the Education Research Reform Act of 2002 (PL 107-279 2002), but also adopted major new legislation on data sharing and statistical confidentiality in the Confidential Information Protection and Statistical Efficiency Act of 2002 (CIPSEA) (PL107– 347, 2002). The Office of Management and Budget promulgated Implementation Guidance for protecting and sharing statistical data under CIPSEA on June 15, 2007 (Office of Management and Budget 2007).

With CIPSEA, Congress at long last enacted general legislation offering statistical confidentiality protections to all federal statistical agencies. Because of the potential importance of this new law for confidentiality protections that can be accorded business data collected by agencies other than the Census Bureau, it is useful to compare the relevant language in CIPSEA with that of the older provisions of the Federal Reports Act.[14]

Several points are noteworthy. CIPSEA includes a formal definition of "statistical purposes" of data and distinguishes these from "nonstatistical purposes." The law "findings" include statements of the importance of assuring public trust in gathering statistical data, and that statistical data collection "serves both the interests of the public and the needs of society." The language of the rules governing disclosure is clearer than that of the Federal Reports Act and does not contain the kinds of exceptions that plagued the Office of Statistical Standards in the 1940s and 1950s:

---

[14] One feature of CIPSEA is that it explicitly does not weaken the confidentiality protections provided by other legislation, such as Title 13.

> ...Data or information acquired by an agency under a pledge of confidentiality for exclusively statistical purposes shall not be disclosed by an agency in identifiable form, for any use other than an exclusively statistical purpose, except with the informed consent of the respondent.

Nevertheless, we are not completely convinced that officials charged with protecting statistical confidentiality would be able to withstand a sustained assault once again if sufficiently important public purposes were raised to challenge it. We are concerned in particular that the lessons of the 1940s, 1950s, and early 1960s have not been passed to the next generation. The power of the Statistical Policy Office to resist improper data requests inside the administration and away from public view is still limited by its place in the overall policy environment of the Office of Management and Budget and larger administration priorities. Possibly further hampering its ability to resist threats to statistical confidentiality, particularly if supported by an Attorney General or another politically powerful administration figure, is the comparatively low position of the Statistical Policy Office in the bureaucratic structure of the OMB.

In both Democratic and Republican administrations, executive branch officials and the courts have, when faced with competing public needs, been disinterested in supporting, if not openly hostile to, the protection of statistical confidentiality, recalling Justice Clark's understanding that "Ours is the duty to avoid a construction that would suppress otherwise competent evidence unless the statute, strictly construed, requires such a result." By contrast, once the issues have been joined publicly, with some notable exceptions like that of Congressman Emanuel Celler, the record in Congress has been far more supportive.

Thus, in the years ahead we expect quiet administrative debate about the meaning of the CIPSEA protections in particular contexts, and possible court challenges. A preliminary indication of how this debate is proceeding may be gleaned from the fact that it has taken over four years for OMB to issue regulations relating to the implementation of CIPSEA (Cf Wallman 2003).

Accordingly, we propose both additional transparency by those in the federal statistical system about the confidentiality issues they confront and further analysis of the historical record pertaining to these issues by those in and outside of the federal statistical system. Both approaches should help us all to better understand the current challenges to statistical confidentiality and the larger history of institutional pressures on the federal statistical system in this area. By way of analogy, the military, in planning for future challenges, makes use of both current intelligence and first-rate historical research of what went right and what went wrong in the "last war."

The institutional history traced in this paper does not appear to be common knowledge among subsequent statistical policy makers. In 1959, Peyton Stapp of the Office Statistical Standards warned that the long controversy between the Bureau of Mines and the Department of Justice would damage the statistical system if it became public knowledge. Unfortunately, he and later officials did not consider the problems for future statistical administrators and others concerned with the health of the federal statistical system if a careful analysis of the problems he faced were not transmitted to the next generation. (Indeed, as we have noted, Stapp himself appears to have been blind-sided by some of his predecessors about disclosures under the Second War Powers Act.)

One perhaps can forgive William Lane Austin for his public statement, patently an exaggeration in the heat of challenges to the income question in the 1940 census, when he assured the public that "the Census Bureau throughout its 150 years has never violated the law requiring secrecy."[15]   But one wishes that the officials in the Office of Statistical Standards from the 1940s, 1950s, and 1960s had transmitted their institutional knowledge to the next generation of officials. Joseph Duncan was Deputy Associate Director for Statistical Policy, Executive Office of the President, Office of Management and Budget in the 1970s. In a paper delivered at the Social Statistics luncheon at the 135th annual meeting of the American Statistical Association in Atlanta, GA, on August 25, 1975, he spoke on "Confidentiality and the Future of the U.S. Statistical System". Duncan proposed several propositions to his audience (Duncan 1976, 54). He assured them that "The protection of the confidentiality of individual responses to statistical inquiries has long been a paramount consideration in the statistical system...." and that the "statistician has long asserted that the protection of data confidentiality is essential to assure the accuracy of statistical programs...." He went on to assure his audience that "The record of statisticians is clear. I do not know of one instance in which there has been a breach of confidentiality pledges by statisticians in the Federal Government...." We strongly support Duncan's first two propositions but we also suggest that the third needs revision.

The standard of statistical confidentiality is extraordinarily important for the integrity of the statistical system and the data needs of society. We also suggest that the standard will continue to be challenged and its institutional defenders portrayed as hidebound bureaucrats creating an unnecessary impediment to proper and efficient government action. The officials so charged find it difficult to defend themselves, without mobilizing their natural allies among the data providers and users. In the case of business data, an important and powerful set of respondents exists. It is thus necessary and appropriate for officials and other stakeholders in the larger public to be aware of and draw on this resource in supporting the principle of statistical confidentiality throughout the federal statistical system.

# 7   Archival Resources

**National Archives:**

Record Group 29 (RG29), Records of the Bureau of the Census (Washington, D.C.).
   Entry 202, Joseph Hill Papers,
   Entry 372L Files of C. Louis Kincannon, Deputy Director (1981-1992).

Record Group 40, Records of the Department of Commerce (College Park, MD).
   General Records of the Department of Commerce, Office of the Secretary, General Correspondence.

---

[15] "Senate Unit Raises New Census Issue," New York Times, March 21, 1940, p. 17. Austin had worked for the bureau since the turn of the century and was aware of the confidentiality breaches during World War I and the early 1920s. Cf. Barabba: "personal information for several hundred young men was released to courts, draft boards, and the Justice Department." We understand Austin's public statement to be technically correct. What he did not say was that the "law" requiring secrecy was 11 years on the books, not 150, as he implied. Austin personally was very committed to statistical confidentiality and worked hard to guarantee it. See Anderson and Seltzer 2007.

Record Group 51, Division of Statistical Standards, Records of the Office of Management and Budget (College Park, MD).

General Records, 1940-1968, Entries 147; 147B; and Series 39.1, General Legislation, 76th - 79th Cong. 1939-1946.

Tom C. Clark Papers, Box A124, Folder 47, Rare Books & Special Collections, Tarlton Law Library, The University of Texas at Austin.

Stuart A. Rice Papers, Harry S. Truman Presidential Library, Independence, MO.

Henry Morgenthau Jr. Papers, Franklin Delano Roosevelt Presidential Library, Hyde Park, NY

Support for this research has come from Institute for Race and Ethnicity at the University of Wisconsin Milwaukee, the Harry Truman Presidential Library, and the Institute for Research in the Humanities at UW-Madison. An earlier version of this paper was delivered at the 2005 meeting of the Federal Committee on Statistical Methodology in Arlington, VA. In addition, the present paper incorporates recent research findings related to disclosures of business data by the U.S. Census Bureau in the 1942-1947 period under the Second War Powers Act and presented in Seltzer and Anderson (2007a).

# References

Anderson, M. (1988), *The American Census: A Social History*, New Haven: Yale University Press, 1988.

Anderson M. and Seltzer, W. (2007), "Challenges to the Confidentiality of U.S. Federal Statistics, 1910-1965," *Journal of Official Statistics*, 23, 1, 1-34.

Ankeny, M. (1957a), Letter to Fred Seaton, March 8, 1957, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Ankeny, M. (1957b), Memorandum to Solicitor, August 19, 1957, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Ankeny, M. (1958), Memorandum to Assistant Secretary, Mineral Resources, April 18, 1958 in Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Barabba, V. (1975), "The Right of Privacy and the Need to Know," in U.S. Census Bureau, *The Census Bureau: A Numerator and Denominator for Measuring Change*, Technical Paper 37. Washington, D.C.: Government Printing Office.

Bohme, F. G., and Pemberton, D.N. (1991), "Privacy and Confidentiality in the US Censuses – A History." Paper presented at the annual meeting of the American Statistical Association. Atlanta, GA, August 18-22.

Bowman, R. (1958) Memorandum to Secretary of the Interior; Memorandum to Attorney General, August 27, 1958, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Brownell, H. (1957a), Letter to Fred Seaton, February 19, 1957, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Brownell, H. (1957b), Letter to Fred Seaton, August 7, 1957, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Chilson H. (1957), Letter to Herbert Brownell, September 5, 1957, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Informa-

tion...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Clark, T. (1961), Memorandum to the Conference, November 15, 1961, Tom C. Clark Papers, Box A124, Folder 47, Rare Books & Special Collections, Tarlton Law Library, The University of Texas at Austin.

Clemence, T. (1986), Letter from Theodore G. Clemence, Senior Advisor, to Annelise Anderson, Hoover Institution, 8/20/1986. NARA, RG 29, Administrative Records of the Bureau of the Census, Entry 372L Files of C. Louis Kincannon, Deputy Director (1981-1992), Alphabetic Files (Advisory Committee – Voting Rights), Box 24, Integrated Survey Proc. to Legislation, Folder "Japanese Americans."

*Congressional Record* (1941), (77th Cong., 1st Session), volume 87, pt. 6, 6969, August 11.

Corcoran, T. F. (1963), "On the Confidential Status of Census Reports" *The American Statistician.* 17, 3, 33-40.

Dandeker, C. (1990), *Surveillance, Power and Modernity: Bureaucracy and Discipline from 1700 to the Present Day*, Cambridge, UK: Polity Press.

Daniels, R. (1982), "The Bureau of the Census and Relocation of the Japanese Americans: A Note and a Document." *Amerasia Journal* 9: 101-105.

Duncan, G., Jabine, T.B.. and de Wolf, V.A., eds. (1993), *Private Lives and Public Policies: Confidentiality and Access of Government Statistics.* Panel on Confidentiality and Data Access, Committee on National Statistics, National Research Council and the Social Science Research Council. Washington, D.C.: National Academy Press.

Duncan, J. W. (1976), "Confidentiality and the Future of the U.S. Statistical System." *The American Statistician.* 30, 2, 54-59.

Duncan, J. W., and Shelton, W.C. (1978), *Revolution in United s Government Statistics, 1926-1976.* Washington, D.C.: Government Printing Office.

Eaton, M (1948), Interoffice note to the Solicitor, Commerce Department, July 9, 1948, Office of the Secretary, General Correspondence, 67001 (Part 3 to Part 7), Box 94, File 67001 (part 3 of 7), RG40, General Records of the Department of Commerce, NARA.

Eckler, A. R. (1972), *The Bureau of the Census.* New York: Praeger.

Engler, R. (1961), *The Politics of Oil: Private Power and Democratic Directions.* Chicago: University of Chicago Press.

*Federal Trade Commission v. Dilger* (1960), 276 F.2d 739..

Fleming, B.A. (1942) Letter to Harold Smith, November 4, 1942, File R84, Reporting Services, Coordinate, Box 154, Series 391, General Legislation, 76th - 79th Cong. 1939-1946; Record

Group 51, Records of the Office of Management and Budget (Bureau of the Budget), NARA.

Foster, W.C. 1947. Letter from the Acting Secretary of Commerce to the Attorney General, December 12, 1947, Office of the Secretary, General Correspondence, 67104 (Part 2) - 67104 (Part 5), Box 144, File 67104 (Part 5), RG40, General Records of the Department of Commerce, NARA.

_____ . 1948a. Letter from the Acting Secretary of Commerce to the Attorney General, May / 27, 1948, ,, Office of the Secretary, General Correspondence, 67104-67105, Box 146, File 67104, RG40, General Records of the Department of Commerce, NARA.

_____ . 1948b. Memorandum from the Under Secretary of Commerce to J. C. Capt, Director Census Bureau, "Securing Consent of Individuals and Firms Supplying Information Pursuant to the Manufactures' Census Desired by the Munitions Board and Other Interested Government Agencies," May 27, 1948, Office of the Secretary, General Correspondence, 67104-67105, Box 146, File 67104, RG40, General Records of the Department of Commerce, NARA.

Frankel, P. H. (1959), "Oil Supplies During the Suez Crisis – On Meeting a Political Emergency," *The Journal of Industrial Economics.* 6, 2 , 85-100.

Goldberg, J. P., and Moye W.T. (1985), *The First Hundred Years of the Bureau of Labor Statistics.* Washington, D.C.: Government Printing Office.

Goldfield, E. D. (1991), Oral History Interview, October 8, 1991 with interviewer Frederick G. Bohme, Chief, History Staff at the Census Bureau, http://www.census.gov/prod/2003pubs/OH-GOLDF.PDF

Hayter, H. H. (1892), *General Report of the Census of Victoria, 1891.* Melbourne: Robert S. Brain, Government Printer.

Headrick, D. (2000), *When Information Came of Age: Technologies of Knowledge in the Age of Reason and Revolution, 1700-1850.* New York: Oxford University Press.

Higgs, E. (2004), *The Information State in England, The Central Collection of Information on Citizens since 1500.* StateNew York: Palgrave Macmillan.

Howrey, E.F. (1953), Letter to Ralph Watkins, October 27, 1953, "Suggestions for Improving the Utility of Bureau of the Census Data," File: Census: Intensive Review Committee Folder # 1; Box 58, Entry 147, Census - Census (Intensive Review Committee); Record Group 51, Records of the Office of Management and Budget, General Records, 1940-1968, NARA

Intensive Review Committee to the Secretary of Commerce (1953), "Appraisal of Census Programs: Report of the Intensive Review Committee to the Secretary of Commerce," File: Watkins Intensive Review Committee, Box 58, Entry 147, Census: Intensive Review Committee; Record Group 51, Records of the Office of Management and Budget, General Records, 1940-1968; NARA.

Jones, C. D. (2005). "The Role of Population Statistics and the Japanese War Relocation Program," Unpublished paper, US Census Bureau. Copy provided by author.

Kaufman, B. I. (1977), "Mideast Multinational Oil, U.S. Foreign Policy, and Antitrust: the 1950s," *Journal of American History*, 63, 4, 937-959.

Kerlin, Malcolm. 1942. Routing slip from the Administrative Assistant to the Secretary of Commerce to Mr. Capt, "Donald M. Nelson (req. for confidential data)," 8/18/1942. NARA, RG40, General Records of the Department of Commerce, General Correspondence, 102517, Box 951, File 102517 (Part 3 of 7).

Kovaleff, T. P. (1980), *Business and Government During the Eisenhower Administration*. Athens: The Ohio State University Press.

Lewis, A. (1958), " U.S. Jury Indicts 29 Oil Concerns as Price Fixers," *New York Times*, May 30, p. 1.

Linnenberg C. (1945), Letter to Stuart A. Rice, April 30, 1945, "Legal Right of Department of Justice to Obtain Individual-Company Information from Other Agencies," File: Privacy; Box 105, Entry 147B, Record Group 51, Division of Statistical Standards, General Records, 1940-1968, Restricted Material, NARA.

