JOSEPH H. HUNT
Acting Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director, Federal Programs Branch
CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch
MARSHA S. EDNEY
Senior Trial Counsel
KATE BAILEY
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Tel.: (202) 514-9239
Email: kate.bailey@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    Defendants. | Civil Action Nos. 3:18-cv-01865-RS<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Dept.:  3<br>Judge:  The Honorable Richard G. Seeborg<br>Trial Date:    January 7, 2019<br>Action Filed:    March 26, 2018 |
| CITY OF SAN JOSE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    Defendants. | Civil Action Nos. 3:18-cv-02279-RS<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Dept.:  3<br>Judge:  The Honorable Richard G. Seeborg<br>Trial Date:    January 7, 2019<br>Action Filed:    March 26, 2018 |

Pursuant to the Court's Guidelines for Final Pretrial Conference in Bench Trials Before District Judge Richard Seeborg, the Defendants United States Department of Commerce, Wilbur L. Ross, Jr., in his official capacity as Secretary of Commerce, Bureau of the Census, and Ron S. Jarmin, in his capacity as performing the non-exclusive functions and duties of the Director of the U.S. Census Bureau, hereby submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

### I.  Background

1. The Undisputed Facts, attached as Exhibit A to the Joint Pretrial Statement and Proposed Order, ECF No. 119 in No. 18-1865 and ECF No. 125 in No. 18-2279, are hereby incorporated by reference.

### II.  Facts Relevant to Plaintiffs' Standing

#### A.  Injury in Fact.

##### 1.  NRFU Can Mitigate A Potential Decline in Self-Response

2. The Census Bureau's comprehensive non-response follow-up ("NRFU") operation, which includes multiple mailings, in-person follow-up visits, the use of high-quality administrative records, and proxy responses from knowledgeable individuals, will mitigate a potential decline in self-response from inclusion of a citizenship question on the 2020 decennial census questionnaire, such that there will be a complete and accurate enumeration.

###### a.  *Any potential decline in self-response is unknown*

3. While the balance of available evidence suggests that including a citizenship question on the 2020 census could lead to a lower self-response rate in households that potentially contain a noncitizen, the extent of any decline, though reliably estimated to be positive, is unknown.

4. A decline in self-response for a subpopulation is not necessarily associated with an increase in the net undercount of that population. A decline in self-response means that the non-

response follow-up workload may be increased, but the Census Bureau may capture all of the additional nonresponding households during NRFU.

5.      Self-response rates have been steadily declining for decades.  AR 162.

6.      The Census Bureau projects an overall self-response rate in the range of 55.5% to 65.5%, and while it uses the midpoint (60.5%) for certain purposes, it uses the low point (55.5%) for budgeting and other planning purposes.  These projections are consistent with the decades-long decline in self-response rates.  AR 172.

7.      For the 2020 decennial census, households will be given the option to complete the questionnaire via the Internet or by telephone, in addition printed questionnaires.  AR 165.

8.      The presence of a citizenship question on the 2020 census will not affect whether addresses are included in the Master Address File.

9.      Regardless how a household responds to the 2020 census, if the household simply skips the citizenship question, that household will nonetheless be enumerated in full.  And if a household reaches the citizenship question and refuses to respond beyond that point, that household will nonetheless be enumerated in full.  It is only if a household does not substantially complete the questionnaire that the household is included in the NRFU workload.

10.     The U.S. Census Bureau issued a working paper in August 2018 that is the best analysis of the citizenship question's impact on the potential decline in self-response rates.  *See* Brown, J. David, Misty L. Heggeness, Suzanne M. Dorinski, Lawrence Warren, and Moises Yi, U.S. Census Bureau, Center for Economic Studies, Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census, Working Paper, CES 18-38, Aug., 2018 ("Brown paper").  Using available data from the 2010 census, the 2010 and 2016 American Community Surveys, and administrative records, the paper estimates a potential 5.8 percentage point decline in self-response from households that contain a noncitizen.  *Id.*

11.     While 5.8 percentage points reflects the best available estimate of the potential decline in self-response rate, because it is an estimate it is unknowable to what extent such a decline will occur.

12.     The analysis of Plaintiffs' expert, Dr. Matthew Barreto, does not provide reliable evidence of a different or greater decline in self-response rates to the 2020 census.  Dr. Barreto conducted a public opinion survey designed to look at response rates to the 2020 census in the face of a citizenship question, but fundamental flaws in the design of that survey and interpretation of its results render its results unreliable.  For example, asking someone about their intention to do something, as Dr. Barreto did, and measuring what they actually do in a field experiment are very different.

### b.   Partnership and communication/outreach efforts will increase the self-response rate

13.     Outreach and communications efforts by the Census Bureau during the 2020 census will have the effect not only of increasing the overall self-response rate, but also of reducing the net differential self-response rate.   *See generally* 2020 Census Operational Plan (DTX-020).

14.     The Census Bureau will utilize an integrated communications and partnership campaign to recruit national, regional, and local partners and develop effective messages stressing the confidentiality of census data, the statistical purposes for census data, and the statutory prohibition against sharing those data with any agency.  *See generally* 2020 Census Operational Plan (DTX-020).

15.     Partners will include both state and local governments and private organizations. While partners are welcomed to spend their own money to aid the Census Bureau's mission, the federal government compensates partners for any expenditures specifically requested by the Census Bureau.  *See generally* 2020 Census Operational Plan (DTX-020).

### c.   NRFU efforts are comprehensive, well-funded, and flexible

16.     At the end of the self-response period, six weeks into the 2020 Census, households without a self-response become part of the NRFU workload.

17.     Any decline in the self-response rate due to the citizenship question is currently expected to be within the budget, planning, and operational design of NRFU and other statistical methods used to mitigate any decrease in the initial self-response rate.  If Congress appropriates

funds in accordance with the Life Cycle Cost Estimate, the Census Bureau will have $1.5 billion to conduct NRFU operations, along with another $1.7 billion in contingency funding.

18. For every one percent increase or decrease in the overall self-response rate above or below the budget planning self-response rate of 55.5%, the Census Bureau assumes $55 million will be saved or spent in NRFU operations. Even if the Brown paper has accurately predicted a 5.8% decline in self-response rate for potential noncitizen households—*i.e.*, approximately 28.6% of the population—this leads to only a 1.5% decline in the overall self-response rate, resulting in an extra $82 million in NRFU expenditures. A higher, hypothetical 10% decline in the self-response rate among potential noncitizen households results in a 2.5% decline in overall self-response rate with an estimated $137.5 million in NRFU costs. These estimates are far below the projected $1.7 billion in contingency funding, and this remains true even if one assumes six enumerator attempts per household and concomitantly doubles all estimated NRFU costs.

19. Enumerator recruiting targets are based on an overall self-response rate of 55.5%, so the Census Bureau will have plenty of enumerators ready to deploy in the event self-response rates decline. These enumerators are drawn from the communities in which they will be deployed, helping households feel comfortable in responding. While the current 2018 Appropriations Act prevents the Census Bureau from hiring noncitizen enumerators, the Census Bureau is seeking to reclassify certain enumerators as translators—an exception to this hiring restriction. The Census Bureau will hire non-U.S. citizens as permitted by federal law. Because it is premature to conclude that the Census Bureau will not be able to hire non-citizens as enumerators for the 2020 census, it is unknown how that fact might affect any net undercount.

20. Enumerators are also deployed in an efficient manner to best obtain census enumerations. Using a state-of-the-art optimizer, 2020 census enumerators will be assigned households to visit, provided the most efficient route to reach each household, and then given the optimal times to visit each household based on statistical models of the local area. The optimizer also will allow Area Census Office managers and staff to identify the most effective enumerators and adjust NRFU workloads accordingly.

4

21.     While many of the historical documents describing the number of NRFU attempts use a hypothetical limit of six visits, in the 2020 Field Operational Control System the actual measure is an "attempt day"—the number of days that NRFU enumerators attempt to obtain a response from a household.  During an attempt day, there can be multiple attempts.  In addition, near the end of NRFU operations, closeout procedures allow the number of attempt days to exceed six.  The binding constraint is the date that NRFU operations close, not a maximum number of attempt days.

22.     If an address in the NRFU workload receives one unsuccessful in-person visit, it becomes eligible for enumeration by administrative records.  Administrative records are electronic records compiled by another unit of the federal government, including the Internal Revenue Service, Health and Human Services, the Bureau of Indian Affairs, the Postal Service, and the Social Security Administration.

23.     If no high-quality administrative records exist for that household, the address stays in the NRFU workload and gets the full NRFU consideration.  The Census Bureau will not conclude that a unit is vacant unless at least three separate administrative records indicate that the unit is vacant.

24.     The use of administrative records will not create or exacerbate a differential net undercount.  Administrative records simply supply a method of low-cost enumeration when high-quality administrative records are available; if no such records exist, then the full NRFU protocol will be used.  The fact that hard-to-count groups are relatively underrepresented in administrative records thus does not establish that the use of administrative records will result in those groups ultimately being undercounted when all enumeration operations are completed.

