MANATT, PHELPS & PHILLIPS, LLP
JOHN F. LIBBY (Bar No. CA 128207)
E-mail: jlibby@manatt.com
JOHN W. MCGUINNESS (Bar No. CA 277322)
E-mail: jmcguinness@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail: epetrossian@manatt.com
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
JON M. GREENBAUM (Bar No. CA 166733)
E-mail: jgreenbaum@lawyerscommittee.org
EZRA D. ROSENBERG (*Pro Hac Vice*)
E-mail: erosenberg@lawyerscommittee.org
DORIAN L. SPENCE (*Pro Hac Vice*)
E-mail: dspence@lawyerscommittee.org
1500 K Street NW Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*Attorneys for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST
IMMIGRATION

*[Additional Counsel Listed on Signature Page]*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California nonprofit corporation,<br><br>              Plaintiffs,<br><br>      vs.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,<br><br>              Defendants. | 3:18-cv-02279-RS<br><br>**PLAINTIFFS CITY OF SAN JOSE AND BLACK ALLIANCE FOR JUST IMMIGRATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Ctrm:      3<br>Judge:    The Honorable Richard G. Seeborg<br>Trial Date: January 7, 2019<br>Complaint Filed: April 17, 2018 |

1

Pursuant to the Court's Guidelines for Final Pretrial Conference in Bench Trials Before District Judge Richard Seeborg, Plaintiffs City of San Jose and Black Alliance for Just Immigration, hereby submit the following proposed findings of fact and conclusions of law.

**PROPOSED FINDINGS OF FACT**

## I.      PARTIES, CLAIMS, AND BACKGROUND.

### A.      Parties.

1.      Plaintiff the City of San Jose ("San Jose"), incorporated in 1850, is the third-largest city in California.  (UF 9).[1]

2.      Plaintiff Black Alliance for Just Immigration is an Oakland-based nonprofit that educates and engages African American and Black immigrant communities in support of racial, social, and economic justice.  (UF 10).

3.      Defendant Wilbur Louis Ross, Jr. is the Secretary of the Department of Commerce.  (UF 11).

4.      Defendant the United States Department of Commerce ("Commerce") is a department of the United States Government.  (UF 12).

5.      Defendant Ron Jarmin is the former Associate Director for Economic Programs of the United States Census Bureau and is currently performing the non-exclusive functions and duties of the Director of the United States Census Bureau.  (UF 13).

6.      The United States Census Bureau (the "Bureau") is a Bureau within the Department of Commerce charged with conducting the decennial census.  (UF 14).

7.      Employees of the Bureau are have expertise in conducting and designing survey instruments, analyzing the results of those surveys, and statistical analysis in general.

---

[1] Plaintiffs San Jose and BAJI cite to the Undisputed Facts (Exhibit A to the Joint Pretrial Statement and Proposed Order, Doc. No. 125) with the abbreviation "UF" and to the Administrative Record with the abbreviation "AR." Plaintiffs San Jose and BAJI have not cited to other material as it has not yet been entered into evidence.

**B.**     **Claims.**

8.      On March 26, 2018, Secretary Ross issued a memorandum (the "Decisional Memo") directing the Bureau to add a question on citizenship status to the 2020 Decennial Census (the "Census").  (AR001313).

9.      Plaintiffs claim that Ross's decision to add a citizenship question to the Census violated the Enumeration Clause of the United States Constitution. U.S. Const., art. I, § 2, cl. 3.

10.     Plaintiffs claim that Ross's decision to add a citizenship question to the Census violated the Apportionment Clause.  U.S. Const. amend. XIV, § 2.

11.     Plaintiffs claim that Ross's decision to add a citizenship question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act ("APA") and must be set aside.  5 U.S.C. § 706(2)(A).

12.     Plaintiffs claim that Ross's decision to add a citizenship question was made "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the APA, because the decision disregarded the statutory requirements of 13 U.S.C. § 6(c) and 13 U.S.C. § 141(f) and must be set aside.  5 U.S.C. § 706(2)(C).

**C.**     **Decennial Census Overview.**

   **1.**     *Census Purpose And Operations.*

13.     The U.S. Constitution requires the federal government to conduct a decennial census counting the total number of "persons"—with no specific reference to citizenship status—residing in each state.  (UF 30).

14.     The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers;" which requires "counting the whole number of persons in each State."  (UF 31).

15.     The Constitution requires that this count be an "actual Enumeration" conducted every ten years.  (UF 32).

16.     Through the Census Act, Congress assigned the responsibility of making this enumeration to the Secretary of Commerce.  (UF 33).

17.   The Secretary of Commerce is charged with the responsibility to take a decennial census to create an actual enumeration of the United States population.  (UF 34).

18.   The central constitutional purpose of the Bureau in taking the decennial census is to conduct an enumeration of the total population.  (UF 35).

19.   To enable a person-by-person count, the Bureau sends a questionnaire to virtually every housing unit in the United States.  (UF 36).

20.   If the Bureau does not receive a response to the questionnaire, it then sends a Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in person interview in order to collect the data.  This process is the Non Response Follow Up ("NRFU") operation. (UF 39).

21.   After the NRFU process is completed, the Bureau then counts the responses from every household, including those completed through the NRFU process, as well as the data from the other enumeration operations, to determine the population count in each state. (UF 47).

22.   Data from the decennial census are reported down to the census block level. (UF 48).

### 2.   *Census Data Used In Federal Funding*.

23.   The federal government also uses decennial census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments. (UF 52).

24.   Approximately 132 programs used Bureau data to distribute hundreds of billions of dollars in funds during fiscal year 2015.  (UF 53).

25.   One of the programs that uses Bureau data is the Home Investment Partnership Program (HOME), run by the Department of Housing and Urban Development (HUD), which uses Bureau data as part of its allocation formula under 42 U.S.C. §§ 12747(b).  (UF 54).

26.   One of the programs that uses Bureau data is the Community Development Block Grant Program ("CDBG"), run by HUD, which uses Bureau data as part of its allocation formula under 42 U.S.C. § 5306(b).  (UF 55).

27. Among the funding programs that use Bureau data are programs administered by the Department of Labor under the Workforce Innovation and Opportunity Act (WIOA), which use Bureau data as part of the allocation formulas set forth in 29 U.S.C. §§ 3162(C) and § 3172(C).  (UF 56).

### 3.   _Prior Undercounts And Hard-To-Count Populations._

28. Some demographic groups have proven more difficult to count in the decennial census than others. The Bureau refers to these groups as "hard-to-count."  (UF 59).

29. Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the decennial census. (UF 60).

30. Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 decennial census.  (UF 61).

31. The 2010 Decennial Census undercounted on net more than 1.5 million Hispanic and African American individuals.  (UF 62).

32. The Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population. (UF 63).

33. The Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills.  (UF 64).

34. In the 2000 and 2010 Decennial Censuses, the Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness.  (UF 65).

35. For the 2000 and 2010 Decennial Censuses, the Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count.  (UF 66).

**4.** *Census History, Census Instruments, And The Citizenship Question.*

36. Plaintiffs' expert, Professor Margo Anderson, is the nation's foremost expert on the history of the Bureau and the United States Census.[2]

37. According to Professor Anderson, while questions that relate in some way to citizenship have appeared on a number of different Bureau instruments, the language, mode of administration, and possible answers to these questions have changed repeatedly over the course of American history.

38. From 1790 to 1960, the Bureau collected data directly from households through in-person interviews.  (UF 75).

39. According to Professor Anderson, the introduction of mail self-enumeration questionnaires in 1970 changed the Bureau's data collection techniques and changed the impact that any particular question could have on response rates.

40. According to Professor Anderson, in 1970, the Bureau introduced the mail questionnaire for about 60% of the residential addresses in the country.  The Bureau expanded the mail census in later decades as the address lists improved.  It used a "short form" questionnaire, with few questions, to most households, and a "long form" questionnaire with additional questions to the remaining smaller number of households, ranging from 5% to 25% of households in different years.

41. A question concerning citizenship did not appear on the decennial census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010.  (UF 77).

---

[2] Plaintiffs rely on Professor Anderson's conclusions only in support of their standing arguments and their Enumeration Clause claim. They do not rely on Professor Anderson's conclusions in support of their APA claims.

42. In the 1970, 1980, 1990, and 2000 Decennial Censuses, the long form decennial census questionnaire contained a question about citizenship status.  (UF 80).

43. The citizenship data collected from the long form questionnaire was reported by the Bureau at the census block group level.  (UF 82).

44. After the 2000 Decennial Census, the functions performed by the long form have been replaced by the American Community Survey ("ACS").  (UF 83).

45. The ACS began operating in 2000 and was at full sample size for housing units in 2005, and for group quarters in 2006.  (UF 84).

46. The ACS is a yearly survey of approximately 2% of households—about 3.5 million—across the United States.  (UF 85).

47. A question concerning citizenship status currently appears as among one of more than 50 questions on the 28-page ACS questionnaire.  (UF 86).

48. The citizenship status question on the ACS is preceded by a question asking where the person was born.  (UF 87).

49. The citizenship question that appears on the ACS is not a binary yes/no question.  (UF 88).

50. The ACS citizenship question asks whether the person was born in the United States, a U.S. territory, or abroad.  (UF 89).

51. The data collected by the ACS allows the Bureau to produce estimates of Citizen Voting Age Population ("CVAP").  (UF 90).

52. CVAP data based on responses to the ACS are reported by the Bureau down to the census block group level.  (UF 91).

53. Margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate.  (UF 92).

54. According to Professor Anderson, because self-response mailers were not used until 1970, and no citizenship question has appeared on any "short form" census since before that census, a citizenship question has never been posed on a Census questionnaire mailed to every household that received a mail questionnaire.

II.  **ADDING A CITIZENSHIP QUESTION POSES A SUBSTANTIAL RISK OF CAUSING A NET UNDERCOUNT AND A DIFFERENTIAL UNDERCOUNT, WHICH WILL HARM SAN JOSE.**

A.  <u>**Defendants Admit That Adding The Citizenship Question Will Increase The Non-Response Rate, And Thereby Create A Risk Of A Net Undercount.**</u>

55.  The Bureau has concluded that adding the citizenship question will lead to at least a 5.8% reduction in self-response in households that include at least one non-citizen.

56.  Dr. John Abowd, Chief Scientist at the Bureau, is aware of considerable evidence, including based on his own analyses, that "self-response is directly related to the quality of components of that net undercount measurement," and thereby a lower self-response rate creates a risk of a net undercount.

B.  <u>**The Bureau Found That It Undercounted Minorities And Young Children In Prior Censuses, Showing That Its NRFU Operations Were Not Fully Successful.**</u>

57.  The Bureau conducted multiple studies on prior undercounts and differential undercounts, including of the 2010 Decennial Census.

58.  The Bureau found that there was 2.06% net undercount of the Black population in the 2010 Decennial Census.

59.  The Bureau found that there was a 1.54% net undercount of the Hispanic population in the 2010 Decennial Census.

60.  The Bureau found that there was a net overcount of the white population in the 2010 Decennial Census.

61.  The Bureau found that there was a statistically significant undercount of young children in the 2010 Census.

62.  The Bureau's NRFU process, including imputation, did not fully mitigate the undercount of young children or the undercount of non-white Hispanics.