Lyon, D. (2001), *Surveillance Society: Monitoring Everyday Life*. Philadelphia: Open University Press.

Morgenthau, H. Jr. (1943). Letter from the Treasury Secretary to Jesse Jones, March 16, 1943. FDR Library, Henry Morgenthau Jr. Papers, Correspondence 1933-1945, War Savings(1942-July 1943) Box 307, Folder "March-July 1943.

Okamura, R. Y. (1981), "The myth of census confidentiality." *Amerasia Journal*, 8 111-120.

Parenti, C. (2004), *The Soft Cage: Surveillance in America from Slavery to the War on Terror*. New York: Basic Books.

President's Commission on Federal Statistics. (1971), *Federal Statistics: Report of the President's Commission* (2 volumes). Washington, D.C.: Government Printing Office.

Rice, S. A. (1942a). Letter from the Assistant Director in Charge of Statistical Standards to Stacy May, Chief Statistical Division, War Production Board. 8/14/1942 and attached list. Harry S. Truman Library, Rice papers, Box 3, Government File 1933-1950, Chronological File, 1/41-6/43, July-December 1942.

_____ . (1942b). Letter from the Assistant Director in Charge of Statistical Standards to Oscar B. Ryder, Vice Chairman, United States Tariff Commission, 8/14/1942. Harry S. Truman Library, Rice papers, Box 3, Government File 1933-1950, Chronological File, 1/41-6/43, July-December 1942.

_____ . (1942c). Letter from the Assistant Director in Charge of Statistical Standards to H. F. Taggart, Dirctor, Accounting Division, Office of Price Administration, 8/14/1942. Harry S. Truman Library, Rice papers, Box 3, Government File 1933-1950, Chronological File, 1/41-6/43, July-December 1942.

Rubin, E. (1962), "Questions and Answers: Government Statistics and Confidentiality of Response." *The American Statistician.* 16, 4, 27-30.

Sawyer, C. (1948), Letter from Secretary of Commerce to the Commissioner, Bureau of Internal Revenue, July 15, 1948, Office of the Secretary, General Correspondence, 67001 (Part 3 to Part 7), Box 94, File 67001 (part 3 of 7), RG40, General Records of the Department of Commerce, NARA.

Scammon R. (1961), Letter to Lee Lovinger, June 19, 1961, Folder: Release and Publication of Statistical Information....Commerce Department, Census Bureau; Box 101, Release and Publication of Statistical Information....Public Access, Entry 147, General Records, 1940-1968, RG 51, Records of the Office of Management and Budget, NARA.

Seltzer, W. and Anderson, M. (2001), "The Dark Side of Numbers: The Role of Population Data Systems in Human Rights Abuses," *Social Research,* 68, 2, 481-513.

_____. (2002), "NCES and the Patriot Act: An Early Appraisal of Facts and Issues." Paper prepared for presentation at the annual Joint Statistical Meetings, New York, August 10-15, 2002.

_____. (2007a), "Census Confidentiality under the Second War Powers Act (1942-1947)." Paper prepared for presentation at the annual meeting of the Population Association of America, New York, March 29-31, 2007.

_____. (2007b), "Using Population Data Systems to Target vulnerable Population Subgroups and Individuals: Issues and Incidents." In *Statistical Methods for Human Rights,* Asher, J., Banks, D., and Scheuren, F. J. (eds.), Berlin: Springer-Verlag, Chapter 13. Originally presented as "Government Statistics and Individual Safety: Revisiting the Historical Record of Disclosure, Harm, and Risk," at a workshop, Access to Research Data: Assessing Risks and Opportunities, organized by the Panel on Confidential Data Access for Research Purposes, Committee on National Statistics (CNSTAT), Washington (October 16-17, 2003).

Smith H. (1942), Letter to Bruce A. Fleming, November 17, 1942, File R84, Reporting Services, Coordinate, Box 154, Series 39.1, General Legislation, 76th - 79th Cong. 1939-1946; Record Group 51, Records of the Office of Management and Budget (Bureau of the Budget), NARA.

*St. Regis Paper Company vs the United States.* (1961), 368 US 208.

Staats E, (1958), Memorandum to Peyton Stapp, December 2, 1958, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Stapp, P. (1958a), Memorandum to Elmer Staats, November 28, 1959, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Stapp, P. (1958b), Memorandum to file, December 2, 1959, Folder: Release and Publication of Statistical Information....; Box 100: Release and Publication of Statistical Information...; Entry 147, General Records, 1940-1968; RG 51, Records of the Office of Management and Budget, NARA.

Steuart, W.M. (1922), Letter to Walter Willcox, March 27, 1922, RG 29, Entry 202, Hill Papers, Box 226.

Taylor, Wayne C. 1942. Letter from the Acting Secretary of Commerce to the Chairman, War Production Board, 8/21/1942. NARA, RG40, General Records of the Department of Commerce, General Correspondence, 102517, Box 951, File 102517 (Part 3 of 7).

_____ . 1943a. Letter from the Under Secretary of Commerce to Grover B. Hill, Assistant Secretary, Department of Agriculture, 2/4/1944. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . 1943b. Letter from the Under Secretary of Commerce to Eugene W. Sloan, Executive Director, War Savings Staff, Treasury Department, 2/27/1943. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . 1943c. Letter from the Under Secretary of Commerce to Charles B. Lawrence Jr., Director, Statistical Standards Office, Office of Price Administration, 2/27/1943. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . 1943d.. Letter from the Acting Secretary of Commerce to the Secretary of Treasury, 3/18/1943. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . 1944a. Letter from the Under Secretary of Commerce to Stuart A. Rice, Assistant Director, Bureau of the Budget, 4/15/1944. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . 1944b. Letter from the Under Secretary of Commerce to J. C. Capt, Director, Census Bureau, 4/15/1944. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

U.S. Census Bureau (1917), Legislation Relating to the Bureau of the Census, July 1, 1917, Census of Population and Housing, Special Collections, http://www2.census.gov/prod2/decennial/documents/12016444_toc.pdf

U.S. Census Bureau, (2004), "Census Confidentiality and Privacy: 1790 - 2002," http://www.census.gov/prod/2003pubs/conmono2.pdf (accessed 6/26/2007).

U.S. Code Congressional Service. (1943), *Acts of 77th Congress.* St. Paul, MN: West Publishing Company.

U.S. General Accounting Office. *Energy Security and Policy: Analysis of the Pricing of Crude Oil and Petroleum Products.* 1993 Report GAO/RCED-93-17. Washington, D.C.: Government Printing Office, 1993.

U.S. House of Representatives, Committee on Post Office and Civil Service. (1962), *Confidentiality of Census Reports.* Hearings before the Committee on Post Office and Civil Service, House of Representatives (87th Congress, 2d Session), July 31 and August 1, 1962. Washington, D.C.: Government Printing Office.

U. S. House of Representatives, Committee on the Census. (1941), *Quinquennial Census of Industry and Business*, Hearings before the Committee on the Census, House of Representatives (77th Congress, 1st Session), October 14, 15, 16, 21, 22, 23, 28, 29, and November 6, 1941. Washington, D.C: Government Printing Office.

U.S. Office of Management and Budget (2007), "Implementation Guidance for Title V of the E-Government Act, Confidential Information Protection and Statistical Efficience Act of 2002 (CIPSEA)," *Federal Register*, 72, No. 115, 33362-77, June 15, 2007.

U. S. Senate. (1957), *"Emergency Oil Life Program and Related Oil Problems."* Joint Hearings Before Subcommittees of the Committee on the Judiciary and Committee on Interior and Insular Affairs, 85th Cong., 1st Sess. Washington, D.C.: Government Printing Office.

Wallace, H. A. (1945a),. Letter from Secretary of Commerce to David E. Lilienthal, Chairman, Tennessee Valley Authority, 3/9/1945. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 104262-104279, Box 1078, File 104262-104276.

_____ . (1945b), Letter from Secretary of Commerce to the Secretary of Agriculture, 4/5/1945. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . (1945c), Letter from Secretary of Commerce to David E. Lilienthal, Chairman, Tennessee Valley Authority, 4/7/1945. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 104262-104279, Box 1078, File 104262-104276.

_____ . (1945d), Letter from Secretary of Commerce to L. B. Schwellenbach, Secretary of Labor, 8/2/1945. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 67104 (Part 2) – 67104 (Part 5), Box 144, File 67104 (Part 3).

_____ . (1945e), Letter from Secretary of Commerce to John D. Small, Chairman, Civilian Production Administration, 11/29/1945. NARA, RG40, General Records of the Department of Commerce, Office of the Secretary, General Correspondence, 102517/106-108, Box 973, File 102517/106.

Wallman, K. K. (2003), "Data Access and Confidentiality - the Changing Legal Landscape." Discussion prepared for presentation at a workshop, Access to Research Data: Assessing Risks and Opportunities, organized by the Panel on Confidential Data Access for Research Purposes, Committee on National Statistics (CNSTAT), The National Academies, Washington, D.C., October 16-17, 2003.
Available at http://www7.nationalacademies.org/cnstat/Katherine_Wallman.pdf

Warren E. (1961), Memorandum to Tom C. Clark, November 16,1961, in Tom C. Clark Papers, Box A124, Folder 47, Rare Books & Special Collections, Tarlton Law Library, The University of Texas at Austin.

Willcox, W. (1914), "The Development of the American Census Office since 1890." *Political Science Quarterly*. 29, 3, 438-59.

52                    *Federal Statistical Confidentiality and Business Data*

| | | | | |
|---|---|---|---|---|
| **Table A – Summary of Section 1402 Business-related Disclosures** | | | | |
| (Disclosures identified through June 2006) | | | | |
| **Requesting agency** | **Material requested or provided** | **Purpose** | **Date of request** | **Documentation of response(s)** |
| War Production Board | Confidential industrial and economic information | NA | 8/17/42 | Letter Wayne C. Taylor, Acting Secretary of Commerce to Donald M. Nelson, Chairman, War Production Board, 8/21/1942, NARA, RG40 |
| Department of Agriculture, Food Distribution Agency | Confidential mailing lists | NA | 2/4/43 | Letter Wayne C. Taylor, Undersecretary of Commerce to Grover B. Hill, Assistant Secretary, Dept. of Agriculture, NARA, RG40 |
| Office of Price Administration | Mailing lists from the 1939 Retail Census | NA | 2/27/43 | Letter Taylor to Charles B. Lawrence, Jr.  Director of Statistical Standards Office, OPA, NARA, RG40 |
| Treasury Department | Confidential mailing lists to be compiled from the retail census records | War Savings drive | 3/18/43 | Letter Taylor to Henry Morgenthau Jr., Treasury Secretary, NARA, RG40 |
| Defense Plants Corporation | Production of specified chemical products, by individual plants, from the 1939 Biennial Census and latest monthly production | NA | 4/15/44 | Letter Taylor to Capt, NARA, RG40. See also letter from Taylor to Rice, 4/15/44, forwarding him a copy of the letter to Capt |
| **Requesting agency** | **Material requested or provided** | **Purpose** | **Date of request** | **Documentation of response(s)** |
| Tennessee Valley Authority | Confidential census information on the production of superphosphate | NA | 3/9/45 | Letter from Henry A. Wallace, Secretary of Commerce, to David E. Lilienthal, Chairman, TVA, NARA, RG40 |
| Department of Agriculture, Bureau of Agricultural Economics | Lists of large farms, names and addresses of various farm operators, and other information from the 1945 Census of Agriculture | NA | 4/5/45 | Letter Wallace to Secretary of Agriculture, NARA, RG40 |
| Department of Labor | List of all 1939 manufacturing establishments | Work of the BLS | 8/2/45 | Letter Wallace to Secretary of Labor, NARA, RG40 |
| Civilian Production Administration | Confidential data from the 1939 Census of Manufactures | NA | 11/29/45 | Letter Wallace to Chairman, Civilian Production Administration to the successor agency to the War Production Board, proposing new transitional arrangements for the continued provision of confidential information from the Census Bureau, NARA, RG40 |

# EXHIBIT 3

Journal of Official Statistics, Vol. 23, No. 1, 2007, pp. 1–34

# Challenges to the Confidentiality of U.S. Federal Statistics, 1910–1965

*Margo Anderson[1] and William Seltzer[2]*

The article uses a new approach to the analysis of statistical confidentiality in official statistics by reframing the discussion of challenges to statistical confidentiality from the hypothetical threats posed by generalized malicious intruders to those posed by other government agencies with investigative, surveillance, or prosecutorial agendas. We examine cases in the half century from 1910 to 1965 in which U.S. federal government officials tried to gain access to data collected under a pledge of confidentiality in another federal government agency, generally the U.S. Census Bureau.

*Key words:* Statistical confidentiality; official statistics; population data collection.

## 1. Introduction

Officials in government statistical agencies are keenly aware that the success of the work they do is heavily dependent on their ability to guarantee to the public that strict procedures exist to protect the privacy of census or survey respondents, and that data collected are confidential and will not be released to users in a manner that will directly harm them. The guarantees are designed to assure the public that they can respond candidly to government statistical inquiries. These officials know that they need to explain the guarantees to the responding public (see, for example, McCaa and Ruggles 2002). Nevertheless, there is ample evidence that the public in the United States and elsewhere is not convinced that such guarantees are truly ironclad (see for example, Hudson 2004; Clemetson 2004; van der Laan 2000).

Thus there is a need to delve further into the concept of statistical confidentiality, particularly to examine the points in the past when confidentiality was actually threatened or even breached. The literature on statistical confidentiality is a large one, both in the United States and internationally. We know, for example, from the reports and analyses of national statistical agencies a good deal about the history of the practices and laws in various nations. Several fine analyses detail the development of the privacy and

[1] University of Wisconsin – Milwaukee, Department of History, Milwaukee, WI 53201, U.S.A. Email: margo@uwm.edu
[2] Fordham University, Department of Sociology and Anthropology, Dealy 407, 441 East Fordham Road, Bronx, NY 10458, U.S.A. Email: seltzer@fordham.edu
**Acknowledgments:** An earlier version of the article was presented at the U.S. Census Bureau Symposium, Woodrow Wilson International Center for Scholars, March 4–5, 2004. The authors are grateful for the helpful comments provided by three anonymous JOS referees and by Clyde Tucker, JOS Associate Editor. The authors alone are responsible for any errors that remain.

© Statistics Sweden

confidentiality provisions for official statistics in the United States (Bohme and Pemberton 1991; Eckler 1972, pp. 164–172, 192–206; President's Commission on Federal Statistics 1971, 1:195–225 and 2:335–66; Corcoran 1963; Duncan, Jabine, and de Wolf 1993). For international treatments, see the sources linked to the United Nations Statistics Division website, Principles and Practice, Organization and Management (http://unstats.un.org/methods/statorg/default.htm. Catherine Hakim, in her survey of census confidentiality in Britain, has suggested that the developments of the administrative and legal safeguards in Britain "closely parallel the history of census confidentiality in other countries" (Hakim 1979, p. 156). There is also a very extensive literature on disclosure avoidance and limitation methods (see, for example, Fienberg and Willenborg 1998).

Less is known, however, about actual breaches or attempted breaches of statistical confidentiality and the impact of those breaches on respondents and agency practice. In this article, therefore, we focus on the experience of one country, the United States, to examine in detail a number of challenges to statistical confidentiality in the federal statistical system from 1910 to 1965. We ask several questions. First, who tries to gain access to confidential statistical data? Second, why did the challenges to confidentiality emerge when they did? And finally, what comprised the challenges? That is, what data were sought and why?