25.     If a household does not self-respond and cannot be enumerated using administrative records, and the Census Bureau is unable to get a response through in-person visits, enumerators may interview a proxy.  A proxy could be a landlord, a neighbor, a postal carrier, or another person with knowledge of the household.  The proxy process is specifically designed to

obtain a head count for the number of people residing at an address, and training techniques have been implemented to ensure that enumerators seek out a reliable proxy for that critical purpose.

26.     The Census Bureau is unaware of any credible empirical evidence suggesting that proxies in the census provide a greater net undercount or differential net undercount in comparison to self-response or in-person interviews.  There is no credible evidence that households enumerated via proxy responses are more likely to be undercounted than self-responding households because proxy respondents are likely to systematically underreport the number of people living in certain units.

27.     The fact that proxy responses tend to generate less accurate demographic data also does not indicate that proxy responses tend to result in higher net undercounts.  Inaccurate demographic data does not affect the actual enumeration.

28.     Dr. Barreto's study does not remotely simulate the extensive recontact efforts undertaken during NRFU—Dr. Barreto did not actually recontact anyone at a later day or at a later time.  He also does not take into account the use of administrative records or proxies, or imputation.  His study therefore does not provide credible evidence as to the expected results after NRFU and imputation in 2020.

**2.  Imputation Will Adequately Account for Any Remaining Households**

29.     The use of imputation to enumerate the limited number of individuals not captured by self-response and NRFU operations will accomplish a complete and accurate enumeration.

30.     No quantitative evidence shows that whole-person census imputations tend to systematically overcount or undercount the number of people in a household.

31.     The Census Bureau uses imputation to enumerate housing units that remain unresolved after the self-response and NRFU operations (in-person interviews, administrative records, and proxy responses) are exhausted.  *See generally* 2020 Census Operational Plan (DTX-020).

32.     The Census Bureau has not yet determined the final imputation algorithms it will use in the 2020 census.  In general, the Census Bureau uses statistical criteria to aggregate nearby

housing units that have characteristics matching those of the missing unit in the Master Address File, taking into account the distribution of household sizes. The Census Bureau then randomly selects one of those nearby units and uses the number of people in that unit to fill in the number of people in the missing unit.

33. Based on assumptions built into the Life Cycle Cost Estimate, along with the rate of imputation from the 2010 Census, the Census Bureau projects that, without a citizenship question, 0.38% of all households would be imputed. Using these same assumptions, along with the Brown paper's 5.8% estimate for the decline in self-response rate for potential noncitizen households, the Census Bureau projects imputation of 0.40% of all households in the 2020 census, assuming the average rate of resolution through the NRFU process. Even assuming that all households not self-responding due to a citizenship question would go through the full NRFU process without achieving the average rate for resolution, the result would be a projected imputation of 0.60% of all households.

34. In none of these scenarios would a household go uncounted simply because it did not self-respond due to a citizenship question. Even in the worst-case scenario, the result is simply more imputations.

35. Increased imputations by themselves do not lead to an increased differential net undercount. To produce a differential net undercount, properties of the imputation model must be credibly linked to non-response due to the presence of a citizenship question, which Plaintiffs have not done.

36. The fact that imputation tends to generate less accurate demographic data does not indicate that imputation tends to result in higher net undercounts. Inaccurate demographic data does not affect the actual enumeration.

### 3. No Increase in the Differential Undercount Will Remain After NRFU Operations and Imputation

37. Any undercount that remains after NRFU operations and imputation will not be "differential," or will not undercount a particular racial or ethnic group to a greater or lesser extent than the overall net undercount or overcount of the population.

7

38.     There have been net differential undercounts in past censuses, including when there was no citizenship question on the "short form" of the census questionnaire sent to every American.  The logical inference is that the net differential undercounts in those censuses could not have been caused by the presence of a citizenship question.

39.     Plaintiffs have adduced no evidence regarding how the citizenship question will impact the differential net undercount.

40.     That the citizenship question may be "sensitive" for certain persons, or groups of persons, does not, without more, establish that the citizenship question is likely to exacerbate the net differential undercount for the 2020 Decennial Census.

### 4.  Specific Claims of Injury

41.     Any differential undercount that remains after NRFU operations and imputation will not be sufficiently large to cause any impact on apportionment or federal funding or produce any of the other specific injuries claimed by Plaintiffs.

#### a.  *Apportionment*

42.     After the census is taken, congressional seats are distributed pursuant to "the method of equal proportions," a complex process that ranks states in order of priority based on their populations (multiplied by a multiplier).  *See* 2 U.S.C. § 2a(a).

43.     Dr. Stuart Gurrea, Defendants' expert, calculated the effect on apportionment assuming a 5.8% decrease in self-response among households with at least one individual without confirmed citizenship (derived from the Brown paper), with a NRFU success rate in 2020 equal to the 2010 census NRFU success rate (and assuming no additional undercount mitigation through imputation).  With these assumptions, congressional apportionment in any state (including California) does not change as a result of the inclusion of a citizenship question.  Plaintiffs have provided no evidence of any adverse effect on their federal representational interests in any reasonable scenario that can be anticipated to occur as a result of the 2020 census.

#### b.  *Federal funding*

44.    A differential net undercount would not have an impact on federal funding under the vast majority of federal funding programs.

45.    Out of the approximately 2,249 government funding programs, only approximately 320 use census-derived data to allocate funds.

46.    All of the census-derived data sets that are used to determine funding amounts under certain federal funding programs use the final census data, not initial self-response rates.

47.    Out of the approximately 320 federal government funding programs that use census-derived data to allocate funds, Plaintiffs' expert, Dr. Reamer, identified only twenty-four programs which used geographic allocation formulas that rely in whole or part on census-derived data, and he performed calculations for only three such programs.

48.    Dr.  Gurrea calculated the effect on the three federal funding programs highlighted by  Dr. Reamer, assuming a 5.8% decrease in self-response among households with at least one individual without confirmed citizenship (derived from the Brown paper), with a NRFU success rate in 2020 equal to the 2010 census NRFU success rate (and assuming no additional undercount mitigation through imputation).  With these assumptions, the distribution of federal funds to the State of California is estimated to decline by 0.01%.  The additional mitigation achieved through imputation would reduce this impact even further.

49.    Because Dr. Reamer's calculations are based entirely upon undercount scenarios which fail to take into account the effect of full NRFU and imputation on response rates, they are inaccurate and unreliable and, as such, of limited evidentiary value.

50.    Dr. Reamer's calculations are also of limited evidentiary value because they do not purport to predict what will happen in 2020.  Instead, his calculations look backwards—to what would have happened in fiscal years 2015 and 2016 had there been an additional undercount due to the presence of a citizenship question on the 2010 decennial census.

51.    The evidentiary value of Dr. Reamer's calculations is further diminished because his calculations rest upon the assumption that allocation formulas for the three programs in question will not change in the coming years and that funding amounts will remain substantially unchanged.

Congress could alter the funding amounts and allocation formulas, including the manner and extent to which they rely upon census-derived data between now and several years after 2020, which is the earliest possible year the 2020 census numbers would impact federal funding.

52.     Plaintiffs have not adduced any quantitative evidence of the amount of federal funding any specific county, city, or municipal government would lose under any federal program if there were an increase in the differential undercount resulting from the inclusion of a citizenship question.

53.     Plaintiff Black Alliance for Immigration Justice ("BAJI") has not adduced any quantitative evidence of the amount of federal funding it or any of its members would lose under any federal program if there is an increase in the differential undercount resulting from the inclusion of a citizenship question.

### c. *Other financial harm*

54.     None of the governmental Plaintiffs have established that the Secretary's decision has required them to divert existing resources or expend additional resources.  Plaintiffs allege that they will need to divert or expend resources as a result of the inclusion of the citizenship question, but they have neither   quantified the specific amount of the resources diverted or expended  nor established that any specific amount of the alleged diverted or increased expenditures is attributable to or made necessary by the citizenship question.  Further, because Plaintiffs have not adduced any evidence indicating that there will be a net undercount, any decision by Plaintiffs to spend or divert resources specifically because of the citizenship question is not based on a reasonable fear that the citizenship question will result in such a net undercount in their jurisdiction.  Plaintiffs also have not shown that they have accounted for the Census Bureau's non-response follow-up and imputation procedures in assessing the risk of any net undercount.

55.     The nongovernmental Plaintiff, BAJI, likewise has not established that the Secretary's decision has required it to divert existing resources or expend additional resources. Though BAJI alleges that it will need to divert or expend resources as a result of the inclusion of the citizenship question, it has neither quantified the specific amount of the resources diverted or

expended nor established that any specific amount of the alleged diverted or increased expenditures is attributable to or made necessary by the citizenship question.  Further, because Plaintiffs have not adduced any evidence indicating that there will be a net undercount, any decision by BAJI to spend or divert resources specifically because of the citizenship question is not based on a reasonable fear that the citizenship question will result in such a net undercount in their jurisdiction.  BAJI also has not shown that it has accounted for the Census Bureau's non-response follow-up and imputation procedures in assessing the risk of any net undercount.