63.  The Bureau has previously concluded, as long ago as 1980 and as recently as 2016, that adding a citizenship question to a decennial census will "enhance the problems of enumerating minorities thereby exacerbating the undercount" and lead to a "reduced rate of response overall and an increase in inaccurate response."

8

1

2

### C.   The GAO Studied The Bureau's 2018 End-to-End Test And Found That The Bureaus' NRFU Preparations Are Insufficient.

3

64.   The United States General Accounting Office ("GAO") studied the NRFU operations of

4   the Bureau's End-to-End Test, the largest pre-Census operational test conducted by the

5   Bureau.

6

65.   The GAO found that the Bureau's NRFU process was inadequate, noting that census field

7   supervisors were not integrated into casework management, that enumerators were

8   undertrained, that there was "confusion" among enumerators about the proxy interview

9   process, and that enumerators were unclear on how to proceed when property managers

10   were not available.

11

66.   Based on the Bureau's historical performance and the analysis of the NRFU process by

12   the GAO, no evidence suggests that the Bureau's NRFU efforts will compensate for the

13   drop in self-response rates that the Bureau acknowledges will be caused by the addition of

14   the citizenship question.

15

67.   Thus, despite the Bureau's optimism that the NRFU process will compensate for the drop

16   in self-response rates due to the addition of a citizenship question to the 2020 Census, the

17   evidence establishes that such efforts are not likely to be adequate and will lead to a net

18   undercount, along with a differential undercount of non-citizens and of non-white

19   Hispanics.

20

### D.   Dr. Matthew A. Barreto Showed That Adding The Citizenship Question Will Lead To A Differential Undercount Of Minorities And An Undercount Of San Jose.

21

22

68.   Dr. Matthew A. Barreto[3] is a professor of political science and Chicano studies at the

23   University of California, Los Angeles.  He is an expert in survey methodology, public

24   opinion polling, and racial and ethnic politics.

25

26

---

[3] San Jose and BAJI rely on Dr. Barreto, Dr. O'Muircheartaigh, and Dr. Reamer to establish standing and for their Enumeration Clause claim.  This evidence is not offered in support of their APA claims.

27

28

9

69. Dr. Barreto reviewed social science literature on the topic of survey methodology, as well as social science research published by the Bureau.  His review confirms that the addition of a sensitive question such as the citizenship question will erode trust and will lead to lower self-response rates.

70. According to Dr. Barreto's literature review, the main factors that impact participation in a survey are: trust in the survey administrator, both the person directly administering the survey and the agency or organization overseeing it; the sensitivity of the questions; and the macro-environment, meaning the social and political climate in which the survey is being administered to the public.

71. Absent trust, respondents will not participate in surveys.  Trust specifically influences census participation because the census is an official government survey.  It is done on behalf of the federal government by the Bureau, and the public has to trust that the federal government is carrying out its job faithfully and using the information confidentially and only for census purposes.  Furthermore, trust is particularly important to a citizenship question, as questions related to citizenship are ones to which many in Latino and immigrant communities are sensitive.

72. The macro-environment is directly related to whether respondents perceive a question as sensitive and therefore to the concomitant response rates.  Where the macro-environment is perceived as threatening, it raises the stakes of participation; if respondents feel that participation will put them at risk, or the information they provide will not be kept confidential and will be provided to other government agencies, self-response rates will decline.

73. Accordingly, Dr. Barreto concludes that given current trust issues arising from the macro-environment, the addition of a citizenship question is a particularly sensitive question and that the addition of this question in today's macro environment will result in reduced participation in Latino and immigrant communities in 2020.

74. Survey research can reliably represent populations with millions of members and present a truly representative and unbiased picture of it.  Survey research is relied on extensively

1  by the federal government – not just by the Bureau – but in many different agencies and

2  across the social sciences to understand public opinion and participation.

3  75.  Dr. Barreto conducted a robust original national survey of 6,309 respondents from across

4  the United States, with an additional oversample of Latinos, and geographic oversamples

5  in San Jose, California and Cameron County and Hidalgo County, Texas.  The survey was

6  designed to ascertain the impact of a citizenship question on the Census.

7  76.  Dr. Barreto's survey met all the applicable criteria for ensuring accuracy and reliability

8  that enabled him to extrapolate his results to the national population, including

9  randomization, response rate, and sample size.

10  77.  Dr. Barreto demonstrates through the survey that the expected drop-off rates nationwide

11  for responses to the Census due to the citizenship question is between 7.1 and 9.7 percent,

12  between 11.3 percent and 17.8 percent for immigrants, and between 14.1 and 16.6 percent

13  among Latinos.  For the state of California, the drop-off rate due to the citizenship

14  question is between 12.3 percent and 18.0 percent -- the highest drop-off rate of any state

15  in the country.  For the City of San Jose the drop-off rate due to the citizenship question is

16  between 12.7 percent and 20.3 percent – this in a city that is nearly 40 percent immigrant.

17  Black immigrants will likewise experience similar highly rates of non-response due to a

18  citizenship question in 2020.

19  78.  Dr. Barreto estimates that between 133,496 and 210,408 people in the City of San Jose

20  will not be counted by the Census due to the citizenship question.

21  79.  Dr. Barreto concluded that it is virtually certain that reduced self-response caused by the

22  addition of the citizenship question will lead to a net undercount among those populations

23  with lower rates of self-response.  This is so, in part, because non-responding households

24  are statistically different than responding-households on a number of dimensions, making

25  imputation inaccurate and unreliable.  For example, non-responding households are

26  likelier to be larger in size, be renter-occupied, clustered in urban areas, be higher in

27  population density, be foreign-born, have foreign-born parents, be non-white, be Latino,

28  and report differences on average age and language.

80.     Additionally, trust and sensitivity concerns concerning the citizenship question will have differential impacts with respect to the Bureau's NRFU process.  For some groups, the NRFU process this year might be as successful in previous years.  But for other groups who feel that the question is sensitive and places them at risk, it is expected to be far less successful.  Not only will overall NRFU will be more challenging and less successful, but there will be a differential success rate, and in particular, NRFU is expected to have less success counting Latino and immigrant communities.

81.     There is no credible evidence, quantitative or qualitative, that NRFU or imputation will be completely effective in 2020 so as to avoid a differential undercount when a citizenship question is added and a socio-political climate of fear and anxiety over immigration issues are at an all-time high.

82.     In fact, many aspects of the Bureau's planned outreach efforts in 2020 could actually create more fear and anxiety in immigrant communities and further drive down response rates and increase the net undercount.  Social science research finds that increased presence and visibility of government officials who appear to be collecting immigration information creates withdrawal and misreporting on government forms.

### E.     Dr. Colm O'Muircheartaigh Found That The Bureau's NRFU Process Will Not Compensate For The Drop In Self-Response Rates.

83.     Dr. Colm O'Muircheartaigh is a professor at the University of Chicago's Harris School of Public Policy and a Senior Fellow at the National Opinion Research Center (NORC).

84.     Dr. O'Muircheartaigh's expert opinion is that the introduction of a citizenship question on the Census will exacerbate the differential non-response among hard-to-count subpopulations; the inclusion of a citizenship question will further result in an increased differential undercount of hard-to-count populations; and NRFU and imputation responses will not only fail to eliminate the impact of the differential non-response, but may actually exacerbate it.

85. According to Dr. O'Muircheartaigh there is no evidence to suggest that Bureau processes will eliminate the impact of the differential non-response stemming from the inclusion of a citizenship question on the 2020 Census.

86. At each stage of enumeration following initial non-self-response (non-response follow-up, administrative record enumeration, proxy enumeration, and imputation), Dr. O'Muircheartaigh has detailed the deficiencies of the Bureau's processes.

87. First, based on an analysis of Computer Assisted Personal Interviewing Operation follow-up in the ACS, Dr. O'Muircheartaigh concludes that NRFU in 2020, including repeated visits from enumerators associated with the federal government, will produce a more severe differential non-response in tracts containing higher proportions of non-citizens than in 2010.

88. Second, enumeration by administrative records will systematically discriminate against hard-to-count subpopulations and will not correct the under-enumeration that occurs at the earlier stages of data collection.

89. Third, given the perceived threat from the citizenship question and poorer linguistic capabilities of enumerators, willing and knowledgeable proxy respondents will likely be more difficult to find in neighborhoods where a substantial portion of households contain at least one non-citizen.  The Bureau itself also acknowledges that proxy responses are higher for hard-to-count subpopulations, provide much lower quality information, and contain more coverage errors than self-responses.

90. Fourth, regardless of the method used, imputation further systematically disadvantages hard-to-count subpopulations, in particular non-citizens and households containing non-citizens.

   **F.     Substantial Evidence In The Administrative Record Shows That Adding The Citizenship Question Poses A Substantial Risk Of An Undercount.**

91. Ross received numerous communications between December 22, 2017 and March 26, 2018 from outside sources providing evidence that adding a citizenship question to the Census would cause an undercount or otherwise degrade census data.

13

92.     For example, on January 26, 2018, six former directors of the Bureau wrote that "adding a citizenship question to the 2020 Census will considerably increase the risks to the 2020 enumeration" because, among other things, "there is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected consequences for the rate, quality, and truthfulness of response." (AR001057).

93.     On January 5, 2018, Eduardo Bonilla-Silva, the president of the American Sociological Association, wrote that if the question were added "the integrity of the 2020 Census data will be fundamentally compromised." (AR000787).

94.     On January 23, 2018, the Population Association of America, a scientific association of population scientists who rely on timely and accurate and timely data from the federal statistical agencies to produce research findings, wrote that adding a citizenship question to the decennial census would produce "harmful effects, including increased costs, suppressed response rates, and unreliable data."  (AR001053).

G.     **Dr. Andrew Reamer Has Shown That The Differential Undercounts Will Reduce The Funding San Jose Receives Through Federal Programs.**

95.     Dr. Andrew Reamer is a professor in the George Washington Institute of Public Policy ("GWIPP") at the George Washington University in Washington, DC.  He received his Ph.D. in Economic Development and Public Policy and a Master of City Planning from the Massachusetts Institute of Technology and a Bachelor of Science in Economics from the Wharton School, University of Pennsylvania.

96.     GWIPP research faculty focuses on various aspects of the public policies of the federal, state, and local governments.

97.     Dr. Reamer began his research at GWIPP in 2011, after six years at the Brookings Institution's Metropolitan Policy Program and 20 years as a consultant in U.S. regional economic development and public policy.

98.     As a Fellow at Brookings, Dr. Reamer was responsible for encouraging a strong, well-functioning federal statistical system that met the data needs of public and private

1    stakeholders.  To that end, he was instrumental in ensuring the commencement and

2    continued existence of the ACS.

3    99.    In Fiscal Year 2017, the federal government provided $4.8 trillion through domestic

4           financial assistance programs, an amount equal to 24.9 percent of gross domestic product.

5           About 30 percent of state government budgets are funded through the federal government.

6    100.   Dr. Reamer identified approximately 320 federal domestic assistance programs that use

7           census-derived data to distribute about $900 billion in Fiscal Year 2016.