We use a new approach in the analysis of statistical confidentiality, focusing on challenges to statistical confidentiality that arose from within government itself. We do so in part because officials in the statistical system at the time perceived these challenges as the most serious confidentiality threats they faced and in part because some, while long forgotten, have reemerged in recent years as matters of current public concern. We examine cases in the half century from 1910 to 1965 in which U.S. federal government officials outside the statistical system tried to gain access to data collected under a pledge of confidentiality in another federal government agency, frequently the U.S. Census Bureau. In several cases, they were successful. Although this article is essentially historical in nature, the experiences it recounts have considerable relevance now and for the foreseeable future. Towards the end of the article we will explicitly discuss some of these present-day implications.

## 2.  Our Approach and Related Issues in Statistical Confidentiality

The analysis of the challenges to statistical confidentiality from within government is but one aspect of a critical history of statistical confidentiality. There are many other issues which deserve analysis as well. For example, the public does not distinguish well between the possible improper uses of privately collected data, for example credit information, and potential improper use of data collected by government. The issue of confidentiality of data outside of government, and questions of the "surveillance society" require separate treatment. Nor do we examine the question of how an individual or organization might "break into" a data system, or the technical questions of protecting data (cf. Dandeker 1990; Higgs 2001; Zureik 2001; Lyon 2001; Dorling and Simpson 1999; Fienberg and Willenborg 1998).

Further, in this article we assume that the original data collection did not represent an invasion of privacy. Finally, this article explicitly excludes any discussion of possible

harms arising from the use of mesodata (i.e., data tabulated for small geographic areas, such as blocks, tracts, or small area postal codes). We do not deal with improper statistical profiling, that is, the classification, categorization, and tabulation of responses or respondents in ways that the respondents might find offensive or damaging, as long as the profiling does not reveal the individual identity of the respondent. These issues are important, as we and others have discussed elsewhere (see for example, Seltzer and Anderson 2000, 2001, and 2003; El Badry and Swanson 2007; and Seltzer 2005).

Finally we recognize that this analysis is quite specific to the United States over a particular period of time, and needs to be supplemented with comparative studies from other nations and other times. The U.S. statistical system is a decentralized one, in which political pressures on the myriad agencies can loom large. Our narrative highlights the interplay of decision making within the U.S. statistical agencies, and between these agencies and other arms of government, including departmental superiors, the President, Congress, and the courts. Legislative and executive action, as well as administrative practice within the agencies, tempered at times by judicial decisions, has shaped the parameters of statistical confidentiality in the United States. Additional comparative work could identify the common patterns and differences among countries in practice, law, and professional standards and their effect on statistical confidentiality and possible confidentiality breaches. We note, however, that issues of statistical confidentiality and the diversion of data obtained through the statistical system to nonstatistical purposes have also arisen in countries in various parts of the world and with quite different types of statistical systems (see for example, Seltzer and Anderson 2001, 2003).

### 3.    Studying Challenges to Statistical Confidentiality: An Incident Register

It is not necessarily easy to obtain information about incidents where one government agency tries to gain access to confidential data that another agency controls. For agencies that have made commitments of confidentiality to their respondents, requests for confidential access pose an immediate threat, and one that the collecting agency likely would prefer either to deny or accommodate as discreetly as possible. These defense mechanisms create difficulties for historians or others trying to determine and understand what has transpired. (In one sense, the "perfect" breach would be one in which neither the statistical agency nor the respondent was aware of the breach.)

In this article, we rely primarily on threats to confidentiality documented by individual statistical agencies, and we add material from the requesting agency to fill out the evidence of the case. We suspect therefore that there may be many more potential cases to study, and cannot be certain of the representativeness of the ones we have. Nevertheless, our review of archival records pertaining to several statistical and nonstatistical agencies, and the relevant legislative and administrative record, gives us confidence that the available evidence is sufficiently coherent to frame the narrative.

Methodologically, we created an incident register of known requests for confidential data. For each case we document the date of the request; the requesting agency or elected official; the statistical agency that controlled the data; the nature of the request; the response of the statistical agency; sources of information about the incident; an evaluation

of the precedent set by the request for the data; and the nature of additional research needed on the case.[3] This incident register helped guide our further archival research.

The narrative provides an interpretation of the logic of the timing, character, and purpose of the challenges in two time periods. The first group of incidents date from World War I through 1930. The second group date from World War II through the early 1960s.

## 4.   The Maturing Statistical System and World War I

Statistical confidentiality is a very complex concept. The standard developed in the United States in the late nineteenth century was designed initially to protect the government rather than the respondent from the unauthorized use of the information provided (Bohme and Pemberton 1991). Furthermore, when the concept in the United States was extended to include the protection of respondents, this protection was aimed at business data at first and only expanded over time to include personal information pertaining to individuals and families. Officials in the new statistical agencies articulated standards for themselves and their enumerators and clerks to reassure the public of the legitimacy of their work and to distinguish statistical data collection from administrative record keeping and police surveillance. They also prohibited practices that would undermine or corrupt the new field of statistics. Instructions to census enumerators, for example, warned against the unauthorized release of information, particularly economic information about individuals or businesses, or the sale of data to private almanac publishers before release. Carroll Wright, the first Commissioner of Labor in the Department of Labor, was particularly sensitive to the issues. He guaranteed business respondents that he would not release individual information to any other arm of government, including Congress (Goldberg and Moye 1985). Early concerns about statistical confidentiality were not unique to the United States. At the same period in Australia, the concept of statistical confidentiality was invoked by the Census Director in Victoria to protect individual-level data on persons enumerated in the 1891 Census from attempts by the police to gain access to these records for the purpose of law enforcement (Hayter 1892).

In the nineteenth century, U.S. federal officials worried about unauthorized leaks of information from census and survey responses. They particularly worried about renegade enumerators or agents who took advantage of their posts (Anderson 1988). At a time of relatively slow mail communication and isolated local communities, officials knew they had very little control over the day to day work of their local agents. Slow communications were troublesome for the Washington officials trying to contact agents across the country, but they also made it difficult for the federal government to compile stores of information that might be considered invasions of privacy. At the time, respondent concern about misuse of information provided to a U.S. Bureau of Labor Statistics survey or census inquiry was framed as fear that the local enumerator or "special agent" (as the data collectors were called) would make improper use of information collected from a business or household, not that the federal government was developing surveillance capacities over people or business firms. The greatest protection against a breach of statistical confidentiality was the administrative incapacity of the federal agencies themselves.

---

[3] The register, as developed by March 1, 2004, is available at http://www.uwm.edu/~margo/govstat/integrity.htm

The Census Office was a temporary agency until 1902. Other statistical agencies, like the U.S. Bureau of Labor Statistics (BLS), or the statistical offices within cabinet departments, were small organizations, as was the entire federal government. There was neither a national police force nor a national vital registration system. Federal government surveillance of any kind was weak due to the federal nature of the American state and the mobility and dispersion of the population. The technological basis of data collection was unwieldy paper files (Anderson 1988, 2000).

In 1902 Congress established the U.S. Census Bureau as a permanent agency and in 1903 placed it in the new Department of Commerce and Labor, then after 1913 in a separate Department of Commerce. The permanent U.S. Census Bureau expanded to collect economic statistics between the decennial census years. The schedules and forms which in previous years would have been put in storage when the agency closed for the decade now remained accessible, along with a staff of clerks who had the experience to readily access them. Through the 1910 Census the agency demonstrated the effects of permanent status in new administrative practice. One innovation was the presidential census proclamation, a practice which has continued to the present. Designed both to advertise the census and promote complete enumeration, it included explicit assurances to the public about the uses of the data. As President William Howard Taft's proclamation stated:

> The census has nothing to do with taxation, with army or jury service. . .or with the enforcement of any national, State, or local law or ordinance, nor can any person be harmed in any way by furnishing the information required (quoted in Barabba 1975: 27; quoted in full in Bohme and Pemberton 1991: 8).[4]

In other words the statistical data collected were not to be used for enforcement or taxation purposes. The individual respondent should suffer no direct harm because of an answer on a census form. The proclamation forcefully represented the understanding among census officials and other statisticians within government that they were drawing a line of separation between their work of providing statistical tabulations and descriptions of the society and the work of other government agencies, whether that was collecting taxes, enforcing the law, or administering benefit programs. By 1890 Congress had amended the census statute to remove the requirement for census enumerators to supply a separate set of the manuscript returns to state or local officials. Instead, Congress substituted a provision permitting local officials, upon payment of the cost of transcription, to order a list of names (with some characteristics) for their local jurisdiction (Wright and Hunt 1900, p. 73). This provision broke the link between the statistical agency and state and local government, where most direct government took place. After the turn of the century Congress authorized the Director to provide governors and courts "at his discretion . . . copies of certified copies of . . . population and agricultural returns" but made the provision onerous. The requesting body had to provide a written request and pay for the cost of the copy. During its first decade as a permanent agency, the U.S. Census Bureau, much to the dismay of departmental leadership, also balked at contributing to the investigatory activities of other agencies, such

---

[4] For the full text, see Records of the Office of Statistical Standards, 1940–1968 (40.7), Entry 147, Box 52, File: Census Proclamations, RG51, NARA.

as the U.S. Bureau of Corporations, within the U.S. Department of Commerce and Labor, for fear such activities would undermine the willingness of respondents to answer questionnaires (Anderson 1988, pp. 118–123).

The entry of the United States into World War I in 1917 posed the question of statistical confidentiality anew, and the line became much less distinct. In practical terms, American entry into the war required the mobilization of the economy and the population. President Woodrow Wilson's administration built new institutions to manage the war economy, including the U.S. Central Bureau of Planning and Statistics in 1918 to gather data on and manage the economy. In order to recruit and deploy an army rapidly, in May 1917 Congress created a draft registration system, Selective Service, and a draft army. The U.S. Census Bureau provided estimates of the distribution of draft age men for planning the location and capacity of the registration and draft system.

Many Americans did not welcome the decision to enter World War I in April 1917. President Wilson had run for reelection on an antiwar platform the previous November. Thus army officials were quite concerned that young men would not register for the draft in June 1917 as required, and that draft resistance would impede the war effort. The registration also raised difficult questions about whether aliens would register, whether the millions of enemy aliens from the Central Power nations would be loyal to the United States, whether aliens from the empires of Germany or Austria Hungary should or would fight for the United States (Fitzpatrick 1940; Chambers 1987).

In the context of these difficult issues, officials in the Army's Provost Marshal General's office, the office responsible for organizing and directing the implementation of military conscription, together with officials in local draft boards, wrestled with procedures to counter resistance to the draft registration and the draft. It soon became clear that the returns from the 1910 Census could provide information to confirm the names, addresses, and ages of individuals who might be suspected of avoiding the draft registration. The possibility of requests for such information framed the conflict between the commitment in President Taft's proclamation and the presumed requirements of modern war. Why should one agency of government prevent another agency of government from doing its job? Why should not the individual-level data be made available to aid the war effort?

In order to respond positively to these requests, in June 1917 Census Director Sam Rogers sought guidance from the Secretary of Commerce William C. Redfield. (Rogers was nominated as Census Director by President Wilson in 1915. He had no prior experience in statistics, having recently served as campaign manager for the Democratic Senator who was chairman of the Senate Finance Committee, *N.Y. Times* 3/4/1915, p. 8.) As Director Rogers explained,

> I have received numerous requests from registration officials in various parts of the United States to furnish them with information from the census records, showing the ages of men who they believe have failed to register, although between the ages of 21 and 30.[5]

---

[5] The United States entered World War I on 4/6/1917. The Selective Service Act became law on 5/18/1917, and all men born 1886–1896 were required to register on 6/5/1917 (a special public holiday set aside for this purpose). Census Director Rogers's request to the Secretary of Commerce was dated 6/22/1917. Samuel Rogers to the Secretary of Commerce, 6/22/1917, and Rogers to the Solicitor, Department of Commerce, 6/28/1917. File 3400-124, Box 157, Genl. Recds. of the Dept. of Commerce, Office of the General Counsel, Subj. and Index Files, 1903–1947, RG40, NARA.

He also knew that Taft's proclamation seemed to guarantee that the individual data would not be used for enforcement purposes. Nevertheless, he saw a higher standard that outweighed the earlier pledge:

> I believe that every branch of the Government, including this Bureau, should assist at the present time, so far as possible, in securing a full registration. Accordingly, it is recommended that the matter be taken up with the President, with the view to having an order issued waiving the rigid rule laid down in Ex-President Taft's proclamation, and authorizing this Bureau to supply the proper officials (both registration and Federal) who are in control of the registration and prosecution of individuals who have failed to register, with data from the census schedules, which may show the ages of such individuals.

On June 25, the Commerce Department Acting Solicitor issued the requested opinion.[6] It gave the Census Director the authority to provide names and ages to the registration authorities:

> It does not appear that any person will be harmed by the furnishing of the information desired and for the purpose which it is desired . . . . Other provisions of the law prohibit the Director of the Census from giving certain information in regard to the business of individuals, firms, and corporations, but these provisions do not, in my opinion, apply to information in regard to names and the ages of individuals . . . . There is nothing in the law or the proclamation which manifests an intent to restrict the Government, through the head of the Department, from furnishing names and ages of individuals as recorded in the Census office.

Vincent Barabba (1975, p. 27) noted that as a result of this opinion "personal information for several hundred young men was released to courts, draft boards, and the Justice Department."[7]

In time of war, then, a Census Director found that the line of separation the official statistical community had hoped to place between confidential census information and other activities of government need not be maintained. Instead, as Director Rogers put it, he found that "this bureau" should "assist at the present time, so far as possible, in securing a full registration." In his judgment, statistical confidentiality should be conditioned and compromised by more apparently pressing government needs.

---

[6] "IN RE authority of the Director of the Census to furnish registration officials with names and ages of certain persons from census records." Opinion of the Acting Solicitor, Office of the Solicitor, Department of Commerce, 6/25/1917, Ibid; Bohme and Pemberton, 1991:10 give 6/26/1917 as the date of this opinion; the file reference in the archival records gives 6/25/1917 as the date. It is possible that the original opinion of the Commerce Department's Solicitor was confirmed the next day by the U.S. Solicitor General, although Census Director Rogers's letter of thanks, 6/28/1917, only refers to the opinion issued by the Departmental Solicitor. U.S. Department of Commerce, 1917. See also Robert Holley, "Confidential nature of individual data returned on population schedules." Memorandum to the Director, 9/8/1938, Entry 274, Box 56 (Holley), Folder: Austin, W.L., Recds. of the Bur. of the Census, RG29, NARA. Holley notes that one section of the 1910 Census Act that states "That information furnished under the provision of the next proceeding section shall be used only for the statistical purposes for which it is supplied," actually refers to data provided by various kinds of manufacturing and other establishments, and not population data.

[7] For an example of a request from the officials in Selective Service to verify the age of a potential draft evader, see James H. Hughes to the Honorable Herbert J. Drane, House of Representatives, July 10, 1918, and Hughes to Bureau of Census, July 10, 1918, Records of the Selective Service System, 1917–1919, General File, Box 9, File: General 17 (331–340), RG163, NARA.

Once breached, statistical confidentiality was difficult to reassert. In the years following the war's end, the U.S. Census Bureau faced a number of requests for the release of confidential data, and proposals for redefining the agency's mission to include population control.