56.    Plaintiffs have not established that their perceived need to increase or divert expenditures is caused by the citizenship question rather than by the general fear and distrust of government among immigrants and communities of color due to the macro-environment.

57.    There is no direct conflict between BAJI's mission and the inclusion of a citizenship question on the census.

### d.  Decrease in data quality

58.    Plaintiffs did not provide credible evidence that, should the inclusion of the citizenship question result in inaccurate demographic data, that result will be harmful to them. Their evidence was conclusory and lacked key specifics, including what services might be affected, how those services depend on demographic data about local populations, and the degree of inaccuracy necessary to affect those services.

### e.  Loss of privacy

59.    The Census Bureau is barred from disclosing individual responses to a citizenship question on the decennial census questionnaire, and cannot disclose any information through which the data furnished by any particular establishment or individual can be identified.

60.    The Census Bureau does not disclose citizenship information that has not gone through an approved disclosure avoidance process.  The Census Bureau is in the process of developing the disclosure avoidance methodology that it will use for the data collected from the citizenship question on the 2020 decennial census.

61.     Plaintiffs' alleged confidentiality or privacy concerns about the possible disclosure of their citizenship information are based on speculation and not a reasonable assessment of an actual risk.

**B.  Causation and Redressabillity**

62.     Any undercount that occurs in 2020 cannot be shown to be specifically attributable to the citizenship question rather than to other, independent factors, such as the general macro-environment.  Similarly, the harm alleged by Plaintiffs cannot be shown to be specifically attributable to the citizenship question rather than to other, independent factors, such as the general macro-environment.

63.     The macro-environment, including the political environment, can affect response rates.

64.     The macro-environment may make persons from some subgroups reluctant to respond to the census questionnaire regardless of whether it contains a citizenship question or not.  Similarly, some households may be unlikely to provide a full enumeration whether or not there is a citizenship question on the census.

65.     Getting accurate household rosters (and hence an accurate household count) has been a continuing issue for the Census Bureau whether or not a citizenship question appears on the census, and there is no quantitative evidence linking the incompleteness of household rosters to a citizenship question on the census.

66.     There is no evidence that removal of the citizenship question from the census will redress Plaintiffs' claimed injuries.

**III.    <u>Administrative Record Facts</u>**

The merits of Plaintiffs' Administrative Procedure Act ("APA") and Enumeration Clause claims must be decided on the basis of the administrative record, without consideration of extra-record evidence produced in discovery or at trial.  Accordingly, set forth below are those facts from the administrative record on which this Court bases its legal review of the Secretary's decision.

**A.  Secretary Ross's Examination of Census Issues**

67.     Soon after Wilbur L. Ross was appointed and confirmed as Secretary of Commerce, he "began considering various fundamental issues" regarding the 2020 census, "including funding and content," as well as schedule, contracting issues, systems readiness, and the upcoming 2018 End-to-End Test.  AR 1321; *see also* AR 317-322, 1416-1470.  The Secretary's ultimate goal in reviewing these issues is "make every effort to provide a complete and accurate decennial census."  AR 1313.

68.     One of the issues Secretary Ross examined early in his tenure "included whether to reinstate a citizenship question," which he and his staff "thought . . . could be warranted."  AR 1321.  Secretary Ross questioned why a citizenship question was not on the census questionnaire and sought other general background "factual information."  AR 2521-2522, 12465, 12541-12543; *see also* AR 3699 (referring in a May 2017 email to his "months['] old request that we include the citizenship question").

69.     Secretary Ross and his staff "had various discussions with other governmental officials about reinstating a citizenship question to the Census" and, "[a]s part of that deliberative process, [they] consulted with Federal governmental components."  AR 1321.  In particular, they inquired "whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act."  *Id.*

70.     DOJ has requested a special tabulation of citizenship data derived from the American Community Survey ("ACS") for the purposes of carrying out its enforcement responsibilities under the Voting Rights Act.  AR 278-283, 9203-9216.

71.     Department of Commerce Deputy Chief of Staff and Chief of Policy Earl Comstock initially reached out to DOJ in May 2017.  AR 2462, 12755.

72.     In August and September 2017, Secretary Ross requested an update on the status of the inquiries regarding the reinstatement of a citizenship question.  AR 2034, 2424, 2459-2460, 4004, 12476.

73.     Secretary Ross spoke with the Attorney General on September 18, 2017, about whether DOJ would find citizenship data from the decennial census useful.  AR 2528, 2636.

**B.  DOJ's Request to Reinstate a Citizenship Question on the 2020 Decennial Census to Facilitate Enforcement of the Voting Rights Act**

74.     On December 12, 2017, Arthur E. Gary, General Counsel of DOJ's Justice Management Division, sent a letter to Dr. Ron Jarmin, performing the non-exclusive functions and duties of the Director of the Census Bureau.  AR 663-65.

75.     In that letter, Mr. Gary stated that "[t]he Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans.  In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called 'long form' census.  This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting.  To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected.  As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2."  AR 663.

76.     Mr. Gary noted the importance of obtaining citizen voting-age population for determining whether a racial group could constitute a majority in a single-member district, and its utility for avoiding the "wrong result" of drawing a single-member district in which a minority group constituted a majority of the voting-age population but not the majority of the citizen voting-age population.  AR 663-64.

77.     Mr. Gary stated that "in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected."  AR 664.

78.     Mr. Gary stated that the Census Bureau had included a citizenship question on the "long form" questionnaire from 1970 to 2000, and that DOJ had formerly used that data to assess compliance with Section 2 and in Section 2 enforcement litigation.  AR 664.

79.     Mr. Gary noted that DOJ had begun using citizenship data from the ACS after the Census Bureau discontinued the use of the "long form" questionnaire, but he explained that the ACS does not yield the ideal data for such purposes for four reasons.  AR 664-65.

80.     First, Mr. Gary explained that "[j]urisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, *see Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly." AR 664.

81.     Second, because the ACS estimates are rolling and aggregated into one-year, three-year, and five- year estimates, Mr. Gary stated that "they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting." AR 665.

82.     Third, Mr. Gary explained that "the ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases.  *See* U.S. Census Bureau, Glossary: Confidence interval (American Community Survey), https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunitySurvey (last visited Nov. 22, 2017).  By contrast, decennial census data is a full count of the population." AR 665.

83.     Fourth, Mr. Gary noted that "[c]ensus data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group.  *See* American Community Survey Data 3, 5, 10.  Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate

citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan." AR 665.  Mr. Gary explained that "[h]aving all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process." *Id.*

84.    For all these reasons, DOJ stated that it "believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates."  Accordingly, "the Department formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship" and "that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census."  AR 677.

### C.  The Department Of Commerce's Analysis of DOJ's Request

85.    Following receipt of DOJ's request, the Secretary of Commerce "set out to take a hard look at the request and ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond."  AR 1313.  To that end, Commerce "immediately initiated a comprehensive review process led by the Census Bureau."  *Id.* "The Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations."  *Id.*  As part of this process, the Secretary "met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, [his] questions about accuracy and response rates, and their recommendations."  *Id.*

86.    The Census Bureau assembled a team to perform the technical analysis, led by Dr. John M. Abowd, Chief Scientist and Associate Director for Research and Methodology.  AR 3354, 5539-5542, 9339; *see also, e.g.,* AR 8990, 9005, 9244.  That team conducted preliminary analyses during the period from December 2017 to January 2018.  *See* AR 5495-5511; *see also* AR 3713-3720, 5538, 5539-5542, 5553-5564, 5658-5677, 5656-5717, 6489-6495, 6533-6542, 7763-8261.

87.     On January 19, 2018, Dr. Abowd and his team, on behalf of the Census Bureau, submitted a detailed memorandum (hereinafter referred to as the "January 2018 Abowd Memo") to Secretary Ross.  AR 1277-85.  This memorandum analyzed three alternatives to provide DOJ with the data it had requested—Option A (make no change), Option B (add the question on the 2020 census questionnaire), and Option C (use administrative data to provide citizenship information).  AR 1277.

88.     The January 2018 Abowd Memo described certain advantages of Option B, adding a citizenship question to the 2020 decennial census, including that it would improve block-level data and would provide a direct measure of self-reported citizenship for the whole population.  AR 1278.

89.     The January 2018 Abowd Memo also reported that because the citizenship question was already asked on the ACS, the Census Bureau "would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question.  This means that the cost of preparing the new question would be minimal."  AR 1279; *see also* AR 415 (Census Bureau presentation on adding questions to the census, stating that "[i]f the question is not currently used in an ongoing survey, the Census Bureau must test the wording of the question").

90.     The January 2018 Abowd Memo also addressed the potential shortcomings of including a citizenship question on the census, including that there would likely be a decrease in the self-response rate, which would lead to higher nonresponse follow-up costs and fewer correct enumerations.  AR 1280-82.  The Memo estimated a potential 5.1% decrease in self-response among noncitizen households.  AR 1280; *see also* AR 456.  The Memo also concluded that the anticipated decrease in self-response would lead to lower quality citizenship data.  AR 1280.