8    101.   In Dr. Reamer's expert opinion, the two most important uses of census-derived data to

9           guide the distribution of federal assistance program funds are setting numerical eligibility

10          criteria and geographically allocating funding through formulas.

11   102.   The federal government uses 32 census-derived datasets to geographically distribute

12          financial assistance.  Geographic allocation formulae are particularly sensitive to

13          inaccuracies in census-derived data.

14   103.   Dr. Reamer has identified 24 large federal financial assistance programs with geographic

15          allocation formulae that rely in whole or in part on census-derived data.

16   104.   The census-derived datasets that are particularly important for determining the geographic

17          allocation of funds by formula are the Bureau's Population Estimates and ACS.  There is

18          a strong, direct relationship between the accuracy of the decennial census and the

19          reliability of both the Population Estimates and the ACS.

20   105.   In Dr. Reamer's expert opinion, a 2020 Census differential undercount would affect each

21          succeeding year's Population Estimate largely because the base of the Population

22          Estimate is the 2020 count.  Moreover, a 2020 Census differential undercount would

23          affect each year's ACS data both because the Population Estimate provides the control for

24          the ACS and because it would inaccurately alter the ACS sampling frame, sampling

25          design, imputation, weighting, and variance.  Further, as the ACS informs the net

26          international migration estimate for the Population Estimates, an undercount would result

27          in an undercount of that component of population change.

28

106. To measure the impact of a decennial census undercount on geographic formula allocations, Dr. Reamer applied projected 2020 Census undercounts by state (as prepared by Prof. Bernard Fraga) to three example federal assistance programs, Title I Grants to Local Education Agencies, Supplemental Nutrition Program for Women, Infants, and Children, and the Social Services Block Grant.

107. Title I Grants to Local Education Agencies, Supplemental Nutrition Program for Women, Infants, and Children, and the Social Services Block Grant rely on a state's share of a U.S. population total.

108. For each of the three programs Dr. Reamer analyzed, the allocation of funds to each state is a function of that state's demographic characteristics relative to the nation as a whole.

109. Each of the undercount scenarios Dr. Reamer analyzed would produce a differential undercount.  That is, the extent of the undercount would vary greatly across states, reflecting the relative presence of non-citizens in the respective state populations.

110. Specifically, Dr. Reamer found that a differential undercount would result in a change in state population shares and a parallel change in funding allocations.  Those states with an undercount greater than that for the U.S. as a whole would lose share relative to the actual population and those states with an undercount less than the national average would gain share. Because a few large states (California, Texas, Florida, New York, and New Jersey, in particular) have relatively high percentages of non-citizens, these states would lose population share while most other states would gain share.  If a differential undercount is present, this dynamic would be realized regardless of the size of the undercount nationwide, even, for example, 0.1%.

111. Because certain programs' allocation formulas address intra-state allocations, the above-described effect of a differential undercount would be similar for particular jurisdictions with relatively above-average non-citizen populations, such as San Jose, California.

112. Additionally, Dr. Reamer considered the impact of a differential undercount of non-citizens on the funding for San Jose under WOIA and CDBG.

113.   WOIA funding is allocated based on a Local Workforce Development Area ("LWD"). The area covered by the City of San Jose comprises over 75% of its LWD.  Because the non-citizen population of this LWD is substantially higher than the average non-citizen population of the state of California, and the state of California's allocation will itself be lower in the event of an undercount, Dr. Reamer concluded with a reasonable degree of certainty that work2future (San Jose's workforce development program that uses WIOA funds) will receive a decrease in WIOA funding under any of the undercount scenarios presented by Dr. Fraga.

114.   Funding under the CDBG program is allocated based on a federal formula that compares different "entitlement communities" across the country and includes data on population, poverty rates, and housing conditions.  Because San Jose has a substantially higher percentage of non-citizens than the relevant geographies that overlap with these entitlement communities, Dr. Reamer can conclude with a reasonable degree of certainty that San Jose will receive less CDBG funding under any of the scenarios presented by Dr. Fraga.

115.   Based on the Bureau's own conclusions, the administrative record, and the analyses of Dr. Matthew Barreto and Dr. Colm O'Muircheartaigh, (as set forth above) the likelihood that adding the citizenship question will directly result in a net undercount, a differential undercount of non-citizens or non-white Hispanics, and a differential undercount of the population of San Jose is overwhelmingly high.

116.   Adding the citizenship question to the Census thereby poses, at minimum, a substantial risk that there will be a differential undercount of non-citizens on the Census.

### III.   SAN JOSE HAS DIVERTED RESOURCES TO MITIGATE THE SUBSTANTIAL RISK OF HARM CREATED BY ADDING THE CITIZENSHIP QUESTION.

#### A.   <u>San Jose Is Reasonably Spending Money And Time Conducting Targeted Outreach To Minimize The Impact Of Adding The Citizenship Question.</u>

117.   Dr. Abowd believes that "the addition of the citizenship question has made it necessary to augment" the part of the integrated partnership and communication program that involves local outreach, such as the outreach being conducted by San Jose.

118. According to statistics produced by the Bureau, 17.2% of San Jose's residents are non-citizens, nearly three times the 6.7% for the United States as a whole and substantially higher than the 13% in the State of California. San Jose's population has been undercounted in prior censuses and San Jose is taking steps to mitigate the likely undercount of its population that adding a citizenship question on the 2020 Census will cause.

119. San Jose, along with other cities, has partnered with the County of Santa Clara to form a "Complete Count Committee" to encourage participation in the Census by hard-to-count communities.

120. San Jose's preparations for the Census are being conducted in concert with the Bureau's integrated partnership and communication program.

121. San Jose has dedicated approximately $300,000 in resources towards performing outreach, and expects to allocate approximately $300,000 more before the Census is conducted.

122. San Jose has dedicated staff resources, including Jeff Ruster, the Assistant Director in the Office of Economic Development, to prepare for the Census.

123. Consistent with recommendations from the Bureau and Commerce, these preparations include targeted outreach that is being performed specifically because Ross has decided to add a citizenship question to the Census.

124. The targeted outreach being conducted by San Jose is designed specifically to mitigate the impact that adding the citizenship question to the Census will have on hard-to-reach populations in San Jose.

125. Therefore, in light of the substantial risk posed by the addition of the citizenship question, it is reasonable for San Jose to spend additional time and money on the outreach that Dr. Abowd believes has been made "necessary" by the addition of the citizenship question.

126. San Jose is diverting time and resources that could be used for other purposes specifically because of the proposed addition of a citizenship question to the Census.

127.  If the citizenship question were to be removed from the Census, San Jose would be able to use the time and resources it is currently specifically devoting to address the risks posed by the citizenship question for other purposes, including increasing Census participation.

**IV.  SAN JOSE RELIES ON ACCURATE CENSUS DATA FOR ITS OPERATIONS AND THE BUREAU ADMITS THAT ADDING THE QUESTION WILL REDUCE THE QUALITY OF CENSUS DATA.**

**A.  San Jose Relies On Accurate Census Data For Its Operations.**

128.  Numerous San Jose agencies use Bureau data, either from the decennial census or the ACS to make strategic decisions.

129.  For example, every branch in the San Jose Public Library prepares an annual Community Branch Profile using decennial Census and ACS data on the age, household composition, languages spoken, and economics of the area the branch library serves.

130.  The San Jose Public Library uses the data from the Community Branch Profiles to determine which materials to make available in each branch and which programs to develop at each branch.

131.  If the quality of the data from the ACS and the decennial census is impaired, strategic decisions regarding collections and programs at the San Jose Public Library will be made improperly, impeding the opportunity for the San Jose to conduct its mission.

132.  As another example, San Jose's work2future program relies on census and ACS data to determine the language needs of the communities served by the its workforce development counselors.

133.  The program hires bilingual counselors to provide services to the unemployed and underemployed, and decides which language speakers to hire based on decennial census data and ACS data.

134.  If the decennial census and ACS data quality are impaired, work2future would not have accurate information from which to select the languages of its counselors.

135.  As a third example, the San Jose Department of Housing uses decennial census and ACS data to create its legally-mandated Fair Housing Assessment, and to create its annual and

1    five-year plans, which identify key locations within the City of San Jose to address

2    housing issues.

3    136.  To identify the key locations, the San Jose Department of Housing uses decennial census

4    and ACS data including data on race, income, and housing conditions.

5    137.  Once the Department of Housing identifies key locations through census data, it uses

6    funding from the Community Development Block Grant ("CDBG") program in those

7    areas, including by adding neighborhood infrastructure improvements such as curb cuts

8    and LED lighting, targeted code enforcement, and 'green' alleyway improvements to

9    promote safety, walkability and sustainability; community-serving capital projects such as

10   community gardens, libraries and community centers; emergency home rehabilitation for

11   low-income homeowners; rehabilitation of nonprofit facilities such as homeless shelters

12   and services spaces; and land acquisition and infrastructure supporting affordable housing

13   creation.

14   138.  Once the Department of Housing identifies key locations through census data, it uses

15   funding it receives from the Home Investment Partnership Program ("HOME"), including

16   development of new affordable rental housing, acquisition and rehabilitation of existing

17   market-rate housing to create newly affordable rental housing, homebuyer loans for low-

18   income homebuyers, and tenant-based rental subsidies for vulnerable populations

19   including formerly homeless individuals and families.

20   139.  If the data from the decennial census and the ACS are of lower quality, then the

21   Department of Housing will not have accurate information with which to determine which

22   locations to target for improved housing conditions in San Jose.

23   140.  As a fourth example, the San Jose Office of Emergency Management ("SJOEM") uses

24   census and ACS data to make strategic decisions and apply for funding.

25   141.  SJOEM provides census data on population to the Federal Emergency Management

26   Program ("FEMA") when applying for funding after disasters.  Because FEMA bases its

27   grants of funding on the number of people affected by a disaster, an undercount of the

28   City of San Jose would reduce SJOEM's ability to obtain funding after a disaster.

142.   SJOEM allocates resources within San Jose based on census data, including age data in particular. Because elderly residents are less able to self-evacuate, SJOEM allocates more resources in areas with high concentrations of elderly residents (according to census data).

143.   If the census data on age are inaccurate, SJOEM will allocate these resources improperly, endangering the lives of elderly San Jose residents.

**B.      Defendants Admit That Adding The Citizenship Question Will Degrade The Quality Of The Data The Bureau Reports.**

144.   The Bureau has concluded that if the citizenship question is included in the Census, there will be an increase in questionnaire non-response specifically because of the question.

145.   The Bureau acknowledges that an increase in non-response will result in more households being enumerated through the NRFU process, including through imputation.

146.   The Bureau acknowledges that the data provided through the NRFU process, including through imputation, are of a lower quality than data obtained through self-response.

147.   The Bureau has concluded, therefore, that, as a direct result of adding the citizenship question, the data provided in the Census will be of lower quality.

148.   This lower quality data will impede the operations of San Jose, including the operations of its public library, its work2future program, its Department of Housing, and its Department of Emergency Management.

**V.   BAJI AND ITS MEMBERS WILL BE HARMED BY THE ADDITION OF A CITIZENSHIP QUESTION TO THE 2020 DECENNIAL CENSUS.**

**A.      BAJI Has Spent And Will Spend Time And Resources To Address The Harm Caused By Adding The Citizenship Question.**

149.   To ensure that BAJI's members are properly counted in the 2020 Census, BAJI plans to conduct additional outreach to these communities to encourage them to participate in the 2020 Census questionnaire.