The most dramatic challenge to the standards articulated in Taft's proclamation came from officials in the Provost Marshal General's office. The *Second Report of the Provost Marshal General to the Secretary of War* (1919, pp. 20–21) described the operations of the selective service system through December 1918. Provost Marshal General Enoch H. Crowder found the example of the draft so attractive that he proposed that the 1920 Census be restructured as a registration activity. "The end of the war," he wrote,

> leads one necessarily to a contemplation of the possible changes that may be brought about in our national life by the application, after the war, of the principles evolved in the operation of the selective service during the emergency . . . .
>
> The taking of the decennial census has heretofore always proceeded upon the idea that no satisfactory results could be attained unless the desired information was sought out piecemeal and compiled. The possibility of having every man, woman and child report at a given place on a given day for enrollment and submitting to an examination as to domestic and industrial status, was considered remote, if indeed it was considered at all. The administration of selective service has demonstrated not only the practicability of such a scheme but the superiority of it in speed, accuracy, and completeness. What under the present census method is a matter of months, becomes under the selective procedure a matter of days. The machinery for the taking of the census by registration is established. To apply the selective plan to the census would not be an experiment but the extending of the application of a principle already established.

Such a registration system would be an administrative and control system first, a statistical resource second. By definition, confidentiality would not exist in such a population registry. Crowder was credited with successful management of the Selective Service system, "a marvel of effective simplicity," as the *New York Times* (2/7/1919, p. 14) put it. His proposal to turn the upcoming census into a "Crowder Census," met with some support.[8] Nevertheless, Crowder's proposal came too late in the legislative debate to affect the plan for the 1920 Census. Congress mandated that the 1920 Census should look much like the 1910 count, but clarified that the confidentiality language applied to both economic and population data (Holley 1938:4). Wilson's presidential proclamation for the 1920 Census again proclaimed that the respondent could not be harmed by providing the information.

Nevertheless, the U.S. Census Bureau continued to receive requests for the release of confidential individual-level information. Bohme and Pemberton (1991, p. 11) note that in early 1920, while the enumerators were in the field, the Justice Department, on behalf of the Department of Labor, asked if the local enumerators in Toledo, Ohio, could provide "information about individuals' citizenship from the 1920 Census of Population. . . for use in deportation cases." The Commerce Department Solicitor "pointed out that the 1920 Census

---

[8] See also, for example, the *New York Times*, 2/6/1919, 3 and 2/16/1919, 41.

act prohibited the Director from disclosing information about private business concerns, it did not restrict his discretionary disclosure of individual information (by the Director, but not (emphasis in original) by any other U.S. Census Bureau employee without the Director's permission) from the population and agriculture censuses." In the early 1920s, Bohme and Pemberton report, state and local governments and private organizations asked for and received lists of illiterates from the 1920 Census. These requests point to an understanding in other government agencies that their investigative and enforcement activities could be aided by data from the Census and either administrative weakness to resist or unwillingness to generate interagency conflict (Bohme and Pemberton 1991, p. 11).

Officials in the statistical agencies found these requests increasingly problematic and sought ways to restore the line of separation between confidential data and program demands. In correspondence in the early 1920s, for example, Census Director William Mott Steuart responded to a request from Walter F. Willcox for access to the schedules. (Steuart was nominated by President Harding as Census Director in 1921. He had had a long career at the U.S. Census Bureau beginning in1880. In 1919, during the Wilson administration, he had been appointed Assistant Director, *The Evening Star* (Washington, DC), 10/21/1956.) Willcox, a former census statistician and member of the Census Advisory Committee, was interested in conducting a research project to evaluate "the accuracy of the census of Tompkins County (New York)." Director Steuart acknowledged that under the law, he had "discretion" to do so, but expressed reservations about giving Willcox access. "I always feel considerable hesitancy about giving out names and addresses, even in a case such as yours where I have every confidence that the information is wanted for legitimate purposes and will be safeguarded as far as possible against any improper use." The Census Director admitted that "we are regularly furnishing to the Internal Revenue Bureau information as to the ages of children, when requested, for the enforcement of the tax on establishments employing child labor." He continued: "But quite apart from any question of law I think as a matter of policy we ought carefully to guard against giving any one the impression that the information collected by the Census under the assurance that it will be treated as confidential is not as carefully safeguarded as it ought to be."[9] As the requests expanded, the rationale shifted from national defense and the control of aliens, to quasi welfare functions at the state and local level. If such requests continued, the census would become an administrative registry by default. At the same time, there is some evidence that officials in the U.S. Bureau of Labor Statistics were reinforcing their guarantee to business leaders that they would not release individual level information, even to Congress.[10]

---

[9] William Mott Steuart to Walter F. Willcox, March 27, 1922, Correspondence of Joseph A. Hill, Entry 202, Box 226, RG29, NARA.

[10] Barabba (1991: 27) reports that in the 1920s the Secretary of State asked the U.S. Census Bureau for data about "individual farms" in Stevens County, Washington for an "international tribunal" adjudicating a dispute about sulphur dioxide pollution from a smelter in Canada. The U.S. Census Bureau provided "aggregated county data ". . ." which allowed the court to award damages to the Washington farmers." In another incident, Herman Byer, Assistant Commissioner of Labor Statistics in the late 1940s, described how a subsequent Commissioner of Labor Statistics, Ethelbert Stewart, was said to have responded to congressional pressure in the 1920s to reveal identifiable *micro* data. According to Byers, Stewart was asked at a Congressional hearing to reveal the data on individual automobile manufacturers to Congress, and he refused on grounds of confidentiality. When the committee chair threatened Stewart, "Mr. Stewart, our committee will subpoena those records," Stewart responded, "You do, and I'll burn them first" (Quoted in Duncan and Shelton 1978: 168).

In 1929 Congress reaffirmed the confidentiality language in the census statute to cover the release of population information by the Director, and President Herbert Hoover's Census Proclamation again affirmed statistical confidentiality. Section 18 of the 1929 Statute retained the language providing discretion to the Director "upon the written request of the governor of any State or Territory or of a court of record, to furnish such governor of court of record with certified copies of so much of the population or agricultural returns as may be requested." Section 18 also authorized the Director "in his discretion, to furnish to individuals such data from the population schedules as may be desired for genealogical or other proper purposes." The section also included the proviso: "that in no case such shall information furnished under the authority of this Act be used to the detriment of the person or persons to whom such information relates" (Holt 1929, p. 189). In 1930, when the Women's Bureau asked for a "list of names, addresses, occupations, and employment status of women living in Rochester, N.Y," the U.S. Census Bureau saw a clear-cut case which could be used to restore confidentiality. There were no questions of national security, deportation of aliens, or criminal activity involved. The U.S. Census Bureau requested an opinion from the Attorney General and on the basis of this opinion denied the request (Bohme and Pemberton 1991, p. 12).

In other words, once census officials supported the initial release of information to draft boards in 1917, officials in other agencies, for example in the Justice Department, asked for further releases. Census officials found they had weakened the principle of statistical confidentiality. There does not seem to be a partisan difference in the willingness to protect confidentiality or to release confidential data. Presidents Taft, Wilson, and Hoover all proclaimed statistical confidentiality, and Census Directors in both Republican and Democratic administrations violated the guarantee. Rather it appears that interagency pressures and perceived national security needs led to weakening the guarantee.

## 5.  Depression, War and Its Aftermath

The demands that the Great Depression made on the statistical system are well-known. From its inception in 1933 the administration of President Franklin D. Roosevelt upgraded the statistical activities of several agencies, and created the Central Statistical Board to study and coordinate statistical work across the federal government (Anderson 1988; Duncan and Shelton 1978). To our knowledge, during the early deep years of the depression, there were no requests for the release of confidential micro data from officials in either the administrations of Herbert Hoover or that of Franklin Roosevelt. Officials in both administrations were concerned primarily with the macro-problems of the depression and were looking at such aggregates as unemployment, production, and migration.

The situation changed dramatically when war broke out in Europe in the fall of 1939. Officials in defense agencies sought information that would help protect the nation and either did not recognize or did not value legislative guarantees of statistical confidentiality that inhibited release of this information to agencies "investigating" national security. Once again the statistical agencies faced requests to release to other government officials individual-level data collected under a pledge of confidentiality. When officials in the statistical system responded that such release violated the law and long-standing practices and norms, the

administration moved to circumvent or change the law, sometimes with proactive support from accommodating individuals within the statistical agencies themselves.

In the period from late 1939 to late 1942, therefore, a plethora of legislative and administrative initiatives emerged to repeal the confidentiality of the responses to data in the census and data collected by other agencies in the Commerce Department. The initiatives culminated in the provisions of Title XIV of the Second War Powers Act (March 1942) and the Federal Reports Act (December 1942). As in World War I, the principle of statistical confidentiality gave way to the perceived needs of a government at war and as with World War I, the challenges to release data continued after the war, culminating in the St. Regis Paper Supreme Court case of 1961. In 1962 once again, Congress restored the standard in clarifying legislation. It is to this complex history that we now turn.

## 6.    Military Intelligence or Statistical Confidentiality

### 6.1.    *1939*

Nineteen thirty-nine was the year before a presidential election and the year before the decennial census. It was also the year that World War II broke out in Europe, which precipitated the Roosevelt administration's efforts to restructure the institutions of government to address issues of national defense. President Roosevelt was a strong internationalist and, during World War I, a former Assistant Secretary of the Navy, but much public opinion was wary of American involvement. The administration proclaimed American neutrality while beginning to consider measures to protect the nation. As part of this effort, for example, on September 1, 1939, Undersecretary of Commerce Edward Noble asked Census Bureau Director William Lane Austin for a report on "whether the existence of a world war. . .is likely to make desirable any changes in the conduct of your Bureau." (Austin had been nominated as Census Director by President Roosevelt in 1933, shortly after the President took office. He had joined the U.S. Census Bureau staff in 1900 as a clerk and in 1932, during the administration of Herbert Hoover, had been named Assistant Director, *The Washington Post*, 4/4/1933, p. 5 and 2/4/1941, p. 5.) Undersecretary Noble asked Director Austin to review and report on the activities of the U.S. Census Bureau during the First World War, and particularly to focus on the service that the Bureau could play in supplying economic information relating to military preparedness, trade, and the "manufacture or export of munitions." The Director replied on September 5, noting that the 1940 Census was the top agency priority at the time. He offered to "render any assistance and cooperation in connection with War work that it may be instructed or required to do," and noted that the U.S. Census Bureau was "in a particularly good position" to aid the war effort because its "large mechanical facilities" could be made available to tabulate data for the federal government. He did not offer to change or redirect fundamentally the activities or practices of the agency.[11]

[11] Noble to Austin, September 1, 1939, and Austin to Noble, September 5, 1939, Entry 142, General Records Maintained by William Lane Austin, 1933–1941, Box 11, Folder: Memoranda: Secretary Hopkins, Secretary Jones, RG 29, NARA.

At the same time other Commerce officials were also considering the role of the census and the war. In early September 1939 David Niles, Special Assistant to Commerce Secretary Harry Hopkins, wrote to the President's secretary, Missy Le Hand, about questions for the 1940 Census. Niles noted that he had "talked with Harry on the "phone a short time ago and he wanted me to ask the President whether there were any new questions that the President might want included on the Census questionnaire because of the war situation." Niles acknowledged that he was not being terribly clear, and indirectly admitted that he was thinking of using the results of such questions for surveillance, not statistical information. "It is not quite clear," he noted, "how we could legally use that information because of the statutes under which the Census operates." As he was aware, since he had been briefed earlier in the year, the confidentiality provisions of the census law prevented the disclosure of individual-level data. To our knowledge the White House did not propose adding new questions to the census form at this time. What it did do, though, was open an internal discussion about census confidentiality by considering a proposal to amend Section 11 of the Census Act.[12]

In November 1939, administration officials raised the question of allowing access to confidential census information to the military intelligence agencies and the Federal Bureau of Investigation.[13] The Attorney General's office drafted a bill to amend the census statute and transmitted it to the Budget Bureau, the office with responsibility for vetting all the administration proposals for legislation to be sent to Congress. (The Budget Bureau was located in the Executive Office of the President.) "Under existing law," noted the Justice Department memorandum accompanying the draft legislation,

> individual reports of the census office are confidential and may not be examined by any person other than sworn employees of that office. While this rule of law is generally desirable, it appears advisable in the interests of national defense to make an exception in connection with investigations of violations of the laws against espionage and other matters relating to national defense. In connection with such investigations the Federal Bureau of Investigation of the Department of Justice, the Office of Naval Intelligence of the Department of the Navy, and the Intelligence Division of the Department of War, should be permitted to have access to such reports.

The actual text of the bill added new language to Section 11 of the 1929 Census Act. The existing language required:

> That the information furnished under the provisions of this Act shall be used only for the statistical purposes for which it is supplied. No publication shall be made by the Census Office whereby the data furnished by any particular establishment or individual can be identified, nor shall the Director of the Census permit anyone other than the sworn employees of the Census Office to examine the individual reports.

---

[12] Niles to LeHand, September 6, 1939; Entry 142, Box 10, Folder: Publicity: Confidential Features of Census 55b, RG 29, NARA.
[13] President's Official File: 3b-3c, Department of Commerce, Box 6, Folder: Commerce Department, 1939–1940, Census Bureau, FDR Library.

The proposed language added:

Provided, however, that the records of the Bureau of the Census, including the individual reports, shall be available to the Federal Bureau of Investigation of the Department of Justice, Office of Naval Intelligence of the Department of the Navy, and the Intelligence Division of the Department of War in connection with violations of the laws against espionage and other matters relating to the national defense whenever, in the opinion of the Attorney General, the Secretary of War or the Secretary of the Navy, the public welfare would be served by according such access to said records.

The Budget Bureau sent the draft legislation and memoranda to the Commerce Department. Commerce officials sent them to the U.S. Census Bureau for comment. When the bill arrived at the Bureau, the reaction was immediate. Officials mobilized to squelch the legislation as quickly as possible. Calvert Dedrick, Chief Statistician in the U.S. Census Bureau's Division of Statistical Research, wrote to Stuart Rice, then Chairman of the Central Statistical Board on December 5: "We consider this one of the most dangerous pieces of legislation which could be introduced, particularly at the time of the decennial census and during a campaign year." Dedrick included a four-page memorandum detailing the history of the development of the confidentiality requirements protecting individual level census information. "The Attorney General's recommendation," he pointed out, "runs directly counter to the development of public policy in this respect for the past 60 years."[14]

A confrontation between the Department of Justice and the Department of Commerce loomed if the U.S. Census Bureau strenuously opposed the legislation. Officials in the Commerce Department responded to the emerging opposition in the U.S. Census Bureau and reported to the President. On December 7, Presidential Aide Edwin M. ("Pa") Watson sent a memorandum to Roosevelt including the draft legislation and David Niles's request for the President's reaction. "If the President is interested, Niles will not make any opposition; otherwise, I believe they (the Commerce Department) will oppose it." The next day President Roosevelt dictated his response through Watson: "Tell Dave Niles's that unrestricted access to Census files should not be given to Army or Navy Intelligence or F.B.I. However, where G2 (as Army Intelligence was called), O.N.I. (Office of Naval Intelligence) or F.B.I need information regarding a specific person, the information should be given to them in confidence after they have stated the reason for asking it."[15]

The President's brief response provided little clarification either on his thinking on the general issue of using individual-level census records for surveillance or on what to do with the draft legislation. Roosevelt implicitly suggested that he was not opposed to amending the Census Act to make information on individuals and firms available to the intelligence agencies. We have been unable to find records indicating if Watson ever communicated Roosevelt's response to Niles, or if Niles ever communicated Roosevelt's wishes to the U.S.