91.     The Census Bureau's conservative estimate that an additional 5.1% of households with at least one noncitizen may not self-respond to the 2020 census questionnaire if a citizenship question were included was based, in the absence of a randomized controlled experiment, on a

natural experiment that could not definitively assign causation to the citizenship question itself. AR 1280.

92.     The January 2018 Abowd Memo concluded that Option C, using administrative records for citizenship data, would yield more accurate results—because administrative records relating to citizenship are more accurate than self-reports—and would be less costly.  AR 1283-1285; *see also* AR 284-310.  *But see* AR 534-544.  However, high-quality administrative records on citizenship do not cover the entire population.  AR 1283-1285; *see also* AR 66-67, 108-09, 116, 660-62.

93.     The January 2018 Abowd Memo recommended that the Secretary either make no change to the Census Bureau's data collection on citizenship or obtain citizenship status from administrative records for the whole 2020 census population.  AR 1277.

94.     Following submission of the January 2018 Abowd Memo to Commerce leadership, Commerce prepared a list of 35 questions to the Census Bureau to obtain more details about and to probe the rationale underlying its analysis.  AR 1286-1303, 8987.  The questions represented a range of perspectives and concerns among the Secretary's staff regarding the Census Bureau's analysis and recommendations.  *See* AR 1335, 1976-1978, 1980, 2043-44, 2046, 2472-2475, 2504-2505, 8678-8680.  The final list of questions was delivered to the Census Bureau on January 30, 2018.  AR 1974, 12902-12904.

95.     The Census Bureau provided answers to the questions through an iterative process, whereby Commerce received many drafts and partial responses before receiving the final response. *See, e.g.*, AR 1340-1352, 1599-1626, 1903-1963, 2316-2376, 5212-5215, 5583-5589, 7638-7645.  The Census Bureau provided its final draft of the responses to Commerce on February 2, 2018.  AR 2292-2315, though some further revisions were made resulting in an updated final draft on February 6, 2018.  AR 2954-2981, 3441-3459; *see, e.g.*, AR 2702-2711, 3142-3181, 6222-6232.  The final version of the questions and answers included a revised answer to question 31, regarding the process that had been used in the past to add questions to the decennial census.  AR 1286-1303, 13023.  The revised answer specified that, because no new questions had been added to the

decennial census in recent years, past precedent relating to changes to the ACS did not govern the process for considering DOJ's request.  AR 1296; *see* AR 13023.

96.     Secretary Ross and his immediate staff reviewed Census's analyses.  *See, e.g.,* 12479.

97.     On February 12, 2018, Commerce and Census Bureau personnel, including Secretary Ross, met to discuss the Census Bureau's analysis to date.  AR 9334-9335.  At this meeting, the Secretary requested that the Census Bureau analyze a fourth alternative, Option D, which would combine Options B and C.  AR 1309; AR 9433-9434.

98.     The Census Bureau provided two memoranda analyzing Option D on February 23, 2018, and March 1, 2018.  AR 1304-1312, 2935-2940, 4713-4721; *see, e.g.*, AR 2180-2198, 4454-4462, 5613-22, 5945-5948, 5967-6155, 6159-6173.  In addition, the Census Bureau continued to answer questions posed by Commerce until late March, 2018.  *See, e.g.*, AR 2670-2680, 2894-2901, 5577-5581, 5608-5610, 5798-5803, 9370, 9680-9721.

99.     The Secretary reviewed over 50 incoming letters and emails from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census.  AR 1313; *see* AR 775-792, 794-1165, 1176-1193, 1195-1197, 1210-1212, 1217-1220, 1222-1255, 1262-1273; *see also* AR 1768-1771, 3563-3565, 3915-3917.  He also monitored views of the public more generally, as represented in media accounts.  AR 1313; *see* AR 666-733.  In addition, he discussed the citizenship question with over 24 diverse, well-informed and interested parties, selected by his staff to represent a broad range of views.  AR 1313; *see* AR 1194, 1198-1209, 1213-1216, 1221, 1256-1261, 1274-1276; *see also* AR 1638, 1798, 1807-08, 1815-1816, 2599-2600, 2604, 3491, 8392-8467.

100.    In considering all available information in determining whether to include a citizenship question, officials at the Department of Commerce recognized that citizenship is one of the core recommendations in the United Nations Principles and Recommendations for Population and Housing Censuses.  AR 1319.

**D.  The Secretary's Decision Memorandum**

101.    On March 26, 2018, Secretary of Commerce Wilbur Ross announced his decision to reinstate a citizenship question on the 2020 decennial census.  AR 1313-20.

102.    In the decision memo, the Secretary stated that the decision was being made in response to the December 12, 2017, DOJ letter, and that, after he had received the DOJ request, "I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond.  To that end, the Department of Commerce ('Department') immediately initiated a comprehensive review process led by the Census Bureau."  AR 1313.

103.    The Secretary stated that this review included legal, program, and policy considerations, and that he had met with Census Bureau leadership on multiple occasions to discuss their review of the DOJ request and their recommendations.  He also noted that he had received and reviewed over fifty letters from stakeholders regarding the issue of reinstatement of a citizenship question on the 2020 Census.  AR 1313.

104.    The Secretary first observed that the citizenship question had been a feature of almost every decennial census for over a century, and had been included in some form on the "long form" or ACS for decades, and was thus a well-tested question.  AR 1314.

105.    The Secretary stated that many stakeholders as well as the Census Bureau itself had raised concerns that the reinstatement of a citizenship question would have a negative impact on the response rate for non-citizens, but also noted that no one had produced evidence that the response rate would decline "materially" as a result of the inclusion of a citizenship question.  AR 1315.

106.    The Secretary observed that although there was recent evidence that self-response rates to the ACS were lower than in the 2010 decennial census, there were a number of potential causes for this separate and apart from the citizenship question, including the outreach efforts resulting in increased public awareness for the decennial census and the greater burden of responding to the much longer ACS.  AR 1315.

107.    Weighing the information that had been provided, the Secretary concluded that, "while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief."  AR 1316.

108.    The Secretary considered the alternative option of only using administrative records to provide the citizenship data requested by DOJ, but noted that the Census Bureau "is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."  AR 1316.  The Secretary noted that this meant that a significant portion of the American voting age population could not be matched to administrative records and, thus, would have to have citizenship information be imputed.  AR 1316.

109.    The Secretary concluded that a combination of using administrative records, the development of which the Census Bureau could prioritize before the 2020 census, and reinstating a citizenship question on the 2020 decennial census questionnaire was the best option to provide DOJ the data it requested.  AR 1317.

110.    In making this determination, the Secretary explained that including the question on the 2020 decennial census will give each person an option to provide an accurate answer, and would only impose a minimal imposition of a single extra question which by law could only be used anonymously and for statistical purposes.  AR 1317.

111.    The Secretary also noted that the use of administrative records in conjunction with a question on the 2020 decennial census questionnaire would provide a method for obtaining citizenship data for people who do not respond, as well as providing a check for accuracy for those who respond with an inaccurate answer.  AR 1317.

112.    The Secretary noted that "I have carefully considered the argument that the reinstatement of a citizenship question on the decennial census would depress response rate." AR 1317.  However, the Secretary determined that the "need for accurate citizenship data" outweighed such concerns, particularly in light of the lack of empirical evidence that the self-

1    response rate would be materially impacted by the reinstatement of a citizenship question.  AR

2    1317.

3           113.    The Secretary also considered the concern that reinstatement of a citizenship

4    question would increase non-self-response rates by imposing an additional burden on those

5    responding to the questionnaire.  However, the Secretary noted that there was very limited

6    empirical evidence that the inclusion of one additional question would have any material impact on

7    self-response rates.  AR 1318.

8           114.    In addition, the Secretary considered whether the sensitivity of a question about

9    citizenship could lead to a decrease in self-response rates.  The Secretary noted that there was

10   evidence from Nielsen studies, as well as past census initiatives, that the inclusion of such a

11   sensitive question would not materially change the response rate.  AR 1318.

12          115.    The Secretary further considered the potential that the reinstatement of a

13   citizenship question on the 2020 decennial census would lead to increased costs.  The Secretary

14   determined that it was difficult to assess whether, if the citizenship question led to lower initial self-

15   response rates, it would lead to an increase in costs for NRFU efforts.  The Secretary noted that the

16   available evidence demonstrated that the impact on the cost of NRFU would likely be very small as

17   the percent decrease in overall self-response estimated to be potentially caused by the citizenship

18   question (½%) was within the percent decrease (3%) accounted for in the Department's recent Life

19   Cycle Cost Estimate for the 2020 census.  AR 1319; *see* AR 173.

20          116.    The Secretary noted not only that some form of citizenship question had been a

21   part of census questionnaires for centuries, but also that censuses in many other major democratic

22   nations, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the

23   United Kingdom, include a question asking about citizenship.  AR 1319.

24          117.    The Secretary ultimately concluded that, while it could not definitively be

25   determined what the impact of a citizenship question would be on response rates, the value of

26   having more complete and accurate citizenship data outweighed those concerns.  AR 1319.