150.   BAJI has determined that, due to the citizenship question, such outreach will require the expenditure of additional resources, such as money, staff time, and operational expenses, including, but not limited to, materials, computers, telephones, and other office equipment.

151. Because these resources will be diverted and used to encourage participation among groups likely to be affected by the citizenship question before the 2020 Census takes place, including Black immigrants and other historically underrepresented minority groups, these resources will be expended regardless of whether the Bureau's NRFU procedures ultimately correct any initial undercount.

152. As a result of an anticipated undercount of Black immigrants and other historically underrepresented communities that BAJI serves, BAJI will further divert resources to investigate the scope of the harm of the undercount on its members and core mission.

153. BAJI has begun to prepare for these harmful effects by engaging partner organizations and donors in conversations about census outreach, preparing strategies to engage Black immigrant communities in the Census, and soliciting potential funding for census outreach and education.

**B.     BAJI's Members Are Afraid That Their Responses To The Citizenship Question Will Be Shared With Law Enforcement, And These Fears Are Reasonable.**

154. According to Professor Anderson, the Bureau has previously disclosed information about individual respondents to other federal agencies, most notably to the Department of Treasury's Secret Service and the Department of Justice's ("DOJ") Federal Bureau of Investigations during 1942-44 under Section 1402 of the Second War Powers Act, which temporarily repealed the statutory privacy provisions protecting such data.

155. According to Professor Anderson, although statutory privacy protections were in effect when the 1940 census was conducted, and individuals responded to that Census under a legal requirement that the confidentiality of their information would be maintained, such information was subsequently disclosed when those provisions were superseded by the Second War Powers Act.

156. According to Professor Anderson, the outgoing Secretary of Commerce wrote to President Roosevelt on January 19, 1945 that the Commerce Department "was in a position to give the military service the name and residence of all Japanese nationals residing in proscribed West Coast areas."

157. According to Professor Anderson, after the war, correspondence from the Secretary of Commerce confirmed that during the war, the Bureau of the Census and the Department of Commerce had provided "confidential data from the 1939 Census of Manufactures and other records collected by the Census Bureau."

158. According to Professor Anderson, there is therefore historical precedent for the Bureau's disclosure of information about individual respondents, even when that information was protected by Title 13 at the time it was collected.  A release to law enforcement of personal information, including names and addresses, pursuant to a new law or a new interpretation of existing law, would be consistent with the Bureau's World War II-era practices.

159. Many of BAJI's members have expressed reluctance about participating in the 2020 Census because of the addition of a citizenship question.

160. The fears of BAJI's members about responding to a citizenship question have been further heightened by the current political environment, including a perceived increase in relentless anti-immigrant rhetoric.

161. Members of BAJI have specifically expressed fear that their citizenship data will be misused in a manner that may expose them, their families, and members of their community to increased immigration and/or law enforcement scrutiny.

**VI.   ADDING THE CITIZENSHIP QUESTION IN THE CURRENT POLITICAL CLIMATE WILL UNREASONABLY JEOPARDIZE A COMPLETE ENUMERATION.**

**A.      The Trump Administration Has Fostered A Climate Of Fear Among Non-Citizens.**

162. On November 2, 2017, Mikelyn Meyers, a research sociolinguist at the Bureau, presented the Bureau's National Advisory Committee on Racial, Ethnic, and Other Populations with the results of a study on confidentiality concerns regarding the 2020 Census (the "Meyers Report").

163. The Meyers report noted that the current political climate had fostered a belief that "certain immigrant groups are unwelcome," and that researchers observed "increased rates

23

1    of unusual respondent behaviors" including data falsification, item non-response, and

2    break-offs.

3    164.    The Meyers report noted that respondents appeared "visibly nervous" and required

4    "extensive explanations about redacting PII and data access."

5    165.    Respondents expressed fears regarding the use of their data, and explicitly referenced

6    policies of the Trump Administration that are perceived as hostile towards immigrants and

7    non-citizens.

8    166.    The report noted that members of focus groups stated that they would not open their door

9    to Bureau employees who came to their residents, and that they would not trust Bureau

10    employees.

11    167.    The Meyers Report concluded that its findings showed that there was an "unprecedented

12    ground swell in confidentiality and data sharing concerns, particularly among immigrants

13    or those who live with immigrants," that could "impact data quality and coverage for the

14    2020 Census."

15    168.    The Meyers Report was submitted before Ross announced his intention to add a

16    citizenship question to the 2020 Census.

17    **B.    The Census Barriers, Attitudes And Motivators Study ("CBAMS"),
      Commissioned By The Census, Confirmed That These Fears Will Be
18    Exacerbated By Adding The Citizenship Question.**

19    169.    The Bureau commissioned Young and Rubicam ("Y&R") to conduct a Census Barriers,

20    Attitudes Study ("CBAMS") in 2018.

21    170.    Y&R conducted a survey of 50,000 households from February to April 2018 to conduct

22    the study and received approximately 17,500 responses.

23    171.    Y&R conducted 42 focus groups in March and April 2018, including 16 non-English

24    focus groups, as part of the study.

25    172.    Only 70% of those surveyed said they were likely to respond to the 2020 Census, a 22.5%

26    drop from the 2008 CBAMS survey.

27

28

173.    One of the conclusions of the study was that "Hispanics believe the census would be used to find undocumented people."

174.    Twenty-eight percent of those who responded to the survey were "extremely concerned" or "very concerned" that the Bureau would not keep their answers confidential.  Thirty-seven percent of those who were born outside the United States expressed concerns about confidentiality.

175.    Twenty-two percent of those who responded were "extremely concerned" or "very concerned" that their answers would be used against them.

176.    Y&R reported that "The citizenship question may be a major barrier" to a successful census, citing concerns that information will be shared with Immigrations and Customs Enforcement or other law enforcement agencies.

## VII.    COMMERCE ENGAGED IN A SCHEME TO DEMAND ANOTHER AGENCY REQUEST THE CITIZENSHIP QUESTION OF THE BUREAU.

### A.    Ross And His Deputy, Earl Comstock, Planned To Add The Question Early In 2017, After The Statutory Deadline To Modify Census Topics Had Passed.

177.    On March 2017, consistent with its statutory obligations under 6 U.S.C. § 141(f)(1), the Bureau reported to Congress the five "topics" that would be on the 2020 Census, including gender, age, race, ethnicity, and homeownership status.  It reported on the many other topics that would only be on the ACS, including citizenship.  (AR000194).

178.    On March 10, 2017, the Commerce Department's Director of Policy and Strategic Planning, Earl Comstock, emailed Ross an answer to "Your Question on the Census," to confirm that non-citizens are indeed counted on the census. (AR0002521).

179.    On April 5, 2017, Ross's executive assistant wrote to Ross's wife that "Steve Bannon has asked the Secretary to talk to someone about the census." (AR0002561).

180.    On May 2, 2017, Ross emailed Comstock that he was "mystified that nothing has been done in response to my month[s'] old request that we include the citizenship question." (AR0003710).

181.    Comstock responded that "[o]n the citizenship question we will get that in place." (AR0003710).

182.  On May 2, 2017, in reference to the statutory requirement that the topics for the Census be submitted by March 2017, Ross wrote to Comstock that "Worst of all they emphasize that they have settled with congress on the questions to be asked." (AR0003710).

183.  In response to Ross's statement about the statutory deadline for submitting the topics, Comstock wrote back that "The broad topics were what were sent to Congress earlier this year as required. It is next March – in 2018 – when the final decennial Census questions are submitted to Congress.  We need to work with Justice to get them to request that citizenship be added back as a census question." (AR0003710).

184.  Comstock did not mention in his May 2, 2017 email that the 2018 questions must be limited to the topics submitted in 2017.

185.  Comstock did not mention in his May 2, 2017 email that the topics could not be changed unless Ross finds new circumstances which necessitate modifying those topics.

**B.**    **Comstock Asked DOJ And DHS To Request The Question But Both Agencies Refused, Leading Ross To Reach Out To The Attorney General.**

186.  On May 3, 2017, Senior White House Advisor Eric Branstad wrote to Matthew J. Flynn, Senior Director of Cabinet Affairs at the Executive Office of the President, to ask "Who is the best counterpart to reach out to at DOJ - regarding Census and Legislative issue?" Flynn directed him to Mary Blanche Hankey at DOJ.  (AR 0003701).

187.  Sometime in May 2017, Comstock spoke with Hankey, who put him in touch with James McHenry, the director of the Executive Office of Immigration Review at the DOJ. McHenry and Comstock spoke several times, and eventually McHenry told Comstock that staff at DOJ did not wish to request that a citizenship question be added to the Census because of the difficulty they were having in the press at the time.  McHenry referred Comstock to Gene Hamilton, then Senior Counselor to the Secretary of Homeland Security and Deputy Chief of Staff for Policy. (AR0012756; AR0009834).

188.  On May 24, 2017, David Langdon, a Senior Policy Advisor within the Office of Policy and Strategic Planning, who reported to Comstock, sent an email to Comstock stating

1   "Long story short is that the counting of illegal immigrants . . . has a solid and fairly long

2   legal history."  (AR0012456).

3   189.   On July 21, 2017, Kansas Secretary of State Kris Kobach emailed Ross that he was

4   writing "at the direction of Steve Bannon," "following up on our telephone discussion

5   from a few months ago," and stated that the lack of a citizenship question on the decennial

6   census "leads to the problem that aliens who do not actually 'reside' in the United States

7   are still counted for congressional appointment purposes."  (AR000763).

8   190.   Meanwhile, Comstock had several phone calls with Gene Hamilton at DHS. Eventually

9   Mr. Hamilton stated to Comstock that DHS believed that requesting a citizenship question

10   was better handled by DOJ.  (AR0012756; AR0009834).

11   191.   On August 8, 2017, Ross wrote to Comstock, "Were you on the call this morning about

12   census? . . . where is the DOJ in their analysis? If they still have not come to a conclusion

13   please let me know your contact person and I will call the AG." (AR0003984).

14   192.   Sometime before September 8, 2017, Comstock asked James Uthmeier in the Office of

15   General Counsel at the Department of Commerce, to determine how Commerce could add

16   the question to the Census itself.  (AR0012756; AR0009834).

17   193.   On September 17, 2017, Danielle Cutrona in the Office of the Attorney General wrote to

18   Wendy Teramoto, Ross's Chief of Staff, to say that "[t]he Attorney General is available

19   on his cell," and that "it sounds like we can do whatever you all need us to do and the

20   delay was due to a miscommunication."  (AR0002637).

21   194.   On or before September 18, 2017, Ross spoke with Attorney General Sessions and asked

22   that he instruct his subordinates at DOJ to request that a question on citizenship be added

23   to the Census.  (AR0002637).

24   195.   On November 27, 2017, Ross wrote to Peter Davidson at the Department of Commerce

25   that "Census is about to begin translating the questions into multiple languages and has let

26   the printing contract. We are out of time.  Please set up  a call for me tomorrow with

27   whoever is the responsible person at Justice.  We  must have this resolved."  On

28

November 28, Davidson wrote back that "I can brief you tomorrow . . . no need for you to call. I should have mentioned it this afternoon when we spoke." (AR0011193).