---

[14] Dedrick to Rice, December 5, 1939, Entry 210, General Records Maintained by Calvert Dedrick, Box 210, Folder: Rice, Dr. Stuart A., RG29, NARA; Dedrick to Austin, December 5, 1939, Records of the Bureau of the Budget, Entry 20A, History of General Legislation, 76th − 79th Congress, 1939–1946 (39.1) (Legislative History of Unenacted and Vetoed Public Bills), Box 27, Folder C158(1)-(5), Commerce Department, Census Bureau #2, RG51, NARA.
[15] President's Official File: 3b-3c, Department of Commerce, Box 6, Folder: Commerce Department, 1939–1940, Census Bureau, FDR Library; cf. O'Reilly 1982.

*Journal of Official Statistics*

Census Bureau, G2, ONI, or the FBI. The normal channels of communication between Watson and Niles would have been oral.[16] In its baldest form, the President was proposing action that violated the existing language of Section 11 of the Census Act. At best his instructions to provide information "regarding a specific person" put the Director in a perilous legal position. If the Director provided such information to the intelligence agencies, he risked violating the "detriment" clause of Section 18 of the Census Act.[17] It is not surprising that Roosevelt's directive, if it was transmitted, was not transmitted through normal bureaucratic channels, though indirect evidence discussed below suggests that Census Bureau officials did become aware of the interest in the administration in giving the intelligence agencies access to individual-level census reports.

*6.2.    1940*

In light of the President's ambiguous response to the legislation, the Budget Bureau faced a conflict between two cabinet departments on the draft legislation. On January 4, 1940, the conflict became official. The Commerce Department formally communicated with the Budget Bureau opposing the legislation. On January 16, 1940, the Budget Bureau moved to resolve the conflict by broadening the discussion to other departments with defense or statistical responsibilities. The Budget Bureau requested "an expression of views on the proposed legislation from the Departments of Treasury, War, Navy, Agriculture, Commerce and Labor, and from the Board of Governors of the Federal Reserve System." The expansion of the discussion of the draft legislation in turn created new political dynamics.[18]

From the moment they learned of the draft legislation in early December 1939, officials in the U.S. Census Bureau were profoundly concerned that any news that such a proposal was afoot would have a negative effect on the responses to the upcoming census. Not surprisingly, then, they kept the internal bureaucratic discussion a quiet one among high-level policy decision makers. Memos initially circulated among very few people: Stuart Rice, former head of the Central Statistical Board and recently named the new Assistant Director for Statistical Standards in the Budget Bureau; Census Director Austin; Census Bureau Assistant Director for Statistical Research Calvert Dedrick; and Budget Bureau Director Harold Smith.[19]

In mid-January, however, when the Budget Bureau asked for responses from five other cabinet departments, the issue began to leak. Furthermore, the discussions from November 1939 through mid January 1940 had taken place while Congress was out of session. Congress returned on January 3, 1940. On January 24, 1940, Congressman Daniel Reed

[16] We contacted Raymond Teichman, supervisory archivist at the FDR Library (email communication of February 12, 2002), to determine the normal channels of communication between Watson and Niles. Teichman indicated that since the library does not have White House telephone records, we are unable to determine if Watson followed up with David Niles. Teichman indicated that their communications would probably have been oral. Teichman also indicated that he found no evidence that the White House communicated about the matter with the agencies in writing in the FDR Library.
[17] The archival record of the consideration of the proposed change in Section 11 of the Census Act is quite detailed. We have not found material in this record to indicate that officials in the Justice Department, the White House, or the U.S. Census Bureau thought that the language of Section 18 of the 1929 Census Act (on the discretion of the Director to provide copies of records) might provide the authority that the administration was seeking.
[18] History of General Legislation, Box 27, Folder C158(1)-(5), RG51, NARA.
[19] Ibid.

"voiced objections to the Census of Housing on the floor of the House." In the first week of February, Senator Charles W. Tobey opened an attack and claimed that the questions on the 1940 schedule, notably that on income, violated individual privacy. Over the next few weeks, a crescendo of newspaper reports picked up the story and challenged the confidentiality of census responses.[20]

In the meantime, on February 9, President Roosevelt signed the 1940 Census Proclamation, which included the following assurance:

> The sole purpose of the census is to secure general statistical information regarding the population. . . of the country, and replies are required from individuals only to enable the compilation of such general statistics. No person can be harmed in any way by furnishing the information required. The census has nothing to do with taxation, with military or jury service, with the compulsion of school attendance, with the regulation of immigration or with the enforcement of any national, State or local law or ordinance. There need be no fear that any disclosure will be made regarding any individual person or his affairs.

> For the due protection of the rights and interests of the persons furnishing information, every employee of the Census Bureau is prohibited, under heavy penalty, from disclosing any information which may thus come to his knowledge.[21]

As the proclamation was issued, the draft bill to repeal the confidentiality provisions of the Census Act was still under review in the Budget Bureau. It does not appear that in February 1940, Senator Tobey or other critics of the census in Congress or the media had access to the actual language of the draft bill. There were hints of the debate, for example an article in the *New York Times* on February 27, 1940, reporting that the "Budget Bureau Reveals Postal and Treasury Department Officials Disapproved FBI Request for Legislation to Permit FBI to Inspect Information."[22] Senator Tobey, however, did not directly frame his attack in terms of a pending piece of legislation. Accordingly, the controversy raged over hypothetical invasions of privacy and confidentiality from the new housing census and the question on income, rather than in terms of the larger question of the use of the data for investigation and surveillance.

The story of Senator Tobey's challenge to the income questions in the 1940 Census is well-known (see for example, Eckler 1972; Barabba 1975). In mid-February Tobey focused his attack on the new question on income. On February 20 he proposed a bill to eliminate the question. He sponsored Senate hearings to gain support for the bill; the bill passed a Senate subcommittee on March 5. Administration and Census Bureau officials strenuously defended the new question and the confidentiality of the census more generally. In mid-March, as Senator Tobey's bill was moving toward further consideration in the Senate, Commerce Secretary Hopkins proposed that individuals who objected to providing an answer to the income question to the enumerator at the doorstep could send the information directly to the U.S. Census Bureau in a sealed envelope. By March 20, Tobey's bill floundered and the census proceeded (Eckler 1972).

---

[20] Rice to Director, 4/9/1940; Ibid., *New York Times,* 2/2/40; 17:2.
[21] *New York Times,* 2/11/1940, 13.
[22] *New York Times,* 2/27/40, 1:4.

*Journal of Official Statistics*

The story behind this story reveals a more complicated resolution of the issues. In early March President Roosevelt agreed to withdraw consideration of the draft legislation. At the height of the uproar about the income questions in late February, Budget Director Harold Smith wrote a memorandum to Roosevelt that highlighted the language concerning census confidentiality in the President's Census proclamation, which Roosevelt had signed on February 9. Smith reminded the President, that "It does not seem to me, therefore, that the enactment of the legislation proposed by the Department of Justice should be considered as being in accord with your program, and, if you approve, I will so advise the Attorney General and the other departments which have submitted their views with respect thereto." In a handwritten note, dated March 2, the President replied, "I agree with you."[23] As a result, the proposed legislation was never introduced.

With the draft legislation withdrawn and the census on track, the confidentiality issue cooled. Census Day was April 1. News articles reported the Census Director Austin visiting the White House to enumerate President Roosevelt. Director Austin assured the public that "the U.S. Census Bureau throughout its 150 years has never violated the law requiring secrecy."[24] Yet buried in the deluge of coverage of the enumerators in the field and other census news in early April was Senator Tobey's evidence that his challenge was not entirely unfounded. On April 8 and April 14, the *New York Times* reported the language of the draft bill. Tobey challenged Attorney General Robert Jackson to explain what he had in mind with the now defunct bill. Both the Attorney General and the U.S. Census Bureau ignored this challenge, neither having any incentive to respond or reopen the debate.

*6.3.   1941*

In January 1941 Franklin Roosevelt began an unprecedented third term as President of the United States and faced a threatening world at war. In a political environment in which the public was still unconvinced that the United States would or should enter the war, the President expanded the defense infrastructure. He created new defense agencies and brought internationalist Republicans, Henry Stimson and Frank Knox, into the cabinet to build bipartisan support for expanding national defense and preparing for war. While census officials and administration advisors had been able to convince Roosevelt that a legislative battle over the confidentiality provisions of the Census Act during a census and an election year was politically dangerous, there were strong signals early in 1941 that the President still sought a mechanism to permit the administrative and intelligence agencies access to individual level information collected by the U.S. Census Bureau. William Lane Austin, Census Director who led the battle against the 1939 legislation, was involuntarily retired at the end of January 1941.[25]

[23] Smith to FDR, Note from FDR to HDS, 3/2/40, President's Official File (POF) 3b-3c: Folder: "Commerce Dept., 1939–40 Census Bureau," FDR Library.
[24] *New York Times*, 3/21/1940, "Senate Unit Raises New Census Issue," 17.
[25] Austin reached 70 near the end of January and it required a Presidential Executive Order for him to remain as Director beyond January 31, 1941. Such Executive Orders were by no means exceptional. Indeed, both he and the federal statistical community had expected that he would be extended for an additional year so he could complete the main work of the 1940 Census. Stuart Rice to W.F. Ogburn, 2/6/1941. W.F. Ogburn papers. Box 27, Census Advisory Committee; Folder 5, Bureau of the Census, correspondence, 1941, University of Chicago Library, Special Collections.

Ignoring the universal recommendation from the statistical, social science, and user communities that a person with professional knowledge be appointed as Austin's replacement, the administration announced the nomination of J.C. Capt as Director on April 22. The Senate confirmed the nomination, without debate, on May 13.[26] Capt took office on May 22, 1941, and on June 6 he obtained the support of Commerce Secretary Jesse Jones for legislation to eliminate the 1941 Census of Manufactures, to provide authority for periodic surveys for national defense needs, and to make individual level census reports available for use in the "national defense program."

Census Director Capt's proposed legislative language was vaguer and broader than that of the 1939 draft bill. It no longer specifically amended Section 11 of the Census Act. Rather it simply authorized the Commerce Secretary to provide officials in other government agencies access to confidential census data for the "national defense program." The implication was that the new defense agencies, for example the Office of Production Management, the Office of Price Administration, and the War Production Board, would have access to the data.[27]

The Census Director found a sympathetic reception in the Senate. Section 3 of the bill which became Senate Bill 1627 (S1627) provided:

That notwithstanding any other provision of law, any individual census report or any information contained therein may be used in connection with the national defense program under such rules and regulations as may be prescribed, with the approval of the President, by the Secretary of Commerce. No person shall disclose or make use of any individual census report or any information contained therein contrary to such rules and regulations; and anyone violating this provision shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding $500 or be imprisoned not exceeding six months or both.[28]

The Senate report accompanying the bill was explicit about the goals of the legislation:

The needs of the defense program are of such a character as to require full and direct information about specific individuals and business establishments. It is clearly the intent of Congress and of the administration to implement in every possible way the defense program. An essential part of this implementation must be through the proper use of statistical data to speed production and to provide the detailed knowledge needed for the planning of total defense. To continue to impose the rigid provisions of the present confidential use law of the Census Bureau on

[26] Capt was an able administrator and very well-connected politically. As described in the words of one White House adviser to the President, "he is the man Harry Hopkins is to speak to you about, Harry brought him over [to the Census Bureau from the WPA]. . . to handle the political patronage [as a Confidential Assistant to Austin]. . . did a splendid job. . . [so that] the Senators and the Congressmen are all for him . . .", but as the same adviser adds, "[u]nfortunately, he has no professional background or standing in his profession. He has absolutely no statistical background." James Rowe, Jr., to FDR, James Rowe Jr. Collection, Box #5, folder "Census Bureau," FDR Library.
[27] See Senate Rept. 495, June 26, 1941, to accompany S 1627 (77th Congress, 1st Session); and Papers accompanying specific bills and resolutions, HR 77A-D20, S2208-S2395, 77th Congress, Box 159, and Letterbooks of the House Census Committee, 77th Congress, Records of the U.S. House of Representatives, RG233, NARA; U.S. House of Representatives, Committee on the Census 1941.
[28] *Congressional Record* (77th Cong., 1st Session), volume 87, pt. 6, 6969, August 11, 1941.

data now in the possession of the Bureau and that to be gathered and used for national defense would defeat the primary objects of the legislation here proposed.[29]

But all was not clear sailing. According to established legislative practice, the House Census Committee was the likely place to initiate and vet such legislation, and thus almost simultaneously with S1627, several similar bills were introduced in the House and referred to the House Census Committee. On June 24, 1942, Representative Guy Moser, Chair of this Committee, introduced House of Representatives Bill 5139 (HR 5139), which among other provisions would permit individual census reports to be used in connection with national defense. HR 5139 also permitted access to individual census reports to members of Congress, and thus was unacceptable to census officials and others in the administration. On July 3, 1941, another member of the House Census Committee, Congressman John Rankin, introduced House Bill 5232 (HR 5232) to allow individual "census reports" to be used in connection with national defense. This bill also had other provisions unacceptable to the administration. Finally, on July 16, 1941, House Census Committee Chair Moser introduced House Joint Resolution 213, to permit individual census reports to be used in connection with national defense by the Office of Production Management. The resolution also permitted access to individual census reports to members of Congress. Again the administration opposed the proposal. None of the House proposals made legislative headway. The Senate passed S1627 in August 1941 and sent the bill to the House, where it met a chilly reaction from Chairman Moser. Moser held hearings on all the bills in October and November, clearly distrusted the testimony of the administration, and vowed that the Senate bill would not get out of his committee.[30]

There was great concern expressed in the hearing testimony about giving government officials access to confidential data, particularly economic information about individual businesses (U. S. House of Representatives, Committee on the Census 1941). S1627 remained in the House Census Committee when the attack on Pearl Harbor brought the United States into the war.

Four days later, on December 11, 1941, Census Director Capt reminded the Commerce Secretary that the U.S. Census Bureau was still constrained by the confidentiality requirements of the Census Act, and proposed to write the language of S1627 into an executive order to get around the ban. As Director Capt wrote,

[T]he Bureau of the Census has no authority at the present time to permit other governmental agencies to obtain from Census records information about individuals or business establishments that may be indispensable to the defense of the nation. Authority therefore is needed for the Bureau of the Census to make available for war purposes any record of information in the possession of the Bureau of the Census when directed to do so by the Secretary of Commerce.

---

[29] Senate Rept. 495, June 26, 1941, to accompany S 1627 (77th Congress, 1st Session).
[30] Papers accompanying specific bills and resolutions, HR 77A-D20, S2208-S2395, 77th Congress, Box 159, and Letterbooks of the House Census Committee, 77th Congress, Records of the U.S. House of Representatives, RG233, NARA; U.S. House of Representatives, Committee on the Census 1941.