27

28

118.    The Secretary announced that "after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request.  To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form."  AR 1320.

119.    The Census Bureau's August 2018 analysis estimating a potential 5.8 percentage point decline in self-response from households containing a noncitizen (the "Brown Paper") did not exist and was not considered or relied upon by the Secretary when he reached his decision to include a citizenship question on the 2020 questionnaire.

## IV.    **Extra-Record Evidence**

The merits of Plaintiffs' APA and Enumeration Clause claims must be decided on the basis of the administrative record, without consideration of extra-record evidence produced in discovery or at trial.  Accordingly, any facts derived from extra-record evidence cannot form the basis for this Court's decision.  However, because the Court allowed extra-record discovery based on a preliminary finding of pretext, facts demonstrating that the Secretary's decision was not based on pretext are set forth below.

### A.  **Plaintiffs Have Failed to Show That the Secretary's Decision Was a "Pretext"**

120.    Plaintiffs failed to produce evidence sufficient to rebut the presumption of regularity.

121.    Plaintiffs did not demonstrate that the Secretary did not believe the rationale set forth in his decision memorandum or that the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious.

122.    It is unremarkable for an agency head to enter office with predispositions toward certain policy choices.  That the Secretary thought reinstatement of a citizenship question "could be warranted," AR 1321, and asked his staff to explore such an action, is neither irregular nor evidence of improper decisionmaking.

123.    To the extent Plaintiffs rely on statements by officials other than the Secretary himself, such reliance is misplaced.  That other officials might have supported the reinstatement of a citizenship question for different reasons does not indicate that the reasons given by the actual decisionmaker—the Secretary—were pretextual.  And most of the officials' statements generally regarding immigration, on which Plaintiffs rely, do not in any way concern the census or the citizenship question.

124.    Even if relevant, no statements of other officials plausibly give rise to a cognizable inference of pretext here.  For example, the Secretary's communication  with Kris Kobach, early in his tenure at the Department of Commerce, about the potential inclusion of a census question on both citizenship and lawful status does not by itself prove that the Secretary shared or was influenced by Mr. Kobach's outreach—indeed, the Secretary rejected the latter's proposed question. Without more, Plaintiffs' reliance on this isolated, unsolicited communication as evidence of pretext is misplaced.

125.    The Secretary's congressional testimony also is insufficient to establish pretext.  For example, the Secretary's statement in his March 2018 memorandum that he "set out to take a hard look at the request" to "ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond," AR 1313, does not necessarily imply either that he had not previously considered whether to reinstate a citizenship question, or that he had not had discussions with other agencies or government officials before he received DOJ's formal request.  Nor would it have made sense for the Secretary to take a "hard look" at DOJ's request before receiving it.

126.    The Secretary's March 20 statement to Congress that he was "'responding solely to the Department of Justice's request,'" Hr'g on FY 2019 Dep't of Commerce Budget: Hearing Before the Subcomm. On Commerce, Justice, Sci. & Related Agencies of the H. Comm. on Appropriations, 115th Cong. 9 (2018), at 2018 WLNR 8815056, was in response to a question asking whether he was also responding to requests from third parties, *see id.*

127.   The Secretary's March 22 statement that DOJ "'initiated the request for inclusion of the citizenship question,'" Hr'g on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum, Hr'g Before the H. Ways & Means Comm., 115th Cong. 24 (2018), at 2018 WLNR 8951469, was in response to a question about whether Commerce planned to include a citizenship question on the 2020 census, not a question about the Secretary's decision-making process.  The statement was immediately followed by an acknowledgment that he had been communicating with "quite a lot of parties on both sides of [the] question" and that he "ha[d] not made a final decision, as yet" on this "very important and very complicated question," *id.*

**B.  DOJ's Request for Citizenship Data Serves Legitimate VRA Enforcement Purposes**

128.   After being contacted by the Secretary of Commerce, the Attorney General decided that DOJ would request that the Census Bureau reinstate a citizenship question on the census questionnaire.

129.   John Gore, Acting Assistant Attorney General for the Civil Rights Division, drafted the letter requesting the reinstatement of the citizenship question.

130.   "[C]itizenship data at the block level is necessary to bring Section 2 cases."  Gore Dep. 33:2-8.  Some courts have determined that CVAP data at the block level is necessary to determine if Hispanics meet the first prong of *Gingles* in Section 2 enforcement cases.  AR 663.

131.   "The Department of Justice is always trying to find the best possible data, whether it's from one source or multiple sources, to analyze jurisdictions for potential Section 2 violations and to bring appropriate Section 2 enforcement actions."  Gore Dep. 25:1-14.

132.   The Department of Justice investigates hundreds of Section 2 matters, and not all investigations result in the filing of a complaint in district court.  Handley Trial Testimony (SDNY) 853:9-15.

133.   "[H]aving the most complete and accurate data regarding citizenship rates that the Census Bureau could provide would allow [DOJ] to fulfill its commitment to robustly enforcing the Voting Rights Act."  Gore Dep. 26:8-13.

DEFS.' PROP. FINDINGS OF FACT/CONCLUSIONS OF LAW – Nos. 3:18-cv-1865-RS; 3:18-cv-2279-RS

134.     It is the position of DOJ that the decennial census questionnaire is the most appropriate vehicle for collecting CVAP data for purposes of VRA enforcement, Gore Dep. 169:22-170:5, although CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts.  Gore Dep. 300:5-11.  However, Mr. Gore is not himself a statistician and has no experience drawing districts or using census block-group-level data to estimate block-level data.  Gore Dep. 17:21-18:14, 167:14-19.  The Census Bureau is therefore better situated than he is to determine the accuracy of various forms of CVAP data.  Gore Dep. 39:16-40:3.  Plaintiffs' expert, Professor Pamela Karlan is also not herself a statistician and has no experience drawing districts or using census block-group-level data to estimate block-level data.  Karlan Trial Dep. 70:19-22, 72:1-23.

135.     Because of the limitations on the data contained in the ACS, analysts use estimation techniques on occasion to estimate block-level data for the purposes of the first *Gingles* precondition in section 2 Voting Rights Act cases.  Karlan Trial Dep. 70:10-18.

136.     The first *Gingles* precondition does not require a functional analysis; rather, it simply requires a bare majority of voting-age citizens.  Handley Trial Testimony (SDNY) 851:1-11.  The Gary letter focuses on the first *Gingles* precondition.  *Id.* 851:10-12.  The functional analysis that Plaintiffs' expert, Dr. Handley, has employed does not relate to the first of the *Gingles* preconditions.  *Id.* 850:22-25.

137.     Dr. Handley is aware that studies show that people do not answer the citizenship question accurately on the ACS, and that could affect her analysis under the first *Gingles* precondition.  Handley Trial Testimony (SDNY) 841:20-842:5.

138.     Dr. Handley is not an attorney and is not an employee of the Justice Department's Civil Rights Division.  She therefore is not a decision-maker for DOJ.  Handley Trial Testimony (SDNY) 853:16-20.  She was not involved in drafting the Gary letter, and was not involved in DOJ's decision-making process concerning the letter.  *Id.* 851:13-19.

1       139.    Dr. Handley is not offering an opinion in this case about the decision-making

2   process DOJ uses in deciding whether to bring a Section 2 case.  Handley Trial Testimony (SDNY)

3   852:24-853:8.

4       140.    DOJ's letter explained that using statistical methods to estimate block-level

5   citizenship data from block-group-level citizenship data results in uncertainty in the estimates.  AR

6   665.  The letter also explained that, unlike ACS citizenship data, citizenship data from the decennial

7   census would align in time with the total and voting-age population data from the census already

8   used in redistricting (called the P.L. 94-171 data).  AR 665.  Finally, the letter stated that census

9   citizenship data would allow the same data set to be used for redistricting, enforcing the Voting

10  Rights Act, and determining compliance with the Constitution's one-person, one-vote requirement.

11  AR 664.

12      141.    The P.L. 94-171 data, providing population numbers by race, does not have the

13  kind of standard errors associated with an estimate based on a statistical sample.  The P.L. 94-171

14  data file does not have sampling margins of error.

15      142.    In contrast, the tabulation of CVAP data does contain sampling errors.

16      143.    The Census Bureau has not made a decision on the way in which it will aggregate

17  the data to the block level for the CVAP table as a public use product, which would be available to

18  DOJ.  Nor has the Census Bureau decided whether the block-level CVAP data will be included in

19  the P.L. 94-171 data file.

20      144.    Although the Census Bureau's position is that administrative data would be the best

21  way to provide block-level CVAP data, it is still working to acquire additional data from certain

22  federal agencies to make this option more practicable.

23      145.    The Census Bureau's use of disclosure avoidance procedures in reporting block-

24  level citizenship data from the 2020 census will not impair DOJ's intended use of that data to

25  assemble voting districts for Voting Rights Act purposes.  The disclosure avoidance procedures,

26  which have been used since the 2000 census, necessarily affect the variability of the data.  It is

27  therefore true that data for a particular census block may be obscured for confidentiality purposes.