196. No evidence in the Administrative Record supports an inference that Ross or Comstock asked DOJ merely to consider the possibility of adding a citizenship question, but instead the Administrative Record shows that Ross issued a "request that we include the citizenship question," (AR0003710), that Comstock assured him that "we will get that in place," (AR0003710), and that Ross intervened with the Attorney General when career staff at DOJ and DHS refused to ask the question.

197. Prior to December 12, 2017, there is no evidence in the Administrative Record to suggest any reason for adding a citizenship question to the Census other than to remove non-citizens from apportionment counts for congressional representation, as suggested by Steve Bannon and Kris Kobach.

198. The Administrative Record does not permit an inference that the motivation behind Ross's insistence on adding a citizenship question to the Census had anything to do with DOJ's needs.  No document in the Administrative Record reflects any person communicating to Ross that the citizenship question could be used to enforce the Voting Rights Act prior to December 12, 2017.  There is no evidence in the Administrative Record that any person mentioned to Ross the use of citizenship questions by other countries prior to the issuance of the Decisional Memo.

C.   **When The DOJ Reluctantly Submitted Its Request, The Bureau Studied The Issue And Showed The Harm That Adding A Citizenship Question Would Create.**

199. On December 12, 2017, DOJ's Arthur Gary signed a letter (the "DOJ Request") to Census Director Ron Jarmin "to formally request that the Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called 'long form' census."  While the DOJ Request states that "reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2," it provides no evidence that DOJ has faced any barriers in enforcing Section 2

28

1    of the Voting Rights Act without block-level citizen voting-age population data.

2    (AR000663).

3    200.    While the DOJ Request cites a number of Voting Rights Act cases and concludes that

4    "[t]hese cases make clear that, in order to assess and enforce compliance with Section 2's

5    protection against discrimination in voting, the Department needs to be able to obtain

6    citizen voting-age population for census blocks, block groups, and counties, towns, and

7    other locations," none of the cases cited suggest that census block-level data is required to

8    enforce the Voting Rights Act.  (AR000664).

9    201.    There is no evidence in the Administrative Record that census block-level data on citizen

10    voting-age populations is required to enforce the Voting Rights Act.

11    202.    It has never been DOJ's position that CVAP data from the decennial census (rather than

12    the ACS or another source) is "necessary" to enforce Section 2 of the Voting Rights Act.

13    203.    Director Jarmin emailed Dr. John Abowd directing him to assemble a team of census

14    experts to evaluate and formulate a response to DOJ's request.  (AR0003350).

15    204.    There is no evidence in the Administrative Record that anyone at the Bureau was notified

16    that Ross was considering adding a citizenship question to the 2020 Census prior to the

17    issuance of the DOJ Request.

18    205.    On December 22, 2017, Dr. Abowd and other career scientists at the Bureau prepared a

19    technical memorandum and White Paper regarding how to meet DOJ's stated need for

20    block-level CVAP data.  (AR0011646; AR0010428).

21    206.    In a series of technical reports, responses to questions posed by Ross, and other briefing

22    documents, Bureau repeatedly and consistently recommended against the addition of a

23    question.

24    207.    The Bureau found that the addition of a citizenship question had a number of

25    disadvantages, including:  (1) potential negative impact on voluntary cooperation with the

26    census, (2) poorer quality citizenship data than would be available through administrative

27    records, and (3) additional costs for follow-up based on initial non-response.

28

208.   The Bureau repeatedly and consistently concluded that adding the question would reduce self-response rates, harm the overall data and integrity of the Census, and serve no useful purpose.

209.   The Bureau noted in a January technical report that the decline in response rate for households with at least one non-citizen to the ACS, which contains a citizenship question, was 5.1 percentage points more than the decline for all-citizen households. (AR001280).

210.   The Bureau found that "there is a tendency for noncitizen ACS respondents to report being U.S. citizens." (AR0010434).

211.   The Bureau calculated additional NRFU costs of $32 million based upon a potential lower response rate. (AR0011647).

212.   The Bureau found that administrative records could be used to cross-reference census data and would provide DOJ with more accurate block-level CVAP information than using the citizenship question, without the drawbacks of adding the question itself. (AR0011647–8).

213.   Following the December 22 memo, the Bureau continued to study the impact of adding a citizenship question to the Census, issuing additional memos on January 3 ("January 3 Memo") (AR0011650) and January 19 (the "January 19 Memo"). (AR001277-85).

214.   In preparing these memos, the Bureau studied three potential alternatives regarding citizenship and the Census:  (A) no change in data collection, (B) adding a citizenship question to the Census, and (C) obtaining citizenship status from administrative records for the whole population.

215.   In the January 3 Memo, the Bureau recommended using Alternative C because it was far less costly than adding a citizenship question to the 2020 Census, and would not harm the quality of the census count. (AR0011652).

216.   In the January 19 Memo, the Bureau recommended either alternative A (no change) or C (using administrative records), explaining that alternative C would meet the stated use in

30

the DOJ Request without increasing response burden or harming the quality of the Census count.  (AR001285).

217.  In the January 19, 2018 Memo, the Bureau recommended against alternative B (adding the citizenship question) because it would increase cost, harm the quality of the census count, and the provide less accurate citizenship status data to DOJ.  (AR001281).

D.  **DOJ's Refused To Meet With The Bureau About Its Request.**

218.  Throughout December 2017 and January 2018, the professional staff at the Bureau sought to meet with representatives of DOJ to understand their request and to satisfy the goals of DOJ.

219.  After a number of attempts, however, the Bureau was advised by DOJ that they did not wish to meet to discuss the proposal.

220.  In his December 22, 2017, correspondence, Director Jarmin suggested a "meeting of Census and DOJ technical experts to discuss the details of this proposal."  (AR006659).

221.  On February 16, 2018, almost two months after Director Jarmin had first suggested the technical meeting to DOJ, he reported the Census and Commerce staff that Gary "has spoken to DOJ leadership.  They believe the letter requesting citizenship to be added to the 2020 Census fully describes their request.  They do not want to meet."  (AR0009074).

222.  A scheduled meeting was cancelled and never took place.  (AR0009193).

E.  **Ross Sought Out Stakeholders Who Would Support The Decision To Add The Question But Still A Majority Of Those Who Met With Him Opposed It.**

223.  During the early part of 2018, Ross conferred with multiple external stakeholders, including academics and representatives of interest groups, regarding the addition of a citizenship question to the Census.

224.  Defendant Jarmin specifically reached out to conservative organizations, including the American Enterprise Institute, to find people "who can speak to the pros of adding such a question," noting that "[m]ost stakeholders will speak against the proposal."  The American Enterprise Institute representative responded by writing that "[n]one of my colleagues at AEI would speak favorably about the proposal."  When Jarmin wrote to

31

Christa Jones at the Bureau to report on AEI's response, she suggested that he write to Mark Krikorian and Steven Camorrota of the Center for Immigration Studies, which has long advocated for adding a citizenship question as a means of excluding non-citizens from apportionment counts.  (AR0008325).

225.   Eventually Ross met with numerous stakeholders.  The majority of such stakeholders did not favor adding a citizenship question to the Census.  Of those who did support adding the question, the majority either had historically opposed including non-citizens in Congressional apportionment counts or were elected Republican officials.

**F.   Ross Met With The Bureau Staff Once And Demanded Further Study Of Ways To Include A Citizenship Question.**

226.   Bureau staff had a single meeting with Ross on February 12, 2018, to discuss the memorandum of January 19, 2018.

227.   After that meeting, Ross requested analysis of a fourth option, Alternative D, under which the Bureau would include the citizenship question on the Census and use administrative records to provide CVAP data.

228.   On January 30, 2018, Comstock asked the Bureau to respond to 35 follow-up questions, one of which ("Question 31") asked "[w]hat was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?"  (AR0005216).

229.   The Bureau responded to this question by describing its "well-established process" for adding content to the decennial census or the ACS, which is based on longstanding practice derived from federal law and regulation.  (AR0009832-33).

230.   The description of this "well-established" process in the Bureau's response to Question 31 is consistent with other Bureau documents describing the process to add a question or change the content of the decennial census.

231.   On March 1, 2018, the Bureau presented its findings (the "March 1 Memorandum"), concluding that, because the drop in self-response rate that would result from adding a citizenship question, "Alternative D would result in poorer quality citizenship data than

1    Alternative C" and "would still have all the negative cost and quality implications of

2    Alternative B" set forth in the January 19 memorandum.  (AR0009812).

3    232.   Bureau professionals expounded upon the differences between Alternative C and

4           Alternative D in a further memorandum titled, "Summary of Analysis of the Key

5           Differences Between Alternative C and Alternative D," with a focus on data quality

6           issues.  (AR0009818).

7    233.   The March 1 Memorandum contains analysis shows that, in comparison to Alternative C,

8           Alternative D will lead to a larger number of people for whom the Census cannot match

9           an administrative record and whose answers must be produced by a model.

10   234.   Further, the March 1 Memorandum explains: "Under Alternative C, there will be error in

11          the administrative records, but we believe these to be relatively limited due to the

12          procedure following by SSA, USCIS and State.  In both Alternative, the modeled cases

13          will be subject to prediction error. … Alternative D has an additional source or error,

14          response error.  This is where 2020 respondent give the incorrect status.  Statisticians

15          often hope these errors are random and cancel out.  However, we know from prior

16          research that citizenship status responses are systematically biased for a subset of

17          noncitizens.  Response error is only an issue in alternative D."  (AR00098189).

18   235.   The Bureau concluded in the March 1 Memorandum that the citizenship data that would

19          be provided to DOJ under Alternative C would be more accurate than under Alternative B

20          or D.  (AR0009819).

21   236.   The Bureau concluded in the March 1 Memorandum that, under Alternative D, for the

22          group of 22 million people for which the Bureau has both a response and administrative

23          records, but they do not match, the citizenship data will be less accurate than under

24          Alternative C, due to response errors.  (AR0009819).

25   237.   The March 1 Memorandum included the Bureau's description of the "well established

26          process" for adding content to the ACS or decennial census.  (AR0009832-33).

27   238.   The Bureau concluded in the March 1 Memorandum that the inclusion of a citizenship

28          question is not necessary to provide complete and accurate data in response to the

33

December 12 Letter, and in fact that adding the citizenship question would result in "poorer quality citizenship data than Alternative C.  It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce."  (AR001312).

### G.      Ross Lied to Congress to Conceal His Scheme.

239.    Although Ross and his staff had worked for months to get DOJ, then DHS, then DOJ again, to add the citizenship question to the Census, when asked about the potential to add a citizenship question during his testimony before Congress on March 22, 2018, he said that "Department of Justice, as you know, initiated the request for inclusion of the citizenship question. … Because it is from the Department of Justice, we are taking it very seriously, and we will issue a fulsome documentation of whatever conclusion we finally come to." (emphasis added).  Ross made no effort to correct or amend this testimony before acknowledging, in a one page addendum to the then existing administrative record dated June 21, 2018, that he had initiated the process for adding the citizenship question.  (AR001321).