> In my judgment, it is necessary to have these powers vested in the Secretary of Commerce at once to make possible the flexible, efficient, and economical war-time operation of the Bureau of the Census in obtaining and making available statistics for planning and directing war efforts.[31]

This time, it was the Justice Department, now under a new Attorney General, Francis Biddle, that objected to the proposal to void the confidentiality provisions of the Census Act. The Attorney General's Office decided that there was no legal authority for such an Executive Order.[32]

### 6.4.   1942

The Census Director was not to be dissuaded however. In January 1942, Director Capt proposed inserting the language of S1627 into the omnibus bill that would become the Second War Powers Act.[33] Budget Director Harold Smith refused his request, and the bill as introduced in the Senate on January 16, 1942, Senate Bill 2208 (S2208), made no mention of census data. Director Capt and Commerce officials continued to try to find a way around census confidentiality in correspondence with Attorney General Francis Biddle through the second half of January. In late January the Second War Powers bill passed the Senate and moved to the House and the House Judiciary Committee. There Capt found the opportunity he wanted. The committee held hearings the first week of February. On Wednesday morning, February 4, Census Director Capt and Commerce Department Solicitor South Trimble, Jr. appeared before the House Judiciary Committee to propose language to permit the abridgment of confidentiality. Both men were well connected to committee chair, Representative Hatton Sumners. Capt was a fellow Texan.[34] South Trimble, Jr., was the son of the Clerk of the House, South Trimble.

That afternoon, Commerce Secretary Jesse Jones, also a Texan, sent bill language to Sumners.[35] Jones proposed "a suggested amendment to the omnibus war-powers bill which was presented to the House Judiciary Committee this morning by South Trimble, Jr., Solicitor of the Department of Commerce, and J. C. Capt, Director of the Bureau of the Census." "This authority," he continued, "is urgently needed by the Department of Commerce in order to collect information in connection with the war effort without delay and to make this and other information now obtained by the Department of Commerce under the seal of confidence available to other war agencies." On Friday, February 6, without further public debate, the House Judiciary Committee incorporated the language proposed by Capt, Trimble, and Jones into S2208. The new Title read:

---

[31] Memorandum from J.C. Capt to the Secretary of Commerce, 12/11/41, Genl. Recds. of the Dept. of Commerce, Off. of the Genl. Counsel, Subj. and Index File, 1903–1946, Box 152, File 5706 -33, RG40, NARA.

[32] Memorandum to the file, E.T. Quigley, 12/23/41, Ibid.

[33] Stuart Rice to Harold Smith, Director, Bureau of the Budget, January 17, 1942, and Rice to Congressman Guy Moser, January 17, 1942, Records of the OMB, General Records, 1940–1968 (40.7), Office of Statistical Standards, Entry 147, Box 51, File: Census Bureau, General File I, 1940–1959, RG51, NARA.

[34] Indeed, Sumners was one of the early supporters of Capt's nomination as Census Director.

[35] Jones to Sumners, with accompanying text, February 4, 1942. Papers accompanying specific bills and resolutions, HR 77A-D20, S2208-S2395, Box 159, File: S2208, RG233. Jones's letter is also reprinted in the House Judiciary Committee Report on S2208.

TITLE XV – UTILIZATION OF VITAL WAR INFORMATION

Sec. 1501. The Secretary of Commerce is authorized, subject to any regulation or direction that the President may issue, to make such special investigations and reports of census or statistical matters as may be needed in connection with the conduct of the war. In carrying out the purpose of this section, the Secretary is further authorized to dispense with or curtail any regular census or statistical work of the Department of Commerce or any bureau or division thereof . . . .

Sec. 1502. That notwithstanding any other provision or law, any record, schedule, report, or return, or any information or data contained therein, now or hereafter in the possession of the Department of Commerce, or any bureau or division thereof, may be made available by the Secretary of Commerce to any branch or agency of Government for use in connection with the conduct of the war, subject to any regulations that the President may issue. No person shall disclose or make use of any individual record, schedule, report, or return, or any information or data contained therein contrary to the terms of such regulations; and anyone violating this provision shall be guilty of a felony and upon conviction thereof shall be fined not exceeding $1,000, or be imprisoned not exceeding two years, or both.

The House Report on the bill explained the addition:

Title XV is a new title added to the bill after it was referred to the Committee on the Judiciary. Its inclusion was requested by the Secretary of Commerce . . . . This new provision would authorize special investigations and reports of census or statistical matters as may be needed in connection with the conduct of the war. It would permit information in the possession of the Department of Commerce to be made available to any branch or agency of the Government for use in connection with the conduct of the war.[36]

The House Judiciary Committee adoption of the Census Director's amendment to S2208 provided the vehicle to propel the abridgment of confidentiality forward. In the rush to move the overall bill, the Committee said little about its rationale beyond endorsing the wishes of Secretary Jones and Director Capt. Clearly one factor was that war was no longer hypothetical. The amendment permitted the use of "vital war information" not data for "national defense." But there were other considerations in early February 1942. On Saturday, February 7, the *New York Times* reported the overall passage of S2208 in the committee. The bill was something of a hodgepodge, some provisions quite controversial, some not. Fifteen titles dealt with everything from the metallic content of five-cent coins, to expedited citizenship status for alien soldiers, to the organization of war production. With all the provisions to choose from, the *Times* chose to highlight the new census provision. The article headlined: "Spy Data Sought from 1940 Census:"[37]

---

[36] Ibid.
[37] 2/7/1941, 9.

> The House Committee on the Judiciary before giving its approval today to the Senate adopted Second War Powers Bill, amended the measure to take back the promise it made in 1940 that all data obtained by the Census takers would be held strictly confidential, even from other bureaus and agencies . . . . Some agencies of the government want data now as a matter of national safety. They seek some of the information obtained particularly from Japanese and others who since have become enemy aliens, especially about those in coastal areas from which they have been ordered evacuated by the Department of Justice . . . . [Such] data, now a secret under law, government officers believe, would be of material aid in mopping up those who had eluded the general evacuation orders.

By early February 1942, there was great fear of enemy alien sabotage and espionage on the West Coast. The West Coast congressional delegation and local officials had called for severe restrictions on Japanese aliens, including evacuation from coastal areas. The more extreme proposals called for wholesale evacuation and incarceration of all persons of Japanese ancestry. As the *Times* reported, the House Judiciary Committee was willing to break the confidentiality commitment to protect against potential sabotage on the coast.[38]

The fate of the provision was not assured, however. In the last week of February, S2208 moved to the House floor. Debate on the myriad titles was long and complex, stretching over five days. Late in the debate House Census Committee Chairman Moser rose on the House floor to oppose Title XV. He attacked the provision because of the irregular way it bypassed his committee, and the substance of the provision. Once the issue was joined, other members rose to question the provision and raised the concern about government snooping into private and confidential matters. Congressman Frederick Cleveland Smith challenged the provision and questioned its intent. "The powers granted under this title are exceedingly broad and comprehensive, and unless used most judicially [sic] and held to the single purpose of expediting the prosecution of the war, can become a great danger to the economy." A bit later Smith challenged the floor managers for the bill in the following exchange:[39]

> Mr. Smith of Ohio: Mr Chairman, I should like to ask the committee where this provision we are discussing originated. Who wrote title XV of this bill?

---

[38] It is beyond the scope of this article to describe in detail the role of the U.S. Census Bureau and its data in the forced removal and incarceration of the West Coast Japanese American population in 1942. The U.S. Census Bureau detailed Calvert Dedrick, head of its Statistical Research Division, to provide statistical expertise to the Western Defense Command in late February 1942. The U.S. Census Bureau provided very detailed small area tabulations (that is, meso data) from the 1940 Census for operational use in the forced removal of the Japanese Americans from their homes. Roughly 110,000 individuals of Japanese ancestry from the West Coast were forcibly evacuated and "relocated" to concentration camps. The removals began in late March 1942 and were completed by the summer. The U.S. Census Bureau has consistently denied that it provided any microdata in connection with the removal process or for any other purpose. After the passage of the Second War Powers Act, such distribution of microdata to the military was legal. The literature on the evacuation is voluminous. For an introduction to the background on the decision to evacuate the Japanese, see CWRIC 1997. For additional background on U.S. Census Bureau involvement, see Seltzer and Anderson 2000.

[39] February 28, 1942, Debate on Title XV, Utilization of Vital War Information, of S2208, Second War Powers Act Bill, *Congressional Record* (77th Congress, 2d Session),Vol. 88, Part 2, 1773, 1803.

Mr. McLaughlin (bill manager). This suggestion was at the request of the Commerce Department in order that it might be in a position to furnish material to the other departments which material is deemed necessary in connection with the prosecution of the war, and which it is not now in a position to give to the other departments.

Mr. Smith of Ohio. We know that the National Resources Planning Board has for some time been making an attempt to get control of the census statistics. What I am wondering is whether it is not some organization that is back of this proposal. **If the purpose of this title is to investigate aliens or get information related to them for the purpose of preventing sabotage or espionage, that is one thing** [emphasis added]. But if the purpose of it is along the lines that the National Resources Planning Board is working, namely a communized state, I think the Congress ought to know about it . . . .

Mr. McLaughlin:. . .Specifically answering the gentleman's question, I believe the matter is in safe hands.

Moser did not convince his colleagues to remove Title XV from the bill. On Saturday, February 28, his efforts failed on a voice vote. Quickly thereafter, the House passed the amended S2208.

In early March 1942, S2208 went to a conference committee to reconcile the difference between the House and Senate versions of the bill. Title XV emerged with the rest of the bill on March 12. The only change in the provision was the additional requirement that any request to the Secretary of Commerce for confidential data be in writing. The rationale for the provision remained the need to identify Japanese aliens and citizens of Japanese ancestry on the West Coast, now made more urgent by intervening decisions by the White House.[40]

Between the introduction of the Title XV language in S2208 in early February, and the passage of the bill in the House at the end of the month, things had been moving quickly on plans for the forced evacuation and exclusion of the Japanese alien and Japanese ancestry population from the West Coast. On February 19, 1942, President Roosevelt promulgated Executive Order 9066, which permitted military commanders to prescribe military areas "from which any or all persons may be excluded, and with such respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion." In early March 1942, Congress considered legislation to enforce Executive Order 9066. Public Law 77-503 was voted on by Congress and signed into law by the President on March 21, 1942. At a Senate Committee on Military Affairs hearing on the enforcement bill on March 13, 1942, Senator Warren Austin, who was also a member of the conference committee for the Second War Powers Act, responded to a fellow senator who asked how the Japanese would be identified:

we are now considering. . . legislation that would empower the [government] to requisition from the Commerce Department, Bureau of the Census, what the census shows about these people. That would give an enumeration of the Japanese and it would also give names and residences, so that, when the Army makes its evacuation it can. . .

---

[40] Conference Report to Accompany S2208, Second War Powers Act, 1942, March 12, 1942, House Report 1896 (77th Congress, 2d Session).

compare its list of evacuees against the census and have some knowledge of whether this has been an effective protection or not.[41]

Senator Austin's characterization of the intent of Title XV of the Second War Powers was the same as the rationale attributed to "government officers" in the *New York Times* story of 2/7/1942, that is, "mopping up" after the forced evacuation program.

After the conference report on S2208, the Second War Powers bill faced two more weeks of wrangling and some further changes before final passage as Public Law 507 (77th Congress, 2d Session). Title XV became Title XIV in the final bill. The President signed the law on March 27. After two and a half years, and with the assiduous efforts of Census Director Capt, the administration had the authority it sought to use for war purposes responses to census and survey questions collected under a guarantee of confidentiality. The final language of Section 1402 (U.S. Code Congressional Service 1943) read:

> That notwithstanding any other provision of law, any record, schedule, report, or return, or any information or data contained therein, now or hereafter in the possession of the Department of Commerce, or any bureau or division thereof, may be made available by the Secretary of Commerce to any branch or agency of the Government, the head of which shall have made written request therefor for use in connection with the conduct of the war . . . .

### 7.  Making Better Statistical Policy

Except for the flurry of opposition to the Justice Department proposal of 1939 to modify Title 13 to permit the diversion of information collected by the U.S. Census Bureau for statistical purposes to serve intelligence and military purposes, statistical confidentiality was *not* an issue of central concern to federal statistical policy makers at that time. Far more important were issues related to the coordination of the decentralized U.S. federal statistical system, including issues of sharing data and information between agencies for statistical purposes. From this perspective, Title XIV of the Second War Powers Act was a clumsy law. The law only authorized access to data produced by the Commerce Department "for use in connection with the conduct of the war." Since the mid 1930s the Central Statistical Board had been proposing the coordination of federal statistical activities in terms of uniform survey practices, question wording, and classification schemes. Some of these goals were achieved when the Central Statistical Board moved into the Budget Bureau in 1939 and Stuart Rice became the Director of the new Office of Statistical Standards. Bills had been introduced in Congress to provide statutory authority for further coordination, but they had not passed. In the summer of 1942 Congress revived the legislation and considered coordination of federal statistical policy. The Federal Reports Act passed on December 24, 1942, and included standardization of the rules governing the sharing of data, including confidential statistical data, among federal agencies. The relevant language read in part:

> Sec. 3 (e) For the purpose of this Act, the Director [that is, the Budget Director] is authorized to require any Federal agency to make available to any other Federal agency

---

[41] U.S. Congress, Senate, Committee on Military Affairs, "S. 2352." Unprinted hearing report prepared by Ward and Paul, official reporters, 77th Congress, 2nd Session, March 13 1942, 8–9, Japanese Evacuation and Resettlement Study Collection (JERS), Banc MSS 67/14c FILM, Reel 4, Frame 69, Bancroft Library.

*Journal of Official Statistics*

any information which it has obtained from any person after the date of enactment of this Act, and all such agencies are directed to cooperate to the fullest practicable extent at all times in making such information available to other such agencies . . . . [exemptions applying to IRS, and other Treasury agencies. . .]

Sec. 4 (a) In the event that any information obtained in confidence by a Federal agency is released by that agency to another Federal agency, all the provisions of law (including penalties) which relate to the unlawful disclosure of any such information shall apply to the officers and employees of the agency to which such information is released to the same extent and in the same manner as such provisions apply to the officers and employees of the agency which originally obtained such information; and the officers and employees of the agency to which the information is released shall in addition be subject to the same provisions of law (including penalties) relating to the unlawful disclosure of such information as if the information had been collected directly by such agency.

(b) Information obtained by a Federal agency from any person or persons may, pursuant to this Act, be released to any other Federal agency only if (1) the information shall be released in the form of statistical totals or summaries; or (2) the information as supplied by persons to a Federal agency shall not, at the time of collection, have been declared by that agency or by any superior authority to be confidential; or (3) the persons supplying the information shall consent to the release of it to a second agency by the agency to which the information was originally supplied; or (4) the Federal agency to which another Federal agency shall release the information has authority to collect the information itself and such authority is supported by legal provision for criminal penalties against persons failing to supply such information.

By the end of 1942, legislatively defined mechanisms existed to share newly gathered confidential data across all agencies of the federal government. Authority for administering such data sharing lay with the Director of Statistical Standards in the Budget Bureau. The provisions of the Federal Reports Act remained in place after the war. The authorizations of the Second War Powers Act were repealed in 1947 as part of the First Decontrol Act of 1947.[42]

In Anderson and Seltzer (2005) we provide further detail on the impact of the authorizations for sharing data across federal agencies permitted under the Federal Reports Act. In Seltzer and Anderson (2007) we discusss the implementation of Section 1402 of the Second War Powers Act between 1942 and 1947. The U.S. Census Bureau and its leadership have continued to deny that individual-level disclosure took place during World War II (see most recently, Habermann 2006). We had hitherto considered that there was conflicting evidence as to whether or not the U.S. Census Bureau actually provided

---

[42] (S931) Chapter 29, Public Law 29, passed March 31, 1947 (50 U.S.C.A. Appendix, Section 644a). The act ended governmental control of the economy except in the case of commodities and products that were still in short supply or needed control during reconversion at home or abroad (e.g., rubber and sugar). The opening section of that law noted that "The Congress hereby declares that it is vital to a free economy and full production in the United States that all emergency controls and war powers under the Second War Powers Act be removed except in certain limited instances." The language continued by detailing the limited circumstances in which control could continue, with no further mention of Section 1402. (For further background, see Seltzer and Anderson 2002.)

individually identified microdata about Japanese Americans from the 1940 Census to other government agencies (Seltzer and Anderson 2003, Table 2). Our more recent research provides ample evidence of the release of identifiable microdata on both individuals, including specifically Japanese Americans, and business entities, during World War II (Anderson and Seltzer 2007, 2005).