28

However, for the 2020 census, the Census Bureau is using Department of Justice input—specifically, examples of cases in which DOJ has used demographic data in Voting Rights Act cases—to adjust the accuracy of the Census Bureau's disclosure avoidance procedures so that when census blocks are combined to build voting districts, the resulting data will be fit for DOJ's intended use.

## PROPOSED CONCLUSIONS OF LAW

I.  <u>Plaintiffs Have Failed to Prove Standing.</u>

### A. General Legal Standards for Article III Standing

1.      The doctrine of constitutional standing, an essential aspect of an Article III case or controversy, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal citation omitted).

2.      At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

3.      The standing requirement of "injury in fact" requires proof that the plaintiff "'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).

4.      The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560).

5.      Thus, an alleged future injury must be "*certainly* impending"; "'[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

6.     The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged conduct of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

7.     In the census context, a mere showing of differential net undercount is not enough, as there has never been a perfect census count.  *See Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981).  Plaintiffs instead must prove by a preponderance of the evidence that any differential net undercount (1) is specifically attributable to the citizenship question and (2) has an actual injurious effect on Plaintiffs.

8.     As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing these elements of standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Defs. of Wildlife*, 504 U.S. at 561.  "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'"  *Id.* (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

9.     If Plaintiffs cannot prove standing by a preponderance of the evidence, *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014), the Court must refrain from addressing the merits of Plaintiffs' APA and Enumeration and Apportionment Clause claims because "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted).

10.     Plaintiffs have not established, by a preponderance of the evidence, the three elements of Article III standing: Plaintiffs have not established a concrete and particularized injury-in-fact, that there is a fairly traceable causal connection between their alleged injury and the inclusion of the citizenship question, and a likelihood that the injury will be redressed by a favorable decision.  *Defs. of Wildlife*, 504 U.S. at 560.

**B.  Plaintiffs Have Failed to Prove a Concrete, Non-Speculative Injury That Is Certainly Impending.**

### 1. Plaintiffs Failed to Prove that They Face Any Imminent Risk of Concrete Injury in the Form of Lost Representation or Federal Funding.

11.     Plaintiffs' claims regarding a loss of representation or funding due to a net undercount resulting from the inclusion of a citizenship question are too speculative to satisfy Article III's requirements.  *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (finding lack of standing where court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," noting that "if a more accurate count would have enlarged some of the communities' shares, it likely would have reduced the shares of other communities"); *id.* at 186 ("interstate vote dilution injury is difficult to establish"); *Strunk v. U.S. Dep't of Commerce*, Civ. A. No. 09-1295, 2010 WL 960428, at *3 (D.D.C. Mar. 15, 2010) (rejecting vote dilution claim for lack of standing where plaintiff was "but one citizen of New York and one voter in New York's 11th Congressional District"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (finding no standing to bring an apportionment claim when "none of the plaintiffs in this case can show which states would gain and which states would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (holding that "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" where plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" which depends, inter alia, on "the interplay of all other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge method of apportionment "presents difficulty" because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but for every other State as well").

12.     Plaintiffs' asserted dilution of representation in the House of Representatives and in the Electoral College purportedly stemming from inclusion of the citizenship question is inherently speculative.  Plaintiffs have not, and cannot, establish that the citizenship question will affect the share of Representatives to Congress allocated to the State of California.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992) (because the plaintiffs had not "shown … that Massachusetts

30

would have an additional Representative if the allocation had been done using some other source of 'more accurate' data," they "d[id] not have standing to challenge the accuracy of the data." *Id.* at 802 (plurality opinion)).

13.     The process of apportionment itself makes any pre-census allegations as to the distribution of representatives (and, therefore, electors) speculative.  Because the apportionment process is based on the population of every state, Plaintiffs cannot establish an imminent injury here because the 2020 census has not yet taken place and projections of state populations will continue to change between now and 2020.  It is therefore impossible to "accurately measure" the population until the decennial census is taken in 2020.  *See Fed'n for Am. Immigration Reform*, 486 F. Supp. at 570, 572 (holding "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" when plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" depending on "the interplay of all the other population factors which affect apportionment").

14.     Plaintiffs also have not shown by a preponderance of the evidence that any potential differential undercount that may remain after NRFU operations and imputation will have an impact on federal funding. *Defs. of Wildlife*, 504 U.S. at 560

## 2.   Plaintiffs Failed to Prove They Have Been Required to Expend Additional Resources

15.      BAJI does not have standing to sue on its own behalf because it has not demonstrated it has suffered a "concrete and demonstrable injury to its activities—with a consequent drain on its resources—constitut[ing] … more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (organization cannot simply "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiff "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending"); *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding

standing because organization showed that "a drain on its resources from both a diversion of its resources and frustration of its mission"); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996) (organization must show that its expenditure of resources was "a necessary link in achieving the organization's ultimate purpose" and not just a product of "unnecessary alarmism constituting a self-inflicted injury"); *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (organization's reallocation of resources not sufficient for standing when organization "and its programs would have been totally unaffected [by defendant's conduct] if it had simply refrained from making the re-allocation).

16.     BAJI's alleged expenditure of resources is not sufficient to establish Article III injury because it has not shown whether, absent any expenditure of resources it chooses to make, the inclusion of a citizenship question on the 2020 census would likely cause a differential net undercount. *La Asociacion de Trabajadores*, 624 F.3d at 1088; *see Clapper*, 133 S. Ct. at 1151 (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). A plaintiff's expenditure of resources is also insufficient to establish Article III standing unless it is "beyond those normally expended" in the absence of the challenged action. *Nat'l Taxpayers Union, Inc. v. United State*s, 68 F.3d 1428, 1434 (D.C. Cir. 1995*); accord Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 182–83 (D.C. Cir. 1996) (organization's expenditure of resources not sufficient to create standing because it was "part of its ordinary program expenditures"). BAJI has failed to show that it is expending any *additional* resources to counteract a sufficiently concrete, impending injury.

17.     BAJI has not established standing because it has not shown a direct conflict between the defendant's conduct and its mission. *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011); *accord Nat'l Treasury Emps. Union*, 101 F.3d at 1429-30 ("[I]n those cases where an organization alleges that a defendant's conduct has made the organization's activities more difficult, the presence of a direct conflict between the defendant's conduct and the organization's mission is necessary—though not alone sufficient—to establish standing.").

18.     When an organization's mission is to vindicate the rights of a particular group, there is no such "direct conflict" between that mission and an undercount of that group in the census because the undercount does not prevent the organization from continuing to pursue its mission of helping that group. *Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 181–82 (D.C. Cir. 1996).

19.     The evidence demonstrates that BAJI lacks standing because it failed to demonstrate concrete and demonstrable injuries to its activities that could be directly attributed to the inclusion of a citizenship question on the 2020 decennial census.

20.     The governmental plaintiffs' alleged expenditure of resources is also not sufficient to establish Article III injury because they have not shown whether, absent any expenditure of resources they choose to make, the inclusion of a citizenship question on the 2020 census would likely cause a differential net undercount. *La Asociacion de Trabajadores*, 624 F.3d at 1088; *see Clapper*, 133 S. Ct. at 1151 (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). In addition, a plaintiff's expenditure of resources is insufficient to establish Article III standing unless it is "beyond those normally expended" in the absence of the challenged action. *Nat'l Taxpayers Union, Inc. v. United State*s, 68 F.3d 1428, 1434 (D.C. Cir. 1995*); accord Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 182–83 (D.C. Cir. 1996) (organization's expenditure of resources not sufficient to create standing because it was "part of its ordinary program expenditures"). The governmental plaintiffs have failed to show that they are expending any *additional* resources to counteract a sufficiently concrete, impending injury.

### 3.   Plaintiffs Failed to Prove That Any Lower Quality Demographic Data Will Perceptibly Impair Any Concrete and Cognizable Interest.

21.     Lower quality data in the abstract is insufficiently "concrete" and "tangible" to constitute an Article III injury in fact. *See Warth*, 422 U.S. at 508. Instead, Plaintiffs must show that that lower quality data will perceptibly impair some concrete and tangible cognizable interest. *See Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality op.) (no standing for claim challenging use of inaccurate data in reapportionment because plaintiffs "have neither alleged nor

shown … that Massachusetts would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data"); *id.* at 823–29 (Scalia, J., concurring in judgment) (no standing for any claims); *Whitmore v. Arkansas*, 495 U.S. 149, 156–57 (1990) (death-row inmate lacked standing to challenge state's incomplete and skewed database of other capital crimes against which his case could be compared because he failed to show that corrected database would lead state court to set aside his death sentence).

22.      Plaintiffs failed to adduce evidence necessary to establish any tangible, cognizable harm based on alleged lower quality data resulting from the inclusion of a citizenship question on the 2020 decennial census.