**VIII.  ROSS ISSUED A DECISIONAL MEMO ORDERING THAT THE CITIZENSHIP QUESTION BE ADDED, BUT THE DECISION IS NOT SUPPORTED BY EVIDENCE IN THE RECORD, IS CONTRADICTED BY VIRTUALLY ALL OF THE RECORD EVIDENCE, IS PRETEXTUAL, AND IS IMPLAUSIBLE.**

240.    On March 26, 2018, Ross issued a Decisional Memo directing the Bureau to add a citizenship question to the 2020 Census.  (AR001313).

241.    Ross wrote that the Bureau found there would be an "increased burden" on those who answered the question but also that there would be no "additional imposition" unless the respondent is a non-citizen.  (AR001317).

242.    Ross cited no evidence for his statement that there would be no additional imposition unless the respondent is a non-citizen; no evidence in the record supports this conclusion; and the statement is counter to the evidence in the record.

243.    Ross wrote that the citizenship question had been "well tested" because it had been included on the ACS.  (AR001314).

244.   While the Citizenship question was subjected to cognitive testing prior to its inclusion on the ACS, it has not been the subject of field testing.

245.   The testing that has been performed on the citizenship question has shown that a high number of respondents claim to be citizens when, as compared to administrative records available for those respondents, they are identified as non-citizens.

246.   The citizenship question has never been tested without being preceded by a question on nationality or place of birth, which contextualizes the question.

247.   There is no evidence in the Administrative Record that the citizenship question had been "well tested" in compliance with the Bureau's policy on testing questions prior to inclusion on a survey instrument.

248.   When discussing Option C in the Decisional Memo, Rose wrote that the Bureau would have to correct for inaccurate responses, noting the Bureau's finding that, when asked a citizenship question, a significant number of non-citizens "inaccurately mark 'citizen.'" (AR001316).

249.   Ross made no mention of inaccurate responses when discussing Option D, writing only that Option D "gives each respondent the opportunity to provide an answer." (AR001317).

250.   There is no evidence anywhere in the record that giving each respondent the opportunity to provide an answer improves Census quality.  To the contrary, the Bureau concluded that adding the question to the Census would reduce data quality.

251.   In the Decisional Memo, Ross wrote that "[t]he citizenship data provided to DOJ will be more accurate with the question than without it which is of greater importance than any adverse effect that may result from people violating their duty."  (AR001319).

252.   Ross cited to no evidence for this conclusion; there is no support for it in the Administrative Record; and substantial evidence in the Administrative Record that the citizenship data will be less accurate with the question than it would be if obtained through administrative records.

253. There is no evidence in the record that Ross weighed the importance of supposedly accurate data against the adverse effects of adding a citizenship question to the 2020 Census.

254. In the Decisional Memo, Ross wrote "I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweighs fears about a potentially lower response rate." (AR001317).

255. There is no evidence in the Administrative Record that adding the citizenship question will produce accurate citizenship data, and substantial evidence that the lower response rate will harm the quality of the census.

256. In the Decisional Memo, Ross wrote that "even if there is some impact on responses, the value of more complete and accurate data . . . outweighs such concerns." (AR001319).

257. There is no evidence in the record that adding the question will produce complete and accurate data, and substantial evidence that it will produce incomplete and inaccurate data.

258. The DOJ Request did not state that adding a citizenship question was either necessary or essential to enforcement of the Voting Rights Act.

259. Ross's conclusions in the Decisional Memo are implausible in light of the fact that Ross knew that DOJ had not requested a citizenship question in prior years, stated it would not request a citizenship question when first approached, and only requested a citizenship question after Ross approached the Attorney General.

260. Although the Administrative Record, as eventually produced, shows that Ross pursued the addition of a citizenship question beginning in early 2017, the Decisional Memo provides no discussion of this process.

261. The Decisional Memo does not set forth all of the material reasons that Ross wanted the citizenship question added to the 2020 Census.

262. The Decisional Memo does not set forth the real reasons wanted the citizenship question added to the 2020 Census.

263.  The reasons set forth in the Decisional Memo to support the addition of the citizenship question to the 2020 Census are pretextual.

264.  There is no evidence anywhere in the Administrative Record that Ross was presented with any reason for adding a citizenship question to the 2020 Census prior to September 2017 other than excluding non-citizens from congressional apportionment counts.

265.  The Decisional Memo does not set forth any "new circumstances" that "necessitate" adding a citizenship question to the 2020 Census.

266.  On March 29, 2018, the Bureau submitted its planned questions to Congress for the 2020 Census.  The questions included a citizenship question.

267.  Ross has never submitted a report to Congress setting forth any "new circumstances" that "necessitate" adding citizenship as a topic to the 2020 Census.

268.  No evidence in the administrative record supports the conclusion that there were any "new circumstances" that "necessitated" adding citizenship as a topic to the 2020 Census, and DOJ has conceded that adding the question is not "necessary" to enforce Section 2 of the Voting Rights Act.

## IX.   THE ADMINISTRATIVE RECORD ORIGINALLY PRODUCED WAS INCOMPLETE AND INCLUDED INACCURATE STATEMENTS ATTRIBUTED TO THE BUREAU THAT COMMERCE HAD WRITTEN.

269.  Commerce produced the original Administrative Record in this matter on June 8, 2018. (Doc. Nos. 38-1 through 38-4).

270.  The original Administrative Record did not include any documents relating to Ross and Comstock's months-long plan to add a citizenship question to the 2020 Census.

271.  The original Administrative Record did not include the Bureau's response to Question 31 but instead substituted a revised answer that had been drafted by an unknown individual at Commerce.  (AR001296).

272.  On June 21, 2018, Commerce supplemented the Administrative record with a one-page memo by Ross acknowledging that the question of adding a citizenship question had been raised by "senior Administration officials" and that he had discussed adding a question

1    with "other governmental officials," including reaching out to the Department of Justice

2    to ask if they would "would support, and if so would request, inclusion of a citizenship

3    question as consistent with and useful for enforcement of the Voting Rights Act."

4    (AR001321).

5    273.   The June 21, 2018 memorandum does not acknowledge that Comstock initially reached

6    out to the DOJ's Executive Office for Immigration Review and the Department of

7    Homeland Security, neither of which enforces the Voting Rights Act.

8    274.   The June 21, 2018 memorandum does not provide all the material reasons that Ross had

9    for wanting the citizenship question added to the 2020 Census.

10   275.   The June 21, 2018 memorandum does not provide the real reasons that Ross had for

11   adding the citizenship question to the 2020 Census.

12   276.   The reasons given in the June 21, 2018 memorandum for adding the citizenship question

13   to the 2020 Census are pretextual.

14   277.   Defendants have since stipulated to the inclusion of additional documents in the

15   Administrative Record.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

## PROPOSED CONCLUSIONS OF LAW

I.   **PLAINTIFFS' HAVE STANDING TO CHALLENGE SECRETARY ROSS'S DECISION TO INCLUDE A CITIZENSHIP QUESTION IN THE 2020 DECENNIAL CENSUS.**

    A.   **Standing Requires An Injury In Fact That Is Fairly Traceable To The Challenged Action And Will Be Redressed By A Favorable Decision.**

1.   To satisfy Article III's standing requirements, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

2.   Plaintiffs have standing to challenge a procedural action when "it is reasonably probable that the challenged action will threaten their concrete interests." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003).

3.   A plaintiff need not "demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013); *see Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

4.   To establish injury in fact, a plaintiff must demonstrate it "has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (quotation omitted).

5.   This injury or threat of injury must be "concrete and particularized" rather than conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

6.   Plaintiffs demonstrate that they have suffered an injury in fact when they "identify a 'substantial risk' of harm and 'reasonably incur costs to mitigate or avoid that harm'" because those costs themselves constitute an injury in fact. *Clapper*, 568 U.S. at 414 n.5; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010).

7.   An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*citing Clapper*, 568 U.S. at 414 n.5).

8.   For standing purposes, "a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (quotation marks omitted).

**B.   Plaintiffs Have Suffered Injuries In Fact.**

    **1.**   *San Jose Has Suffered And Will Suffer An Injury In Fact.*

9.   Because the risk that adding the citizenship question will cause a net or differential undercount, which in turn would harm San Jose through a loss of funding, is not merely substantial but overwhelming, and the additional spending to prevent that harm is not merely reasonable but—according to Dr. John Abowd, Chief Scientist of the Census Bureau—"necessary," San Jose has suffered injury in fact based on its additional outreach spending, and therefore has standing to sue. *Clapper*, 568 U.S. at 414 n.5.

10.  Failure to provide accurate information creates an injury-in-fact sufficient to confer standing.  *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-51 (1989) (plaintiff had standing to sue under the Federal Advisory Committee Act for defendant's failure to make publicly available reports and minutes of American Bar Association meetings relating to prospective judicial nominees).

11.  Even if information is not fully withheld, providing inaccurate or incomplete information creates an injury sufficient to convey standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding that because the Fair Housing Act created a statutory right to truthful information concerning the availability of housing, "testers" who were misinformed had standing to sue without demonstrating any further injury).

12.  Defendants have a constitutional and statutory obligation to convey accurate demographic information to San Jose, and San Jose has a right to receive accurate information. *See Utah v. Evans*, 536 U.S. 452, 478 (2002) (explaining Framers' "strong constitutional interest in accuracy" in the census); *Wisconsin v. City of N.Y.*, 517 U.S. 1, 20 (1996) (the conduct of the census must bear a "reasonable relationship to the accomplishment of an

40

1    actual enumeration of the population, keeping in mind the constitutional purpose of the

2    census," namely, obtaining an accurate count of the population in each state); 13 U.S.C. §

3    141(c); *see also* Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481 ("Congress finds that

4    . . . [i]t is essential that the decennial enumeration of the population be as accurate as

5    possible, consistent with the Constitution and laws of the United States.")

6    13.   The harm that San Jose will suffer (in its housing policy decisions, its library

7    programming decisions, its workforce development policy decisions, and its emergency

8    management deployment decisions) based on the inaccurate information that Defendants

9    acknowledge will be provided by the Bureau because of the addition of a citizenship

10   question, is "certainly impending." *Clapper*, 568 U.S. at 401.

11   14.   Because a net undercount, a differential undercount of non-citizens, and a differential

12   undercount of San Jose residents are each overwhelmingly likely to occur as a result of the

13   addition of the citizenship question, and because each will cause San Jose to lose federal

14   funds it would otherwise receive, San Jose has standing to sue based on the addition of the

15   question. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir. 2002)

16   (explaining that loss of money is the prototypical "concrete, actual injury.").

17        **2.    *BAJI Has Suffered And Will Suffer An Injury In Fact.***

18   15.   An injury in fact is established where a nonprofit organization shows "a drain on its

19   resources from both a diversion of its resources and frustration of its mission." *Fair Hous.*

20   *of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *Havens Realty Corp. v. Coleman*,

21   455 U.S. 363, 378 (1982).  Because BAJI has diverted resources to encourage its

22   constituents to participate in the census and to counteract the chilling effects of the

23   citizenship question, it has suffered an injury in fact and has standing to sue on its own

24   behalf.