## 8.  Postwar Years

As after World War I, the U.S. Census Bureau faced additional requests for access to confidential data after 1945. The legislative changes to confidentiality provisions made during the war blurred the boundaries of acceptable "sharing" of data among agencies of the federal government. The U.S. Census Bureau once again discovered it needed to explain to the officials in other federal agencies why it should not provide the data requested. In 1947, the Attorney General's Office sought "information from census records about certain individuals for use by the FBI" in the context of "rising concern about possible Communist infiltration and sabotage" (Barabba 1975, p. 27). The U.S. Census Bureau denied the request. In the late 1940s, the Secret Service asked for information about the people in a neighborhood in Washington, DC which was planned as the temporary residence of President Harry Truman. The U.S. Census Bureau denied the request but provided small area tabulations of the neighborhood to the Secret Service. By the time of the 1950 Census, the U.S. Census Bureau was again guaranteeing the confidentiality of responses, but there is strong evidence that they had not convinced their colleagues in other federal agencies.[43]

The U.S. Census Bureau faced conflicting mandates. On the one hand, the Federal Reports Act required that "any Federal agency" was "to make available to any other Federal agency any information which it has obtained from any person. . . and all such agencies are directed to cooperate to the fullest practicable extent at all times in making such information available to other such agencies." On the other, Section 9 of Title 13, the 1954 codification of the Census Act, required that the Bureau not:

- use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or
- make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or
- permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

Throughout the 1950s, the ambiguities surrounding the principle of statistical confidentiality bedeviled the federal statistical system.[44] They finally erupted in a major interagency conflict when the Federal Trade Commission (FTC) asked the St. Regis Paper

---

[43] Barabba 1975: 27. The temporary White House incident is used as a prominent example of the agency's refusal to breach confidentiality. See http://www.census.gov/dmd/www/dropin09.htm. See also Anderson 1988: 200, for an example of the advertising for the 1950 Census.

[44] There is considerable internal government discussion about statistical confidentiality and the implementation of the provisions of the Federal Reports Act in the records of the Division of Statistical Standards, Bureau of the Budget, General Records, 1940–1968 (40.7), Entry 147b, RG51, NARA.

Company for the file copies the company retained of its 1958 manufacturing census responses. (At that time the FTC had important responsibilities in the enforcement of anti-trust laws.) The company refused, citing the support of the U.S. Census Bureau and an earlier court decision upholding the right of the company to refuse the request. The U.S. Census Bureau also refused to provide the copy of the St. Regis report to the FTC. The FTC sued St. Regis in federal court to gain access to the form and fought the case to the Supreme Court. In 1961, the Supreme Court sided with the FTC and required that St. Regis Paper turn over the file copies to the FTC.

The U.S. Census Bureau, though not formally party to the litigation, nevertheless recognized that the outcome of the case would have an extraordinarily damaging impact on compliance with its censuses and surveys. Mr. Justice Clark based his majority opinion on a strict reading of the Census statute: "Congress did not prohibit the use of the reports per se but merely restricted their use while in the hands of those persons receiving them, i.e., government officials. Indeed, where Congress has intended like reports not to be subject to compulsory process, it has said so" (*St. Regis Paper Company and the United States*, 368 US 208 (1961); quoted in Rubin 1962, p. 28). In a dissenting opinion Mr. Justice Black criticized Clark for missing the point. He argued that the majority opinion made a mockery of the agency's pledge printed on its forms that any information given would not be used "for purposes of taxation, investigation, or regulation." Black noted that the

> Census Bureau and the President promised that the Census Bureau would keep Census reports particularly confidential . . . . Quite plainly, the promised protection was against governmental "taxation, investigation, or regulation" generally, and to protect the integrity of that promise, it is, of course, necessary that all of the particular arms of Government which are engaged in those activities be bound by the Government's pledges. Our Government should not, by picayunish haggling over the scope of its promise, permit one of its arms to do that which, by any fair construction, the government has given its word that no arm will do (quoted in Rubin 1962, p. 28).

In early 1962 the issues moved to Congress, as a number of bills were introduced to clarify the meaning of the confidentiality pledge in Title 13. The debate was extraordinarily broad and to our knowledge this was the first time in the twentieth century that Congress undertook a full examination of the purposes of and potential limitations on statistical confidentiality. In the summer of 1962, the House Committee on Post Office and Civil Service conducted far-reaching hearings and heard from all sides (U.S. House of Representatives 1962). Once again, one sees positions aired both supporting and opposing strict standards of statistical confidentiality. Defending the standard as it had developed over the past 50 to 75 years, Census Bureau Director Richard Scammon testified:

> Once you start saying that material is not confidential, that material may be used to your disadvantage, that this material may be used to your disinterest, then you are going to get just as dubious a set of reports as the imagination of man can devise and I would

suggest that this imagination is a pretty far reaching thing (U.S. House of Representatives 1962, 23; also quoted in Rubin 1962, p. 28).

Statistical confidentiality was not only an ethical requirement, but absolutely essential to the integrity of the publications and analyses produced in the federal statistical system. On the other side of the argument were the defenders of efficient government. Echoing the logic of coordination underlying the Federal Reports Act, Representative Emmanuel Celler, Chair of the House Judiciary Committee, came before the House Post Office and Civil Service Committee to testify in favor of the Supreme Court majority view. Representative Celler had also been a member of the House Judiciary Committee in the 77th Congress, and participated in the debates about Section 1402 of the Second War Powers Act. He thought that the St. Regis decision should be taken further:

> As a general rule, information in the files of one agency should be available to other agencies of the executive branch in the enforcement of the laws. The administration of justice should not be reduced to the level of blind man's buff, played by different departments of the same government.

> If the Bureau of the Census has in its files information relevant to a violation of the antitrust laws, it seems to me as a general proposition that such information should be available to the Department of Justice and the Federal Trade Commission – the agencies charged with antitrust enforcement.

> It would be more appropriate, therefore, to repeal the secrecy presently accorded the original census returns in the possession of the Bureau of the Census than to extend the shroud of secrecy to file copies of census returns retained by reporting companies ((U.S. House of Representatives 1962, 34; also quoted in Corcoran 1963, p. 39).

In the fall of 1962 Congress rejected Celler's position and amended Title 13 to provide a confidentiality guarantee for the file copies retained by companies filing census reports. The new language read:

> No department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual. Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding (Title 13, United States Code, Section 9; Public Law 87–813).

President John Kennedy signed the bill on October 15. The Cuban missile crisis began the next day, and census confidentiality was swept from the attention of Congress and the public. (For a more complete treatment of statistical confidentiality issues as they arose in connection with data on businesses and enterprises, see Anderson and Seltzer 2005.)

At the time, commentators close to the issue were not sure that it had been resolved. In retrospect, though, one can see that the 1962 amendment to Title 13 had the same effect as the 1930 Attorney General opinion denying the Women's Bureau access to individual census reports from Rochester, New York. The issue was put to rest. To our knowledge, in the 40 years between 1962 and 2001, the U.S. Census Bureau effectively resisted any federal agency requests for access to individual reports for the purpose of taxation, investigation or regulation, and has been able to respond to the challenges that the federal data collections are an invasion of personal privacy. Although the passage of the Privacy Act of 1974 and the Freedom of Information Act brought the issue of statistical confidentiality to legislative attention again, the U.S. Census Bureau claim to strict confidentiality prevailed.[45] Unlike during the two world wars, the administration did not propose administrative procedures or legislative changes to abridge confidentiality during the Vietnam War or the first Gulf War.

Since the terrorist attacks of September 11, 2001, however, the situation has become far more murky. Statisticians in many U.S. federal agencies have been reluctant to talk about requests made by security or intelligence agencies and personnel for access to data and information initially collected for statistical purposes, let alone any incidents where access may have been provided. An overt breach in the legislation protecting statistical confidentiality took place when the so-called Patriot Act was enacted into law in October 2001. One of the sections of that omnibus legislation set aside, with minimum legal protections for data providers, the strong confidentiality protections that had hitherto governed the data-gathering operations of the National Center for Education Statistics (NCES) in the Department of Education. For a description and one view of this development, see Seltzer and Anderson 2002.

At the same time, studies of the U.S. Census Bureau's involvement in the round-up of Japanese Americans after the United States entered World War II have added to public concern about statistical confidentiality. This became apparent in 2004 when the U.S. Census Bureau found itself involved in a public controversy about the assistance it had provided to the U.S. Department of Homeland Security in facilitating the latter agency's access to 2000 Census mesodata at the level of 5-digit postal codes about Arab-Americans by detailed ancestry. From the start, the U.S. Census Bureau's role in the World War II round-up was mentioned in press accounts of this new controversy (see, for example, *NY Times*, 7/29/2004, p. 19) and has been prominently featured in subsequent professional papers on the subject (see for example, El Badry and Swanson 2007; Habermann 2006; and Seltzer 2005).

On a more positive note, in late 2002 Congress revisited the debates once again and passed the Confidential Information Protection and Statistical Efficiency Act (CIPSEA) (116 Stat. 2962, Public Law 107–347) clarifying the protections to data collected for statistical purposes across the federal government and defining the conditions under which the U.S. Census Bureau, U.S. Bureau of Labor Statistics, and U.S. Bureau of Economic Analysis can share micro data.

---

[45] In 1971, California Rural Legal Assistance asked the U.S. Census Bureau for "individual census data for jury selection." Bohme and Pemberton 1991:12. The bureau denied the request. In the early 1980s, the courts ruled that the U.S. Census Bureau did not have to release address registers to local governments so they could evaluate accuracy of the 1980 Census (Baldrige vs. Shapiro 1982).

## 9.  Discussion

We conclude with some observations about recent and future developments in statistical confidentiality in the United States. Are the legal and administrative understandings and safeguards of statistical confidentiality put in place in the period from 1910 to 1965 adequate for the future? Forty years after the St. Regis case there are some very new challenges on the horizon.

First, the technical situation has changed, and with it the participants in the debates about statistical confidentiality. For most of the period we reviewed, micro data were collected and preserved on paper schedules and punch cards. Only the statistical agencies themselves had easy, if slow, access to the cards and forms, and requests for micro data required the cooperation of the agency to provide lists, names, or individual forms. As late as the mid-twentieth century, only the U.S. Census Bureau had the administrative and technical capacity to manage the data files necessary to surveil the entire American population and economy, and even its capacity was limited. Since the 1960s, the computer revolution and innovations in massive statistical data processing have made it possible for individuals and organizations outside the federal government to access large data files. No longer does the U.S. Census Bureau have an overwhelming technological advantage in being the prime site for comprehensive data analysis on the American population and economy.

One can see the effect of the new technical situation in a shift in the nature of the literature on statistical confidentiality since the 1970s. With the computer revolution and the emergence of the World Wide Web, discussion of statistical confidentiality within official statistical agencies and the research community has shifted to such questions as how to guarantee confidentiality while providing increased access to data files through public use samples, to the technical, legal, and ethical dimensions of linking micro data and/or administrative data, and to the technical requirements for nondisclosure. These discussions have expanded to a much larger community of officials in statistical agencies, academic researchers, and most recently the private sector data providers. In the earlier period we reviewed, a small number of officials who oversaw the federal statistical system, chief among them the Director of the U.S. Census Bureau, the Commissioner of Labor Statistics, and after 1940, the Director of the Office of Statistical Standards in the Budget Bureau, set standards for statistical confidentiality because they held the monopoly on technical expertise and data stewardship. That monopoly of technical expertise and capacity and hence authority to set standards for statistical confidentiality has disappeared.

Second, it is important to broaden the discussion of statistical confidentiality from a narrow, technical consideration of statistically-based disclosure limitation methods typically designed to protect against a hypothetical "intruder" (see for example, Fienberg and Willenborg 1998, p. 340) to a broader range of substantive, technical, operational, legal, policy, and ethical safeguards designed to deter the most likely and persistent "intruders," that is, other agencies of government with investigative, intelligence, or prosecutorial agendas.

Third, as already discussed the war on terror and threats to national security once again highlight in particularly stark terms the inherent conflict between governmental efficacy

and statistical confidentiality (cf. National Research Council 2005, pp. 55–64; Seltzer and Anderson 2002; Habermann 2006; Seltzer 2005). As during the world wars, there is much discussion today in the United States about coordination of government information and efficiency, and once again Congressman Celler's common sense notions of data sharing for the common good are on the agenda. Again we have to articulate a response to his 1962 argument that "*/a/s* a general rule, information in the files of one agency should be available to other agencies of the executive branch in the enforcement of the laws. The administration of justice should not be reduced to the level of blind man's buff, played by different departments of the same government." Once again, it is necessary to explain exactly why statistical confidentiality should be preserved when doing so might appear to endanger people's lives. We suggest that an enlarged community of official statisticians, academic researchers, and private data providers needs to be involved in the discussion. Participants should also include policy makers and the public alike.

There are many ways to bring about the involvement of a larger community in the discussion. But any such discussion must begin with a full and open examination of the past that addresses both what happened and why it took place (National Research Council 2005, 5, 83). Such a discussion can rightly begin among those familiar with the federal statistical system, including both those in government and those outside it. However, ultimately this discussion must move to a wider audience if the important concept of statistical confidentiality is to be maintained. This article was intended to both contribute to our internal dialogue within the statistical profession and to help pave the way for the needed wider discussion. Finally, although we have explored these issues with the U.S. statistical system in mind, it is clear that many of the issues raised have parallels in other countries.

## A.  Archival Sources

**National Archives and Records Administration (NARA), Washington, D.C.**

   Records of the Bureau of the Budget, Record Group 51 (RG51)
      History of General Legislation, 76th–79th Congress, 1939–1946 (39.1) (Legislative
      History of Unenacted and Vetoed Public Bills), Entry 20A.
      Records of the Office of Statistical Standards, General Records, 1940–1968 (40.7),
      Entry 147.
   Bureau of the Census, Record Group 29 (RG29)
      Correspondence of Joseph A. Hill, 1911–1940, Entry 202.
      General Records Maintained by Calvert Dedrick, Entry 210.
      General Records Maintained by William Lane Austin, 1933–1941, Entry 142.
      Office File of Robert H. Holley, Entry 274.
   Department of Commerce, Record Group 40 (RG40).
      General Records of the Department of Commerce, Office of the General Counsel,
      Subject and Index Files, 1903–1947.
   Records of the U.S. House of Representatives, Record Group 233 (RG233).
      Letterbooks of the House Census Committee, 77th Congress.
   Records of the Selective Service System, Record Group 163 (RG163).
      General Files.