### 4.  Plaintiffs Failed to Prove a Nonspeculative Risk of Loss of Confidentiality or Privacy

23.      Plaintiffs failed to establish that BAJI members' sense of "fear and intimidation" based on concerns that their census responses will not be kept confidential rise to the level of injury-in-fact.  Plaintiffs must demonstrate a substantial risk that BAJI members' confidentiality or privacy is actually in danger—speculative worry does not satisfy Article III.  *Clapper*, 133 S. Ct. at 1151.  Plaintiffs have not pointed to a single piece of evidence indicating that the Census Bureau will alter its longstanding and deeply held commitment to preserving the confidentiality of census responses, or make any other change that would lead to the disclosure of census responses.

### C.  Plaintiffs Failed to Prove That Any Injury is Traceable to the Inclusion of the Citizenship Question or that Any Alleged Injury Could be Redressed.

24.      To ensure that a plaintiff's allegations of harm are fairly attributable to the challenged action, it is necessary to allege "a causal connection between the injury and conduct complained of so that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party who is not before the court."  *Defs. of Wildlife*, 504 U.S. at 560; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 ("[A] federal court [must] act only to redress injury that fairly can be traced to the challenged conduct of the defendant, and not injury from independent action of some third party not before the court."); *see*

*also Warth,* 422 U.S. at 504 (finding standing lacking where alleged injury resulted from outside forces, "rather than . . . respondents' assertedly illegal acts").

25. The evidence demonstrates that Plaintiffs cannot meet their burden of establishing that any differential undercount remaining after NRFU operations is traceable specifically to the citizenship question rather than to the general macro-environment and political climate. Plaintiffs' own experts testified about challenges facing the census in the current macro-environment, and Plaintiffs will be unable to untether any incremental impact on census participation from those pre-existing factors.

26. Because Plaintiffs cannot decouple any impact on census participation due to the purported impact of the citizenship question from other, pre-existing factors, it follows they cannot demonstrate that their alleged injuries would be redressed by the removal of the citizenship question. *Defs. of Wildlife*, 504 U.S. at, 560.

## II.   **Plaintiffs Failed to Prove that the Secretary's Decision to Reinstate a Citizenship Question was Arbitrary and Capricious.**

### A. Legal Standards for Review Under the Administrative Procedure Act

27. Under the APA, a court is not authorized to set aside agency action as arbitrary and capricious if the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 52 (1983). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016) (citation omitted).

28. An agency decision will only be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1244 (9th Cir. 2013) (citation omitted).

29. The Court's role is limited to determining whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.  And "[t]hat requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).

30.    The Court's review in this case must be particularly deferential because Plaintiffs challenge the Secretary's broad discretion over the census.  "The text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides."  *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting art. 1, § 2, cl. 3) (emphasis added).

31.    Congress, in turn, "has delegated its broad authority over the census to the Secretary."  *Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)).  Thus, "'[t]he wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary' demands a high degree of 'judicial deference' to the Secretary's decisions concerning the conduct of the census."  *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 799 (S.D.N.Y. 2018) (quoting *Wisconsin*, 517 U.S. at 22-23).

32.    Plaintiffs' arbitrary-and-capricious claim should be resolved as a matter of law based on an evaluation of the record before the agency decisionmaker.  Where, as here, "a party seeks review of agency action under the APA …, the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."  *Herguan Univ. v. ICE*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).

33.    Any testimony introduced by Plaintiffs at trial should not properly be considered on APA review because such evidence was not before the Secretary and thus is irrelevant to his decision.  Considering expert testimony after the fact is inconsistent with the APA standard of review and the required deference to the agency's factfinding.  *See, e.g., Vt. Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

34.      Similarly, materials produced in discovery are not, as a general matter, properly considered in a review of agency action under the APA because those materials are not considered part of the "whole record" before the agency.  5 U.S.C. § 706; *see e.g., Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (discussing exceptions).

35.      The Administrative Record contains all relevant information pertaining to Secretary Ross's decision.

36.      Under Title 13, Secretary Ross has virtually unlimited discretion to consider and weigh evidence in the record to make policy decisions regarding the census, including such decisions made in response to agency requests.

**B.  The Secretary's Decision to Reinstate a Citizenship Question on the 2020 Decennial Census was Reasonable.**

**37.**      The administrative record demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census was reasonable and fully consistent with the APA.  *See* AR 1-13,024.

38.      The Secretary's decision is reasonable because his memorandum reflects that he conducted "a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Bureau leadership and interested stakeholders."  *See, e.g.,* AR 1320.

39.      The Secretary's decision is reasonable, and specifically his Decision Memorandum does not run counter to the evidence, because the memorandum reflects that he determined that adding the citizenship question "is necessary to provide complete and accurate data in response to the DOJ request."  AR 1320.

40.      The Secretary's decision is reasonable because he considered and accounted for the effect of a citizenship question on census response rates and correctly noted in his decision the lack of evidence that response rates would decline materially because of the question, and because the Secretary expressly addressed how the Bureau's budget provided sufficient funding for NRFU efforts to prevent an undercount. AR 1315-1319.

41.     The Secretary's decision is reasonable because he explicitly recognized that both stakeholders and the Census Bureau had raised concerns that the inclusion of a citizenship question on the census could have a negative impact on self-response rates for non-citizens, but correctly noted that no one had produced evidence that the response rate would decline materially as a result of the inclusion of a question that had previously been on the census for decades.  AR 1315.

42.     The Secretary's decision is reasonable because, as he explained in his Decision Memorandum, asking a citizenship question in conjunction with using administrative records allows the Bureau to compare the responses to the records to establish the most accurate, usable, and complete citizenship data and could reduce the Bureau's burden of imputing missing citizenship data.   AR 1317.

43.     The Secretary's decision is reasonable because he considered alternative options, such as the use of administrative records only, but  concluded that the Census Bureau "is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."  AR 1316.

44.     The Secretary's decision is reasonable because he carefully considered the possibility of depressed self-response rates before making the reasonable determination that "the need for accurate citizenship data and the limited burden that the inclusion of the citizenship question would impose outweigh fears about a potentially lower response rate."  AR 1317.

45.     The Secretary acknowledged the macro-environment and that there may be a distrust of government, and recognized that this distrust would exist regardless of a citizenship question.  AR 1317.  The Secretary correctly noted that no one could provide an analysis showing a material decline in self-response rates among those who generally distrusted the government.  *Id.*

46.     The Secretary's decision to add the citizenship question is reasonable because the Secretary expressly addressed how the Bureau's budget provided sufficient funding for NRFU efforts to prevent an undercount, and because "[t]he citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond."  AR 1319.

47.     The Secretary's decision is reasonable because he weighed the evidence, including the possible cost and quality implications of reinstating a citizenship question, and concluded that a combination of using administrative records and reinstating a citizenship question on the 2020 decennial census, was the best option to provide DOJ the data it requested.  AR 1317.

48.     Secretary Ross's decision was not pretextual because no evidence suggests that Secretary Ross did not believe the stated rationale in his Decision Memorandum.  *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014).

49.     The Secretary's decision to add the citizenship question was not contrary to law because his Decision Memorandum responds to a new circumstance—DOJ's request to the Bureau for block-level CVAP data to enforce the Voting Rights Act—and reflects the Secretary's understanding of the value of such data, and because the Secretary made an explicit determination based on the information provided by the Census Bureau that using administrative records alone would be inadequate for a significant portion of the population.

50.     Secretary Ross's decision to add the citizenship question was not contrary to law because the Bureau's internal data collection standards do not require pretesting for questions that perform adequately in another survey, and the Bureau's senior executive staff determined and informed Secretary Ross that the question was adequately tested, given the thorough testing of the citizenship question on the American Community Survey and the logistical constraints that prevented further pretesting.

## III.   The Secretary's Decision to Reinstate a Citizenship Question Was in Accordance With Law.

### A.  The Secretary's Decision Fully Complies with 13 U.S.C. § 6(c).

51.     There is a statutory requirement that, "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries."  13 U.S.C. § 6(c).

52.     DOJ specifically requested that a citizenship question be included on the 2020 decennial census to gather census-block level data to facilitate its enforcement efforts under Section 2 of the Voting Rights Act (VRA).  AR 663-64.

53.     The Secretary made an explicit determination that using administrative records alone would be inadequate for a significant portion of the population, and that the information that could be gained from administrative records alone was not of "the kind, timeliness, quality and scope of the statistics required" for DOJ's VRA enforcement efforts.  *See* AR 1316.  Therefore, 13 U.S.C. § 6(c) does not prohibit the Secretary from including a citizenship question on the 2020 decennial census in addition to the use of administrative records.

**B.  The Secretary's Decision Was in Accordance with 13 U.S.C. § 141(f).**

**1.  The Court Lacks Jurisdiction to Review Plaintiffs' Claim that Secretary Ross Violated the Reporting Requirement of § 141(f)(3).**

54.     Plaintiffs' assertion that the Secretary violated Section 141(f) of the Census Act because he did not identify "citizenship" as a subject for the 2020 census in his March 2017 report to Congress, and "there are no 'new circumstances . . . which necessitate' the inclusion of the citizenship question on the census" must be rejected as a matter of law.