25   16.   Harm caused by infringement on "noneconomic values," such as a loss of privacy, also

26   provides standing through its members.  *Ass'n of Data Processing Serv. Orgs., Inc. v.*

27   *Camp*, 397 U.S. 150, 154 (1970).

28

17. The fears that BAJI members have that their private responses to the citizenship question will not remain confidential are reasonable in light of the Bureau's past history releasing information collected under a guaranty of privacy, the Department of Justice's failure to confirm its 2010 position that the USA PATRIOT Act does not override the confidentiality provisions of Title 13, and the climate of anti-immigrant sentiment fostered by the Trump Administration ("Administration").  These facts provide BAJI standing to sue on behalf of its members. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017), cert. denied, 138 S. Ct. 931 (2018) (holding a plaintiff suffers injury in fact based on a loss of "reputational and privacy interests that have long been protected in the law.").

18. Finally, the burden of filling out the question on the form is sufficient to establish an injury-in-fact on behalf of BAJI's members, and through them, BAJI itself and therefore provides BAJI standing to sue on behalf of its members. *Van Patten v. Vertical Fitness Grp.*, LLC, 847 F.3d 1037, 1043 (9th Cir. 2017).

## C.    Plaintiffs' Injuries Are Fairly Traceable To Secretary Ross's Decision.

19. To demonstrate that an injury is fairly traceable to a government action, a plaintiff must show that the "government's unlawful conduct is at least a substantial factor motivating the third parties' actions."  *Mendina v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quotation omitted).

20. "[W]hat matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain."  *Mendina*, 768 F.3d at 1012–13 (quotation and citation omitted); *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998) (finding that harm to a golf club, in the form of losing membership, is "fairly traceable" to agency building a rival clubhouse that lured members away).

21. Because adding the citizenship question creates the "substantial risk" of a net undercount and a differential undercount, adding the question is fairly traceable to San Jose's and BAJI's additional spending.

22. Because adding the question will directly lead to a drop in data quality, adding the question is fairly traceable to San Jose's data quality harm.

23.   Because BAJI members' reasonable privacy fears are directly related to the addition of the citizenship question, adding the question is fairly traceable to those concerns.

24.   Because adding the question will produce the drop in self-response rate, which in turn makes it overwhelmingly likely that there will be a differential undercount of non-citizens and San Jose, San Jose's ultimate funding injury is fairly traceable to the addition of the citizenship question.

### D.   Plaintiffs' Harms Will Be Redressed By A Favorable Decision.

25.   "[T]o have standing, a federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will inevitably redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994).

26.   Because removal of the citizenship question will allow San Jose and BAJI to use funds for other purposes than responding to the concerns created by the citizenship question, BAJI and San Jose's harm regarding spending on outreach is redressable by a favorable decision.

27.   Because removal of the citizenship question will prevent the drop in data quality associated with the addition of the question, San Jose's data quality concerns are redressable by a favorable decision.

28.   Because removal of the citizenship question will prevent the eventual net undercount of non-citizens and San Jose residents that the question will cause, and thereby prevent it from losing funding, San Jose's ultimate undercount injury is redressable by a favorable decision.

29.   Because removal of the citizenship question will diminish the fears of and burdens on BAJI's members, BAJI's injuries are redressable by a favorable decision.

## II.   ADDING THE CITIZENSHIP QUESTION VIOLATED THE ENUMERATION CLAUSE.

30.   This Court has held that a "decision to alter the census in a way that affirmatively interferes with the actual enumeration, and does not fulfill any other reasonable governmental purpose, is subject to a challenge under the Enumeration Clause." (Order

43

1   Denying Summary Judgment, Doc. No. 119 at 8, *quoting* Order Denying Motion to

2   Dismiss, Doc. No. 86, at 29).

3   31.   The U.S. Constitution provides for an "actual Enumeration" of the population once every

4         decade to count "the whole number of persons" in each state. U.S. Const. Art. I § 2, cl. 3,

5         and Amen. XIV § 2.

6   32.   "Congress finds that . . . the decennial enumeration of the population is a complex and

7         vast undertaking, and if such enumeration is conducted in a manner that does not comply

8         with the requirements of the Constitution or laws of the United States, it would be

9         impracticable for the States to obtain, and the courts of the United States to provide,

10        meaningful relief after such enumeration has been conducted."  Pub. L. No. 105-119, §

11        209(a)(8), 111 Stat. at 2481.

12  33.   Although Congress has delegated to the Secretary of Commerce its constitutional duty to

13        conduct the census, the Secretary does not have unfettered discretion in carrying out those

14        duties. *Wisconsin v. City of New York*, 517 U.S. 1 (1996). *See also* 13 U.S.C. § 141,

15        declaring it "essential" to obtain a population count that is "as accurate as possible,

16        consistent with the Constitution and laws of the United States."

17  34.   Courts have routinely held that the Enumeration Clause does not textually commit

18        exclusive, non-reviewable control over the census to Congress.  *See Young v. Klutznick*,

19        497 F. Supp. 1318, 1326 (E.D. Mich. 1980), *rev'd other grounds*, 652 F.2d 617 (6th Cir.

20        1981) (finding the Enumeration Clause "does not say that Congress and Congress alone

21        has the responsibility to decide the meaning of, and implement, Article I, Section 2,

22        Clause 3."); *State of Texas v. Mosbache*r, 783 F. Supp. 308, 312 (S.D. Tex. 1992) (finding

23        Congress's exclusive power to determine the manner of the census did not preclude

24        judicial review of its actions); *City of Willacoochee v. Baldridge*, 556 F. Supp. 551, 557

25        (S.D. Ga. 1983) ("[T]he Court finds no support for the argument that the Framers intended

26        that all aspects of conducting the census be exclusively within the province of Congress

27        and exempt from judicial review.").

28

35.   The evidence demonstrates that, given the political climate identified by the Meyers Report and further described by Y&R's CBAMS report, adding the citizenship question will substantially degrade the accuracy of the 2020 Decennial Census without any attendant benefit, and therefore does not bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," which is "to determine the apportionment of the Representatives among the states."  *Wisconsin*, 517 U.S. at 19-20.

III.   **ROSS'S DECISION TO ADD THE CITIZENSHIP QUESTION WAS MADE IN EXCESS OF STATUTORY JURISDICTION, AUTHORITY, OR LIMITATIONS.**

36.   Courts must set aside agency actions that are made "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

37.   When "a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer."  *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018).

38.   The Census Act requires that the Secretary of Commerce submit to Congress a final list of subjects to be covered in the census questionnaire at least three years before the census date, and must submit a final list of specific questions two years before the census date. 13 U.S.C. §§ 141(f)(1)-(2).

39.   Once these reports are submitted, the Secretary of Commerce has limited discretion to alter their content and may do so only if "*new circumstances exist* which *necessitate* that the subjects, types of information, or questions contained in report so submitted be modified."  13 U.S.C. § 141(f)(3) (emphasis added).

40.   The proper framework for analyzing whether a federal agency has complied with a congressional reporting statute is set forth in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Allied Local and Regional Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 66–67  (C.A.D.C., 2000) (applying the *Chevron* framework to a challenge to an EPA report submitted to Congress under Section 183(e) of the Clean Air

1    Act, which "further directs that the study be completed, and a report submitted to

2    Congress, 'not later than 3 years after November 15, 1990.'").

3    41.   If an agency fails to comply with a congressional reporting statute, a court may require the

4          agency to submit a report that complies with the statute or strike down the underlying

5          agency action on which the report is based. *See Center for Biological Diversity v.*

6          *Brennan*, 571 F. Supp. 2d 1105, 1113 (N.D. Cal. 2007); *South Carolina v. United States,*

7          329 F. Supp. 3d 214, 219 (D.S.C. 2018).

8    42.   This Court has already noted that "Defendants do not request *Chevron* deference" and that

9          such deference "is not appropriate here because the canons of construction provide a clear

10         interpretation of the statute." (Order Denying Motions for Summary Judgment, Doc. No.

11         119 at 15).

12   43.   This Court has already concluded that the "resolution of this claim ultimately turns on

13         whether [Secretary Wilbur] Ross concluded new circumstances necessitated addition of

14         the citizenship question." (Order Denying Motions for Summary Judgment, Doc. No. 119

15         at 15).

16   44.   Because it has never been DOJ's position that CVAP data from the decennial census

17         (rather than the ACS or another source) is "necessary" to enforce Section 2 of the Voting

18         Rights Act, and no evidence in the administrative record suggests that Ross concluded

19         new circumstances necessitated addition of the citizenship question, the decision was

20         made in violation of 13 U.S.C. § 141(f)(3).

21   45.   In addition, 13 U.S.C. § 6(c) requires that "[t]o the maximum extent possible and

22         consistent with the kind, timeliness, quality and scope of the statistics required, the

23         Secretary shall acquire and use information" from other federal sources "instead of

24         conducting direct inquiries."

25   46.   Because Ross violated both 13 U.S.C. § 141 and 13 U.S.C. § 6(c), the decision to add the

26         citizenship question was made "in excess of statutory jurisdiction, authority, or

27         limitations, or short of statutory right" and must be set aside. 5 U.S.C. § 706(2)(C).

28

IV.     **THE DECISION TO ADD A CITIZENSHIP QUESTION MUST BE STRUCK DOWN AS ARBITRARY AND CAPRICIOUS.**

47.     The standard for evaluating whether an agency's decision was arbitrary and capricious is whether the decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 52 (1983).

48.     Agency action is arbitrary and capricious when any of the following factors are met: "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Courts evaluate whether a decision complied with the APA based on the record before the decisionmaker and "*post hoc* rationalizations for agency action" carry no weight. *Id.* at 50.

49.     When "an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly . . . but must treat the agency's justification as a fictional account of the actual decisionmaking process and must perforce find its actions arbitrary." *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54-55 (C.A.D.C. 1977).

50.     It is arbitrary and capricious for an agency "to rely on portions of studies in the record that support its position, while ignoring . . . those studies that do not." *Genuine Parts Company v. Environmental Protection Agency*, 890 F.3d 304, 313 (C.A.D.C. 2018).

51.     An agency acted arbitrarily and capriciously when it "ignore[d] critical context" and "cherry-pick[ed] evidence." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 69 (D.D.C. 2016).

**A.**   **The Decision Was Arbitrary And Capricious Because The Administrative Record Does Not Disclose Ross's True Decision-Making Process Or The True Reasons For The Decision.**

52.   There is no basis in the record to support a conclusion that the reason Ross engaged in a months-long effort to add a citizenship question to the 2020 Census had anything to do with the reasons he gave in his Decision Memo, rendering the Decisional Memo a "fictional account of the actual decisionmaking process" which "must perforce find its actions arbitrary." *Home Box Office*, 567 F.2d at 54-55.

53.   The absence of any explanation for Ross's months-long campaign to add the citizenship question suggests "that there is here one administrative record for the public and this court and another for the Commission and those 'in the know'" rendering the decision arbitrary and capricious. *Id.* at 54.