**Franklin Delano Roosevelt Presidential Library, Hyde Park, NY**
   James Rowe Jr. Collection.
   President's Official File: 3b–3c, Department of Commerce, Box 6, Folder: Commerce
      Department, 1939–1940, U.S. Census Bureau.
**Bancroft Library, University of California – Berkeley, Berkeley, CA.**
   Japanese Evacuation and Resettlement Study Collection (JERS), Banc MSS 67/14c.
**University of Chicago Library, Special Collections, Chicago, IL.**
   W.F. Ogburn Papers.

## 10.   References

Anderson, M. (1988). The American Census: A Social History. New Haven: Yale University Press.

Anderson, M. (2000). Building the American Statistical System in the Long Nineteenth Century. In L'ere du chiffre: Systemes statistiques et traditions nationales/The Age of Numbers: Statistical Systems and National Traditions, Jean-Pierre Beaud and Jean-Guy Prevost (eds). Quebec, Canada: Presses de l'Universite du Quebec, 105–130.

Anderson, M. and Seltzer, W. (2005). Federal Statistical Confidentiality and Business Data: Twentieth Century Challenges and Continuing Issues. Paper presented at session on Confidentiality, Federal Committee on Statistical Methodology (FCSM) Research Conference, Arlington (VA), November 15.

Baldrige vs. Shapiro. (1982). 455 US 345.

Barabba, V. (1975). The Right of Privacy and the Need to Know. In The Census Bureau: A Numerator and Denominator for Measuring Change. Technical Paper 37. Washington, D.C.: Government Printing Office.

Bohme, F.G. and Pemberton, D.N. (1971). Privacy and Confidentiality in the U.S. Censuses – A History. Paper presented at the annual meeting of the American Statistical Association. Atlanta, GA, August 18–22.

Chambers, J.W. (1987). To Raise an Army: The Draft Comes to Modern America. New York: Free Press.

Clemetson, L. (2004). Homeland Security Given Data on Arab-Americans. The New York Times, July 30. http://www.nytimes.com/2004/07/30/politics/30census.html

Corcoran, T.F. (1963). On the Confidential Status of Census Reports. The American Statistician, 17, 33–40.

Dandeker, C. (1990). Surveillance, Power and Modernity: Bureaucracy and Discipline from 1700 to the Present Day. Cambridge, UK: Polity Press.

Dorling, D. and Simpson, S. (eds) (1999). Statistics in Society: The Arithmetic of Politics. London: Arnold.

Duncan, G., Jabine, T.B., and de Wolf, V.A. (eds) (1993). Private Lives and Public Policies: Confidentiality and Access of Government Statistics. Panel on Confidentiality and Data Access, Committee on National Statistics, National Research Council and the Social Science Research Council. Washington: National Academy Press.

Duncan, J.W. and Shelton, W.C. (1978). Revolution in United States Government Statistics, 1926–1976. Washington, DC: Government Printing Office.

Eckler, A.R. (1972). The Bureau of the Census. New York: Praeger.

El-Badry, S. and Swanson, D. (2007). Providing Census Tabulations to Government Security Agencies in the United States: The Case of Arab Americans. Government Information Quarterly, In Press, Corrected Proof, Available online 21 February.

Fienberg, S.E. and Willenborg, L.C.R.L. (1998). Disclosure Limitation Methods for Protecting the Confidentiality of Statistical Data. Journal of Official Statistics, 14, 337–565 (Special Issue).

Fitzpatrick, E.A. (1940). Conscription in America: A Study of Conscription in a Democracy. Milwaukee, WI: Richard Publishing Company.

Goldberg, J.P. and Moye, W.T. (1985). The First Hundred Years of the Bureau of Labor Statistics. Washington: Government Printing Office.

Habermann, H. (2006). Ethics, Confidentiality, and Data Dissemination. Journal of Official Statistics, 22, 599–614. Based on President's invited address, International Statistical Institute, 55th Session, Sydney (Australia), April 5–12. Original paper available at http://www.unstats.un.org/unsd/ethics.pdf

Hakim, C. (1979). Census Confidentiality in Britain. In Censuses, Surveys and Privacy, Martin Bulmer (ed.). London: The Macmillan Press Ltd.

Hayter, H.H. (1892). General Report of the Census of Victoria, 1891. Melbourne: Robert S. Brain, Government Printer, 19.

Higgs, E. (2001). The Rise of the Information State: The Development of Central State Surveillance of the Citizen in England, 1500–2000. Journal of Historical Sociology, 14, 175–197.

Holley, R. (1938). Confidential Nature of Individual Data Returned on Population Schedules. Memorandum to the Director, 9/8/1938, Entry 274, Box 56 (Holley), Folder: Austin, W.L., Records of the Bureau of the Census, RG29, NARA.

Holt, W.S. (1929). The Bureau of the Census: Its History, Activities and Organization. Washington, D.C: Brookings Institution.

Hudson, A. (2004). Study Used Census Information for Terror Profile. The Washington Times, January 19. http://www.washingtontimes.com/national/20040118-114335-2930r.htm 1-24-2004.

Lyon, D. (2001). Surveillance Society: Monitoring Everyday Life. Philadelphia: Open University Press.

McCaa, R. and Ruggles, S. (2002). The Census in Global Perspective and the Coming Microdata Revolution. Scandinavian Population Studies, 13, 7–30.

National Research Council (2005). Expanding Access to Research Data: Reconciling Risks and Opportunities. Panel on Data Access for Research Purposes, Committee on National Statistics, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

O'Reilly, K. (1982). A New Deal for the FBI: The Roosevelt Administration, Crime Control, and National Security. Journal of American History, 69, 638–658.

President's Commission on Federal Statistics (1971). Federal Statistics: Report of the President's Commission (2 Volumes). Washington: Government Printing Office.

Rubin, E. (1962). Questions and Answers: Government Statistics and Confidentiality of Response. The American Statistician, 16, 27–30.

St. Regis Paper Company vs. the United States (1961). 368 US 208.

Seltzer, W. (2005). Statistics and Counterterrorism: The Role of Law, Policy and Ethics. Presented at the Workshop on Statistics and Counterterrorism, National Institute of Statistical Science and the American Statistical Association, New York, November 20, 2004. Proceedings of the American Statistical Association, Section on Risk Analysis [CD-ROM]. Alexandria, VA, 4052–4059.

Seltzer, W. and Anderson, M. (2000). After Pearl Harbor: The Proper Role of Population Statistics in Time of War. Paper presented at the Annual Meeting of the Population Association of America, Los Angeles, CA, March. Available at http://www.uwm.edu/~margo/govstat/integrity.htm

Seltzer, W. and Anderson, M. (2001). The Dark Side of Numbers: The Role of Population Data Systems in Human Rights Abuses. Social Research, 68, 481–513.

Seltzer, W. and Anderson, M. (2002). NCES and the Patriot Act: An Early Appraisal of Facts and Issues. Paper prepared for presentation at the annual Joint Statistical Meetings, New York, August 10–15. Available at http://www.uwm.edu/~margo/govstat/integrity.htm

Seltzer, W. and Anderson, M. (2003). Government Statistics and Individual Safety: Revisiting the Historical Record of Disclosure, Harm, and Risk. Prepared for presentation at a workshop, Access to Research Data: Assessing Risks and Opportunities, organized by the Panel on Confidential Data Access for Research Purposes, Committee on National Statistics (CNSTAT), Washington, October 16–17. Available at http://www.uwm.edu/~margo/govstat/integrity.htm

Seltzer, W. and Anderson, M. (2007). Census Confidentiality under the Second War Powers Act (1942–1947). Paper prepared for presentation at the Population Association of America Annual Meeting, March 29–31, New York, NY. Available at http://www.uwm.edu/~margo/govstat/integrity.htm

U.S. Code Congressional Service (1943). Acts of 77th Congress. St. Paul, MN: West Publishing Company.

U.S. Commission on Wartime Relocation and Internment of Civilians (CWRIC) (1997). Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians. Seattle: University of Washington Press. Reissue of government published CWRIC Report of 1982 (Washington, D.C.: Government Printing Office), with a new foreword by Tetsuden Kashima.

U.S. House of Representatives, Committee on the Census (1941). Quinquennial Census of Industry and Business. Hearings before the Committee on the Census, House of Representatives (77th Congress, 1st Session), October 14, 15, 16, 21, 22, 23, 28, 29, and November 6. Washington, D.C: Government Printing Office.

U.S. House of Representatives, Committee on Post Office and Civil Service (1962). Confidentiality of Census Reports. Hearings before the Committee on Post Office and Civil Service, House of Representatives (87th Congress, 2nd Session), July 31 and August 1. Washington, D.C.: Government Printing Office.

U.S. Provost Marshal General (1919). Second Report of the Provost Marshal General to the Secretary of War on the Operations of the Selective Service System. Washington, D.C.: Government Printing Office.

van der Laan, P. (2000). The 2001 Census in the Netherlands Integration of Registers and Surveys. Paper prepared for the conference on "The Census of Population: 2000 and

34                                    *Journal of Official Statistics*

Beyond" organized by the Cathie Marsh Centre for Census and Survey Research, Faculty of Economics and Social Studies, University of Manchester, Manchester, UK, 22–23 June. Reprint published. Also available at www.ccsr.ac.uk/conference/Vander-Laanpap.doc

Wright, C. and Hunt, W.C. (1900). The History and Growth of the United States Census. Washington: Government Printing Office.

Zureik, E. (2001). Constructing Palestine through Surveillance Practices. British Journal of Middle Eastern Studies, 28, 205–227.

Received March 2006
Revised June 2006

# EXHIBIT 4

Reproduced from the Collections of the Manuscript Division, Library of Congress

January 19, 1945.

Dear Mr. President:

The Department of Commerce has participated in direct national defense and war activities to a major extent. Some of its Bureaus, such as the National Bureau of Standards, Civil Aeronautics Administration, Weather Bureau, Coast and Geodetic Survey, and the National Inventors Council have become virtual adjuncts of the military establishments; and the remaining Bureaus — Bureau of Foreign and Domestic Commerce, Bureau of the Census, Patent Office, and Inland Waterways have subordinated their normal functions to such an extent that war work has become their dominant concern. The war work of the Bureaus of the Department of Commerce has consisted both of activities independent in character and those carried on in cooperation with direct war agencies. This has been so to a very great extent, probably more than is realized.

The Bureau of Standards, for instance, has subordinated all of its peace-time functions to tasks concerned with the production and improvement of military materiel. The Bureau grounds have been declared a prohibited zone by the War Department. It flies the Army-Navy E pennant with two stars. It is, today, one of the largest producers of optical glass, and, through the manufacture of lenses and prisms, provided the armed services with their requirements following the outbreak of the war. Due to this production, the supply of range finders, gun-sights, airplane cameras, and field binoculars has been kept abreast of the demand. Equally important have been the precise scientific tests which the Bureau of Standards conducts in the field of ordnance development, leading in many instances to major improvements in the offensive weapons of the United States.

The Civil Aeronautics Administration's direct contribution to the prosecution of the war consists of the maintenance and operation of the 35,000 miles of Federal airways in the United States and the operation of numerous communication and flight control facilities outside the United States, including Alaska, the Aleutians, the South Pacific and points in South America, Africa and India. The Civil Aeronautics Administration in addition has taken over traffic control and certain important airports for the Army and Navy and is operating oceanic aircraft control for Pacific air traffic, which is made up entirely of military aircraft operations.

The Airways Engineering Division of the Civil Aeronautics Administration furnishes and constructs communication facilities for the Army and Navy at many locations outside of the United States, and has accomplished the airport construction program involving airports designated by the military services.

The Civilian Pilot Training Program, inaugurated by the Civil Aeronautics Administration before the war, provided the armed services with 100,000 aviation candidates during the early war days when aviators were in such great demand by the military.

Copy in Commerce Dept. of - White House supply behind guide     file copy not rec'd

Jesse Jones Papers, LOC, Box 171, Commerce Dept. Reading File, Dec 22-1944 - Jan 27, 1945

Reproduced from the Collections of the Manuscript Division, Library of Congress

-2-

The facilities of the Weather Bureau have been adjusted and expanded to meet a great variety of war-time needs. Special forecasting services have been instituted to facilitate artillery and aircraft tests and to serve Army posts, construction projects, munitions plants and the Air Transport Command. Military aviation communication networks have been extended to service Army establishments wherever necessary. The Alaskan and Caribbean weather services have been reorganized and improved to meet special military needs. Skilled personnel have been assigned to full-time service details with the armed forces. The Weather Bureau has through the Joint Meteorological Committee coordinated the activities of civilian and military requirements.

The Coast and Geodetic Survey has placed its products and services entirely at the disposal of the armed services. The production of nautical charts for use by the Navy and Merchant Marine has been greatly expanded. The output of aeronautical charts for air navigation and pilot training has been tremendously increased, and many special nautical and aeronautical charts have been added. Geodetic control surveys have been expanded and enlarged, many of them being made in regions classed as "combat areas". Certain vessels of the Coast and Geodetic Survey have been transferred to the Navy Department, and certain personnel to the War and Navy Departments, to constitute a part of the active military or naval forces of the United States. The Philippine charts were produced by this Bureau.

The National Inventors Council was established to aid the defense and war effort. It has served as the screening point for thousands of suggestions submitted by American inventors as of possible use in the war effort. Every idea believed to be of even the slightest merit has been considered by some of the outstanding scientists of the country, and a number of devices extremely useful in the war effort have been developed.

The Bureau of Foreign and Domestic Commerce has served not only the military establishments through providing economic information, but has been a storehouse of facts on which the war agencies have drawn continuously. The factual material on which the War Production Board, the Combined Resources and Allocations Board, the Foreign Economic Administration, the Office of Price Administration, and many others have based most of their major decisions, has been provided by the Bureau of Foreign and Domestic Commerce.

The Bureau of Foreign and Domestic Commerce is the co-issuer of the Proclaimed List of Certain Blocked Nationals. Members of the staff serve on dozens of Interdepartmental Committees directly concerned with the war effort.

The Bureau of the Census provided much of the basic factual data needed for nearly every phase of planning for total war. It has been drawn upon for such statistical material by nearly every other agency of the Government; and the factual material which it was able to supply time and time again disclosed the location of facilities and man-power which would be employed for war production. Procurement agencies, through the assistance of the Bureau of the Census, have been able to obtain both speedy and accurate economic information needed for hundreds of major decisions. From its population records, the Bureau of the Census was able to establish the

Reproduced from the Collections of the Manuscript Division, Library of Congress

-3-

citizenship of hundreds of thousands of workers who needed this proof in order to be employed in our plants; and, immediately after Pearl Harbor, was in a position to give the military services the name and residence of all Japanese nationals residing in prescribed West Coast areas.

The Patent Office, through the War Division, initiates searches for applications on inventions deemed important by Government war agencies; it determines cases in which secrecy orders shall be issued to protect the interests of the United States under inventions, and determines the withholding of licenses required to file Patent Applications abroad, to prevent our inventions from reaching unauthorized persons. It has cooperated with the Foreign Economic Administration and the Alien Property Custodian in matters involving enemy-owned patents.

The resources of the Inland Waterways Corporation have been utilized to a great extent for the transportation of critical and strategic materiel needed in the war effort. It has moved without accident from the Great Lakes to New Orleans a number of combat vessels which could not go down the rivers under their own power.

I should like to commend the heads of the various Bureaus in the Department and their respective organizations. They have all been prompted by a fine sense of patriotism and have done their jobs well.

Sincerely yours,


(Signed)  JESSE H. JONES
Secretary of Commerce.


The President
The White House