55.     Congressional reporting requirements—like § 141(f)—are beyond the courts' jurisdiction to review for two reasons: (1) the courts cannot redress any injury resulting from an inadequate report because it is Congress's sole decision how to respond to a report, adequate or inadequate; and (2) submitting an informational report to Congress is not the type of "final agency action" covered by APA review because it does not determine rights or obligations or trigger legal consequences. 5 U.S.C. §§ 551 (13), 701(a); *Guerrero v. Clinton*, 157 F.3d 1190, 1191-92, 1196 (9th Cir. 1998) ("[T]his issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." (quoting *Nat. Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988)); *see also, e.g., Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012) (explaining that the courts could not redress an injury based on an alleged violation of a requirement "to file an annual report to Congress"); *Wilderness Soc'y v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006) (declining to review agency's required submission of recommendations to the

President, because "[t]here is no good reason to believe that such an order will redress [plaintiffs']

injuries. No legal consequences flow from the recommendations"); *Taylor Bay Protective Ass'n v.*

*Adm'r, EPA*, 884 F.2d 1073, 1080-81 (8th Cir. 1989) (declining to review agency compliance with a

congressional reporting provision because "nothing in the scheme indicat[es] that judicial review . .

. is necessary or advisable. … Additionally, the nature of the agency action here is distinct from the

type of agency action normally reviewable"); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989)

(declining to review an agency's compliance with a congressional reporting requirement because

"[t]his court will not scrutinize the merits or timeliness of reports intended solely for the benefit of

Congress"); *Natural Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988)

(declining to review an agency's allegedly insufficient report under a congressional reporting

provision because managing the reports should be left to Congress, and the Court "despair[ed] at

formulating judicially manageable standards" to evaluate the reports on Congress's behalf); *Coll.*

*Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) (holding that

plaintiffs could not bring an APA claim to challenge an agency's misstatements to Congress under a

reporting statute because "[w]here a report is not explicitly or implicitly intended as anything more

than a vehicle to inform Congress, it is for Congress alone to determine if the Report satisfies the

statutory requirements it enacted" (internal quotation marks and citation omitted)).

### 2. Secretary Ross's Submission of § 141(f) Reports Was Entirely Proper

56.     Even if this claim were reviewable, Section 141(f) has been fully satisfied.  Pursuant

to 13 U.S.C. § 141(f)(2), the intended questions for the 2020 decennial census have been submitted

to Congress.  *See* Questions Planned for the 2020 Census and American Community Survey (Mar.

29, 2018), https://www2.census.gov/library/publications/decennial/2020/operations/planned-

questions-2020-acs.pdf.  Through that report, Secretary Ross informed Congress of the questions

for the 2020 decennial census, including the citizenship question, *id.* at 7, thus satisfying the

requirements of § 141(f)(3), if a 141(f)(3) report were required.   There is no requirement that the

Secretary inform Congress of the new circumstances triggering modifications to subjects submitted

under (f)(1).  13 U.S.C. § 141(f)(3).

57.     In any event, Secretary Ross could remedy any error by simply submitting a §141(f)(3) report at any time between now and the 2020 census.  *See* 13 U.S.C. § 141(f)(3) (permitting submission of such a report at any time after the submission of a § 141(f)(1) or (2) report and "before the appropriate census date").   Accordingly, if a §141(f)(3) report is required, the Secretary has fully satisfied the Census Act, or could do so any time before April 1, 2020.

**IV.     Plaintiffs Have Failed To Show That the Secretary's Decision Was a "Pretext"**

58.     "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 394 n.7 (2d Cir. 2000) ("Absent a showing to the contrary, it is presumed the agency considered all evidence in the record when making its determination.").

59.     As the Supreme Court repeatedly has explained, where there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding."  *Camp*, 411 U.S. at 143.  Because the Court should be applying "the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 743-44 (1985) (internal citation omitted), Plaintiffs may not rely on material outside the properly designated administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

60.     Even if the Secretary had additional reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the analysis under the APA would remain unchanged.  *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").

61.     Plaintiffs have failed to prove that the Secretary did not actually believe the rationale set forth in his decision memorandum or that he acted with an unalterably closed mind.

Nor can they show that the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious. *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). As Justice Gorsuch has explained, "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape." *In re Dep't of Commerce*, __ S. Ct. __, 2018 WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring in part and dissenting in part).

## V.     **Plaintiffs' Enumeration Clause Claim Must Be Rejected**

62.     Plaintiffs' Enumeration Clause claims must be decided on the basis of the administrative record, without consideration of extra-record evidence produced in discovery or at trial, because the APA provides the waiver of soverign immunity for this claim and its stirctures on judicial review apply with equal force. *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237 (D.N.M. 2014) (that the case "alleges constitutional violations as well as statutory ones does not take it outside of the APA").

63.     Plaintiffs cannot show that the inclusion of a citizenship question will prevent the accomplishment of an actual enumeration of the population. *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996)

64.     Plaintiffs have not shown that the inclusion of a citizenship question undermines the strong constitutional interest in the accuracy of the census. *Utah v. Evans*, 536 U.S. 452, 478 (2002).

65.     The possibility of an undercount exists in every census and the Constitution does not require perfection, *Utah v. Evans*, 536 U.S. at 504 (Thomas, J., concurring in part and dissenting in part); *Wisconsin v. City of New York*, 517 U.S. at 6 (recognizing that no census has been wholly successful in achieving goal of complete enumeration).

## VI.     **Any Relief Granted to Plaintiffs Must Comport with the APA and Art. III's Limitations**

**A. Remand to the Agency Is the Only Potentially Appropriate Remedy**

66.     This Court should uphold the Secretary's decision to include a citizenship question and enter judgment in Defendants' favor.

67.     If the Court were to conclude that the Secretary's decision is not supported by the administrative record or is otherwise unlawful, the appropriate remedy would be to remand to the agency for further consideration.  5 U.S.C. § 706(2); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n.* 988 F.2d 146, 151 (D.C. Cir. 1993) (holding that remand without vacatur was appropriate when "the consequences of vacating may be quite disruptive" and "the possibility that the [agency] may be able to justify" the decision on remand); *California Communities Against Toxics v.  EPA,* 688 F.3d 989, 992 -94 (9th Cir. 2012)(recognizing that a flawed rule need not be vacated and can be left in place while the agency follows the necessary procedures to correct its action); *Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392, 1405 (9th Cir.1995) (holding that although "ordinarily" regulations that are not promulgated in compliance with the APA are invalid, "when equity demands, the regulation can be left in place while the agency follows the necessary procedures.");.*Nat. Res. Def. Council v. U.S. Envt'l Prot. Agency*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) ("Where an agency action is remanded for further proceedings, the determination of whether or not also to vacate the agency action is left to the court's discretion.") (citing *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002)).

68.     A remand to the agency without vacatur is appropriate here because the agency could correct any procedural deficiencies on remand, and vacatur would be extremely disruptive to the agency. *Allied-Signal*, 988 F.2d at 151; *AquAlliance v. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018)(stating that in "determining whether to vacate an agency decision, courts in the Ninth Circuit look to the factors described in *Allied-Signal*").

69.     Courts have repeatedly emphasized that remand without vacatur is appropriate even if there is only "'a non-trivial likelihood' that the [agency] will be able to state a valid legal basis for its rules," *In re Core Comm'ns, Inc.*, 531 F.3d 849, 861 (D.C. Cir. 2008) (quotation omitted), or a

"significant possibility" that the agency may be able to explain itself on remand. *Williston Basin Interstate Pipeline Co v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008).

70.     Should the Court determine that the decision should be remanded, Plaintiffs' request that this Court enjoin Secretary Ross and his staff at the Department of Commerce from participating in the decision on remand must be rejected as beyond the scope of relief contemplated by the APA and unjustified by the record in this case.

**B.  Any Relief Granted in this Case Should Not Extend Beyond the Plaintiffs That Demonstrate an Injury-in-Fact Traceable to Defendants**

71.     **Any request by** Plaintiffs for an injunction that would extend beyond the Plaintiffs in this litigation must be rejected. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (to establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought."); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").

72.     Article III requires this Court to reject any relief to Plaintiffs that extends beyond the injuries they have proven they have sustained and that are directly attributable to the Defendants' conduct. *See Gill v. Whitford*, 138 S. Ct. 1916, 1930-31 (holding in case challenging alleged gerrymandering, that "the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts.") *Id.* at 1934 (cautioning that, on remand, "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353).

73.     Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

Respectfully submitted,

Dated:  December 28, 2018

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

CARLOTTA P. WELLS
Assistant Branch Director

MARSHA S. EDNEY
Senior Trial Counsel

*/s/ Kate Bailey*
KATE BAILEY
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Phone: (202) 514-9239
Email: kate.bailey@usdoj.gov
*Attorneys for Defendants*

DEFS.' PROP. FINDINGS OF FACT/CONCLUSIONS OF LAW – Nos. 3:18-cv-1865-RS; 3:18-cv-2279-RS