54.   Because there is no basis in the administrative record to suggest that Ross was motivated by concerns of enforcing the Voting Rights Act, and because the DOJ Request does not require addition of the citizenship question to enforce the Voting Rights Act, the stated motivation for adding the question in the Decisional Memo is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see also Organized Village of Kake v. U.S. Dept. of Agriculture*, 795 F.3d 956, 969 (9th Cir. 2015) (holding that the explanation that decision was based on comments to a proposed rule was "implausible" given the fact that the comments in question raised "no new issues regarding alternatives already fully explored" by the agency).

55.   Ross relied on only the portions of the record before him that supported his conclusion and ignored those portions of the record that contradicted his conclusion, rendering the decision arbitrary and capricious. *Genuine Parts*, 890 F.3d at 313.

56.   The scheme in which Ross and Comstock engaged, and which Defendants attempted to conceal even after this litigation was filed, constitutes "administrative misconduct not covered by the other more specific paragraphs" that renders a decision arbitrary and

capricious. *Ass'n. of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

57.   Whatever Ross's motivation, the failure to include his motivating rationale in the Administrative Record itself renders the decision arbitrary and capricious and supports setting it aside. 5 U.S.C. § 706(2)(A).

**B.      The Decision Was Arbitrary And Capricious Because It Was Pretextual.**

58.   The Administrative Record provides no support for the proposition that Ross engaged in a months-long effort to add a citizenship question to the 2020 Census in order to provide more accurate information to DOJ for purposes of enforcing the Voting Rights Act.

59.   The Administrative Record provides support for the proposition that Ross engaged in a months-long effort to add a citizenship question to the 2020 Census relating to the issue of whether non-citizens should be included in apportionment counts.

60.   The Administrative Record provides support for the proposition that the reasons given by Ross in his Decision Memo and in his June 21, 2018 supplement to the Administrative Record were not the true reasons behind his decision, and were certainly not all of the material reasons behind his decision.

61.   The Administrative Record demonstrates that Ross had made a decision as early as May 2017 to add a citizenship question to the 2020 Census when he wrote that he was "mystified that nothing has been done in response to my month[s'] old request that we include the citizenship question."

62.   Because the scheme in which Ross and Comstock engaged—including searching for an agency to make a request that Ross had already decided to accept—shows that the request from DOJ was made to "provide a pretext for the ulterior motive" of the decision-maker, that decision is arbitrary and capricious. *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994).

**C.**   **The Decision Was Arbitrary And Capricious Because It Is Not Supported by The Evidence And Is Contrary To The Evidence Before The Agency Decision-Maker.**

63.   The Decisional Memo "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

64.   No evidence in the Administrative Record supports any of the key conclusions in the Decisional Memo, including but not limited to the conclusion that there will be no "additional imposition" for citizens to answer the question, that giving "each respondent the opportunity to provide an answer" improves data quality,  that  "the citizenship data provided to DOJ will be more accurate with the question than without it," and that providing DOJ with accurate citizenship data "outweighs any adverse effect" on the Census of people not responding to the survey because of the question.

65.   In fact all of the impartial scientific evidence in the Administrative Record shows that adding the question will reduce data quality, reduce self-response rates, and result in lower-quality citizenship data being provided by the Census Bureau.

66.   Ross "ignore[d] evidence contradicting [his] position," including all of the evidence from the Bureau, rendering the decision arbitrary and capricious. *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010); *see also Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015).

67.   Ross "failed to explain how the other sources [he] relied on provide substantial evidence" to support his conclusion in light of the Bureau's scientific evidence. *Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 315 (D.C. Cir. 2018).

68.   The Decisional Memo cites only to the DOJ Request for support, and Defendants have acknowledged that DOJ does not consider adding the question necessary. When an agency receives an intra-agency request, it is "not required 'to undertake an independent analysis' of another agency's conclusions," but "it may not 'blindly adopt [those] conclusions.'" *Ergon-W. Virginia, Inc. v. United States Envtl. Prot. Agency*, 896 F.3d 600, 610 (4th Cir. 2018) *quoting City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d 53, 76 (D.C. Cir. 2006). The DOJ Request asks for a specific method—putting the citizenship question on the

50

Census—for obtaining the data but "provides no analysis or factual data to support this concern" over other means of doing so. *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1065 (N.D. Cal. 2018).

69. Agency action that appears "perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." *City of Chicago, Ill. v. Federal Power Commission*, 458 F.2d 731, 742 (C.A.D.C. 1972). Because no evidence in the Administrative Record – including the DOJ Request – suggests that the DOJ Civil Rights Division has been unable to enforce the Voting Rights Act based on a lack of block-level citizenship data, Ross's decision to add the question addresses a problem that "does not exist" and is therefore capricious.

70. Even had the DOJ Request provided substantial evidence to support adding the question, "evidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account," so in light of the overwhelming evidence that adding the citizenship question will harm census quality, and that adding the citizenship question will result in poorer quality citizenship data, Ross's treatment of the DOJ Request as asking for the addition of a citizenship question and addition of the citizenship question on that basis is rendered insubstantial. *Landry v. F.D.I.C.*, 204 F.3d 1125, 1140 (C.A.D.C. 2000).

71. For all of these reasons, including Ross's knowledge of and participation in the events leading up to the DOJ Request, his decision that providing DOJ with citizenship data through the addition of the citizenship question outweighed "any adverse effect" on the census was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

72. The decision to add the citizenship question was therefore arbitrary and capricious and should be set aside under 5 U.S.C. § 706(2)(A).

1
2

    **D.**    **The Decision Was Arbitrary And Capricious Because Secretary Ross Was Guided By Improper Political Influence.**

3  73.    The Administrative Record shows that the decision originated with senior Administration

4        officials, and should be set aside for being guided by improper political influence.

5        *Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v. Babbitt*, 961

6        F. Supp. 1276, 1286 (W.D. Wis. 1997) (explaining that an agency decisions may be set

7        aside for improper political influence when "the pressure was intended to and did cause

8        the [Agency's] actions to be influenced by factors not relevant under the controlling

9        statutes.").  *See also D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1237 (D.C. Cir.

10      1971) ("Even if the Secretary had taken every formal step required by every applicable

11      statutory provision, reversal would be required . . . [if] extraneous pressure intruded into

12      the calculus of considerations on which the Secretary's decision was based.").

13  74.    An agency's consideration of some relevant factors does not "immunize" the decision; it

14      would still "be invalid if based in whole or in part on the pressures emanating from

15      [political actors]." *Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009).

16  75.    In determining whether an agency acted with improper political motivation, a court may

17      rely on "inferences" based on the record before it.  *Tummino*, 603 F. Supp. 2d at 546

18      (inferring political motivations based on the timing of agency action).

19  76.    Here, the record provides evidence that Ross both received communications from "senior

20      Administration officials" and requested that the Attorney General direct his underlings to

21      ask the question, from which it may be inferred that the decision was based "in part on the

22      pressures emanating from [political actors]." *Tummino*, 603 F. Supp. 2d at 544.

23    **E.**    **The Decision Was Arbitrary Because It Abandoned The Bureau's Policy On Testing Questions Prior To Inclusion On A Census Instrument.**

24

25  77.    "It is well settled that an agency, even one that enjoys broad discretion, must adhere to

26      voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822

27      F.2d 97, 100 (D.C. Cir. 1987) (citation omitted)).

28

78.   Because Ross and Commerce ignored the Bureau's long-standing process for changing the content on questionnaires, including the process for testing questions prior to adding them to a census instrument, the decision failed to comply with agency regulations and policies and therefore constitutes arbitrary and capricious conduct. *De Loss v. Dep't of Hous. & Urban Dev.*, 714 F. Supp. 1522, 1534 (S.D. Iowa 1988).

79.   Because Ross did not consider the prior inadequate testing of the citizenship question, or the fact that the question had not been subject to field testing in the context of the survey, the decision was arbitrary and capricious. *See also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) ("a policy change violates the APA if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so").

80.   By stating that prior tests of different questions on a similar topic were sufficient, despite concerns from those who knew best, Ross "ignore[d] critical context" and "cherry pick[ed] evidence." *Water Quality*, 225 F. Supp. 3d at 69.

## V.   DEFENDANTS SHOULD BE ENJOINED FROM ADDING A CITIZENSHIP QUESTION TO THE CENSUS.

81.   Because including the citizenship question on the 2020 Census violates Article I, Section 2, Clause 3 of the United States Constitution, Defendants should be enjoined from adding a citizenship question to the 2020 Census.

82.   Because the decision to add the question was made in violation of the Administrative Procedure Act, Defendants should be enjoined from adding a citizenship question to the 2020 Census.

83.   The decision to add the question should be set aside and an injunction issued to prohibit "the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and to ensure that the agency complies with the law going forward. *See Central United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), aff'd, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest.").

84. Remand for further consideration is not appropriate because "the record here has been fully developed, and the conclusions that must follow from it are clear." *Sierra Club v. U.S. E.P.A.*, 346 F.3d 955, 963 (9th Cir. 2003) (remanding a decision to an agency with instructions on how to rule on the matter).

85. Instead, this court should remand to Commerce with instructions to exclude the citizenship question from the 2020 Decennial Census. *See also Tummino*, 603 F. Supp. 2d at 550 (remanding to an agency with instructions).

86. Should the Court remand for further consideration, it should recuse Ross and Commerce from participating in such consideration because the record provides clear and convincing evidence that Ross and Commerce have an "unalterably closed mind on matters critical to the disposition of the proceeding." *Ass'n of Nat'l. Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1170 (D.C. Cir. 1979). *See Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp. 2d 830, 847 (E.D. Cal. 2008) (barring HUD Secretary from participating in reconsideration based on public statement that "HUD intends to approve the new rule by the end of the year even if the agency receives critical comments").

1

Respectfully submitted,

2

Dated:    December 28, 2018          **MANATT, PHELPS & PHILLIPS, LLP**

3

4

By:   *s/ John F. Libby*
           John F. Libby

5

John W. McGuinness

6

Emil Petrossian
11355 West Olympic Boulevard
Los Angeles, California 90064

7

Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

8

9

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Kristen Clarke

10

Jon M. Greenbaum
Ezra D. Rosenberg

11

Dorian L. Spence
1500 K Street NW Suite 900

12

Washington, DC 20005
Telephone:  (202) 662-8600

13

Facsimile:  (202) 783-0857

14

**PUBLIC COUNSEL**
Mark Rosenbaum

15

610 South Ardmore Avenue
Los Angeles, California 90005

16

Telephone:  (213) 385-2977
Facsimile:  (213) 385-9089

17

18

**CITY OF SAN JOSE**
Richard Doyle, City Attorney

19

Nora Frimann, Assistant City Attorney
Office of the City Attorney

20

200 East Santa Clara Street, 16th Floor
San Jose, California 95113-1905

21

Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131

22

E-Mail:  cao.main@sanjoseca.gov

23

*Attorneys for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE FOR

24

JUST IMMIGRATION

25

26

27

28

SAN JOSE/BAJI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (3:18-cv-02279)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FILER'S ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, Ana G. Guardado hereby attests that concurrence in the filing of this document has been obtained from all the signatories above.

Dated: December 28, 2018                              *s/ Ana G. Guardado*
                                                                        Ana G. Guardado

SAN JOSE/BAJI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (3:18-cv-02279)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2018, I served the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

*/s/ Ana G. Guardado*
Ana G. Guardado

SAN JOSE/BAJI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (3:18-cv-02279)